# EXHIBIT F

STATE OF NEW MEXICO
ENVIRONMENTAL IMPROVEMENT BOARD

| | |
|---|---|
| **Proposed Amendments to 20.2.91** ) | |
| **NMAC: New Motor Vehicle Standards;** ) | **Proposal Notice Date: July 7, 2023** |
| **Proposal to Adopt California's** ) | **Matter No. E1B 23-56(R)** |
| **"Omnibus" Low-NO$_x$ Regulations and** ) | **Public Hearing Date: November 13-16, 2023** |
| **Advanced Clean Trucks (ACT)** ) | |
| **Regulations** ) | |

**COMMENTS OF THE
TRUCK AND ENGINE MANUFACTURERS ASSOCIATION**

September 28, 2023

pamela.jones@env.nm.gov                     Timothy A. French
claudia.borchert@env.nm.gov             Truck & Engine Manufacturers Association
michelle.miano@env.nm.gov               333 West Wacker Drive, Suite 810
michael.bowers2@env.nm.gov            Chicago, IL 60606

STATE OF NEW MEXICO
ENVIRONMENTAL IMPROVEMENT BOARD

| | |
|---|---|
| **Proposed Amendments to 20.2.91** ) | |
| **NMAC: New Motor Vehicle Standards;** ) | **Proposal Notice Date: July 7, 2023** |
| **Proposal to Adopt California's** ) | **Matter No. E1B 23-56(R)** |
| **"Omnibus" Low-NO$_x$ Regulations and** ) | **Public Hearing Date: November 13-16, 2023** |
| **Advanced Clean Trucks (ACT)** ) | |
| **Regulations** ) | |

   The Truck and Engine Manufacturers Association (EMA) hereby submits its comments on the proposal that the New Mexico Environment Department (NMED) has made to the Environmental Improvement Board (EIB) to adopt California's "Omnibus" Low-NO$_x$ (Omnibus) and Advanced Clean Trucks (ACT) regulations. EMA is the trade association that represents the world's leading manufacturers of medium-duty and heavy-duty (MHD) on-highway vehicles and engines, and is a key stakeholder in the development and implementation of the Omnibus and ACT regulations that the California Air Resources Board adopted in 2020 and 2021.

   Recently, EMA entered into a comprehensive agreement with CARB regarding the implementation of a suite of state and federal regulations to help transition the MHD on-highway vehicle sector to zero-emission (ZE) trucks. (See CARB website; "CARB and truck and engine manufacturers announce unprecedented partnership to meet clean air goals.") That agreement includes, among other things, commitments to cooperate on the implementation of CARB's ACT regulations in the increasing number of "opt-in" states, and to align CARB's MHD "Omnibus" low-NO$_x$ regulations with EPA's recently-finalized "Clean Trucks Plan" (CTP) regulations as of the 2027 model year.

   Consistent with the recent agreement between EMA and CARB, EMA does not oppose the NMED's proposal to opt-in to the Omnibus and ACT regulations starting with the 2027 model year. As noted, CARB and EMA have agreed to take steps to ensure that the California and federal MHD low-NO$_x$ regulations are fully aligned starting in 2027. Accordingly, EMA has agreed not to oppose any state opt-ins to the Omnibus regulations that take effect starting in the 2027 model year or later. Similarly, EMA has agreed not to oppose any opt-ins to the ACT regulations that take effect as of 2027. That said, EMA does want to highlight a number of specific issues that New Mexico should address to assure the successful implementation of the Omnibus and ACT regulations in New Mexico.

   With respect to the Omnibus regulations, the NMED is proposing that the EIB adopt the version of the Omnibus regulations that will be in place in California on the effective date of the opt-in regulations, presumably sometime in December of this year. (See Proposed Regulatory Section, 20.2.91.102.)  However, that version of the Omnibus regulations is slated to be substantially amended under the comprehensive agreement that EMA and CARB entered into in July. More specifically, under the CARB/EMA agreement, CARB has committed to amend the Omnibus regulations to allow for increased sales of "legacy" engines, and also has agreed "to

1

amend the Omnibus Regulation's 2027 and later model year requirements to align with the United States Environmental Protection Agency's (U.S. EPA) Clean Trucks Plan (CTP) Oxides of Nitrogen ($NO_x$) Final Rule." CARB has further agreed "to commence the contemplated 2027 and later model year amendments to CARB's Omnibus regulations as soon as possible."

