# EXHIBIT G

STATE OF MARYLAND
DEPARTMENT OF THE ENVIRONMENT

| | |
|---|---|
| **Proposal to Adopt California's** ) | **Public Hearing Date:** |
| **Advanced Clean Trucks (ACT)** ) | **October 11, 2023** |
| **Regulations; COMAR 26.11.34 Low** ) | **Public Comment Deadline:** |
| **Emissions Vehicle Program** ) | **October 11, 2023** |

COMMENTS OF THE
TRUCK AND ENGINE MANUFACTURERS ASSOCIATION

September 28, 2023  
mde.mobilecomments@maryland.gov

Timothy A. French
Truck & Engine Manufacturers Association
333 West Wacker Drive, Suite 810
Chicago, IL 60606

STATE OF MARYLAND
DEPARTMENT OF THE ENVIRONMENT

| | | |
|---|---|---|
| **Proposal to Adopt California's** | ) | **Public Hearing Date:** |
| **Advanced Clean Trucks (ACT)** | ) | **October 11, 2023** |
| **Regulations; COMAR 26.11.34 Low** | ) | **Public Comment Deadline:** |
| **Emissions Vehicle Program** | ) | **October 11, 2023** |

  The Truck and Engine Manufacturers Association (EMA) hereby submits its comments on the proposal of the Maryland Department of the Environment (MDE) to adopt California's Advanced Clean Trucks (ACT) regulations. EMA is the trade association that represents the world's leading manufacturers of medium-duty and heavy-duty (MHD) on-highway vehicles and engines, and is a key stakeholder in the development and implementation of the ACT regulations that the California Air Resources Board adopted in 2021.

  Recently, EMA entered into a comprehensive agreement with CARB regarding the implementation of a suite of state and federal regulations to help transition the MHD on-highway vehicle sector to zero-emission (ZE) trucks. (See CARB website; "CARB and truck and engine manufacturers announce unprecedented partnership to meet clean air goals.") That agreement includes, among other things, commitments to cooperate on the implementation of CARB's ACT regulations in the increasing number of "opt-in" states, and to align CARB's MHD "Omnibus" low-$NO_x$ regulations with EPA's recently-finalized "Clean Trucks Plan" regulations as of the 2027 model year.

  Consistent with the recent agreement between EMA and CARB, EMA does not oppose the MDE's proposal to opt-in to the ACT regulations starting with the 2027 model year. That said, EMA does want to highlight four important prerequisites that Maryland should address to assure the successful implementation of the ACT regulations in Maryland: first, the MDE will need to take steps to align with California's proposed changes to the manner in which ACT credits and ACT deficits are generated and balanced; second, the MDE should consider the merits of establishing a coordinated and pooled ACT credit banking and trading program; third, as required under the Maryland Clean Trucks Act of 2023, the MDE should ensure that the necessary ZE-truck recharging and hydrogen-refueling infrastructure is put in place in Maryland sufficiently in advance of the implementation of the ACT regulations' annually increasing ZE-truck sales mandates; and fourth, the MDE should work with other agencies and departments to ensure that sufficient ZE-truck purchase incentives are available to trucking fleet operators in Maryland. EMA's comments will expand on each of these prerequisites to a successful ACT program in Maryland.

  As the MDE has recognized, the availability of zero-emission vehicle (ZEV) credits will be integral to the feasibility of the ACT regulations. Indeed, the MDE's proposal specifically allows for the early generation of ZEV credits starting with the 2026 model year (see proposed regulatory section .04(A)(1)). However, there are a number of issues currently frustrating the development of a robust ACT credit program that the MDE will need to address. Specifically,

1

California's underlying regulations currently create a misalignment between when and how ACT deficits are generated (with respect to sales of conventionally-fueled MHD vehicles) and when and how ACT credits are generated (with respect to the sales of ZE trucks). The ACT regulations currently state that deficits and credits are generated as follows:

> *1963.1 (a) Deficit Generation. Starting with the 2024 model year, a manufacturer shall annually incur deficits based on the manufacturer's annual sales volume of on-road vehicles produced and delivered for sale in California. Deficits are incurred when the on-road vehicle is sold to the ultimate purchaser in California.*
>
> *1963.2 (a) ZEV Credit Calculation. A manufacturer may generate ZEV credits for each ZEV produced and delivered for sale in California for the manufacturer-designated model year. ZEV credits are earned when a new on-road vehicle is sold to the ultimate purchaser in California.*

California has recognized the operational mismatch in credit/deficit generation and in early credit reporting requirements, and has acknowledged that future updates will be needed to the ACT sales/credit reporting system to account for, among other things, vehicles that have been sold by OEMs but remain on dealer lots, and for vehicles that may be delivered for sale in California but are sold thereafter to an ultimate customer out-of-state. To that end, CARB has issued a Manufacturers Advisory Correspondence (MAC), that states as follows:

