1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MYUNG J. PARK, State Bar No. 210866
    Supervising Deputy Attorney General
3   BENJAMIN P. LEMPERT, State Bar No. 344239
    DAVID M. MEEKER, State Bar No. 273814
4   JONATHAN A. WIENER, State Bar No. 265006
    M. ELAINE MECKENSTOCK, State Bar No. 268861
5   Deputy Attorney General
      1515 Clay Street, 20th Floor
6     P.O. Box 70550
      Oakland, CA  94612-0550
7     Telephone:  (510) 879-0299
      Fax:  (510) 622-2270
8     E-mail:  Elaine.Meckenstock@doj.ca.gov
    *Attorneys for Defendants*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14   **DAIMLER TRUCK NORTH AMERICA, LLC; INTERNATIONAL MOTORS, LLC; PACCAR, INC.;** and **VOLVO GROUP NORTH AMERICA, LLC,** | 2:25-cv-02255-DC-AC |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF 23, 57)** |
| **THE UNITED STATES OF AMERICA;** and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** | Date:            October 31, 2025<br>Time:            1:30 PM<br>Courtroom:    8, 13th Floor<br>Judge:          Hon. Dena Coggins<br>Trial Date:    Not Set<br>Action Filed:  August 11, 2025 |
| Plaintiff-Intervenors | |
| **v.** | |
| **CALIFORNIA AIR RESOURCES BOARD, STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board**;** and **GAVIN NEWSOM,** in his official capacity as the Governor of California**,** | |
| Defendants. | |

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

    A.    Congress Intentionally Preserved California's Vehicle Emission Control Program, While Ensuring Manufacturers Face Only Two Such Programs ........... 2

    B.    California's Recent Efforts to Reduce New Motor Vehicle Emissions ................. 4

    C.    The Clean Truck Partnership Provides Parties with Increased Certainty .............. 6

    D.    The Congressional Review Act Provides Fast-Track Review of Generally Applicable Federal *Rules* ....................................................................................... 7

    E.    The Federal Government Mounts an Unprecedented Attack on California's Program ............................................................................................................... 9

    F.    California Responds to the Extraordinary Uncertainty the Federal Government Introduced into the State's Longstanding Program ......................... 10

    G.    Procedural History ............................................................................................ 11

STANDARD OF REVIEW ......................................................................................... 12

ARGUMENT ............................................................................................................... 12

I.    The CTP Should Not Be Preliminarily Enjoined ................................................ 12

    A.    The CTP Is Not Irreparably Injuring Plaintiffs, and the Equities Do Not Remotely Favor Them ....................................................................................... 12

    B.    Plaintiffs' Challenges to the CTP Fail ............................................................. 14

        1.    The CTP Is Not Preempted ................................................................... 14

        2.    The CTP Does Not Violate the First Amendment ................................. 15

        3.    The State Law Challenges to the CTP Are Barred and Fail .................. 16

II.    The ACT, Omnibus, and Advanced Clean Cars II Regulations Should Not Be Preliminarily Enjoined ......................................................................................... 18

    A.    Plaintiffs Have Not Established Injuries from These State Laws that a Preliminary Injunction Can Redress or Equities that Favor Their Request ......... 18

    B.    Plaintiffs' Challenge to the Regulations Is Not Likely to Succeed Because the Allegedly Preempting Resolutions Are Unconstitutional ............................. 20

        1.    The CRA Does Not Bar Defendants' Challenges to The Resolutions ...... 20

        2.    The Resolutions Violated the Separation of Powers ................................ 23

            a.    Congress Impermissibly Overrode Three Adjudications by the Executive Branch of a Single Party's Rights Under Extant Law ...................................................................................... 23

            b.    Congress Unlawfully Allowed the Executive Branch To Direct Legislative Procedure ..................................................... 24

        3.    The Resolutions Violate the Tenth Amendment and Principles of Structural Federalism .......................................................................... 28

III.    The 2036 Sales Requirement Should Not Be Preliminarily Enjoined ............................. 32

i

**TABLE OF CONTENTS**
(continued)

Page

IV.    The Phase 2 Regulations Should Not Be Preliminarily Enjoined .................................... 32

V.    The May MAC Should Not Be Preliminarily Enjoined .................................................... 33

VI.    Executive Order N-27-25 Should Not Be Preliminarily Enjoined .................................. 33

    A.    CTP Plaintiffs' Challenges to the EO Are Unripe, Their Alleged Injuries from It Are Speculative, and the Equities Favor Defendants ............................. 33

    B.    If They Were Somehow Ripe, CTP Plaintiffs' Challenges to the EO Would Fail on Their Merits ................................................................................................ 34

        1.    The Market Participant Exception Is Fatal to the Preemption Challenge ............................................................................................. 34

        2.    The First Amendment Challenge Is Without Merit ................................. 35

CONCLUSION ......................................................................................................................... 35

# TABLE OF AUTHORITIES

<u>Page</u>

CASES

*Actmedia, Inc. v. Stroh*
    830 F.2d 957 (9th Cir. 1986) ................................................................................... 16

*Airlines for Am. v. City & Cnty. of San Francisco*
    78 F.4th 1146 (9th Cir. 2023) ................................................................................... 14

*Am. Airlines, Inc. v. Wolens*
    513 U.S. 219 (1995) (9th Cir. 1983) ......................................................................... 14

*Am. Motorcyclist Ass'n v. Watt*
    714 F.2d 962 (9th Cir. 1983) ................................................................................... 19

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
    569 U.S. 641 (2013) ................................................................................................. 14

*Arc of Cal. v. Douglas*
    757 F.3d 975 (9th Cir. 2014) .............................................................................. 32, 33

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*
    208 F.3d 1 (1st Cir. 2000) ........................................................................................ 14

*Bank Markazi v. Peterson*
    578 U.S. 212 (2016) ................................................................................................. 24

*Bennett v. Isagenix Int'l LLC*
    118 F.4th 1120 (9th Cir. 2024) ................................................................................ 13

*Bond v. United States*
    564 U.S. 211 (2011) ................................................................................................. 28

*Bowsher v. Merck & Co., Inc.*
    460 U.S. 824 (1983) ............................................................................................. 8, 23

*Bowsher v. Synar*
    478 U.S. 714 (1986) ............................................................................................. 8, 23

*Brach v. Newsom*
    38 F.4th 6 (9th Cir. 2022) ........................................................................................ 33

*Cal. Pharm. Ass'n v. Maxwell-Jolly*
    563 F.3d 852–53 (9th Cir. 2009) ............................................................................. 18

*California v. Azar*
    911 F.3d 558 (9th Cir. 2018) ................................................................................... 12

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*California v. United States*
    No. 3:25-cv-04966 (N.D. Cal.) ......................................................................... 19

*Caribbean Marine Servs. Co. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) ...................................................................... 19, 34

*City of Arlington v. FCC*
    569 U.S. 290 (2013) ............................................................................................ 24

*City of San Joaquin v. State Bd. of Equalization*
    9 Cal. App. 3d 365 (Ct. App. 1970) ................................................................ 17

*Clark v. Martinez*
    543 U.S. 371 (2005) ............................................................................................ 23

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*
    527 U.S. 666 (1999) ............................................................................................ 13

*Ctr. for Biological Diversity v. Bernhardt*
    946 F.3d 553 (9th Cir. 2019) ............................................................................ 20

*Davies v. Grossmont Union High Sch. Dist.*
    930 F.2d 1390 (9th Cir. 1991) ..................................................................... 15, 16

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ............................................................................................ 22

*Doe v. Regents of the Univ. of Cal.*
    891 F.3d 1147 (9th Cir. 2018) .......................................................................... 17

*Ellenburg v. Brockway, Inc.*
    763 F.2d 1091 (9th Cir. 1985) .......................................................................... 14

*Engine Mfrs. Ass'n v. EPA*
    88 F.3d 1075 (D.C. Cir. 1996) ..................................................................... 3, 13

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
    498 F.3d 1031 (9th Cir. 2007) .......................................................................... 34

*Epic Sys. Corp. v. Lewis*
    584 U.S. 497 (2018) ............................................................................................ 22

*Ex Parte Young*
    209 U.S. 123 (1908) ............................................................................................ 15

# TABLE OF AUTHORITIES
### (continued)

**Page**

*FCC v. Consumers' Rsch.*
    145 S. Ct. 2482 (2025) ................................................................................. 27

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*
    535 U.S. 743 (2002) ............................................................................. 28, 32

*Fikre v. Fed. Bureau of Investigation*
    904 F.3d 1033 (9th Cir. 2018) .................................................................... 33

*Fletcher v. Peck*
    10 U.S. 87 (1810) ...................................................................................... 24

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
    561 U.S. 477 (2010) .................................................................................. 27

*Garcia v. Google, Inc.*
    786 F.3d 733 (9th Cir. 2015) ..................................................................... 13

*Garcia v. San Antonio Metro. Transit Auth.*
    469 U.S. 528 (1985) ............................................................................. 28, 31

*Gilbreath v. Cutter Biological, Inc.*
    931 F.2d 1320 (9th Cir. 1991) .................................................................... 16

*Gundy v. United States*
    588 U.S. 128 (2019) .................................................................................. 27

*Horne v. Dep't of Agric.*
    576 U.S. 350 (2015) .................................................................................. 23

*Hughes v. Alexandria Scrap Corp.*
    426 U.S. 794 (1976) .................................................................................. 35

*INS v. Chadha*
    462 U.S. 919 (1983) ............................................................................. 24, 28

*Jamgotchian v. Ferraro*
    No. 8:22-cv-01893, 2023 WL 5420311 (C.D. Cal. July 19, 2023) ................... 16

*King v. Burwell*
    576 U.S. 473 (2015) .................................................................................. 25

*Koontz v. St. Johns River Water Mgmt. Dist.*
    570 U.S. 595 (2013) .................................................................................. 13

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Legal Services Corporation v. Velazquez*
531 U.S. 533 (2001) ............................................................................... 15

4

*Leonard v. Clark*
5
12 F.3d 885 (9th Cir. 1993) .............................................................. 15, 16

6

*Los Angeles Cnty. Bar Ass'n v. Eu*
7
979 F.2d 697 (9th Cir. 1992) .................................................................. 15

8

*Mapp v. Ohio*
367 U.S. 643 (1961) ............................................................................... 27

9

*Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise*
10
501 U.S. 252 (1991) ............................................................................... 23

11

*Michel v. Anderson*
12
14 F.3d 623 (D.C. Cir. 1994) ................................................................. 23

13

*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard*
38 Cal. App. 5th 421 (2019) ................................................................... 33

14

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*)
15
627 F.2d 1095 (D.C. Cir. 1979) ....................................................... 2, 3, 4

16

*Motor & Equip. Mfrs. Ass'n v. Nichols* (*MEMA II*)
17
142 F.3d 449 (D.C. Cir. 1998) ............................................................ 4, 6

18

*Nevada v. Skinner*
884 F.2d 445 (9th Cir. 1989) .................................................................. 31

19

*NLRB v. Noel Canning*
20
573 U.S. 513 (2014) .................................................................. 25, 27, 31

21

*O'Donoghue v. United States*
289 U.S. 516 (1933) ............................................................................... 27

22

*Pan. Refin. Co. v. Ryan*
23
293 U.S. 388 (1935) ............................................................................... 27

24

*Pennhurst State Sch. & Hosp. v. Halderman*
465 U.S. 89 (1984) ................................................................................. 16

25

*Powell v. SEC*
26
No. 24-1899, 2025 WL 2233792 (9th Cir. Aug. 6, 2025) ...................... 15

27

28

vi

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Pub. Citizen v. U.S. Dep't of Justice*
    491 U.S. 440 (1989) .......................................................................................... 27

*Pub. Utilities Comm'n of State of Cal. v. FERC*
    100 F.3d 1451 (9th Cir. 1996)............................................................................. 33

*Ray v. County of Los Angeles*
    935 F.3d 703 (9th Cir. 2019)............................................................................... 19

*Retail Dig. Network, LLC v. Prieto*
    861 F.3d 839 (9th Cir. 2017)............................................................................... 16

*San Diego Cnty. Water Auth. v. Metro. Water Dist. of S. Cal.*
    12 Cal. App. 5th 1124 (2017).............................................................................. 17

*South Carolina v. Baker*
    485 U.S. 505 (1988) ..................................................................................... 29, 31

*South Carolina v. Katzenbach*
    383 U.S. 301 (1966) .......................................................................................... 28

*Twitter, Inc. v. Paxton*
    56 F.4th 1170 (9th Cir. 2022)....................................................................... 15, 34

*United States ex rel. Kelly v. Boeing Co.*
    9 F.3d 743 (9th Cir. 1993)................................................................................... 20

*United States v. Munoz-Flores*
    495 U.S. 385 (1990) .......................................................................................... 28

