# Exhibit A7

# California State Motor Vehicle and Nonroad Engine Pollution Control Standards; The "Omnibus" Low NOx Regulation; Waiver of Preemption

## Decision Document



United States
Environmental Protection
Agency

# California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The "Omnibus" Low NOx Regulation; Waiver of Preemption

## Decision Document

Office of Transportation and Air Quality
U.S. Environmental Protection Agency



United States
Environmental Protection
Agency

EPA-420-R-24-028
December 2024

EPA-420-R-24-028; December 2024

**California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The "Omnibus" Low NOx Regulation; Waiver of Preemption; Decision Document**

On June 13, 2022, the Environmental Protection Agency (EPA) published a *Federal Register* notice announcing its receipt of the California Air Resources Board's (CARB's) request for a waiver of regulations applicable to new 2024 and subsequent model year (MY) California on-road heavy-duty vehicles and engines and an authorization for portions of the Omnibus Low NOx program that pertain to off-road diesel engines, hereinafter the Omnibus Low NOx regulations.[1] The notice for comment on CARB's request indicated that the request would be open for public comment until August 2, 2022. The Docket ID No. is EPA-HQ-OAR-2022-0332. EPA also held a public hearing on CARB's request, and the transcript of that hearing is included in the docket. Subsequently, on July 8, 2024, CARB submitted to EPA supplemental information relating to the Omnibus Low NOx Regulation, addressing certain targeted amendments CARB adopted in 2023.[2]  In this Decision Document, EPA is taking final action to waive preemption for CARB's Omnibus Low NOx regulations, including the 2023 amendments, pursuant to section 209(b) and section 209(e) of the Clean Air Act (CAA).[3] EPA is also providing notice of the availability of this Decision Document in the *Federal Register*.

---

[1] 87 FR at 35765-35768 (June 13, 2022).
[2] Docket No. EPA–HQ–OAR–2022–0332-0099.
[3] The Decision Document can be found in the public docket at regulations.gov at EPA-HQ-OAR-2022-0332.

**Table of Contents**

I.  Executive Summary

II. Background

    A.  EPA's Consideration of CARB's Request

    B.  Principles Governing this Review

        1.  Scope of Preemption and Waiver Criteria Under the Clean Air Act

        2.  Deference to California

        3.  Standard and Burden of Proof

III. Discussion

    A.  California's Protectiveness Determinations

        1.  Comments on California's Protectiveness Determination

        2.  Is California's Protectiveness Determination Arbitrary and Capricious?

        3.  Section 202(b)(1)(A) and Section 209(e)(2)(A)(i) Conclusion

    B.  Does California Need Its Standards to Meet Compelling and Extraordinary Conditions?

        1.  Comments on the Second Prong

        2.  Does California Need Its Standards to Meet Compelling and Extraordinary Conditions?

        3.  Section 209(b)(1)(B) and Section 209(e)(2)(A)(ii) Conclusion

    C. Are California's Regulations Consistent with Section 202(a) of the Clean Air Act?

        1.  Comments on the Third Prong

        2.  Are California's Standards Consistent with Section 202(a)?

            a.  HD Omnibus Low NOx Regulation

            b.  The Inapplicability of Section 202(a)(3)(C)

            c.  Section 209(b)(1)(C) and Section 209(e)(2)(A)(iii) Conclusion

D. Other Issues

IV. Decision

V. Statutory and Executive Order Reviews

## I.  Executive Summary

Today, as Administrator of the EPA, I am granting California's request for waiver of Clean Air Act (CAA) preemption regarding the California Air Resources Board (CARB) regulations for heavy-duty ("HD") on-road vehicles and engines "Omnibus" Low NOx rule and an authorization for portions of the Omnibus Low NOx program that pertain to off-road diesel engines. CARB made this request in a letter to EPA in January 2022, as described below.

In a January 31, 2022, letter to the Administrator, CARB notified EPA of their adoption of its "Omnibus" Low NOx Regulation.[4] This regulation, adopted by the CARB Board on August 27, 2020, establishes the next generation of exhaust emission standards for nitrogen oxides (NOx) and particulate matter (PM) and other emission-related requirements for new 2024 and subsequent model year on-road medium- and heavy-duty engines and vehicles. In addition to these on-road requirements, the Omnibus Low NOx Regulation incorporates the PM emission standard established in the federal Phase 2 GHG Regulation into both California's Heavy-Duty Diesel Engine Idling Regulation and the associated California off-road diesel test procedures for diesel-fueled auxiliary power units (APUs).[5] CARB requested that EPA grant a new waiver for

---

[4] Omnibus Low NOx Waiver Request, Docket No. EPA–HQ–OAR–2022–0332-0012; Omnibus Low NOx Waiver Support Document, Docket No. EPA–HQ–OAR–2022–0332-0009.
[5] The Omnibus Low NOx Regulation was adopted by the California Air Resources Board on August 27, 2020, by Resolution 20-23, and includes amendments approved by the CARB Executive Officer on September 9, 2021, under CARB Order No. R-21-007.  The Omnibus Low NOx Regulation is comprised of new title 13, California Code of Regulations (Cal. Code Regs.) sections 2139.5, and 2169.1 through 2169.8; amendments to title 13, Cal. Code Regs., sections 1900, 1956.8, 1961.2, 1965, 1968.2, 1971.1, 1971.5, 2035, 2036, 2111, 2112, 2113, 2114, 2115, 2116, 2117, 2118, 2119, 2121, 2123, 2125, 2126, 2127, 2128, 2129, 2130, 2131, 2133, 2137, 2139, 2140, 2141, 2142, 2143, 2144, 2145, 2146, 2147, 2148, 2149, 2166, 2166.1, 2167, 2168, 2169, 2170, 2423, and 2485; and

the onroad medium- and heavy-duty engines and vehicles standards and an authorization for the off-road regulation for the APUs. On July 8, 2024, CARB submitted to EPA supplemental information for the Omnibus Low NOx Regulation, addressing certain targeted amendments CARB adopted in 2023 ("2023 Targeted Amendments").[6]  By today's decision EPA finds that Omnibus Low NOx Regulation, including the 2023 Targeted Amendments, meets the criteria for a new waiver under section 209(b) for portions that pertain to onroad requirements and meets the criteria for a new authorization under section 209(e) for the portions that pertain to nonroad requirements.

The legal framework for this decision stems from the waiver provision first adopted by Congress in 1967, and later modified in 1977. Congress established that there would be only two programs for control of emissions from new motor vehicles—EPA emission standards adopted under the Clean Air Act, and California emission standards adopted under state law. Congress accomplished this by preempting all state and local governments from adopting or enforcing emission standards for new motor vehicles, while at the same time providing that California could receive a waiver of preemption for its emission standards and enforcement procedures. Other states can only adopt standards that are identical to California's standards. This struck an important balance that protected manufacturers from multiple and different state emission standards, while preserving California's pivotal role in the control of emissions from new motor vehicles. Congress also recognized that California could serve as a pioneer and a laboratory for

---

amendments to title 17 Cal. Code Regs. sections 95662 and 95663.  The 2023 Targeted Amendments to Omnibus were adopted on December 28, 2023, by CARB Executive Order No. R-23-006.   The 2023 Targeted Amendments are comprised of title 13, California Code of Regulations (Cal. Code Regs.) sections 1956.8, 1971.1, and 1971.5.
[6] Docket No. EPA–HQ–OAR–2022–0332-0099.  Note, the 2023 Targeted Amendments did not modify the emission standards, implementation dates, or test procedures of the Omnibus Low NOx program, but rather provided additional implementation flexibilities related to the 2024-2026 model year standards, for the regulated industry. The 2023 Targeted Amendments did not modify the 2027 and subsequent model years standards nor did the July 8, 2024, submission withdraw or modify CARB's initial waiver request from January 31, 2022.

the nation in setting new motor vehicle emission standards and the development of new emission control technologies.

Further, Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver. The provision was designed to ensure California's broad discretion to determine the best means to protect the health and welfare of its citizens. Section 209(b) specifies that EPA must grant California a waiver if California determines that its standards are, in the aggregate, at least as protective of the public health and welfare as applicable federal standards. EPA may deny a waiver only if it makes at least one of three findings specified under the Clean Air Act. The three criteria for denial of a waiver are: first, whether California's determination that its standards are, in the aggregate, at least as protective as applicable federal standards is arbitrary and capricious (Section 209(b)(1)(A)); second, whether California has no need for such standards to meet compelling and extraordinary conditions (Section 209(b)(1)(B)); or third, whether California's standards are inconsistent with Section 202(a) of the Clean Air Act (Section 209(b)(1)(C)).

Therefore, EPA's role upon receiving a request for waiver of preemption from California is to determine whether it is appropriate to make any of the three factual findings specified by the Clean Air Act; if the Agency cannot make at least one of the three findings then the waiver must be granted.[7] EPA and the Court of Appeals for the District of Columbia Circuit have consistently interpreted section 209(b) as placing the burden on the opponents of a waiver to demonstrate that one of the criteria for a denial has been met.[8]

---

[7] *Motor and Equipment Manufacturers' Association v. EPA (MEMA II)*, 142 F.3d 449, 462–63 (D.C. Cir. 1998) ("[S]ection 209(b) sets forth the only waiver standards with which California must comply …. If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application.").
[8] *Motor and Equipment Manufacturers' Association v. EPA (MEMA I)*, 627 F.2d 1095, 1121 (D.C. Cir. 1979).

If California acts to amend a previously waived standard or accompanying enforcement procedure, the amendment may be considered within the scope of a previously granted waiver provided that it does not undermine California's determination that its standards in the aggregate are as protective of public health and welfare as applicable federal standards, does not affect the regulation's consistency with section 202(a) of the Clean Air Act, and raises no new issues affecting EPA's previous waiver decisions.

In addition to preempting states from adopting and enforcing standards relating to the control of emissions from new motor vehicles, section 209 also preempts states from adopting and enforcing standards for nonroad vehicles and engines. The legal framework for EPA's evaluation of CARB's APU regulations, within the Omnibus Low NOx Regulation, stems from the 1990 amendments to the CAA, specifically, the addition of section 209(e) and the preemption provisions pertaining to new nonroad vehicles and engines. Section 209(e)(1) of the Act permanently preempts any state, or political subdivision thereof, from adopting or attempting to enforce any standard or other requirement relating to the control of emissions for certain new nonroad engines or vehicles.[9] For all other nonroad engines, states are generally preempted from adopting and enforcing standards and other requirements relating to the control of emissions. Section 209(e)(2)(A), however, requires the Administrator, after notice and opportunity for public hearing, to authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare

---

[9] States are expressly preempted from adopting or attempting to enforce any standard or other requirement relating to the control of emissions from new nonroad engines which are used in construction equipment or vehicles or used in farm equipment or vehicles, and which are smaller than 175 horsepower. Such express preemption under section 209(e)(1) of the Act also applies to new locomotives or new engines used in locomotives. CAA § 209(e)(1), 42 U.S.C. 7543(e)(1)(A).

as applicable Federal standards. Similar to waivers of preemption under section 209(b), EPA shall not grant such authorization if it finds that (1) the determination of California is arbitrary and capricious; (2) California does not need such California standards to meet compelling and extraordinary conditions; or (3) California standards and accompanying enforcement procedures are not consistent with CAA section 209.[10] Considering the similar language in both sections 209(b) and 209(e)(2)(A), EPA has reviewed California's requests for authorization of nonroad vehicle or engine standards under section 209(e)(2)(A) using the same principles that it has historically applied in reviewing requests for waivers of preemption for new motor vehicle or new motor vehicle engine standards under section 209(b).[11]

On June 13, 2022, EPA issued a notice of opportunity for hearing and comment for the "Omnibus" Low NOx Regulation.[12] As part of EPA's public comment process for CARB's waiver request, we have received comments from several states and organizations representing states, health and environmental organizations, industry, and other stakeholders. The vast majority of comments EPA received supported granting the waiver request. Commenters generally supporting the waiver request included CARB,[13] environmental and public health organizations,[14] state and

---

[10] EPA historically has interpreted the consistency inquiry under the third criterion, outlined above and set forth in section 209(e)(2)(A)(iii), to require that California standards and enforcement procedures be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) of the Act. *See* 40 CFR Part 1074, Subpart B, 73 FR 59379 (October 8, 2008).

[11] *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1087 (D.C. Cir. 1996) (". . . EPA was within the bounds of permissible construction in analogizing § 209(e) on nonroad sources to § 209(a) on motor vehicles.'').

[12] 87 FR 35765 (June 13, 2022). On the same date, EPA also issued a notice of opportunity for hearing and comment on waiving preemption for several other CARB heavy-duty vehicle and engine regulations. EPA subsequently waived preemption for those regulations. See 88 FR 20688 (Apr. 6, 2023). At that time, EPA indicated it would address the Omnibus Low NOx rule in a separate decision.

[13] CARB Initial Omnibus Low NOx, Docket No. EPA-HQ-OAR-2022-0332-0059; CARB Supplemental Comments, EPA-HQ-OAR-2022-0332-0083.

[14] Environmental and Public Health Organizations, EPA-HQ-OAR-2022-0332-0065.

local governments,[15] states' organizations,[16] members of Congress,[17] and some auto manufacturers.[18] Commenters generally opposing the waiver requests included the Truck and Engine Manufacturers Association (EMA),[19] the National Automobile Dealers Association (NADA),[20] the American Trucking Associations (ATA)[21] and the Texas Public Policy Foundation.[22] In addition, EPA also received late comments which we also considered as part of the record.[23] On July 8, 2024, CARB also submitted a waiver request support document.[24] After an evaluation of the entire record (including all the late submissions), EPA has determined that the waiver opponents have not met their burden of proof to deny the CARB waiver request, including

---

[15] *See, e.g.*, State of California et al, Docket No. EPA-HQ-OAR-2022-0332-0060 (including comments submitted on behalf of the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, the Commonwealth of Massachusetts, the District of Columbia, and the City of New York); New York State Department of Environmental Conservation (NYSDEC), Docket No. EPA-HQ-OAR-2022-0332-0069; Maine Department of Environmental Protection (Maine), Docket No. EPA-HQ-OAR-2022-0332-0049; Colorado Energy Office (Colorado), Docket No. EPA-HQ-OAR-2022-0332-0028; Washington State Department of Ecology (Washington), Docket No. EPA-HQ-OAR-2022-0332-0074; South Coast Air Quality Management District (SCAQMD), Docket No. EPA-HQ-OAR-2022-0332-0050; San Joaquin Valley Unified Air Pollution Control District (SJVUAPCD), Docket No. EPA-HQ-OAR-2022-0332-0050.
[16] *See, e.g.*, Northeast States for Coordinated Air Use Management (NESCAUM), Docket Nos. EPA-HQ-OAR-2022-0332-0023, EPA-HQ-OAR-2022-0332-0070, and EPA-HQ-OAR-2022-0332-0086; National Association of Clean Air Agencies (NACAA), Docket Nos. EPA-HQ-OAR-2022-0332-0051, and EPA-HQ-OAR-2022-0332-0025; Ozone Transport Commission (OTC), Docket Nos. EPA-HQ-OAR-2022-0332-0071, EPA-HQ-OAR-2022-0332-0027, and EPA-HQ-OAR-2022-0332-0085.
[17] Padilla et al, Docket No. EPA-HQ-OAR-2022-0332-0032.
[18] Tesla, Docket No. EPA-HQ-OAR-2022-0332-0043; Rivian, Docket No. EPA-HQ-OAR-2022-0332-0053.
[19] EMA Testimony, Docket No. EPA-HQ-OAR-2022-0332-0021; EMA Initial Comments, Docket No. EPA-HQ-OAR-2022-0332-0048; EMA Supplemental Comments, Docket No. EPA-HQ-OAR-2022-0332-0082.
[20] NADA, Docket No. EPA-HQ-OAR-2022-0332-0056.
[21] ATA, Docket No. EPA-HQ-OAR-2022-0331-0091.
[22] Texas Public Policy Foundation, Docket No. EPA-HQ-OAR-2022-0332-0042.
[23] These late comments include, but are not limited to, Cummins Inc., EPA-HQ-OAR-2022-0332-0089 and EPA-HQ-OAR-2022-0332-0094 (which withdraws from the record Cummins Inc.'s EPA-HQ-OAR-2022-0089); and Truck and Engine Manufacturers Association EPA-HQ-OAR-2022-0332-0091 and EPA-HQ-OAR-2022-0332-0093 (which withdraws from the record Truck and Engine Manufacturers Associations EPA-HQ-OAR-2022-0332-0091. EPA did not consider the information contained in EPA-HQ-OAR-2022-0332-0089 and EPA-HQ-OAR-2022-0332-0091 because the commenter withdrew those comments. EPA responds to the other late comments later in this Decision Document.
[24] *See* Docket No. EPA–HQ–OAR–2022–0332-0097, EPA–HQ–OAR–2022–0332-0098, and EPA–HQ–OAR–2022–0332-0099. Note, the 2023 Targeted Amendments did not modify the emission standards, implementation dates, or test procedures of the Omnibus Low NOx program, but rather provided additional implementation flexibilities for the regulated industry. Given the limited nature of the 2023 Targeted Amendments, they do not adversely affect EPA's findings on the three waiver criteria. As such, EPA found it unnecessary to convene a new public hearing or afford a new comment period specifically for the 2023 Targeted Amendments. We address this further in the other issues section.

the 2023 Targeted Amendments, under any of the three criteria in section 209(b)(1) or the authorization criteria in section 209(e)(2)(A). As such, EPA is granting the waiver request.

## II.    Background

### A. EPA's Consideration of CARB's Request

On June 13, 2022, EPA announced the opportunity for hearing and comment on CARB's waiver HD Omnibus request in a Federal Register notice (FR Notice).[25] EPA held a public hearing on June 29 and June 30, 2022.[26] EPA has considered all comments submitted, including those submitted after the close of the comment period.[27]

EPA's June 2022 FR Notice on CARB's waiver request regarding the Omnibus Low NOx regulation, EPA asked for comment on several matters. We requested comment on all aspects of a full waiver analysis; therefore, we asked commenters to consider the same three criteria under section 209(b)(1) of the CAA as noted above.  EPA also sought comment on its intention to use the traditional interpretation of section 209(b)(1)(B) as well what provisions under section 202(a) should apply (and how such provisions should be evaluated) under section 209(b)(1)(C) that requires consistency with section 202(a).[28]

In addition, because the Omnibus Low NOx Regulation incorporates a PM emission standard established under the federal Phase 2 GHG Regulation into both California's Heavy-Duty Diesel Engine Idling Regulation (for which CARB seeks a section 209(b) waiver) and the

---

[25] 87 FR 35765 (June 13, 2022).
[26] A transcript for each day of the hearing (June 29th and 30th, 2022) can be found in the docket:  June 29th Hearing Transcript, Docket No. EPA-HQ-OAR-2022-0332-0035; June 30th Hearing Transcript, Docket No. EPA-HQ-OAR-2022-0332-0036.
[27] EMA Supplemental Comments, Docket No. EPA-HQ-OAR-2022-0332-0082; CARB Supplemental Comments, Docket Nos. EPA-HQ-OAR-2022-0332-0083; Mass Comment Campaign sponsored by Union of Concerned Scientists, Docket No. EPA-HQ-OAR-2022-0332-0084; NESCAUM, Docket Nos. EPA-HQ-OAR-2022-0332-0086; OTC, Docket No. EPA-HQ-OAR-2022-0332-0085; Mid-Atlantic/Northeast Visibility Union (MANEVU), Docket Nos. EPA-HQ-OAR-2022-0332-0088, EPA-HQ-OAR-2022-0332-0087.
[28] 87 FR 35765, 35767.

associated California off-road diesel test procedures for diesel-fueled APUs, EPA also sought

comment on the APU regulations under criteria set forth in section 209(e)(2)(A) including: (1)

whether CARB's determination that its standards, in the aggregate, are at least as protective of

public health and welfare as applicable federal standards is arbitrary and capricious; (2) whether

California needs such standards to meet compelling and extraordinary conditions; and (3)

whether California's standards and accompanying enforcement procedures are consistent with

section 209 of the Act.[29]

B. *Principles Governing this Review*

The CAA has been a paradigmatic example of cooperative federalism, under which

"States and the Federal Government [are] partners in the struggle against air pollution."[30] In Title

II, Congress authorized EPA to promulgate emission standards for mobile sources and generally

preempted states from adopting their own standards.[31] At the same time, Congress created an

important exception for the State of California.[32]

---

[29] *Id.* at 35767–68. On July 20, 1994, EPA promulgated a rule that sets forth, among other things, regulations providing the criteria, as found in section 209(e)(2)(A), which EPA must consider before granting any California authorization request for new nonroad engine or vehicle emission standards. 59 FR 36969 (July 20, 1994). EPA revised these regulations in 1997. These regulations were subsequently slightly modified and move to 40 CFR part 1074, *See* 73 FR 53979 (Oct. 8, 2008). As stated in the preamble to the 1994 rule, EPA has historically interpreted the section 209(e)(2)(A)(iii) ''consistency'' inquiry to require that California standards and enforcement procedures be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) (as EPA has interpreted that subsection in the context of section 209(b) motor vehicle waivers). In order to be consistent with section 209(a), California's nonroad standards and enforcement procedures must not apply to new motor vehicles or new motor vehicle engines. To be consistent with section 209(e)(1), California's nonroad standards and enforcement procedures must not attempt to regulate engine categories that are permanently preempted from state regulation.
[30] *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).
[31] "The regulatory difference [between Titles I and II] is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states." *Engine Mfrs. Ass'n v. EPA (EMA)*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). Congress also asserted federal control in this area to avoid "the specter of an anarchic patchwork of federal and state regulatory programs" nationwide. *Motor & Equip. Mfrs. Asso. v. Envtl. Prot. Agency (MEMA I)*, 627 F.2d 1095, 1109 (D.C. Cir. 1979).
[32] *See, e.g.*, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy); *MEMA I* at 1111.

Since the earliest days of the Act, EPA has generally employed a consistent legal

framework for adjudicating California's waiver requests, founded on the statutory text, context,

purpose, and history.[33] EPA's longstanding approach has been repeatedly ratified by Congress[34]

and upheld by the courts.[35] In today's adjudication, EPA recites and applies these same

longstanding principles.[36]

1.  Scope of Preemption and Waiver Criteria Under the Clean Air Act

The legal framework that governs today's decisions stems from the waiver provision first

adopted by Congress in 1967 and its subsequent amendments. In Title II of the CAA, Congress

established only two programs for control of emissions from new motor vehicles—EPA emission

standards adopted under the Act and California emission standards adopted under its state law.[37]

Congress accomplished this by preempting all state and local governments from adopting or

enforcing emission standards for new motor vehicles, while at the same time providing that

California could receive a waiver of preemption for its emission standards and enforcement

---

[33] See the Federal Register citations collected in this and following sections, especially, 36 FR 17458 (August 14, 1971); 40 FR 23102 (May 28, 1975); 61 FR 53571; 58 FR 4166 (January 13, 1993); 71 FR 58190 (December 28, 2006); 74 FR 32744 (July 8, 2009); 78 FR 2211 (January 9, 2013); 87 FR 14332 (March 14, 2022). *See also* the following sections for specific discussion of our interpretation of each waiver prong.

