ROB BONTA, State Bar No. 202668
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, STATE BAR NO. 344239
DAVID M. MEEKER, STATE BAR NO. 273814
JONATHAN A. WIENER, State Bar No. 265006
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAIMLER TRUCK NORTH AMERICA, LLC, INTERNATIONAL MOTORS, LLC., PACCAR INC., and VOLVO GROUP NORTH AMERICA LLC**,<br><br>Plaintiffs,<br><br>**THE UNITED STATES OF AMERICA;** and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**,<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>**CALIFORNIA AIR RESOURCES BOARD, STEVEN S. CLIFF**, in his official capacity as the Executive Officer of the California Air Resources Board; and **GAVIN NEWSOM**, in his official capacity as the Governor of California,<br><br>Defendants. | 2:25-cv-02255-DC-AC<br><br>**DECLARATION OF ROBIN U. LANG IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION**<br><br>Date: October 31, 2025<br>Time: 1:30 PM<br>Courtroom: 8, 13th Floor<br>Judge: Hon. Dena Coggins<br>Trial Date: Not Set<br>Action Filed: August 11, 2025 |

I, Robin U. Lang, declare as follows:

1. I am the division chief of Emissions Certification and Compliance at the California Air Resources Board (CARB). This Declaration is based on my personal knowledge, and, if called as a witness, I could and would testify to the statements herein. The following statements are based upon my personal knowledge and upon my review of records kept by CARB in the ordinary course of its business practice. I have personal knowledge of the manner in which CARB's records are kept. Each of the records upon which I rely was made in the ordinary course of business at or near the time of the act, condition, or event. The sources of information at the time of preparation are such that I believe the records to be trustworthy.

2. I have worked in my current position at CARB since July 11, 2022. In this role, I currently manage a team of approximately 125 engineers and scientists. These staff are responsible for processing certification applications for mobile source emissions sources in the State of California and confirming compliance with appropriate California standards. I issue approximately 3,000 Executive Orders per year confirming certification status per delegated authority from the executive office.

**BRIEF HISTORY OF CARB'S REGULATION OF NEW MEDIUM- AND HEAVY-DUTY VEHICLE EMISSIONS**

3. Medium- and heavy-duty vehicles contribute 32% of California's oxides of nitrogen (NOx) emissions and are a significant source of Statewide diesel particulate matter (PM) and greenhouse gas (GHG) emissions. Freight trucking activity is concentrated at seaports, warehouses, railyards, and other major freight hubs throughout California. Nearby communities are disproportionately burdened by the cumulative health impacts from these facilities and the vehicle traffic serving them.

4. CARB first adopted regulations limiting emissions from new medium- and heavy-duty engines for model year (MY) 1973 for gasoline-powered engines and for MY 1979 for diesel-powered engines. The 1973 regulations required new heavy-duty engines to emit no more than 16 grams per brake horsepower of hydrocarbon plus NOx and 40 grams per brake horsepower hour of carbon monoxide. The MY 1979 regulations limited new heavy-duty engines

1

to no more than 5 grams per brake horsepower hour of hydrocarbons plus NOx (or up to 7.5 grams of NOx per brake horsepower hour if hydrocarbons were limited to 1.5 grams) and 25 grams per brake horsepower hour carbon monoxide.

5. CARB has amended its medium- and heavy-duty vehicle and engine emission standards many times since, as emission control technologies have advanced.

6. For example, in 2001, for MY 2007 and subsequent, CARB amended its standards for heavy-duty diesel-powered engines to permit no more than 0.20 grams per brake horsepower hour emissions of NOx—a dramatically lower limit than allowed under the first ever standards described above. The United States Environmental Protection Agency (EPA) waived preemption for these amendments in 2005. 70 Fed. Reg. 50,322 (Aug. 26, 2005). CARB made some technical amendments to these requirements, without changing the standards, in 2007; and EPA later agreed that those technical amendments were within the scope of the existing waiver, 82 Fed. Reg. 4867 (Jan. 17, 2017).

7. Separately, in 2000 and again in 2002, CARB amended its standards for heavy-duty Otto-cycle (gasoline) engines to permit no more than 0.20 grams per brake horsepower-hour emissions of NOx for MY 2008 and subsequent—again, a dramatically lower limit than the original standards. CARB also set a standard of 0.01 gram per brake horsepower hour emissions of PM for these engines. 75 Fed. Reg. 70,238 (Nov. 17, 2010).

