GIBSON, DUNN & CRUTCHER LLP
BENJAMIN WAGNER, SBN 163581
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5395
Facsimile: 640.849.5095
BWagner@gibsondunn.com

RACHEL S. BRASS, SBN 219301
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8293
Facsimile: 415.393.8306
RBrass@gibsondunn.com

STACIE B. FLETCHER, *pro hac vice*
MIGUEL A. ESTRADA, *pro hac vice*
VERONICA J.T. GOODSON, SBN 314367
1700 M Street N.W.
Washington, D.C. 20036-4504
Telephone: 202.955.8500
Facsimile: 202.467.0539
SFletcher@gibsondunn.com
MEstrada@gibsondunn.com
VGoodson@gibsondunn.com

*Attorneys for Plaintiff Daimler Truck North America LLC*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAIMLER TRUCK NORTH AMERICA LLC, INTERNATIONAL MOTORS, LLC, PACCAR INC, and VOLVO GROUP NORTH AMERICA LLC,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA AIR RESOURCES BOARD; STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board; and GAVIN NEWSOM, in his official capacity as the Governor of California,<br><br>Defendants,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>Plaintiffs-Intervenors. | CASE NO. 2:25-cv-02255-DC<br><br>**DECLARATION OF DANIEL POTTER IN SUPPORT OF PLAINTIFFS' REPLY RE MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Dena Coggins<br>Action Filed: August 11, 2025 |

I, Daniel Potter, pursuant to 28 U.S.C. § 1746, state and declare:

1. I am over eighteen years of age. If called to testify in this matter, I can and will competently testify to the following facts, of which I have personal knowledge, personal experience, and personal participation in communications with business associates.

2. I am a resident of Ann Arbor, Michigan.

3. I have worked at Daimler Truck North America ("DTNA") or an affiliate since 2008. I am a Manager of Compliance and Regulatory Affairs at DTNA, a position I have held since 2019. Prior to this position, I worked for DTNA or its affiliates as a contract engineer on performance and emissions engineering (2008-2011), as a project engineer leading the engine diagnostics team (2011-2016), and as a senior engineer leading the fuel systems software team (2016-2019).

4. I attended Lawrence Technological University, from which I received a B.S.E. in mechanical engineering, with a concentration in automative engineering.

5. As a compliance and regulatory affairs manager, I have significant experience with and knowledge of the regulations related to heavy-duty emissions standards. I am generally familiar with the heavy-duty emissions standards in titles 13 and 17 of the California Code of Regulations. I also have detailed knowledge of the process to obtain regulatory approval before selling new heavy-duty trucks in the United States, known as "certification." In the course of my responsibilities, I have reviewed recent regulatory actions by the California Air Resources Board ("CARB") related to heavy-duty emissions standards, and I have personal knowledge of the potential business implications for DTNA.

6. Since my initial declaration on August 10, 2025 (Dkt. 23-15), CARB has announced changes to its regulatory program for heavy-duty trucks. Those announced changes were discussed in and included as exhibits to the Defendants' opposition to the preliminary injunction motion in this case (Dkt. 73-32, Dkt. 73-33). I submit this declaration in response to Defendants' opposition and these new CARB actions, which exacerbate the irreparable harm that DTNA will suffer if preliminary relief is not granted. Specifically, CARB's latest regulatory actions have increased the uncertainty regarding which products DTNA can sell in California and may result in DTNA ceasing to take orders for federally certified trucks in California.

7.     On September 15, 2025, CARB announced an Emergency Amendment and Adoption of Vehicle Emissions Regulations ("Emergency Rulemaking").  (Dkt. 73-33.)  DTNA disagrees with many aspects of this rulemaking, including CARB's assertion that these new standards can rely on old preemption waivers, and DTNA therefore submitted comments to CARB and the California Office of Administrative Law on September 26, 2025 opposing the Emergency Rulemaking.

8.     The newly adopted emissions standards in the Emergency Rulemaking are not feasible for DTNA to implement for model year 2026.  By adopting new sections into the California Code of Regulations, CARB is promulgating emissions standards that, until September 22, 2025, did not apply to model year 2026 vehicles.  Because these standards were not in the California Code of Regulations until now, it was not possible for the regulatory and compliance team at DTNA to know that the specific tailpipe emissions standards, OBD standards, and other emissions standards in the 571-page-long rule[1] applied to model year 2026.  That means DTNA did not have any lead-time to implement those standards.

