1    ROB BONTA, State Bar No. 202668
     Attorney General of California
2    MYUNG J. PARK, State Bar No. 210866
     Supervising Deputy Attorney General
3    BENJAMIN P. LEMPERT, State Bar No. 344239
     DAVID M. MEEKER, State Bar No. 273814
4    JONATHAN A. WIENER, State Bar No. 265006
     M. ELAINE MECKENSTOCK, State Bar No. 268861
5    Deputy Attorney General
       1515 Clay Street, 20th Floor
6      P.O. Box 70550
       Oakland, CA  94612-0550
7      Telephone:  (510) 879-0299
       Fax:  (510) 622-2270
8      E-mail:  Elaine.Meckenstock@doj.ca.gov
     *Attorneys for Defendants*

9

10                    IN THE UNITED STATES DISTRICT COURT

11                   FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13

| | |
|---|---|
| 14  **DAIMLER TRUCK NORTH AMERICA,** | 2:25-cv-02255-DC-AC |
| 15  **LLC; INTERNATIONAL MOTORS, LLC; PACCAR, INC.;** and **VOLVO GROUP** | |
| 16  **NORTH AMERICA, LLC,** | **DEFENDANTS' SUR-REPLY TO THE** |
| 16                                    Plaintiffs | **UNITED STATES' REPLY ON** |
| 17 | **PLAINTIFFS' MOTION FOR** |
| 18  **THE UNITED STATES OF AMERICA;** and | **PRELIMINARY INJUNCTION** |
| 19  **UNITED STATES ENVIRONMENTAL** | Date:          October 31, 2025 |
| 19  **PROTECTION AGENCY,** | Time:          1:30 PM |
| 20 | Courtroom:   8, 13th Floor |
| 20                 Plaintiff-Intervenors | Judge:         Hon. Dena Coggins |
| 21 | Trial Date:    Not Set |
| 22                              **v.** | Action Filed:  August 11, 2025 |
| 23  **CALIFORNIA AIR RESOURCES BOARD,** | |
| 24  **STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air | |
| 25  Resources Board; and **GAVIN NEWSOM,** in his official capacity as the Governor of | |
| 26  California, | |
| 27                              Defendants. | |

28

---

1

**TABLE OF CONTENTS**

2

**Page**

3  INTRODUCTION ................................................................................................. 1

4  ARGUMENT ...................................................................................................... 1

   I.    CARB's Regulations Should Not Be Enjoined ............................................. 1

5        A.    Plaintiffs' Complaints and Motion Target *Specific* Regulations and Provide
              No Basis to Enjoin *All* of CARB's Regulations .......................................... 1

6

7        B.    CARB's Regulations Are Not Irreparably Injuring Plaintiffs ........................... 2

         C.    CARB's Pre-Omnibus Regulations Are Not Preempted ................................. 4

8        D.    CARB's More Recent Regulations Are Also Not Preempted Because the
              Allegedly Preempting Resolutions Are Unconstitutional ............................... 6

9

              1.    The Court Has Jurisdiction to Hear Defendants' Constitutional
                    Challenges ........................................................................................ 6

10

11            2.    The Resolutions Violate the Separation of Powers ............................... 8

12                  a.    Congress Impermissibly Overrode Three Adjudications by
                          the Executive Branch of a Single Party's Rights Under
                          Extant Law ................................................................................ 8

13                  b.    Congress Unlawfully Allowed the Executive Branch To
                          Direct Legislative Procedure ...................................................... 11

14            3.    The Resolutions Violate the Tenth Amendment and Structural
                    Federalism ...................................................................................... 12

15

16  II.   The CTP Should Not Be Enjoined ............................................................... 14

         A.    The United States Is Not Likely to Succeed on Its Preemption
              Claim ............................................................................................................ 14

17

18       B.    The United States Is Not Being Irreparably Injured by the CTP ............... 15

    CONCLUSION .................................................................................................. 15

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Adamo Wrecking Co. v. United States*
    434 U.S. 275 (1978) ................................................................................................... 7

5

6

*Am. Career Coll., Inc. v. Medina*
    No. CV 21-698 PSG (SKX), 2021 WL 8742155 (C.D. Cal. Dec. 9, 2021) ............................ 2

7

8

*Arce v. United States*
    899 F.3d 796 (9th Cir. 2018) ..................................................................................... 6

9

*Baldwin v. Fifth Third Bank, N.A.*
    No. 2:24-CV-03401-DC-JDP, 2025 WL 1787480 (E.D. Cal. June 26, 2025) .................... 1

10

11

*Bank Markazi v. Peterson*
    578 U.S. 212 (2016) ................................................................................................. 11

12

13

*Bowen v. Georgetown Univ. Hosp.*
    488 U.S. 204 (1988) ................................................................................................. 10

14

*California ex rel. Lockyer v. Dep't of Agric.*
    575 F.3d 999 (9th Cir. 2009) ..................................................................................... 6

15

16

*Chadha v. INS*
    634 F.2d 408 (9th Cir. 1980) ................................................................................... 10

17

18

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*
    482 F.3d 1157 (9th Cir. 2007) ............................................................................... 7, 8

19

20

*Coyle v. Smith*
    221 U.S. 559 (1911) ................................................................................................. 13

21

*Ctr. for Biological Diversity v. Bernhardt* (*CBD*)
    946 F.3d 553 (9th Cir. 2019) ........................................................................... 6, 7, 11

22

23

*Edgar v. MITE Corp.*
    457 U.S. 624 (1982) ................................................................................................... 4

24

25

*EPA v. Calumet Shreveport Refining, LLC*
    145 S.Ct. 1735 (2025) ................................................................................................ 7

26

*Ford Motor Co. v. EPA*
    606 F.2d 1293 (D.C. Cir. 1979) ................................................................................ 5

27

28

*Garcia v. San Antonio Metro. Transit Auth.*
    469 U.S. 528 (1985) ..................................................................................... 12, 13, 14

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*INS v. Chadha*
  462 U.S. 919 (1983) ................................................................................ 10

4

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*
  627 F.2d 1095 (D.C. Cir. 1979) ............................................................... 9

