1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9            FOR THE EASTERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  DAIMLER TRUCK NORTH AMERICA LLC, et al., | No. 2:25-cv-02255-DC-AC |
| 12 | |
| 13       Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| 14    v. | |
| 15  CALIFORNIA AIR RESOURCES BOARD, et al., | (Doc. Nos. 23, 57) |
| 16       Defendants. | |
| 17 | |

18        This matter came before the court on October 31, 2025 for a hearing on Plaintiffs' motion

19   for a preliminary injunction, to which Plaintiffs-Intervenors have joined in part. (Doc. Nos. 23,

20   57.) Attorneys Benjamin B. Wagner, Miguel Estrada, Rachel Brass, Stacie Fletcher, and Veronica

21   Goodson appeared on behalf of Plaintiff Daimler Truck North America LLC; Attorney Robin

22   Hulshizer appeared on behalf of Plaintiff International Motors, LLC; Attorney Joseph Ostoyich

23   appeared on behalf of Plaintiff PACCAR Inc; Attorney Jeremy Heep appeared on behalf of

24   Plaintiff Volvo Group North America LLC; Attorneys Robert Stander and John Adams appeared

25   on behalf of Plaintiffs-Intervenors United States of America and United States Environmental

26   Protection Agency; and Attorneys Margaret Elaine Meckenstock and Cecilia Segal appeared on

27   behalf of Defendants California Air Resources Board, Steven S. Cliff, and Gavin C. Newsom. For

28   the reasons explained below, Plaintiffs' motion for a preliminary injunction will be granted in part

                                            1

1    and denied in part.

2                                  **FACTUAL BACKGROUND**[1]

3          This case arises from alleged violations of the Clean Air Act's provision preempting the

4    State of California from regulating motor vehicle emissions unless the United States

5    Environmental Protection Agency ("EPA") has issued a preemption waiver for those regulations.

6          This case is brought by Plaintiffs Daimler Truck North America LLC ("Daimler"),

7    International Motors, LLC ("International"), PACCAR Inc. ("PACCAR"), and Volvo Group

8    North America LLC ("Volvo"), four companies that design, develop, manufacture and sell heavy-

9    duty trucks and engines (referred to as "Original Equipment Manufacturers" or "OEMs").[2] (Doc.

10   No. 1 at ¶¶ 1, 24.) According to Plaintiffs, in June 2025, President Trump signed joint

11   congressional resolutions of disapproval that "expressly stripped" California's preemption

12   waivers for three regulation programs that set certain emissions standards for heavy-duty

13   vehicles, and thus, any continued enforcement of those allegedly preempted regulations violates

14   the Clean Air Act. (Doc. No. 1 at 13–16, 21–23.) Plaintiffs also contend California should not be

15   permitted to enforce three other regulation programs on the ground that they are preempted

16   because California has not obtained preemption waivers for those standards. (*Id.* at 16–17.)

17   **A.    Regulatory Background**

18         1.     The Clean Air Act

19         The Clean Air Act[3] provides that the EPA Administrator "shall by regulation prescribe . . .

20

21   ---
     [1]  This factual background is derived from Plaintiffs' operative complaints (Doc. Nos. 1, 56),
22   Plaintiffs' motion for a preliminary injunction and reply briefs along with their supporting
     declarations and exhibits (Doc. Nos. 23, 57, 58, 74, 75), and Defendants' opposition brief and
     sur-reply along with their supporting declarations and exhibits (Doc. Nos. 73, 80).
23
24   [2]  Consistent with Plaintiffs' complaint, this order refers interchangeably to "heavy-duty trucks"
     and "heavy-duty vehicles" as shorthand for the vehicles and engines covered by the CARB
25   regulations at issue in this case (including certain medium-duty vehicles and engines), and those
     terms shall have the same meaning as described in Plaintiffs' complaint. (Doc. No. 1 at ¶ 4, n.1.)
26
27   [3]  The Clean Air Act was originally called the Air Quality Act of 1967, which was later amended
     with the Clean Air Amendments of 1970 and the Clean Air Act Amendments of 1977. *See Engine
     Mfrs. Ass'n v. U.S. E.P.A.*, 88 F.3d 1075, 1078 (D.C. Cir. 1996); Pub. L. No. 91–604, 84 Stat.
28   1676 (1970); Pub. L No. 95–9, 91 Stat. 685 (1977).

                                              2

standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). In enacting federal emissions standards, the Clean Air Act also included a preemption provision, expressly prohibiting states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines . . . " and from "requir[ing] certification, inspection, or any other approval relating to the control of [such] emissions . . . as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment." 42 U.S.C. § 7543(a).

However, recognizing California's unique role in pioneering regulations of vehicle emissions, Congress included in the Clean Air Act a preemption waiver provision specifically for California, i.e., an exception for when California "determined that its standards would be 'more stringent' than applicable federal standards." *Motor & Equip. Mfrs. Ass'n, Inc. v. E.P.A.*, ("*MEMA*") 627 F.2d 1095, 1109 (D.C. Cir. 1979) (summarizing legislative history of the Clean Air Act and the exception made for California); *see also Engine Mfrs. Ass'n v. E.P.A.*, 88 F.3d 1075, 1079 (D.C. Cir. 1996) ("In spite of Congress' determination to protect manufacturers from multiple emissions standards, California was granted an exemption from the [Clean Air Act] preemption.") (internal citation omitted).

Pursuant to that waiver provision, the EPA Administrator "shall, after notice and opportunity for public hearing, waive application" of the preemption provision to California, if California determines that its "standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(b)(1). The waiver is not necessarily automatic because "the Administrator shall not grant the waiver request if he finds (1) that California's determination of protectiveness was arbitrary and capricious; (2) that California does not need the standards to meet compelling and extraordinary circumstances; [or] (3) that the standards and accompanying enforcement procedures are [not] . . . technologically feasible." *MEMA*, 627 F.2d at 1111; 42 U.S.C. § 7543(b)(1)(A)–(C).

A preemption waiver allows California to require "certification . . . or any other approval

3

1  relating to the control of emissions . . . as a condition precedent" to the sale of a vehicle or engine.

2  42 U.S.C. § 7543(a). In 1977, Congress amended the Clean Air Act to permit other states to "opt-

3  in" to using the California vehicle emissions standards, rather than the Federal EPA standards, as

4  conditions precedent for sale of vehicles in their state. 42 U.S.C. § 7507. Following the 1977

5  amendments, motor vehicles had to be either "'federal cars' designed to meet the EPA's standards

6  or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n* v, 88 F.3d at

7  1080 (explaining that "[r]ather than being faced with 51 different standards, as they had feared, or

8  with only one, as they had sought, manufacturers must cope with two regulatory standards under

9  the legislative compromise embodied in [the Clean Air Act]"). Thus, "there have historically been

10 two distinct sets of emissions standards applicable to vehicle manufacturers, including

11 manufacturers of heavy-duty vehicles and engines: (1) standards promulgated by the California

12 Air Resources Board ("CARB"), and then approved by EPA, that apply in California and any

13 other state that has adopted California's standards; and (2) standards promulgated by the EPA."

14 (Doc. No. 1 at ¶ 3.)

15        2.     <u>Relevant CARB Regulations and EPA Waivers</u>

16       Pursuant to the Clean Air Act, California imposes conditions precedent to the sale of new

17 vehicles and engines sold in the state by requiring manufacturers to apply for certification from

18 CARB. (Doc. No. 56 at ¶ 58.) To obtain CARB certification for a heavy-duty vehicle,

19 manufacturers submit one application and pay an application fee that CARB uses to offset its

20 costs of implementation. (Doc. No. 73-30 at ¶¶ 37, 38.) For example, for model year 2025,

21 applicants for certification of a medium- or heavy-duty compression ignition engine family were

22 charged an application fee of $121,265. (*Id.* at ¶ 38.)

23       To be certified by CARB, a vehicle must demonstrate that its emissions control systems

24 comply with relevant standards and "are durable such that the vehicle will comply with the

25 emission standards for its useful life." (*Id.* at ¶ 28.) Manufacturers must also demonstrate

26 compliance with other requirements, as applicable, such as "anti-tampering, fuel tank fill pipe and

27 openings, crankcase emissions, etc." (*Id.*) If CARB finds the relevant requirements have been

28 satisfied, CARB issues an "executive order" that approves that particular vehicle or engine for

sale in California for that model year ("CARB certification"). (Doc. Nos. 56 at ¶ 59; 73-30 at ¶ 30.) CARB processes applications that are submitted after the start, but before the end, of a given model year, and CARB certifications are effective from the date of issuance until December 31 of that model year. (Doc. No. 73-30 at ¶ 30.) The certification process takes considerable time, estimated to be at least 60 days, though often longer. (*See* Doc. No. 23-15 at ¶ 11) ("[F]or model year 2025, [Daimler] began submitting materials to CARB in August of 2024, and did not receive its final certification until December 19, 2024."); (Doc. No. 23-20 at ¶ 6) ("Given the prolonged process of obtaining CARB certification on any vehicle or engine family, on April 22, 2024, International paid approximately $823,973 to CARB to initiate the certification process to position itself to obtain Executive Orders for its 2026 model year vehicle and engine families prior to the start of the model year.").

Selling vehicles in California without a CARB certification is a serious offense that subjects the seller to substantial penalties, specifically an inflation-adjusted penalty of up to $48,788 for each vehicle sold. (Doc. Nos. 1 at ¶ 62; 56 at ¶ 60.)

Relevant here, from 2021 to 2023, CARB promulgated a series of emissions standards for heavy-duty trucks and engines, including those manufactured by the OEM Plaintiffs. (Doc. No. 1 at ¶ 4.)

a.    *Advanced Clean Trucks ("ACT") Regulations*

The ACT regulations "require[] manufacturers to sell increasing percentages of zero-emissions vehicles year-over-year, or to buy credits from other entities that exceeded their own percentage obligations," beginning with model year 2024. (Doc. No. 1 at ¶ 35.) CARB adopted the ACT regulations in 2021. Cal. Code Regs., tit. 13, § 1963.1. CARB submitted a request to EPA for a preemption waiver for the ACT regulations, and EPA published its notice of decision granting CARB's request on April 6, 2023 in the Federal Register. 88 Fed. Reg. 20688.

b.    *Omnibus Low NOx ("Omnibus") Regulations*

In 2001, CARB amended its standards for emissions of oxide of nitrogen ("NOx"), a smog precursor, beginning with model year 2007, and EPA granted CARB's request for a preemption waiver of those standards in 2005. (Doc. No. 73-30 at ¶ 6); *see also* 70 Fed. Reg.