As the foregoing makes clear, the NMED is proposing to opt-in to a version of the Omnibus regulations that soon will be substantially amended, such that New Mexico's version of the Omnibus regulations will not be "identical" to the Omnibus regulations that California is planning to finalize, as required under section 177 of the federal Clean Air Act. Accordingly, to avoid having to repeat an opt-in rulemaking, the NMED should consider deferring the proposed Omnibus opt-in to a date that follows CARB's anticipated Omnibus amendments.

Turning to the proposed opt-in to the ACT regulations, there are four important prerequisites to the successful implementation of the ACT regulations in New Mexico that the NMED should address. First, the NMED will need to take steps to align with California's proposed changes to the manner in which ACT credits and ACT deficits are generated and balanced. Second, the NMED should consider the merits of establishing a coordinated and pooled ACT credit banking and trading program before the end of the year. Third, the NMED should ensure that the necessary ZE-truck recharging and hydrogen-refueling infrastructure is put in place in New Mexico sufficiently in advance of the implementation of the ACT regulations' annually increasing ZE-truck sales mandates. And fourth, the NMED should work with other agencies and departments to ensure that sufficient ZE-truck purchase incentives are available to trucking fleet operators in New Mexico. EMA's comments will expand on each of these prerequisites to a successful ACT program in New Mexico.

As the NMED has recognized, the availability of zero-emission vehicle (ZEV) credits will be integral to the feasibility of the ACT regulations. Indeed, the NMED's proposal allows for the early generation of ZEV credits starting with the 2024 model year (which begins in just over four months). However, there are a number of issues currently frustrating the development of a robust ACT credit program that the NMED will need to address. Specifically, California's underlying regulations currently create a misalignment between when and how ACT deficits are generated (with respect to sales of conventionally-fueled MHD vehicles) and when and how ACT credits are generated (with respect to the sales of ZE trucks). The ACT regulations currently state that deficits and credits are generated as follows:

> *1963.1 (a) Deficit Generation. Starting with the 2024 model year, a manufacturer shall annually incur deficits based on the manufacturer's annual sales volume of on-road vehicles produced and delivered for sale in California. Deficits are incurred when the on-road vehicle is sold to the ultimate purchaser in California.*
>
> *1963.2 (a) ZEV Credit Calculation. A manufacturer may generate ZEV credits for each ZEV produced and delivered for sale in California for the manufacturer-designated model year. ZEV credits are earned when a new on-road vehicle is sold to the ultimate purchaser in California.*

California has recognized the operational mismatch in credit/deficit generation and in early credit reporting requirements, and has acknowledged that future updates will be needed to the ACT sales/credit reporting system to account for, among other things, vehicles that have been sold by

2

OEMs but remain on dealer lots, and for vehicles that may be delivered for sale in California but are sold thereafter to an ultimate customer out-of-state. To that end, CARB has issued a Manufacturers Advisory Correspondence (MAC), that states as follows:

> "Credits and deficits are accrued when a vehicle is delivered to the ultimate purchaser in California. However, we recognize that all sales for a given model year will not be delivered to the ultimate purchaser by the time the first annual report is due for the applicable model year. ***Future updates will be necessary until all sales for the model year are completed and compliance can be determined.***"
> [Manufacturer Advisory Correspondence, ACT 2023 (ca.gov)](#)

The specific problem centers around the regulatory language stating the ZEV credits "are earned when a new on-road vehicle is sold to the ultimate purchaser in California." Vehicle manufacturers, especially in the MHD market, often are not aware of the timing of when a given MHD vehicle is sold to an ultimate purchaser, especially since the vehicle manufacturer may have initially sold the unfinished truck to a body-builder, truck dealership or other intermediate third-party in the MHD vehicle distribution chain. For example, a vehicle could be sold by an OEM to a dealership group, and then to a body-builder company (that up-fits the vehicle with a box, or a refrigerator unit, or a tow-bed, or whatever), and then back to a dealership, where it might eventually, after all that, be sold to an ultimate customer who puts the truck in service.