> "Credits and deficits are accrued when a vehicle is delivered to the ultimate purchaser in California. However, we recognize that all sales for a given model year will not be delivered to the ultimate purchaser by the time the first annual report is due for the applicable model year. ***Future updates will be necessary until all sales for the model year are completed and compliance can be determined.***"
> [Manufacturer Advisory Correspondence, ACT 2023 (ca.gov)](#)

The specific problem centers around the regulatory language stating the ZEV credits "are earned when a new on-road vehicle is sold to the ultimate purchaser in California." Vehicle manufacturers, especially in the MHD market, often are not aware of the timing of when a given MHD vehicle is sold to an ultimate purchaser, especially since the vehicle manufacturer may have initially sold the unfinished truck to a body-builder, truck dealership or other intermediate third-party in the MHD vehicle distribution chain. For example, a vehicle could be sold by an OEM to a dealership group, and then to a body-builder company (that up-fits the vehicle with a box, or a refrigerator unit, or a tow-bed, or whatever), and then back to a dealership, where it might eventually, after all that, be sold to an ultimate customer who puts the truck in service.

Given that chain of distribution, OEMs are typically not aware of their MHD vehicles' final sales transactions and state registrations until the trucks show up in the OEMs' warranty systems (for which there is no strict timing), or, more likely, until their vehicles show up as registered in the Polk data base as new registrations. Thus, the best and most accurate source of data that OEMs have is often Polk, since it contains the timing of registration and the state of registration, and so can serve as the "final arbiter" of whether or not a vehicle has been "sold in California" so as to count under the ACT regulations.

The problem with this process is that it lags the manufacture and initial shipment of the MHD vehicle by months, and sometimes even years, and is, in the end, a process over which OEMs have no control. In that regard, if an OEM sells a vehicle in Nevada, there is nothing that stops a final customer from registering it in California, and the OEM would have no ability to control or even be aware of that transaction upfront. Consequently, and by way of example, if an OEM plans 9% ZEV sales into California, or Oregon, or any other opt-in state, that OEM will not actually have upfront control over where the ZEVs ultimately end-up in the hands of ultimate purchasers, which means that the OEM will not actually know upfront in which state the credit from the ZEV sale will actually count. The adverse consequence of that is that OEMs may unwittingly undersell ZEVs in certain originally-targeted states, which can lead to ACT non-compliance, through no actual fault of the OEM. This is a real possibility, since, when faced with potentially limited availability of conventionally-fueled vehicles in the vehicle stock of California/opt-in-state dealerships, fleets might look to purchase vehicles from out-of-state dealerships, and then, without the OEM's knowledge, register those vehicles in California, thereby frustrating OEMs' calculations and plans for percentage-based sales of ZEVs in the various ACT states.

In recognition of this significant misalignment and timing problem, and as part of the previously referenced agreement between CARB and EMA, CARB has confirmed that:

> *In a show of good faith, in calendar year 2023, CARB issued guidance on ACT credit reporting, clarifying that compliance determination and sales reporting requirements are both defined when vehicles are produced and delivered for sale in California. CARB staff will also propose to initiate a rulemaking action to that effect in calendar year 2024. Staff also will propose to modify section 1963.3(b) to lengthen the number of years a manufacturer has to make up a deficit from one year to three years.*

Because CARB will not finalize the necessary ACT revisions before year-end, the MDE will need to take its own steps to align with CARB's proposed amendments, and to make clear that ACT credits can be generated when an OEM delivers a vehicle to another party where the vehicle is *intended* for sale by the OEM in Maryland, and that the ACT credit/deficit averaging period will be extended to three years.

Turning to the second prerequisite to a successful ACT program in Maryland, the MDE should work with California, NESCAUM and the other opt-in states to establish a pooled ACT credit program, since the sales volumes in several of the opt-in states, including Maryland, are likely too low to sustain viable stand-alone ACT credit programs. Significantly, in the recent agreement between CARB and EMA, CARB has agreed to "work with OEMs and section 177 states in an effort to develop and implement a pooling structure for states that have adopted the ACT regulations to provide OEMs flexibility."

Such a pooled credit program will need to allow for the use of credits among the various pooled opt-in states regardless of which particular opt-in state a credit may have been "earned" in – i.e., without regard to which individual opt-in state turns out to be where each individual MHD ZEV is ultimately registered and operated. Since the transaction path for a commercial vehicle is so much more complicated and obscured than for a passenger vehicles (as described above), manufacturers have limited capability to track and precisely distribute exact percentages of ZEV products in each opt-in state (the number of which continues to grow).