*Vasquez, v. Dep't of Pesticide Regul.*
    68 Cal. App. 5th 672 (Ct. App. 2021) ................................................................ 17

*Watkins v. Westinghouse Hanford Co.*
    12 F.3d 1517 (9th Cir.1993)................................................................................ 14

*West Virginia v. EPA*
    597 U.S. 697 (2022) .......................................................................................... 31

*WildEarth Guardians v. Mont. Snowmobile Ass'n*
    790 F.3d 920 (9th Cir. 2015)............................................................................... 34

# TABLE OF AUTHORITIES
## (continued)

Page

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 5, cl. 2 ........................................................................... 25

U.S. Const. art. II, § 1, cl. 1 .......................................................................... 24

**STATUTES**

1 U.S.C. § 102 ................................................................................................ 22

1 U.S.C. § 103 ................................................................................................ 22

5 U.S.C. § 551 ............................................................................................ 9, 21

5 U.S.C. § 553 ................................................................................................ 29

5 U.S.C. § 801 ............................................................... 8, 21, 22, 23 25, 29

5 U.S.C. § 802 .......................................................................... 8, 22, 23 25

5 U.S.C. § 804 ................................................................................ 8, 22, 27

5 U.S.C. § 805 ............................................................................ 20, 22, 23

5 U.S.C. § 806 ................................................................................................ 22

42 U.S.C. § 7507 ............................................................................................. 3

42 U.S.C. § 7543(b)(1) ............................................................................. 3, 21

42 U.S.C. § 7607 ....................................................................................... 13, 21

42 U.S.C. § 5911 ............................................................................................ 22

Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965) ............................................. 3

Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967) ......................... 3

Pub. L. 104-121, 110 Stat. 847 (Mar. 29, 1996) ............................................ 7

Cal. Gov. Code § 8550 et seq. ....................................................................... 34

Cal. Health & Saf. Code, § 43000 .................................................................. 2

Cal. Health & Saf. Code § 43105 ................................................................... 3

Defendants' Opp. to Plaintiffs' Motion for Preliminary Injunction (2:25-cv-02255-DC-AC)

# TABLE OF AUTHORITIES
## (continued)

**Page**

**REGULATIONS**

Cal. Code Regs., tit. 13, § 1900(b) ............................................................................... 5

Cal. Code Regs., tit. 13, § 1956.8 ............................................................................ 5, 6

Cal. Code Regs., tit. 13, § 1960.1(g)(2) (1991) ........................................................... 4

Cal. Code Regs., tit. 13, § 1963 .................................................................................. 4

Cal. Code Regs., tit. 13, § 1963.1 ............................................................................... 5

Cal. Code Regs., tit. 13, § 1971.1 ............................................................................... 6

Cal. Code Regs., tit. 13, § 2016 .................................................................................. 5


**CONGRESSIONAL RECORD**

119 Cong. Rec. S3017 (daily ed. May 21, 2025) ............................................ 29, 30, 31

119 Cong. Rec. S3099  (daily ed. May 22, 2025) ................................................. 10, 26


**FEDERAL REGISTER**

59 Fed. Reg. 36,969 (July 20, 1994) ........................................................................... 3

69 Fed. Reg. 59,920 (Oct. 6, 2004) ............................................................................ 8

70 Fed. Reg. 50,322 (Aug. 26, 2005) .......................................................................... 5

81 Fed. Reg. 78,149 (Nov. 7, 2016) ............................................................................ 6

81 Fed. Reg. 95,982 (Dec. 29, 2016) .......................................................................... 5

84 Fed. Reg. 51,310 (Sept. 27, 2019) ....................................................................... 8, 9

87 Fed. Reg. 14,332, (Mar. 14, 2022) .......................................................................... 4

88 Fed. Reg. 20,688 (Apr. 6, 2023) .......................................................................... 5, 9

90 Fed. Reg. 644 (Jan. 6, 2025) ................................................................................. 5

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**OTHER AUTHORITIES**

A. Scalia & B. Garner, Reading Law 127 (2012) ........................................................ 22

Congressional Resarch Service, *The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress* (updated Oct. 22, 2024)............................. 8

Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946 (2020) ............................... 24, 30

*Regulatory Reform Act: Hearings on H.R. 2327 Before the Subcomm. on Admin. Law and Govt'l Relations of the H. Comm. on the Judiciary,* 98th Cong. (1983).................. 28

The White House,, *President Trump Participates in a Bill Signing Ceremony,* YouTube (June 12, 2025) https://www.youtube.com/watch?v=QjakZRoGnxk.................... 31

Waxman,, *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990*, 21 Env't L. 1947 (1991) .................................................... 4x

1

**INTRODUCTION**

2      This Court should deny the motion of Plaintiffs—four vehicle/engine manufacturers and the

3 United States—for a preliminary injunction against nine separate actions of Defendants.

4 Plaintiffs primarily attack the Clean Truck Partnership (CTP)—an agreement these manufacturers

5 (CTP Plaintiffs) voluntarily signed with the California Air Resources Board (CARB) two years

6 ago and now disavow. CTP Plaintiffs effectively ask this Court to immunize them from any

7 consequence of that disavowal, but that request is baseless on its merits, and also inequitable.

8 Moreover, that request is the proper subject of contract claims brought in state court, not the

9 federal claims brought here. The United States' request to enjoin the CTP fares no better. It

10 simply joins CTP Plaintiffs' unavailing claims and fails to explain how the federal government

11 would be harmed if manufacturers honored their freely made commitment to sell clean vehicles in

12 California. The United States feigns injury to what it calls uniform national emissions standards,

13 but that "uniformity" is a myth. California began regulating vehicle emissions even before the

14 federal government. And, by congressional design, this Nation has had *two* sets of new motor

15 vehicle emission standards—EPA's and California's—since the federal government later entered

16 the field.

17      Plaintiffs also attack a subset of California's vehicle emission standards, alleging they are

18 preempted by recently enacted congressional resolutions. Plaintiffs are unlikely to succeed on the

19 merits because those resolutions are invalid, as California is demonstrating in a separate action.

20 But, most significant for immediate purposes, CARB is not currently requiring manufacturers to

21 meet those standards, at least while its challenge to those resolutions is pending. Thus, even if the

22 congressional resolutions were valid, there would be no need for an injunction *now*, particularly

23 since any challenge to possible future enforcement would be both speculative and unripe. Nor

24 could any preliminary injunction provide Plaintiffs with the relief they seek. First, CARB is

25 currently permitting manufacturers to certify to earlier-adopted standards with separate, extant

26 preemption waivers. This Court cannot enjoin certification to standards which are unequivocally

27 not preempted (or even challenged here). This Court thus cannot provide Plaintiffs with the

28 uniform, national standards they desire. Second, only a final, non-appealable judgment (not a

1

1    preliminary injunction) can provide the other result Plaintiffs say they seek: *certainty* that no

2    manufacturer will ever be subject to the standards they challenge.  Should the congressional

3    resolutions be declared invalid in a future final judgment, that will mean they were always invalid

4    and the relevant California standards were always enforceable.  Any preliminary relief awarded

5    now will neither change that nor protect the manufacturers from retroactive enforcement.

6         Plaintiffs also seek to enjoin enforcement of a different requirement (part of the Advanced

7    Clean Fleets regulation) that will first apply *nine years from now* and that CARB has stipulated

8    (in a separate case) it will not enforce unless and until it receives a preemption waiver from EPA.

9    Plaintiffs identify no reason this Court should grant preliminary relief in these circumstances.

10        The rest of CTP Plaintiffs' motion—not joined by the United States—also fails to carry

11   their burden for extraordinary relief.  They challenge California's "Phase 2" standards for

12   greenhouse gas emissions, but those are not being enforced and will not be enforced absent a

13   preemption waiver.  They also challenge a May advisory notice.  But that has been superseded;

14   challenges to it are moot (and were never likely to succeed); and it is no longer injuring anyone

15   (if it ever did).  The Governor's Executive Order N-27-25 (EO) does not regulate Plaintiffs at all;

16   it simply directs state agencies to take various steps and consider certain factors when doing so.

17   Because none of those steps have been taken, all assertions of injuries from the EO are

18   speculative, and all claims against it are unripe.  Each of the manufacturers' scattershot

19   challenges to the EO also fails on its merits, as explained below.

**BACKGROUND**

20

21   **A.    Congress Intentionally Preserved California's Vehicle Emission Control**
           **Program, While Ensuring Manufacturers Face Only Two Such Programs**
22

23        California has long faced severe air quality challenges, including ozone (or smog) pollution,

24   which increases incidences of respiratory ailments; and particulate matter pollution, which can

     lead to heart attacks and premature deaths.  Exhs. A1 at 1-2; A2 at 15-16.[1]  Motor vehicles are
25

26   substantial sources of this pollution.  Cal. Health & Saf. Code § 43000(a).  Accordingly,

27   California has been setting emission standards for new motor vehicles since the 1950s, *Motor &*

28   _____
          [1] Exhibits designated by A, B, and C are attached, respectively, to the Meckenstock, Lang, and Heroy-Rogalski declarations filed simultaneously with this brief.

1  *Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979); and CARB

2  must certify that vehicles meet those standards before they can be sold in the State, Cal. Health &

3  Saf. Code § 43105.

4      Congress began requiring federal vehicle emission standards in 1965 but did not initially

5  preempt the States.  Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).  Two years later,

6  manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory

7  programs."  *MEMA I*, 627 F.2d at 1109.  Acting on this concern, Congress generally preempted

8  States from setting emission standards for new motor vehicles.  But, after "intense debate," *id.*,

9  Congress also required EPA to waive that preemption for California, upon request, absent limited

10  conditions.  Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967).  Congress did so in

11  recognition of "the benefits for the Nation to be derived from permitting California to continue its

12  experiments in the field of emissions control … and the benefits for the people of California to be

13  derived from letting that State improve on 'its already excellent program.'"  *MEMA I*, 627 F.2d at

14  1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)).  In 1977, Congress further expanded

15  California's "discretion in selecting the best means to protect the health of its citizens."  *MEMA I*,

16  627 F.2d at 1110 (quoting H.R. Rep. No. 95-294, at 301-02 (1977)).  Congress also provided

17  other States the option to adopt standards identical to California's as their own, subject to certain

18  conditions.  42 U.S.C. § 7507.  Thus, by congressional design, manufacturers must meet two, but

19  only two, sets of emission standards; and new motor vehicles produced since 1967 have been

20  "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet

21  California's standards."  *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996).

22      The waiver provision requires California to determine that its standards "will be, in the

23  aggregate, at least as protective of public health and welfare as" EPA's.  42 U.S.C. § 7543(b)(1).

24  CARB makes that finding after it adopts new or amended standards and then submits its waiver

25  request to EPA.  59 Fed. Reg. 36,969, 36,982 (July 20, 1994).  Following "notice and opportunity

26  for public hearing," EPA "shall … waive" preemption unless the record evidence supports one of

27  the three limited findings that permit denial.  42 U.S.C. § 7543(b)(1).  As the word "shall"

28  underscores, "Congress intended the State to continue and expand its pioneering efforts at

1    adopting and enforcing motor vehicle emission standards different from and in large measure

2    more advanced than the corresponding federal program; in short, to act as a kind of laboratory for

3    innovation." *MEMA I*, 627 F.2d at 1111.

4        As intended, the federal government has "drawn heavily on the California" laboratory "to

5    fashion and to improve the national efforts at emissions control." *Id.* at 1110.  For example,

6    "California first required automobile manufacturers to install" emission-system monitoring "in

7    new cars sold in the state in 1988—two years before Congress mandated [such systems] in cars

8    sold nationwide." *Motor & Equip. Mfrs. Ass'n v. Nichols* (*MEMA II*), 142 F.3d 449, 454 (D.C.

9    Cir. 1998).  Similarly, the federal emission standards for passenger cars that were "phased in

10   beginning in model year 1994 [were] based on standards adopted in 1989 by the state of

11   California."  Waxman, *Cars, Fuels, and Clean Air: A Review of Title II of the Clean Air Act

12   Amendments of 1990*, 21 Env't L. 1947, 1956 (1991).

13       **B.    California's Recent Efforts to Reduce New Motor Vehicle Emissions**

14       Although the State has made tremendous progress reducing harmful air pollution, including

15   emissions from motor vehicles, more progress is needed.  Exhs. A1 at 1; A3 at 15, 18.  Indeed,

16   several, heavily populated areas in California experience the worst air quality—in terms of ozone

17   and particulate matter—in the country.  Exhs. A4 at 1; A5 at 1.  In one of these areas, the South

18   Coast air basin around Los Angeles, meeting federally mandated ozone standards will require

19   reducing certain emissions *by more than eighty percent* from 2018 levels (already substantially

20   reduced from earlier decades).  Exh. A1 at 14, 24.  To meet those standards, and the State's other

21   air pollution goals, CARB regularly amends and adds to its regulatory program, as technologies

22   advance and new information emerges about air pollution threats.  Lang Decl., ¶¶ 4-14.  For

23   example, in 1990, CARB adopted standards requiring gradually increasing sales of zero-emission

24   passenger cars and light trucks in California.[2]  Cal. Code Regs. tit. 13, § 1960.1(g)(2) (1991).