[34] *MEMA I* at 1110.  (citing H.R.Rep. No. 294, 95th Cong., 1st Sess. 301-02 (1977)) (describing the 1977 Amendments as ratifying the waiver provision and EPA's interpretation, and quoting the House Committee Report which states "The Committee amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, i.e., to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."); CAA section 209(e) (in the 1990 CAA Amendments, ratifying the waiver provision and EPA's interpretation by re-enacting Section 209(b)'s language almost exactly to provide a waiver for California regulation of nonroad vehicles and engines in Section 209(e)).

[35] *See, e.g.*, *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449 (D.C. Cir. 1998) (*MEMA II*); *Motor & Equip. Mfrs. Asso. v. Envtl. Prot. Agency,* 201 U.S. App. D.C. 142, 627 F.2d 1128, 1132 (1979)*; MEMA I*, 627 F.2d 1095 (D.C. Cir. 1979); *Ford Motor Co. v. Envtl. Prot. Agency (Ford)*, 606 F.2d 1293 (D.C. Cir. 1979).

[36] *See Loper Bright Enters. v. Raimondo (Loper Bright)*, 144 S. Ct. 2244, 2257-59 (2024) (respect is warranted for the interpretations of the Executive Branch, particularly for interpretations that were issued roughly contemporaneously with enactment of the statute and remained consistent over time) (collecting authorities including *Edwards' Lessee v. Darby*, 25 U.S. 206 (1827) and *Skidmore v. Swift & Co*., 323 U. S. 134 (1944)).

[37] Motor vehicles are "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *EMA*, 88 F.3d at 1079–80, 1088; see also id. ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards.").

procedures in keeping with its prior experience regulating motor vehicles, its role as a laboratory for innovation in emission reduction technologies for vehicles, and its serious air pollution problems.[38] This framework struck an important balance that protected manufacturers from multiple and different state emission standards and preserved a role for state level innovation to advance emissions control from new motor vehicles. Recognizing both the harsh reality of California's air pollution and California's ability to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology, Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver, ensuring that California had broad discretion in selecting the best means to protect the health and welfare of its citizens.[39]

Accordingly, CAA section 209(a) preempts states or political subdivisions from adopting or attempting to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines. However, under the terms of CAA section 209(b)(1), after notice and opportunity for public hearing, EPA must waive the application of section 209(a) to California unless the Administrator finds that at least one of three criteria (sometimes also referred to in this notice as the three "prongs") to deny a waiver in section 209(b)(1)(A)–(C) has been met. EPA may thus deny a waiver, in the context of EPA's adjudicatory review, only if it makes at least one of these three factual findings based on evidence in the record.

The 1970 CAA Amendments strengthened EPA's authority to regulate vehicular emissions of air pollutants, while reaffirming the corresponding breadth of California's ability to

---

[38] *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1174 (E.D. Cal. 2007) ("The waiver provision of the Clean Air Act recognizes that California has exercised its police power to regulate pollution emissions from motor vehicles since before March 30, 1966; a date that predates. . . the Clean Air Act.").

[39] *See, e.g.*, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy); *MEMA I*, 627 F.2d at 1111.

regulate those emissions. Congress did so by amending CAA section 202 and recodifying the waiver provision as CAA section 209(b), respectively.[40] Congress also established the National Ambient Air Quality Standards (NAAQS) program, under which EPA issues air quality criteria and sets ambient air quality standards for so-called "criteria" pollutants, and states with regions that have levels of pollutants greater than those federal standards must submit state implementation plans, or SIPs, indicating how they plan to attain the NAAQS. These attainment SIPs are often multi-year, comprehensive plans.[41]

With the CAA Amendments of 1977, Congress confirmed that California may consider the protectiveness of its standards "in the aggregate," rather than requiring each California standard to be as or more stringent than its federal counterpart. This codified the flexibility to shape the air pollution control program to meet the particular needs of the State, including by adopting a stronger standard for a specific pollutant where a weaker standard for a second pollutant was necessary due to interactions between control technologies or where California's air quality goals and policy preferences may focus on specific pollutants or objectives.[42] Congress also ratified EPA's interpretation of the waiver provision as providing appropriate

---

[40] In the 1970 CAA Amendments, section 202(a) was divided into section 202(a)(1) and section 202(a)(2). Section 202(a)(1) included the directive for the Administrator to "prescribe standards applicable to emissions of any air pollutant…which in his judgement cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." The previous lead time requirement in section 202(a) was moved to section 202(a)(2) and included the directive that any regulation prescribed under 202(a)(1) "shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." The 1970 CAA did not change the cross reference to section 202(a) in section 209(b)(1)(C). As described below, the 1977 amendments also did not change the cross reference to section 202(a) in section 209(b)(1)(C) but did expand the flexibility afforded to California under section 209(b).

[41] For example, EPA has approved a revision to California's State Implementation Plan (SIP) to include mobile source regulations such as CARB's LEV III and ZEV regulations from the ACC I program (81 FR 39424 (June 16, 2016)).

[42] 42 U.S.C. 7543(b)(1). *See also* Clean Air Act Amendments of 1977, Pub. L. No. 95–95, § 207, 91 Stat. 685; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Env't Conservation*, 17 F.3d 521, 525 (2d Cir. 1994).

deference to California's policy goals and consistent with Congress's intent "to permit California to proceed with its own regulatory program" for new motor vehicle emissions.[43]

In addition, the 1977 amendments recognized the serious air pollution problems facing many states in the nation and added an option for such states to address their air pollution problems while protecting the manufacturers from facing more than two motor vehicle emission control programs. The amendments continued to recognize the significance of California's standards to the Nation as a whole with Congress' adoption of a new section 177. CAA section 177 permits other states that meet certain criteria to address their own air pollution problems, and avoid the preemption in CAA section 209(a), by adopting and enforcing California new motor vehicle standards for which a waiver has been granted.[44]

Any state with qualifying SIP provisions may exercise this option and become a "section 177 State" without first seeking approval from EPA. Thus, the 1977 amendments further recognize California's important role in mobile source air pollution control, both by making it easier for California to obtain waivers (by allowing the State's protectiveness determination to be made "in the aggregate") and by expanding the opportunity (via CAA section 177) for other states to adopt California's standards.

---

[43] H.R. Rep. No. 95–294, at 301 (1977).

[44] This provision was intended to continue the balance, carefully drawn in 1967, between states' need to meet increasingly stringent federal air pollution limits and the burden of compliance on auto-manufacturers. *See, e.g.*, H.R. Rep. No. 294, 95th Cong., 1st Sess. 309–10 (1977) ("[S]ection 221 of the bill broadens State authority, so that a State other than California . . . is authorized to adopt and enforce new motor vehicle emission standards which are identical to California's standards. Here again, however, strict limits are applied . . .. This new State authority should not place an undue burden on vehicle manufacturers . . .."); *Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation,* 17 F.3d 521, 527 (2d Cir. 1994) ("Many states, including New York, are in danger of not meeting increasingly stringent federal air pollution limits . . .. It was in an effort to assist those states struggling to meet federal pollution standards that Congress, as noted earlier, directed in 1977 that other states could promulgate regulations requiring vehicles sold in their state to be in compliance with California's emission standards or to 'piggyback' onto California's preemption exemption. This opt-in authority, set forth in § 177 of the Act, 42 U.S.C. 7507, is carefully circumscribed to avoid placing an undue burden on the automobile manufacturing industry.").

14

Given the statutory language, legislative history, and judicial precedent, EPA has consistently interpreted CAA section 209(b) as requiring EPA to grant a waiver unless EPA or opponents of a waiver can demonstrate that one of the criteria for a denial has been met.[45] In this context, since inception, EPA has recognized its limited discretion in reviewing California waiver requests. Therefore, EPA's role upon receiving a request for waiver of preemption from California is only to determine whether it is appropriate to make any of the three factual findings specified by the Act. If EPA cannot make at least one of the three findings, then the waiver must be granted. The three waiver criteria are properly seen as criteria for a denial. This reversal of the normal statutory structure embodies and is consistent with the congressional intent of providing deference to California to maintain and further develop its own new motor vehicle emissions program.

Additionally, in previous waiver decisions, EPA has noted that CAA section 209(b)(1) specifies particular and limited grounds for rejecting a waiver and has therefore limited its review to those grounds.[46] This has led EPA to reject arguments that are not specified in the statute as grounds for denying a waiver:

> The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California. Thus, my consideration of all the evidence submitted concerning a waiver

---

[45] *MEMA I* at 1120–21 ("The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them."); *MEMA II* at 462–63. ("[S]ection 209(b) sets forth the only waiver standards with which California must comply. . .. If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application.").
[46] *See, e.g.*, 78 FR 2112 (January 9, 2013); 87 FR 14332 (March 14, 2022) (SAFE 1 Reconsideration Decision).

decision is circumscribed by its relevance to those questions that I may consider under section 209(b).[47]

## 2. Deference to California

Apart from adjudicating the statutory waiver criteria, the Administrator lacks the authority to generally review the State's program based on his own notions of reasonableness or the public interest.[48] CAA section 209(b) directs the Administrator to waive application of section 209(a) and then provides specified findings under which the Administrator is directed to not grant the waiver. EPA has consistently noted that the text, structure, and history of the California waiver provision clearly indicate congressional intent to leave decisions on "ambiguous and controversial matters of public policy" to California's judgment.[49] Congress did so to ensure that the Federal government did not second-guess the wisdom of state policy.[50] In an early waiver decision, EPA highlighted this deference:

> It is worth noting … I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach … may be attended with costs, in the shape of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory

---

[47] 78 FR at 2115 (footnote omitted).

[48] *MEMA I*, 627 F.2d at 1124 n.56; *see also* at 1119 ("The EPA Administrator does not have authority to regulate either the motor vehicle manufacturing industry or the State of California under a broad charter to advance the public interest.... As the Administrator has consistently held since first vested with the waiver authority, **his inquiry under section 209 is modest in scope. He has no "broad and impressive" authority to modify California regulations."); *id.* at 1124 ("whether the [CARB] regulations were themselves arbitrary and capricious ... is not a question for the Administrator or this court").

[49] 40 FR 23102, 23103–04 (May 28, 1975); *see also* LEV I, 58 FR 4166 (January 13, 1993), Decision Document at 64.

[50] *Ford*, 606 F.2d at 1302. ("The Administrator is charged with undertaking a single review in which he applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver without exploring the consequences of nationwide use of the California standards or otherwise stepping beyond the responsibilities delineated by Congress.").

agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[51]

This view is further supported by the House Committee Report accompanying the 1977 amendments to the Act. The Report explained that, although Congress had the opportunity to restrict the waiver provision, it instead elected to expand California's flexibility to adopt a complete program of motor vehicle emission controls. According to the Report, the 1977 amendments were intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.[52]

3.   Standard and Burden of Proof

In *Motor and Equipment Manufacturers' Association, Inc. v. EPA*, 627 F.2d. 1095, 1122 n.54 (D.C. Cir. 1979) (*MEMA I*), the U.S. Court of Appeals for the District of Columbia stated, with regard to the standard and burden of proof, that the Administrator's role in a CAA section 209 proceeding is to

> consider all evidence that passes the threshold test of materiality and . . . thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver.[53]

The court in *MEMA I* considered the standards of proof under CAA section 209 for the two factual findings necessary to grant a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) Protectiveness in the aggregate and (2) consistency with CAA section 202(a) findings. The court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies

---

[51]  40 FR 23102, 23103–04 (May 28, 1975); LEV I, 58 FR 4166 (January 13, 1993), Decision Document at 64.
[52]  H.R. Rep. No 294, 95 Cong., 1st Sess. 301–02 (1977) (cited in *MEMA I*).
[53] *MEMA I,* 627 F.2d at 1122.

with the finding involved. We need not decide how this standard operates in every waiver decision."[54]

With respect to California's protectiveness determination, the court upheld the Administrator's position that to deny a waiver there must be clear and compelling evidence to show that the proposed procedures undermine the protectiveness of California's standards.[55] The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare.[56]

With respect to the consistency finding, the court did not articulate a standard of proof applicable to all proceedings but found that the opponents of the waiver were unable to meet their burden of proof even if the standard were a mere preponderance of the evidence. Although *MEMA I* did not explicitly consider the standards of proof under CAA section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations. EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary conditions and whether the standards are technologically feasible—Congress intended that the standard of EPA review of the State decision to be a narrow one."[57]

As noted earlier, the burden of proof in a waiver proceeding is on the opponents of the waiver. This is clear from the statutory language stating that EPA "shall . . . waive" preemption

---

[54] *Id.*
[55] *Id.* at 1122 & n.54 (citing H.R. Rep. 294, 95th Cong. 1st Sess. 302 (1977)).
[56] *Id.* at 1122.
[57] *See, e.g.,* 40 FR 21102–03 (May 28, 1975).

unless one of three statutory factors is met. This reading was upheld by the D.C. Circuit in

*MEMA I*, which found that:

> The language of the statute and its legislative history indicate that California's regulations, and California's determinations that they must comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied.[58]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the

information in the record in coming to the waiver decision. As the court in *MEMA I* stated:

> The Administrator is not entitled to ignore the evidence adduced at the hearing. He must consider all evidence that passes the threshold test of materiality and he must thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended denial of the waiver.[59]

## III. Discussion

As discussed below, EPA is evaluating the Omnibus Low NOx waiver request under each

waiver criterion of section 209(b)(1). In addition, because of the nonroad authorization request,

as it pertains to the APUs regulation within Omnibus Low NOx Regulation, EPA's application

of the section 209(e)(2) authorization criteria is also set forth below.[60] Finally, EPA received

comments outside the scope of EPA's limited review of the waiver and authorization criteria in

---

[58] *MEMA I,* 627 F.2d at 1121

[59] *Id.* at 1122-1123. The court further provided that "Here, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assertions of his own, he runs the risk of having his waiver decision set aside as arbitrary and capricious. His "burden" is the burden of acting reasonably." The court, in footnote 56 to the quote here, noted that "Here the Administrator has no broad mandate to assure that California's emissions control program conforms to the Administrator's perceptions of the public interest. Absent the contingency that he is able to make contrary findings, his role with respect to the California program is largely ministerial."

[60] In the following discussion, EPA generally focuses on the waiver criteria in section 209(b) as opposed to section 209(e). This is because the adverse comments generally focus on the onroad heavy-duty standards subject to section 209(b), and EPA received few comments regarding the nonroad APU standards subject to section 209(e). EPA's conclusions regarding each waiver prong, however, apply to the entire Omnibus package, including both the onroad portions subject to section 209(b) and the nonroad portions subject to section 209(e).

section 209. A discussion of those comments is found in the "Other Issues" section of this

decision.

### A. *California's Protectiveness Determinations*

We now turn to California's protectiveness determinations for its waiver request. Section

209(b)(1)(A) of the Clean Air Act requires EPA to deny a waiver if the Administrator finds that

California was arbitrary and capricious in its determination that its State standards will be, in the

aggregate, at least as protective of public health and welfare as applicable Federal standards.

EPA may not disregard California's determination unless there is "clear and compelling

evidence" to the contrary.[61] Moreover, "[t]he language of the statute and its legislative history

indicate that California's regulations, and California's determination that they comply with the

statute, when presented to the Administrator are presumed to satisfy the waiver requirements."[62]

EPA's long-standing interpretation is that the phrase "State standards" in section

209(b)(1) means the entire California new motor vehicle emissions program.[63] Therefore, as

explained below, when evaluating California's protectiveness determination, EPA compares the

California standards to the Federal standards. That comparison is undertaken within the broader

context of the previously waived California program, which relies upon protectiveness

determinations that EPA has previously found were not arbitrary and capricious.[64] That

---

[61] *MEMA I,* 627 F.2d 1095, 1121–22 (D.C. Cir. 1979)

[62] *Id. See also Ford Motor,* 606 F.2d 1293, 1297 (D.C. Cir. 1979).

[63] 74 Fed. Reg. 32744, 32749 (July 8, 2009); 70 Fed. Reg. 50322 (Aug. 26, 2005); 77 Fed. Reg. 9239 (Feb. 16, 2012); 78 Fed. Reg. 2112, 2123 (Jan. 9, 2013).

[64] 36 FR 17458 (Aug. 31, 1971). ("The law makes it clear that the waiver requests cannot be denied unless the specific finding designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California."). The "more stringent" standard expressed here in 1971 was superseded by the 1977 amendments to section 209, which established that California's standards must be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. The stringency standard remains, though, in section 209(b)(2).

evaluation follows the instruction of section 209(b)(2), which states: "If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of [209(b)(1)]."

To review California's protectiveness determination in light of section 209(b)(2), EPA conducts its own analysis of the newly adopted California standards to comparable applicable Federal standards. The comparison quantitatively answers whether the new standards are more or less protective than the Federal standards.

Section 209 provides two paths for a reasonable protectiveness finding. In addition to a side-by-side comparison of California and applicable Federal standards considering section 209(b)(2), California's program can still be at least as protective as EPA's program, even if some (or even all) of the new or amended standards in a waiver request are less stringent than EPA's standards.[65] Thus, EPA first examines whether the side-by-side analysis under section 209(b)(2) resolves the protectiveness inquiry. If, and only if, there are some EPA standards numerically more stringent that the California standards, then the question that EPA reviews is whether the new or amended standards would cause California's new motor vehicle emissions program as a whole ("in the aggregate") to become less protective than EPA's program. A finding that California's determination was arbitrary and capricious under section 209(b)(1)(A) must be based upon "'clear and compelling evidence' to show that proposed [standards] undermine the protectiveness of California's standards."[66]

Further, section 209(e)(2)(A) directs EPA to grant an authorization to California for emissions standards and other emissions-related requirements with criteria like section 209(b).

---

[65] Id.
[66] MEMA I, 627 F.2d at 1122.

As such, the protectiveness language in section 209(e)(2)(A)(i) is identical to the protectiveness language in 209(b)(1)(A). EPA confirms that it similarly interprets sections 209(b) and (e) because the language is similar.[67]

As noted previously, when considering whether to grant waivers for accompanying enforcement procedures tied to standards for which a waiver has already been granted, Administrators have long held that they will only address the question under section 209(b)(1)(A) is whether the enforcement procedures are so lax that they threaten the validity of California's determination that its standards are as protective of public health and welfare as applicable federal standards.[68]

With respect to the Omnibus Low NOx waiver request, CARB notes that in adopting the Omnibus Regulation, the Board approved Resolution 20-23, in which it expressly declared:

> BE IT FURTHER RESOLVED that the Board hereby determines that the regulations adopted herein will not cause California motor vehicle and off-road engine emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards.[69]

CARB notes there is no basis for the Administrator to find that the CARB Board's determination is arbitrary or capricious. As previously discussed, the Administrator has already determined that California's preexisting emission standards and emissions-related requirements, generally, and for heavy-duty diesel and Otto-cycle engines and vehicles, specifically, are, in the aggregate, at least as protective of public health and welfare as applicable federal standards. CARB also notes that the Omnibus Regulation establishes emission standards and emissions-related requirements

---

[67] *Air Pollution Control; Preemption of State Regulation for Nonroad Engine and Vehicle Standards (Final 209(e) Rule)*, 59 Fed. Reg. 36969 (July 20, 1994), Decision Document accompanying 60 Fed. Reg. 37440 (July 20, 1995) at p. 11; 65 Fed. Reg. 69763, 69764 (Nov. 20, 2000).

[68] *Motor and Equipment Mfrs. Ass'n, v. E.P.A*, 627 F.2d 1095, 1113 n.36 (D.C. Cir. 1979) (The Administrator "explored whether the procedures had a negative effect on the protectiveness of the California standards for which a waiver had already been granted. *See* 43 Fed.Reg. 32183 (1978), *reprinted in* J.A. at 56. This inquiry is perfectly consistent with the Administrator's past practice and his position in this court.")

[69] EPA-HQ-OAR-2022-0332. *See* Board Resolution 20-23.

"are significantly more stringent than corresponding federal emission standards and emissions related requirements, and consequently only increases the relative stringency of California's motor vehicle emissions control program compared to the federal motor vehicle emissions control program." Thus, CARB maintains there is no basis to deny this waiver request under the protectiveness criterion—under either the analysis undertaken pursuant to section 209(b)(2) or the aggregate analysis undertaken pursuant to section 209(b)(1).[70]  Regarding the 2023 Targeted Amendments, CARB notes that the amendments "do not reduce the stringency of the emissions standards, associated test procedures, or accompanying enforcement procedures of the Omnibus regulation, but instead solely provide manufacturers additional compliance options to sell legacy engines during the 2024 through the 2026 MYs, provided manufacturers fully offset the emissions increases resulting from the new compliance options".[71]

1. Comments on California's Protectiveness Determination

EPA received several comments that claimed that CARB's protectiveness determinations in support of the Omnibus Low NOx waiver request is arbitrary and capricious. Several commenters asserted that *CARB* over-estimated the emission benefits of its standards, even though CARB noted that its standards would still enhance the relative protectiveness of the California program that EPA previously found to be as protective as the federal program.[72] EPA did not receive any comments on CARB's APU regulations (contained in the Omnibus Low NOx regulation) related to the protectiveness finding at section 209(e)(2)(A)(i).

---

[70] *Id.* at 46-50.
[71] Docket No. EPA–HQ–OAR–2022–0332-0099, page 12.
[72] CARB Supplemental Comments, Docket No. EPA-HQ-OAR-2022-0332-0083 at 2. CARB notes that if there are any benefits from the new standards then their adoption cannot render the existing California program less protective.

EPA also received comment that questioned the policy of CARB's adoption of the Omnibus Low NOx regulation. One commenter claimed that maintaining the existing federal standards would be the best way for California to minimize environmental impacts, instead of California's approach that would slow fleet turnover. Some commenters also claimed that CARB should have adopted different regulatory approaches such as one that incorporates low NOx emission standards with increased introduction of renewable liquid and gaseous fuels, which the commenter claimed would be more cost effective.[73] In response, CARB noted that EPA is precluded from considering different policy or hypothetical rulemaking options that CARB might have considered and rather is properly guided by the language at section 209(b)(2) that clearly states that if each state standard is at least as stringent as the comparable federal standard that such California standards shall be deemed at least as protective of public health and welfare as such federal standards for purposes of section 209(b)(1).[74]

As noted above, EPA received several comments that claimed that CARB's Omnibus Low NOx regulation would slow down fleet turnover.  EPA similarly received the comments that the Omnibus Low NOx rule would encourage the longer use of older equipment so the "aggregate" emissions would actually increase.[75] This commenter also stated that "California's go-it-alone approach" was arbitrary because the Omnibus Low NOx rule would be unable to "address out-of-state or foreign emissions from transportation."[76] Another commenter stated that

---

[73] One commenter suggests that to the extent the Omnibus Low NOx rule is technologically infeasible or cost prohibitive for customers or otherwise raise reliability concerns then CARB's protectiveness finding would be "arbitrary and capricious to issue such a rule". NADA at 2-3. EPA received similar statements from another commenter that also noted that "While it is true that the CARB in-state NOx manufacturer "sales" standards are more stringent than the 2010 EPA federal NOx standard for heavy-duty vehicles" scenarios that encourage the longer use of older equipment experiencing natural emission deterioration has the potential to increase emissions "in the aggregate."" ATA at 2-3.
[74] CARB Supplemental Comments, at 2.
[75] ATA at 2.
[76] ATA at 2-3.

that CARB's Omnibus Low NOx Regulation is either infeasible or that the vehicles meeting such standards are cost prohibitive for customers, as well as that such standards raise reliability concerns. This commenter raised these issues and referenced section 209(b)(1)(C) but also contended that "the agency" would be acting "arbitrarily and capriciously" to grant a waiver for such a rule or standard.[77] We further address these latter comments in our analysis of the third waiver criterion below. [78]

2.  Is California's Protectiveness Determination Arbitrary and Capricious?

As described above, EPA's traditional analysis has been to evaluate California's protectiveness determination first by comparing the new California standards, or amendments, to applicable EPA emission standards for the same pollutants. The comparison of EPA and California standards is undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA has previously found were not arbitrary and capricious.[79] The prior statutory requirement that the California standard be "more stringent" than the federal standard was superseded by the 1977 amendments to section 209, which established that a waiver must be granted where California's standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. This was intended to afford California the broadest possible discretion in designing is motor vehicle emission program.