8. The evolution of these standards reflects technological advancements in pollution control and the development of scientific and other information about the need to limit pollution—e.g., adverse impacts of pollution on public health, public welfare, and the environment.

9. Continuing in that vein, in 2014, CARB adopted GHG emission standards for MY 2014 and subsequent medium- and heavy-duty vehicles and engines, known as "Phase 1 GHG standards." EPA waived preemption for these amendments in 2016. 81 Fed. Reg. 95,982 (Dec. 29, 2016). CARB adopted more stringent GHG emission standards for these vehicles and engines in 2018, known as "Phase 2 GHG standards." Cal. Code Reg., tit. 13, §§ 1956.8 1961.2, 1965, 2036, 2037, 2065, 2112, and 2141; Cal. Code Reg., tit. 17, §§ 95300, 95301, 95302, 95303,

95304, 95305, 95306, 95307, 95311, 95662, and 95663. The "Phase 2 GHG standards" aligned with EPA's federal standards applicable to the same model years. While there are small differences between the state and federal requirements, the alignment intentionally allows manufacturers to demonstrate compliance with both standards simultaneously. Manufacturers have been doing so since MY 2014. CARB has not requested a preemption waiver for the Phase 2 GHG standards. CARB is not now requiring manufacturers to certify to, or otherwise meet, those standards, and will not do so absent a preemption waiver that covers them. CARB is also not otherwise enforcing the Phase 2 GHG standards and will not do so absent a preemption waiver. CARB will, however, process any applications for certification to these standards if manufacturers voluntarily submit them.

10. In 2021, CARB again amended its program, adopting the Advanced Clean Trucks regulation. Building on the success of CARB's long-standing zero-emission-vehicle requirements for light-duty vehicles, Advanced Clean Trucks requires medium- and heavy-duty vehicle manufacturers to sell increasing percentages of zero-emission vehicles in California beginning with MY 2024. Cal. Code Reg., tit. 13, § 1963.1(b). The percentage requirement in a given model year varies based on the class of vehicles and applicable MY. Each individual manufacturer need not itself meet the percentage requirements, however, because the program allows credit accumulation and trading. Cal. Code Reg., tit. 13, § 1963.2(d)-(e). EPA published its preemption waiver for the addition of Advanced Clean Trucks to California's program in April 2023. 88 Fed. Reg. 20,688 (Apr. 6, 2023).

11. In 2025, CARB adopted amendments to the Advanced Clean Trucks regulation to provide manufacturers additional flexibility to comply with the regulation, address issues that had arisen during CARB's implementation to date, and honor commitments made by CARB in the Clean Truck Partnership agreement. These amendments include extending the period that manufacturers must offset deficits from one to three years, and clarifying that compliance determinations and sales reporting requirements are both defined when vehicles are produced and delivered for sale in California, instead of when the vehicles are delivered to the ultimate purchaser. In addition, CARB's Board approved additional amendments to, among other

1 changes, allow pooling of credits from sales in other states that have adopted the Advanced Clean
2 Trucks regulation. These amendments, too, honor commitments made by CARB in the Clean
3 Truck Partnership. These amendments are not yet final under California administrative law.

4     12. Under the Advanced Clean Trucks regulation, manufacturers could earn credits by
5 selling qualifying zero-emission vehicles before MY 2024, when the requirements began. Many
6 manufacturers did so as summarized in CARB's Advanced Clean Trucks Credit Summary
7 through the 2023 MY, which is available at https://ww2.arb.ca.gov/resources/fact-sheets/ACT-
8 Credits-Summary%202023, last visited September 11, 2025.

9     13. CARB has also adopted more stringent requirements for medium- and heavy-duty
10 vehicles with internal-combustion engines. (All models of such vehicles currently emit pollution
11 from their tailpipes and thus do not currently qualify as zero-emission vehicles in California.)

12     14. In 2021, CARB amended its program with the Omnibus regulation. At a high level of
13 summarization, that regulation reduces the amount of NOx emissions permitted from heavy-duty
14 trucks from 0.20 to 0.05 grams per brake horsepower-hour for MY 2024 through 2026, Cal. Code
15 Regs., tit. 13, § 1956.8(a)(2)(C), and then reduces that figure to 0.02 for MY 2027 and
16 subsequent, *id.* § 1956.8(a)(2)(D). CARB made modest amendments to the Omnibus regulation
17 in 2023. EPA published its preemption waiver for the Omnibus regulation (as amended) on
18 January 6, 2025. 90 Fed. Reg. 643 (Jan. 6, 2025).