9.     As explained in my August 10 declaration, to apply for CARB certification DTNA must conduct tests according to CARB's procedures, and such tests must be started significantly before submitting an application. (Dkt. 23-15, ¶ 9.)  The Emergency Rulemaking includes a change to the applicable test procedures,[2] but there is not enough time left in 2025 to perform all-new testing according to new procedures, much less to do this testing *and* go through the CARB certification process.  This means that DTNA suffers a new harm if the Emergency Rulemaking is implemented, because it cannot even timely test to the newly announced standards, much less obtain a CARB certification before model year 2026 sales begin.

10.    In addition, the Emergency Rulemaking is not technologically feasible, including because it contains on-board diagnostic (OBD) standards that are over ten years old.  (Dkt. 73-33 at 5.)  In the intervening 10 years, DTNA has updated its OBD systems to comply with CARB's subsequent rulemaking.  The outdated OBD standards that CARB is newly adopting here are not technologically

---

[1] CARB, Appendix A-2-1, Proposed Regulation Order: Emergency Vehicle Emissions Regulations Part I, available at https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2025/emergencyvehemissions/app_a-2-1.pdf (last visited Sept. 25, 2025).
[2] *Compare* Appendix A-2-1 note 1 above, at 16 (proposed revision to Cal. Code Regs. tit. 13 § 1956.8.1(b)) *with* Cal. Code Regs. tit. 13, § 1956.8(b).

2

DECLARATION OF DANIEL POTTER ISO PLAINTIFF OEMS' REPLY RE PI MOTION
CASE NO. 2:25-CV-02255-DC

feasible.

11. The Emergency Rulemaking also provides standards that are less stringent than EPA standards for model year 2027. DTNA is already committing money, personnel, and other resources towards testing engines for potential model year 2027 certification (Dkt. 23-15 ¶ 9.b.), meaning that changes to the model year 2027 emissions standards and test procedures are relevant to us now. CARB's new section 1956.8.1 in title 13 of the California Code of Regulations[3] adopts carbon dioxide ($CO_2$) and oxides of nitrogen ($NO_x$) emissions standards that are less stringent than EPA's standards at 40 C.F.R. § 1036 that will take effect in model year 2027.

12. CARB's Emergency Rulemaking has significant implications for DTNA's go-to-market plans. They leave DTNA without certainly on which trucks it can sell. DTNA cannot sell trucks under the alternative "pathways" in CARB's August MAC and now in the Emergency Rulemaking without risking retroactive enforcement and penalties. The only way to eliminate a risk of potential retroactive enforcement, which could include fines per vehicle sold, is to comply with CARB's rules subject to the CRA Resolutions, including Omnibus. Complying with Omnibus would mean placing volume restrictions on model year 2026 products in California:

   a. DTNA's legacy engines (DD5, DD8, and DD15) would be strictly limited to 10% of our overall volume. This has a significant impact because the DD15 is otherwise DTNA's best-selling engine.

   b. Sales of DTNA's DD13 engines would be limited by the number of NOx credits DTNA has available and the costs of obtaining additional credits / NOx mitigation.

   c. High-horsepower exempt engines would be strictly limited based on the volume DTNA sold in prior model years.

13. DTNA needs certainty: a clear statement that we can offer trucks that comply with federal law anywhere in the United States without the need for CARB approval or the threat of CARB enforcement. If it does not receive that certainty through an injunction by October 31, and has to seek CARB approval, DTNA will have to pay significant unrecoverable certification fees. And if DTNA seeks approval pursuant to Omnibus, it will have to enforce strict regulatory volume limitations,

---

[3] Appendix A-2-1, note 1 above, at 16 (proposed revision to Cal. Code Regs. tit. 13 § 1956.8.1(b)),

1  including on our best-selling engine.  That means customers may not have the trucks they need.

2      14.    DTNA's other option is to stop offering federally certified trucks for sale in California for model year 2026.  But that choice would risk harm to customer goodwill, potentially impact preexisting orders, and could cause DTNA to lose revenue that can never be recovered.  Certainty through an injunction that federal law applies would eliminate that harm.  In either case, DTNA faces certain negative consequences.

    15.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 30, 2025.

_____
Daniel Potter