5

6

*Nat'l Ass'n of Mfrs. v. DOD*
  583 U.S. 109 (2018) .................................................................................. 7

7

*Nevada v. Skinner*
  884 F.2d 445 (9th Cir. 1989) .............................................................. 8, 14

8

9

*Nevada v. Watkins*
  914 F.2d 1545 (9th Cir. 1990) ................................................................ 14

10

*NRG Power Mktg., LLC v. FERC*
  862 F.3d 108 (D.C. Cir. 2017) ................................................................. 9

11

12

*Ohio Telecom Ass'n v. FCC*
  150 F.4th 694 (6th Cir. 2025) ................................................................... 7

13

14

*Oklahoma Operating Co. v. Love*
  252 U.S. 331 (1920) ................................................................................. 4

15

*Sheldon v. Sill*
  49 U.S. 441 (1850) ................................................................................. 10

16

17

*Sierra Club v. Trump*
  963 F.3d 874 (9th Cir. 2020) .................................................................... 7

18

19

*South Carolina v. Baker*
  485 U.S. 505 (1988) ........................................................................ 8, 13, 14

20

*United States v. Ballin*
  144 U.S. 1 (1892) ............................................................................... 8, 13

21

22

*United States v. Brown*
  381 U.S. 437 (1965) ............................................................................... 10

23

24

*United States v. Mancuso*
  139 F.2d 90 (3d Cir. 1943) ....................................................................... 4

25

26

*United States v. Ruiz*
  536 U.S. 622 (2002) ................................................................................. 7

27

28

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

Tenth Amendment..................................................................................................... 12, 13

U.S. Const. Article I, § 5, cl. 2 ............................................................................... 11

U.S. Const. Article III, § 1 ..................................................................................... 10

**STATUTES**

5 U.S.C.
    § 551(4)........................................................................................................... 9
    § 551(6)........................................................................................................... 8
    § 551(7)........................................................................................................... 8
    § 551(8)........................................................................................................... 8
    § 706(2)(A)...................................................................................................... 9
    § 801(a).......................................................................................................... 7
    § 802(g).......................................................................................................... 8
    § 805.............................................................................................................. 6, 7

33 U.S.C.
    § 1342(c)......................................................................................................... 5

42 U.S.C.
    § 7507............................................................................................................ 9
    § 7543(a)........................................................................................................ 9, 10
    § 7543(b)(1).................................................................................................... 5, 9, 10
    § 7607(b)(1).................................................................................................... 10

44 U.S.C. § 903 ....................................................................................................... 12

**REGULATIONS**

Cal. Code Regs., Title 13
    § 1956.8(a)(2)(A)........................................................................................... 3
    § 1956.8(a)(2)(C)(2)....................................................................................... 3
    § 1956.8(a)(2)(C)(3)....................................................................................... 3

**CONGRESSIONAL RECORD**

171 Cong. Rec. S3047 (daily ed. May 21, 2025)...................................................... 12

171 Cong. Rec. S3140 (daily ed. May 22, 2025)...................................................... 12

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

**FEDERAL REGISTER**

42 Fed. Reg. 1503 (Jan. 7, 1977) ................................................................................. 5

42 Fed. Reg. 31,639 (June 22, 1977) ............................................................................ 5

43 Fed. Reg. 20,549 (May 12, 1978) ............................................................................ 5

43 Fed. Reg. 36,679 (Aug. 18, 1978) ........................................................................... 5

57 Fed. Reg. 24,788 (June 11, 1992) .......................................................................... 10

82 Fed. Reg. 4867 (Jan. 17, 2017) ............................................................................... 5

# INTRODUCTION

Plaintiffs' complaints and moving papers attack specific California regulations that CARB is not presently enforcing. Plaintiffs are thus not being irreparably injured by those regulations. Plaintiffs now seek to enjoin enforcement of *any and all* CARB regulations applicable to new medium- and heavy-duty vehicles and engines. They cannot obtain that sweeping relief on their more limited complaints and motion. Nor have they met their burdens to do so.

CARB has been regulating new medium- and heavy-duty vehicle emissions in California for more than fifty years, pursuant to numerous Clean Air Act preemption waivers. Plaintiffs seek to upend this status quo and force California to stop regulating altogether. But Congress did not legislate that result with Resolutions disapproving three preemption waivers applicable to the most recent changes to CARB's program. To be clear, those Resolutions are unconstitutional and have no effect whatsoever, but even if that is wrong, the Resolutions could not have done more than disapprove the three waivers they named. They did not, for example, reverse prior, unmentioned waivers applicable to preceding regulations. Those regulations are not preempted, and their enforcement is not causing any injury that could be, or should be, redressed through a preliminary injunction. There is no basis here to enjoin *any*, much less *all*, CARB regulation.

There is likewise no basis to enjoin the Clean Truck Partnership (CTP), a voluntary, bargained-for agreement. It is not preempted because it is not a regulatory standard or an attempt to enforce one. Nor can Plaintiffs establish irreparable injury from this agreement, particularly given their statements that the CTP is no longer having *any* effect on production or sales.

# ARGUMENT

## I.    CARB's Regulations Should Not Be Enjoined

### A.    Plaintiffs' Complaints and Motion Target *Specific* Regulations and Provide No Basis to Enjoin *All* of CARB's Regulations

"A plaintiff is not entitled to an injunction based on claims not pled in his complaint." *Baldwin v. Fifth Third Bank, N.A.*, No. 2:24-CV-03401-DC-JDP, 2025 WL 1787480, at *2 (E.D. Cal. June 26, 2025). The United States' Complaint and joinder to this motion allege three

1

1    particular CARB regulations are preempted by the Clean Air Act.  ECF 56 at 22:22; *id.* ¶¶ 33-55;

2    ECF 57 at 1:18-19, 2:9-12.  Private Plaintiffs' Complaint and motion likewise target specific

3    CARB regulations, albeit a slightly broader set.  ECF 1 ¶¶ 35-36; *see also* ECF 23 at ii:6-8, ii:24-

4    26; ECF 23 at 5-7.  Plaintiffs cannot leverage these Complaints and this motion to enjoin *other*

5    CARB regulations.[1]  Yet, that is precisely what they seek to do.  US Reply (ECF 74) at 17:12:18-

6    2 (claiming injury from *any* "emissions certifications from CARB"); *see also* ECF 75-5 ¶ 4

7    (Proposed Order); *id.* ¶ 2.  "[T]he factual and legal basis for" such an injunction "falls outside the

8    scope of Plaintiffs' … complaint, [and] the Court lacks authority" to provide that relief.  *Am.*

9    *Career Coll., Inc. v. Medina*, No. CV 21-698 PSG (SKX), 2021 WL 8742155, at *3 (C.D. Cal.