50322. CARB made some technical amendments to those standards in 2007, and EPA confirmed in a notice of decision published in 2017 that those amendments were within the scope of the previous waivers issued by EPA.[4] (Doc. No. 73-30 at ¶ 6); *see also* 82 Fed. Reg. 4867.

In 2021, CARB further amended NOx emissions standards and other standards affecting heavy-duty engines and vehicles by adopting the Omnibus regulations, beginning with model year 2024. (Doc. Nos. 1 at ¶ 35; 73-30 at ¶ 14.) The Omnibus regulations "require manufacturers to reduce heavy-duty vehicle emissions of nitrogen-oxide (NOx) and particulate matter." (Doc. Nos. 1 at ¶ 35.) The Omnibus regulations "reduce[] the amount of NOx emissions permitted from heavy-duty trucks from 0.20[5] to 0.05 grams per brake horsepower-hour for [model year] MY 2024 through 2026, Cal. Code Regs., tit. 13, § 1956.8(a)(2)(C), and then reduce[] that figure to 0.02 for MY 2027 and subsequent [model years], *id.* § 1956.8(a)(2)(D)."[6] (Doc. No. 73-30 at ¶ 14.)

CARB submitted a request for a preemption waiver for the Omnibus regulations to EPA

---

[4] As explained in EPA's notice of decision:

> If California amends regulations that have been previously authorized by EPA, California may ask EPA to determine that the amendments are within the scope of the earlier authorization. A within-the-scope determination for such amendments is permissible without a full authorization review if three conditions are met. First, the amended regulations must not undermine California's previous determination that its standards, in the aggregate, are as protective of public health and welfare as applicable federal standards. Second, the amended regulations must not affect consistency with section 209 of the Act, following the same criteria discussed above in the context of full authorizations. Third, the amended regulations must not raise any new issues affecting EPA's prior waiver or authorization decisions.

82 Fed. Reg. 4869.

[5] The "pre-Omnibus" regulations that began with model year 2007 had imposed a limit of no more than 0.20 grams per brake horsepower hour emissions of NOx. (Doc. No. 73-30 at 3, ¶ 6.)

[6] After Plaintiffs filed the complaint and the pending motion for a preliminary injunction in this action, CARB commenced emergency rulemaking and changed many of the sections of the California Code of Regulations at issue in this case, effective October 2, 2025. In this order, citations to the California Code of Regulations refers to the versions of those regulations in effect prior to CARB's emergency rulemaking.

in 2022. *See* 90 Fed. Reg. 643. While that request was pending, in 2023, CARB made modest amendments to the Omnibus regulations. (Doc. No. 73-30 at ¶ 14.) EPA published its notice of decision granting CARB's request for a preemption waiver for the Omnibus regulations, including the 2023 amendments, on January 6, 2025 in the Federal Register. 90 Fed. Reg. 643.

> c.    *Advanced Clean Cars II Regulations*

The Advanced Clean Cars II regulations primarily apply to light-duty vehicles like cars and pickup trucks, but those regulations also modified certain standards for heavy-duty vehicles and engines and medium-duty vehicles. (Doc. No. 1 at ¶ 35.) For heavy-duty vehicles and engines, the standards for evaporative emissions and refueling emissions were modified. (*Id.*) For medium-duty vehicles, on-board diagnostics standards were also modified. (*Id.*)

CARB adopted the Advanced Clean Cars II regulations in 2022. Cal. Code Regs., tit. 13, §§ 1976, 1978. On December 26, 2023, EPA published a Federal Register notice announcing its receipt of CARB's waiver request for the Advanced Clean Cars II regulations. 90 Fed. Reg. 642, 642. EPA published its notice of decision granting CARB's request on January 6, 2025 in the Federal Register. 90 Fed. Reg. 642, 643.

> d.    *Advanced Clean Fleets ("ACF") Regulations*

In 2023, CARB promulgated the ACF regulations, which require that "all new, medium- and heavy-duty vehicles sold in California beginning with the 2036 model year be zero-emissions vehicles."[7] (Doc. No. 73-30 at ¶ 18); Cal. Code Regs., tit. 13, § 2016. On November 15, 2023, CARB submitted a request for a preemption waiver to EPA for parts of the ACF regulations, including the model year 2036 zero-emissions requirement. (Doc. No. 73-30 at ¶ 20); 89 Fed. Reg. 57151. However, on January 13, 2025, CARB withdrew that request. (Doc. Nos. 1 at ¶ 36; 73-30 at ¶ 20.) CARB did not obtain a preemption waiver for the ACF regulations and has agreed

/////

/////

---

[7] The ACF regulations also require the gradual phasing-in of zero-emissions vehicles to three categories of fleets (state and local government fleets, drayage fleets, and high priority and federal fleets). (Doc. No. 73-30 at ¶ 18); Cal. Code Regs., tit. 13, §§ 2013–2015. Plaintiffs do not challenge these other requirements of the ACF regulations in this lawsuit.

1    /////

2    that it will not enforce those regulations until it obtains a waiver.[8]

3                      e.      *Phase 2 Greenhouse Gas Regulations*

4          In 2014, CARB adopted greenhouse gas ("GHG") emissions standards applicable to

5    heavy-duty vehicles beginning with model year 2014, and EPA granted CARB's request for a

6    preemption waiver as to those "Phase 1" GHG emissions standards in 2016. (Doc. No. 73-30 at

7    ¶ 9); 81 Fed. Reg. 95982. In EPA's notice of decision granting that preemption waiver, EPA

8    stated: "This regulation generally aligns California's GHG emission standards and test procedures

9    with the federal GHG emission standards and test procedures that EPA adopted in 2011. A

10   deemed-to-comply provision is included in CARB's regulation whereby manufacturers may

11   demonstrate compliance with California's Phase 1 GHG Regulation by complying with EPA's

12   Phase 1 regulation." 81 Fed. Reg. 95982, 95983.

13         In 2018, CARB adopted more stringent "Phase 2" GHG standards beginning with model

14   year 2021, though those standards likewise aligned with EPA's federal standards applicable to the

15   same model years. (Doc. Nos. 1 at ¶ 36; 73-30 at ¶ 9.) Thus, similar to Phase 1, the Phase 2 GHG

16   regulations provide for manufactures to demonstrate compliance with both CARB and federal

17   standards simultaneously. (Doc. No. 73-30 at ¶ 9.)

18         CARB has not requested a preemption waiver from EPA for the Phase 2 GHG

19   regulations.[9] (Doc. Nos. 1 at 16, ¶ 36; 73-30 at ¶ 9.) CARB is not enforcing Phase 2 GHG

20

---

21   [8] Shortly after the ACF regulations were promulgated, a trucking association sued CARB to
     challenge certain requirements of those regulations. *Cal. Trucking Assoc. v. Cal. Air Res. Bd., et
22   al.*, 2:23-cv-02333-TLN-CKD (E.D. Cal. Oct. 16, 2023). The parties stipulated to stay
     proceedings in that case given CARB's withdrawal of its request for a preemption waiver, and in
23   their stipulation, CARB agreed that it "will not enforce the part of the Advanced Clean Fleets
     regulation requiring 100% zero-emission-vehicle sales in the medium- and heavy-duty categories
24   beginning with model year 2036 (Cal. Code Regs., tit. 13, § 2016), until CARB obtains a Clean
     Air Act preemption waiver from EPA for that regulatory requirement." *Cal. Trucking Assoc*, No.
25   2:23-cv-02333-TLN-CKD, Stipulation and Order, Doc. Nos. 55, 56 (E.D. Cal. Apr. 25, 2025);
     (*see also* Doc. No. 73-7).
26

27   [9] In the support document CARB submitted to EPA with its request for a waiver of the Omnibus
     regulations in 2022, CARB noted that it "will submit a separate waiver request for the California
28   Phase 2 GHG Regulation." (Doc. Nos. 1 at 16, ¶ 36.) CARB did not thereafter submit such

1    standards or requiring manufacturers to certify to those standards, and CARB will not do so

2    unless it obtains a preemption waiver. (Doc. No. 73-30 at ¶ 9.) CARB clarified in an advisory to

3    manufacturers that it will process any applications for certifications to these standards if

4    manufacturers voluntarily submit them. (Doc. Nos. 1 at ¶ 36; 73-30 at ¶ 9.)

5                    f.      *Heavy-Duty On-Board Diagnostic Regulations*

6            In addition to the emissions standards themselves, CARB also requires vehicles to be

7    equipped with on-board diagnostic ("OBD") devices "to monitor vehicle and engine components

8    that can impact emissions performance." (Doc. No. 1 at ¶ 36.) The OBD devices also "store

9    information about emissions system faults for later retrieval by regulatory agencies,

10   manufacturers, or mechanics," and the devices "warn drivers of problems through features such

11   as the 'check engine' light." (Doc. No. 73-30 at ¶ 16.)

12           CARB has required OBDs in medium- and heavy-duty vehicles sold in California since

13   model years 1988 and 2010, respectively. (Doc. No. 73-30 at ¶ 16.) CARB has amended its OBD

14   requirements several times and received CARB preemption waivers. (*Id.*); *see also* 81 Fed. Reg.

15   78143, 78149 ("EPA is hereby granting a waiver for California's 2007, 2010, 2012, and 2013

16   amendments to its OBD II Requirements and OBD II Enforcement Regulation."); 81 Fed. Reg.

17   78149, 78154 (granting EPA waiver to 2013 OBD requirements for heavy-duty vehicles).