Given that chain of distribution, OEMs are typically not aware of their MHD vehicles' final sales transactions and state registrations until the trucks show up in the OEMs' warranty systems (for which there is no strict timing), or, more likely, until their vehicles show up as registered in the Polk data base as new registrations. Thus, the best and most accurate source of data that OEMs have is often Polk, since it contains the timing of registration and the state of registration, and so can serve as the "final arbiter" of whether or not a vehicle has been "sold in California" so as to count under the ACT regulations.

The problem with this process is that it lags the manufacture and initial shipment of the MHD vehicle by months, and sometimes even years, and is, in the end, a process over which OEMs have no control. In that regard, if an OEM sells a vehicle in Nevada, there is nothing that stops a final customer from registering it in California, and the OEM would have no ability to control or even be aware of that transaction upfront. Consequently, and by way of example, if an OEM plans 9% ZEV sales into California, or Oregon, or any other opt-in state, that OEM will not actually have upfront control over where the ZEVs ultimately end-up in the hands of ultimate purchasers, which means that the OEM will not actually know upfront in which state the credit from the ZEV sale will actually count. The adverse consequence of that is that OEMs may unwittingly undersell ZEVs in certain originally-targeted states, which can lead to ACT non-compliance, through no actual fault of the OEM. This is a real possibility, since, when faced with potentially limited availability of conventionally-fueled vehicles in the vehicle stock of California/opt-in-state dealerships, fleets might look to purchase vehicles from out-of-state dealerships, and then, without the OEM's knowledge, register those vehicles in California, thereby frustrating OEMs' calculations and plans for percentage-based sales of ZEVs in the various ACT states.

In recognition of this significant misalignment and timing problem, and as part of the previously referenced agreement between CARB and EMA, CARB has confirmed that:

3

> *In a show of good faith, in calendar year 2023, CARB issued guidance on ACT credit reporting, clarifying that compliance determination and sales reporting requirements are both defined when vehicles are produced and delivered for sale in California. CARB staff will also propose to initiate a rulemaking action to that effect in calendar year 2024. Staff also will propose to modify section 1963.3(b) to lengthen the number of years a manufacturer has to make up a deficit from one year to three years.*

Notwithstanding CARB's agreements, given the compressed time between now and the beginning of next year when early ACT credits can start to be generated in New Mexico, the NMED will need to take its own steps now to align with CARB's proposed amendments, and to make clear that ACT credits can be generated when an OEM delivers a vehicle to another party where the vehicle is *intended* for sale by the OEM in New Mexico, and that the ACT credit/deficit averaging period will be extended to three years.

Turning to the second prerequisite to a successful ACT program in New Mexico, the NMED should work with California, NESCAUM and the other opt-in states to establish a pooled ACT credit program, since the sales volumes in several of the opt-in states, including New Mexico, are likely too low to sustain viable stand-alone ACT credit programs. Significantly, in the recent agreement between CARB and EMA, CARB has agreed to "work with OEMs and section 177 states in an effort to develop and implement a pooling structure for states that have adopted the ACT regulations to provide OEMs flexibility."

Such a pooled credit program will need to allow for the use of credits among the various pooled opt-in states regardless of which particular opt-in state a credit may have been "earned" in – i.e., without regard to which individual opt-in state turns out to be where each individual MHD ZEV is ultimately registered and operated. Since the transaction path for a commercial vehicle is so much more complicated and obscured than for a passenger vehicles (as described above), manufacturers have limited capability to track and precisely distribute exact percentages of ZEV products in each opt-in state (the number of which continues to grow).

In light of the foregoing, the opt-in states (perhaps coordinating through California and NESCAUM) should consider pooling all ACT credits and deficits equally, without any discounts, regardless of which individual opt-in state turns out to be where a particular ultimate purchaser resides. In essence, all ACT opt-in states will need to be treated as "one big state" for the purposes of calculating ACT volumes. That would have the benefit of allowing manufacturers to ease state transitions into the ACT program, since OEMs would be able to leverage credits they had already built-up in other states to offset conventional vehicles in new states that have not yet developed a robust ZEV market. It would preserve a continued functional body-builder and TEM (truck equipment manufacturer) market, and avoid potential shortages of the new trucks that are needed to move goods and do work throughout the nation. Even more fundamentally, since the GHGs at issue are global pollutants, not local air contaminants, it should not matter where a particular ZEV truck ends up among the opt-in states so long as the overall ZEV-truck sales mandates are being met.