In light of the foregoing, the opt-in states (perhaps coordinating through California and NESCAUM) should consider pooling all ACT credits and deficits equally, without any discounts, regardless of which individual opt-in state turns out to be where a particular ultimate purchaser resides. In essence, all ACT opt-in states will need to be treated as "one big state" for the purposes of calculating ACT volumes. That would have the benefit of allowing manufacturers to ease state transitions into the ACT program, since OEMs would be able to leverage credits they had already built-up in other states to offset conventional vehicles in new states that have not yet developed a robust ZEV market. It would preserve a continued functional body-builder and TEM (truck equipment manufacturer) market, and avoid potential shortages of the new trucks that are needed to move goods and do work throughout the nation. Even more fundamentally, since the GHGs at issue are global pollutants, not local air contaminants, it should not matter where a particular ZEV truck ends up among the opt-in states so long as the overall ZEV-truck sales mandates are being met.

A third prerequisite to the deployment of a successful ACT program in Maryland is taking steps to ensure that the necessary infrastructure to recharge battery-electric (BEV) trucks and to refuel hydrogen fuel-cell (FCEV) trucks will be in place *before* the ACT ZE-truck sales mandates kick in. In that regard, Maryland's Clean Trucks Act of 2023 requires the MDE to work with other agencies to prepare a comprehensive ZE-truck infrastructure needs assessment and deployment plan for the successful implementation of the ACT regulations, and to submit that assessment and plan to the General Assembly by the end of 2024. Thus, the MD will need to undertake that important work now, and will need to monitor the progress and pace of that necessary infrastructure development. In addition, as also specified under the Maryland Clean Trucks Act, the MDE may need to delay the phase-in of the ACT sales mandates if that requisite ZE-truck infrastructure is not installed at scale and on time.

As the MDE is well aware, trucking fleet operators in Maryland are unlikely to buy ZE-trucks if they cannot be sure that the necessary ZE-truck infrastructure is in place and fully operational *before* they purchase a ZE-truck. That is a real challenge, since third-party analyses indicate that the ACT program in Maryland could require the sale of approximately 18,000 BEV trucks and 2,000 FCEVs by 2032. Those sales in turn would require the installation of approximately 17,000 MHD charging ports and multiple hydrogen refueling stations *before* 2032. The MDE will need to help coordinate and ensure the development of that vital infrastructure development.

As a fourth and final prerequisite to a successful ACT program, the MDE will need to coordinate with other state agencies and departments to ensure that sufficient publicly-funded incentives are available to trucking fleet operators in Maryland for the purchase of ZE-trucks. The current price of a ZE-truck is more than twice that of a conventionally-fueled truck. As a result, trucking fleet operators could be unwilling to purchase ZE-trucks in the near-term without some form of incentive funding to offset the significant difference in capital costs. While the total cost of ownership (TCO) calculations continue to improve for ZE-trucks, it may take until the 2030-plus time period for those TCO calculations to come out consistently in favor of ZE-trucks. During that interim period, it is vital that the MDE take additional steps to try to ensure that sufficient public funding is available to bridge the capital-cost differentials for MHD truck purchasers in the state.

It is critically important that the MDE resolve the foregoing issues promptly. More specifically, if MHD truck manufacturers cannot be assured of when and where their ZEV-truck credits can be generated and used – i.e., if OEMs cannot be assured that ZEV-truck credits will be generated when a ZEV truck is "delivered for sale" in a particular opt-in state as intended by the OEM – then truck manufacturers could be compelled to take other measures to ensure compliance with the ACT's ZEV-truck sales mandates. Stated differently, and as may be raised by other stakeholders during the public hearing on this matter, if an OEM cannot predict with a reasonable degree of certainty when a ZEV-truck credit will be generated in a given opt-in state, the OEM would have no compliance option other than to reduce the sales of conventionally-fueled trucks into that state to protect against violating that state's ACT ZEV-sales requirements, which requirements are set based on a percentage of sales of conventionally-fueled trucks. To guard against violating the ZEV-truck sales mandate in an opt-in state, OEMs would have no choice other than to reduce the scale of that mandate by reducing the number of conventionally-fueled vehicles sold into the opt-in state, especially if the state lacks the necessary infrastructure capabilities and incentive programs, or has trucking fleets that are poorly suited to the early deployment of ZEV-trucks in the first place.

Thus, unless the MDE can promptly resolve the ZEV-credit problems at issue (as well as assure that the needed infrastructure and incentives will be in place), there is a risk, as other commenters have stated, that opting-in to the ACT program could lead to reduced availability of new conventionally-fueled trucks in Maryland. In raising this point, we want to stress again that we do not oppose the proposed opt-in. However, in order for it to be successful, Maryland (along with the other opt-in states) will need to address the issues discussed above.

EMA appreciates the opportunity to submit these comments, and we look forward to working with the MDE on the implementation of this important rulemaking going forward.

Respectfully Submitted,

TRUCK AND ENGINE
MANUFACTURERS ASSOCIATION

5