25   CARB has since amended that aspect of its program multiple times, as these technologies have

26   matured.  *See* 87 Fed. Reg. 14,332, 14,351 & n.168 (Mar. 14, 2022).

27   _____

28       [2] As currently defined, a zero-emission vehicle is one that produces zero exhaust
     emissions of any pollutant—e.g., a battery-electric vehicle.  Cal. Code Regs., tit. 13, § 1963(c).

4

1    CARB built on that success when it adopted the Advanced Clean Trucks (ACT) regulation

2    in 2021, which similarly requires increasing sales of zero-emission vehicles—but in the medium-

3    and heavy-duty sector—beginning with model year 2024.[3]  Cal. Code Regs., tit. 13, § 1963.1(b).

4    EPA waived preemption for ACT in 2023.  88 Fed. Reg. 20,688 (Apr. 6, 2023).  As part of a

5    different regulation (Advanced Clean Fleets), CARB adopted a requirement that all medium- and

6    heavy-duty vehicles sold in California in model year 2036 be zero emission.  Cal. Code Regs., tit.

7    13, § 2016.[4]  EPA has not yet waived preemption for this requirement, and CARB has

8    stipulated—in a court order in another case—that it will not enforce this requirement until it has

9    such a waiver.  Lang Decl., ¶ 22, Exh. A6.

10    At the same time, CARB has required new vehicles with combustion engines sold in the

11    State to reduce emission levels.  For example, in 2001, CARB tightened its standards for

12    emissions of oxide of nitrogen (NOx), a smog precursor, from heavy-duty diesel-powered engines

13    beginning with model year 2007.  Lang Decl., ¶ 6.  EPA waived preemption in 2005.  70 Fed.

14    Reg. 50,322 (Aug. 26, 2005); *see also* Lang Decl., ¶¶ 7-14 (describing other regulations).  CARB

15    tightened these standards again in the Omnibus regulation.  Code Regs., tit. 13, § 1956.8(a)(2)(C),

16    (a)(2)(D).  EPA once again waived preemption.  90 Fed. Reg. 644 (Jan. 6, 2025).

17    CARB also regulates vehicular greenhouse gas emissions.  It began doing so for medium-

18    and heavy-duty vehicles and engines with the 2014 model year, pursuant to a waiver from EPA.

19    81 Fed. Reg. 95,982 (Dec. 29, 2016).  In 2018, CARB adopted more stringent ("Phase 2")

20    greenhouse gas emission standards for these vehicles and engines that aligned with EPA's.  Cal.

21    Code Reg., tit. 13, § 1956.8(a)(7)(A).  CARB has not yet requested a waiver for these standards

22    and is not presently enforcing them.  Lang Decl., ¶ 9.

23    CARB's standards tend to increase in stringency over a set of model years, with the final

24    year's standard applicable to all future years to prevent backsliding.  Lang Decl., ¶ 15.  Thus, for

25    example, the Omnibus regulation established a NOx emission standard that increased in

26

27    [3] Vehicles are classified as medium- or heavy-duty based primarily on their weight.  Cal.
Code Regs., tit. 13, § 1900(b)(6), (b)(13).

28    [4] The Advanced Clean Fleets regulation contains several other components that are not at
issue here.  Lang Decl., ¶¶ 18-19.

1  stringency between model year 2024 and 2027, with the 2027 standard then applicable to all

2  "subsequent" model years.  Cal. Code Regs., tit. 13, § 1956.8(a)(2)(A), (a)(2)(D).

3       Along with emission standards, CARB's program has long required that emission control

4  technologies continue to perform at requisite levels after a vehicle is sold.  Thus, CARB requires

5  on-board diagnostic (OBD) devices that "monitor, control, and record the [engine's] emissions,"

6  "store information about emissions system faults for later retrieval," and "warn drivers of

7  problems through [features such as] 'check engine' lights."  *MEMA II*, 142 F.3d at 453.

8  California has required OBDs in medium- and heavy-duty vehicles sold in the State since model

9  years 1988 and 2010, respectively.  Lang Decl., ¶ 16.  CARB most recently amended the OBD

10  requirements for heavy-duty vehicles (Cal. Code Regs., tit. 13, § 1971.1) and for medium-duty

11  vehicles (*id.* § 1968.2) in 2023.  EPA waived preemption for these requirements, as amended.

12  Exhs. A7 at 3 n.5; A8 at 3 n.4.[5]  A prior EPA waiver covered OBD amendments through 2013.

13  81 Fed. Reg. 78,149 (Nov. 7, 2016).

14       **C.   The Clean Truck Partnership Provides Parties with Increased Certainty**

15       In 2023, several manufacturers of medium- or heavy-duty engines and vehicles (including

16  CTP Plaintiffs) and their trade association (the Engine Manufacturers Association (EMA)) signed

17  the CTP with CARB.  Exh. C1.  All parties sought to reduce or resolve uncertainties they faced.

18  For their part, the manufacturers wanted assurances that CARB would provide four years of "lead

19  time" before future heavy-duty vehicle standards would apply.  Heroy-Rogalski Decl. ("CTP

20  Decl."), ¶¶ 8-12.  The manufacturers also wanted certainty that CARB would consider certain

21  amendments to existing CARB regulations, including greater alignment between state and federal

22  NOx standards beginning with model year 2027.  *Id.*  For its part, CARB wanted greater certainty

23  that vehicle emissions in California would be reduced, as required to protect public health and

24  meet federal air quality standards.  *Id.* ¶ 15.  CARB was well aware of the risk that the

25  manufacturers might challenge these emission standards or any waiver granted for them.  *Id.*

26  ¶¶ 13-14.  CARB was also aware that other parties might bring suits and that manufacturers might

27       [5] California thus *has* "obtained a waiver for its [OBD] standards at section 1971.1 since
2016."  *Contra* ECF 23 (Mot.) 7:5.  And these OBD requirements should not be enjoined for the

28  same reasons as the Advanced Clean Cars II and Omnibus regulations.  *Infra* Argument II.

1    support those efforts—whether through amici briefs, declarations, or public statements opposing

2    the regulations.  *Id.* ¶ 14.  CARB sought to reduce these risks and increase the certainty that

3    cleaner vehicles would be sold in California.  *Id.* ¶ 15.

4          The parties' negotiations culminated in the CTP, which was fully executed by July 5, 2023.

5    Exh. C1.  CARB agreed to provide manufacturers four years of lead time in future heavy-duty

6    vehicle regulations.  *Id.* at 1; CTP Decl., ¶¶ 23, 30.  CARB also agreed to commence

7    consideration of certain amendments to its existing regulations by specified dates.  Exh. C1 at

8    App. B.  EMA and the manufacturers promised not to bring legal challenges to the Omnibus,

9    ACT, or Advanced Clean Fleets regulations, and to refrain from supporting challenges brought by

10   others.  *Id.* at App. D, ¶ A.  The manufacturers also agreed to sell clean vehicles in California

11   consistent with the Omnibus and ACT regulations, and with the 2036 requirement in Advanced

12   Clean Fleets, regardless of CARB's authority to enforce those regulations.  *Id.* at App. D, ¶ B.

13         After signing the CTP, EMA issued a press release stating that "[t]his agreement reaffirms

14   EMA's and its members' longstanding commitment to reducing emissions and to a zero-

15   emissions commercial vehicle future."  Exh. C3 at 1.  EMA also asserted the CTP "demonstrates

16   how EMA and CARB can work together to achieved shared clean air goals" and highlighted the

17   CTP's benefits for EMA's members, including "lead time and stability" and "regulatory

18   changes."  *Id.*  Several CTP Plaintiffs also directly lauded the agreement, touting the "regulatory

19   certainty" it would provide and the "cooperative effort[]" it reflected.  *Id.* at 2, 3.

20         **D.    The Congressional Review Act Provides Fast-Track Review of Generally
                   Applicable Federal *Rules***

21         In 1996, the push for federal regulatory reform evolved into what became a broad,

22   bipartisan bill—the Contract with America Advancement Act of 1996.  Pub. L. 104-121, 110 Stat.

23   847 (Mar. 29, 1996).  That Act contained an increase to the Nation's debt limit and an increase to

24   the amount of income Social Security recipients may earn without losing benefits.  110 Stat. at

25   847, 875.  It also included a component known as the Congressional Review Act (CRA).  The

26   complete bill passed the House by a bipartisan vote and then passed the Senate, without

27   amendment, by unanimous consent.  142 Cong. Rec. S3114 (Mar. 28, 1996).

28

1    The CRA applies only to federal "rule[s]," as that term is defined in the statute.  5 U.S.C.

2    § 804(3).  "Before a rule can take effect," the promulgating agency must submit a report to

3    Congress and the Government Accountability Office (GAO).  *Id.* § 801(a)(1)(A).[6]  If an agency

4    does not submit an action, any member of Congress may ask the GAO to opine on whether the

5    action is a "rule" subject to the CRA. Cong. Rsch. Serv., *The Congressional Review Act:*

6    *Determining Which "Rules" Must Be Submitted to Congress* 23 (updated Oct. 22, 2024) ("CRS

7    Report").  If the GAO concludes the action is a rule, Congress treats it as such for CRA purposes.

8    *Id.*  Congress can disapprove of rules subject to the CRA through resolutions adopted using

9    expedited and extraordinary procedures.  Motions, amendments, and even debate over such

10   resolutions are severely limited.  5 U.S.C. §§ 802(d)(1), 802(d)(2).  And the Senate's 60-vote

11   cloture rule, commonly known as the filibuster, does not apply.

12       The CRA operated in this way from 1996 until earlier this year.  Agencies frequently

13   submitted rules prior to their effective dates.  CRS Report 21.  When they did not, members of

14   Congress sought and relied upon GAO opinions as to whether an agency action was a "rule." *Id.*

15   at 26, 31-35.  And, until the resolutions at issue here, neither House of Congress had used

16   extraordinary procedures to disapprove of agency action in the face of controversy about whether

17   it was a "rule," unless the GAO independently concluded it was.  *See id*. at 26.

18       Through Administrations of both parties, EPA has consistently maintained that its Clean

19   Air Act preemption waiver decisions are not "rules" under the Administrative Procedure Act

20   (APA) or CRA because they merely adjudicate whether EPA "shall" grant California's request

21   for a waiver of preemption under the Clean Air Act's statutory criteria.  EPA has thus maintained

22   that waivers are not subject to a host of requirements that apply only to rules—including the

23   CRA.  *E.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The CRA does not apply … because

24   this action is not a rule."); 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is

25   not a rule ..., consistent with its previous actions on waiver requests.").  The GAO agreed,

26   concluding that a preemption waiver is an "order," rather than a "rule," because it is "a 'final

27   _____

28   [6] "The GAO is an independent agency within the legislative branch that exists in large part
     to serve the needs of Congress."  *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983).

disposition' granting California a 'form of permission' which meets the definition of order under APA." Exh. A9 at 5 (quoting 5 U.S.C. § 551(6), (8), (9)). Following that GAO conclusion, members of the House and Senate introduced bills—which never got out of committee—to repeal the Clean Air Act's waiver provision, explaining they believed the bills were necessary because these waivers are not "*rule[s]* as that term is defined in the CRA" and "cannot be reviewed under" its expedited procedures. Exh. A10 n.3; *see also* Exh. A11 at 1.

### E.    The Federal Government Mounts an Unprecedented Attack on California's Program

When it finalized the waivers for the ACT, Omnibus, and Advanced Clean Cars II amendments to California's program, EPA reiterated its longstanding position that preemption waivers are not rules. *E.g.*, 88 Fed. Reg. 20,688, 20,725-26 (Apr. 6, 2023). Accordingly, EPA did not submit these waivers to Congress in April 2023 or December 2024 when they were signed. Exh. A15 at 5. No member of Congress sought a GAO determination. *See id.*

Instead, after the change in Administrations, President Trump and EPA Administrator Zeldin declared in a press release, without process or explanation, that these three waivers were actually rules subject to the CRA. Exh. A12 at 1. EPA later submitted the notices of these waiver decisions to Congress and the GAO. Exhs. A13 at 1, 3-4; A14 at 1, 2; A16 at 1, 3. EPA provided no administrative process or explanation for its change in position. *See* Exh. A15 at 5-6.