EPA has received no comment or other information in the record to support an argument that EPA's statutory interpretation of the first waiver prong is unreasonable. In addition, EPA

---

[77] NADA at 2-3.
[78] In general, EPA has long explained that "questions concerning the effectiveness of the available technology are also within the category outside my permissible scope of inquiry," under section 209(b)(1)(C). 41 FR 44209, 44210 (October 7, 1976).
[79] ACC waiver at 2123.

25

received no comment or information that provided any type of numerical comparison of the stringency of CARB's standards to applicable Federal standards. Specifically, there is no evidence in the record to demonstrate, by way of numerical comparison, that CARB's standards are not as stringent, in the aggregate, as EPA's requirements. To the extent that commenters said that CARB over-estimated the emission benefits of its standards, EPA agrees with CARB that, under a numerical comparison of the standards, the new standards will still be more stringent than the federal program if they have any emission benefits.

Regarding the 2023 Targeted Amendments, EPA agrees with CARB that because the amendments do not change the Omnibus emission standards, associated test procedures, or accompanying enforcement procedures, but rather provide additional implementation flexibilities that if used by the manufacturer require the offsetting of any emissions increase, the 2023 Target Amendments do not change EPA's views regarding protectiveness.  CARB also notes that even with the EPA's adoption of more stringent criteria pollutant standards for MY 2027 and later heavy-duty engines,[80] the Omnibus Low NOx program has numerically more stringent emission standards for MYs 2024 – 2026, and similar or more stringent numeric standards for MYs 2027 and later, and thus the Omnibus program is at least as protective as the current Federal program.[81]

Thus, CARB recognizes that even with the most recent EPA on-highway rulemaking actions, the CARB Omnibus Low NOx program (including the minor updates made to the Omnibus Low NOx regulations made in the 2023 Targeted Amendments) is more stringent than the applicable Federal standards for highway heavy-duty engines, and the California motor vehicle program in the aggregate is more stringent than the federal program in the aggregate.

---

[80] See 88 FR 4296 (Jan. 24. 2023).
[81] Docket No. EPA–HQ–OAR–2022–0332-0099, pages 11-15.

EPA agrees with this assessment.  The CARB Omnibus Regulation is more stringent than the applicable Federal standards for criteria pollutants. The Omnibus Regulation is significantly more stringent in Model Years 2024 – 2026 than the EPA criteria pollutant standards for highway heavy-duty engines for those same model years, and for Model Years 2027 and later the Omnibus Regulation is at least as stringent, and in some respects more stringent, than the EPA Model Year 2027 and later criteria pollutant standards.

Because EPA's evaluation of protectiveness considers the entire CARB motor vehicle program, EPA also assessed the protectiveness of CARB's heavy-duty standards as a whole, including with respect to greenhouse gas (GHG) emissions and EPA's most recent heavy-duty GHG rulemaking.[82] For GHGs, the California heavy-duty program is also more stringent than the applicable Federal standards.  The CARB Advanced Clean Trucks (ACT) program includes zero-emission vehicle (ZEV) standards which require new ZEV sales percentages for heavy-duty vocational vehicles which increase each MY from 2024 through 2035, and for MY2035 and later require a 75% penetration of ZEVs, and for heavy-duty tractors the ACT program also begins in MY 2024 and requires increases each year in ZEV sales through MY 2032, and for MY 2032 and later requires a 40% penetration of ZEV technology.  These ACT requirements are more stringent than the performance-based $CO_2$ standards EPA established in the heavy-duty Phase 3 program.  The EPA Phase 3 program begins in MY 2027 (3 years later than the ACT program) and increases in stringency through MY2032.  EPA projected the industry could comply with Phase 3 by selling 30 to 60% ZEVs in MY2032 in the vocational vehicle market (much less than

---

[82] Further consideration of the entire CARB motor vehicle program, including the light-duty program, also do not render CARB's protectiveness determination arbitrary and capricious. No commenter raised such a claim, and as such EPA need not further discuss this here.

the ACT's 75% ZEV requirement) and 25 – 40% ZEV in the tractor market (less than the ACT's 40% for all tractors requirement).[83]

Therefore, we find that the opponents of the waiver have not met their burden of proof to demonstrate that CARB's protectiveness determination contained within their waiver request were arbitrary and capricious and, therefore, EPA cannot deny the CARB's waiver request based on section 209(b)(1)(A).

Additionally, in response to comments suggesting that CARB should have adopted different policies or different regulations, as we further address these latter comments in our analysis of the third waiver criterion below, EPA is not permitted in its statutory role to assess different, hypothetical CARB regulations that CARB might have adopted and then, in turn, compare those regulations to Federal standards.[84]  That is, the relevant question before EPA is whether California's standards are in the aggregate at least as protective as the federal ones, not whether California hypothetically should have adopted a different program that the commenter prefers.

---

[83] EPA's performance-based GHG standards also allow manufacturers to comply in other ways. However, comparing the proportion of ZEVs in the Federal modeled compliance pathway performed for the EPA Phase 3 final rule is an informative way to assess the relative protectiveness of the Federal and State programs.  For additional detail demonstrating that the overall stringency of the CARB ACT program is greater than the EPA Phase 3 program, see the Regulatory Impact Analysis document for the Phase 3 final rule, Section 4.2.2, including Table 4-5, EPA report EPA-420-R-24-006, March 2024.

[84] EPA has recognized that the intent of Congress in creating a limited review based on the section 209(b)(1) criteria was to ensure that the federal government did not second-guess state policy choices. This has led EPA to state "It is worth noting … I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shaped of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score." (40 FR 23103–23104; *see also* LEV I (58 FR 4166), January 13, 1993) Decision Document at 64).

EPA also finds no evidence in the record, to support the claim that purchasing decisions will result in fewer emission benefits from CARB's Omnibus Low NOx Regulation, and commenters do not otherwise demonstrate that the regulation will result in a less protective program than applicable Federal standards. Moreover, the protectiveness inquiry is focused on whether CARB's standards are on their face more protective based on the statutory language in CAA section 209(b)(2), and the statute does not permit EPA to conduct an extensive inquiry into whether independent decisions made by unregulated third parties (like purchasers of trucks) could somehow affect the emissions benefits of the standards.

Finally, EPA received no adverse comments regarding the protectiveness of the nonroad elements of the Omnibus Low NOx rule or of California's nonroad program.

3. Section 202(b)(1)(A) and Section 209(e)(2)(A)(i) Conclusion

Based on the record before EPA, we cannot find that CARB was arbitrary and capricious in its determination that the California heavy-duty vehicle and engine standards, including the Omnibus Low NOx rule, are in the aggregate at least as protective of public health and welfare as applicable federal standards. Nor can EPA find that CARB was arbitrary and capricious in its determination that the California nonroad program, including the relevant elements of the Omnibus Low NOx rule, are in the aggregate at least as protective of public health and welfare as applicable federal standards. Therefore, we find that the opponents of the waiver have not met their burden of proof to demonstrate that CARB's protectiveness determinations associated with the Omnibus Low NOx regulations were arbitrary and capricious and, therefore, EPA cannot deny CARB's waiver requests based on section 209(b)(1)(A) or 209(e)(2)(A)(i).

B. Does California Need Its Standards to Meet Compelling and Extraordinary Conditions?

29

Under section 209(b)(1)(B) of the Act, EPA cannot grant a waiver if EPA finds that California "does not need such State standards to meet compelling and extraordinary conditions." EPA has traditionally interpreted this provision as requiring a consideration of whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions.[85]

For nearly the entire history of the waiver program, EPA has read the phrase "such State standards" in section 209(b)(1)(B) as referring back to standards "in the aggregate," in the root paragraph of section 209(b)(1), which calls for California to make a protectiveness finding for its standards. EPA has interpreted the phrase "in the aggregate" as referring to California's program as a whole, rather than each State standard, and as such not calling for the Agency's standard-by-standard analysis of California's waiver request.[86] EPA has thus reasoned that both statutory provisions must be read together so that the Agency reviews the same standards that California considers in making its protectiveness determination.[87] More recently, EPA has also had cause to explain that section 209(b)(1)(C) also supports the "whole program" interpretation of section 209(b)(1)(B).[88]

---

[85] 87 FR 14332 (March 14, 2022).

[86] "The interpretation that my inquiry under section 209(b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[87] 74 FR at 32751 n. 44, 32761 n.104; 78 FR at 2126–2127 n. 78.

[88] EPA notes there would be an inconsistency if "State standards" meant all California standards when used in section 209(b)(1) but only particular standards when used in 209(b)(1)(B) and 209(b)(1)(C). EPA has traditionally interpreted the third waiver criterion's feasibility analysis as a whole-program approach. 87 FR 14361, n.266. See also 84 FR at 51345; *Am. Trucking Ass'n v. EPA*, 600 F.3d 624, 627 (D.C. Cir. 2010) (*ATA v. EPA*); *Dalton Trucking v. EPA*, No. 13–74019 (9th Cir. 2021) ("The EPA was not arbitrary and capricious in declining to find that 'California does not need such California standards to meet compelling and extraordinary conditions,' § 7543(e)(2)(A)(ii), under the alternative version of the needs test, which requires 'a review of whether the Fleet Requirements are per se needed to meet compelling and extraordinary conditions,' 78 FR at 58,103. The EPA considered 'the relevant factors,' *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., Inc*., 463 U.S. 29, 42–43 (1983), including statewide air quality, 78 FR 58,104, the state's compliance with federal National Ambient Air Quality standards for ozone and PM2.5 on a statewide basis, id. at 58,103–04, the statewide public health benefits, id. at 58,104, and the utility of the Fleet Requirements in assisting California to meet its goals, id. at 58,110. Contrary to Dalton's argument, the EPA did not limit its review to two of California's fourteen air quality

Addressing section 209(b)(1)(B) in the 1983 LEV waiver, EPA explained that:

> This approach to the "need" criterion is also consistent with the fact that because California standards must be as protective as Federal standards in the aggregate, it is permissible for a particular California standard or standards to be less protective than the corresponding Federal standard. For example, for many years, California chose to allow a carbon monoxide standard for passenger cars that was less stringent than the corresponding Federal standard as a "trade-off" for California's stringent nitrogen oxide standard. Under a standard of review like that proposed by MVMA/AIAM, EPA could not approve a waiver request for only a less stringent California standard because such a standard, in isolation, necessarily could be found to be contributing to rather than helping, California's air pollution problems.[89]

In 1994, EPA again had cause to explain the Agency's reading of section 209(b)(1)(B) in the context of California's particulate matter standards waiver request:

> [T]o find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could 'include some less stringent than the corresponding federal standards.' See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977). Congress could not have given this flexibility to California and simultaneously assigned to the state the seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard.[90]

Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for EPA review of California's whole program. With two noted exceptions described below, EPA has consistently interpreted this provision as requiring the Agency to consider whether California needs a separate motor vehicle emission program as compared to the specific standards in the waiver request at issue to meet compelling and extraordinary conditions. Congress intended to allow California to address its extraordinary environmental conditions and foster its role as a laboratory for motor vehicle emissions control. The Agency's longstanding practice therefore has

---

regions. The EPA examined the relevant data provided by CARB, and it articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.' See *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (cleaned up).").

[89] 58 FR 4166, LEV Waiver Decision Document at 50–51.

[90] 49 FR at 18887, 18890.

been to evaluate CARB's waiver requests with the broadest possible discretion to allow California to select the means it determines best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[91] EPA notes that "the statute does not provide for any probing substantive review of the California standards by federal officials."[92] As a general matter, EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[93]

EPA has on two separate instances limited its interpretation of this provision to California motor vehicle standards that are designed to address local or regional air pollution problems.[94] In both instances EPA determined that the traditional interpretation was not appropriate for standards designed to address a global air pollution problem and its effects and that it was appropriate to address such standards separately from the remainder of the program (the alternative interpretation).[95] However, more recently, EPA has explained that the reinterpretation of the second waiver prong in this manner is flawed and such interpretation is inappropriate, and

---

[91] See, e.g., S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 (''[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.'') (Statement of Sen. Murphy).

[92] Ford Motor, 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[93] 74 FR at 32763–65; 76 FR 34693; 79 FR 46256; 81 FR 95982.

[94] 73 FR 12156 (March 8, 2008); 84 FR 51310 (September 27, 2019) (SAFE 1).

[95] Id. In SAFE 1 EPA withdrew a portion of the waiver it had previously granted for California's Advanced Clean Cars (ACC) program – specifically, the waiver for California's zero emission vehicle (ZEV) mandate and the GHG emission standards within California's ACC program. EPA based its action, in part, on its determination that California did not need these emission standards to meet compelling and extraordinary conditions, within the meaning of section 209(b)(1)(B) of the CAA. That determination was in turn based on EPA's adoption of a new, GHG-pollutant specific interpretation of section 209(b)(1)(B). In any event, EPA expressly stated that its new interpretation of section 209(b)(1)(B) only applies to waiver requests for GHG emission-reducing standards, 84 FR 51341, and n. 263. Therefore, even under the SAFE 1 interpretation (which EPA does not agree with for the reasons explained below and in the SAFE 1 Reconsideration Decision), EPA's traditional interpretation would still apply to this request given all of the standards at issue are related to the reduction of criteria pollutant emissions.

32

that the traditional interpretation – in which EPA reviews the need for California's motor vehicle program is the best interpretation.[96] In the SAFE 1 Reconsideration Decision the Agency evaluated the traditional interpretation and the appropriateness of interpreting section 209(b)(1)(B) the same for all pollutants as well as a textual analysis of why both section 209(b)(1)(A) and section 209(b)(1)(C) help inform the best interpretation that the "need for such standards" means the need for California's mobile source emission program rather than a need for a specific standard. EPA believes that the rationale for this position contained in the SAFE 1 Reconsideration Decision continues to apply and that as explained below EPA believes this is the best interpretation. Further, EPA's FR Notice for Omnibus Low NOx waiver request noted the intention to use the traditional interpretation and sought comment on whether the standards within the waiver request met section 209(b)(1)(B).[97]

CARB noted, in the context of its HD Omnibus waiver request, that at the time of the adoption of the regulation CARB found that "California still has the most severe air pollution problems in the United States" and that CARB needs to seek emission reductions from all sources under its authority to meet federal emission reduction requirements.[98] CARB noted particularly that the South Coast and San Joaquin Valley Air Basins continue to experience some of the worst air quality in the nation and that these challenges that moved Congress to authorize California to establish separate on-road vehicle standards in 1967, still exist today.[99] CARB also

---

[96] SAFE 1 Reconsideration Decision.

[97] See 87 FR at 35767 (this FR Notice also notes EPA will evaluate CARB's APU regulation under section 209(e) - with the same "whether California needs such standards to meet compelling and extraordinary conditions criterion").

[98] Omnibus Low NOx Waiver Support Document, at 51 (citing CARB Board Resolution 20-23).

[99] Id. at 51–52 (citing 74 FR. 32744, 32762–63 (July 8, 2009); 79 FR 6584, 6588–90 (Feb. 4, 2014); 82 FR 6540, 6543 (Jan. 19, 2017)). In 2007, 19 of California's air quality districts were in nonattainment with the eight-hour ozone 0.08 ppm NAAQs. Currently, 37 California counties are in nonattainment with the 2015 eight-hour ozone 0.070 ppm NAAQs, and 26 of California's counties are in nonattainment with the 2006 PM 2.5 NAAQS. https://www3.epa.gov/airquality/greenbook/ancl.html (last accessed Oct. 28, 2021).

noted that, in the event EPA determines that the alternative interpretation of section 209(b)(1)(B) applies to the waiver request, CARB still satisfies this criterion.[100]

1. Comments on the Second Prong

EPA received several comments requesting a denial of the Omnibus Low NOx waiver request based on the grounds of section 209(b)(1)(B)—that "such State does not need such State standards to meet compelling and extraordinary conditions." Commenters asserted that the second waiver prong should be interpreted so that the need for California's standards is interpreted on a standard-by-standard basis. In the context of such an interpretation several commenters claimed that one or more of the standards in the waiver requests was not needed to meet compelling and extraordinary conditions.

Regarding the interpretive issue of whether EPA should evaluate a need for the motor vehicle emission program versus an evaluation of the need for a specific standard, EPA received comment that raise arguments that EPA has previously addressed in other waivers. This commenter claims that EPA continues to incorrectly interpret the waiver criteria in a manner that does not allow evaluation of each new California emission standard. The commenter asserts that

---

[100] Omnibus Low NOx Waiver Support Document, at 51 ("Even in the event that EPA determines that its SAFE 1 interpretation of section 209(b)(1)(B) applies to this waiver request, CARB satisfies that interpretation of the criterion. The on-road heavy-duty vehicles regulated by the Omnibus Regulation are significant sources of harmful air pollutants, especially oxides of nitrogen (NOx) and particulate matter (PM). (ISOR, pp. ES-1 and ES-2), and constitute the largest source of NOx emissions in California. (ISOR, ES-1). California needs to achieve reductions of both NOx and PM to attain the national ambient air quality standards for ozone and particulate matter, and in fact the Omnibus Regulation will achieve approximately half of the NOx commitments in California's State Implementation Plan (ISOR, p. ES-2). In addition, NOx emissions pose serious risks to the health and welfare of Californians, because NOx emissions not only cause lung irritation and aggravate lung diseases, they also react in the atmosphere to form additional pollutants - ozone and particulate matter, which additionally pose serious risks to the health and environment of Californians, including increased risks of lung and heart diseases and premature death. (Appendix E to ISOR). The Omnibus Regulation is expected to reduce the total number of incidents for premature mortality, cardiovascular hospitalization, acute respiratory hospitalization, and emergency room visits by 4,494 between 2022 through 2050, which is equivalent to the monetized health benefits of approximately $23.4 billion (FSOR, p. 247). EPA has never disputed California's need to reduce emissions of criteria pollutants. 79 Fed. Reg. 46256, 46261-262 (Aug. 7, 2014).").

EPA conflates the protectiveness criteria with the "Needs Test" in section 209(b)(1)(B).[101] This commenter also asserts that EPA's interpretation of the second waiver criterion grants California with preferential regulatory treatment "by rubber-stamping every regulatory change CARB makes" and thus violates the equality of the states under the Equal Sovereignty doctrine and also raises questions of vast economic and political significance.

One commenter also asserted that, within the context of the alternative interpretation, California only needs to reduce criteria air pollution in two air districts in and cannot therefore "need" statewide standards.[102]

In their own comments, CARB noted that California needs to reduce criteria pollution along major roadways throughout many parts of the State and that even if California only needed to reduce criteria pollutants in the two districts with the worst overall air quality, statewide standards are still needed due to trucks travelling from one part of the State to these districts.[103] CARB notes that EPA has consistently found these challenges, and the conditions that give rise to them, are "extraordinary and compelling" and thus the California needs a separate new motor vehicle emissions program.[104]  CARB noted that even under an alternative interpretation of section 209(b)(1)(B), that its regulations are needed as they dramatically reduce NOx emissions from heavy-duty vehicles and engines and also reduces particulate matter emissions.[105]

---

[101] Texas Public Policy Foundation at 2-4. This commenter also asserts that legislative intent does not justify EPA's interpretation and that California must submit a new waiver request each time it alters or adds emission standards reflects a test different from whether California continues to need its motor vehicle emission program.
[102] Texas Public Policy Foundation at 3.
[103] CARB Supplemental Comments at 5–6, note 36. *See also* CARB Initial Omnibus Low NOx Comments, at 5–6, 26–27("[B]oth the South Coast and San Joaquin Valley air districts—which are home to over half of California's population—are classified as 'extreme nonattainment areas for the 2008 eight-hour federal ozone standard.' These are the only extreme nonattainment areas in the country. These same districts are also the only serious nonattainment areas in the country for the federal particulate matter standards.").
[104] *Id.*
[105] CARB Initial Omnibus Low NOx Comments, at 5–6,

EPA also received comments that the specific regulations are not necessary (as a factual matter) because there are other, more effective existing or proposed standards and/or because these standards will be ineffective.  A commenter argues that the Omnibus Low NOx Regulation is not necessary because EPA's pending HD 2027 rule is the "more logical national solution."[106] EPA also received comment that the Omnibus Low NOx regulation[107] is not necessary because the regulation may actually increase criteria emissions by making new trucks more expensive and slowing fleet turnover.

2.  Does California Need Its Standards to Meet Compelling and Extraordinary Conditions?

With respect to the need for California's state standards to meet compelling and extraordinary conditions, EPA continues to apply the traditional interpretation of the waiver provision. Many of the adverse comments arguing against the traditional interpretation were also made in the SAFE 1 Reconsideration proceeding. EPA's responses to applicable comments on these arguments generally remains the same as in the SAFE 1 Reconsideration decision, and the agency incorporates the relevant reasoning in that action here.[108]

As stated above and in the SAFE 1 Reconsideration decision, the better way to interpret this provision is to determine whether California continues to have compelling and extraordinary conditions giving rise to a need for its own new motor vehicle emission program.[109] As explained

---

[106] ATA at 4.
[107] ATA at 3.
[108] 87 FR 14332 (March 14, 2022).
[109] To the extent comments contend that EPA's interpretation of the second waiver prong provides preferential treatment to California over other States, EPA incorporates the reasoning from the SAFE 1 Reconsideration Decision at 14360. EPA evaluates CARB's waiver requests based solely on the criteria in section 209(b)(1) and the authorization criteria in section 209(e)(2)(A) and not constitutional claims and continues to find that Congress struck a reasonable balance in authorizing two standards (EPA's and California's if certain criteria are met) but that that equal sovereignty principle simply does not fit in section 209. EPA further addresses the commenter's concerns relating to the Equal Sovereignty doctrine in the Other Issues section below. Similarly, to the extent that commenters contend that EPA's traditional interpretation raises questions of vast economic and political significance where Congress must speak clearly, EPA believes that this doctrine is inapplicable. That doctrine posits that in certain extraordinary cases, Congress should not be presumed to delegate its own authority over matters of vast economic

in the SAFE I decision, and as set forth here, EPA believes the traditional interpretation is the best interpretation. EPA believes this is true both for section 209(b)(1)(B), which was at issue in the SAFE 1 Reconsideration action, and also for the analogous section 209(e)(2)(A)(ii), which uses similar language as 209(b)(1)(B). Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems. It is inappropriate for EPA to second-guess CARB's policy choices and objectives in adopting its heavy-duty vehicle and engine standards designed to achieve long term emission reductions.  EPA's longstanding practice, based on the statutory text, legislative history, and precedent, calls for deference to California in its approach to addressing the interconnected nature of air pollution within the state and is not limited to criteria pollutant problems. Critically, EPA is not to engage in "probing substantive review" of waiver requests,[110] but rather to "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[111]

As noted above, the term compelling and extraordinary refers primarily to the factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems.[112] California still faces such conditions. For example, as stated in CARB's waiver request and additional written comment, California and particularly the

---

and political significance to federal agencies in the absence of clear statutory authorization. These concerns have no logical connection to provisions that preserve state authority. Furthermore, the language and history of section 209(b) and (e) provide clear evidence that Congress intended for California to have great deference in designing its own vehicle program. *MEMA I*, 627 F.2d at 1111.