19     15. As the above examples illustrate, CARB's standards tend to increase in stringency
20 over a set of model years, with the final year's standard applicable to all future years to prevent
21 backsliding.

22     16. CARB has also long required vehicle manufacturers to install on-board diagnostic
23 (OBD) devices to monitor, control, and record the emissions released by the vehicle's engine, to
24 store information about emissions system faults for later retrieval by regulatory agencies,
25 manufacturers, or mechanics, and to warn drivers of problems through features such as the "check
26 engine" light. CARB first required OBD in heavy-duty engines in 2006 for MY 2010. CARB
27 first required OBD in medium-duty vehicles in 1985 for MY 1988.
28

17.    CARB has amended its OBD requirements for medium- and heavy-duty vehicles multiple times since. Most recently, in 2023, CARB amended the OBD requirements for heavy-duty vehicles ( Cal. Code Regs., tit. 13, § 1971.1) as part of the amendments to the Omnibus regulation and for medium-duty vehicles (*id.* § 1968.2) as part of the Advanced Clean Cars II regulation. EPA waived preemption for these requirements, as amended.

18.    In 2023, CARB further amended its program with the promulgation of the Advanced Clean Fleets (ACF) regulation. ACF is comprised of three sets of fleet requirements applicable to (1) state and local government fleets (*id.*, § 2013), (2) drayage fleets (*id.*, § 2014(b)), and (3) high-priority (*id.* § 2015(a)(1)(A)–(C)) and federal fleets. All three categories of fleets are required to gradually phase-in zero-emission vehicles. The fourth component of ACF—the 2036 Sales Requirement—requires that all new, medium- and heavy-duty vehicles sold in California beginning with the 2036 model year be zero-emission vehicles. *Id.* § 2016(c).

19.    As I understand it, this last requirement—the 2036 Sales Requirement—is the only part of ACF challenged in this case. Because this requirement does not apply until MY 2036, and that MY begins no earlier than January 2, 2035, no enforcement could occur for at least nine years.

20.    On November 15, 2023, CARB submitted a request to EPA seeking a Clean Air Act preemption waiver under Section 209(b)(1), 42 U.S.C. § 7543(b)(1), for parts of CARB's Advanced Clean Fleets regulation. On January 13, 2025, CARB withdrew the waiver request.

21.    On July 29, 2025, CARB initiated a rulemaking to repeal the drayage and high-priority fleet requirements of the ACF regulation. Neither the 2036 Sales Requirement nor the state and local fleets requirements are part of the proposed repeal.

22.    In separate litigation, CARB's Executive Officer has stipulated that CARB will not enforce the 2036 Sales Requirement until CARB obtains a Clean Air Act preemption waiver from EPA for that regulatory requirement.

**CARB'S CERTIFICATION PROGRAMS AND PROCESS**

23.    The New Vehicle/Engine Programs Branch within the Emissions Certification and Compliance Division (ECCD) of CARB evaluates manufacturer applications for certification of

5

the emission control systems of new vehicles, engines, and evaporative emission control systems (EVAP)[1] produced for sale in California.

24.  Within the New Vehicle/Engine Programs Branch, the On-Road Light-Duty Certification Section is responsible for the certification and production audit of new passenger cars, light-duty trucks, and medium-duty vehicles, among others.

25.  Within the New Vehicle/Engine Programs Branch, the Compression Ignition and Heavy-Duty Certification Section is responsible for the certification and production audit of new heavy-duty engines. This section includes certification under Omnibus, and also includes certifications for "Legacy" engines), as well as EVAP systems.

26.  Within the New Vehicle/Engine Programs Branch, the Heavy-Duty Greenhouse Gas Certification Section is responsible for certification of heavy-duty vehicles to CARB's GHG standards, among other things, and Zero-Emission Powertrains (ZEPs) used in heavy-duty and some medium-duty vehicles. ZEPs are typically battery electric or hydrogen fuel cell systems that do not produce any emissions, and are not considered either engines or vehicles.

27.  The OBD Branch is responsible for certification of all OBD systems for light- medium- and heavy-duty engines and vehicles.

28.  To be certified by CARB for sale in California, a vehicle must demonstrate that its emission control systems, including exhaust, OBD, and in certain cases, EVAP systems (as applicable, depending on the specific vehicle category) comply with the relevant standards and are durable such that the vehicle will comply with the emission standards for its useful life. This is done through durability and certification testing of the prototype certification vehicle or engine. The vehicle manufacturer must demonstrate compliance with requirements for OBD, anti-tampering, fuel tank fill-pipe and openings, crankcase emissions, etc., as applicable. The vehicle manufacturer must also meet other requirements, such as proper vehicle labeling and providing to the customer a California emissions warranty.