10   Dec. 9, 2021).  Plaintiffs have also failed to meet their burdens to obtain this relief.

11   **B.    CARB's Regulations Are Not Irreparably Injuring Plaintiffs**

12   None of Plaintiffs' alleged injuries from CARB's regulations carries water.

13   1.  Plaintiffs are not experiencing "per se" irreparable injuries from the enforcement of

14   preempted regulations because no such enforcement is occurring.  The regulations targeted by the

15   unconstitutional Resolutions are not preempted, *infra* I.D, but CARB is not currently enforcing

16   those regulations in any event.  And CARB's earlier-adopted ("pre-Omnibus") regulations are not

17   preempted because their previously granted waivers still apply.  *Infra* I.C.

18   2.  Plaintiffs also claim irreparable injury from *any* state regulations applicable to new

19   medium- and heavy-duty vehicles, asserting the field belongs solely to the Federal Government.

20   But *Congress* chose to preserve a separate California program more than sixty years ago, and the

21   Resolutions did not undo that choice (even if they invalidated three specifically named waivers).

22   3.  Plaintiffs massively exaggerate the practical ramifications of the continuation of a

23   California program.  Manufacturers have three clear options to sell in California:  (1) certify to

24   the Omnibus standards as they had planned to do; (2) certify to the less stringent pre-Omnibus

25   standards they have been meeting for years; or (3) demonstrate certification to EPA's current

26   standards.  August MAC (ECF 73-32) at 2.  This free choice is far from "impossible."  US Reply

27

28   ---

[1] The United States joined many of Private Plaintiffs' arguments in its reply.  Defendants respond to those herein because of that joinder and refer to all Plaintiffs by the use of that term.

19:6-7.  In fact, *none* of these choices requires manufacturers to alter their products for model year 2026.  Manufacturers were meeting the pre-Omnibus standards (option 2) for years.  *See* Cal. Code of Reg., tit. 13, § 1956.8(a)(2)(A) (oxides of nitrogen standard unchanged from 2007-2023). And they have continued to produce and sell similar "legacy" vehicles as allowed (subject to caps) under Omnibus through model year 2026.  Cal. Code Reg., tit. 13, § 1956.8(a)(2)(C)(2), (3); Req. for Jud. Not. (RJN) at ¶ 1.  Thus, the purportedly impossible choice between options 1 and 2 is simply how many "legacy" vs. "Omnibus" vehicles to produce—i.e., whether or not to comply with the Omnibus caps on "legacy" sales.  A manufacturer can also exercise option 3 and offer "federally certified trucks."  Pl. Reply (ECF 75) at 7:17, 13:12, 13:26.

The options for California sales in model year 2027 are also straightforward, even though both the Omnibus and EPA's standards become more stringent.  Under option 2, they can continue to offer *current* products that emit at pre-Omnibus levels.  August MAC at 2; RJN ¶ 1. Alternatively, manufacturers can satisfy the more stringent standards they have been planning for since December 2022 when EPA promulgated its standards, RJN Exh. 1 at 1, and since at least July 2023 when they agreed, in the CTP, to meet Omnibus standards aligned with EPA's, ECF 73-35 at 1, 10.  Staying the course on those long-range plans will not result in unexpected costs, and Private Plaintiffs expressly reserved this option—to "voluntarily … apply[] for a California emissions certification"—just two months ago.  *E.g.*, ECF 73-38 at 3 n.4.[2]

CARB approval for California sales has been the status quo for half a century.  None of these readily viable options to continue obtaining those approvals will disrupt the "national economy."  *See* US Reply 19:15 (no evidence); *id.* at 20:3 (claiming harms are "self-evident").

4.  Finally, Plaintiffs object to, and seek to enjoin, the possibility of "retroactive enforcement"—i.e., future enforcement as to conduct occurring now—in the event the allegedly preempting Resolutions are ultimately invalidated.  US Reply 18:14-15; ECF 75-5 (Proposed Order) ¶ 3.  That remedy is not available on this motion.  Opp. (ECF 73) at 19:19-20:6.  Plaintiffs argue otherwise, relying on a fact-bound and highly distinguishable case involving sizable daily

---

[2] Many manufacturers have also been exceeding the Advanced Clean Trucks requirements.  RJN Exh. 2 at 10.  CARB is not presently enforcing those.  August MAC at 2-3.

1 penalties that were held to be an unconstitutionally high price to pay to challenge a state

2 commission's rate-setting rule. *Oklahoma Operating Co. v. Love*, 252 U.S. 331, 337 (1920). The

3 Court said that "a permanent injunction should … restrain enforcement of penalties accrued

4 pendente lite," even if the rates were ultimately affirmed. *Id.* at 338. The Court did *not* preclude

5 retroactive enforcement of the challenged law (the rates) and thus did not decide whether courts

6 may do so in a preliminary injunction.[3] The Court did address that question in *Edgar v. MITE*

7 *Corp.*, 457 U.S. 624, 630 (1982), where the majority wrote that the propriety of retroactive

8 penalties "is an issue to be decided when and if" final judgment issues *and* an enforcement action

9 is initiated—in other words, *not* at the preliminary injunction stage. Plaintiffs' position is that of

10 two *dissenting* Justices, who argued that "federal courts … have the power to issue a preliminary

11 injunction that offers permanent protection from penalties for violations … during the period the

12 injunction was in effect." *Id.* at 656 (Marshall, J., dissenting). Plaintiffs' concerns about *future*

13 enforcement actions CARB *might* take are not ripe and cannot be resolved on this motion.[4]

14      Unless or until Congress decides that a state-level laboratory is no longer of benefit to

15 California and the Nation, the state program should continue to operate whether or not the three

16 specific waivers targeted by the Resolutions are in effect.