18           According to Defendants, in 2023, CARB amended the OBD requirements for heavy-duty

19   vehicles as part of the Omnibus regulations, (Doc. No. 73-30 at ¶ 17); Cal. Code Regs., tit. 13, §

20   1971.1, and for medium-duty vehicles as part of the Advanced Clean Cars II regulations, (Doc.

21   No. 73-30 at ¶ 17); Cal. Code Regs., tit. 13, § 1968.2. Relying on the preemption waivers granted

22   for the Omnibus regulations and the Advanced Clean Cars II regulations, Defendants contend

23   EPA has waived preemption for these OBD requirements, as amended. (Doc. No. 73 at 17.)

24           Plaintiffs allege that CARB has not obtained a waiver for its OBD requirements since

25   EPA's grant of the waivers for the 2013 amendments, and thus any subsequent amendments (such

26   as amendments CARB made in 2016 and 2019) lack waivers. (Doc. No. 1 at ¶ 36.) Yet, elsewhere

27

28   request. (*Id.*)

in Plaintiffs' complaint, their allegations are consistent with Defendants' position. In describing the Advanced Clean Cars II regulations in their complaint, Plaintiffs allege "[t]he on-board diagnostics standards applicable to medium-duty vehicles were also modified in Advanced Clean Cars II," and "EPA approved the waiver for Advanced Clean Cars II." (Doc. No. 1 at 15.) In describing the Omnibus regulations as a regulatory package that "included extensive changes to other CARB standards affecting heavy-duty engines and vehicles," Plaintiffs noted the numerous sections of title 13 of the California Code of Regulations amended by the Omnibus regulations, including sections 1971.1 and 1971.5. (Doc. No. 1 at 14 n.5.) Those sections are entitled "On-Board Diagnostic System Requirements—2010 and Subsequent Model-Year Heavy-Duty Engines," and "Enforcement of Malfunction and Diagnostic System Requirements for 2010 and Subsequent Model-Year Heavy-Duty Engines," respectively. Cal. Code Regs., tit. 13, §§ 1971.1, 1971.5. Further, these two sections were explicitly noted by EPA in its decision document granting a preemption waiver for the Omnibus regulations as being included in the waiver. (Doc. No. 73-8 at 6–7 n.5) ("The 2023 Targeted Amendments are comprised of title 13, California Code of Regulations [] sections 1956.8, 1971.1, and 1971.5."); (Doc. No. 73-8 at 7) ("By today's decision EPA finds that Omnibus Low NOx Regulation, including the 2023 Targeted Amendments, meets the criteria for a new waiver under section 209(b) for portions that pertain to onroad requirements and meets the criteria for a new authorization under section 209(e) for the portions that pertain to nonroad requirements.").

**B.    The Clean Truck Partnership**

During the years that CARB promulgated the regulations at issue in this case, manufacturers of heavy-duty trucks, including the OEM Plaintiffs, and their industry trade association, the Truck and Engine Manufacturer's Association ("EMA"), raised serious concerns regarding the legality of those regulations and the technical feasibility of meeting CARB's standards within the time allotted. (Doc. No. 1 at ¶¶ 37–39.) For example, in 2020, the EMA expressed concerns during CARB's rulemaking for the Omnibus regulations that the NOx emissions standards were unachievable, and in 2022, the EMA sued CARB alleging the Omnibus regulations violated the Clean Air Act because they did not provide the requisite four-year lead

10

1    time. (*Id.* at 38–40.) The EMA withdrew that lawsuit when EPA commenced a waiver proceeding

2    regarding the Omnibus regulations and accepted comments on the lead time issue. (*Id.* at ¶ 40.)

3    Nonetheless, manufacturers still wanted assurances that CARB would provide four years of lead

4    time in their regulations, and they continued to express concerns that CARB's standards were too

5    stringent and diverged too much from EPA's federal standards. (Doc. No. 73-34 at ¶¶ 8, 12.) For

6    its part, CARB was concerned about the risks of further legal challenges to their regulations and

7    to any preemption waivers granted for those regulations, as defending against those legal

8    challenges would negatively impact CARB's ability to develop plans to improve air quality in

9    California. (Doc. No. 73-34 at ¶¶ 11–14.) To address these concerns, in the fall of 2022, CARB

10   initiated discussions with the EMA, and negotiations continued over the next nine months,

11   leading to the announcement in July 2023 of an agreement, which the parties refer to as the

12   "Clean Truck Partnership."[10] (Doc. Nos. 1 at ¶ 41; 73-34 at ¶ 15–24.) The Clean Truck

13   Partnership was signed by CARB, EMA, and certain heavy-duty on-highway manufacturers,

14   including the OEM Plaintiffs in this case. (Doc. No. 1-2 at 5–7.) Several manufacturers of internal

15   combustion-engines operating in California did not sign on to the Clean Truck Partnership, and

16   manufacturers of zero-emissions vehicles (such as Tesla) also did not sign on to the Clean Truck

17   Partnership. (Doc. No. 73-34 at ¶ 25.)

18       The Clean Truck Partnership outlined a plan for CARB to undertake several of the

19   regulatory actions sought by the industry. (Doc. No. 1 at ¶ 41.) The Clean Truck Partnership

20   consists of an introductory paragraph in which the signatories acknowledge the importance of

21   several environmental and industry goals, followed by eight paragraphs of agreed upon

22   commitments. (Doc. No. 1-2 at 2–4.) Certain of those commitments are set forth in further detail

23   in the appendices attached to the Clean Truck Partnership and referenced therein: "Appendix A –

24   Amendments to Omnibus Legacy Provisions in Title 13 California Code of Regulations (CCR)

25   1956.8 to Ease Transition"; "Appendix B – CARB Truck Regulations Compliance and U.S. EPA

26   Clean Trucks Plan Harmonization"; "Appendix C – Emission Warranty Information Reporting, In

27   _____

28   [10]  The agreement itself is simply titled "Agreement" and does not mention "Clean Truck Partnership." (Doc. Nos. 1-2 at 2; 73-35 at 2.)

1  Use Compliance, Advanced Clean Trucks and Advanced Clean Fleet Regulatory Implementation

2  Efforts"; "Appendix D – Support for CARB's Regulations and for States that have Adopted

3  CARB Regulations per [Section 177 of the Clean Air Act]." (*Id.* at 8–17.)

4      The Clean Truck Partnership states that the signatory manufacturers:

5          commit to meet, in California, the relevant provisions of the CARB
           regulations set forth in Appendices A and B, and any agreed upon
6          modifications to such regulations as set forth in this Agreement,
           irrespective of the outcome of any litigation challenging the waivers
7          or authorizations for those regulations or of CARB's overall
           authority to implement those regulations.
8

9  (*Id.* at 3.) Further, the signatory manufacturers and EMA agreed that they:

10         will not (i) challenge CARB's issuance of the regulations set forth
           in Appendix B; (ii) file a Petition for Review or otherwise challenge
11         any U.S. EPA waiver or authorization granted for such regulations;
           (iii) file amicus briefs supporting challenges to such waivers or
12         authorizations, or such regulations; or (iv) support stay motions or
           similar motions practice challenging such waiver or authorization
13         decisions, or such regulations.

14  (*Id.*)

15      Notably, in Appendix B, the signatory manufacturers "commit to meet, in California, the

16  requirements" of several listed regulations, including "the 100 percent ZEV sales

17  requirement set forth in Cal. Code Regs title 13, section 2016, as it existed on April 28, 2023."

18  (Doc. No. 73-35 at 12.) That is the model year 2036 zero-emissions requirement from the ACF

19  regulations for which CARB had not yet obtained a preemption waiver, and although CARB

20  subsequently submitted a preemption waiver request, it later withdrew its request. (*See* Doc. No.

21  73-30 at ¶ 20).

22      The Clean Truck Partnership states that the "[t]he Parties acknowledge the efforts that

23  have resulted in this Agreement and their respective commitments to follow through in

24  implementing the Agreement," *id.*, though the agreement does not include any enforcement or

25  penalty provisions or otherwise set forth any general consequences for failure to follow through

26  with the commitments made in the agreement.[11]

27  ───────────────

28  [11]  Appendix A does state that, "[t]o give certainty regarding what happens if legacy thresholds
       are exceeded, CARB has clarified the consequence if the legacy caps are exceeded, as detailed in

On July 6, 2023, EMA issued a press release titled, "CARB and truck and engine manufacturers announce unprecedented partnership to meet clean air goals: The new Clean Truck Partnership agreement offers flexibility to address public health of Californians and the needs of fleet manufacturers that build the technology required for the transition to zero-emissions." (Doc. No. 73-37 at 2.) That press release included several quotes from signatories to the agreement: EMA's president stated, "[t]hrough this agreement, we have aligned on a single nationwide nitrogen oxide emissions standard, secured needed lead time and stability for manufacturers, and agreed on regulatory changes that will ensure continued availability of commercial vehicles"; a vice president at Daimler stated, "[a]t Daimler Truck we continue working towards achieving our goal of offering only carbon-neutral vehicles by 2039. For the overall industry transformation to become a reality, we believe the key to success is a close collaboration with all our stakeholders"; PACCAR's chief technology officer stated, "[t]his agreement provides regulatory certainty and supports a balanced transition to zero emissions by ensuring continued supply of product into California and opt-in states"; and a vice president at Volvo stated, "[t]he Volvo Group is pleased to support this joint agreement between [CARB] and [EMA]. We believe this lays the foundation for our customers to have the greatest possible product availability consistent with California's climate change and air quality goals. Through cooperative efforts such as this, the Volvo Group believes we can achieve the quickest and least disruptive transition to a commercial zero-emission vehicle future." (*Id.* at 3–4.) Other signatory manufacturers who are not plaintiffs in this case, such as Cummins Inc. and Ford Motor Company, similarly lauded the Clean Truck Partnership.[12]

---

footnotes 1 and 2," and those footnotes in turn provide that all vehicles sold above those thresholds "would be considered as non-compliant sales." (Doc. No. 1-2 at 8 n.1, 2.)