A third prerequisite to the deployment of a successful ACT program in New Mexico is taking steps to ensure that the necessary infrastructure to recharge battery-electric (BEV) trucks and to refuel hydrogen fuel-cell (FCEV) trucks will be in place *before* the ACT ZE-truck sales

mandates kick in. The NMED will need to monitor the progress and pace of that necessary infrastructure development, and potentially will need to make adjustments if that infrastructure is not installed at scale and on time. As the NMED is well aware, trucking fleet operators in New Mexico are unlikely to buy ZE-trucks if they cannot be sure that the necessary ZE-truck infrastructure is in place and fully operational *before* they purchase a ZE-truck. That is a real challenge, since independent analysis indicates that the ACT program in New Mexico could require the sale of more than 11,250 BEV trucks and 250 FCEVs by 2032. Those sales in turn could require the installation of approximately 10,000 MHD charging ports and multiple hydrogen refueling stations in New Mexico *before* 2032. The NMED will need to help coordinate and ensure the development of that vital infrastructure development.

   As a fourth and final prerequisite to a successful ACT program, the NMED will need to coordinate with other state agencies and departments to ensure that sufficient publicly-funded incentives are available to trucking fleet operators in New Mexico for the purchase of ZE-trucks. As the NMED is aware, the current price of a ZE-truck is more than twice that of a conventionally-fueled truck. As a result, trucking fleet operators may be unwilling to purchase ZE-trucks in the near-term without some form of incentive funding to offset the significant difference in capital costs. While the total cost of ownership (TCO) calculations continue to improve for ZE-trucks, it may take until the 2030-plus time period for those TCO calculations to come out consistently in favor of ZE-trucks. During that interim period, it is vital that the NMED take additional steps to try to ensure that sufficient public funding is available to bridge the capital-cost differentials for MHD truck purchasers in the state.

   It is critically important that the NMED resolve the foregoing issues promptly. More specifically, if MHD truck manufacturers cannot be assured of when and where their ZEV-truck credits can be generated and used – i.e., if OEMs cannot be assured that ZEV-truck credits will be generated when a ZEV truck is "delivered for sale" in a particular opt-in state as intended by the OEM – then truck manufacturers could be compelled to take other measures to ensure compliance with the ACT's ZEV-truck sales mandates. Stated differently, if an OEM cannot predict with a reasonable degree of certainty when a ZEV-truck credit will be generated in a given opt-in state, the OEM would have no compliance option other than to reduce the sales of conventionally-fueled trucks into that state to protect against violating that state's ACT ZEV-sales requirements, which requirements are set based on a percentage of sales of conventionally-fueled trucks. To guard against violating the ZEV-truck sales mandate in an opt-in state, OEMs would have no choice other than to reduce the scale of that mandate by reducing the number of conventionally-fueled vehicles sold into the opt-in state, especially if the state lacks the necessary infrastructure capabilities and incentive programs, or has trucking fleets that are poorly suited to the early deployment of ZEV-trucks in the first place.

   Thus, if the NMED is unable to resolve the ZEV-credit problems at issue (as well as assure that the needed infrastructure and incentives will be in place) in a prompt manner, there is a risk, as other commenters have noted, that opting-in to the ACT program could lead to reduced availability of new conventionally-fueled trucks in New Mexico. That said, we want to stress again that we do not oppose the proposed opt-ins. However, in order for the opt-ins to be successful, New Mexico (along with the other opt-in states) will need to address the issues discussed above.

      EMA appreciates the opportunity to submit these comments, and we look forward to working with the NMED on the implementation of these important rulemakings going forward.

      Respectfully Submitted,

      TRUCK AND ENGINE
      MANUFACTURERS ASSOCIATION