The previous Trump Administration had also taken issue with parts of a preemption waiver granted to California and had purported to withdraw those parts through an administrative proceeding. 84 Fed. Reg. 51,310 (Sept. 27, 2019). Although a day-one Executive Order suggested this Administration would take that path again, Exh. A17 § 3(b), advocates urged the use of the CRA because "the administrative process" could "take years … and ordinary legislation … would have to overcome the 60-vote filibuster in the Senate." Exh. A18.

Waiver opponents in Congress cheered EPA's purported reclassification and submission, announcing "[Zeldin] submitted it to us [so] we can take it down." Exh. A26 at 2. But, in response to a request from other members, the GAO once again concluded that the CRA is inapplicable to preemption waivers because they are not "rules" as the CRA defines that term.

Exh. A15 at 7-8.  The Senate Parliamentarian—the nonpartisan arbiter of Senate rules—agreed.  Exh. A27.  Congressional leadership then jumped through unusual—even extraordinary—procedural hoops to attempt to apply the CRA to these waivers, including adopting the remarkable position that:  "When an Agency says [something] is a rule," it is.  119 Cong. Rec. S3017, S3140 (May 21, 2025) (Sen. Lankford).  In other words, EPA's post-hoc and unexplained about-face from its consistent position that waivers are not rules was sufficient to determine that expedited procedures could apply.

On May 22, 2025, the Senate passed the Resolutions (which had previously passed the House) with votes of 51-45 (H.J. Res. 87, ACT), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus).  On June 12, 2025, the President signed the Resolutions.

### F. California Responds to the Extraordinary Uncertainty the Federal Government Introduced into the State's Longstanding Program

On May 23, 2025, after Congress passed the Resolutions but before the President signed them, CARB issued Manufacturers Advisory Correspondence ECCD-2025-03 to provide initial and "necessary guidance" in light of Congress's actions.  Exh. B1 (May MAC) at 1.  CARB noted that model year 2026 certifications were already "well underway" and indicated it would "continue to accept and process certification applications" for that model year in order "to provide certainty to affected parties and consumers, provide consistent treatment of regulated entities, maintain stability in the market, [and] enable lawful vehicle sales in California."  *Id* at 2.  This would also allow manufacturers to meet their commitments under the CTP.  *Id.*  CARB indicated that additional information would be forthcoming.  *Id.*

After the President signed the Resolutions, on June 12, 2025, Governor Newsom issued Executive Order N-27-25 (EO), reaffirming the State's commitment to reducing air pollution.  ECF 23-17 (EO).  The EO directs CARB to begin developing new regulations, *id.* at ¶ 2, and to "identify, maintain, and update publicly available lists of" manufacturers and fleets that choose to follow the regulations targeted by the Resolutions, *id.* at 3.  The EO further directs CARB and other state agencies to align state vehicle procurement and state-funded incentives with those

lists, and directs CARB to "explore opportunities for special considerations and flexibilities for listed manufacturers and fleets" as part of its consideration of future regulations. *Id.* at ¶ 3.

On August 25, 2025, CARB provided the "further clarity" about its certification processes that it had promised, issuing a new, superseding Manufacturers Advisory Correspondence (August MAC). Exh. B2 at 2. CARB recognized that the intervening enactment of the Resolutions had created "unprecedented uncertainty" in California's vehicle market, prompting more manufacturer questions. *Id.* at 1-2. The August MAC clarifies there are three pathways to obtain the requisite approval from CARB to sell vehicles or engines in the State:

- Manufacturers may certify to the ACT, Omnibus, and Advanced Clean Cars II standards—i.e., the standards for which waivers were targeted by the Resolutions.
- Manufacturers may certify to earlier-adopted California standards that were applicable to all future model years when promulgated and have extant preemption waivers not subject to the Resolutions.
- Manufacturers may demonstrate that they have obtained EPA certification to applicable federal standards, as currently codified.

*Id.* at 2-3. While the August MAC states that manufacturers who choose the second or third options may be subject to enforcement action, including for interim model years, if the Resolutions are ultimately declared invalid, it also makes clear that CARB will decide whether or not to pursue such enforcement when and if "that question becomes ripe." *Id.* at 3.

On September 15, 2025, CARB issued a notice of emergency rulemaking to confirm that its earlier-adopted standards remain operative, as described in the August MAC, "until a court resolves the uncertainty created by the federal government's actions." Exh. B3 at 3. CARB intends to proceed to adopt these same regulations through non-emergency procedures during the 180 days that an emergency regulation may remain in effect. Lang Decl., ¶ 48.

### G.    Procedural History

CTP Plaintiffs filed suit on August 11, 2025. ECF 1. They submitted a preliminary injunction motion on all claims the next day, along with a motion to file an overlength brief. ECF 22, 23. The Court permitted the filing on August 13. ECF 36.[7] The United States moved to

---

[7] Plaintiffs filed this motion before any response to the Complaint. Defendants reserve their rights to present all affirmative defenses at the appropriate time, even if not presented here.

1  intervene.  ECF 43.  This Court granted that motion and set a briefing and hearing schedule for

2  the preliminary injunction, after considering the parties' competing schedule proposals.  ECF 54.

3  The United States joined that motion in part, only as to the preemption challenges to the CTP and

4  the ACT, Advanced Clean Fleets, and Omnibus regulations.  ECF 57.[8]  One Plaintiff, alone,

5  sought to expedite the hearing on that motion, ECF 64, and the Court denied that request, ECF 71.

6  **STANDARD OF REVIEW**

7  "A preliminary injunction is … an extraordinary remedy that may only be awarded upon a

8  clear showing that the plaintiff is entitled to such relief."  *California v. Azar*, 911 F.3d 558, 575

9  (9th Cir. 2018) (cleaned up).  "A party can obtain a preliminary injunction by showing that (1) it

10 is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of

11 preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public

12 interest."  *Id.*  "When the government is a party, the last two factors merge."  *Id.*  In the event a

13 movant makes all four showings clearly, the scope of the preliminary injunction "must be no

14 broader and no narrower than necessary to redress the injury shown."  *Id.* at 584.

15 **ARGUMENT**

16 Between them, Plaintiffs seek to enjoin (1) the CTP, (2) regulations they allege have been

17 preempted by congressional resolutions, (3) a sales requirement applicable beginning in model

18 year 2036, (4) greenhouse gas standards, (5) the May MAC, and (6) EO N-27-25.  To obtain

19 relief, Plaintiffs must meet their burdens for the extraordinary relief they seek *as to each action or*

20 *set of actions* they challenge.  They have not done so for any of them.

21 **I.    THE CTP SHOULD NOT BE PRELIMINARILY ENJOINED**

22 **A.    The CTP Is Not Irreparably Injuring Plaintiffs and the Equities Do Not
           Remotely Favor Them**

23

24 The United States identifies no injury to it from the CTP.  ECF 57 (US Br.) 2-4 (alleging

25 harms from "laws" and "regulations").  And no Plaintiff can claim—much less demonstrate—that

26 the CTP is adversely affecting "decisions about the type and quantity of vehicles" to sell because

27 each of the CTP Plaintiffs has publicly affirmed that it will make those decisions "without regard

28 _____
   [8] Defendants do not seek to present oral testimony, unless Plaintiffs offer such testimony,
   and anticipate that 120 minutes will be required for the hearing.

1    to whether those decisions are compliant with any restrictive terms of the CTP." Exhs. C3-C7.

2    CTP Plaintiffs face no "Hobson's choice," Mot. 30:3, or harm from "continu[ing] to comply," *id.*

3    at 29:14. They have made their choice and do not intend to comply. These CTP signatories may

4    wish to avoid a suit for breach or other consequences of disavowing their commitments. *See* ECF

5    23-25 (Proposed Order) at 1. But they cannot do so by seeking a preliminary injunction on

6    unrelated legal theories. *Garcia v. Google, Inc.*, 786 F.3d 733, 737 (9th Cir. 2015) (denying

7    preliminary injunction due, in part, to "mismatch" between claim asserted and relief sought).[9] In

8    any event, as CTP Plaintiffs themselves recognize, parties are not irreparably injured by terms to

9    which they agreed. *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1130 (9th Cir. 2024); Mot.

10   30:8-9.

11       CTP Plaintiffs' myriad attempts to evade that conclusion are unavailing. They first suggest

12   this principle applies only to "private contracts" but cite no authority. Mot. 30:10. Next, they

13   claim their decision to join the CTP was not "truly voluntary" because it was "the only way" they

14   could "obtain [the] lead time, to which they were entitled under the Clean Air Act." *Id.* 30:15-25.

15   But, as these Plaintiffs know, there is another way to bring Clean Air Act claims: a petition for

16   judicial review. 42 U.S.C. § 7607(b); *Engine Mfrs. Ass'n*, 88 F.3d at 1078. CTP Plaintiffs

17   wanted assurance that their proposed amendments to existing regulations would be considered

18   and that future regulations would provide Plaintiffs' preferred lead time. Exh. C1 at 2 ¶ 5; CTP

19   Decl., ¶¶ 9–12. They got the consideration they bargained for, and that is the essence of a

20   voluntary agreement. Their citations to inapposite cases concerning coercive land-use regulation,

21   *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013), and waivers of sovereign

22   immunity, *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 668

23   (1999), only highlight the absence of any support for this involuntariness claim. Mot. 30:17-22.

24       CTP Plaintiffs finally try arguing that the agreement does not mean what it says—that they

25   "did not agree" to sell vehicles and engines in California consistent with ACT, Omnibus, and

26

---

27       [9] CTP Plaintiffs appear to assert that CARB breached the CTP. Mot. 31:19-32:6; *but see*
     CTP Decl., ¶¶ 30-31. They can attempt to seek contract remedies in a proper forum but cannot
28   obtain a preliminary injunction on any theory advanced here. Their repeated citations to a state
     law contract case only underscore the point. Mot. 31:21-23, 33:2-4.

13

1   Advanced Clean Fleets if those regulations were preempted. *Id.* at 30:26, 31:12-18. But that is

2   *precisely* what they agreed to do "irrespective of the outcome of any litigation challenging the

3   waivers … or of CARB's overall authority to implement." Exh C1 at 2 ¶ 2. That term

4   contemplates the possibility of preemption, which could be an outcome of litigation challenging a

5   preemption waiver and is also the most obvious reason CARB might lack authority.[10]

6       CTP Plaintiffs should not be heard to cry irreparable injury from an agreement they

7   voluntarily entered into two years ago; and the balance of the equities certainly does not support

8   relief for the party that comes with unclean hands, having disavowed any intent to honor their

9   agreement's terms. *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985), *abrogated

10  on other grounds by Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1527 (9th Cir. 1993).

11      **B.    Plaintiffs' Challenges to the CTP Fail**

12          **1.    The CTP Is Not Preempted**

13      The Clean Air Act does not preempt the sales commitments CTP Plaintiffs entered into

14  voluntarily. "[F]ederal preemption is generally confined to formal state laws and regulations and

15  not applicable to contracts and other voluntary agreements" like the CTP that, by definition, are

16  not "command[s]." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 208

17  F.3d 1, 7 (1st Cir. 2000) (citing *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 (1995)).[11] And

18  Section 209(a) of the Clean Air Act was "intended to govern formal regulations adopted by the

19  states, rather than voluntary and cooperative agreements between the states and automakers." *Id.*

20      The analysis is no different because a public entity is party to the CTP.   Contracts with

21  the government *may* be subject to preemption when they "result[] not from ordinary bargaining

22  … but instead from the threat of criminal sanctions," *Am. Trucking Ass'ns, Inc. v. City of Los

23  Angeles*, 569 U.S. 641, 650-51 (2013), or are enforceable in ways only available to governmental

24  actors, *Airlines for Am. v. City & Cnty. of San Francisco*, 78 F.4th 1146, 1147 (9th Cir. 2023).

25  But Plaintiffs do not and cannot claim either is true here, and cannot establish that these

26      _____
        [10] CTP Plaintiffs' contention that the "newly amended" ACT is a regulation they "never
27  agreed to follow" is equally specious. Mot. 30:5-6. The ACT amendments are "any agreed upon
    modifications." Exh. C1 ¶ 2; CTP Decl., ¶ 30.
        [11] Plaintiffs' claim that the CTP is a preempted attempt to enforce the ACT and Omnibus
28  standards fails for the additional reason those standards are not preempted. *Infra* II.B.

1    commitments were not entered into voluntarily. *Infra* 15:18-22; *see also* CTP Decl., ¶¶ 8-29.