[110] *Ford Motor*, 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[111] *MEMA II*, 142 F.3d 449, 453 (D.C. Cir. 1998).

[112] In response to commenters that believe that the traditional interpretation is simply a "rubbers-stamp" because EPA has already once decided that California "needs" its own motor vehicle program, EPA notes that although California has yet to resolve its pollutant problems, that does not mean it will never do so or that Congress could not aim for that goal. *See* 87 FR at 14336 n.22. So long as those problems persist, however, EPA's affirmance of California's need for a separate vehicle program allows California to continue to serve as a "laboratory" for resolving its own pollution problems and those of the entire nation. *See MEMA I*, 627 F.2d at 1109-11.

South Coast and San Joaquin Valley Air Basins continue to experience some of the worst air quality in the nation and continue to be in nonattainment with national ambient air quality standards (NAAQS).[113]

In addition, EPA did not receive any adverse comments suggesting that California no longer needs a separate motor vehicle emissions program to address the various conditions that lead to serious and unique air pollution problems in California. EPA did receive comment that did not address the underlying conditions but rather contend that California does not have a need for its standards as only two areas in the State (the San Joaquin Valley and the South Coast) have serious air quality issues, EPA believes this commenter has not met their burden of proof in light of evidence regarding the air quality in the remainder of the State.[114] Based on the record, EPA is unable to identify any change in circumstances or any evidence to suggest that the conditions that Congress identified as giving rise to serious air quality problems in California no longer exist. Therefore, using the traditional approach of reviewing the need for a separate California program to meet compelling and extraordinary conditions, EPA cannot deny these respective waiver requests.

Further, EPA does not believe, to the extent that it is appropriate to examine the need for CARB's specific heavy-duty vehicle and engine standards to meet compelling and extraordinary conditions, that the opponents of the waiver request have met their burden of proof. The record

---

[113] *See, e.g.*, CARB Supplemental Comments at 5-6, note 36; CARB Initial Omnibus Low NOx Comments, at 5–6, 26–27("[B]oth the South Coast and San Joaquin Valley air districts—which are home to over half of California's population—are classified as 'extreme nonattainment areas for the 2008 eight-hour federal ozone standard.' These are the only extreme nonattainment areas in the country. These same districts are also the only serious nonattainment areas in the country for the federal particulate matter standards."); State of California et al, at 12–13 ("Sixteen of the 8-hour ozone nonattainment areas are located in California and the only two extreme nonattainment areas in the nation are located in the South Coast Air Basin and San Joaquin Valley of California. Indeed, for the South Coast Air Basin to meet the federal ozone standards, overall NOx emissions need to be reduced by 70 percent from today's levels by 2023, and approximately 80 percent by 2031.").
[114] *Id.*

demonstrates that the Omnibus Low NOx regulation is designed to produce reductions in criteria emissions that continue to be of serious air quality concern in California that is a result of its compelling and extraordinary conditions.

Regarding comments received that the specific regulations are not necessary because CARB's Heavy-Duty Inspection & Maintenance Program and EPA's HD 2027 criteria pollutant rule are or will be more effective, EPA notes that California is entitled to substantial deference in its policy choices regarding the best path to address its air pollution problems, including the choice to adopt or retain emission standards that overlap with previous California standards and EPA's standards.[115]  In response to comments received that the specific regulations are not necessary (as a factual matter) because they may slow fleet turnover, EPA believes that these commenters have not met their burden of proof that such a result in fleet turnover would cause an increase in emissions or that California otherwise does not continue to need every reduction in criteria pollutant emissions it can obtain. Nor is fleet turnover even relevant to the second prong, as whether California needs its standards to meet compelling and extraordinary conditions relates to the State's air pollution problems, not to EPA's judgment as to how unregulated third parties might respond to the California regulations and how such responses might affect their ultimate efficacy. As EPA continues to believe California has compelling and extraordinary conditions, it

---

[115] *See, e.g.,* 78 FR at 2129 ("The Commenter . . .  relies on the existence of the federal GHG standards and the 'deemed to comply' language to claim that there is no need for CARB's GHG standards . . . EPA believes that the commenter does not appropriately appreciate the role that Congress envisioned California to play as an innovative laboratory that may set standards that EPA may ultimately harmonize with or that California or EPA may otherwise accept compliance with the others emission program as compliance with their own."). In addition, given that there are a variety of regulatory measures and levels of stringency that California may choose to address the durability of emission controls on vehicles and engines while in use, and the lack of evidence in the record that an inspection and maintenance program is more protective than a warranty regulation (or that both may be implemented at some point), EPA finds that opponents of the waiver have no met their burden of proof with evidence to support their policy preference on an inspection and maintenance program.

is appropriate for EPA to continue giving substantial deference to California's policy choices on how it chooses to protect public health and welfare and achieve its air quality objectives.

With regarding to the CARB 2023 Targeted Amendments, nothing in the amendments impacts EPA's assessment that California continues to have compelling and extraordinary conditions. CARB continues to find that it needs its standards to meet similar compelling and extraordinary conditions as existed at the time of its waiver request, regardless of whether it looks at its motor vehicle emissions program as a whole, or only at the Omnibus Low NOx regulation.[116]

3. Section 209(b)(1)(B) and Section 209(e)(2)(A)(ii) Conclusion

As previously explained, EPA believes that the traditional interpretation of the section 209(b)(1)(B) criterion is the best reading of the statute.[117] Given the similarity between the language in section 209(b)(1)(B) and section 209(e)(2)(A)(ii), EPA believes it is appropriate to apply the same, traditional interpretation to 209(e)(2)(A)(ii). The traditional approach is to evaluate California's need for a separate motor vehicle emission program under section 209(b)(1)(B) (or a separate nonroad program under section 209(e)(2)(A)(ii)) to meet compelling and extraordinary conditions. The issue of whether any particular standard is needed or provides comparable emission reductions to federal standards is not a relevant criterion under section 209(b)(1)(B). Applying this approach with the reasoning noted above, with due deference to California, EPA cannot deny the respective waiver requests. CARB has repeatedly demonstrated the need for its motor vehicle program and nonroad program to address compelling and extraordinary conditions in California and opponents of the waiver requests have not demonstrated that California does not need its state standards to meet compelling and

---

[116] Docket No. EPA-HQ-OAR-2022-0332-0099, pages 15-16.
[117] 87 FR 14332 (March 14, 2022).

extraordinary conditions. Therefore, EPA cannot deny the Omnibus Low NOx Regulation waiver request under section 209(b)(1)(B) or 209(e)(2)(A)(ii).

Even if EPA were to look solely at the Omnibus Low NOx regulation, the regulation addresses criteria pollutants such as NOx and PM and aids the State in reducing ambient NOx, PM, and ozone pollution. California continues to experience compelling and extraordinary conditions with regard to criteria air pollution, and it needs the Omnibus Low NOx regulation to address such conditions. Thus, even under this alternative interpretation advanced by some commenters, EPA also cannot deny the waiver request under section 209(b)(1)(B) or 209(e)(2)(A)(ii).

## C. Are California's Regulations Consistent with Section 202(a) of the Clean Air Act?

Under section 209(b)(1)(C), EPA must deny California's waiver request if the Agency finds that California standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. The scope of EPA's review under this criterion is also narrow. This is consistent with the motivation behind section 209(b) to foster California's role as a laboratory for motor vehicle emission control, in order "to continue the national benefits that might flow from allowing California to continue to act as a pioneer in this field."[118] For these reasons, EPA has long believed that California must be given substantial deference when adopting motor vehicle emission standards which may require new or improved technology to meet challenging levels of compliance. Over 50 years ago, this deference was discussed in an early waiver decision that approved a waiver request for California:

> It is worth noting … I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated

---

[118] 40 FR 23102, 23103 (waiver decision citing views of Congressman Moss and Senator Murphy) (May 28, 1975).

standards. Such an approach * * * may be attended with costs, in the shape of a reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score."[119]

In keeping with this deferential posture, as noted earlier, EPA's "traditional" interpretation of section 209(b) has also been to assess whether California's program of motor vehicle emission standards *as a whole* provides for adequate lead time consistent with section 202(a). EPA has also traditionally viewed the third waiver criterion's feasibility analysis as a whole-program assessment, *i.e.*, one that ensures manufacturers have sufficient lead time to comply with the program's standards as a whole, accounting for the interactions between technologies necessary to meet both new and existing standards.[120] EPA's assessment thus involves an analysis of feasibility that can take more than the feasibility and impacts of the *new* standards into account.[121]

EPA has also previously stated that the feasibility determination is limited to whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the federal test procedure. Previous waivers of federal preemption have thus stated that California's standards are not consistent with section 202(a) if there is inadequate lead time to

---

[119] 40 FR 23102, 23104 (May 28, 1975). *See also* 78 FR 2111, 2115–16 (Jan. 9, 2013); 79 FR 46256, 46258 (Aug. 7, 2014); 81 FR 95982, 95984 (Dec. 29, 2016).

[120] As a practical matter, EPA's consideration of the third waiver prong, like the first waiver prong, does not necessitate in every case that EPA re-review previously-approved aspects of California's program – for example, where it is evident that new standards will not interact with existing ones. But where a new waiver request might affect one of EPA's previous assessments under any of the waiver criteria, EPA reviews the program as a whole – or any aspect necessary to confirm alignment with the statutory text. 87 FR at 14361 & n.266.

[121] *Id.* at 14361. The feasibility assessment conducted for a new waiver request focuses on the standards in that request but builds on the previous feasibility assessments made for the standards already in the program and assesses any new feasibility risks created by the interaction between the standards in the petition and the existing standards.

permit the development of technology necessary to meet those requirements, giving appropriate consideration to the cost of compliance within that time.[122] Therefore, EPA's review is limited to the feasibility of the technology rather than whether the underlying requirements are effective or whether other technology might be a better policy choice for California. The Administrator has thus long explained that "questions concerning the effectiveness of the available technology are also within the category outside my permissible scope of inquiry," under section 209(b)(1)(C).[123] Regarding, California's accompanying enforcement procedures, EPA has explained that these procedures would be inconsistent with section 202(a) if the federal and California test procedures conflict, *i.e.*, if manufacturers would be unable to meet both the California and federal test requirements with the same test vehicle.[124] EPA has also explained that "the import of section 209(b) is not that California and Federal standards be identical, but that the Administrator not grant a waiver of Federal preemption where compliance with the California standards is not technologically feasible within available lead time."[125]

Regarding lead time, decisions from the U.S. Court of Appeals for the D.C. Circuit provide guidance regarding the lead time requirements of section 202(a). Section 202(a)(2) states that "any regulation prescribed under paragraph (1) of this subsection (and any revision thereof)

---

[122] *See e.g.*, 38 FR 30136 (Nov. 1, 1973); 40 FR 30311 (July 18, 1975); 71 FR 335 (Jan. 4, 2006) (2007 Engine Manufacturers Diagnostic standards); 70 FR 50322 (August 26, 2005) (2007 California Heavy Duty Diesel Engine Standards); 77 FR 9239 (February 16, 2012) (HD Truck Idling Requirements); 79 FR 46256 (Aug. 7, 2014) (the first HD GHG emissions standard waiver, relating to certain new 2011 and subsequent model year tractor-trailers); 81 FR 95982 (December 29, 2016) (the second HD GHG emissions standard waiver, relating to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers); 82 FR 4867 (January 17, 2017) (On-Highway Heavy-Duty Vehicle In-Use Compliance Program).

[123] 41 FR 44209, 44210 (October 7, 1976); 47 FR 7306, 7310 (February 18, 1982 ("I am not empowered under the Act to consider the effectiveness of California's regulations, since Congress intended that California should be the judge of 'the best means to protect the health of its citizens and the public welfare.'" (Internal citations omitted).

[124] To be consistent, the California certification test procedures need not be identical to the Federal test procedures. California procedures would be inconsistent, however, if manufacturers would be unable to meet both the state and Federal test requirements with the same test vehicle in the course of the same test. *See, e.g.*, 43 FR 32182, (July 25, 1978).

[125] 46 FR 22032, 22034–35 (April 15, 1981).

shall take effect after such period as the Administrator finds necessary to permit the development

and application of the requisite technology, giving appropriate consideration to the cost of

compliance within such period." In *Natural Resources Defense Council v. EPA (NRDC)*, the

court reviewed claims that EPA's PM standards for diesel cars and light trucks were both too

stringent and not stringent enough. In upholding the EPA standards, the court concluded:

> Given this time frame [a 1980 decision on 1985 model year standards]; we feel
> that there is substantial room for deference to the EPA's expertise in projecting
> the likely course of development. The essential question in this case is the pace of
> that development, and absent a revolution in the study of industry, defense of such
> a projection can never possess the inescapable logic of a mathematical deduction.
> We think that the EPA will have demonstrated the reasonableness of its basis for
> projection if it answers any theoretical objections to the [projected control
> technology], identifies the major steps necessary in refinement of the technology,
> and offers plausible reasons for believing that each of those steps can be
> completed in the time available.[126]

Another key case addressing the lead time requirements of section 202(a) is *International

Harvester v. Ruckelshaus (International Harvester)*. In *International Harvester*, the court

reviewed EPA's decision to deny applications by several automobile and truck manufacturers for

a one-year suspension of the 1975 emission standards for light-duty vehicles. In the suspension

proceeding, the manufacturers presented data which, on its face, showed little chance of

compliance with the 1975 standards, but which, at the same time, contained many uncertainties

and inconsistencies regarding test procedures and parameters. In a May 1972 decision, the

Administrator applied an EPA methodology to the submitted data, and concluded that

"compliance with the 1975 standards by application of present technology can probably be

achieved," and so denied the suspension applications.[127] In reviewing the Administrator's

decision, the court found that the applicants had the burden of providing data showing that they

---

[126] *NRDC*, 655 F.2d 318, 331 (D.C. Cir. 1981).
[127] *International Harvester v. Ruckelshaus*, 478 F 2d. 615, 626 (D.C. Cir. 1979).

could not comply with the standards, and if they did, then EPA had the burden of demonstrating that the methodology it used to predict compliance was sufficiently reliable to permit a finding of technological feasibility. In that case, EPA failed to meet this burden.

With respect to lead time, the court in *NRDC* pointed out that the court in *International Harvester* "probed deeply into the reliability of EPA's methodology" because of the relatively short amount of lead time involved (a May 1972 decision regarding 1975 MY vehicles, which could be produced starting in early 1974), and because "the hardship resulting if a suspension were mistakenly denied outweigh[s] the risk of a suspension needlessly granted."[128] The *NRDC* court compared the suspension proceedings with the circumstances concerning the diesel standards before it: "The present case is quite different; 'the base hour' for commencement of production is relatively distant, and until that time the probable effect of a relaxation of the standard would be to mitigate the consequences of any strictness in the final rule, not to create new hardships."[129] The *NRDC* court further noted that *International Harvester* did not involve EPA's predictions of future technological advances, but an evaluation of presently available technology.

EPA has reviewed the information submitted to the record of this proceeding to determine whether the parties opposing, or seeking deferrals of, the waiver request have met their burden to demonstrate that the Omnibus Low NOx Regulation standards (and accompanying enforcement procedures) are not consistent with section 202(a).[130] Despite

---

[128] *NRDC*, 655 F.2d 318, 330.
[129] *Id.* The "hardships" referred to are hardships that would be created for manufacturers able to comply with the more stringent standards being relaxed late in the process.
[130] CAA § 209(e)(2)(A)(iii), 42 U.S.C. 7543(e)(2)(A)(iii) ("No such authorization shall be granted if the Administrator finds that . . . California standards and accompanying enforcement procedures are not consistent with this section"). EPA historically has interpreted the consistency inquiry under the third criterion, outlined above and set forth in section 209(e)(2)(A)(iii), to require that California standards and enforcement procedures be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) (and therefore section 202(a)) of the Act. *See* 40 CFR Part 1074, Subpart B, 73 FR 59379 (October 8, 2008).

comments received suggesting that the CAA prescribes a pre-determined amount of lead time that both EPA and CARB must afford when issuing heavy-duty vehicle emission standards, EPA does not believe that there is a reason to interpret and assess the third waiver criterion any differently than EPA's traditional evaluation of the third criterion as set out above. There is no factual evidence in the record (*e.g.,* supply chains, technology development and implementation, etc.) that indicates an inherent difference in how the emission control technologies that are needed to meet CARB's heavy-duty vehicle regulations should be reviewed by EPA when making a determination about technological feasibility or consistency of test procedures. It is appropriate to evaluate the consistency with section 202(a) requirement the same for each mobile source sector based on such factors as the development and implementation of necessary emission controls (including whether technologies already exist or can be refined) and the lead time and costs associated with doing so. EPA's review of the evidence on the technological feasibility of CARB's standards, in particular the standards which EPA received comment, follows.

Congress has stated that the consistency requirement of section 202(a) relates to technological feasibility.[131] Section 202(a)(2) states, in part, that any regulation promulgated under its authority "shall take effect after such period as the Administrator finds necessary to permit the development and application of the relevant technology, considering the cost of compliance within that time." Section 202(a) thus requires the Administrator to first review whether adequate technology already exists, or if it does not, whether there is adequate time to develop and apply the technology before the standards go into effect. In *MEMA I*, the court

---

[131] H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 301 (1977) ("Also preemption could not be waived if California standards and enforcement procedures were found not to be 'consistent with section 202(a)' (relating to the technological feasibility of complying with these standards).").

addressed the cost of compliance issue at some length in reviewing a waiver decision. According to the court:

> Section 202's cost of compliance concern, juxtaposed as it is with the requirement that the Administrator provide the requisite lead time to allow technological developments, refers to the economic costs of motor vehicle emission standards and accompanying enforcement procedures. See S. Rep. No. 192, 89th Cong., 1st Sass. 5–8 (1965); H.R. Rep. No. 728 90th Cong., 1st Sass. 23 (1967), reprinted in U.S. Code Cong. & Admin. News 1967, p. 1938. It relates to the timing of a particular emission control regulation rather than to its social implications. Congress wanted to avoid undue economic disruption in the automotive manufacturing industry and also sought to avoid *doubling or tripling* the cost of motor vehicles to purchasers. It, therefore, requires that the emission control regulations be technologically feasible within economic parameters. Therein lies the intent of the cost of compliance requirement (emphasis added).[132]

Previous waiver decisions are fully consistent with *MEMA I*, which indicates that the cost of compliance must reach a very high level before the EPA can deny a waiver. Therefore, past decisions indicate that the costs must be excessive to find that California's standards are inconsistent with section 202(a).[133] It should be noted that, as with other issues related to the determination of consistency with section 202(a), the burden of proof regarding the cost issue falls upon the waiver opponents.

Consistent with *MEMA I*, the Agency has evaluated costs in the waiver context by looking at the actual cost of compliance in the time provided by the regulation, not the regulation's cost-effectiveness. The appropriate level of cost-effectiveness is a policy decision of California that is considered and made when California adopts the regulations, and EPA, historically, has deferred to these policy decisions. EPA has stated in this regard, "the law makes it clear that the waiver request cannot be denied unless the specific findings designated in the

---

[132] *MEMA I* at 1118 (emphasis added). *See also id.* at 1114 n. 40 (A[T]he 'cost of compliance' criterion relates to the timing of standards and procedures.).
[133] See, e.g., 47 FR 7306, 7309 (Feb. 18, 1982), 43 FR 25735 (Jun. 14, 1978), and 46 FR 26371, 26373 (May 12, 1981).

statute can be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209."[134] Thus, EPA will consider compliance costs for manufacturers in developing and applying the technology and not at cost effectiveness when making a waiver decision.

In its initial waiver request for the Omnibus Low NOx regulation, CARB submitted information and argument that the subject standards and requirements are consistent with section 202(a). CARB notes that it evaluated the technical feasibility of the emission standards and accompanying enforcement procedures and concluded that those standards and accompanying enforcement procedures are attainable within the specified lead times because the technologies that manufacturers will likely use to comply with the 2024 model year emission standards are presently commercially available at reasonable costs within those specified lead times.[135] CARB further determines that manufacturers should have sufficient time to develop and implement future technologies or to refine existing emission control technologies needed to comply with the 2027 and subsequent model year emission standards.[136] In concluding that the Omnibus Low NOx regulation's requirements are technologically feasible, CARB considered the cost of compliance within the lead time provided.[137] CARB also concluded that the associated test

---

[134] 36 FR 17158 (August 31, 1971). See also 40 FR 23102, 23104; 58 FR 4166 (January 7, 1993), LEV Waiver Decision Document at 20.
[135] Omnibus Low NOx Waiver Support Document, at 53.
[136] *Id.*
[137] *Id.* at 71 ("CARB appropriately considered the cost of compliance of the Regulation by estimating the costs and savings associated with every element of the Regulation that affects the costs of affected engines and vehicles; i.e., it conducted an "all-in" cost analysis of the elements of the Regulation that: establish the more stringent NOx and PM emission standards, amend the durability demonstration program, extend the useful life periods, establish the CA ABT program, lengthen the emissions warranty periods, amend the EWIR and corrective action procedures, and amend the heavy-duty in-use test procedures")

procedures are consistent with applicable Federal test procedures.[138] In addition, in the context of California's new emission standards for APUs that correspond to federal emission standards, CARB notes that the APU standards are consistent with section 209 and thus meet the third authorization criteria at section 209(e)(2)(A)(iii).[139]

With regard to the 2023 Targeted Amendments, CARB commented to EPA that the 2023 amendments "present no issues that adversely affect the technical feasibility, lead time, or costs of compliance of the Omnibus regulation", because the 2023 amendments do not change the Omnibus standards.[140] In other words, because the 2023 Targeted Amendments offer regulated manufacturers additional options to comply, and do not impose any new significant regulatory obligations that pose potential feasibility concerns (e.g., in addition to additional flexibilities, the 2023 amendments do include minor updates such as changes to the engine labeling requirements and clarifications of existing requirements), the amendments would only further support the feasibility of the Omnibus regulations.

1. Comments on the Third Prong

EPA received a range of comments on the Omnibus Low NOx Regulation relating to the third criteria. Most of these comments focused on whether CARB, to be consistent with section 202(a), must provide the four years of lead time and three years of stability for standards applicable to new heavy-duty vehicles and engines required under section 202(a)(3)(C), or whether CARB only needs to meet the general technological feasibility requirements of section

---

[138] *Id.* at 72 ("CARB is not aware of any instances in which a manufacturer is precluded from conducting one set of tests on a medium-duty or heavy-duty engine or vehicle to determine compliance with both California and federal requirements. The Regulation establishes emissions standards and associated test procedures that only apply to California-certified medium and heavy-duty engines and vehicles, but those California-specific requirements do not preclude a manufacturer from complying with both California and federal test requirements with one test engine or vehicle").