---

[1] EVAP systems prevent fumes from vehicle fuels from evaporating directly into the atmosphere. The OBD system runs diagnostics for possible fuel vapor leaks, will trigger a fault code if any are present, and will activate the check engine light on the dashboard.

29. CARB processes applications for certification of both vehicles and engines. For example, Detroit Diesel Corporation (DDC) is the manufacturing arm for Daimler Truck North America's (DTNA) proprietary engines, transmissions, and axles, which are branded under the "Detroit" name, so DDC submits *engine* certification applications to CARB. DDC produces components for DTNA's commercial trucks, like the Freightliner Cascadia and Western Star, which are certified under CARB's *vehicle* program.

30. When CARB finds that the relevant requirements are met, CARB issues an Executive Order (EO) certifying the vehicle, engine, OBD or EVAP system is compliant with California's emissions requirements. The EO is effective for one MY, which begins as early as January 2 of the calendar year preceding the named MY and ends December 31 of the calendar year of the named MY. For example, an EO for MY 2026 issued on June 1, 2025, is effective from that date until December 31, 2026. Manufacturers may submit applications to CARB after the start, but before the end of, a given MY, and CARB will process those applications. For example, for MY 2025, one of the manufacturer plaintiffs here submitted two applications to CARB after January 1, 2025, and CARB processed those and issued an EO for each.

**MODEL YEAR 2025 AND 2026 APPLICATIONS**

31. For MY 2025, EOs have been issued under the certification process for medium-duty and heavy-duty engines, vehicles, EVAP, and ZEPs for all submitted applications from DTNA, International Motors (International), PACCAR, and Volvo Group North America (Volvo) (collectively, the "Plaintiffs"). CARB is still, however receiving and accepting engine and vehicle applications from other manufacturers for MY 2025.

32. For MY 2025, most applications for CARB engine and EVAP certifications were submitted between June 2024 and December 2024. That timing is not unusual in CARB's experience.

33. For MY 2026, CARB is still receiving and accepting engine, vehicle, EVAP, and ZEP applications. The number of applications CARB has received to-date for MY 2026 is consistent with prior model years at a similar point in time, except as to engine applications from DTNA. CARB continues to accept applications from any manufacturer.

34. As of September 15, 2025, for MY 2026, DTNA has not submitted any applications other than one EVAP application. But it may do so at any time before the end of the model year. CARB imposes no penalty or additional cost if a manufacturer submits one or more applications later than it usually does.

35. The other Plaintiffs have submitted applications for MY 2026 and based on information from prior years, the number of applications submitted is consistent with the number of applications CARB would expect to have at this time of year.

36. As of September 15, 2025, for MY 2026, CARB has also received engine, vehicle, EVAP, and ZEP applications from several other manufacturers other than the Plaintiffs and has already issued EOs to multiple manufacturers for some of those applications.

37. To obtain CARB certification for an internal combustion engine for sale in California, manufacturers submit one application, and obtain an OBD approval and a CARB EO, if the application satisfies the applicable requirements.

38. CARB requires manufacturers of many types of mobile sources, including, medium-duty and heavy-duty engines, vehicles, EVAP, and ZEP, to pay a certification fee for all applications seeking certification to facilitate sale of the product in California. Cal. Code Regs., tit. 13, § 2900 et seq. The fee is to offset the costs of implementation, and, in very general terms, is an average cost per application (i.e., CARB's implementation costs divided by the number of applications). For example, for MY 2025, all applications for certification of a medium-duty or heavy-duty compression ignition engine family are assessed the same fee of $121,265, except carry-over and partial carry-over applications that are subject to a lower fee of $30,316, or $60,633, respectively.

**CARB'S ACTIONS IN RESPONSE TO UNPRECEDENTED FEDERAL ACTIONS**

39. Earlier this year, the federal government targeted three of the waivers described above with congressional resolutions of disapproval (Resolutions): the waivers EPA granted that authorized enforcement of (1) Advanced Clean Cars II, (2) Omnibus; and (3) Advanced Clean Trucks, including the OBD provisions as amended with Advanced Clean Cars II and Omnibus.