17      **C.    CARB's Pre-Omnibus Regulations Are Not Preempted**

18      Plaintiffs also fail to establish likelihood of success on their unpled preemption challenge to

19 the pre-Omnibus regulations. The preemption waivers granted for CARB's program as it stood

20 before the Omnibus regulation remain effective, and no preemption claim can be sustained.

21      The United States' sole counter argument is a naked assertion, made in EPA's comments on

22 CARB's emergency regulations, that these earlier waivers are "no longer valid." US Reply

23 17:23-18:2.[5] But the Clean Air Act neither imposes expiration conditions nor authorizes EPA to

24

25      [3] *United States v. Mancuso*, 139 F.2d 90, 92 (3d Cir. 1943) is even more inapposite, not least because there are no criminal penalties at issue here. Pl. Reply 17:4-6.

26      [4] The United States claims CARB "*will* retroactively enforce" the challenged regulations if the Resolutions are invalidated. US Reply 18:4 (emphasis added). CARB has made no such decision. August MAC at 3 (question not ripe).

27      [5] The United States also brazenly asserts that "California admits … 'CARB has *no* operative emissions standards.'" US Reply 17:18-20 (cleaned up). That quote describes

28 "*Plaintiffs'* position," not California's. Pl. Reply 6:5-6 (emphasis added); ECF 73-33 at 3.

4

1   do so. 42 U.S.C. § 7543(b)(1). It authorizes only a one-time act of waiving preemption. *Id.* By

2   contrast, the Clean Water Act *does* impose on-going conditions on federally authorized state

3   programs, directing States to operate "at all times … in accordance" with certain requirements.

4   33 U.S.C. § 1342(c)(2). Yet, even when a State fails to do so, a return to exclusive federal

5   permitting is not automatic: it requires notice, a hearing, and EPA action. *Id.* § 1342(c)(3).

6   Congress does not *silently* impose automatic termination conditions on States and did not do so in

7   a waiver provision intended "to afford California the broadest possible discretion in selecting the

8   best" program for the State. *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

9       Nor is there anything in the relevant waiver decisions that purports to impose an expiration

10  condition, even assuming such conditions were authorized. That is telling because when EPA has

11  (very rarely) sought to impose conditions, it has done so expressly. 42 Fed. Reg. 31,639 (June 22,

12  1977) ("It is a condition of this waiver that ….").[6] Here, the decisions simply confirm that EPA

13  waived preemption for California standards that operated *indefinitely* into the future. *E.g.*, 82

14  Fed. Reg. 4867, 4868 (Jan. 17, 2017) ("standards for 2007 *and subsequent* [model years]")

15  (emphasis added). EPA cannot impose post hoc expiration conditions on these waivers at all; it

16  certainly cannot do so by way of a litigation brief or comment in a state rulemaking proceeding.

17      The United States' position here is also a drastic and unexplained departure from its long-

18  held view that "[o]nce California receives a waiver …, it need only" obtain a new waiver "when

19  it adopts new or different standards or accompanying enforcement procedures." 43 Fed. Reg.

20  36,679, 36,680 (Aug. 18, 1978). Thus, EPA affirmed that a new waiver was not needed to extend

21  previously approved standards to *additional model years*. 42 Fed. Reg. 1503, 1504 (Jan. 7,

22  1977). No new waiver can therefore be required to do what CARB is doing here—enforcing

23  standards *for the same model years* covered by a previously granted waiver.[7]

24      Finally, the United States' position that the pre-Omnibus waivers are no longer extant is

25  inconsistent with its contention that the Resolutions terminated the Omnibus waiver as a rule.

26      [6] Defendants include this example solely to demonstrate that any condition would be
    express. Defendants do not concede that EPA may lawfully impose this—or any—condition.
27      [7] That the emergency rulemaking assigned new section numbers to the regulations is
    irrelevant. *Contra* Pl. Reply 6:15-16, 7:1-2. EPA waives preemption for "standards," not section
28  numbers. 42 U.S.C. § 7543(b)(1); *see also* 43 Fed. Reg. 20,549 (May 12, 1978).

5

1    Generally, "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force."

2    *California ex rel. Lockyer v. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) (cleaned up).  If,

3    as the United States contends, the Omnibus waiver displaced the pre-Omnibus waivers but no

4    longer has any legal effect, the pre-Omnibus waivers and California's pre-Omnibus program are

5    restored.  California contends the Resolutions did *not* deprive the Omnibus waiver of any legal

6    effect, but that just means there is a legal dispute about *which* California regulations can be

7    applied (Omnibus or pre-Omnibus)—which is why CARB is accepting certification to either.

8    August MAC at 2.  It does not mean there are *no* enforceable California regulations.

9        D.    **CARB's More Recent Regulations Are Also Not Preempted Because the
              Allegedly Preempting Resolutions Are Unconstitutional**

10       As to the CARB regulations allegedly preempted by the Resolutions, the United States'

11   jurisdictional and merits arguments in defense of those Resolutions fail.

12            1.    **The Court Has Jurisdiction to Hear Defendants' Constitutional
                     Challenges**

13

14       The United States maintains that both Section 805 of the CRA and the political-question

15   doctrine prevent this Court from considering the Resolutions' constitutionality. US Reply 6-8.

16   That is an extraordinary proposition:  The United States invokes the Resolutions as a sword, yet

17   contends that Defendants cannot interpose *defenses* that the Resolutions are invalid—and indeed,

18   unconstitutional.  Nothing strips this Court of jurisdiction to consider these defenses.

19       **Section 805** does not apply here.  That is clear, but if there were any doubt, this Court

20   should resolve it "in favor of the narrower interpretation, and by the strong presumption in favor

21   of judicial review."  *Arce v. United States*, 899 F.3d 796, 801 (9th Cir. 2018) (cleaned up).