[12]  One of the commitments made by the signatory manufacturers was to meet the requirement of Cal. Code Regs., tit. 13, § 2016, which requires "all new, medium- and heavy-duty vehicles sold in California beginning with the 2036 model year be zero-emissions vehicles." (Doc. No. 73-35 at 12.) As described above, that sales requirement was part of the Advanced Clean Fleets regulation, for which CARB did not obtain a preemption waiver. In part for this reason, in December 2024, the American Free Enterprise Chamber of Commerce (on behalf of its members, manufacturers of internal-combustion engines and their customers) filed a lawsuit against all signatories to the Clean Truck Partnership, alleging that the agreement is an attempt to enforce standards that are preempted by the Clean Air Act. *See Am. Free Enter. Chamber of Com. v. Engine Mfrs. Ass'n*, No. 3:24-cv-50504 (N.D. Ill. Dec. 16, 2024); (Doc. No. 1 at ¶ 46). That litigation remains

1    (*Id.*)

2    /////

3    **C.    Congressional Review Act**

4           In the "Statutory and Executive Order Reviews" section of EPA's notices of decision

5    granting preemption waivers for the ACT regulations, the Omnibus regulations, and the

6    Advanced Clean Cars II regulations, EPA states, "the Congressional Review Act, 5 U.S.C. [§]

7    801, *et seq*., . . . , does not apply because this action is not a rule for purposes of 5 U.S.C. [§]

8    804(3)." 88 Fed. Reg. 20688, 20725; 90 Fed. Reg. 643, 645; 90 Fed. Reg. 642, 643.

9           The Congressional Review Act ("CRA"), codified at 5 U.S.C. §§ 801–808, was "enacted

10   as part of the Contract with America Advancement Act of 1996" and "was designed to give

11   Congress an expedited procedure to review and disapprove federal regulations." *Ctr. for*

12   *Biological Diversity v. Bernhardt*, 946 F.3d 553, 556 (9th Cir. 2019); (Doc. No. 56 at ¶ 27). "The

13   CRA establishes a set of Congressional procedures for reviewing and disapproving certain agency

14   rules through joint resolutions passed by majority vote of both the House and Senate and

15   presented to the President." (Doc. No. 56 at ¶ 27.) The CRA "provides that '[b]efore a rule can

16   take effect, the Federal agency promulgating such rule shall submit' a report that includes 'a

17   concise general statement relating to the rule' and a 'proposed effective date.'" *Bernhardt*, 946

18   F.3d at 556 (quoting 5 U.S.C. § 801(a)(1)(A)). Congress then has a specific period of time after

19   receiving the agency's report to—if it chooses to do so—"enact a joint resolution that disapproves

20   the regulation and states that 'such rule shall have no force or effect.'" *Bernhardt*, 946 F.3d at 557

21   (quoting 5 U.S.C. § 802(a)). "If the House and Senate pass a joint resolution of disapproval, and

22   the President signs it into law,[13] the agency's rule 'shall not take effect (or continue).'"

23   *Bernhardt*, 946 F.3d at 557 (quoting 5 U.S.C. § 801(b)(1)). The CRA also provides that "[a]ny

24   rule that takes effect and later is made of no force or effect by enactment of a joint resolution

25   pending.

26   [13] When Congress passes resolutions of disapproval in both houses pursuant to the CRA and
     presents them to the President for signature or veto, Congress complies with the process of
27   bicameralism and presentment. *Bernhardt*, 946 F.3d at 562 ("Under the Presentment Clause, the
     House of Representatives and the Senate must each pass a bill, and then present it to the
28   President, who may then sign the bill into law.") (citing U.S. Const. art. I, § 7, cl. 2).

under section 802 shall be treated as though such rule had never taken effect." 5 U.S.C. § 801(f).

Further, a disapproved rule "may not be reissued in substantially the same form, and a new rule

that is substantially the same as such a rule may not be issued, unless the reissued or new rule is

specifically authorized by a law enacted after the date of the joint resolution disapproving the

original rule." 5 U.S.C. § 801(b)(2). Moreover, the CRA provides that "[n]o determination,

finding, action, or omission under this chapter [i.e., the CRA] shall be subject to judicial review."

5 U.S.C. § 805.

   The CRA defines the term "rule" by referring to the definition of "rule" in the

Administrative Procedure Act, codified at 5 U.S.C. § 551–559, with some exceptions. 5 U.S.C.

§ 804(3). Under the Administrative Procedure Act,

> "rule" means the whole or a part of an agency statement of general
> or particular applicability and future effect designed to implement,
> interpret, or prescribe law or policy or describing the organization,
> procedure, or practice requirements of an agency and includes the
> approval or prescription for the future of rates, wages, corporate or
> financial structures or reorganizations thereof, prices, facilities,
> appliances, services or allowances therefor or of valuations, costs,
> or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). The CRA incorporates this definition of "rule" but also provides some

exceptions, clarifying that for CRA purposes, the term "rule" does not include:

> (A) any rule of particular applicability, including a rule that
> approves or prescribes for the future rates, wages, prices, services,
> or allowances therefor, corporate or financial structures,
> reorganizations, mergers, or acquisitions thereof, or accounting
> practices or disclosures bearing on any of the foregoing;
>
> (B) any rule relating to agency management or personnel; or
>
> (C) any rule of agency organization, procedure, or practice that
> does not substantially affect the rights or obligations of non-agency
> parties.

5 U.S.C. § 804(3).

   The CRA itself does not provide a process for Congress to review an agency's

determination that an action it has taken constitutes a "rule" (or does not constitute a rule) under

the CRA. However, as described in detail in a Congressional Research Service report, Congress

and the Government Accountability Office[14] ("GAO") have developed a process by which members of Congress can request GAO to provide a formal legal opinion on whether a particular agency action qualifies as a "rule," and an affirmative answer from GAO enables Congress to use the CRA procedures notwithstanding the agency's decision not to submit its action to Congress as a "rule." *See* Valerie C. Brannon & Maeve P. Carey, Cong. Rsch. Serv., R45248, The Congressional Review Act: Determining Which "Rules" Must Be Submitted to Congress (Oct. 22, 2024). For example, in May 2022, U.S. Senator Shelley Moore Capito sought such a legal opinion from GAO regarding whether EPA's notice of its decision to reinstate a preemption waiver granted to CARB for its Advanced Clean Car Program was a "rule" under CRA. (*See* Doc. No. 73-10 at 2.) On November 30, 2023, GAO issued its decision on that request and concluded that EPA's notice was not a "rule" and was instead "an adjudicatory order because it is a final disposition rescinding a waiver withdrawal for California's Advanced Clean Car Program, bringing back into force a waiver of preemption to enforce the program." (*Id.* at 8.)

No member of Congress sought a GAO legal opinion following the issuance of EPA's notices of decision to grant preemption waivers for the CARB regulations at issue in this case. (Doc. No. 73-16 at 6.) In a "one-pager" for his proposed legislation to repeal the Clean Air Act's waiver provision (the Stop CARB Act), U.S. Senator Mike Lee noted that California's Clean Air Act "federal preemption waivers cannot be reviewed under the Congressional Review Act (CRA) because the waiver granted by EPA is not a rule as that term is defined in the CRA." (Doc. No. 73-11.) Similarly, a House member's press release announcing introduction of the Stop CARB Act states, "CARB has over 100 active waivers that set higher emissions standards than [EPA], and none of them are subject to congressional review." (Doc. No. 73-12.)

Nevertheless, on February 14, 2025, President Trump and the new EPA Administrator issued a press release announcing that EPA is transmitting to Congress "California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus NOx rules" for review in "accordance with statutory review requirements." (Doc. No. 73-13.) On February 19, 2025, EPA submitted to

---

[14] "The GAO is an independent agency within the legislative branch that exists in large part to serve the needs of Congress." *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983).

16

Congress for its review under the CRA the notices of decision EPA issued for the ACT

regulations and Advanced Clean Cars II regulations. (Doc. Nos. 73-14 at 2, 4; 73-15 at 3.) On

March 5, 2025, EPA similarly submitted the Omnibus regulations to Congress for review under

the CRA.[15] (Doc. No. 73-17 at 2, 4.)

**D.    Resolutions of Disapproval**

On April 2, 2025, members of the U.S. House of Representatives introduced resolutions of

disapproval under the CRA, specifically House Joint Resolution 87 to disapprove of the ACT

regulations ("H.J. Res. 87"), House Joint Resolution 88 to disapprove of the Advanced Clean

Cars II regulations ("H.R. Res. 88"), and House Joint Resolution 89 to disapprove of the Omnibus

regulations ("H.J. Res. 89"), as follows:

> H.J. Res. 87. A joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to "California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification; Waiver of Preemption; Notice of Decision"; to the Committee on Energy and Commerce.

> H.J. Res. 88. A joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to" California State Motor Vehicle and Engine Pollution Control Standards; Advanced Clean Cars II; Waiver of Preemption; Notice of Decision"; to the Committee on Energy and Commerce.

> H.J. Res. 89. A joint resolution providing congressional disapproval under chapter 8 of title 5, United States Code, of the rule submitted by the Environmental Protection Agency relating to " California State Motor Vehicle and Engine and Nonroad Engine Pollution Control Standards; The 'Omnibus' Low NOX Regulation; Waiver of Preemption; Notice of Decision"; to the Committee on Energy

---

[15]  Shortly after EPA's submission to Congress in February 2025, three U.S. Senators (Sheldon Whitehouse, Alex Padilla, and Adam Schiff) requested GAO provide a legal decision regarding whether those preemption waivers and notices of decision are "rules" subject to the CRA. (*See* Doc. No. 73-16 at 2.) In GAO's letter responding to that request, GAO referred to its November 30, 2023 response to Senator Capito's request for a legal opinion as to the Advanced Clean Car Program and explained that its "prior analysis and conclusion"—that the preemption waiver notice is an order, not a rule—"would apply to the three notices at issue here." (*Id.* at 8, 10.) GAO also noted that "EPA did not explain in either submission why the agency was submitting the notices under CRA given its statement in each notice that CRA did not apply." (*Id.* at 7.)

1    and Commerce.

2    171 Cong. Rec. H1411-02, H1412.

3        On April 30, 2025 and May 1, 2025, the full House considered those resolutions and

4    passed all three of them. *See* Pub. L. No. 119-15, June 12, 2025, 139 Stat. 65 (ACT); Pub. L. No.