2            **2.    The CTP Does Not Violate the First Amendment**

3            CTP Plaintiffs are unlikely to succeed on their First Amendment challenge to the

4    agreement because the Court lacks jurisdiction over that claim.  CTP Plaintiffs point to state

5    regulatory proceedings during which they claim their trade association, EMA, would have spoken

6    differently absent the CTP.  Mot. 21:13-27; ECF 23-4 (Mandel Decl.) ¶¶ 9-11.  There is no

7    remedy for that both because the speech cannot be retroactively altered and because the Eleventh

8    Amendment forbids retrospective relief here.  *See Ex parte Young*, 209 U.S. 123, 150 (1908); *Los*

9    *Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  CTP Plaintiffs nowhere

10   suggest that additional States might open relevant rulemakings, so claims of future chilled speech

11   are speculative and unripe.  *See Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174-75 (9th Cir. 2022).

12   Moreover, any claim of ongoing violation of CTP Plaintiffs' First Amendment rights is undercut

13   by their public disavowal of the agreement, Exhs. C4-C7, and their filing of this very lawsuit.

14           In any event, voluntary relinquishment of constitutional rights is "permissible, so long as

15   appropriate safeguards are attached."  *Powell v. SEC*, No. 24-1899, 2025 WL 2233792, at *5 (9th

16   Cir. Aug. 6, 2025).  More specifically, First Amendment rights "may be waived upon clear and

17   convincing evidence that the waiver is knowing, voluntary, and intelligent," as is the case here.

18   *Id*.; *see also* CTP Decl., ¶¶ 18-23.  CTP Plaintiffs are "sophisticated players" with access to

19   experienced counsel.  *Powell*, 2025 WL 2233792, at *9; *see also Leonard v. Clark*, 12 F.3d 885,

20   890 (9th Cir. 1993).  Indeed, EMA's President claims he "was in charge of negotiating the CTP"

21   on the manufacturers' behalf, and he is a partner and founding member of a Chicago law firm.

22   Mandel Decl., ¶¶ 4-6.  CTP Plaintiffs also have experienced in-house attorneys.  *E.g.*, Exhs. A19

23   at 8; A20 at 1-2; A21 at 1.  If these Plaintiffs felt their First Amendment rights were "burdened"

24   by the CTP, they "should not have bargained them away."  *Leonard*, 12 F.3d at 890.[12]

25           Because CTP Plaintiffs' waiver was knowing, voluntary, and intelligent, it is enforceable

26   so long as CARB had a "legitimate reason" for including it in the agreement.  *Davies v.*

27   _____

            [12] Plaintiffs' reliance on *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 548
28   (2001) is misplaced because CARB did not "impose" any rule or condition insulating the CTP
     from judicial challenge; instead, Plaintiffs voluntarily waived their First Amendment rights.

                                              15

1    *Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991).  "A legitimate reason

2    will almost always include a close nexus—a tight fit—between the specific interest the

3    government seeks to advance … and the specific right waived."  *Id.*  *Leonard* upheld a limited

4    waiver of presumed First Amendment rights in a collective bargaining agreement between a city

5    and a union where the relevant provision did "not ban *all* Union speech."  12 F.3d at 891.

6    Because the waiver only affected endorsements of payroll-increasing legislation, it was "narrowly

7    tailored to achieve the City's goal of budgetary predictability."  *Id.*  The Union remained "free to

8    endorse legislation" on other topics, such that "the public policy in favor of the Union's

9    completely unfettered freedom of expression" did not outweigh "the public interests in the finality

10   of collective bargaining agreements and the predictability of municipal budgets."  *Id.* at 891-92.[13]

11        So, too, here.  The CTP does not ban *all* of these Plaintiffs' speech.  In exchange for

12   CARB's agreement to consider CTP Plaintiffs' desired amendments to certain regulations, these

13   Plaintiffs waived their rights to challenge those same regulations, including indirectly—*e.g.*, with

14   public comments opposing adoption by other States.  *See* Exh. C1 ¶¶ 3-4, App. B, App. D.  Even

15   then, CTP Plaintiffs were free to provide comments to those States on key implementation

16   issues—and in fact claim to have done so.  *See id.* App. D ¶¶ D-E; Mandel Decl. (attaching

17   comments).  These Plaintiffs also remained free to challenge and oppose future CARB

18   regulations.  These "narrowly tailored" restrictions furthered CARB's legitimate interest in

19   ensuring its negotiating partners would not upend the agreed-upon program, achieving the same

20   sort of stability the City sought in *Leonard*.  Such stability would, in turn, ensure "significant

21   reductions of air pollutants," Exh. C1—an interest of CARB's that has not waned, *see* Mot. 19:6-

22   8.  This stability would also allow the agency to focus on implementing the negotiated

23   amendments, rather than defending its program.  CTP Decl., ¶ 31.

24            **3.    The State Law Challenges to the CTP Are Barred and Fail**

25        CTP Plaintiffs also seek to enjoin the CTP based on allegations that it violates the

26   California Constitution, Article I, Section 3, Mot. 22:12-23:19, and the California APA, *id.* at

27   _____
     [13] CTP Plaintiffs' interest in unrestricted public expression is not "of the highest order"
28   because it does not implicate the fundamental constitutional "right of the people to elect
     representatives of their own choosing to public office."  *Davies*, 930 F.2d at 1397.

23:20-26:1.  But "the Eleventh Amendment deprives federal courts [of] jurisdiction to order state actors to comply with state law." *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)); *see also Actmedia, Inc. v. Stroh*, 830 F.2d 957, 964 (9th Cir. 1986) (free speech claim), *abrogated on other grounds*, *Retail Dig. Network, LLC v. Prieto*, 861 F.3d 839 (9th Cir. 2017); *Jamgotchian v. Ferraro*, No. 8:22-cv-01893, 2023 WL 5420311, at *5 (C.D. Cal. July 19, 2023) (underground regulation claim under California APA), *rev'd and remanded on other grounds*, 93 F.4th 1150 (9th Cir. 2024).  Defendants have not "unequivocally" waived immunity.  *Doe v. Regents of the Univ. of Cal.*, 891 F.3d 1147, 1152 (9th Cir. 2018).

Even if jurisdiction lies, CTP Plaintiffs' claims also fail on the merits.  The CTP does not violate the California Constitution because (1) CTP Plaintiffs' waiver of their right to challenge specific CARB regulations is "reasonably related" to CARB's compelling interests; (2) "the public value of imposing the condition manifestly outweighs its burden on constitutional rights"; and (3) "there are no less restrictive means to achieve" CARB's goals.  *San Diego Cnty. Water Auth. v. Metro. Water Dist. of S. Cal.*, 12 Cal. App. 5th 1124, 1160 (2017).  The CTP's narrow waiver is closely tied to CARB's legitimate interests in providing stability, reducing emissions, and conserving agency resources to focus on the negotiated amendments.  There are no "less restrictive" means by which CARB could achieve these objectives because the limited waiver is already precisely tailored to them.  *Supra* I.B.2.

CTP Plaintiffs' challenge under the California APA likewise fails.  Plaintiffs assert the CTP is a "regulation" under California law because the agreement contemplates CARB will continue implementing it, even if the referenced standards are preempted.  Mot. 24:23-25:3.  But whether a state agency has established a state law rule without appropriate procedures does not turn on federal preemption.  Moreover, Plaintiffs' obligations under the CTP derive from promises they themselves made in a "contract which [they] ultimately signed."  *City of San Joaquin v. State Bd. of Equalization*, 9 Cal. App. 3d 365, 375 (Ct. App. 1970).  Such promises are not regulations, *id.*, especially when they only bind those that voluntarily signed the agreement, *cf. Vasquez, v. Dep't of Pesticide Regul.*, 68 Cal. App. 5th 672, 689-90 (Ct. App. 2021) (MOU governed non-party

1   conduct).  The CTP binds only the signatories to it, not every manufacturer of heavy-duty

2   vehicles, *contra* Mot. 24:19-20, much less every vehicle manufacturer subject to CARB's

3   certification program.  CTP Decl., ¶ 25.  Plaintiffs have not remotely established that CARB has

4   imposed new regulatory obligations without rulemaking.  *Cf. Vasquez*, 68 Cal. App. 5th at 691

5   (numeric cap on pesticide use was a regulation because it made statute more specific).

6   **II.    THE ACT, OMNIBUS, AND ADVANCED CLEAN CARS II REGULATIONS SHOULD NOT
        BE PRELIMINARILY ENJOINED**

7

8        **A.    Plaintiffs Have Not Established Injuries from These State Laws that a
            Preliminary Injunction Can Redress or Equities that Favor Their Request**

9        Plaintiffs' request for a preliminary injunction against the enforcement of ACT, Omnibus

10  and parts of the Advanced Clean Cars II regulations[14] fails because CARB is not currently

11  enforcing those regulations; because the prospect of future enforcement is speculative; and

12  because any injury from regulatory uncertainty cannot be redressed by interim relief.

13       To sell their vehicles or engines in California, manufacturers *may* request that CARB

14  certify to the Advanced Clean Cars II, ACT, or Omnibus regulations (and the amended OBD

15  requirements contained therein).  August MAC at 2.  But manufacturers may also sell vehicles in

16  California that are (1) certified by CARB to earlier-adopted CARB standards (which are not

17  preempted) or (2) certified by EPA to currently applicable federal standards.  *Id*.  Manufacturers

18  thus need not incur costs now to comply with the standards they claim are preempted, Mot 28:3,

19  and are not "barred from selling their products in California" absent that compliance, *id.* at 28:18-

20  19, 33:23-34:13.[15]  The United States' asserted *parens patriae* injuries derive from CTP

21  Plaintiffs' asserted harms, U.S. Br. 3:21-4:5, and fail with them.

22       The United States also asserts "'per se irreparable harm' to [itself] when States attempt

23  to … enforce preempted laws," *Id.* at 3:1-2, but no such enforcement is occurring here.[16]  And

24       [14] The United States seeks no injunction against any part of the Advanced Clean Cars II
    regulation.  US Br. 18:21.  CTP Plaintiffs seek only to enjoin the portions of that regulation that
25  apply to medium- or heavy-duty vehicles.  Mot. 6:6-19.
         [15] CTP Plaintiffs will incur costs to obtain approval to sell in California, as they have for
26  decades, but an injunction against *these* California standards will not avoid those costs because
    other standards and the approval requirement would remain.  *See* Lang Decl., ¶ 38.
27       [16] CTP Plaintiffs identify no binding precedent for their dubious assertion that private
    parties experience per se injury and are "entitle[d] … to equitable relief" merely from being
28                                                                                    (continued…)

1    manufacturers face no danger of federal enforcement "if they continue to comply with [these

2    standards]," *id.* at 29:13-14, because that compliance is not currently required.  Plaintiffs also fail

3    to identify a charge that could be brought against manufacturers for selling vehicles that *meet or*

4    *exceed* federal emission standards, *id.*; *see also*, *e.g.*, ECF 23-19 (US DOJ letter).

5         Even if CARB were currently enforcing these regulations, manufacturers failed to seek this

6    relief in time to prevent the primary harms they allege:  costs associated with certification for

7    model year 2026 vehicles and engines.  Mot. 27:26-28:8; *see id.* 28:1-2 (costs incurred before suit

8    filed); *id.* at 27:27-28:1 (asserting further harm "within a matter of weeks").  Plaintiffs could have

9    sought relief as early as June 12, 2025, when the President signed the Resolutions.  *See California*

10   *v. United States*, No. 3:25-cv-04966 (N.D. Cal.) (filed that day).  Instead, most CTP Plaintiffs

11   have been submitting model year 2026 certification applications and fees, consistent with prior

12   years.  Lang Decl., ¶ 33.  Plaintiff DTNA appears to have chosen to delay its submissions, ECF

13   70-1 ¶ 15, despite its earlier assertion that it "must begin" "by mid-August" (when it filed suit),

14   ECF 23-15 ¶¶ 8, 11.  But that delay does not change the fact that all manufacturers (DTNA

15   included) have a pathway to sell in California without certifying to standards they claim are

16   preempted.  A preliminary injunction against the challenged standards will not change the

17   availability, cost, or timing of that pathway.  And the same is true for model year 2027

18   certifications, to the (minimal) extent CTP Plaintiffs rely on those.  Mot. 28:10-11.[17]

19        The August MAC does reserve CARB's rights to enforce the challenged regulations "in the

20   event a court of law holds [the congressional] resolutions invalid, including with respect to model

21   years" in which manufacturers opted to certify under an alternative pathway.  Aug. MAC at 3.

22   But that reservation does not support preliminary relief now.  Any future injury is speculative as it

23   depends on both litigation outcomes (whether the Resolutions are invalidated) and future choices

24   by CARB (whether CARB then elects to enforce for model years that passed during that

25   litigation).  *Id.*; *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988)

26   subject to an allegedly preempted regulation.  Mot. 27:9-10.  *Cal. Pharm. Ass'n v. Maxwell-Jolly*,
     563 F.3d 852-53 (9th Cir. 2009) addressed statutory violations, not preemption, and considered

27   those only under the public interest prong, after finding *economic* injury, *id.* at 851-52.