[139] *Id.* at 75-77.

[140]  Docket No. EPA–HQ–OAR–2022–0332-0099, page 20.

202(a)(2). In addition to these lead time arguments, discussed in more detail below, some commenters also raised concerns that the Omnibus Low NOx Regulation is inconsistent with section 202(a) even under EPA's traditional analysis because the regulation is technologically infeasible and will result in new vehicles that are cost-prohibitive and unreliable.[141]

On the issue of lead time, commenters objected to the waiver request on the grounds that the third waiver criterion requires "consistency" with every provision of section 202(a) and therefore, by the text of the statute, CARB must provide four years of lead time and three years of stability for its new heavy-duty vehicle and engine standards.[142] In response, supporters of the regulation argue that "consistency" does not require identicality with lead time and stability requirements imposed on EPA. Such a strict imposition, they argue, would frustrate Congress' intent to give California flexibility and deference to create innovative standards that are more stringent than the federal standards.[143] Identicality also cannot be required, they argue, because it would be impossible for certain sub-provisions of section 202(a) to apply to CARB.[144] In response, one commenter argues that, even if some provisions of 202(a) are relevant only to EPA and not CARB, "consistency" still requires CARB to abide by relevant provisions, such as 202(a)(3)(C)'s lead time and stability requirements.[145]

---

[141] EMA Initial Comments, at 8 note 5 (incorporating comments submitted to CARB as part of the Omnibus regulation comment period); NADA at 2–3. EPA notes that it is unclear from EMA's reference made to comments it provided previously in the context of CARB's Omnibus Low NOx rulemaking whether it disagrees with CARB's responses provided in the Final Statement of Reasons (FSOR). For example, see FSOR at 17–20, 24–32, 245–61. EMA does not provide a reasonable level of specificity in its incorporation by reference to a lengthy comment made during the state rulemaking. As discussed below, EPA finds that EMA and other commenters have not meet their burden of proof to demonstrate that the technologies and compliance program required to demonstrate compliance with CARB's Omnibus Low NOx Regulation is technologically infeasible, giving consideration to lead time and cost.

[142] EMA Initial Comments, 4–5, 6–7; EMA Supplemental Comments, 3–4. NADA at 2; ATA at 3. WSPA at 2.

[143] See, e.g., CARB Initial Omnibus Low NOx Comments, at 9; CARB Initial ACT Comments, at 17–18; CARB Supplemental Comments page 7–8.

[144] CARB Supplemental Comments page 7–8.

[145] EMA Supplemental Comments, at 4 ("Of course, all of the provisions of section 202(a) are directed on their face to EPA, not California, and that is no reason to distinguish one part of section 202(a) from another. Consistency

EPA also received comment that four years of lead time is supported by federal case law and EPA's prior waiver decisions. In particular, one commenter notes EPA's 1994 waiver decision memo, which found that CARB is subject to 202(a)(3)(C)'s four-year lead time requirement.[146] That decision considered the plain text and congressional intent of the CAA as well as the 1979 D.C. Circuit case, *American Motors Corporation v. Blum* (*Blum*), which incorporated a specific minimum two-year lead time from CAA section 202(b)(1)(B) into the 202(a)(2) general technological feasibility analysis. The commenter explains that the D.C. Circuit in *Blum* "found that the Congressionally-specified lead time requirement was implicitly incorporated into section 202(a)(2)" and argues that *Blum*'s logic applies equally to section 202(a)(3)(C).[147]

2. Are California's Standards Consistent with Section 202(a)?

After a review of the record, information, and comments received in this proceeding, EPA has determined that the opponents of the Omnibus Low NOx Regulation waiver request have not demonstrated that the regulation is inconsistent with section 202(a) of the CAA.[148] As

---

means that CARB must abide by and avoid contradicting those provisions that are relevant. CARB agrees that it must abide by the technology lead-time requirement directed at EPA in section 202(a)(2), and CARB must equally abide by the four-year lead-time requirement in section 202(a)(3)(C) that is directed at EPA in precisely the same way. Neither of those provisions is uniquely applicable to EPA")

[146] EMA Initial Comments at 3; EMA Supplemental Comments at 2–3.

[147] EMA Initial Comments at 7–9 ("The D.C. Circuit's reasoning in *Blum* applies with equal force here: failing to apply the minimum four-year leadtime requirement would frustrate the leadtime that Congress explicitly found to be necessary for [heavy-duty on-highway] standards."); EMA Supplemental Comments at 2–3 ("In addition to the general technology-based lead-time required for all vehicles and engines, section 202(a)(3)(C) is aimed specifically at the heavy-duty industry, which is not vertically integrated, involves much lower production volumes, is more capital intensive, requires longer planning and product development timelines, and requires longer time periods to recoup large capital investments. See, e.g., Hearing on S.1630 Before Subcomm. on Env't Protection, 101st Cong. 312-13 (1989). These considerations make lead-time necessary regardless of whether it is EPA or CARB that adopts the applicable standards with which the industry must make investments to comply. Thus, as EPA rightly concluded in 1994, the section 202(a)(3)(C) lead-time requirement is no different than the lead-time provision at issue in *Blum*.").

[148] As noted above, section 209(e)(2)(A)(iii) also imposes additional requirements for nonroad emission standards, including consistency with section 209(a) and section 209(e)(1). EPA received no adverse comment regarding these. In any case, we find no inconsistency with either section 209(a) or section 209(e)(1). With regard to 209(a), while the Omnibus Low NOx regulation does regulate motor vehicles (in addition to nonroad), we find that a waiver of

noted above, even though CARB's waiver request indicated that control technology either presently exists or is in use, these opponents argue primarily that these regulations are not consistent with section 202(a) because they do not provide 4 years of lead time and 3 years of stability, as found in section 202(a)(3)(C). Under section 209(b)(1)(C), EPA is to determine whether CARB's standards are technologically feasible, within the lead time provided by CARB and giving consideration to cost.[149] EPA has long stated that this determination is limited to whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the federal test procedure. EPA is guided in its textual interpretation of the "consistent with 202(a)" language in section 209(b)(1)(C) by the general understanding that Congress sought to ensure that EPA would review the technological feasibility of California's standards when it set forth the specific language in the waiver provisions and section 202(a) in 1967, wherein no prescribed or specific number of years of lead time was present.[150] EPA has long recognized that congressional intent in limiting review of California waiver requests to the section 209(b)(1) criteria was to ensure that the federal government did not second-guess the

---

209(a) preemption is required under 209(b), as explained throughout this notice. With regard to 209(e)(1), the nonroad portions of Omnibus Low NOx do not regulate any of the types of vehicles or engines listed in that section.

[149] EPA has previously stated that the determination is limited to whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible, or that California's test procedures impose requirements inconsistent with the federal test procedure. *See, e.g.*, 38 FR 30136 (Nov. 1, 1973); 40 FR 30311 (July 18, 1975); 71 FR 335 (Jan. 4, 2006) (2007 Engine Manufacturers Diagnostic standards); 70 FR 50322 (August 26, 2005) (2007 California Heavy Duty Diesel Engine Standards); 77 FR 9239 (February 16, 2012) (HD Truck Idling Requirements); 78 FR 2111, 2132 (Jan. 9, 2013); 79 FR 46256 (Aug. 7, 2014) (the first HD GHG emissions standard waiver, relating to certain new 2011 and subsequent model year tractor-trailers); 81 FR 95982 (December 29, 2016) (the second HD GHG emissions standard waiver, relating to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers); 82 FR 4867 (January 17, 2017) (On-Highway Heavy-Duty Vehicle In-Use Compliance Program).

[150] When Congress first enacted the waiver provision and its requirement of consistency with Section 202(a), the latter section was a single subprovision that read: "The Secretary shall by regulation, giving appropriate consideration to technological feasibility and economic costs, prescribe as soon as practicable standards, applicable to the emission of any kind of substance, from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause or contribute to, or are likely to cause or to contribute to, air pollution which endangers the health or welfare of any persons, and such standards shall apply to such vehicles or engines whether they are designed as complete systems or incorporate other devices to prevent or control such pollution."

wisdom of state policy. So, as previously noted, for instance, EPA has explained that "questions concerning the effectiveness of the available technology are also within the category outside my permissible scope of inquiry," under section 209(b)(1)(C).[151] Further, Congress could not have reasonably envisioned California's ability to blaze its own trail and to be a laboratory for the country yet also impose pre-determined lead time and stability requirements or by imposing the "identical" requirements on both California and EPA.[152] In promulgating section 202(a)(3), Congress did not contemplate that California would be bound by the same lead time and stability requirements in section 202(a)(3)(C) and set standards that reflect "the greatest degree of emission reduction achievable" as required by section 202(a)(3)(A) that is applicable to EPA, yet still be able to blaze its own trail, design an emission program based on its air quality conditions, and serve as a laboratory for the country. Such an interpretation of section 202(a)(3)(C) would obviate this intent and the legislative history of the waiver provision. The textual analysis set forth below falls plainly within the construct of the legislative intent and history. The language in section 202(a)(2) ("Any regulation prescribed under paragraph (1) of this subsection (and any revision thereof) shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period.") is precisely the criteria EPA has applied in its review of California waiver requests since 1967.[153] EPA has only applied this requirement from section 202(a) to best reflect Congressional intent and because it would make no logical sense to

---

[151] 41 FR 44209, 44210 (October 7, 1976).

[152] "The Administrator is charged with undertaking a single review in which he applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver without exploring the consequences of nationwide use of the California standards or otherwise stepping beyond the responsibilities delineated by Congress." *Ford Motor*, 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[153] "The EPA's power under section 202(a)(1) antedates the 1977 amendments such authorization, to the agency and its predecessors, has been present in varying forms since the Clean Air Act Amendments of 1965, Pub. L. No.89-272, § 101, 79 Stat. 992.

apply numerous other provisions of section 202(a) in order for California's standards to be "consistent" with the section.

Although EPA has received several claims that the regulations within CARB's Omnibus Low NOx regulation are not consistent with section 202(a), as required by section 209(b)(1)(C), these claims are primarily based on the premise that CARB's regulations do not provide manufacturers with four years of lead time and three years of stability as required of EPA by section 202(a)(3)(C). Because EPA is applying its traditional interpretation of section 209(b)(1)(C) to CARB's regulations, EPA first examines whether the opponents of the waiver have met their burden of proof to demonstrate that the regulation is not technologically feasible, within the lead time provided and giving consideration to cost in subsections a below. Then, in subsection b, EPA examines and rejects the comments that claim that section 202(a)(3)(C) applies to California and sets forth its determination that the longstanding interpretation that section 202(a)(2) applies to California by way of the reference to section 202(a) found in section 209(b)(1)(C).

*a.  HD Omnibus Low NOx Regulation*

As set forth above, CARB noted that its evaluation of the technical feasibility of the emission standards and accompanying enforcement procedures and concluded that those standards and accompanying enforcement procedures are attainable within the specified lead times because the technologies that manufacturers will likely use to comply with the 2024 model year emission standards are presently commercially available at reasonable costs.[154] Based on the

---

[154] CARB's Omnibus Low NOx Waiver Request also included the ISOR and FSOR from its rulemaking record (included in the Omnibus Low NOx Waiver docket at EPA-HQ-OAR-2022-0332-0017 and EPA-HQ-OAR-2022-0332-0014). EPA finds no evidence in the record to rebut CARB's statements that the NOx emission standards for model years 2024-2026 can be achieved through a combination of engine calibration strategies to reduce cold start emissions and available exhaust aftertreatment systems, or that such strategies and systems are not consistent with section 202(a). *See* CARB Initial Omnibus Low NOx Comments, at 8.

record from CARB and the lack of evidence that technologies are not available, too costly, or cannot be implemented with adequate lead time, the opponents of the waiver for the 2024 model year requirements have not met their burden of proof. [155] With regard to the 2027 model year requirements, CARB has submitted sufficient information into the record that identifies further improvements to emission control technologies and that manufacturers should have sufficient time to develop and implement refined emission control technologies or future technologies to comply with the 2027 and subsequent model year emission standards.[156] With respect to the 2023 Targeted Amendments, those amendments did not change the emission standards, test procedures, or implementation dates for the standards established in the Omnibus program, and thus do not change EPA's views with respect to the third prong.  Based on the record from CARB and the lack of evidence that CARB's identification of refined or future technologies is inaccurate, too costly, or cannot be implemented with adequate lead time, EPA finds that the opponents of the waiver for these 2027 model year requirements have not met their burden of proof, either.

In addition, in the context of California's new emission standards for APUs that correspond to federal emission standards, there is no evidence in the record that such

---

[155] As noted previously, EPA recognizes that CARB may make different policy choices based on the air quality and other conditions within the State, and that EPA does not play the role of second-guessing such choices. 40 FR 23103-23104.  It therefore follows that in response to California's regulations that a manufacturer will determine which product offerings to make available in the California marketplace during the transition to and for showing compliance with the new standards. These market choices could include offering for sale a limited set of products. Given the statutory scheme, the EPA Administrator is to give very substantial deference to California's judgments. *See also International Harvester* at 640 ("We are inclined to agree with the Administrator that as long as feasible technology permits the demand for new passenger automobiles to be generally met, the basic requirements of the Act would be satisfied, even though this might occasion fewer models and a more limited choice of engine types. The driving preferences of hot rodders are not to outweigh the goal of a clean environment.").

[156] EPA finds no evidence in the record to rebut CARB's statements that compliance with the NOX emission standards for 2027 and later model years can be achieved in a number of ways, including by combining  existing technologies or by the use of new engines types that have demonstrated compliance and are expected to be commercially available, or that such approaches are technologically infeasible or that CARB has not provided the requisite level of projected technologies to meet the 2027 model year standards.

requirements do not meet the authorization criteria at section 209(e)(2)(A)(iii).  EPA also received no comments raising specific technical or cost concerns with this set of emissions standards.

Therefore, based on the record before us, EPA cannot find that the opponents of the Omnibus Low NOx Regulation waiver (and authorization for the APUs regulation subject to section 209(e)(2)(A)(iii)) have met their requisite burden of proof to demonstrate that such requirements are inconsistent with section 202(a). Thus, EPA cannot deny CARB's Omnibus Low NOx Regulation waiver request on this basis.[157]

Regarding consistency of the Omnibus Low NOx regulation with federal test procedure requirements, CARB states in their Authorization Request for both the initial Omnibus regulation, and the 2023 Targeted Amendments, that no issues exist regarding inconsistency between federal and California emission test procedures that preclude manufacturers from meeting both California and federal requirements with one set of tests to determine compliance with both California and federal requirements.[158]  In addition, EPA did not receive any comments raising a concern with respect to test procedure consistency.   Based on the record before EPA, and with the burden of proof on opponents of the authorization, there is no reasonable basis to deny the waiver request based on a finding of test procedure inconsistency.

   b.  *The Inapplicability of Section 202(a)(3)(C)*

---

[157] EPA evaluates the lead time associated with a CARB's regulation by in part examining the date of CARB's adoption of the regulation and when manufacturers are required to meet the regulation. EPA is guided both by the amount of lead time provided and by the principles set forth in cases such as *International Harvester* and *NRDC.* The lead time between the CARB Board's adoption of the Omnibus Low NOx Regulation in August 2020 and the initial compliance implementation for the 2024 model year (recognizing that manufacturers may choose to certify earlier in 2023 for the 2024 model year though/while noting that typically in this sector certification occurs later) is of a length of time that requires CARB to demonstrate with more immediate certainty the technological feasibility of its requirements. EPA finds no evidence in the record that manufacturers have been unable to comply with CARB's requirements that commence with the 2024 model year.
[158] *See* Docket No. EPA–HQ–OAR–2022–0332–0009, page 72 and EPA–HQ–OAR–2022–0332–0099, page 22.

As previously explained, under section 202(b)(1)(C), EPA is to determine whether CARB's standards are technologically feasible, within the lead time provided by CARB and giving consideration to cost.[159] Since the inception of the waiver program in 1967, except for a single instance in 1994, EPA has read the "consistent with section 202(a) language" as requiring the Agency to assess whether CARB's standards are technologically feasible within the lead time provided, giving consideration to cost, and whether the California and federal test procedures are inconsistent. EPA has explained instead that under section 209(b)(1)(C): "[i]n order for California standards to be consistent with section 202(a), it is not required that the requisite technology be developed at present, but rather that the available lead time appear to be sufficient to permit the development and application of that technology."[160] "The 'technological feasibility' component of section 202(a) obligates California to allow sufficient lead time to permit manufacturers to develop and apply the necessary technology."[161] EPA practice has been to conduct this technology feasibility analysis for CARB's standard under review as a whole-program assessment, *i.e.*, one that ensures manufacturers have sufficient lead time to comply with the program's standards as a whole, accounting for the interactions between technologies necessary to meet both new and existing standards.[162] Early in EPA's administration of the waiver program, the Administrator also explained the general deference Congress expected EPA to afford California in the review of the third waiver prong contained in section 209(b)(1)(C):

---

[159] 38 FR 30136 (Nov. 1, 1973); 40 FR 30311 (July 18, 1975); 71 FR 335 (Jan. 4, 2006) (2007 Engine Manufacturers Diagnostic standards); 70 FR 50322 (August 26, 2005) (2007 California Heavy Duty Diesel Engine Standards); 77 FR 9239 (February 16, 2012) (HD Truck Idling Requirements); 78 FR 2111, 2132 (Jan. 9, 2013); 79 FR 46256 (Aug. 7, 2014) (the first HD GHG emissions standard waiver, relating to certain new 2011 and subsequent model year tractor-trailers); 81 FR 95982 (December 29, 2016) (the second HD GHG emissions standard waiver, relating to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers); 82 FR 4867 (January 17, 2017) (On-Highway Heavy-Duty Vehicle In-Use Compliance Program).

[160] 41 FR 44210 (Oct. 7, 1976); *See also* 43 FR 1830, January 12, 1978).

[161] *American Motors Corp. v. Blum*, 603 F.2d 978, 981 (D.C.Cir.1979); *MEMA II*, 142 F.3d 449, 463.

[162] 38 FR 30136 (November 1, 1973) and 40 FR 30311 (July 18, 1975)).

"[w]hile section 209(b) requires consideration of whether the adoption of standards by California is consistent with section 202(a), nevertheless, my discretion in determining whether to deny the waiver is considerably narrower than my discretion to act in the context of promulgating federal standards under section 202(a)."[163] Thus, EPA's historical interpretation of this provision does not call for California to provide a specific amount of lead time for standards covered by a waiver request, merely "sufficient" time. Some commenters, however, have claimed that section 209(b)(1)(C) requires CARB to comply with the fixed lead time and stability provisions of section 202(a)(3)(C). EPA believes that the best interpretation of section 209(b)(1)(C) is the traditional interpretation, based on an analysis of the statutory text of sections 209(b)(1), 202(a), and 177. This interpretation is further supported by the statutory purpose, legislative history, as well as relevant case law and EPA's past waiver practice. EPA also finds that the 1994 Medium Duty Vehicle waiver decision did not accurately interpret the text or describe the legislative history of sections 202(b)(1) and 202(a)(3) and the consequences of the holding in *Blum. Subsequent case law has also called into doubt the findings of this waiver decision, which in any event did not appropriately reflect the best interpretation of section 209(b)(1)(C).

We begin by interpreting the text of the third criterion of section 209(b), which requires EPA to assess whether CARB's standards are "*consistent* with section [202(a)]." The dictionary definition of "consistent" does not require absolute compliance. Rather, "consistent" can mean "compatible" and "marked by harmony,"[164] and its synonyms include "harmonious" and "congruous."[165] These definitions support the conclusion that the phrase "consistent with [section

---

[163] 40 FR 23104 (May 28, 1975); 41 FR 44210 (Oct. 7, 1976).
[164] https://www.merriam-webster.com/dictionary/consistent. *See also* 88 FR 20712 (April 6, 2023); https://www.ahdictionary.com/word/search.html?q=consistent.
[165] https://www.merriam-webster.com/dictionary/consistent; https://www.dictionary.com/browse/consistent

202(a)]" does not require California's standards to comply with all aspects of section 202(a). Rather, "consistent" can call for congruence and compatibility.[166]

Beyond the dictionary definition, an interpretation of the "consistent with" provision must "account for the broader context of the statute as a whole" and should be based on analysis of the text, context, purpose, and history of the relevant portions of the Act.[167] The statutory context strongly supports EPA's reading. The CAA provides numerous instances of provisions where identicality rather than consistency is expressly required, indicating that Congress knew how to clearly require perfect identicality—i.e., California's exact compliance with CAA section 202(a)—if it wanted to. Most notably, CAA section 177 allows qualifying states to adopt standards waived pursuant to CAA section 209 if "such standards are identical" to those for which preemption has been waived. Thus, even within the Title II motor vehicle waiver program itself, Congress variously required consistency and identicality where it deemed each appropriate. Similarly, in the CAA section 211(c) program for EPA regulation of fuels, the preemption of state fuels regulation may be waived by EPA, but only where such state regulation is "identical" to that put in place by EPA.[168]

Elsewhere in the Act, Congress also expressly required States to comply with Federal law. For example, CAA section 110 variously requires States to submit plans to "meet the applicable requirements" of the Act.[169] The Administrator is also authorized to call for State plan

---

[166] *See also MEMA II*, 142 F.3d *at* 463-64 ("section 209(b)(1) makes clear that section 202(a) does not require, through its cross-referencing, consistency with each federal requirement in the act. California's consistency is to be evaluated "in the aggregate," rather than on a one-to-one basis"). See also 88 FR at 20712-20713.
[167] *Wisconsin* v. *EPA,* 938 F.3d 303, 316 (D.C. Cir.2019) (Citing *Envtl. Def. Fund Inc.* v. *EPA,* 82 F.3d 451, 460 (D.C. Cir. 1996); *Nuclear Energy Institute, Inc.* v. *EPA,* 373 F.3d 1251, 1270 (D.C. Cir. 2004)). See also *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024) ("courts should prefer textually permissible readings that would advance statutory or regulatory goals over ones that would frustrate them").
[168] 42 USC § 7545(c)(4)(A)(ii); *see also* 42 USC § 7573 (state regulation of aircraft emissions preempted "unless such standard is identical to a standard applicable to such aircraft under this part").
[169] *E.g.*, CAA section 110(a)(2)(A), (I), (J), (k)(3)-(5).

revisions if he determines that the plan fails to "comply with any requirement of this chapter."[170] Had Congress wanted California to comply with Federal law, it could have easily used similar language, but instead it chose to require mere consistency, not compliance.

EPA's interpretation of "consistent" also coheres with how the word "consistent" is used in many other parts of the Act. For example, in *Wisconsin* v. *EPA*, 938 F.3d 303, 316 (D.C. Cir. 2019), the D.C. Circuit stated that "we do not conclude that the phrase 'consistent with' in the Good Neighbor Provision necessarily effects an incorporation of the full contours of every provision of Title I in pure, lockstep fashion. As we have observed elsewhere in construing the same words in the context of the same statute, the phrase 'consistent with' other statutory sections calls for congruence or compatibility with those sections, not lock-step correspondence.'"