8

40. After Congress passed the Resolutions, but before the President signed them, manufacturers began asking questions due to the high level of uncertainty created by the prospect of the Resolutions.

41. In response, CARB issued a manufacturer advisory correspondence on May 23, 2025 ("May MAC"). Attached hereto as **Exhibit B1** is a true and correct copy of the May MAC. CARB noted that MY 2026 certifications were already underway and conveyed that CARB would continue to accept and process certifications for that MY 2026 to "maintain stability in the market" and for other reasons. *Id.* at 2. It also stated that additional information would be forthcoming. *Id.*

42. After the Resolutions were signed on June 12, 2025, California immediately filed a lawsuit challenging them. *California v. United States*, N.D. Cal. 3:25-cv-04966 (filed June 12, 2025).

43. Manufacturers continued to have questions about how to lawfully sell their vehicles or engines in California in light of the uncertainty, caused by the Resolutions, about which standards manufacturers were required to meet. CARB needed time to determine how best to proceed, particularly given the complexity of its program (including the number and diversity of vehicles, engines, and manufacturers involved and the array of regulatory provisions potentially at issue), as well as the unprecedented level of uncertainty the Resolutions injected.

44. Prior to the Resolutions, CARB's regulatory program had operated in a very stable fashion for almost sixty years. EPA had granted CARB's waiver requests, only once denying such a request in full (and that denial was reversed shortly thereafter).[2] And EPA had only once purported to withdraw a waiver after initially granting it—and even that action (which CARB contends was unlawful) touched only two standards in a waiver covering many more. The purported simultaneous invalidation of three waivers in full has no precedent (or even analog) in the history of California's new motor vehicle emission program, which predates EPA's.

---

[2] On very rare occasions, EPA has partially denied a waiver request—e.g., denying it for the first MY due to concerns about lead time.

9

45. After due consideration, on August 25, 2025, CARB issued a superseding manufacturers advisory correspondence ("August MAC"). Attached hereto as **Exhibit B2** is a true and correct copy of the August MAC. The August MAC indicates that CARB will continue to accept and process applications for certification to the standards covered by the preemption waivers the Resolutions targeted. August MAC at 2. CARB also clarified that it would process certifications through two other pathways. First, CARB would process applications and issue EOs for certification to the relevant, earlier-adopted California emission standards for which EPA has waived preemption. *Id.* For medium- and heavy-duty vehicles or engines, these standards include those described above in paragraphs 6-7. Second, CARB would also process applications containing a demonstration that EPA has certified the vehicle or engine to federal emission standards as currently codified. *Id.* Manufacturers utilizing these latter two pathways may sell new vehicles in California "while litigation is pending." *Id.* at 3. CARB reserved its right to enforce the regulations covered by the targeted waivers, including for sales during the period of litigation, in the event the Resolutions are determined to be invalid. *Id.* CARB also reserved its discretion *not* to take such enforcement action, noting it would make that determination "if and when that question becomes ripe." *Id.*

46. On September 15, 2025, CARB initiated an emergency rulemaking process to clarify how it plans to address the fact that there are potentially two sets of operative standards at the moment as a consequence of the Resolutions purporting to undo the effectiveness of Advanced Clean Cars II and Omnibus, which displaced the antecedent standards for which preemption waivers for future model years remain in effect.

47. The emergency rulemaking clarifies that manufacturers may choose between the two sets of operative standards, with the same caveat provided in the August MAC: manufacturers certifying to the earlier-adopted (and less stringent) standards may be subject to enforcement action under Omnibus or Advanced Clean Cars II, as allowed by law, if the allegedly preempting Resolutions are invalidated. Again, the rulemaking documents make clear, as did the August MAC, that CARB has made no decisions yet about any such enforcement.

Decl. of Robin Lang in Support of Opposition to Plaintiffs' PI Motion  (2:25-cv-02255-DC-AC)

48. Under California law, an emergency rulemaking may be submitted to the California Office of Administrative Law (OAL) five working days after it is noticed. Cal. Gov. Code § 11346.1 (a)(2). OAL has 10 calendar days to review, and, if approved, it then becomes effective. *Id.* § 11349.1. Regulations adopted through this emergency procedure may only remain effective for 180 days. *Id.* § 11346.1 (e). CARB intends to proceed to adopt these same regulations through non-emergency procedures during that period.

49. Attached hereto as **Exhibit B3** is a true and correct copy of the notice of public availability of documents for the emergency rulemaking.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 16, 2025.

*/s/ Robin U. Lang*
ROBIN U. LANG