22       1. Section 805 does not preclude constitutional challenges, full stop, because it contains no

23   "explicit language barring judicial review of constitutional claims."  *Ctr. for Biological Diversity*

24   *v. Bernhardt* (*CBD*), 946 F.3d 553, 561 (9th Cir. 2019).[8]  This "basic rule[] of statutory

25   construction," *id.*, makes no distinction among different constitutional claims.  The United States'

26   feint at such a distinction is wholly unsupported.  US Reply 7:15-8:10.

27

28       [8] Defendants raise constitutional, not statutory, challenges, US Reply 7:2, and contend the
     CRA did not apply, not that it was "somehow violated," *see id.* at 6:13, 7:4.

6

1    2. In any case, this Court "always has jurisdiction to determine its own jurisdiction," *United*

2    *States v. Ruiz*, 536 U.S. 622, 628 (2002), even when that determination turns on whether an

3    agency action is "under" a particular statute or provision, 5 U.S.C. § 805; *see also Nat'l Ass'n of*

4    *Mfrs. v. DOD*, 583 U.S. 109, 121 (2018); *CBD*, 946 F.3d at 564.  Section 805's reach is limited to

5    the "various obligations and requirements" the CRA imposes.  *Ohio Telecom Ass'n v. FCC*, 150

6    F.4th 694, 722 (6th Cir. 2025).  The CRA does not impose *any* duties absent a federal agency

7    "rule," *e.g.*, 5 U.S.C. § 801(a)(1)(A), (a)(1)(B), and there is no bona fide "rule" here, *infra*

8    I.D.2.a.  EPA cannot extinguish jurisdiction by "mere designation," *Adamo Wrecking Co. v.*

9    *United States*, 434 U.S. 275, 283 (1978), of its adjudications as rules.  Section 804(d)'s "framing

10   of the relevant 'action' [is] controlling, regardless of how EPA chooses to package" that action in

11   a report to Congress.  *EPA v. Calumet Shreveport Refining, LLC*, 145 S.Ct. 1735, 1747 (2025).[9]

12   3. Even if Section 805 barred review of EPA's relabeling of waivers as rules, this Court

13   could still reach and agree with Defendants' *defense* against the United States' reliance on the

14   Resolutions.  Defendants' arguments may "stem[] from"—i.e., start or develop as a result of—

15   EPA's post hoc and unexplained about-face.  Opp. 20 (quoted in US Reply 8).  But that conduct,

16   while "relevant," "does not transform … constitutional claim[s] into [] statutory one[s]."  *Sierra*

17   *Club v. Trump*, 963 F.3d 874, 894 (9th Cir. 2020), *vacated sub nom. Biden v. Sierra Club*, 142

18   S.Ct. 46 (2021) (mem.); *contra* US Reply 8:1-10.  Moreover, even if EPA's relabeling were

19   somehow correct, it would not change the fact that the federal government employed an

20   unprecedented process to target particular state laws or that the resulting Resolutions violated

21   federalism and separation of powers principles.

22   **The political-question doctrine** does not apply either. None of Defendants' arguments is

23   "based on the asserted failure of Congress to comply with its own procedural rules."  *Consejo de*

24   *Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171 (9th Cir. 2007);

25   *see* US Reply 8.  Defendants' first separation-of-powers argument has nothing to do with

26   _____

27   [9] The contention that an agency's decision to report an action to Congress as a "rule" precludes any judicial review of whether the action *was* a rule cannot be right.  It would mean, for example, that procedural challenges to agency adjudications—e.g., claims alleging prohibited ex parte contacts—could be evaded by simply reporting the action to Congress as a "rule."

28

7

1    procedure.  Opp. 23-24.  Defendants' second contention (Opp. 24-28)—that the Senate

2    unconstitutionally transferred power "textually commit[ted]" solely to it, *Consejo*, 482 F.3d at

3    1172—is likewise not a claim that the Senate contravened its own rules.  And Defendants'

4    federalism argument (Opp. 28-32) identifies a host of "extraordinary defects" throughout the

5    "national political process"—a claim both the Supreme Court and Ninth Circuit have indicated is

6    judicially reviewable.  *South Carolina v. Baker*, 485 U.S. 505, 512 (1988); *Nevada v. Skinner*,

7    884 F.2d 445, 452 (9th Cir. 1989).  The fact that *some* of the defects here involve departures from

8    Congress's ordinary rules makes the defects "extraordinary;" it does not preclude judicial review.

9    Questions of whether the procedures Congress *actually used* "ignore[d] constitutional restraints,"

10   or lacked "a reasonable relation between the mode or method of proceeding … and the result

11   which is sought to be attained," *United States v. Ballin*, 144 U.S. 1, 5 (1892), remain justiciable.[10]

### 2.    The Resolutions Violate the Separation of Powers

#### a.    Congress Impermissibly Overrode Three Adjudications by the Executive Branch of a Single Party's Rights Under Extant Law

Defendants explained that Congress acted unconstitutionally by overturning isolated

adjudications of one party's rights under extant law.  Opp. 23-24.  The United States retorts that

(1) EPA's waiver proceedings are not adjudications; (2) Congress has power to revoke

adjudicatory orders issued by the Executive Branch; and (3) the Resolutions accomplished more

than simply revoking EPA's grants of three waivers.  The United States is incorrect on all counts.

1. Every waiver proceeding is an adjudication.  *Contra* US Reply 14.  The United States

does not dispute that a waiver grant is a "statutory exemption or other form of permission"—i.e.,

a "license."  5 U.S.C. § 551(8); Opp. 21.  That silence is telling because licensing is adjudication,

not rulemaking.  5 U.S.C. § 551(6), (7).  The United States attempts to distinguish waivers from

licenses granted to "private parties."  US Reply 14.  But the definition of an adjudicatory order

does not distinguish between public and private requestors, and federal agencies routinely issue

---

[10] The United States asserts that "the CRA" was enacted as an exercise of the rulemaking power of each House of Congress.  U.S. Reply 8.  But Section 802 states only that "[t]his *section* is enacted" as an exercise of that power, 5 U.S.C. § 802(g) (emphasis added), and that each House's authority to unilaterally change its rules extends only "so far as relating to the procedure of that House," *id.* § 802(g)(2). Everything outside Section 802, and everything non-procedural inside Section 802, is statutory text changeable only through bicameralism and presentment.