5    119-16, June 12, 2025, 139 Stat. 66 (Advanced Clean Cars II); Pub. L. No. 119-17, June 12,

6    2025, 139 Stat. 67 (Omnibus). On May 21 and 22, 2025, the Senate likewise considered and

7    passed each of the joint resolutions. *Id.* On June 12, 2025, the President signed the joint

8    resolutions, which state:

9        Resolved by the Senate and House of Representatives of the United
10       States of America in Congress assembled, That Congress
         disapproves the rule submitted by the Environmental Protection
         Agency relating to "California State Motor Vehicle and Engine
11       Pollution Control Standards; Heavy-Duty Vehicle and Engine
         Emission Warranty and Maintenance Provisions; Advanced Clean
12       Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train
         Certification; Waiver of Preemption; Notice of Decision" (88 Fed.
13       Reg. 20688 (April 6, 2023)), and such rule shall have no force or
         effect.
14
         Resolved by the Senate and House of Representatives of the United
15       States of America in Congress assembled, That Congress
         disapproves the rule submitted by the Environmental Protection
16       Agency relating to "California State Motor Vehicle and Engine
         Pollution Control Standards; Advanced Clean Cars II; Waiver of
17       Preemption; Notice of Decision" (90 Fed. Reg. 642 (January 6,
         2025)), and such rule shall have no force or effect.
18
         Resolved by the Senate and House of Representatives of the United
19       States of America in Congress assembled, That Congress
         disapproves the rule submitted by the Environmental Protection
20       Agency relating to "California State Motor Vehicle and Engine and
         Nonroad Engine Pollution Control Standards; The "Omnibus" Low
21       NOX Regulation; Waiver of Preemption; Notice of Decision" (90
         Fed. Reg. 643 (January 6, 2025)), and such rule shall have no force
22       or effect.

23   *Id.* In the President's signing statement, the President stated, "[b]ecause of the joint resolutions I

24   signed today, California's Advanced Clean Cars II, Advanced Clean Trucks, and Omnibus Low

25   NOX programs are fully and expressly preempted by the Clean Air Act and cannot be

26   implemented." (Doc. No. 56 at 83.)

27   **E.      California's Response to the Resolutions of Disapproval**

28       After Congress passed the resolutions of disapproval, but before the President signed them

18

1  into law, CARB issued guidance to manufacturers informing them that CARB will continue to

2  accept and process certification applications for model year 2026, a process that was already well

3  underway. (Doc. Nos. 1 at ¶ 61; 23-16 at 3–4.) Specifically, CARB issued a manufacturers

4  advisory correspondence ECCD-2025-03 on May 23, 2025 ("the May MAC") clarifying CARB's

5  intention to continue enforcing its regulations (including ACT, Omnibus, and Advanced Clean

6  Cars II) even if the President signed the joint resolutions of disapproval, which CARB "contends

7  are the result of illegal actions and thus invalid." (Doc. No. 23-16 at 2.)

8        In the hours following the President's signing of the joint resolutions on June 12, 2025,

9  California filed a lawsuit challenging those allegedly unlawful resolutions,[16] (Doc. No. 1 at ¶ 8),

10  and California's Governor Gavin Newsom issued Executive Order N-27-25 (the "Executive

11  Order") to "reaffirm[] [California's] commitment to accelerate the deployment of zero-emission

12  technologies," (Doc. No. 23-17). The Executive Order sets forth several directives to CARB and

13  other state agencies and departments. (*Id.*) The Executive Order directs CARB to develop and

14  propose regulations "to advance progress towards the deployment of clean air vehicles and

15  technologies in the State, as an additional measure to build on existing regulations or as an

16  alternative measure for deployment if the federal disapprovals of the Advanced Clean Cars II,

17  [ACT], and [Omnibus] regulations are not invalidated in court." (*Id.* at 3–4.) The Executive Order

18  also directs CARB to maintain lists of manufacturers who continue to comply with CARB

19

20      [16]  On June 12, 2025, California and ten other states filed a declaratory relief action against the

21  United States, the EPA, the EPA Administrator Lee Zeldin, and President Donald J. Trump in the
    United States District Court for the Northern District of California. *State of California, et al. v.*

22  *United States of America, et al*., No. 4:25-cv-04966-HSG (N.D. Cal. June 12, 2025). The
    plaintiffs in that case seek a declaration that "the Resolutions are unconstitutional and have no

23  effect on the status or enforceability of state emissions control programs," or alternatively, that
    the resolutions "were not enacted under the CRA because these waivers are not 'rules' under that

24  statute." *California*, No. 4:25-cv-04966-HSG, First Am. Compl., Doc. No. 157 at ¶ 13 (N.D. Cal.
    Oct. 10, 2025). Those plaintiffs also request the court "declare that EPA's post-hoc purported

25  reclassification and submission of these waivers as supposed 'rules' subject to the CRA were
    unlawful actions and enjoin EPA from similarly targeting other preemption waivers." *Id.* Pursuant

26  to a stipulation by the parties, and due to the federal government shutdown and lapse in
    appropriations to fund defense counsel, the court granted an extension of time for the United

27  States to file its anticipated motion to dismiss and set a hearing for January 29, 2026 on that

28  motion. *California*, No. 4:25-cv-04966-HSG, Order, Doc. No. 162 (N.D. Cal. Oct. 23, 2025).

requirements and to use those lists to prioritize those manufacturers when making decisions on procurement, funding, and incentive programs. (*Id.* at 4.) Further, the Executive Order directs CARB to "continue to work with manufacturers consistent with the commitments made in the Clean Truck Partnership," and to provide the Governor with a report "every six months on manufacturer progress towards those commitments." (*Id.*)

## F.     Cease-and-Desist Letters

On August 7, 2025, the U.S. Department of Justice sent letters to Plaintiffs Daimler, Volvo, and International stating that CARB's "so-called 'Clean Truck Partnership' is an illegal attempt to enforce preempted state vehicle emission regulations."[17] (Doc. Nos. 23-19, 23-21, 23-24.) In that letter, the DOJ explains its view that in light of the joint resolutions of disapproval, "[f]ederal law [] prohibits CARB from adopting or attempting to enforce those regulations," and "CARB may not circumvent federal law by disguising its enforcement of vehicle emissions regulations as an 'agreement,'" especially "where the purported agreement was entered into under threat of enforcement of the very regulations that federal law preempts." (Doc. Nos. 23-19 at 2.) Further, the DOJ states that "by its own terms, the Clean Truck Partnership is the regulatory mechanism by which CARB attempts to enforce preempted California emissions standards." (*Id.* at 3.) The DOJ's letter concludes with the following directive: "[B]ecause CARB's regulations are preempted, the Clean Truck Partnership is preempted and unlawful. You must therefore immediately cease and desist your compliance with both the Clean Truck Partnership and its preempted state vehicle emission regulations." (*Id.*)

The DOJ letter does not mention any consequences that would befall a recipient who did not comply with the cease-and-desist directive, such as penalties, fines, or other enforcement action that the federal government would take in response.

## G.     Manufacturers Advisory Correspondence Issued August 25, 2025

On August 25, 2025, CARB issued a new manufacturers advisory correspondence ECCD-

---

[17]  The declaration of Carl Hergart, a senior director at PACCAR, does not mention PACCAR receiving a cease-and-desist letter nor attach a copy of a cease-and-desist letter as an exhibit. (*See* Doc. No. 23-22.)

2025-08 ("the August MAC"), which supersedes the May MAC, to address manufacturers' questions and "provide further clarity on how CARB will process the applications for certifications that it continues to receive, so that vehicle and engine manufacturers may continue to offer, sell, and deliver new vehicles and engines in the state amid the ongoing legal uncertainty caused by the federal government." (Doc. No. 73-32 at 3.) The August MAC explains that manufacturers may obtain approval from CARB to sell vehicles and engines in California through three pathways: (1) certify to the CARB regulations that were disapproved of by the congressional resolutions (i.e., ACT, Omnibus, and Advanced Clean Cars II); (2) certify to the CARB regulations "that immediately preceded those covered by the waivers that were targeted by the congressional resolutions"; and/or (3) certify to the federal EPA standards and submit that EPA certification to CARB. (*Id.*) However, as to manufacturers who opt for the second and third pathway, the August MAC advises:

> CARB reserves its right to enforce the regulations covered by the waivers targeted by the congressional resolutions in the event a court of law holds those resolutions invalid, including with respect to model years that such manufacturers ask CARB to certify under these alternative pathways. Whether CARB opts to pursue such enforcement would be decided if and when that question becomes ripe.

(*Id.* at 4.)

## PROCEDURAL BACKGROUND

On August 11, 2025, the OEM Plaintiffs filed this lawsuit for declaratory judgment and injunctive relief against Defendants CARB, Steven S. Cliff in his official capacity as the Executive Officer of CARB, and Gavin C. Newsom in his official capacity as the Governor of California. (Doc. No. 1.) Plaintiffs bring this action "with the goal of clarifying and establishing the regulatory obligations that they must follow to lawfully offer products for sale in California and the various opt-in states, and to prevent California officials from violating their constitutional rights." (*Id.* at ¶ 16.)