          [17] DTNA claims it needs relief by October 31, 2025 for model year 2026 certifications,
28   ECF 70:2-3, belying any claim that extraordinary relief is needed *now* for model year 2027.

                                                    19

1    (declining to find injury where "[m]ultiple contingencies must occur" first).  Indeed, "[i]ssuance

2    of a preliminary injunction would do little to redress" concerns about future enforcement because

3    the legal status of these regulations "will remain uncertain until judgment has been entered on the

4    merits."  *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966-67 (9th Cir. 1983); *see also Ray v.*

5    *County of Los Angeles*, 935 F.3d 703, 715 (9th Cir. 2019) (requiring retroactive compliance with

6    federal rule despite earlier vacatur by district court).

7         By contrast, Defendants and the public interest would be harmed by any injunction that

8    interfered with CARB's acceptance of voluntary certifications to these standards.  That would

9    discourage clean-vehicle production and increase emissions, threatening public health and

10   complicating the State's compliance with federal air quality standards.  If manufacturers who are

11   not plaintiffs here wish to obtain certification to these standards—for their own business

12   reasons—the public interest is served by CARB remaining free to process those requests.

13        **B.    Plaintiffs' Challenge to the Regulations Is Not Likely to Succeed Because
              the Allegedly Preempting Resolutions Are Unconstitutional**

14

15        In considering Plaintiffs' request for a preliminary injunction, this Court "must not hesitate"

16   to set the Resolutions aside, as they are unconstitutional.  *United States ex rel. Kelly v. Boeing*

17   *Co.*, 9 F.3d 743, 750 (9th Cir. 1993).  They breach the separation of powers in multiple respects

18   and also violate the Tenth Amendment and the structural principles of federalism.  Each of those

19   problems stems from the proposition—so clear that no one thought to question it until recently—

20   that waivers of statutory preemption that EPA issues to California are not "rules" that could be

21   subject to the CRA.  For the same reason, the CRA does not bar judicial review of Defendants'

22   arguments here.  All of Plaintiffs' claims based on the Resolutions are likely to fail.

23        **1.    The CRA Does Not Bar Defendants' Challenges to The Resolutions**

24        Section 805 of the CRA prohibits judicial review of any "determination, finding, action, or

25   omission under this chapter."  5 U.S.C. § 805.  That prohibition lacks the clear statement needed

26   to foreclose a constitutional challenge.  *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553,

27   561 (9th Cir. 2019).  Indeed, Section 805 does not forbid *any* challenges to the Resolutions since,

28   as discussed below, the Resolutions were not "action[s] … under" the CRA.  5 U.S.C. § 805.

To be "actions under" the CRA, the Resolutions would have to satisfy the narrow, multipart definition of "joint resolution of disapproval, described under section 802." *Id.* § 801(b)(1).

> "[J]oint resolution" means only a joint resolution [of text set out verbatim in the statute] introduced in the period beginning on the date on which the report referred to in section 801(a)(1)(A) is received by Congress and ending 60 [legislative] days thereafter ….

*Id.* § 802(a). The Resolutions meet the first half of that definition, as they recite the cookie-cutter language after their resolving clauses. But they do not meet the second half because Congress did not receive "the report[s] referred to in section 801(a)(1)(A)." *Id.* EPA sent Congress reports that *claimed* to be section 801(a)(1)(A) reports, but an *actual* section 801(a)(1)(A) report must involve a "rule." *Id.* § 801(a)(1)(A) ("[T]he Federal agency promulgating such *rule* shall submit to each House of Congress … a report containing … a copy of the *rule*; a concise general statement relating to the *rule* …; and … the proposed effective date of the *rule*." (emphases added)). Absent a "rule," there can be no qualifying "report," and thus no qualifying "joint resolution."

"[A] waiver granted under" Section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b)(1), is not a "rule" as defined in Section 804(3) of the CRA. That definition draws from the APA, which divides administrative proceedings into rulemakings and adjudications. Adjudications include all forms of licensing. *See* 5 U.S.C. § 551(6), (7). "'[L]icensing' includes agency process respecting the grant," *id.* § 551(9), of an "approval, … statutory exemption or other form of permission," *id.* § 551(8). That definition perfectly fits a waiver, which *approves* a request made by an individual party (the State) for a *statutory exemption* from "application of" Section 209 of the Clean Air Act. 42 U.S.C. § 7543(b)(1). An EPA waiver is a *form of permission* for California to enforce its laws. Waivers thus are not rules under the APA, or the CRA.[18] Congress agrees. *See id.* § 7607(d)(1) (listing Clean Air Act "rulemakings" without listing waivers). So does the GAO. *See* Exhs. A9 at 4-5; A15 at 6-8. Even if waivers *were* rules, they would not be subject to the CRA, which

---

[18] The rebuttal that Russell Vought, the White House Office of Management and Budget Director, submitted to GAO—after the Resolutions were enacted and their validity challenged in court—refutes itself. Vought conflates EPA's waiver grant and California's standards, Exh. A23 at 4; asserts, contrary to the APA's text, that the downstream effects of a license can transform it into a rule, *id.* at 5; and suggests, again atextually, that "[t]rue adjudications" lack future effect and further lack predictive findings, *id.* at 6. On Vought's logic, even a driver's license is a rule.

1  excludes dispositions of "particular applicability," 5 U.S.C. § 804(3)(A)—i.e., dispositions that

2  afford relief to individual named parties based on specific facts.  *See* Exhs. A9 at 6; A15 at 7.

3    In short, an EPA waiver is not a Section 804(3) rule; EPA's reports of these three waivers

4  were not Section 801(a)(1)(A) reports that opened periods for Members of Congress to introduce

5  Section 802(a) joint resolutions; the Resolutions are not CRA actions; and Section 805's judicial-

6  review bar does not attach.  The foregoing is true despite the prefatory clauses of the Resolutions,

7  which purport to "[p]rovid[e] congressional disapproval under chapter 8 of title 5, [U.S.] Code."

8  139 Stat. 65, 66, 67 (June 12, 2025).  Prefatory clauses lack legal effect, *see* 1 U.S.C. §§ 102-03,

9  and cannot "expand the scope of the operative clause[s]," *District of Columbia v. Heller*, 554 U.S.

10  570, 578 (2008).  The Resolutions' operative clauses do not even purport to augment the CRA's

11  reach to cover agency actions that are not Section 804(3) rules.  By contrast, one operative clause

12  of the CRA states that its precise definitions of *rule* and *joint resolution* control "notwithstanding

13  any other provision of law."  5 U.S.C. § 806(a).  That clause means those definitions "absolutely,

14  positively prevail" over all but the most crystalline statements in other legislation.  A. Scalia & B.

15  Garner, Reading Law 127 (2012); *cf.* 42 U.S.C. § 5911(b) (explicitly subjecting a type of "order"

16  to the CRA).  Especially where the issue is whether a sovereign State's constitutional challenge to

17  a federal statute is justiciable, only text Congress enacted into law could "bear[] the heavy burden

18  of showing a clearly expressed congressional intention," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497,

19  510 (2018) (cleaned up), to bring the Resolutions *under* the CRA.  It is far from crystal clear that

20  Congress intended, through fast-track procedures no less, to aggrandize the CRA itself simply by

21  reciting the cookie-cutter language of a Section 802(a) joint resolution.

22    This is not to say that Congress accomplished nothing through the Resolutions, whose clear

23  purpose was to revoke the three subject EPA waivers.  That purpose can be accomplished without

24  declaring the Resolutions to be "under" the CRA.  The way to harmonize the Resolutions with the

25  CRA's definitions and its *notwithstanding* clause is to read the Resolutions to do what they say—

26  disapprove the three EPA waivers.  As that is all the Resolutions do, Section 805 does not apply.

27    Lastly, this analysis is not affected by "the constitutional right of either House to change the

28  rules [in Section 802 of the CRA] (so far as relating to the procedure of that House) at any time."

5 U.S.C. § 802(g)(2).  Section 802(a)'s definition of "joint resolution" is not a procedural rule; it anchors the entire CRA, repeats throughout, and means the same thing every time.  *See, e.g.*, *id.* § 801(b)(1) (referencing "joint resolution of disapproval, described under section 802").  The Act would make no sense if each chamber could unilaterally redefine "joint resolution," as that would leave the term with indeterminate meaning—or worse, meaning two things at once.  *Cf. Clark v. Martinez*, 543 U.S. 371, 383, 386 (2005) (holding that the "same statutory text" cannot "bear[] two different meanings"). The codified definitions of "rule" and "joint resolution" "trump[ed] any authority of [either] House to change its rules unilaterally."  *Michel v. Anderson*, 14 F.3d 623, 628 (D.C. Cir. 1994).  For all these reasons, Section 805 does not make the Resolutions unreviewable.

### 2.    The Resolutions Violated the Separation of Powers

"[O]ur Government as conceived by the Framers of our Constitution disperses the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each."  *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 272 (1991).  When passing the Resolutions, Congress improperly exceeded its substantive power and improperly ceded its procedural power.  These are independent reasons to hold the Resolutions unlawful and set them aside for purposes of this case.

### a.    Congress Impermissibly Overrode Three Adjudications by the Executive Branch of a Single Party's Rights Under Extant Law

As explained above, EPA waivers are not rules.  *See supra* II.B.1.  A waiver proceeding is an adjudication under the Clean Air Act of whether, based on a specific set of facts, California is entitled to a waiver of the Act's preemption for a set of state laws.  Here, the Executive Branch (acting through EPA) determined that the Clean Air Act does not preempt the California laws at issue.  Members of Congress who disagreed with those determinations could have responded with legislation to preempt those laws.  For example, Congress could have amended Section 209 of the Act to preempt them without possibility of a waiver—as some Members had previously proposed.  Instead, Congress passed the Resolutions, which did no more or less than countermand Executive adjudications that, by that time, were under judicial review.  The Resolutions may have sought to achieve the same end as those proposals.  "The Constitution, however, is concerned with means

as well as ends." *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015). And Congress did not act within its means by revoking Executive adjudications rather than amending the underlying laws.

The Vesting Clauses strictly divide powers among the three branches and "do[] not permit Congress to execute laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). That task falls solely to the Executive Branch. U.S. Const. art. II, § 1, cl. 1. "[S]ince the beginning of the Republic," the Executive has, in appropriate cases, executed laws by determining individual parties' legal rights in adjudications. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). And, where Article III permits, the Judiciary is available to review the lawfulness of adjudications by the Executive. But whether in the first instance or on review, *Congress* cannot declare the rights of individual parties under its own laws. *See Fletcher v. Peck*, 10 U.S. 87, 136 (1810) ("[T]he legislature [is] to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments."). Yet that is just what happened here.

In overriding the waivers, the Resolutions "create no new substantive law"; they just decide "how pre-existing law applies to particular circumstances." *Bank Markazi v. Peterson*, 578 U.S. 212, 225 n.17 (2016). The preexisting Clean Air Act entitled California to waivers of preemption unless the Executive made one of three findings spelled out in Section 209(b)(1). After assessing three sets of "particular circumstances," the Executive did not make such a finding. Majorities of the House and Senate evidently would have retained preemption in all three cases, had they stood in the Executive's shoes. But just as EPA made no law by granting the waivers, Congress made no law by "disapproving" them. By overriding three isolated applications of the Clean Air Act's waiver provision, the Resolutions simply declared the State's rights under that preexisting law.

The Constitution forecloses that mode of action. Congress may change the law, midstream or after the fact, but it may not second-guess a different Branch's adjudications under extant law.

### b.   Congress Unlawfully Allowed the Executive Branch To Direct Legislative Procedure

The unprecedented procedure Congress used to pass the Resolutions violated the separation of powers in another respect. Under the guise of changing an internal procedural rule, the Senate transformed an innocuous reporting requirement into a vehicle for the Executive Branch to direct

1  legislative procedure.  The Constitution forbids any amount of Executive direction in this setting.

2  *See* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings ….").

3  And courts must strike down legislation enacted through procedures that "ignore[d] constitutional

4  restraints," as the Senate's did.  *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) (cleaned up).[19]

5      **Normal Operation of the CRA:**  Section 801(a)(1)(A) of the CRA directs each Executive

6  agency to report each rule "[b]efore [the] rule can take effect."  5 U.S.C. § 801(a)(1)(A).  Receipt

7  of a section 801(a)(1)(A) report triggers extraordinary procedures for any "joint resolution" that a

8  Member of Congress introduces to disapprove that rule.  These extraordinary procedures include

9  prioritized consideration, no opportunity for amendment, limited debate, and bypass of the Senate

10  filibuster.  *Id.* § 802.  Each smooths the path for bills responding to agency "rules," as defined in

11  the CRA, whereas legislation responsive to the array of *other* Executive action still receives "the

12  type of care and deliberation that one might expect."  *King v. Burwell*, 576 U.S. 473, 492 (2015).