To provide another example, CAA section 101(c) states that "[a] primary goal of this chapter is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, *consistent with* the provisions of this chapter, for pollution prevention."[171] But this does not mean that all State and local air pollution prevention actions can only be limited to EPA's powers under the Act; in fact, the exact opposite is true as States and localities can impose additional requirements beyond what EPA may require.[172] Other examples of similar usage of "consistent with" abound.[173]

---

[170] CAA section 110(k)(5).

[171] CAA section 101(c) (emphasis added).

[172] *See, e.g.,* CAA section 116, 110(a)(5).

[173] For example, section 202(l)(2) requires EPA to promulgate mobile source air toxics regulations and says, "Such regulations shall not be inconsistent with standards under subsection (a)." That requires harmony between the air toxics standards and the other section 202(a) standards, but it does not mean the air toxics standards must now comply with all the directives under section 202(a), many of which do not apply to air toxics but rather apply to criteria pollutants, *see, e.g.,* CAA section 202(a)(3)(A)(i), (B)(ii).

Commenters' reading of "consistent with" as requiring California to perfectly comply with all of CAA section 202(a) would also create unworkable conflicts with the statutory structure and give rise to difficult constitutional issues. Notably, section 202(a) imposes a number of duties on EPA, many of which cannot reasonably be interpreted as applying to the state. This begins with the first sentence and central command of section 202(a)(1), directing EPA to set standards for dangerous pollutants emitted by mobile sources upon making an endangerment finding. It is clear that this directive from Congress to EPA does not, by virtue of the consistency requirement of CAA section 209(b)(1)(C), become a directive to the state. Because nothing in the CAA requires the state to have a mobile source program at all, such a requirement cannot be read into the section 209 consistency requirement. Indeed, the remainder of section 209 makes it inescapably clear that whether California has its own motor vehicle program or not is, in the first instance, the State's choice, not a Federal mandate.[174] Moreover, construing the Act as commandeering that California establish its own motor vehicle program could violate the anti-commandeering doctrine.[175]

The CAA section 202(a)(1) directive to EPA to set mobile source standards is but one of many requirements in section 202(a) that only make sense as applied to EPA.[176] It follows that

---

[174] CAA section 209(b)(1) (directing EPA to waive preemption "*if the State determines* that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards" (emphasis added)).

[175] *See Printz v. United States*, 521 U.S. 898, 925, 117 S. Ct. 2365, 2379 (1997) (discussing the constitutional infirmity of prior EPA regulations that required States to establish auto emissions testing programs).

[176] Another provision that cannot reasonably be applied to the state is section 202(a)(3)(A)(i), which requires EPA to establish standards that reflect "the greatest degree of emission reduction achievable" for four listed pollutants for heavy duty motor vehicles. A requirement to regulate a class of motor vehicles in a specific manner cannot be reconciled with the requirement of section 209(b)(1) that the state's protectiveness determination be evaluated "in the aggregate." Section 202(a) calls for even more specific emission limits, for example in sections 202(a)(3)(B)(ii) and 202(a)(6), that likewise cannot be reconciled with the "in the aggregate" language. To provide another example, the requirement in section 202(a)(3)(D) for the Administrator to conduct a study for the practice of rebuilding heavy-duty engines and, on the basis of such study, consider prescribing requirements for rebuilding practices is clearly directed at EPA and not a requirement of California. It would not be a reasonable reading of section 209(b)(1)(C) to require California to complete an identical study in order to be "consistent with" section 202(a).

commenters' assertion that section 209(b)(1)(C) consistency requires that state standards must comply with all aspects of section 202(a) cannot be reconciled with the terms of that provision.

Beyond these specific conflicts, commenters' reading also runs afoul of the purposes of CAA section 209. Commenters make no attempt to reconcile, on the one hand, the restriction on state authority they assert flows from the consistency requirement of the third waiver criterion with, on the other, the purpose of the waiver program as demonstrated by the statutory context and the legislative history. As described elsewhere in this notice and throughout the history of EPA's waiver notices, section 209(b) is premised on the idea of two complementary motor vehicle regulatory programs, with California's dedicated to addressing the state's severe air pollution problems while serving as a laboratory for experimentation for motor vehicle emission policy designs and technologies. The legislative history of CAA section 209 is replete with evidence that Congress intended to allow the state the broadest discretion possible, and is devoid of any indication that the state's authority should be limited in scope to that of EPA's authority under section 202(a).[177] In light of the statutory structure and legislative history, it is not credible that Congress would have carved out from section 209(a) preemption an exception specifically designed to allow the State to address its exceptional air quality issues and continue its historical role as regulatory innovator only to, in the same breath, limit that flexibility to what EPA itself could achieve through the third waiver criterion's consistency requirement.

That the intent and purpose of the CAA section 209 waiver program is to provide broad policy discretion to the state has been repeatedly affirmed by the courts. The *MEMA I* Court noted that the structure of section 209(b), and in particular the decision in the 1977 Amendments to adopt the "in the aggregate" approach to determining protectiveness, was intended "to afford

---

[177] *See* Section II.B.2, above.

California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[178] The *MEMA II* Court observed that section 209(b) is designed "to permit California to blaze its own trail with a minimum of federal oversight."[179]

CAA Amendments subsequent to 1977 further confirm a statutory design to allow the state the broadest possible discretion in general and support the conclusion that a waiver is available for ZEV standards. The addition of CAA section 209(e) in 1990 extended the waiver program to nonroad vehicles and engines, and in so doing emulated the structure of CAA section 209(b), including the three waiver criteria. Following EPA's longstanding and consistent interpretation of the third waiver criterion's consistency requirement as entailing review of lead time for technology considering costs, use of the same approach in section 209(e) represents a ratification by Congress of that interpretation.[180]

The commenters also fail to address EPA's longstanding historical practice on this issue. EPA's approach ensures that California in setting its own standards evaluates feasibility, lead time, and cost, consistent with how EPA also must evaluate these factors in setting Federal standards. EPA's historical approach also ensures that enforcement mechanisms, such as test procedures, are compatible to avoid creating challenges for automakers in complying with both

---

[178] *MEMA I*, 627 F.2d at 124 (citing H.R.Rep. No. 294, 95th Cong., 1st Sess. 301-02 (1977), U.S. Code Cong. & Admin. News 1977, p.1380).

[179] *MEMA II*, 142 F. 3d 449, 463.

[180] *See* ''Air Pollution Control; Preemption of State Regulation for Nonroad Engine and Vehicle Standards,'' 59 FR 36969 (July 20, 1994). (To determine consistency with section 209(b)(1)(C), EPA typically reviews nonroad authorization requests under the same "consistency" criteria that are applied to motor vehicle waiver requests under section 209(b)(1)(C). That provision provides that the Administrator shall not grant California a motor vehicle waiver if the Administrator finds that California ''standards and accompanying enforcement procedures are not consistent with section 202(a)'' of the Act. Previous decisions granting waivers and authorizations have noted that state standards and enforcement procedures will be found to be inconsistent with section 202(a) if (1) there is inadequate lead time to permit the development of the necessary technology, giving appropriate consideration to the cost of compliance within that time, or (2) the federal and state testing procedures impose inconsistent certification requirements.)

California and federal standards.[181] This is in accordance with the dual-program structure enacted by Congress.

EPA has followed this approach since the inception of its waiver practice and has adhered to it in countless waiver proceedings. The D.C. Circuit has also repeatedly upheld this approach to the third prong, stating that "[i]n the waiver context, section 202(a) relates in relevant part to technological feasibility and to federal certification requirements…. Neither the court nor EPA has ever interpreted compliance with section 202(a) to require more."[182] As noted above, Congress also ratified EPA's general approach to the waiver program in the 1977 and 1990 amendments. Commenters fail to adduce any persuasive explanation as to why EPA should suddenly deviate from its five-decade long precedent to further preempt the State's ability to adopt its own motor vehicle program.

Beyond the above general defects with the commenters' interpretive arguments, their reading founders for additional reasons in the specific context of imposing the requirements of section 202(a)(3)(C) on California. By its terms, section 202(a)(3)(C) applies only "[a]ny standard promulgated or revised under this paragraph." "This paragraph" refers to paragraph (3), under which EPA is required to, among other things, promulgate standards for four criteria pollutants for heavy-duty vehicles and engines "which reflect the greatest degree of emission reduction achievable." 202(a)(3)(A)(i). EPA believes that Congress intended the fixed lead-time and stability provisions of 202(a)(3)(C) as a companion to the requirement in 202(a)(3)(A) to promulgate maximum feasible standards, balancing the mandate for the most stringent possible standards with granting regulated entities a minimum amount of lead time. By contrast, for other

---

[181] 42 FR 2337, 2338 (January 11, 1977).
[182] *MEMA II*, 142 F. 3d at 463 (citing *MEMA I*, 627 F.2d at 1101, 1111; *Ford*, 606 F.2d at 1296 n.17; *American Motors Corp.*, 603 F.2d at 981; Waiver of Federal Preemption, 46 Fed. Reg. at 26372).

motor vehicle and engine standards promulgated under the more general authority in 202(a)(1)-(2), EPA has greater discretion over the stringency of the standards and need only provide lead time that the Agency deems sufficient based on its analysis of technology feasibility and cost.

It is clear that the section 202(a)(3)(A) requirement to promulgate maximum feasible standards does not apply to California. The text and history of the 1977 amendments to section 209(b)(1) allow California to adopt standards that are in some respects weaker than the federal standards, so long as the state's standards are "in the aggregate" more protective. And because section 202(a)(3)(A)'s standard-setting requirements do not apply to California, the companion lead time and stability requirements in 202(a)(3)(C) do not apply either. Therefore, compliance with 202(a)(3)(C) is not a relevant consideration in determining consistency with 202(a) in the waiver context. We further explain our analysis in the pages that follow.

Section 202(a)(3), which was first added in the 1977 amendments, reflected congressional frustration at EPA's slow pace of regulating emissions from heavy-duty vehicles and engines and was thus a direct command only to EPA.[183] By the time of this amendment California had been regulating HD emissions with the appropriate waivers that EPA granted applying the traditional consistency test.[184] Section 202(a)(3) provides, *inter alia*, the authority to set standards for emissions of four listed pollutants from heavy duty engines and vehicles, classify these engines and vehicles, and establish the compliance period that EPA sets under this

---

[183] Section 202(a)(3)(A)(iii) was originally contained in the 1977 Senate bill "applicable to emissions of carbon monoxide, hydrocarbons, particulates, and oxides of nitrogen from heavy duty trucks, buses, and motorcycles and engines thereof," S. 252, 95th Cong., 1st Sess. s 19 (1977), see S.Rep.No.127, 95th Cong., 1st Sess. 193 (1977), reprinted in 3 Legislative History 1567. The 1977 amendments added section 202(a)(3) directing EPA to set heavy-duty vehicle emission standards for certain emissions for the 1983 model year and later. (Congress having identified a need for standards in 1970 "had become impatient with the EPA's failure to promulgate a particulate standard" for heavy duty vehicles." *NRDC*, 655 F.2d at 325 (citing S. Rep. No.127, 95th Cong., 1st Sess. 67 (1977), reprinted in 3 Legislative History 1441).

[184] *See for example*, 36 FR 8172 (April 30, 1971) (HD MY 72 and later MY); 40 FR 23102, 23105 (May 28, 1975) (extending waiver of April 30, 1971, to MY 1975 HD standards).

provision. The four-year lead time and three-year stability requirement for heavy duty engines and vehicles standards contained in section 202(a)(3)(C) is relevant to EPA's standard-setting authority. Congress also chose this prescribed lead time and constrained EPA to keeping standards the same for a minimum of three years under the stability provisions precisely because of industry concerns over the level of stringency expected of EPA's standards. These timeframes provide assurance to the heavy-duty industry of a minimum amount of lead time and stability to meet EPA's standards in light of section 202(a)(3)(A)(i)'s mandate to EPA to promulgate maximum achievable standards.[185] In contrast, section 202(a)(1) grants EPA authority to regulate motor vehicle emissions generally and section 202(a)(2) contains no specific lead time for such standards that are promulgated under section 202(a)(1). Those standards are to "take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."[186] But most important is that section 202(a)(3)(C) is explicitly linked to standards promulgated under section 202(a)(3)(A), and as noted the command to EPA in section 202(a)(3)(A) to set standards that achieve "the greatest degree of emission reduction achievable" is plainly not relevant to California.

Applying the language of section 202(a)(3)(C) to California by including it in EPA's technology feasibility analysis would conflict with the language and intent of section 209(b)(1), which Congress first promulgated in 1967 and designed in recognition of California's pioneering efforts at regulating motor vehicle emissions, and to ensure California's broad discretion to

---

[185] "[I]n adding section 202(a)(3)(A)(iii) . . . Congress directed the EPA to give priority to establishing particulate emission standards for heavy-duty vehicles, and left the agency free to exercise its power under section 202(a)(1) to regulate light-duty automobiles, whether diesel-powered or otherwise." *NRDC.*, at 326; *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079–80, 1088 (D.C. Cir. 1996) (Motor vehicles are "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards.").
[186] CAA section 202(a)(2).

determine the best means to protect the health and welfare of its citizens based on its own air quality conditions and policy choices. [187] And as also shown below, in section 209(b)(1)(C), Congress did not set out any fixed period of lead time regardless of the feasibility, and instead only called for California's standards to be "consistent with section 202(a)."

A plain reading of "under this paragraph" in section 202(a)(3)(C) means *under paragraph 3 of section 202(a)*. Paragraph 3 grants EPA the authority to establish heavy duty engine and vehicles standards for four listed pollutants in 202(a)(3)(A)(i), classify or categorize heavy duty vehicles and engines in 202(a)(3)(ii); revise earlier promulgated heavy duty standards in 202(a)(3)(B); and establish standards for motorcycles in 202(a)(3)(E). In contrast to section 202(a)(3)(C), these sub provisions explicitly cross reference section 202(a)(1) by providing for regulations "*under paragraph 1 of this subsection," (For example*, section 202(a)(3)(A)(i), provides in relevant part for "regulations **under paragraph (1) of this subsection**…"). Section 202(a)(3)(C) thus contains no discernible reference to both sections 202(a)(1) and 202(a)(2). And EPA has thus long read and applied in its regulatory practice "under this paragraph" in section 202(a)(3)(C) as meaning *under paragraph 3, i.e.,* section 202(a)**(3)**,[188] and not under the general authority of paragraph (1)."[189] EPA has thus also long read section 202(a)(3)(C) as the authority to provide the specified lead time and stability requirements when it promulgates HD emissions standards "under this paragraph." Specifically, this language applies when EPA promulgates HD

---

[187] H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 301-302 (1977). The amendment is to afford California "the best means to protect the health of its citizens and the public welfare."

[188] "[I]n adding section 202(a)(3)(A)(iii) . . . Congress directed the EPA to give priority to establishing particulate emission standards for heavy-duty vehicles, and left the agency free to exercise its power under section 202(a)(1) to regulate light-duty automobiles, whether diesel-powered or otherwise." *NRDC v. EPA*, 655 F.2d 318, 326 (D.C. Cir. 1981); *See, e.g.*, EPA's statutory authority requires a four-year lead time for any heavy-duty engine or vehicle standard promulgated or revised under CAA section 202(a)(3) (see Section I.F). *See also* 81 FR 95982 (December 29, 2016); 79 FR 46256 (August 7, 2014); 77 FR 73459 (December 10, 2012); 73 FR 52042 (September 8, 2008).

[189] *See for e.g.*, MDV Waiver Decision Document, pg. 26, n.59 ("For gaseous-fueled vehicles and engines, EPA's regulations are promulgated under section 202(a) (1) and therefore the four-year lead time of section 202(a) (3) (B) does not apply.").

emissions standards for the listed pollutants: HC, NOx, CO and PM, under section 202(a)(3).[190] The 1994 MDV decision that commenters rely on also acknowledged this reading of section 202(a)(3)(C) at the time.[191]  Thus, for example, because greenhouse gas (GHG) is not a listed pollutant under section 202(a)(3), EPA has explained in setting HD GHG emission standards that it acts under the broad and general authority of section 202(a) instead of section 202(a)(3)(A).[192] Additionally, EPA has never applied section 202(a)(3)(C) to authorizations for nonroad engines and vehicles.[193] And as also shown below, California is presumed to satisfy the waiver requirements once it makes the protectiveness finding, under section 209(b)(1)(A).  It is also this protectiveness determination by California, under section 209(b)(1) that determines EPA's scope of review of waiver requests, under section 209(b)(1)(C).[194] Relatedly, as a general matter, California adopts standards for which it seeks a waiver as a matter of law under its police powers.[195]

In contrast, the reading proffered by commenters asking for a denial of California's waiver requests, would, in addition to requiring the Administrator to constrain California to

---

[190] *See, e.g.*, 87 FR 17414, 17420 n.26 (March 28, 2022) ("Section 202(a)(3)(A) and (C) apply only to regulations applicable to emissions of these four pollutants and do not apply to regulations applicable to GHGs."); 87 FR 17435-36. EPA's statutory authority requires a four-year lead time for any heavy-duty engine or vehicle standard promulgated or revised under CAA section 202(a)(3).

[191] MDV Waiver Decision Document, pg. 26, n.59 ("For gaseous-fueled vehicles and engines, EPA's regulations are promulgated under section 202(a) (1) and therefore the four-year lead time of section 202(a) (3) (B) does not apply.").

[192] 88 FR 4296, 4299 (Jan. 24, 2023); 87 FR 17593 (EPA proposed under its authority in CAA section 202(a) to revise $CO_2$ emissions standards for a subset of MY 2027 heavy-duty vehicles); *See  e.g.*, 87 FR 17414, 17420 n.26 ("Section 202(a)(3)(A) and (C) apply only to regulations applicable to emissions of these four pollutants and do not apply to regulations applicable to GHGs."); *See also* 81 FR 95982 (December 29, 2016); 79 FR 46256 (August 7, 2014); 77 FR 73459 (December 10, 2012); 73 FR 52042 (September 8, 2008).

[193] *See* for example, 77 FR 9249 n.73.("EPA notes that even if the language in section 202(a)(1)(C)(sic) were relevant to its consistency analysis, that section by its own terms applies only to standards applicable to emissions from new heavy-duty on-highway motor vehicle engines, not the nonroad engines being regulated by California.").

[194] EPA believes it appropriate to read the entirety of 209 together, along with its purposes, in order to properly interpret its components such as 209(b)(1)(C). See for e.g., 87 FR 14332.

[195] *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F.Supp.2d 1151, 1174 ("The waiver provision of the Clean Air Act recognizes that California has exercised its police power to regulate pollution emissions from motor vehicles since before March 30, 1966; a date that predates. . .the Clean Air Act.").

keeping HD vehicle emission standards the same for a minimum of three years by virtue of the stability provision, also mean that such standards must perforce be "consistent" with numerous other sub provisions in section 202(a)(3) for EPA to grant a waiver.[196] But "it would appear virtually impossible for California to exercise broad discretion if it had to comply with every subsection of section 202 that cross-referenced subsection (a). See, e.g., CAA § 202(b), (g), (h), (j), (m)(1), (m)(2), (m)(4)."[197] Within just section 202(a)(3) there are several subdivisions that have no relevance to California, which therefore supports the idea that none of section 202(a)(3) read together is triggered by section 209(b)(1)(C). EPA sees no reason to dismember in whole or in part section 202(a)(3), as some commenters suggest, in order to apply only section 202(a)(3)(C) to California. For instance, California would be constrained under section 202(a)(3)(A) to promulgate standards that "reflect the greatest degree of emission reduction achievable" through technology which the Administrator determines will be available for the model year to which the standards apply, giving consideration to listed factors. To give proper effect to the "in the aggregate" language in section 209(b)(1), which was also added in the 1977 amendments, and for California to retain its ability to set more stringent standards for some pollutants and less stringent for others, California is expressly not required nor should it be

---

[196] EMA claims, first, that "the section 209(b)(1)(C) waiver provision requires consistency with all of section 202(a)" and that this "directive does not have any carve-outs or exceptions," and second, in the alternative, that "even if certain provisions in section 202(a)(3)(C) are not directly relevant to CARB . . . that does not mean CARB need not abide by those provisions that *are* relevant." Consistency with section 202(a) "does not require that CARB follow EPA, but rather only that CARB act *consistently* with the same statutory commands in section 202(a) to which EPA is subject." See EPA-HQ-OAR-2022-0332-0082, EMA Supplemental Comments at 3–4. As for this alternative argument, EPA notes that EMA does not offer clear criteria for determining which provisions of section 202(a) are "uniquely applicable to EPA" and which are also applicable to California. EPA does not believe this approach, which would require EPA to conduct a separate analysis after the traditional consistency test, is a workable solution, especially when EPA believes it is clear that its historical interpretation (assessing whether California's standards are technologically feasible within the lead time provided, giving consideration to cost, and whether the associated test procedures are inconsistent with federal procedures) is the best reading.
[197] *MEMA II*, 142 F.3d at 463–64.

implicitly required by the cross-reference to section 202(a) to set heavy-duty vehicle emission standards that "reflect the greatest degree of emission reduction."[198]

It is also true that the Act reflects Congressional intent for the differing treatment of HD engines and vehicles, but such Congressional intent tends to be evident in either explicit provisions or exceptions. For example, under section 217(a) manufacturers of HD engines and vehicles may be "charged a reasonable amount to recover an appropriate portion of [the EPA's] reasonable costs" of the motor vehicle and engine certification program. (Alteration in original).[199] Similarly, under section 246(f)(4), which sets out a State Implementation Plan provision regarding fleet programs required for certain nonattainment areas "standards established by the Administrator under this paragraph . . . shall conform as closely as possible to standards which are established for the State of California for ULEV and ZEV vehicles in the same class." But "[f]or vehicles of 8,500 lbs. GVWR or more, the Administrator shall promulgate comparable standards for purposes of this subsection."[200]

In the waiver context, Congress in its legislative role could have explicitly provided that the four-year lead time and three-year stability requirements in section 202(a)(3)(C) apply to California HD standards.  For example, in section 202(m)(2) where for certain standards that were determined infeasible by EPA, Congress set out a specific delayed lead time requirement that is "consistent with corresponding regulations or policies adopted by the California Air

---

[198] But "California would not be denied a waiver if its CO standard were slightly higher than the federal . . . standard. . .. This is despite the fact that section 202(g) contains specific standards for CO that EPA must promulgate." *MEMA II*, 142 F.3d 464. CO is also listed in section 202(a)(3) and commenter's reading would require exactly the kind of standard-by-standard, detailed review and limitation on California's flexibility that Congress did away with in the 1977 amendments by adding the "in the aggregate" language in section 209(b)(1).

[199] *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1183 (D.C. Cir. 1994) (EPA's calculation of certification fees was "by no means of trivial advantage to the heavy-duty manufacturers").

[200] Section 246(f)(4).