1    licenses to public entities.  Moreover, these preemption waivers do not "authorize[] California to

2    regulate millions of people."  US Reply 14:4-5.  They "waive application of" Section 209(a)

3    preemption "to" *one party* ("the State"), 42 U.S.C. § 7543(b)(1), and permit California to "adopt

4    or … enforce" emission standards that regulate *manufacturers* selling in that State, *id.* § 7543(a).

5    Likewise, when FERC determines in an adjudicatory order that one system operator's proposed

6    energy-market tariff is "just and reasonable," that order permits the operator to enforce its tariff's

7    rules on market participants (including utilities and power generators) with potentially significant

8    effects on millions of Americans.  *E.g.*, *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 111-115

9    (D.C. Cir. 2017) (describing import of tariff proposal and FERC's limited adjudicatory authority).

10    Moreover, it is *Congress's* policy choice, 42 U.S.C. § 7507, that "allows other states to adopt

11    California's regulations," US Reply 14:5.  It is then the policy decisions of *those States* whether

12    to exercise that option and "foreclos[e] federal regulation" of vehicles sold within their borders,

13    *id.* at 14:6.  *EPA* makes none of these policy choices.

14        In fact, Congress "sharply restricted [EPA's] role in a waiver proceeding," authorizing the

15    Administrator to deny a waiver request only if "he finds one of the factual circumstances set out

16    in section 209(b)(1)(A)-(C)."  *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA.*, 627 F.2d 1095, 1121

17    (D.C. Cir. 1979) (cleaned up).  Fact-finding alone does not "implement, interpret, or prescribe

18    law or policy."  5 U.S.C. § 551(4) (definition of "rule").  Instead, like court judgments in

19    preemption cases, these waivers decisions declare that the specific state program at issue is not

20    preempted under a particular statute; they do not prescribe the legal requirements (*e.g.*, how many

21    grams of pollution may be emitted).  The question before both EPA and a court in both contexts is

22    whether the law *prescribed by the State* can be enforced.

23        EPA also applies the same "arbitrary and capricious" standard of review to California's

24    protectiveness "determination," 42 U.S.C. § 7543(b)(1)(A), that courts use to review agency

25    action, 5 U.S.C. § 706(2)(A).  And EPA "waive[s] application" of Section 209(a) preemption in

26    full, 42 U.S.C. § 7543(b)(1), so the waiver applies to the already completed "adopt[ion]" of the

27    regulations as well as future actions to "enforce," *id.* § 7543(a); *Bowen v. Georgetown Univ.*

28    *Hosp.,* 488 U.S. 204, 216 (1988) (Scalia, J., concurring) ("rules have legal consequences *only for*

9

1    *the future*") (emphasis added). *See also*, *e.g.*, 57 Fed. Reg. 24,788, 24,789 (June 11, 1992)

2    (waiving preemption for 1990 and later standards). The parallels between waiver decisions and

3    *judicial* determinations confirm that these actions are not exercises of delegated *legislative* power.

4    Waiver proceedings are adjudications, not rulemakings, and Congress must act accordingly.

5      2. Although Congress can alter or remove an agency's *general* authority to adjudicate, it

6    cannot revoke *individual* adjudicatory orders issued by the Executive Branch. "Congress

7    possesses full legislative authority, but the task of adjudication must be left to other tribunals."

8    *United States v. Brown*, 381 U.S. 437, 461 (1965). Congress may have "different" and "broader"

9    authority over agencies than over courts, US Reply 13:22-23, but that does not make it an

10    "adventurous leap," US Reply 14, to apply the Supreme Court's reasoning in cases involving

11    Judicial adjudication to the context of Executive adjudication. As with agencies, Congress

12    "ordain[s] and establish[es]" inferior Article III courts, U.S. Const. art. III, § 1, and chooses

13    which disputes they may (and must) adjudicate, *see Sheldon v. Sill*, 49 U.S. 441, 449 (1850).

14    Congress can broaden, narrow, or eliminate that adjudicatory power, or enact legislation

15    prohibiting the conduct that past adjudications allowed. But Congress cannot abrogate the final

16    decision of an adjudicator that sits in either the Judicial Branch *or* the Executive Branch. That

17    would vest too many powers in a single Branch. *See Chadha v. INS*, 634 F.2d 408, 434 (9th Cir.

18    1980) (Kennedy, J.) ("Plenary power for making laws does not import authority to revise

19    particular administrative dispositions. This is a case in which the greater power definitely does

20    not include the lesser."), *aff'd on other grounds*, 462 U.S. 919 (1983).[11]

21      3. Claiming Congress did more here than just disapprove EPA's waiver actions, the United

22    States cites Section 801's collateral legal consequences that may follow from a CRA resolution.

23           [11] In *INS v. Chadha*, the Court ultimately did not need to decide whether a unicameral
House resolution disapproving the Attorney General's suspensions of individual deportation

24    proceedings breached the separation of powers by infringing on another Branch's role, though
Justice Powell—like the Ninth Circuit—would have found such a violation. 462 U.S. 919, 964-

25    67 (1983) (Powell, J., concurring in the judgment); *Chadha*, 634 F.2d at 429-35. The suspensions
were discretionary, unreviewable by courts, and expressly subject to the one-House veto, *see*

26    *Chadha*, 462 U.S. at 957 n.22; *id.* at 1001 (White, J., dissenting) (equating the suspensions "to a
proposal for legislation"), and the majority found them "legislative in purpose and effect and

27    subject to the procedures set out in Art[icle] I" for bicameralism and presentment, *id.* at 957 n.22.
By contrast, an EPA waiver is a nondiscretionary, final action that is subject to court review. 42

28    U.S.C. §§ 7543(b)(1), 7607(b)(1).

US Reply 3:14, 13:13-16 (citing *CBD*).  None of those collateral consequences attend the

Resolutions.  *See supra*, I.D.2.  Regardless, it was not the potential operation of Section 801 that

"amended the substantive environmental law" in *CBD*.  946 F.3d at 562.  The change in law was

the requirement to "revoke a rule" adopted as an exercise of discretion.  *Id.* at 561; *see also id.* at

562.  Moreover, the action that Congress disapproved in *CBD* was a *rule* that had changed the

substantive law (and whose revocation necessarily did the same), not an *adjudicatory order* like

an EPA waiver that leaves the substantive law intact (and whose revocation does the same).