In their complaint, Plaintiffs bring the following seven declaratory and injunctive relief claims seeking: (1) a declaration that CARB's emissions standards for heavy-duty vehicles are preempted by the Clean Air Act, and an injunction barring Defendants from enforcing those

preempted standards; (2) a declaration that CARB's May 23, 2025 MAC and the Governor's Executive Order N-27-25 violate the Clean Air Act and the Supremacy Clause of the U.S. Constitution, and an injunction barring Defendants "from carrying out the enforcement, compliance, and punishment directives described in the May 23, 2025 MAC and Executive Order N-27-25"; (3) a declaration that the Clean Truck Partnership violates the Clean Air Act and the Supremacy Clause of the U.S. Constitution, and an injunction barring Defendants enforcing the Clean Truck Partnership; (4) a declaration that the May 23, 2025 MAC, the Executive Order N-27-25, and the Clean Truck Partnership violate Plaintiffs' First Amendment freedom of speech rights, and an "injunction barring Defendants from using Executive Order N-27-25, the May 23, 2025 MAC, or the Clean Truck Partnership to insulate themselves from legitimate legal challenges or to punish entities that raise such challenges"; (5) a declaration that the May 23, 2025 MAC, the Executive Order N-27-25, and the Clean Truck Partnership violate Article I Section 3 of the California Constitution, and "an injunction barring Defendants from enforcing Executive Order N-27-25, the May 23, 2025 MAC, or the Clean Truck Partnership to restrict [Plaintiffs'] petitioning rights under Article I Section 3 of the California Constitution"; (6) a declaration that the May 23, 2025 MAC constitutes an underground regulation in violation of the California Administrative Procedure Act, and an injunction barring Defendants from enforcing the May 23, 2025 MAC; (7) a declaration that the Clean Truck Partnership constitutes an underground regulation in violation of the California Administrative Procedure Act, and an injunction barring Defendants from enforcing the Clean Truck Partnership. (*Id.* at ¶¶ 78, 86, 94, 114, 121, 132, 137.)

On August 12, 2025, Plaintiffs filed the pending motion for a preliminary injunction to prohibit Defendants from implementing or enforcing: (i) six CARB emissions regulations (namely, Advanced Clean Trucks, Omnibus Low NOx, Advanced Clean Cars II, Advanced Clean Fleets, Phase 2 Greenhouse Gas, and Heavy-Duty On-Board Diagnostic); (ii) the Clean Truck Partnership; (iii) the May 23, 2025 MAC; and (iv) Executive Order N-27-25. (Doc. No. 23.) In support of their motion, Plaintiffs concurrently filed the declarations of Rachel S. Brass (Plaintiffs' counsel), Andrea Brown (a director of product management at Plaintiff Volvo), Carl

1   Hergert (a senior director at Plaintiff PACCAR), Jed Mandel (the president of a non-party trade

2   group representing medium- and heavy-duty OEMs), Mike Noonan (a vice president at Plaintiff

3   International), and Daniel Potter (a manager of compliance and regulatory affairs at Plaintiff

4   /////

5   Daimler).[18] (Doc. Nos. 23-1–23-14.)

6       On August 14, 2025, the United States of America and the United States Environmental

7   Protection Agency filed a motion to intervene in this action as plaintiffs, which the court granted

8   on August 20, 2025. (Doc. Nos. 43, 54.) Plaintiffs-Intervenors filed their complaint-in-

9   intervention on August 22, 2025. (Doc. No. 56.) Therein, Plaintiffs-Intervenors bring two claims

10  for declaratory and injunctive relief. (*Id.* at 23–26.) Like the OEM Plaintiffs' first claim,

11  Plaintiffs-Intervenors likewise seek a declaration that CARB's emissions standards for heavy-

12  duty vehicles (specifically Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean

13  Fleet) are preempted by the Clean Air Act and the Supremacy Clause, and seek an injunction

14  barring Defendants from enforcing those preempted standards. (*Id.* at 23–25.) In addition, like the

15  OEM Plaintiffs' third claim, Plaintiffs-Intervenors likewise seek a declaration that the Clean

16  Truck Partnership violates the Clean Air Act and the Supremacy Clause, and seek an injunction

17  barring Defendants enforcing the Clean Truck Partnership. (*Id.* at 25–26.)

18      On August 27, 2025, Plaintiffs-Intervenors filed a joinder in the OEM Plaintiffs' pending

19  motion for a preliminary injunction, specifically joining the portions of that motion that argue

20  CARB's emissions regulations and the Clean Truck Partnership are preempted and urge the court

---

21  [18]  On August 29, 2025, OEM Plaintiffs filed a request for judicial notice, specifically asking the
22  court to take judicial notice of two state agency documents: (1) a copy of a decision from the
    State of California's Office of Administrative Law ("OAL") issued on August 18, 2025; and (2) a
23  copy of the August MAC. (Doc. No. 58.) Public records are properly the subject of judicial notice
    because the contents of such documents contain facts that are not subject to reasonable dispute,
24  and the facts therein "can be accurately and readily determined from sources whose accuracy
    cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Intri-Plex Techs. v. Crest Grp., Inc.*,
25  499 F.3d 1048, 1052 (9th Cir. 2007); *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1192
    (9th Cir. 2008) (taking judicial notice of the state public utility commission's decision to approve
26  a network interconnection agreement); *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282
    (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501
27  U.S. 104 (1991) ("[A] court may take judicial notice of 'records and reports of administrative
    bodies.'"). Accordingly, the court will grant OEM Plaintiffs' request for judicial notice.
28

1   to enjoin Defendants' enforcement of them on that basis. (Doc. No. 57.)

2          On September 16, 2025, Defendants filed an opposition to the pending motion for a

3   preliminary injunction, including Plaintiffs-Intervenors' partial joinder therein. (Doc. No. 73.) In

4   support of their opposition, Defendants concurrently filed the declarations of M. Elaine

5   Meckenstock (Defendants' counsel), Robin U. Lang (division chief of emissions certification and

6   compliance at Defendant CARB), and Kimberly Ayn Heroy-Rogalski (chief of the mobile source

7   regulatory development branch at Defendant CARB). (Doc. No. 73-1–73-42.) Defendants also

8   filed evidentiary objections to certain portions of the declarations Plaintiffs filed in support of

9   their pending motion. (Doc. No. 73-43.)

10          On September 30, 2025, Plaintiffs-Intervenors and OEM Plaintiffs filed their respective

11   replies in response to Defendants' opposition. (Doc. Nos. 74, 75.) The OEM Plaintiffs also

12   concurrently filed a second declaration from Daniel Potter and a response to Defendants'

13   evidentiary objections.[19] (Doc. Nos. 75-6, 76.) Further, in their reply, OEM Plaintiffs state they

14   "withdraw their state law allegations as a basis for this court to preliminarily enjoin Defendants'

15   conduct."[20] (Doc. No. 75 at 18 n.10.)

16          On October 14, 2025, Defendants filed an authorized sur-reply and a request for judicial

17   /////

---

18   [19]  In their evidentiary objections, Defendants object to certain portions of the declarations of Jed
19   Mandel (EMA president), Daniel Potter (Daimler compliance manager), Mike Noonan
    (International vice president), Carl Hergert (PACCAR senior director), and Andrea Brown (Volvo
20   director), on the grounds that they "present lay opinion, argument, and legal conclusions
    regarding the legal status of CARB's regulations" and "regarding the provisions of the Clean
21   Truck Partnership." (Doc. No. 73-43.) Defendants' objections are based largely on the declarants'
    use of the phrase "preempted regulations" to refer to the regulations at issue," which the court
22   views as the declarants' way of identifying the referenced regulations, rather than the declarants'
    attempt to offer an improper legal opinion or conclusion. Having reviewed and considered
23   Defendants' evidentiary objections and Plaintiffs' responses thereto, the court finds Defendants'
    objections lack merit. Accordingly, Defendants' evidentiary objections (Doc. No. 73-43) are
24   overruled.
25
    [20]  The court notes that in the motion to dismiss filed by Defendants on October 10, 2025,
26   Defendants state that "[d]uring the parties' meet and confer, Plaintiffs stated they are willing to
27   have their state law claims dismissed without prejudice." (Doc. No. 78 at 19 n.8.) Indeed, in their
    opposition to the pending motion to dismiss, Plaintiffs confirm that they are willing to dismiss
28   their state law claims (claims 5, 6, and 7) without prejudice. (Doc. No. 84 at 8 n.1.)

1    /////

2    /////

3    /////

4    notice of certain facts and documents.[21] (Doc. Nos. 80, 81.)

5                                    **LEGAL STANDARD**

6            Under Federal Rule of Civil Procedure 65, the court has the authority to issue preliminary

7    injunctive relief. An injunction is a matter of equitable discretion and is "an extraordinary remedy

8    that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*

9    *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

10   _____

     [21] Defendants request the court take judicial notice of three facts, and the existence and contents
11   of six documents. (Doc. No. 81.) Pursuant to Federal Rule of Evidence 201(b), a court may
     "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known
12   within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined
     from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). First,
13   Defendants request the court take judicial notice of the fact that "manufacturers received CARB
     approval—in the form of an Executive Order—to sell model year 2025 medium- and heavy-duty
14   engines in California that meet two different standards—the "legacy" standard (which mirrors the
     "pre-Omnibus" emission standard) and the more stringent Omnibus standard for model years
15   2024-2026." (*Id.* at 1.) Defendants contend that fact can be ascertained from "CARB's lists of
     Executive Orders for these engines, which are publicly available on a government website," for
16   which Defendants provide a hyperlink to an online Excel spreadsheet and direct the court to
     certain rows and columns of a tab that contains over 4,000 rows and 61 columns. (*Id.*) Contrary to
17   Defendants' assertion, their purported fact is not subject to judicial notice because it cannot be
     "readily" determined from the source identified (the spreadsheet), nor is it clear that this Excel
18   spreadsheet is a "source whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid.
     201(b). Thus, the court will deny Defendants' request for judicial notice of this fact. The other
19   two facts that Defendants request the court judicially notice—(1) that "in December 2022, the
     [EPA] announced new, more stringent emission standards for heavy-duty vehicles which take
20   effect beginning with model year 2027," and (2) "that EPA routinely enters into settlement
     agreements in which the agency agrees to take a particular action in a regulatory matter by a
21   specified deadline"—are derived from press releases on the EPA's website. Thus, the court will
     grant Defendants' request to take judicial notice of these two facts. *See Jarose v. Cnty. of*
22   *Humboldt*, No. 18-cv-07383-SBA, 2020 WL 999791, at *4 (N.D. Cal. Mar. 2, 2020) (taking
     judicial notice of information publicly available on the EPA's website). For the same reason, the
23   court will grant Defendants' request to take judicial notice of the existence and contents of the six
     documents requested by Defendants, which consist of (i) a webpage from the CARB's website
24   regarding a summary of credits under the Advanced Clean Trucks regulation, (ii) a template
     Fireplace Partnership Agreement from EPA's website, (iii) an EPA webpage regarding EPA's
25   Voluntary Fireplace Program, (iv) an EPA webpage regarding EPA's GreenChill Program, (v) a
     proposed settlement agreement described on EPA's website, and (vi) a Federal Trade
26   Commission press release posted on its website.