13      The CRA leaves each House free to vary its own procedures, *see* 5 U.S.C. § 802(g)(2), but

14  subject to constitutional restraints.  Until this case, however, neither House had given a different

15  Branch free rein to decide whether proposed legislation will come in for ordinary or extraordinary

16  procedures.  To pass the Resolutions, the Senate gave that free rein to the Executive Branch.

17      **The Senate's Extraordinary Maneuver:**  Members of Congress opposed to the three EPA

18  waivers in these cases hoped to override them without abandoning facial support for the filibuster

19  or the traditional adherence to the Senate Parliamentarian's rulings on procedural issues.  *See* 171

20  Cong. Rec. S3047-48 (May 21, 2025) (Sen. Thune); *id.* at S3087-88 (Sen. Capito).  That fidelity

21  put waiver opponents in a bind because EPA, GAO, and the Parliamentarian agreed that waivers

22  are not rules.  *Supra* 8:18-9:1.  So Senators teed up a "vote[] on what qualifies for [a] fast-track

23  procedure," 171 Cong. Rec. S3048 (May 21, 2025), and the Senate sustained a point of order that:

24      joint resolutions that meet all the requirements of section 802 of the [CRA] or are
        disapproving of Agency actions which have been determined to be rules subject to the
25      CRA by a legal decision from GAO are entitled to expedited procedures under the
        [Act]

26

27  ───────────────────────

28      [19] The House of Representatives implicitly did the same.  But it is enough that the Senate
    violated the Constitution.  *Cf. INS v. Chadha*, 462 U.S. 919 (1983) (invalidating one-House veto).

1    *Id.* at S3051 (Sen. Thune).  The Senate then fast-tracked the three Resolutions "[p]ursuant to the

2    precedent just established" in the point of order.  *Id.* at S3052 (Sen. Capito as presiding officer).

3        At first blush, this course of proceedings is puzzling.  The first half of the point of order—

4    that fast-track procedures are used for joint resolutions "that meet all the requirements of section

5    802 of the [CRA]," *id.* at S3051—seemed to merely recite the status quo.  And the second half—

6    that fast-track procedures are used for joint resolutions "disapproving of Agency actions which

7    have been determined to be rules subject to the CRA by a legal decision from GAO," *id.*—would

8    not apply to these Resolutions, which GAO had determined were *not* subject to the CRA.  But the

9    Resolutions' proponents "clarif[ied]" what they meant.  171 Cong. Rec. S3140 (May 22, 2025)

10   (Sen. Lankford).  The Senate had voted to fast-track resolutions that would disapprove agency

11   actions that the Executive Branch *denominated* as "rules" in a submission to Congress, whether or

12   not they *were* rules.  The Senate thus modified its internal procedural rules to substitute the term

13   "Agency-submitted rule," 171 Cong. Rec. S3018 (May 21, 2025) (Sen. Barrasso); *accord id.* at

14   S3088 (Sen. Capito), for the definition of "rule" that had been (and still is) codified in the CRA.

15       The Senate's abdication to the Executive Branch on this question of procedure is apparent

16   from remarks of Senator Capito, who "r[o]se in support of [her] resolution" to disapprove EPA's

17   preemption waiver for California's Advanced Clean Cars II regulation.  *Id.* at S3086.  It was

18   "[f]ortunate[]," she noted, that "President Trump and EPA Administrator Lee Zeldin decided to

19   give the American people a say by submitting the approved California waiver to Congress as a

20   rule."  *Id.* at S3087.  Waiver opponents were fortunate because, absent EPA's after-the-fact

21   reclassification in a report to Congress, the Senate would not have considered, much less fast-

22   tracked, her Resolution.  The next day, in the debate over the disapproval of EPA's waiver for

23   California's Omnibus standards, Senator Lankford left no doubt as to what had transpired:

24       So we worked to make sure that we were clarifying one simple thing . . . this one
         simple question:  When an Agency says it is a rule, is it a rule? . . . . The answer is,

25       yes, it is a rule.  And then we acted on that.

26   171 Cong. Rec. S3140 (May 22, 2025).  In "acting on that," the Senate acted unconstitutionally.

27   **The Constitutional Problem:**  The Senate's *when you say so* regime invites the Executive

28   to manipulate the Senate's procedure to serve Executive purposes.  The President may, in his sole

26

discretion, direct an agency head to slap the new (and errant) label "rule" on any action by a prior Administration that the President disfavors and report it to Congress, upon which the Senate will dutifully fast-track a joint resolution introduced to disapprove it, without the ordinary procedural safeguards.  This regime is especially pernicious because it encourages the President to treat the reporting requirement still on the books as a farce.  *Cf. Mapp v. Ohio*, 367 U.S. 643, 659 (1961) ("Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.").

Since "the Constitution by explicit text commits the power at issue to the exclusive control of" each House of Congress, courts cannot "tolerate *any* intrusion by" the Executive and must act "to prevent any other Branch from undertaking to alter" that textual commitment.  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 485, 487 (1989) (Kennedy, J., concurring in the judgment). It is of no moment that the Branch with the power ceded it willingly, or even that it came up with the idea.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010). Indeed, the Senate's "enthusiasm for" this novel arrangement "sharpen[s] rather than blunt[s]" the need for judicial scrutiny.  *Noel Canning*, 573 U.S. at 572 (Scalia, J., concurring in the judgment).

In an ordinary case, this Court would turn to "the 'intelligible principle' standard" to decide whether Congress delegated lawmaking power to the Executive.  *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2498 (2025).  That forgiving standard "respects the President's Article II authority to execute the laws—that is, to exercise discretion and policymaking authority within the limits set by Congress and without undue judicial interference."  *Id.* at 2514 (Kavanaugh, J., concurring). But Article II is irrelevant here because the Executive Branch does not execute Congress's own internal procedures.  The Framers told each House to run its own show, from start to finish.  If the intelligible-principle standard applied here, though, the Senate's delegation fails it.  *When you say so* is the least intelligible principle there is; it "sweep[s] so wide as to make a laughingstock of the statute's core definition," *Gundy v. United States*, 588 U.S. 128, 143 (2019) (opinion of Kagan, J.), of a "rule," 5 U.S.C. § 804(3).  The Senate "left the matter to the President without standard or rule, to be dealt with as he pleased."  *Pan. Refin. Co. v. Ryan*, 293 U.S. 388, 418 (1935).

It is not enough that the Senate stayed *more* in control of its procedures than the Executive because the Senate retained the power to amend those procedures again at any time until it passed the legislation. The Senate had a passenger-side brake, but it still let the President drive. And the Constitution demands that each House stay in absolute, not relative, control of its own procedure, which "shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other [Branches]." *O'Donoghue v. United States*, 289 U.S. 516, 530 (1933).

The Senate's maneuver is no less troubling because it concerns "procedure." Process often determines substance. *See Regulatory Reform Act: Hearings on H.R. 2327 Before the Subcomm. on Admin. Law and Govt'l Relations of the H. Comm. on the Judiciary*, 98th Cong., 312 (1983) (statement of Rep. John Dingell) ("I'll let you write the substance on a statute and you let me write the procedure, and I'll screw you every time."). The power to determine internal rules of procedure "only empowers Congress to bind itself," *Chadha*, 462 U.S. at 955 n.21, but that is precisely why the power must be "independent … of the President," *id.* at 955. The flaw in the Senate's process was not made harmless by the House's passage of, and the President's signature on, the Resolutions. *Cf. United States v. Munoz-Flores*, 495 U.S. 385, 397 (1990) ("A law passed in violation of the Origination Clause" is "no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than … a law passed in violation of the First Amendment."). The process by which the Resolutions became law is incurably unconstitutional.

### 3.    The Resolutions Violate the Tenth Amendment and Principles of Structural Federalism

The Resolutions also failed to respect the "affirmative limits the constitutional structure … impose[s] on federal action affecting the States under the Commerce Clause." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 556 (1985). "The true 'essence' of federalism is that the States *as States* have legitimate interests which the National Government is bound to respect even though its laws are supreme." *Id.* at 581 (O'Connor, J., dissenting). Separate and apart from honoring their "residual sovereignty," the Constitution "preserves the integrity" and the "dignity" of States. *Bond v. United States*, 564 U.S. 211, 221 (2011). And while States are not "person[s]" afforded Fifth Amendment due process rights, *South Carolina v. Katzenbach*, 383 U.S. 301, 323

1    (1966), the need to turn square corners in dealings with States—to "accord [them] the respect

2    owed them as joint sovereigns," *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765

3    (2002) (cleaned up)—is one of the "postulates which limit and control" the permissible conduct

4    of the Federal Government, *Garcia*, 469 U.S. at 547 (cleaned up).  The "extraordinary defects in

5    the national political process" that led to the Resolutions violated that postulate, rendering them

6    "invalid under the Tenth Amendment" and structural federalism.  *South Carolina v. Baker*, 485

7    U.S. 505, 512 (1988).

8         California and its congressional representatives were deprived of "any right to participate

9    in," *id.* at 513, what proved to be the pivotal step in the legislative process:  the Executive

10   Branch's post-hoc declaration that these waivers are "rules" subject to the CRA.  EPA did not

11   open an administrative process to reconsider the waivers or to revise their classification.  The

12   Executive Branch's process foul was as extraordinary as it was novel.  It also contravened clear

13   requirements for public participation in the promulgation of any "rules," *e.g.*, 5 U.S.C. § 553(c),

14   as well as the CRA's requirement that agencies submit qualifying rules *before* their actions take

15   effect (not months or years later), *id.* § 801(a)(1)(A).  In fact, EPA's post-hoc reclassifications

16   and belated submissions were so far beyond the bounds of the agency's own procedures that its

17   first submission to Congress referred to the waivers as "actions" and "notices of decision," not

18   "rules," based (as it usually would be) on the agency's statements in the decisions themselves.

19   *Compare* Exhs. A13 at 1, 3-4, *with* A16 at 1, 3; *see also* Exh. A22 at 1, 3-4.  And even when EPA

20   relabeled, the agency provided no explanation for the inconsistency with the underlying decisions

21   or its departure from its decades-old, consistently held position.  Exhs. A16 at 1, 3; A15 at 2.

22        Congress then followed suit—disregarding ordinary procedures for extraordinary ones at

23   every turn.   When Members believe an agency "failed to send rules" to Congress (as the claim is

24   here, Exh. A12 at 1), the routine course is to request a GAO determination—not wait for a new

25   Administration to reclassify and submit agency actions months or years after the actions took

26   effect.  No Member of Congress sought such a determination—not in March 2023 when EPA

27   purportedly failed to submit the ACT waiver; and not in December 2024 when EPA purportedly

28   failed to submit the Advanced Clean Cars II and Omnibus waivers.  *See* 119 Cong. Rec. at S3087.

1    Notably, Congress *had* taken this ordinary course in 2022 when EPA reinstated parts of a waiver

2    the first Trump Administration had earlier purported to withdraw.  Exh. A9 at 1.  GAO had

3    concluded that action was not a "rule"; and—again following the ordinary course—neither House

4    of Congress took up resolutions of disapproval.  *See id.* at 5-6.  This time, however, EPA

5    belatedly slapped "rule" labels on the waivers, without process or explanation; and congressional

6    leadership claimed *that* made these actions "rules" subject to the CRA.  Exh. A26 at 2.  And when

7    GAO was asked for a determination about *these* waivers (after EPA submission), Congressional

8    leadership simply disregarded that opinion—although Congress otherwise relies on the GAO for

9    determinations of CRA applicability.  *See* CRS Report 26; *see also* Exh. A24.

10         The Senate then veered deeper into unchartered procedural territory.  It began ordinarily

11    enough with members consulting the Senate Parliamentarian.  Jonathan S. Gould, *Law Within

12    Congress*, 129 Yale L. J. 1946, 1959 (2020) ("The parliamentarians are the primary interpreters

13    of the rules governing Congress.").  And, when the Parliamentarian concluded the CRA did *not*

14    apply, Exh. A28 at 1, many Senators—including some waiver opponents—"weren't convinced

15    the chamber could use the CRA against the waivers," *id.* at 2.  That's because "in the ordinary

16    course of business, … the parliamentarians' interpretations … are as good as binding."  Gould,

17    129 Yale L. J. at 1958.  Senate leadership then decided to overrule the Parliamentarian—an

18    unusual move in itself.  119 Cong. Rec. at S3031 ("The Senate has never overruled the

19    Parliamentarian regarding the CRA ….").  But even that was not done in the usual way—an

20    overriding floor vote on the Parliamentarian's CRA decision.  *See id.* at S3026.