Resources Board."[201] Similarly, in section 428 of the 2004 Consolidated Appropriations Act Congress required that EPA specifically address safety implications of any California standard for certain engines prior to granting authorizations under section 209(e).[202] Section 202(a)(3)(C), however, is devoid of either any explicit language or exception that would be read as a reference to California HD standards. Congress does not "hide elephants in mouseholes [by making] radical but entirely implicit changes to the law."[203]

Additionally, EPA's view is supported by legislative history. According to relevant legislative history the "consistent with section 202(a)" language in section 209(b)(1)(C) was designed to ensure that California regulations are consistent with the lead time and technological feasibility requirements in CAA section 202(a)(2), and to ensure test procedure consistency.[204] Further relevant legislative history from the 1967 Clean Air Act, indicates that EPA must grant a waiver request unless it finds that there is: "Inadequate time to permit the development of the necessary technology given the cost of compliance within that time period."[205] And "[t]hat California standards are not consistent with the intent of section 202(a) of the Act, including economic practicability and technological feasibility."[206] In terms of accompanying enforcement

---

[201] "The regulations required under paragraph (1) of this subsection shall take effect in model year 1994, except that the Administrator may waive the application of such regulations for model year 1994 or 1995 (or both) with respect to any class or category of motor vehicles *if the Administrator determines that it would be infeasible to apply the regulations to that class or category in such model year or years, consistent with corresponding regulations or policies adopted by the California Air Resources Board for such systems*." Section 202(m)(2)(Emphasis added).

[202] Codified at 40 CFR 1074.105(c). "In considering any request from California to authorize the state to adopt or enforce standards or other requirements relating to the control of emissions from new nonroad spark-ignition engines smaller than 50 horsepower, the Administrator will give appropriate consideration to safety factors (including the potential increased risk of burn or fire) associated with compliance with the California standard."

[203] *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001).

[204] See S. Rep. No. 90-403 at 32- 33 (1967).

[205] H. Rep. No. 728, 90th Cong., 1st Sess. 21 (1967).

[206] S. Rep. No. 403, 90th Cong. 1st Sess. 32 (1967).

procedures, relevant legislative history explains that EPA can only deny a waiver for such procedures on grounds that they "are in conflict with the intent of Section 202(a)."[207]

In contrast, as noted above, the relevant legislative history for section 202(a)(3)(C), which was added in the 1977 amendments, and a decade after Congress first enacted section 209(b), evinced congressional frustration at EPA's slow pace of setting HD standards,[208] and as such was added by Congress in the 1977 amendments under a different context than that associated with the cross-reference to section 202(a) that Congress first set out in 1967.[209] Congress "had become impatient with the EPA's failure to promulgate a particulate standard" for heavy-duty engines and thus, enacted section 202(a)(3).[210] This language appears in the same legislative history where Congress expressed approval for EPA's implementation of the waiver provision over the past decade and expanded California's discretion to adopt standards that were intended to address the state's severe air quality issues. In any event, except for the 1994 waiver decision, since the 1977 amendments, EPA has granted HD engine and waivers where California

---

[207] S. Rep. No. 403, 90th Cong., 1st Sess. 33-34 (1967).

[208] *MEMA I*, 627 F.2d 1095, 1112 n.35 (D.C. Cir. 1979) ("For this reason we find unpersuasive petitioners' suggestion that section 302(k) of the Clean Air Act, 42 U.S.C. 7602(k) (Supp. I 1977), which contains a definition of "emission standards," controls our examination of the meaning of the word "standards" in section 209. Section 302(k)'s definition was not enacted until ten years after the original waiver provision, and it was developed in the context of regulating emissions from stationary sources. The Conference Report on the 1977 amendments, which explained many of the differences between the Senate and House versions of the 1977 bill, strongly intimates that the definition applies only in the stationary source context. *See* H.R. Rep. No. 564, 95th Cong., 1st Sess. 172 (1977), U.S. Code Cong. Admin. News 1977, p. 1077 (Conference Report).") See also *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521, 533 (2d Cir. 1994).

[209] The 1977 amendments also added section 202(a)(3) directing EPA to set heavy-duty vehicle emission standards for certain emissions for the 1983 model year and later. Congress recodified the four-year lead time and three-year stability requirements in the 1990 amendments (*see* Pub. L. No. 101-549, § 201(1), 104 Stat. 2399, 2472 (1990). While the 1977 amendments that added section 202(b)(1) included specific concurrent testimony from a member of Congress as to the intent of section 202(b)(1), there was no concurrent testimony from a member of Congress in 1977 or 1990 regarding the intent of section 202(a)(3) and certainly nothing to indicate that it would apply to California. While there was general testimony from a member of industry during the 1990 process, there is no evidence in the record suggesting the applicability of 202(a)(3)(C) to California.

[210] *NRDC*, 655 F.2d at 325 (citing S. Rep. No. 127, 95th Cong., 1st Sess. 67 (1977), reprinted in 3 Legislative History 1441). See also H.R. Rep. 95-294 at 271–72 (1977); (concluding that heavy-duty vehicle emissions "have not been adequately reduced" by EPA's program) (summarizing multiple studies and reports indicating "the inadequacy of truck emission standards"); S. Rep. 95-127 at 65-66 (1977) (describing need for "more effective controls" of heavy-duty vehicles).

has provided less than 4-years of lead time and 3 years stability also under the traditional

consistency test.[211]

Turning to section 209(b), in section 209(b)(1), Congress directed that EPA "shall" grant

waivers absent one of the three limited bases for a waiver denial.[135] Section 209(b)(1) "contains

an imperative to do an act — grant the waiver after a hearing — once California has made the

protectiveness determination." Congress did not amend section 209(b)(1)(C) in the 1977

amendments, rather the "more stringent" standard required for California standards and

contained in section 209(b)(1) in the 1967 Act was superseded by amendments to section 209,

which established that California's standards must be, in the aggregate, at least as protective of

public health and welfare as applicable Federal standards. Specifically, under section 209(b)(1),

California is now required to make a protectiveness finding "in the aggregate" for each waiver

request by looking at the summation of the standards within its vehicle program. The

protectiveness finding does not call for identicality of the standards under review with federal

standards. Instead, the 1977 Clean Air Act Amendments to section 209(b)(1), which reflected

California's wish to trade off emissions of carbon monoxide (CO), which was not so much of a

problem in California, for NOx emissions, which were and continue to present severe air quality

issues in California.[212] With this amendment, California was no longer required to design a

program more stringent than applicable Federal standards, but rather can prioritize the emission

reductions it views as most important and to regulate certain pollutants less stringently than the

---

[211] For example, 36 FR at 8172, 35 FR 19598, 43 FR 1829, 49 FR 18887.

[212] The House Committee recognized "California's longstanding belief that stringent control of oxides of nitrogen emission from motor vehicles may be more essential to public health protection than stringent control of carbon monoxide," and was aware that it might be technologically difficult to meet both the NO[x] standards California desired and the federal CO standard. Accordingly, Section 209(b) was rewritten to permit California to obtain a waiver of federal preemption so long as it determines that its emission control standards would be, "*in the aggregate,* at least as protective of public health and welfare as applicable Federal standards." *Ford Motor*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

federal government, as long as the state program standards are in the aggregate at least as protective as the Federal standards.[213] CARB may now design motor vehicle emission standards that might sometimes not be as stringent as federal standards but collectively with other standards would be best suited for California air quality problems as long as the "in the aggregate" protectiveness finding is made and it is not arbitrary and capricious.[214] "[T]here is no question that Congress deliberately chose in 1977 to expand the waiver provision so that California could enforce emission control standards which it determined to be in its own best interest even if those standards were in some respects less stringent than comparable federal ones."[215]

It is also this protectiveness determination by California, under section 209(b)(1) that determines EPA's scope of review for consistency under section 209(b)(1)(C).[216] EPA has reasoned that this is appropriate because the phrase "in the aggregate," which as earlier explained is California's whole program, precedes "such state standards," which is the relevant language in section 209(b)(1)(C).[217] EPA has thus long read both sub-provisions together so that the Agency reviews the same standards that California considers in making its protectiveness

---

[213] H.R. Rep. No. 95-294, 95th Cong., 1st Sess., 301-302 (1977). The amendment is to afford California "the best means to protect the health of its citizens and the public welfare." (*Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation*, 17 F.3d at 525 ("§ 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver of preemption if its standards 'in the aggregate' protected public health at least as well as federal standards.")).

[214] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards."); *Ford Motor*, 606 F.2d 1293, 1302 (D.C. Cir. 1979) ("[T]he 1977 amendments significantly altered the California waiver provision.").

[215] *Ford Motor Co.*, 606 F.2d 1293, 1301; *MEMA II*, 142 F.3d 464 ("California would not be denied a waiver if its CO standard were slightly higher than the federal . . . standard. . .. This is despite the fact that section 202(g) contains specific standards for CO that EPA must promulgate.").

[216] EPA believes it appropriate to read the entirety of 209 together, along with its purposes, in order to properly interpret its components such as 209(b)(1)(C). See for e.g., 87 FR 14332.

[217] 78 FR 2131–45. EPA notes that the term "such state standards" in 209(b)(1)(C) allows the Agency, in appropriate circumstances, to review the consistency of CARB's suite of standards, for a particular vehicle category, with section 202(a). For example, EPA evaluated all of the standards (LEV III criteria pollutant, ZEV sales mandate, and GHG standards) of the ACC program in recognition of the aggregate costs and lead time associated with CARB's standards as well as technologies that may be employed to meet more than one standard.

determination.[218] This interpretation is supported by case law, such as *MEMA II*: "Section 209(b)(1) makes clear that section 202(a) does not require, through its cross-referencing, consistency with each federal requirement in the act. . . California's consistency [with section 202(a)] is to be evaluated 'in the aggregate,' rather than on a one-to-one basis.  CAA § 209(b)(1)."[219]

   And most important, because California can "include some less stringent [standards] than the corresponding federal standards" California would logically not be expected to take section 202(a)(3)(C) into account in any protectiveness finding made for a waiver request for California standards with a shorter lead time than specified in section 202(a)(3)(C), and such standards would be properly considered more stringent than federal standards.[220] The agency's long-standing interpretation that section 209(b) does not require California to establish perfect compliance with the CAA to obtain a waiver is particularly plausible because section 209(b) explicitly requires only that the state's standards "be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." CAA § 209(b)(1).

   EPA's past waiver decisions have also consistently made clear that the scope of review under section 209(b)(1)(C) is narrow. Explaining for example, that "[e]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and

---

[218] 49 FR 14353-14354, 1438-14362; EPA notes there would be an inconsistency if "State standards" meant all California standards when used in section 209(b)(1) but only particular standards when used in 209(b)(1)(B) and 209(b)(1)(C). EPA has traditionally interpreted the third waiver criterion's feasibility analysis as a whole-program approach. 87 FR 14361, n.266.

[219] *MEMA II*, 143 F.3d 449, 463–64 (D.C. Cir. 1998).

[220] See for example, 87 FR 14372 ("In the ACC program waiver request, CARB made a protectiveness finding that, as a quantitative matter, its standards, in the aggregate, were as protective as the Federal standards and did not address preemption under EPCA. In fact, while California might opt to respond to comments on preemption under EPCA, California would not be expected to take it into account in any protectiveness finding made for a waiver request. It bears note that California's practice is not unusual because there are other factors and provisions of the CAA that California does not account for in making its protective finding under section 209(b)(1)"); "California is not required to comply with section 207 to get a waiver." *MEMA II*, 142 F.3d at 67.

extraordinary' conditions and whether the standards are technologically feasible—Congress intended that the standards of EPA review of the State decision to be a narrow one."[221] Commenters' reading of "consistency" would however require EPA to first conduct "the narrow[] … congressionally mandated EPA review" under which EPA's scope of review is delineated by the protectiveness finding California has made, and then a second broader review that would account for aspects beyond the limits of the waiver authority all within the same waiver decision.[222] Under this reading, "[EPA] must come to the rather curious conclusion that Congress intended the Administrator to approach every new set of California standards wearing two hats one expressly provided by statute and the other a product of elusive inference. Under the first he would undertake the cursory review set forth in Section 209(b) for purposes of deciding whether to grant California a waiver of preemption; and under the other he would turn around and, apparently in the course of a full-fledged rulemaking proceeding, plumb the merits of the California standards."[223] EPA disagrees. "The Administrator has consistently held since first vested with the waiver authority, his inquiry under section 209 is modest in scope. He has no broad and impressive authority to modify California regulations."[224] "[H]is role with respect to the California program is largely ministerial."[225] And "[t]he statute does not provide for any probing substantive review of the California standards by federal officials."[226] Rather "[t]he Administrator is charged with undertaking *a single review* in which he applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver without

---

[221] *See, e.g.,* 40 FR 21102–103 (May 28, 1975).
[222] *Ford Motor*, 606 F.2d 1293, 1298-1299.
[223] *Id.* at 1302.
[224] *MEMA I*, 627 F.2d at 1119 (internal citations omitted).
[225] *Id. at* 1123 n.56. "[T]he Administrator has no broad mandate to assure that California's emissions control program conforms to the Administrator's perceptions of the public interest. Absent the contingency that he is able to make contrary findings, his role with respect to the California program is largely ministerial."
[226] *Ford Motor*, 606 F.2d at 1301.

exploring the consequences of nationwide use of the California standards or otherwise stepping

beyond the responsibilities delineated by Congress." (Emphasis added).[227] As previously

discussed, the deference called for in reviewing California's waiver request led an Administrator

to explain over 50 years ago:

> Even on this issue of technological feasibility I would feel constrained to approve
> a California approach to the problem which I might feel unable to adopt at the
> Federal level in my own capacity as a regulator. The whole approach to the Clean
> Air Act is to force the development of new types of emission control technology
> where that is needed by compelling the industry to 'catch up' to some degree with
> newly promulgated standards. Such an approach to automotive emission control
> might be attended with costs, in the shape of reduced product offering, or price
> and fuel economy penalties, and by risks that a wider number of vehicle classes
> may not be able to complete their development work in time. Since a balancing of
> these risks and costs against the potential benefits from reduced emissions is a
> central policy decision for any regulatory agency, under the statutory scheme
> outlined above I believe I am required to give very substantial deference to
> California's judgment on that score.[228]

Commenters' reading would also introduce a dichotomy between California onroad and

offroad vehicle and engine standards that is neither supported by the statute nor EPA waiver

practice. For instance, before the 1990 Amendments that provided for authorizations of nonroad

engines and vehicles, EPA practice was to review California HD standards as a whole

recognizing that the only differences between these classes of vehicles was the placement in

service.[229]

As also previously discussed, in the 1990 amendments, Congress added subsection (e) to

address the preemption of State or political subdivision regulation of emissions from nonroad

engines or vehicles. Since then and considering the similarity in language in both sections 209(b)

---

[227] *Id*. at 1302.
[228] 36 FR 17158 (August 31, 1971); See also See 78 FR at 2133. (EPA notes that when reviewing California's standards under the third waiver prong, the Agency may grant a waiver to California for standards that EPA may choose not to adopt at the federal level due to different considerations).
[229] 36 FR 8172 (April 30, 1971).

and 209(e)(2)(A), EPA has reviewed California's requests for authorization of nonroad vehicle or engine standards under section 209(e)(2)(A) using the same principles that we have historically applied in reviewing requests for waivers of preemption for new motor vehicle or new motor vehicle engine standards under section 209(b).[230] Under section 209(e)(2)(A)(iii) the Administrator shall not grant California an authorization if he or she finds that California "standards and accompanying enforcement procedures are not consistent with section 209" of the Act.[231] In the section 209(e) rule, EPA interpreted this sub provision to mean that California standards and accompanying enforcement procedures must be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C), as EPA has interpreted that subsection in the context of motor vehicle waivers.[232] Thus EPA has reviewed nonroad authorization requests under the same "consistency" test that are applied to motor vehicle waiver requests since the inception of the waiver program and has never applied the lead time and stability requirements of section 202(a)(3)(C) to authorization decisions for California's nonroad vehicles and engines standards.[233] Accordingly, as previously discussed, EPA has not applied section 202(a)(3)(C) in reviewing whether the APU requirements (installed on heavy-duty vehicles) in this waiver request are consistent with section 209(b)(1)(C).

The legislative history of the 1977 amendments contains other relevant portions that indicates Congress's general approval of the Administrator's waiver decisions and that EPA's

---

[230] *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1087 (D.C. Cir. 1996): ". . . EPA was within the bounds of permissible construction in analogizing § 209(e) on nonroad sources to § 209(a) on motor vehicles."

[231] 40 CFR section 1074.105(b)(3).

[232] EPA historically has interpreted the consistency inquiry under the third criterion, outlined above and set forth in section 209(e)(2)(A)(iii), to require that California standards and enforcement procedures be consistent with section 209(a), section 209(e)(1), and section 209(b)(1)(C) of the Act. *See* 40 CFR Part 1074, Subpart B, 73 FR 59379 (October 8, 2008).

[233] See for example, 77 FR 9249 n.73.("EPA notes that even if the language in section 202(a)(1)(C) (sic) were relevant to its consistency analysis, that section by its own terms applies only to standards applicable to emissions from new heavy-duty on-highway motor vehicle engines, not the nonroad engines being regulated by California.").

construct of section 209(b)(1) for the decade prior was consistent with congressional intent.[234]

The amendment to section 209(b)(1) was also intended *to ratify and strengthen* the California

waiver provision and to affirm the underlying intent of that provision, i. e., *to afford California*

*the broadest possible discretion in selecting the best means to protect the health of its citizens*

*and the public welfare.*[235] (Emphasis added)." **Additional relevant legislative history cautioned**

the Administrator "not to overturn California's judgment lightly. Nor . . . substitute his judgment

for that of the State."[236] Notably, this language appeared in the same House Report that indicated

Congressional impatience for EPA's failure to promulgate a "particulate standard" for HD

engines and vehicles under section 202(a). The entire relevant legislative history is devoid of any

indication that Congress intended to constrain California's discretion to the lead-time and

stability requirements in section 202(a)(3)(C). "The history of congressional consideration of the

California waiver provision, from its original enactment up through 1977, indicates that

Congress intended the State to continue and expand its pioneering efforts at adopting and

enforcing motor vehicle emission standards different from and in large measure more advanced

than the corresponding federal program; in short, to act as a kind of laboratory for innovation."[237]

The reading by commenters challenging the waiver request is thus a particularly odd one

considering that in this amendment Congress also generally approved of EPA's implementation

of the waiver program for over a decade as well as expanded California's discretion in setting

standards that it considered beneficial for the state.

      EPA's long-time practice of feasibility review does not call for assessing California

standards against federal provisions or requirements that California does not account for in its

---

[234] See H.R. Rep. No. 294, 95th Cong., 1st Sess. 301 (1977).
[235] H.R. Rep. No. 294, 95th Cong., 1st Sess. 30102 (1977), U.S. Code Cong. Admin. News 1977, p. 1380
[236] H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977), U.S. Code Cong. Admin. News 1977, p. 1381.
[237] *MEMA I*, 627 F.2d 1095, 1110.

protectiveness finding under section 209(b)(1). Consistent with statutory text, congressional intent and caselaw, EPA may not disregard California's determination absent "clear and compelling evidence" to the contrary.[238] Moreover, as also previously explained, the Administrator's scope of review "is limited to determining whether those opposed to the waiver have met their burden of establishing that California's standards are technologically infeasible."[239]  And this "technological feasibility component of section 202(a) [only] obligates California to allow sufficient lead time to permit manufacturers to develop and apply the necessary technology." [240] In sum, "the import of section 209(b) is not that California and Federal standards be identical, but that the Administrator does not grant a waiver of Federal preemption where compliance with the California standards is not technologically feasible within available lead time."[241]

As also noted above, EPA received comment that *Blum* along with EPA's 1994 MDV waiver Decision constrain EPA and require that EPA apply section 202(a)(3)(C) to these standards in reviewing for consistency with section 202(a).[242] But the lead time section at issue in *Blum* is distinguishable from section 202(a)(3)(C) in several key respects, and *Blum* thus does not constrain EPA's consideration of that latter section. In *Blum*, the D.C. Circuit held that EPA granted a waiver of preemption that denied a small volume manufacturer the statutorily mandated lead time specified in section 202(b)(1)(B) and as a result that the relevant California's standards were inconsistent with section 202(a).[243] According to the court, "Congress itself finds

---

[238] Id. at 1122.
[239] Id. at 1126.
[240] *MEMA II*, 142 F.3d at 463 (Internal citations omitted).
[241] 46 FR 22032, 22034-35 (April 15, 1981).
[242] 59 FR 48625 (September 22, 1994) and associated Decision Document at EPA-HQ-OAR-2022-0330, (MDV Waiver Decision Document).
[243] Waiver of preemption for California to Enforce NOx emissions standards for 1981 and later model years passenger cars. 43 FR 25729 (June 14, 1978).

and mandates that with respect to small manufacturers a lead period two years is necessary. We

think the effect of this congressional mandate is to *assimilate* or *incorporate* in section 202(a)(2)

the proviso of section 202(b)(1)(B)."[244]

There is a textual distinction that underpins the applicability of section 202(b)(1)(B) to

California, in contrast to section 202(a)(3)(C), within the cross-reference to section 202(a) found

in section 209(b)(1)(C). Unlike the incorporation of section 202(b) into 202(a)(2), EPA finds no

textual parallel that would either assimilate or incorporate section 202(a)(3)(C) into section

202(a)(2). There is no reference to section 202(a)(2) in section 202(a)(3)(C) that would couple

language of both sections so that section 202(a)(3)(C) is either "incorporated" into or overrides

section 202(a)(2). This contrasts with section 202(b)(1)(B), which was the section at issue in

*Blum*.[245] Section 202(a) expressly recognizes the overriding effect of section 202(b) in the

introductory sentence because section 202(a) clearly cross-references to subsection (b) and thus

the lead time requirements in section 202(a)(2) are subject to 202(b). Immediately introducing

section 202(a), and the authority of the Administrator to prescribe by regulation, is the phrase

"Except as otherwise provided in subsection (b) – "which requires specific terms set forth in

subsection (b) to govern over more general and potentially conflicting terms in 202(a).

---

[244] *American Motors Corp. v. Blum*, 603 F.2d 978, 981 (D.C. Cir. 1979) ("Section 202(b)(1)(B) directs that the regulations prescribed by the Administrator pursuant to section 202(a) shall require that NOx emissions may not exceed 2.0 grams per vehicle mile for vehicles and engines manufactured during model years 1977 through 1980. For those manufactured during model year 1981 and thereafter, NOx emissions may not exceed 1.0 grams per vehicle mile. . .. In establishing these regulations the Administrator is bound by section 202(a)(2) to allow such lead time as he finds necessary.")

[245] In *American Motors Corp. v. Blum*, 603 F.2d 978 (D.C. Cir. 1979), the D.C. Circuit held that EPA had granted a waiver of preemption that denied a small volume manufacturer the statutorily mandated lead time specified in section 202(b)(1)(B) and as a result that the relevant California's standards were inconsistent with Section 202(a). "Congress itself finds and mandates that with respect to small manufacturers a lead period two years is necessary. We think the effect of this congressional mandate is to assimilate or incorporate in section 202(a)(2) the proviso of section 202(b)(1)(B)." *Id.* at 981.