Finally, even if Section 801 attached to the Resolutions, collateral consequences would not be

enough to rescue them.  Congress "could not enact a statute directing that, in '*Smith v. Jones*,'

'Smith wins,'" *Bank Markazi v. Peterson*, 578 U.S. 212, 255 n.17 (2016), even if the judgment of

the court had knock-on legal consequences for Smith or Jones.  All these Resolutions did, by their

terms, is countermand EPA's final adjudicatory orders.  That alone makes them unconstitutional.

### b.    Congress Unlawfully Allowed the Executive Branch To Direct Legislative Procedure

To pass the Resolutions, the Senate adopted a procedural rule that left it up to the Executive

Branch whether legislation introduced to disapprove an agency action that does not meet the CRA

definition of "rule" should nonetheless be expedited with extraordinary procedures akin to those

in Section 802 of the CRA.  The Senate's *when you say so* rule of procedure violated the

Constitution by ceding to the Executive Branch part of the Senate's exclusive (and preclusive)

power over its own internal procedures.  *See* U.S. Const. art. I, § 5, cl. 2 (Rulemaking Clause).

And because the Senate used an unconstitutional rule of procedure to pass the Resolutions, the

Resolutions are unconstitutional—even if the Senate could have attempted to pass them by using

different rules of procedure that comported with the constitutional separation of powers.

The United States submits there was no problem because the Senate, not the Executive

Branch, voted to adopt the rule of legislative procedure.  US Reply 10.  But under that theory, the

nondelegation doctrine would not exist.  Congress is the voting body in *every* nondelegation case,

whatever the congressional power in question might be.  The issue is not whether Congress acted,

but whether it acted unconstitutionally by giving up *its own* power to the Executive.

1   The United States makes a half-hearted effort to rebut Defendants' recitation of the Senate

2   proceedings.  But there is no better evidence of which procedures Congress used to pass

3   legislation than "[t]he public proceedings of each House as reported by the Official Reporters"

4   and then "printed in the Congressional Record."  44 U.S.C. § 903.  The United States belittles that

5   record as "legislative history," US Reply 11, which might persuade if the issue here were one of

6   statutory construction.  No statute, however, can shed light on what happened on the Senate floor.

7   Quoting a floor speech by Senate Majority Leader Thune, the United States asserts that he

8   reached "his own independent conclusion" that EPA waivers are rules under the CRA.  US Reply

9   11:7.  The views of individual Senators are irrelevant to Defendants' argument, though.  What

10  matters is which *procedure* Senators intended to enshrine.  And, in the same speech, Senator

11  Thune tipped his hand on that point: in his view, agency actions "submitted to Congress[ as]

12  rules" *are* in fact rules "eligible for consideration under the [CRA]," regardless of whether they

13  meet the statutory definition.  171 Cong. Rec. S3047 (daily ed. May 21, 2025); *accord* 171 Cong.

14  Rec. S3140 (daily ed. May 22, 2025) (Sen. Lankford).  In other words, the Senate's procedural

15  rule simply established reflexive deference to the Executive.

16  In the United States' apparent view, even a rule of procedure that required a Senator to

17  procure the President's seal of approval before introducing a bill or amendment would be not only

18  constitutional, but unreviewable.  The Framers did not mean for their careful separation of powers

19  to be so easily discarded.  The Rulemaking Clause, no less than other explicit congressional

20  powers, preserves that separation.

### 3.    The Resolutions Violate the Tenth Amendment and Structural Federalism

21
22  The Resolutions are also unconstitutional under the Tenth Amendment and structural

23  federalism.  Opp. 28-32.  The United States dismisses this argument as "based on the thinnest of

24  reeds," US Reply 9:5, but that reed is nothing less than the "affirmative limits" imposed by our

25  "constitutional structure."  *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 556 (1985).

26  The United States does not meaningfully deny that it targeted particular state laws in an

27  extraordinary and defective manner.  It simply says that bicameralism and presentment cure any

28

12

1    federalism violations; or, put another way, that no other defects in the national political process

2    are reviewable. *Id.* at 10:13-14.  The Supreme Court disagrees.  Although "[t]he constitution

3    empowers each house to determine its rules of proceedings," those rules may not "ignore

4    constitutional restraints." *Ballin*, 144 U.S. at 5.  And *every* Justice that heard *Garcia* and *South*

5    *Carolina* agreed that the Tenth Amendment and structural federalism act as such restraints,

6    separate and apart from the bicameralism and presentment clauses (which were satisfied in both

7    cases).  The *Garcia* majority recognized the availability of a judicial remedy "tailored to

8    compensate for possible failings in the national political process."  469 U.S. at 554.  The

9    dissenting Justices argued the Constitution provides *more* protection—not less—for "the role of

10   the States in the federal system." *Id.* at 560-61 (Powell, J., dissenting); *see also id.* at 580

11   (O'Connor, J., dissenting); *South Carolina*, 485 U.S. at 512 (reaffirming "extraordinary defects in

12   the national political process" are reviewable); *id.* at 528 (Scalia, J., concurring) (asserting more

13   expansive "judicial relief" is available).  That the Ninth Circuit has twice "rejected such claims"

14   *on their merits*, US Reply 9:14, only underscores the point.