27

28

                                             25

1    A preliminary injunction may issue if a plaintiff establishes that (1) they are likely to

2    succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary

3    relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.

4    *See Winter*, 555 U.S. at 20. When the nonmovant is the government, the last two *Winter* factors

5    merge. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023).

6    The Ninth Circuit has adopted a "sliding-scale approach" where "a stronger showing of

7    one [*Winter*] element may offset a weaker showing of another." *All. for Wild Rockies v. Cottrell*,

8    632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, "'serious questions going to the merits

9    and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

10   preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

11   injury and that the injunction is in the public interest." *Id.* at 1135. "[T]he serious questions

12   standard is 'a lesser showing than likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot*

13   *Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild*

14   *Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). "Serious questions are 'substantial,

15   difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative

16   investigation.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)

17   (citation omitted). Serious questions "need not promise a certainty of success, nor even present a

18   probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (citation

19   omitted).

20   **ANALYSIS**

21   The OEM Plaintiffs seek preliminary injunctive relief based on their three preemption

22   claims—(claim 1) preemption of six regulations – ACT, Omnibus, Advanced Clean Cars II, ACF,

23   Phase 2 Greenhouse Gas, and Heavy-Duty On-Board Diagnostic; (claim 2) preemption of the

24   May MAC and Executive Order N-27-25; (claim 3) preemption of the Clean Truck Partnership—

25   and their First Amendment free speech claim (claim 4). (Doc. Nos. 23; 75 at 18 n.10.) Plaintiffs-

26   Intervenors join in seeking a preliminary injunction based on preemption of those regulations and

27   preemption of the Clean Truck Partnership. (Doc. No. 57 at 2.) The court will address each claim

28   in turn, beginning with the second *Winter* factor of whether Plaintiffs have shown "they are likely

26

1    to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20

2    **A.    Preemption of Six CARB Regulations (Claim 1)**

3    　　The court first addresses the regulations for which CARB concedes it has neither sought

4    nor obtained a waiver: Advanced Clean Fleets and Phase 2 Greenhouse Gas. Because CARB did

5    not obtain waivers for those regulations and has acknowledged it cannot enforce them unless and

6    until it receives a waiver, there is no showing of irreparable harm in the absence of an injunction

7    prohibiting CARB from enforcing those regulations. Indeed, as noted above, CARB stipulated

8    that it will not enforce the Advanced Clean Fleets's requirement of 100% zero-emission-vehicle

9    sales beginning with model year 2036. CARB has also confirmed that it is not requiring

10   manufacturers to certify to the Phase 2 Greenhouse Gas standards. Thus, Plaintiffs have not

11   demonstrated irreparable harm is likely, as is required under *Winter*. *See Ctr. for Food Safety v.*

12   *Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) (citation omitted) ("After *Winter*, 'plaintiffs must

13   establish that irreparable harm is likely, not just possible, in order to obtain a preliminary

14   injunction.'").

15   　　As for the Heavy-Duty On-Board Diagnostic regulations, Plaintiffs' allegations and

16   arguments are not consistent regarding whether CARB obtained a preemption waiver. As far as

17   the court can tell from the evidence submitted by the parties, the on-board diagnostics standards

18   were not submitted to EPA as a stand-alone regulation for its consideration in granting a

19   preemption waiver. Rather, CARB's on-board diagnostic standards were part of the amendments

20   CARB made to the Omnibus and Advanced Clean Cars II regulations, for which EPA granted a

21   preemption waiver specifically including those amendments. Because the challenged Heavy-Duty

22   On-Board Diagnostic regulations are included in the Omnibus and Advanced Clean Cars II

23   regulations, the court's analysis below regarding the Omnibus and Advanced Clean Cars II

24   applies to those regulations as well; the court will not separately address the Heavy-Duty On-

25   Board Diagnostic regulations.

26   　　As for the ACT, Omnibus, and Advanced Clean Cars II regulations, Defendants argue that

27   Plaintiffs have not met their burden of establishing irreparable harm because "CARB is not

28   currently enforcing those regulations," and "the prospect of future enforcement is speculative."

(Doc. No. 73 at 29.) In light of the August MAC clarifying that manufacturers may sell vehicles that comply with federal EPA standards—specifically through "[s]ubmission to CARB of U.S. EPA certification to its motor vehicle emission standards applicable to the given vehicle in the relevant model year, as those regulations are currently codified" (Doc. No. 73-32 at 3)— manufacturers are not required to comply with ACT, Omnibus, and Advanced Clean Cars II. That is, manufacturers are not required to obtain CARB certification to those standards (or any CARB standards) to sell vehicles in California. As a result, OEM Plaintiffs' arguments regarding the harms they would suffer from having to obtain CARB certification based on allegedly preempted standards are no longer viable arguments. OEM Plaintiffs may sell federal vehicles in California by certifying to federal EPA standards. OEM Plaintiffs have not shown how they would suffer harm from certifying to federal EPA standards; indeed, that is the relief they are ultimately seeking in this action.

OEM Plaintiffs argue they are nonetheless harmed because in the August MAC, CARB threatens to impose penalties on manufacturers who choose to sell federal trucks in California, instead of opting to certify to CARB standards. (Doc. No. 75 at 21.) But these retroactive penalties are highly speculative, given that there are multiple levels of contingencies that may never happen. For example, by the August MAC's own terms, any such retroactive penalties are contingent on a particular outcome of litigation. (Doc. No. 73-32 at 4) ("CARB reserves its right to enforce the regulations covered by the waivers targeted by the congressional resolutions in the event a court of law holds those resolutions invalid."). A court would first have to find in CARB's favor that the resolutions of disapproval are invalid and find that reinstatement of the preemption waivers for the challenged CARB regulations is the appropriate relief. The court would also have to rule that such relief applies retroactively for vehicles that have already been sold, as opposed to just prospectively for manufacturers to continue or begin selling new vehicles in California. On top of those layers of contingency, CARB would also have to decide whether to impose retroactive penalties, a decision CARB has not made, as the August MAC makes clear. (Doc. No. 73-32 at 4) ("Whether CARB opts to pursue such enforcement would be decided if and when that question becomes ripe.") For these reasons, OEM Plaintiffs have not shown that they will suffer

1  irreparable harm in the absence of an injunction prohibiting CARB from enforcing the ACT,

2  Omnibus, and Advanced Clean Cars II regulations. *See Caribbean Marine*, 844 F.2d at 675–76

3  (finding an injury was "too speculative to constitute an irreparable harm justifying injunctive

4  relief" where multiple contingencies must occur before an injury becomes concrete).

5          Likewise, the court is not persuaded by Plaintiffs-Intervenors' arguments that they are

6  suffering "per se irreparable" harm. (*See* Doc. No. 57 at 4). Plaintiffs-Intervenors argue "the

7  United States suffers irreparable harm so long as California enforces preempted regulations or

8  compels certification." (*Id.*) But as shown in the August MAC, because manufacturers can choose

9  to comply with federal EPA standards and are not required to certify to CARB standards,

10  California is not "enforc[ing] preempted regulations or compel[ling] certification." (*Id.*)

11          Because Plaintiffs have not satisfied their burden of showing they would suffer irreparable

12  harm as to their first preemption claim, the court need not address the remaining *Winter* factors,

13  such as whether Plaintiffs are likely to succeed on the merits as to this claim. Plaintiffs' motion

14  for a preliminary injunction based on their first claim will be denied.

15  **B.      Preemption of the May MAC and Executive Order N-27-25 (Claim 2)**

16          In their second claim, Plaintiffs seek a declaration that CARB's May 23, 2025 MAC and

17  the Governor's Executive Order N-27-25 violate the Clean Air Act and the Supremacy Clause.

18  (Doc. No. 1 at 33.) As an initial matter, because the May MAC was superseded by the August

19  MAC, Plaintiffs' arguments with regard to the May MAC have been rendered moot. Plaintiffs

20  argue in their reply that the August MAC similarly indicates CARB's intent to continue enforcing

21  its regulations and is therefore likewise preempted. (Doc. No. 75 at 14.) However, as discussed

22  above, the August MAC provides an option for manufacturers to sell vehicles in California by

23  complying with federal EPA standards; compliance with CARB's standards is not required. Thus,

24  for the same reasons that Plaintiffs have not sufficiently demonstrated they are likely to suffer

25  irreparable harm if CARB is not enjoined from enforcing the ACT, Omnibus, and Advanced

26  Clean Cars II regulations, Plaintiffs have similarly failed to demonstrate they would likely suffer

27  irreparable harm if the court does not enjoin implementation and enforcement of the August

28  MAC.

1    As for Executive Order N-27-25, the court agrees with Defendants that the Executive

2    Order merely provides policy priorities and directives for state agencies and departments. (See

3    Doc. No. 73 at 44–45.) Those directives pertain to future actions that might be undertaken by

4    state agencies and departments. But those actions have not happened and might not happen.

5    Consequently, Plaintiffs' purported injuries from the Executive Order are neither concrete nor

6    ripe. Here too, Plaintiffs' assertion of irreparable harm is too speculative to justify granting an

7    injunction barring Defendants from carrying out the directives in the Executive Order.