21         Instead, during consideration of a different CRA resolution (concerning a DOT rule), *id.* at

22    S3025, Senate leadership introduced a parliamentary "point of order" allowing points of order on

23    CRA resolutions, *id.* at S3048; *see also* Exh. A25 at 2.  This seemingly inexplicable procedural

24    maneuver was, in fact, entirely unnecessary for consideration of the resolution at hand; rather, its

25    sole purpose was to permit a *second* point of order—also unnecessary to the DOT resolution—

26    that would "bypass … the Parliamentarian's decision" on the *waiver resolutions* without

27    appearing to overrule her "directly."  119 Cong. Rec. at S3025-26.  As shown above, that second

28    point of order transferred the decision whether to use extraordinary procedures to the Executive

30

1    Branch, *see supra* II.B.2.b.  But even if this maneuver had not violated separation of powers, it

2    compounded the extraordinary defects in this process, relying on EPA's unfounded and

3    unexplained actions to dismantle duly adopted state programs through fast-track procedures

4    designed exclusively for federal rules.  Nothing like this had ever been done before.  *See* 119

5    Cong. Rec. at S3048.  Indeed, there was no semblance of a "reasonable relation between the

6    mode or method of proceeding established by the [CRA] and the result which [Congress] sought

7    to be attained."  *Noel Canning*, 573 U.S. at 551.

8        In purporting to use the CRA in this way, the federal government also nullified California's

9    participation in the enactment an expressly limited CRA—the one to which all States consented

10   through their Senators.  And the government did so for the singular purpose of preventing

11   California from implementing the laws it had determined (through state-law proceedings) would

12   best serve its residents' needs.  *E.g.*, 119 Cong. Rec. at S3017 (Sen. Barasso) ("This week, this

13   Senate will end California's mandate madness.").  Yet, the Framers intended that "legislating at

14   the federal level" be difficult precisely "to preserve room for lawmaking by governments" like

15   States, which are "more local and more accountable than a distant federal authority."  *West*

16   *Virginia v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch, J., concurring) (cleaned up).

17       The exclusion of California from pivotal procedural steps was not just the means here; it

18   was also the intended end.  The federal government skirted *any* administrative process in an effort

19   to deprive California of participation *and* of judicial review.  This is why the Executive Branch

20   declined to reconsider these waivers administratively—as the first Trump Administration had

21   done and as President Trump initially signaled his second Administration would do.  119 Cong.

22   Rec. at S3026; *see also supra* 9:19-22.  Indeed, the federal government preferred the CRA—

23   despite its obvious inapplicability—because, in the President's words, California "can't do

24   anything about it," and specifically, "can't take us to court."[20]  *But see supra* II.B.1.

25       Both political branches were far from "disinclined to invade the rights of the individual

26   States, or the prerogatives of their governments," as the Framers envisioned.  *Garcia*, 469 U.S. at

27

28   _____

[20] The White House, *President Trump Participates in a Bill Signing Ceremony*, YouTube
(June 12, 2025) at 28:31, https://www.youtube.com/watch?v=QjakZRoGnxk; *id.* at 2:31.

1  551 (quoting The Federalist No. 46, p. 332 (B. Wright ed. 1961)).  By invading those rights and

2  prerogatives through a process riddled with extraordinary defects from start to finish, the federal

3  government violated the Tenth Amendment and principles of structural federalism.  *See South*

4  *Carolina*, 485 U.S. at 512.  Although "the contours of the 'extraordinary defects' test remain[]

5  fuzzy," *Nevada v. Skinner*, 884 F.2d 445, 452 (9th Cir. 1989), and "the Framers likely did not

6  envision the intrusion on state sovereignty at issue in today's case," this Court can be "confident

7  that it is contrary to their constitutional design," *Fed. Mar. Comm'n*, 535 U.S. at 769.

8  **III.  THE 2036 SALES REQUIREMENT SHOULD NOT BE PRELIMINARILY ENJOINED**

9  Plaintiffs also seek to enjoin enforcement of the model year 2036 sales requirement adopted

10  as part of the Advanced Clean Fleets regulation, asserting that requirement has no waiver and is

11  therefore preempted.  Mot. 6:20-26; US Br. 2:9-10.  But CARB has already stipulated—in a

12  signed court order in another case—that it will not enforce this regulatory requirement unless and

13  until it has a preemption waiver from EPA.  Exh. A6.  The possibility of enforcement during the

14  pendency of this litigation is thus speculative—all the more so because this requirement does not

15  become enforceable for *nine years*.  Lang Decl., ¶ 19; *see also, e.g.*, ECF 23-15 (Potter Decl.)

16  ¶ 9b (alleging manufacturers' "work begins at least two years in advance of a given model year").

17  In any event, in light of CARB's stipulation, the possibility of *preempted* enforcement is nil.

18  There is no basis for a preliminary injunction of this requirement.

19  **IV.  THE PHASE 2 REGULATIONS SHOULD NOT BE PRELIMINARILY ENJOINED**

20  There is likewise no basis for an injunction against the "Phase 2 Greenhouse Gas

21  Regulations."  Mot. 6:26-7:3.  CARB is not requiring manufacturers to certify to these standards,

22  though it will continue to accept and process certification applications if manufacturers

23  voluntarily submit them.  Lang Decl., ¶ 9.  In any event, CTP Plaintiffs identify no injury from

24  these standards, presumably because (as they concede) vehicles or engines that meet existing

25  federal standards will also meet these California standards.  Mot. 6:26-28.  CTP Plaintiffs fail to

26  identify any differences between the two or any other injury the state standards cause them.  By

27  contrast, Defendants and the public interest would be harmed by interference with voluntary

28  certifications, as described above.  *Supra* 20:7-12.

1  **V.     THE MAY MAC SHOULD NOT BE PRELIMINARILY ENJOINED**

2      CTP Plaintiffs' motion is moot as to the May MAC because the August MAC expressly

3  superseded it, Aug. MAC at 2, and "there is nothing left … to enjoin," *Arc of Cal. v. Douglas*,

4  757 F.3d 975, 982 (9th Cir. 2014); *see also Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022) (en

5  banc) (challenge to rescinded executive order was moot).  The voluntary cessation exception to

6  mootness is inapplicable as the August MAC was not issued "because of" this litigation, *Pub.*

7  *Utilities Comm'n of State of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996), but rather

8  reflects CARB's ongoing evaluation of unprecedented circumstances and responsiveness to

9  questions from regulated parties, Lang Decl., ¶¶ 39-49.  Moreover, CARB cannot reasonably be

10  expected to reissue the May MAC.  It was an initial advisory, as evinced by the express indication

11  that further information would be forthcoming.  May MAC at 2.  CARB has also since begun a

12  rulemaking to further clarify a certification pathway described in the August MAC.  *See* Exh. B3.

13  Those regulatory modifications cannot be "easily abandoned," *Brach*, 38 F.4th at 12-13 (cleaned

14  up), and provide "procedural safeguards" against reissuance of the May MAC, *Fikre v. Fed.*

15  *Bureau of Investigation*, 904 F.3d 1033, 1039 (9th Cir. 2018).  For the same reasons, the May

16  MAC is not capable of repetition yet evading review.  *Brach*, 38 F.4th at 15.

17      Even if these claims were not moot, CTP Plaintiffs cannot show they are being irreparably

18  harmed by a superseded advisory.  Nor are they likely to succeed in their claims.  The May MAC

19  was merely "repetitive of" other sources of law, *Missionary Guadalupanas of Holy Spirit Inc. v.*

20  *Rouillard*, 38 Cal. App. 5th 421, 432 (2019)—namely, CARB's duly-adopted *emission standards*,

21  Mot. 11:3-18.  It cannot therefore give rise to a free-floating preemption claim, any speech-based

22  claim, or an underground regulation challenge.  And CTP Plaintiffs' state law challenges are

23  barred by sovereign immunity.  *Supra* 17:1-9.

24  **VI.     EXECUTIVE ORDER N-27-25 SHOULD NOT BE PRELIMINARILY ENJOINED**

25      **A.     CTP Plaintiffs' Challenges to the EO Are Unripe, Their Alleged Injuries
       from It Are Speculative, and the Equities Favor Defendants**

26
      As CTP Plaintiffs concede, the EO merely directs state agencies to take further actions,

27  without prescribing the time or manner of performance.  *See* Mot. 11:23-25 (referring to "future

28

33

1    regulations"); *id.* at 16:15 (same); *id.* at 29:2-3 (referring to "future government incentive

2    programs").  The EO thus does not operate on these Plaintiffs at all.  An executive order by the

3    Governor is merely a tool for organizing and administering state government by giving direction

4    to state agencies; an executive order does not and *cannot* compel or prohibit action by private

5    actors.[21]  If and when CARB or another state agency implements the EO's direction, and if the

6    CTP Plaintiffs believe that implementation adversely affects them, then and only then would they

7    have a concrete, ripe claim.  *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 933

8    (9th Cir. 2015); *see also Twitter*, 56 F.4th at 1174.  Any alleged injuries from such future actions

9    are also too speculative to support a preliminary injunction.  *Caribbean Marine Servs.*, 844 F.2d

10   at 674-75.  Defendants, on the other hand, would be injured by interference with the Governor's

11   ability to direct state agencies.

12       **B.    If They Were Somehow Ripe, CTP Plaintiffs' Challenges to the EO Would**
13              **Fail on Their Merits**

14           **1.    The Market Participant Exception is Fatal to the Preemption**
                    **Challenge**

15           Even if it were ripe, CTP Plaintiffs' preemption challenge to the EO would fail because

16   state actions taken as market participants "are generally protected from federal preemption,"

17   including under the Clean Air Act.  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498

18   F.3d 1031, 1040, 1043 (9th Cir. 2007).  As CTP Plaintiffs admit, the EO gives direction as to

19   "government vehicle procurement decisions."  Mot. 11:21-22.  And the Ninth Circuit has already

20   held that "provisions directing state and local governmental entities to purchase, procure, lease, or

21   contract for use of vehicles meeting specified air pollution criteria constitute direct state

22   participation in the market" and are thus exempt from Clean Air Act preemption.  *South Coast*,

23   498 F.3d at 1045.  As a market participant, California may prefer certain suppliers over others, for

24   any number of reasons (including their production of cleaner vehicles), just as "private fleet

25   operators do."  *Id.* at 1047.  CTP Plaintiffs' attack on the EO's prioritization of certain

26

27           [21] Executive orders issued in response to a state of emergency proclaimed under
     California's Emergency Services Act, Cal. Gov. Code § 8550 et seq., are distinct; those do have
     the force and effect of law and may regulate private conduct.  EO N-27-25 is not an *emergency*
28   executive order, however.

                                                    34

1    manufacturers' vehicles for state-funded incentives fails for the same reason.  Mot. 11:22; *see*

2    *also* EO, ¶ 3.  Just as Maryland's qualifications for state incentives to remove "automobile hulks"

3    from the State reflected its participation in the market, *Hughes v. Alexandria Scrap Corp.*, 426

4    U.S. 794, 809 (1976), so too do these qualifications for California's incentives.

5              **2.    The First Amendment Challenge Is Without Merit**

6         CTP Plaintiffs' First Amendment challenge would likewise fail, if it were ripe, because the

7    EO also does not restrict speech or deny benefits based on the exercise of protected speech.[22]

8    The EO directs CARB to keep and publish lists of vehicle manufacturers that continue to follow

9    several enumerated emissions requirements.  EO, ¶ 3.  State agencies are then to use these lists to

10   prioritize manufacturers in their own vehicle procurement, for certain incentive programs, and

11   when developing regulatory flexibilities for new emissions requirements.  *Id.*  CTP Plaintiffs

12   claim that the EO directs CARB to leave manufacturers—such as themselves—that fail to comply

13   with speech conditions they agreed to when they signed the CTP off the list.  Mot. 20:19-21:6.

14   Yet the CTP is referenced only once, and only indirectly, in the EO:

15        [CARB] shall identify, maintain, and update publicly available lists of … medium-
          and heavy-duty vehicle manufacturers that are continuing to certify to and follow
16        the requirements of the [ACT] regulation and the [Omnibus] regulation, or
          requirements agreed to as part of any agreements between such manufacturer and
17        [CARB]….

18   The reference to agreement requirements has the same meaning as the other "requirements" listed

19   in the paragraph: *emissions* requirements, not speech.  Because the EO directs nothing with

20   respect to the CTP's speech restrictions, it has no plausible impact on CTP Plaintiffs' First

21   Amendment rights.

22                            **CONCLUSION**

23        The motion for preliminary injunction should be denied.

24

25

26

27   _____

28   [22] The Eleventh Amendment bars Plaintiffs' state constitutional challenge to the EO,
     *supra* 17:1-9, which lacks merit for the same reasons that their federal constitutional claim fails.

                                         35

Dated:  September 16, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Defendants*

36