According to relevant legislative history of 202(b)(1)(B), the language was introduced due to concerns that small volume manufacturers would not be able to comply with the 1.0 gram per mile (gpm) NOx standard for light-duty vehicles. According to statements made at the time of the amendment's introduction and debate, the amendment was intended to apply to only American Motors Corporation (AMC) and one other small manufacturer (Avanti).[246]  Even the EPA Administrator acknowledged AMC's specific need for extra lead time in a letter to Congress in support of the amendment. Both the amendment's sponsor and the Administrator explained that the 1.0 gram/mile standard created a "peculiar" and "special" problem for AMC and other small manufacturers: the standard required the development of a specific technology that AMC would have to purchase and adapt from other manufacturers because, "unlike the big three automakers, it does not design and build its own pollution control systems," and, due to the one to two years it would take to "modify and adapt the system to its own product line," AMC would be unavoidably behind in the pollution abatement timetable from the very beginning.[247] This legislative history was crucial to the *AMC* Court's holding that Congress had "f[ound] and mandate[d] that with respect to small manufacturers a lead period two years is necessary."  In contrast, there does not appear to be similar legislative history detailing a special or peculiar need for the strict lead time requirements for section 202(a)(3)(C), which was enacted in the same Amendment as section 202(b)(1)(B), that would indicate Congress's belief that a specific amount of lead time was "necessary."[248]

---

[246]123 Cong. Rec. S9233 (daily ed. June 9, 1977).
[247] *Id.*; 123 Cong. Rec. at S9232 (daily ed. June 9, 1977).
[248] To the extent commenters cite statements in the legislative history regarding the need for 3years of stability and 4 years of lead time, EPA notes that none of the cited statements are from members of Congress themselves and are instead testimony from commenters themselves. *See, e.g.*, EMA Initial Comments, at 10.

EPA therefore believes that there is no textual evidence or legislative history to support the idea that both sections 202(a)(2) and 202(a)(3)(C) would apply to both EPA and California, nor that they would apply to California (as they would to EPA). Notably, section 202(a)(3)(C) stands in place of section 202(a)(2) as applicable to EPA and again, there is no evidence to suggest that section 202(a)(2) would not apply to California's heavy-duty vehicle emission standards as it does to all other California emission standards under waiver review by EPA.

Moreover, after *Blum*, the D.C. Circuit also considered a somewhat analogous argument in *MEMA II* where petitioners maintained that section 202(m), which calls for promulgation of regulations "under section 202(a)," meant that EPA was to evaluate applicability of section 202(m) to California's onboard diagnostic regulations for consistency with section 202(a). The court disagreed, held that section 202(m) does not apply and declined to extend its holding in *Blum,* holding instead that "section 209(b)(1) makes clear that section 202(a) does not require, through its cross-referencing, consistency with each federal requirement in the act. California's consistency is to be evaluated 'in the aggregate,' rather than on a one-to-one basis.[249] According to the court "[a]lthough statutory cross-referencing presents a superficially plausible textual argument linking compliance with subsection (m) to compliance with subsection (a), the agency has long interpreted the statute to give California very broad authority, and the court has held that this interpretation is not unreasonable."[250]

EPA also disagrees with commenter's claim that the 1994 waiver decision constrains and binds EPA in the current waiver review. EPA no longer feels bound by that decision for all the reasons discussed herein, including that *MEMA II* casts considerable doubt on the applicability of

---

[249] *MEMA II* at 463.
[250] *Id*.

section 202(a)(3)(C) to California standards.[251] In *MEMA II* the court revisited *Blum* and

explained:

> Petitioners' reliance on American Motors Corp., [] is misplaced. In that case, EPA
> viewed the petitioner's complaint about the lead time for a proposed action by
> CARB to be solely based on section 202(b), not section 202(a), and so was not
> cognizable in the waiver process. The court disagreed, observing that the lead
> time for implementation of the NOx standard was governed by section 202(a)(2)
> and concluding that the California regulation, which denies to [petitioner] a lead
> time of two years, is inconsistent with section 202(a)(2). *Id*. at 981. Thus, the
> American Motors decision did not suggest that all of the subsections of section
> 202 were incorporated into subsection (a) for the purposes of assessing a
> California waiver application. Instead, it concluded that the EPA had granted a
> waiver without determining whether California had met the standards of section
> 202(a)."[252]

And in the intervening years since the 1994 MDV waiver decision, EPA has not applied

section 202(a)(3)(C) to any other waiver decisions for California's HD standards. So, the 1994

MDV waiver decision remains the sole waiver decision where EPA reviewed California

standards for consistency with section 202(a) under both section 202(a)(3) and the traditional

technology feasibility test (202(a)(2)). At the time of the 1994 waiver, EPA posited that "*Blum*

indicates that California would be required to provide the statutory lead time required under

section 202(a)(3)(C)."[253] But EPA also reviewed the standards under the traditional technology

---

[251] *Id*. at 463-64.

[252] 142 F.3d at 464 n.14 (internal citations omitted).

[253] 59 FR 48625 (September 22, 1994) and associated Decision Document at EPA-HQ-OAR-2022-0330, (MDV
Waiver Decision Document) at page 26.  "Under section 209, the Administrator has an oversight role to review
California lead time decisions associated with their rules. While CARB may well choose to provide a different
amount of lead time for light-duty vehicles than EPA has determined is necessary, *Blum* instructs that the specific
lead time requirements of section 202 apply to both agencies with equal force. Again, the *Blum* court interpreted
literally the specific congressional requirement of lead time and stated, '[t]he necessity for lead time cannot be
obviated by a waiver.'" *Id*. at 32; (As Congress intended, EPA has liberally construed the section 209 waiver
provision to give California broad discretion with its program. Nonetheless, EPA's discretion is not unlimited. In
light of the plain language and Congressional intent of sections 202 and 209, and applying the rationale of Blum, I
find that the opposing parties have provided persuasive arguments that California is subject to the four year lead
time requirement under section 202(a) (3) (b) of the Act and is required to provide four years of lead time for the
proposed MDV standards.).

feasibility test finding that "no significant development nor associated lead time is required."[254]

Notably, California had provided four-year lead time for the standards at issue. EPA also did not

discuss an earlier decision denying the petition for reconsideration that sought reconsideration of

a waiver decision on grounds that *Blum* also required the Administrator to take certain lead time

provisions into account when considering California waiver requests at issue.[255] There EPA

explained in relevant part that:

> The specific Congressional finding that under prescribed circumstances additional
> lead time is necessary is unique to the small volume manufacturer provision, and
> is not present in the other sections of the Act. Moreover, the fact that Congress
> determined that qualified manufacturers such as *AMC* are entitled to additional
> lead time was the critical factor leading to the Court's decision. *AMC v. Blum* did
> not involve or discuss other Federal waiver provisions, which, unlike section
> 202(b)(1)(B), do not reflect such a Congressional finding.[256]

EPA further explained that:

> The small-volume manufacturer waiver provision was interpreted by the court as
> a "proviso" to section 202(a) of the Act, such that the determination of
> technological feasibility of the 1.0 gpm NOx, standard in question within
> available lead time is taken out of the hands of the Administrator and is made by
> *the unique Congressional finding of 202(b)(1)(B* (Emphasis added).[257]

Most significant was EPA's explanation of the protectiveness finding California makes under

section 209(b)(1) on EPA's consistency determination. EPA explained that:

> California standards need not be identical to their Federal counterparts, even those
> established in waiver decisions. An argument along those lines would be
> inconsistent with section 209(b) of the Act. Because California has special air
> pollution problems, section 209(b) permits the Administrator to waive Federal
> preemption to permit the State of California to implement its own air pollution
> control programs that are, in the aggregate, at least as protective as nationally
> applicable standards. *The import of section 209(b) is not that California and
> Federal standards be identical, but that the Administrator not grant a waiver of*

---

[254] Medium-Duty Waiver Decision at page 48-49 ("In view of these facts, I agree with CARB's assessment that adequate technology exists and may be readily adapted to enable MDVs to meet all of CARB's standards. Thus, no significant development nor associated lead time is required.").
[255] Petition for Reconsideration of Waiver of Federal Preemption for California To Enforce Its NOx Emission Standards and Test Procedures: Notice of Denial. 46 FR 22032 (April 15, 1981).
[256] 46 FR 22034.
[257] *Id.*

*Federal preemption where compliance with the California standards is not technologically feasible within available lead time, consistent with section 202(a).*[258]

Lastly, EPA has examined the text of section 177 of the CAA, added by Congress in the 1977 amendments. At the time that Congress was affording California additional programmatic flexibility and policy deference with the addition of the "in the aggregate" language to section 209(b)(1), Congress added section 177 to allow other States (those with plan provisions approved under Part D) to adopt California's new motor vehicle emission standards if certain criteria are met. Such criteria include that the State standards adopted be identical to the California standards for which a waiver has been granted for such model year, and that "California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator)."[259] EPA believes that Congress understood and knew how to specify a number of years applicable to California and other States before other States could enforce its standards under section 177. In the same 1977 amendments to the CAA, Congress did not specify the applicability of the lead time and stability requirements in the new section 202(a)(3)(C). EPA finds no basis to find or infer that the 202(a)(3)(C) requirements apply to California. And, as importantly, Congress established a structure by California would receive a waiver for standards that EPA deemed feasible with the lead time provided within the California market.[260] Other States (section 177 States) could enforce California's standards but would have to allow two years of lead time. It is assumed that these additional two years would allow manufacturers time to comply with the expanded market for the California standards, but this would still not be a fully national market subject to EPA

---

[258] 46 FR 22034-35.
[259] 42 U.S.C. 7507(1), 7507(2).
[260] 78 FR at 2143, n. 165.

standards. There is an absence of any language in section 177 that would require the section 177 states to provide more lead time (an additional two years) in order to be consistent with the 4 years of lead time that commenters claim to apply to California. EPA agrees with CARB comment that it makes little sense to assume Congress would have provided four years of lead time to prepare to comply in the California market but only two years to prepare for compliance in a potentially larger market captured, collectively, in the section 177 States.

Further, EPA traditionally applies a "record-based" review to determine the actual technological feasibility of California's standards, and to the degree requisite technology is not currently available then EPA examines the factual record to determine whether sufficient lead time is provided, giving consideration to cost. As such, a record-based review would be inappropriately constrained by a pre-determined number of lead time years that would apply to California regardless of the record, particularly in circumstances where the record clearly reflects the emission standards are already technologically feasible or are reasonably projected to be reasonable in a time period short of the 4 years of lead time that Congress prescribed for EPA. In addition, EPA's technological feasibility assessment is conducted within the confines of the manufacturers' ability to meet the California standards within California and the California market.[261] It is illogical to couple EPA's limited role in reviewing the feasibility of CARB's standards, confined to the manufacturers' ability to meet the emission standards for new vehicles introduced into commerce in California, with the 4 year lead time directive that Congress provided to EPA in setting national new heavy-duty vehicle emission standards.

   c.  *Section 209(b)(1)(C) and Section 209(e)(2)(A)(iii) Conclusion*

---

[261] *Id* at 2143.

As previously explained, EPA believes that the traditional interpretation of the section 209(b)(1)(C) (and the section 209(e)(2)(A)(iii)) criterion is the best reading of the statute. The traditional approach is to evaluate the standards contained in California's waiver request (and any additional standards associated with the motor vehicle category, as necessary) to determine whether the opponents of the waiver have met their burden of proof (as a factual matter) to demonstrate that California's standards are not technologically feasible, giving consideration to lead time and cost. Applying this approach with the reasoning noted above, with due deference to California, I cannot deny the Omnibus Low NOx Regulation waiver request. CARB has demonstrated that technologies exist today to meet the most imminent standards and has identified refinements to emission control technologies and other possible emission controls to meet the emission standards in later model years. EPA finds that there is no evidence in the record to demonstrate that CARB's assessments, including those made in the state rulemakings, are unreasonable.  Therefore, I determine that I cannot deny of the waiver request under section 209(b)(1)(C) or 209(e)(2)(A)(iii).

In addition, after a review of the text in sections 209, 202, and section 177, EPA finds that the language Congress added in 1977 in section 202(a)(3)(C) was only directed at EPA and does not apply to California by way of EPA's review of section 209(b)(1)(C) and section 209(e)(2)(B)(iii). Further, EPA has reviewed the legislative history, EPA's prior waiver decisions, and applicable case law and concludes that each of these considerations further supports EPA's textual analysis that section 202(a)(3)(C) does not apply to California and thus EPA cannot deny CARB's waiver request on this basis.

*D.  Other Issues*

One commenter claimed that EPA's interpretation of CAA Section 209 grants preferential regulatory treatment to California over other states by rubber-stamping every regulatory change CARB makes, and that this violates the equality of the states.[262]  EPA has previously considered equal sovereignty objections to waiver requests as outside the scope of EPA's review and incorporates the reasoning in that prior decision.[263]

As the D.C. Circuit stated clearly, "[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims."[264] In the waiver context, EPA does not consider factors beyond those expressed in CAA section 209(b). Even if it were to consider constitutional questions, the resolution of such issues "is the most important of judicial functions, 'one that even the judiciary is reluctant to exercise.'"[265] EPA has therefore declined to consider constitutional challenges in waiver requests since at least 1976.[266] EPA in turn does not interpret nor attempt to apply the equal sovereignty doctrine or other constitutional provisions in this waiver determination. However, EPA notes that the D.C. Circuit in *Ohio v. EPA* rejected the petitioners' equal sovereignty claim, holding "that Section 209(b) is subject to traditional rational basis review for Commerce Clause legislation and—as no one disputes—that it is constitutional under that standard."[267]

---

[262] *Texas Public Policy Foundation (TPPF), Docket No. EPA-HQ-OAR-2022-2032-0042, at 4.*
[263] 87 FR 14332, 14376–77 (March 14, 2022).
[264] *MEMA I*, 627 F.2d at 1115.
[265] *Id.* (quoting *Panitz v. District of Columbia*, 112 F.2d 39, 41 (D.C. Cir. 1940)).
[266] *See, e.g.*, 41 FR 44212 (Oct. 7, 1976) (declining to consider a due process violation claim); 43 FR 32182, 32184 (July 25, 1978) (rejecting constitutional objections as beyond the "narrow" scope of the Administrator's review).
[267] *Ohio v. EPA*, 98 F.4th 288, 308 (D.C. Cir. 2024) (holding further that the *Shelby County* was inapplicable to the waiver context in part because it was applied to the Fifteenth Amendment context, not to Congress's Commerce Clause power). EPA recognizes that petitions for certiorari were filed following the D.C. Circuit's decision. See *Diamond Alternative Energy v. EPA*, U.S. 24-7; *Ohio v. EPA*, U.S. 24-13. The Supreme Court denied certiorari in *Ohio* on December 16, 2024, thus declining to review the D.C. Circuit's merits holding with respect to the state petitioners' equal sovereignty claims discussed herein. The Supreme Court granted certiorari in *Diamond Alternative* on December 13, 2024, limited to the question of whether "a party may establish the redressability component of Article III standing by relying on the coercive and predictable effects of regulation on third parties." This standing question was not present in *Ohio*, where the D.C. Circuit concluded the state petitioners had standing to bring their equal sovereignty claims and resolved those claims on the merits.

The same commenter claims that EPA's interpretation of CAA Section 209, by granting preferential regulatory treatment to California, also raises questions of "vast economic and political significance."[268] Util. Air Regulatory Grp. v. EPA, 573 U.S. 302, 324 (2014). This commenter failed to adequately develop this argument. EPA believes that to the extent that commenters contend that EPA's traditional interpretation of section 209 raises questions of vast economic and political significance where Congress must speak clearly, EPA believes that this doctrine is inapplicable. That doctrine posits that in certain extraordinary cases, Congress should not be presumed to delegate its own authority over matters of vast economic and political significance to federal agencies in the absence of clear statutory authorization. These concerns have no logical connection to provisions that preserve state authority. Furthermore, the language and history of section 209(b) and (e) provide clear evidence that Congress intended for California to have great deference in designing its own vehicle program. *MEMA I*, 627 F.2d at 1111. Further, EPA notes that the major questions doctrine is concerned with "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."[269] In CAA section 209, Congress required that federal preemption be waived (or an authorization be issued by EPA) for the state unless the EPA determines that criteria specified in the statute are met. In this context, EPA does not exercise its own regulatory authority but rather sits in an adjudicatory role evaluating state standards (in this case California standards that were adopted under its own state police power authority) against these criteria; EPA's evaluation and final decision regarding a request for waiver of preemption under CAA section 209 is not predicated on any federal rulemaking authority or rulemaking action associated with mobile sources.  This action does not represent a "transformative expansion in [the agency's] regulatory

---

[268] TPPF at 4.
[269] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

authority,"[270] because EPA is not exercising any regulatory authority to begin with. It follows that the grant of a CAA section 209 preemption waiver does not raise the concerns regarding separation of powers amongst branches of the federal government that motivate the major questions doctrine. There can be no concern in the section 209 waiver context that EPA may make "major policy decisions" that should be reserved to Congress.[271] As we explain above, the language, structure, legislative history, and longstanding implementation of CAA section 209 all confirm that this provision serves the purpose of allowing the State to innovate and pursue its own policy priorities, provided the waiver criteria are satisfied. Rather than involving "consequential tradeoffs . . . that Congress likely would have intended for itself,"[272] CAA section 209 represents Congress' decision to allow consequential policy tradeoffs regarding the regulation of new motor vehicles to be made by the State limited only by the Congressionally specified criteria in section 209(b)(1).

California's authority to implement and enforce the Omnibus regulations is not the result of a delegation by Congress or EPA.[273] The State possesses sovereign authority to adopt its own legal code and to exercise its police powers to regulate air pollution from mobile sources.[274] EPA's waiver action does not add to or subtract from that sovereign authority, but merely adjudicates whether California's regulatory choices satisfy the statutory criteria for a waiver of preemption under CAA section 209(b). Relevant case law, including *West Virginia*, is devoid of

---

[270] *Id.* at 2610.
[271] *Id.* at 2609.
[272] *Id.*, at 2613.
[273] *See, e.g.*, TPPF, p.3.
[274] *Central Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F.Supp.2d 1151, 1174 ("The waiver provision of the Clean Air Act recognizes that California has exercised its police power to regulate pollution emissions from motor vehicles since before March 30, 1966; a date that predates both the Clean Air Act and EPCA."). *See also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig*., 959 F.3d 1201, 1206 (9th Cir. 2020) ("the regulation of air pollution for health and welfare purposes falls within the exercise of even the most traditional concept of what is compendiously known as the police power").

any suggestion that the major questions doctrine limits a State's sovereign powers. It follows that the doctrine does not apply when the Federal government adjudicates the State's request to implement its own laws as not being preempted by Federal statute.

A commenter submitted a late comment asking EPA to reopen the comment period.[275] Among other things, the commenter alleged that the comment period closed over two years ago and significant changes have occurred in the intervening time, citing to the 2023 Targeted Amendments, CARB's July 2024 supplemental submission to EPA, and the Clean Truck Partnership, which is an  agreement between CARB, certain manufacturers, and the manufacturers' trade group.[276] The comment claimed that EPA must reopen the comment period in this context, citing specifically to section 307(d)(7)(B) of the Act.

EPA disagrees with this comment for several reasons. First, the sole legal authority cited by the commenter, CAA section 307 and specifically 307(d)(7)(B) is inapplicable. Section 307(d)(7)(B) only applies to those agency actions identified in section 307(d)(1). EPA's adjudication of California waiver is not such an action, and thus section 307(d)(7)(B) does not apply.[277]

Second, EPA is not aware of any other authority that requires the agency to reopen the comment period in this adjudicatory context merely due to the passage of time.[278] Nor do we believe that reopening the comment period is appropriate considering the limited nature of the 2023 Targeted Amendments, which did not modify the emission standards, implementation

---

[275] Roush, December 4, 2024, available in docket EPA-HQ-OAR-2022-0332.
[e] *Id.* at 2.
[277] Neither does section 307(h), which only applies to EPA's regulations.
[278] EPA notes that some past California waivers or authorizations have entailed longer periods of time between the initial notice and EPA's final decision. See, e.g., 74 FR 3030, 3032 (Jan. 16, 2009) (stating that EPA provided notice on November 21, 2005).

dates, or test procedures of the Omnibus Low NOx program, but rather provided additional implementation flexibilities for the regulated industry.

As we explained in the sections addressing each waiver prong, the flexibilities added by the 2023 Targeted Amendments inherently do not affect total emissions reductions and thus do not undermine protectiveness; additional flexibilities do not negatively affect technological feasibility, but rather provide manufacturers with more options for compliance; and nothing about the amendments affects California's need for its own motor vehicle standards to address compelling and extraordinary conditions. As such, the amendments do not materially affect EPA's adjudication of the waiver and authorization criteria specified in section 209. In fact, EPA's decision to grant a waiver and authorization for the Omnibus Low NOx program can be justified solely on the original CARB January 31, 2022, submission of the Omnibus Regulation adopted by the CARB Board in August 2020, without any need to rely on the 2023 Targeted Amendments or the accompanying information in the July 2024 supplemental submission. In this context, additional opportunity for comment would have been unlikely to alter EPA's decision on the three waiver criteria and thus would have been futile. Such additional process would have, however, delayed States' ability to enforce the Omnibus Low NOx regulations and obtain critical emissions reductions necessary to meet CAA Title I obligations.

Third, the commenter's characterizations of the events since the original comment period are misplaced. For example, the commenter suggests that CARB's supplemental request for EPA to consider the 2023 Amendments was not made public in EPA's docket until November 25, 2024. In fact, CARB's supplemental request and significant accompanying information were

posted to the docket in July 2024.[279]  The commenter also suggests that CARB's 2023

Amendments, CARB's July 2024 supplemental submission, or the Clean Trucks Partnership,

indicate that CARB concedes the original Omnibus package fail to meet the waiver criteria. The

opposite is true. For instance, the CARB July 2024 submission states that "the 2023

Amendments are not anticipated to change the emission benefits of the Omnibus regulation as

originally adopted, or to alter the analysis of any of the waiver criteria such that EPA could deny

this waiver request."[280]

## IV.    Decision

After evaluating California's Omnibus Low NOx Regulations, CARB's submissions, and

relevant public comments, EPA is granting a waiver of preemption and authorization, as

applicable, for these regulations.

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA.

Petitions for review must be filed within 60 days from the date notice of this final action is

published in the Federal Register.

## V.    Statutory and Executive Order Reviews

As with past waiver and authorization decisions, this action is not a rule as defined by

Executive Order 12866. Therefore, it is exempt from review by the Office of Management and

Budget as required for rules and regulations by Executive Order 12866.

---

[279] See EPA-HQ-OAR-2022-0332-0097, available at https://www.regulations.gov/comment/EPA-HQ-OAR-2022-0332-0097 (posted to the docket July 19, 2024); EPA-HQ-OAR-2022-0332-0098, available at https://www.regulations.gov/comment/EPA-HQ-OAR-2022-0332-0098 (posted to the docket July 24, 2024). EPA acknowledges that further information regarding the 2023 Amendments were posted to the docket on November 25, 2024. EPA-HQ-OAR-2022-0332-0099.
[280] EPA-HQ-OAR-2022-0332-0099 at 1.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Further, the Congressional Review Act, 5 U.S.C. 801, et seq., as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does not apply because this action is not a rule for purposes of 5 U.S.C. 804(3).[281]

Dated: December 17, 2024

**Michael S. Regan,**

*Administrator.*

---

[281] The U.S. Government Accountability Office (GAO) has issued a decision (in the context of its review of EPA's SAFE I Reconsideration decision) that the Congressional Review Act does not include adjudicatory orders and also excludes certain categories of rule from coverage, including rules of particular applicability. As part of this decision, the GAO also determined that even if the SAFE I Reconsideration waiver action were to satisfy the Administrative Procedure Act's definition of a rule, it would be considered a rule of particular applicability, and, therefore, would still not be subject to the CRA's submission requirement. https://www.gao.gov/products/b-334309.