15        The United States mounts little defense on the merits.  It asserts that California has a large

16   number of representatives in Congress.  US Reply 9:22.  But no State—no matter its size—has a

17   majority in either House of Congress.  Thus, *any* State could be deprived of participation,

18   "singled out," or "politically isolated." *South Carolina*, 485 U.S. at 513.  Ours is "a union of

19   states, equal in power, dignity, and authority," *Coyle v. Smith*, 221 U.S. 559, 567 (1911), and

20   States with larger populations are not less protected from defective national political processes.

21   This claim is likewise not precluded simply because a State's representatives were outvoted. *See*

22   US Reply 9:3, 10:15.  Indeed, almost by definition, political isolation includes being outvoted.

23        The United States also tries to cast shade by observing that "no court to [its] knowledge has

24   invalidated any statute" on this ground.  US Reply 9:13.  But that just confirms that what the

25   Federal Government set out to do here was, literally, without precedent.  Two branches of the

26   Federal Government ventured deep into uncharted procedural waters—each in its own way—for

27   the sole purpose of targeting specific California regulations and depriving the State of access to

28   the third branch, the judiciary.  Opp. 31:17-24.  This *is* the rare case when the structural

1  protections designed to make the Federal Government "disinclined to invade the rights of the

2  individual States, or the prerogatives of their governments" failed.  *Garcia*, 469 U.S. at 551

3  (quoting The Federalist No. 46, p. 332 (B. Wright ed. 1961)). [12]

4      Indeed, extraordinary defectiveness infected every step in this process:  from EPA's

5  unprecedented, unexplained, and unlawful post hoc relabeling of "orders" as "rules" to

6  Congress's disregard for not one, but *three*, reasoned conclusions that extraordinarily expedited

7  procedures did not apply; and from the Senate's passage of seemingly inexplicable procedural

8  points of order wholly unrelated to the debate into which they were introduced to the absolute

9  deference afforded to the Executive to determine the Senate's procedural rules.  Opp. 8-10, 24:25-

10  31:24.  *All* of these unprecedented steps were taken with a singular purpose:  to "take … down"

11  certain California regulations and preclude recourse to the courts.  *See* ECF 73-27 at 2.

12      The United States identifies no other instances where highly expedited procedures were

13  utilized—through a concerted effort by two Branches—to reverse federal approval of a state

14  regulatory program or otherwise directly invade "the prerogatives of [state] governments."

15  *Garcia*, 469 U.S. at 551 (cleaned up).  If *this* national political process does not contravene the

16  protections the Constitution affords the States, it is hard to say what process would.

17  **II.    THE CTP SHOULD NOT BE ENJOINED**

18      **A.    The United States Is Not Likely to Succeed on Its Preemption Claim**

19      In the words of the lead negotiator for the manufacturers, the CTP "established *a*

20  *consensual* path forward toward cleaner … trucks" in California.  ECF 23-12 (emphasis added).

21  The United States claims otherwise:  that the CTP is a preempted "regulatory enforcement

22  device."  US Reply 15:3, 15:7.  The lead negotiator is correct, and the United States is wrong.

23  Moreover, its argument that the CTP is non-voluntary and thus regulatory is surprising, since

24  Plaintiff EPA routinely enters into voluntary agreements that have the same features.

25  _____

26      [12] Most attempts to bring this claim have identified no defects in the political process.  *See South Carolina*, 485 U.S. at 513; *Skinner*, 884 F.2d at 452.  In *Nevada v. Watkins*, 914 F.2d 1545,
27  1556 (9th Cir. 1990), the State arguably alleged a procedural problem:  its lack of representation on the conference Committee. Nevada did not, however, argue that Committee assignments had followed unusual procedures or were determined in order to exclude the State.  Here, numerous
28  extraordinary procedures were utilized for the sole purpose of targeting California's regulations.

1    For example, EPA's "Voluntary Fireplace Program" is designed to encourage

2  "manufacturers to develop and offer new, cleaner wood-burning fireplace models," with the

3  intent to "reduce air pollution emissions *sooner than could be achieved by Federal regulation*."

4  RJN Exh. 3 at 2 (emphasis added).  "*[M]anufacturers must follow detailed certification and*

5  *qualification steps* per the partnership agreement."  RJN Exh. 4 at 1 (emphasis added); *see also*

6  RJN 5 at 1-2 (voluntary "Green Chill Program" "protect[s] the environment" by issuing

7  "certification" to "specific environmental performance criteria that go above and beyond federal

8  requirements").  EPA also frequently enters into voluntary settlement agreements in which the

9  agency agrees to act on a regulatory matter by a specified deadline.  RJN ¶ 7; Exh. 6 at 4-5.  The

10  United States cannot credibly maintain that the CTP is a non-voluntary, regulatory "device" just

11  because it may "require manufacturers to comply with" stricter emission obligations than required

12  by regulation; because it "require[es] certification;" because it furthers the "policy goal to reduce

13  emissions;" or because CARB agreed to consider taking regulatory action.  US Reply 15:8-15.

14    The United States also appears to embrace the Private Plaintiffs' argument that the only

15  way to enforce the CTP is through regulatory penalties.  US Reply 15:6; 15:21-22; 16:1.  But

16  private parties have no power to impose such penalties, so that would mean that the private

17  parties to the CTP (including Private Plaintiffs) never had any means to enforce it.  Sophisticated

18  parties would be unlikely to sign such a one-sided agreement—that could be enforced *against* but

19  not *by* them.  The CTP is a bargained-for, voluntary agreement enforceable through state-law

20  contract remedies (not regulatory penalties).  It is not preempted.  Opp. 14:13-15:1.

21    **B.    The United States Is Not Being Irreparably Injured by the CTP**

22    The United States claims only a "per se" preemption injury from the CTP, US Reply 18:16-

23  24, and that injury claim fails along with the merits claim.  In fact, having asserted that the CTP

24  has been "put … squarely in the rearview mirror" by Private Plaintiffs' disavowal, RJN Exh. 7 at

25  2, the United States cannot credibly assert any irreparable injury at all.

26                              **CONCLUSION**

27    Plaintiffs' preliminary injunction motion should be denied.

28

1    Dated:  October 14, 2025                          Respectfully submitted,

2                                                       ROB BONTA
                                                        Attorney General of California
3                                                       MYUNG J. PARK
                                                        Supervising Deputy Attorney General
4

5

6                                                       /s/ M. Elaine Meckenstock
                                                        M. ELAINE MECKENSTOCK
7                                                       Deputy Attorney General
                                                        Attorneys for Defendants
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    16