8    Thus, Plaintiffs have not satisfied their burden of showing they would suffer irreparable

9    harm as to their second preemption claim. Plaintiffs' motion for a preliminary injunction based on

10    their second claim will be denied

11    **C.    Preemption of the Clean Truck Partnership (Claim 3)**

12    In their third claim, Plaintiffs seek a declaration that the Clean Truck Partnership violates

13    the Clean Air Act and the Supremacy Clause of the U.S. Constitution, and an injunction barring

14    Defendants from enforcing the Clean Truck Partnership. (Doc. No. 1 at 94.) Plaintiff OEMs

15    allege in their complaint that in the absence of an injunction, they "will be irreparably harmed as

16    they are forced to choose between investing substantial resources to comply with ultimately

17    preempted standards on the one hand, and risking significant liability (and a loss of customer

18    goodwill) from regulatory noncompliance on the other hand." (Doc. No. 1 at ¶ 36.) Substantiating

19    these allegations with evidence, the OEM Plaintiffs point to the declarations from their

20    representatives, which describe the manufacturer's side of the CARB certification process,

21    including the time and investments made to satisfy CARB's extensive testing requirements that

22    exceed the testing required by EPA. (*See* Doc. No. 23-15 ¶¶ 9–10) ("Each year, [Daimler]

23    employees and contractors spend well over ten thousand manhours planning, preparing, and

24    submitting the required certification paperwork to CARB."); (*Id.* at ¶ 10) ("CARB's annual

25    certification requirements will conservatively cost [Daimler] at least $3.6 million for model year

26    2026 in internal expenses."); (Doc. No. 23-20 at ¶ 7) ("CARB's annual certification process

27    requires that International invest a significant amount of time and money to design, develop and

28    test its vehicles and engines. This work entails tens of millions of dollars and thousands of hours

30

1  that International and its employees are currently investing to obtain Executive Orders for each of

2  its 2026 model year vehicle and engine families."); (*Id.* at ¶ 8) (explaining that if CARB were

3  enjoined from attempting to enforce its standards "International could immediately seek to

4  modify its current California certification applications to align with federal-based requirements.

5  This would, for instance, allow International to suspend ongoing costly testing, including the

6  aging of engines, that California requires above and beyond federal testing requirements"); (Doc.

7  No. 23-23 at ¶ 11) ("It is very burdensome for Volvo to comply with CARB's emissions

8  certification processes. To receive a certification from CARB, Volvo must conduct significant

9  testing of Volvo's [Medium- and Heavy-Duty Vehicles] and engines. This process takes months

10  of preparation, testing, and analysis.").

11           In contrast to the absence of irreparable harm discussed above that was based on the

12  August MAC's provision for manufacturers to comply with federal EPA standards and the lack of

13  current enforcement by CARB of the challenged regulations, the same cannot be said of the Clean

14  Truck Partnership. Defendants argue that Plaintiffs face "no harm from continuing to comply"

15  with the Clean Truck Partnership as "[t]hey have made their choice and do not intend to comply,"

16  emphasizing the OEM Plaintiffs' disavowal of the Clean Truck Partnership. (Doc. No. 73 at 24.)

17  Specifically, Defendants point to the OEM Plaintiffs' disavowal of the Clean Truck Partnership in

18  their letters to the Federal Trade Commission on August 10, 2025, affirming that the Clean Truck

19  Partnership "became unenforceable on June 12, 2025," and that they "will independently make

20  decisions about the type and quantity of vehicles it sells without regard to whether those decisions

21  are compliant with any restrictive terms of the [Clean Truck Partnership]." (Doc. Nos. 73-38

22  (Daimler); 73-39 (International); 73-40 (PACCAR); 73-41 (Volvo).) At the time Defendants

23  raised these arguments in their opposition brief, there may have been some persuasive weight to

24  them. But whatever weight those arguments may have carried has since evaporated, and

25  Defendants' arguments now ring hollow: On October 27, 2025, just days before the scheduled

26  hearing on Plaintiffs' motion for a preliminary injunction, CARB filed a breach-of-contract

27  lawsuit against the OEM Plaintiffs seeking specific performance of the Clean Truck Partnership,

28  i.e., seeking a court order requiring OEM Plaintiffs to certify to CARB's standards—regardless of

1    whether those standards were ever the subject of a preemption waiver. (*See* Doc. No. 85.) Even if

2    the validity of the resolutions of disapproval as to the ACT, Omnibus, and Advanced Clean Cars

3    II regulations remain in doubt, CARB's filing of that lawsuit is clearly an attempt to enforce

4    preempted standards as least in part, because the model year 2036 zero-emissions requirement is

5    included in the Clean Truck Partnership yet CARB never obtained a preemption waiver for that

6    requirement. Thus, Plaintiffs have shown at a minimum that there are serious questions going to

7    the merits of their claim that the Clean Truck Partnership is preempted, and there is concrete,

8    irreparable harm due to the attempted enforcement by CARB through its recently-filed lawsuit

9    against the OEM Plaintiffs. Moreover, as a result of that lawsuit seeking specific performance as

10   a remedy, the harms identified by the OEM Plaintiffs are no longer speculative.

11        Similarly, given that CARB's lawsuit represents its attempts to enforce at least some

12   standards for which it admittedly never obtained preemption waivers, the court is persuaded by

13   Plaintiffs-Intervenors' arguments that they will suffer per se irreparable harm in the absence of an

14   injunction barring enforcement of the Clean Truck Partnership. *See Vermont Agency of Nat. Res.*

15   *v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("It is beyond doubt that the complaint asserts an

16   injury to the United States—[] the injury to its sovereignty arising from violation of its laws.");

17   *United States v. Idaho*, 623 F. Supp. 3d 1096, 1115 (D. Idaho 2022) (finding the United States

18   met its burden to show it is likely to suffer irreparable harm "as Supremacy Clause violations

19   trigger a presumption of irreparable harm when the United States is a plaintiff") (citing *United*

20   *States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), rev'd in part on other grounds, 567 U.S. 387

21   (2012) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm.")

22   (citation omitted)); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United

23   States suffers injury when its valid laws in a domain of federal authority are undermined by

24   impermissible state regulations.");

25        Thus, as to Plaintiffs' claim that the Clean Truck Partnership is preempted and should be

26   enjoined, Plaintiffs have satisfied the first and second *Winter* factors. As to the third *Winter*

27   factor, the court also finds that the balance of equities tips in Plaintiffs' favor. The harm on

28   CARB's side of the scale if the court were to preliminarily enjoin enforcement of the Clean Truck

1    Partnership is minimal given that CARB's August MAC already provides for manufacturers to

2    sell vehicles that certify to federal EPA standards during the pendency of this litigation. As to the

3    fourth and final *Winter* factor, the court also finds that an injunction is in the public interest. *See*

4    *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) (explaining that the district court's

5    conclusion that the plaintiff United States will suffer irreparable harm based on alleged

6    constitutional violations "was consistent with [the Ninth Circuit's] previous recognition that

7    preventing a violation of the Supremacy Clause serves the public interest") (citing *Arizona*, 641

8    F.3d at 366); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009),

9    *vacated and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606

10    (2012) (granting preliminary injunction barring enforcement of a state law that conflicts with

11    federal law and finding "it is clear that it would not be equitable or in the public's interest to

12    allow the state to continue to violate the requirements of federal law").

13          In sum, as to their Clean Truck Partnership preemption claim, Plaintiffs have satisfied

14    their burden to show that a preliminary injunction is warranted. Accordingly, the court will grant

15    Defendants' motion for a preliminary injunction based on their claim that the Clean Truck

16    Partnership violates the Clean Air Act and the Supremacy Clause of the U.S. Constitution. The

17    court will preliminarily enjoin Defendants from enforcing the Clean Truck Partnership.

18    **D.    First Amendment Free Speech (Claim 4)**

19          In their fourth claim, the OEM Plaintiffs seek a declaration that the May 23, 2025 MAC,

20    the Executive Order N-27-25, and the Clean Truck Partnership violate Plaintiffs' First

21    Amendment freedom of speech rights, and an "injunction barring Defendants from using

22    Executive Order N-27-25, the May 23, 2025 MAC, or the Clean Truck Partnership to insulate

23    themselves from legitimate legal challenges or to punish entities that raise such challenges."

24    (Doc. No. 1 at ¶ 114.)

25          As discussed above, the May MAC was superseded by the August MAC, so the OEM

26    Plaintiffs' First Amendment free speech arguments as to the May MAC have been rendered moot.

27          As for the Executive Order, the OEM Plaintiffs do not advance any arguments in their

28    motion or reply brief to show how the Executive Order restricts their exercise of free speech

1    rights, let alone show that they would suffer irreparable harm in the absence of an injunction

2    barring Defendants from carrying out the directives in the Executive Order. Thus, the OEM

3    Plaintiffs' motion to preliminary enjoin the Executive Order based on their First Amendment free

4    speech claim will be denied.

5          As for the Clean Truck Partnership, the court need not address the parties' First

6    Amendment arguments because the court is already enjoining Defendants from enforcing that

7    agreement.

8                                  **CONCLUSION**

9          For the reasons explained above,

10         1.     Plaintiffs' request for judicial notice (Doc. No. 58) is GRANTED;

11         2.     Defendants' request for judicial notice (Doc. No. 81) is GRANTED in part and

12                DENIED in part, as set forth in this order;

13         3.     Plaintiffs' motion for a preliminary injunction (Doc. Nos. 23, 57) is GRANTED in

14                part, and DENIED in part, as follows:

15                a.     Plaintiffs' motion for a preliminary injunction based on their claim that the

16                       Clean Truck Partnership is preempted is GRANTED; and

17                b.     Plaintiffs' motion for a preliminary injunction is otherwise DENIED;

18         4.     While this litigation is pending or until further order of this court, Defendants are

19                ENJOINED from implementing, enforcing, attempting to enforce, or threatening

20                to enforce the Clean Truck Partnership[22]; and

21   /////

22   /////

23   /////

24   /////

25   /////

26   
27   ───────────────────────
     [22] At the October 31, 2025 hearing, Plaintiffs-Intervenors requested the court enjoin CARB from
     pursuing the breach-of-contract lawsuit it filed against OEM Plaintiffs in Alameda County
28   Superior Court. The court clarifies that this injunction includes enjoining CARB from enforcing
     the Clean Truck Partnership by seeking specific performance as a remedy in that lawsuit.

5.  The court finds no bond under Federal Rule of Civil Procedure 65(c) to be necessary as to the OEM Plaintiffs, and the bond requirement does not apply to the Plaintiffs-Intervenors. *See* Fed. R. Civ. P. 65(c) ("The United States, its officers, and its agencies are not required to give security.").

IT IS SO ORDERED.

Dated:   **October 31, 2025**

Dena Coggins
United States District Judge

35