GIBSON, DUNN & CRUTCHER LLP
BENJAMIN WAGNER, ~~State Bar No.~~SBN
163581
310 University Avenue
Palo Alto, CA 94301-1744
Telephone:    650.849.5395
Facsimile:    640.849.5095
BWagner@gibsondunn.com

RACHEL S. BRASS, ~~State Bar No.~~SBN 219301
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:    415.393.8293
Facsimile:    415.393.8306
RBrass@gibsondunn.com

~~STACIE B. FLETCHER (*pro hac vice* forthcoming)~~
~~MIGUEL A. ESTRADA (*pro hac vice* forthcoming)~~
~~VERONICA J.T. GOODSON, State Bar No. 314367~~
~~1700 M Street N.W.~~
~~Washington, D.C. 20036-4504~~
~~Telephone:    202.955.8500~~
~~Facsimile:    202.467.0539~~
~~SFletcher@gibsondunn.com~~
~~MEstrada@gibsondunn.com~~
~~VGoodson@gibsondunn.com~~

~~*Attorneys for Plaintiff Daimler Truck North America LLC*~~
~~(additional counsel on signature pages)~~

STACIE B. FLETCHER, *pro hac vice*
MIGUEL A. ESTRADA, *pro hac vice*
JACOB T. SPENCER, *pro hac vice*
VERONICA J.T. GOODSON, SBN 314367
1700 M Street N.W.
Washington, D.C.  20036-4504
Telephone:    202.955.8500
Facsimile:    202.467.0539
SFletcher@gibsondunn.com
MEstrada@gibsondunn.com
JSpencer@gibsondunn.com
VGoodson@gibsondunn.com

*Attorneys for Plaintiff Daimler Truck North America LLC*
(additional counsel on signature pages)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAIMLER TRUCK NORTH AMERICA LLC, INTERNATIONAL MOTORS, LLC, PACCAR INC, and VOLVO GROUP NORTH AMERICA LLC, <br><br> Plaintiffs, <br><br> THE UNITED STATES OF AMERICA, and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Plaintiffs-Intervenors. <br><br> v. | Civil Action No. 2:25-cv-02255-DC <br><br> **CORRECTED FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** <br><br> Judge:        Hon. Dena Coggins <br> Action Filed:        August 11, 2025 |

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CALIFORNIA AIR RESOURCES BOARD;
STEVEN S. CLIFF, in his official capacity as the
Executive Officer of the California Air
Resources Board;,
and GAVIN NEWSOM, in his official capacity
as the Governor of California,

Defendants.

2

## NATURE OF THE ACTION

1.      This case arises from the State of California's ~~violation~~repeated and ongoing violations of ~~a prohibition in~~ the Clean Air Act ~~that~~.  Section 209(a) of the Clean Air Act expressly bars any State from adopting or attempting to enforce any standards relating to the control of emissions from new heavy-duty vehicles and engines, or from requiring certification before their sale or registration, without a waiver of federal preemption.  In June 2025, pursuant to the Congressional Review Act, the federal government statutorily preempted California's emissions standards governing heavy-duty vehicles and engines.  Notwithstanding that new legislation, California continues to demand compliance with its heavy-duty emissions standards, and it has threatened Original Equipment Manufacturers ("OEMs") that design, develop, manufacture and sell heavy-duty vehicles and engines—four of whom are Plaintiffs here—with civil sanctions and unfavorable regulatory treatment if the OEMs refuse to comply with the State's unlawful standards, while also taking measures to insulate itself from lawful challenges to those standards.  Indeed, in October 2025 California filed a lawsuit in state court against the OEM-Plaintiffs in this case seeking to enforce the preempted regulations at issue under the guise of contract law, including by seeking damages and specific performance.  The federal government ~~has responded in turn,~~ through the U.S. Department of Justice, ~~which~~has in turn issued Cease & Desist letters to Plaintiff OEMs stating that California's enforcement of its standards is contrary to federal law, and directing Plaintiff OEMs to immediately cease and desist compliance with California's preempted and unlawful mandates.  They have also sued to permanently enjoin California's attempts at enforcement.  In the meantime, Plaintiffs are caught in the crossfire: California demands that OEMs follow preempted laws; the United States maintains such laws are illegal and orders OEMs to disregard them.  This situation is not tenable.  Accordingly, Plaintiff OEMs ~~file~~filed this lawsuit to clarify their legal obligations under federal and state law and to enjoin California from ~~enforcing~~any and all attempts to enforce standards or certification requirements preempted by federal law.

2.      Recognizing the harms that would result from a patchwork of environmental regulations, Congress in 1970 enacted Title II of the Clean Air Act, which authorizes the Environmental Protection Agency ("EPA") to establish a comprehensive program for regulating emissions from new motor vehicles.  42 U.S.C. § 7522(a)(1).  To that end, the Clean Air Act explicitly preempts state laws

3

that regulate motor vehicle emissions with one exception—EPA may waive the application of federal preemption for California emissions standards under certain defined circumstances.  42 U.S.C. § 7543. Once EPA has issued a waiver, other states are permitted to opt-in to California's standards under section 177 of the Clean Air Act.  42 U.S.C. § 7507.

3. As a result, there have historically been two distinct sets of emissions standards applicable to vehicle manufacturers, including manufacturers of heavy-duty vehicles and engines:  (1) standards promulgated by the California Air Resources Board ("CARB"), and ~~then~~ approved by EPA, that apply in California and any other state that has adopted California's standards; and (2) standards promulgated by EPA.

4. When CARB has EPA-approved emissions standards, CARB's authority extends to imposing a requirement on sellers of heavy-duty trucks in California to certify that their vehicles comply with CARB standards.  Obtaining CARB certification imposes additional and often more onerous testing requirements on manufacturers, requires manufacturers to submit extensive documentation to CARB, and imposes other California-specific requirements, including labelling requirements for trucks and engines subject to CARB's certification authority.

~~4.~~5. From 2021 to 2023, CARB promulgated a series of emissions standards significantly more stringent than their federal counterparts on heavy-duty trucks, including those manufactured by Plaintiff OEMs, and sought preemption waivers from the Biden Administration EPA.[1]  ~~As part of its program, CARB requires that sellers of heavy-duty trucks in California certify that their vehicles comply with CARB standards.~~

~~5.~~6. The inconsistent regulatory requirements resulting from those standards created an unstable and untenable landscape for manufacturers of heavy-duty trucks and engines, including Plaintiff

---

[1] California regulations for emissions from new motor vehicles and engines are divided into categories based on vehicle weight, with the largest vehicles and engines categorized as "heavy-duty," moderately sized vehicles often used in commercial applications falling into the "medium-duty" category, and most cars and pickup trucks referred to as "light-duty."  *See, e.g.*, Cal. Code Regs. tit. 13, §§ 1900 (b)(5), (b)(6).  Federal law also categorizes certain types of vehicles as "heavy duty" vehicles or engines.  *See, e.g.,* 42 U.S.C. § 7521(a)(3)(B) (directing EPA to set emissions standards applicable to "heavy-duty vehicles or engines").  This complaint refers to "heavy-duty trucks" or "heavy-duty vehicles" as shorthand for the vehicles and engines, including medium-duty vehicles and engines, covered by the California regulations described herein and which are manufactured by ~~the plaintiffs~~Plaintiffs.

4

OEMs, and their customers.  Among other things, ~~the misaligned~~ California's aggressive emissions standards—and their lack of alignment with federal ~~and California emissions~~ standards —provided Plaintiff OEMs with barely two years of lead time to comply ~~with California's aggressive emissions standards~~, a woefully inadequate compliance window given that the Clean Air Act itself mandates a minimum of *four* years of lead time for any new pollutant standards for heavy-duty vehicles.  42 U.S.C. § 7521(a)(3)(C).  California's ~~most recent tailpipe emissions rules for trucks also did not align~~lack of alignment with corresponding federal standards~~, creating~~ also created significant development and technical feasibility issues for industry.  *See* Complaint*, Engine Mfrs. Ass'n v. Cal. Air Res. Bd.*, No. 2:22-cv-03663-JFW-PVC (C.D. Cal. May 27, 2022).

~~6.~~7.    To address these concerns, heavy-duty truck and engine manufacturers and their trade association petitioned CARB for relief from these infeasible regulatory requirements.  The result, in July 2023, was the "Clean Truck Partnership," in which CARB outlined a plan to undertake regulatory changes sought by industry—specifically, that CARB would exercise its regulatory authority to harmonize federal and California tailpipe emissions standards ~~with~~, promulgate agreed-upon regulatory amendments, and provide sufficient lead time for future regulations.  As conditions for this relief, CARB extracted new concessions from the manufacturers, including that the manufacturers would comply with CARB's emissions standards "irrespective of the outcome of any litigation challenging" them or CARB's authority to implement those standards.  *See* Clean Truck Partnership ("CTP"), Ex. A, ¶ 2 & App'x B ~~(emphasis added).~~.

~~7.~~8.    Under the Biden Administration, EPA had issued preemption waivers relating to CARB's emissions standards governing certifications of heavy-duty trucks.  ~~But earlier this year~~In May 2025, Congress acted through a bicameral legislative process under the Congressional Review Act to pass joint resolutions disapproving the EPA's earlier preemption waivers for California.  On June 12, 2025, the President signed those Congressional ~~resolutions~~Resolutions, creating new federal laws that ~~expressly preempt~~void those waivers, rendering California's heavy-duty vehicle emissions standards ~~under~~ expressly preempted by the Clean Air Act.  In taking this action, the President emphasized that the federal government must have a primary role in regulating vehicle emissions due to the

1  "inherently interstate nature of air quality" and explained that these new laws would avoid an "unwork-

2  able" "patchwork of State vehicle regulations."  Statement by the President, The White House (June

3  12, 2025) ("June 12 Statement by the President"), https://perma.cc/Y4JJ-4HLS.  As a result of con-

4  gressional disapproval of EPA's previously issued waivers, California (and other states) are now pro-

5  hibited by ~~federal law~~the Clean Air Act from adopting ~~and~~or attempting to enforce emissions-related

6  standards~~.  EPA's emissions~~, or from imposing conditions precedent, including certification require-

7  ments, before the initial sale or registration of vehicles subject to those standards.  EPA's emissions

8  standards and certification requirements now apply exclusively on a nationwide basis, including in

9  California.  And DOJ has issued a letter to Plaintiff OEMs stating that "Federal law thus prohibits

10 CARB from adopting or attempting to enforce those regulations" governing heavy-duty trucks, and

11 ordering Plaintiff OEMs to cease compliance with the preempted rules.  *See, e.g.*, Ex. B (U.S. Dep't of

12 Just., Env't & Nat. Res. Div., Cease & Desist Letter (Aug. 7, 2025) [hereinafter Aug. 7, 2025, DOJ

13 Letter]), at 1.  EPA's emissions standards now apply exclusively on a nationwide basis, including in

14 California.

15     8.9.    ~~California nevertheless~~On the same day the President signed the Congressional Resolu-

16 tions disapproving California's preemption waivers, California sued the United States in the U.S. Dis-

17 trict Court for the Northern District of California, alleging that ~~the Congressional resolutions disap-~~

18 ~~proving California's preemption waivers~~those Resolutions are unlawful and unconstitutional.  *Califor-*

19 *nia v. EPA*, No. 3:25-cv-04966-HSG (N.D. Cal. filed June 12, 2025).  California ~~has~~did not ~~moved~~

20 move for preliminary relief~~.~~ or expedition.  As of the filing of this Amended Complaint, ~~the United~~

21 ~~States has not made any responsive filing.  That case~~motion to dismiss briefing is ongoing ~~and will~~

22 ~~continue without a resolution for months or longer.~~ .

23     9.10.    ~~At the same time, notwithstanding~~Notwithstanding the Congressional ~~Review Act leg-~~

24 ~~islation, California has~~Resolutions, Defendants have asserted that heavy-duty vehicle and engine man-

25 ufacturers must continue to follow California's preempted standards and obtain CARB certification to

26 lawfully sell vehicles in the State—including by pointing to the Clean Truck Partnership as a source of

27 ~~its continuing authority.  California has taken additional affirmative steps to enforce its preempted and~~

28 ~~unlawful standards:~~continuing authority.  Beginning in May 2025 and continuing through the filing of

1    this Amended Complaint, Defendants have repeatedly issued directives, rulemakings, and other official

2    documents to destabilize OEMs and create further regulatory uncertainty in an attempt to compel com-

3    pliance with California's preempted rules.  Although Defendants' actions have taken various forms, all

4    of them are part of Defendants' ongoing conduct that violates the three prohibitions in Section 209(a)

5    of the Clean Air Act against adopting, attempting to enforce, or imposing certification requirements

6    based on preempted emissions standards:

7            a.    First, California seeks to use the Clean Truck Partnership, which was

8            intended to harmonize compliance with state and federal law, to compel an entire in-

9            dustry to follow California emissions standards that are now in conflict with federal law,

10           and which have been expressly preempted by federal law.  *See* Ex. B (Aug. 7, 2025,

11           DOJ Letter) at 1-2.  In effect, California is seeking to enforce the Clean Truck Partner-

12           ship as an industry-wide mandate to follow regulations abrogated by federal legislation

13           and prohibited by federal law. This approach disregards the Clean Air Act's preemption

14           clause, which prohibits not just the adoption by any State of emissions standards re-

15           served to the federal government, but any State's "*attempt* to enforce" preempted stand-

16           ards.  42 U.S.C. § 7543(a) (emphasis added).  California also disregards the plain lan-

17           guage of the Clean Truck Partnership, which states that manufacturers are obligated to

18           follow CARB's emissions regulations "regardless of the outcome of any litigation chal-

19           lenging … those regulations, or CARB's overall authority to implement those regula-

20           tions," not federal legislative action taken to invalidate them. Ex. A (CTP), ¶ 2 & App'x

21           B.  In sum, notwithstanding Congress' removal of California's authority to regulate

22           heavy-duty trucks and engines, CARB is attempting to use the Clean Truck Partner-

23           ship—which was intended to achieve alignment with federal standards—to compel

24           compliance with misaligned and now-preempted state emission standards.  That attempt

25           is both inconsistent with the Clean Truck Partnership and violative of federal law.

26           CARB cannot attempt to enforce through a misapplied Clean Truck Partnership what

27           federal law prohibits it from doing as a regulator, nor can California contract around the

28           Supremacy Clause.

7

b.a.    ~~Second, on May 23, 2025,~~ First, on May 23, 2025—the day after the Senate passed the Congressional Resolutions—CARB issued an industry directive (in the form of a Manufacturers Advisory Correspondence or "MAC") stating that manufacturers must continue to follow CARB's preempted standards, including the certification requirement, to ensure "lawful" sales of vehicles and engines in California.—an attempt to enforce California's standards regardless of federal law. Manufacturers Advisory Correspondence ECCD-2025-3, CARB (May 23, 2025) [hereinafter May 23, 2025 MAC~~].~~], Dkt. 23-16.

b.    ~~Third~~Second, on June 13, 2025,—the day after the President signed the Congressional Resolutions—California Governor Gavin Newsom issued Executive Order N-27-25 directing CARB to continue implementing the Clean Truck Partnership and ~~threatening unfavorable regulatory treatment, as well as exclusion from government purchase and incentive programs, for~~to disadvantage vehicle and engine manufacturers who dispute the validity of the Clean Truck Partnership or do not comply with the preempted standards in several ways, including when undertaking rulemakings and structuring government purchase and incentive programs. Dkt. 23-17.

c.    Third, on August 25, 2025, CARB issued another MAC reiterating some of the requirements in the May MAC; listing new, but equally preempted or otherwise legally problematic, criteria that manufacturers must meet to obtain certification, including purported "pathways" to certification; and threatening retroactive enforcement of Omnibus Low NOx. Manufacturers Advisory Correspondence ECCD-2025-08 (August 25, 2025) [hereinafter August 25, 2025 MAC], Dkt. 58-2.

d.    Fourth, on September 15, 2025, CARB initiated an emergency vehicle emissions rulemaking ("Emergency Rulemaking") to "clarify that protective emission standards for vehicles and engines remain operative" during what CARB characterized as "unprecedented uncertainty" following the Congressional Resolutions. CARB Emergency Vehicle Emissions Rulemaking Public Notice, Dkt. 73-33 at 6–7. The Emergency Rulemaking purports to "amend" and "adopt new sections into" the California

8

Code of Regulations to "confirm that"—until a court resolves the validity of the Congressional Resolutions revoking the waivers—"certain earlier-adopted regulations (displaced by Advanced Clean Cars II and Omnibus) remain operative (as previously adopted)." *Id.* at 1. In reality, the Emergency Rulemaking seeks to establish a new emissions regulation regime, adding dozens of sections to title 13 of the California Code of Regulations under the guise of reanimating an assortment of long-superseded standards and applying them prospectively to model year 2026 and subsequent vehicles with no lead time. Further, the Emergency Rulemaking purports to codify retroactive enforcement of CARB's currently preempted standards, should developments later render those standards lawful. *Id.* at 6. CARB has also proposed to make the Emergency Rulemaking permanent. *See infra* ¶ 79..

c.e. Fifth, on October 27, 2025, CARB filed suit in state court to enforce the Clean Truck Partnership (the "Alameda County CTP Litigation") and to compel Plaintiff OEMs to follow California emissions standards that are now in conflict with, and which have been expressly preempted by, federal law. Dkt. 85-1; *see also California Air Resources Board v. Daimler Truck North America LLC et al.*, No. 25CV151420 (Alameda Sup. Ct. Oct. 27, 2025).

10.11. California also has continued to make public statements reinforcing its position that industry is obligated to disregard what CARB considers "unconstitutional and illegal resolutions purporting to overturn three of U.S. EPA's decisions to grant California waivers" regarding its emissions standards. Thus, in a July 24, 2025 press release, CARB again reinforced its view that compliance with the Clean Truck Partnership was still necessary to enable "lawful vehicle sales in California." *See* Press Release, CARB, CARB approves amendments to clean truck standards to provide flexibility while maintaining emissions benefits (July 24, 2025), https://perma.cc/8D4R-A26K.

11.12. Meanwhile, in response to CARB's actions, the federal government has reiterated that CARB's vehicle emissions standards are preempted and thus California is now prohibited from attempting to enforce the those state emissions standards at issue and certification requirements. On Au-

gust 7, 2025, the U.S. Department of Justice sent a letter to Plaintiff OEMs reinforcing that the disapproval of California's waivers by the federal legislative action has rendered California's standards preempted, and further explaining that the Clean Truck Partnership itself is preempted under federal law as "the regulatory mechanism by which CARB attempts to enforce preempted California emissions standards." *See, e.g.*, Ex. B (Aug. 7, 2025 DOJ Letter), at 2. And when CARB attempted to revitalize old standards in the Emergency Rulemaking, EPA pointed out that, "[u]ntil and unless EPA waives preemption" for the new or amended standards therein, "no such standard may have legal force or effect." *See* U.S. EPA Comment on CARB's Emergency Rulemaking (Sept. 27, 2025) at 2, https://perma.cc/CC38-K3SE.

12.13. The OEMs are in an impossible position. On the one hand, California insists that Plaintiff OEMs must follow CARB's standards, including CARB's truck and engine certification requirements, or be excluded from the California market, subjected to significant civil penalties, shut out of special considerations and flexibilities in future regulatory considerations, and excluded from state purchasing and incentive programs. On the other hand, the United States Department of Justice has issued cease-and-desist letters to Plaintiff OEMs stating that those same standards are invalid and unlawful, such that only the EPA regulations apply, and that the cornerstone of CARB's new enforcement efforts, the Clean Truck Partnership, is itself preempted by federal law. As a result, the OEMs are subject to two sovereigns whose regulatory requirements are irreconcilable and who are openly hostile to one another. Each wields a hammer to enforce its will on industry, leaving OEMs—who simply seek to sell heavy-duty trucks in compliance with the law—unable to plan with the necessary certainty and clarity where their products need to be certified for sale and by which regulatory authority.

13.14. Plaintiff OEMs have been and continue to be irreparably harmed by this uncertainty. To adequately plan product production and allocation, OEMs must know which vehicles they are authorized to sell, and *where*, well in advance of the start of a~~each~~ model year on January 1. Applying for and receiving CARB certifications takes months—by CARB's own account, the process takes at *least* sixty days but there is no deadline by which CARB must complete its certification process.[2]

---

[2] CARB, On-Road Heavy-Duty and Off-Road Compression Ignition Certification Programs: Certification Steps Overview, https://perma.cc/UUT3-HWG5.

10

OEMs must also incur significant costs and expend significant resources to engage in the certification process. To allow sufficient time for planning and running ~~its business~~their businesses, Plaintiff OEMs need to know ~~within a matter of weeks~~promptly whether they must obtain a model year ~~2026~~2027 certification from CARB in order to lawfully sell their products in California and other opt-in states, which together represent approximately 25% of the national market for new vehicle registrations for heavy-duty vehicles.[3] ~~Citing the Clean Truck Partnership, California contends that OEMs must obtain this certification to have lawful vehicle sales in California. The federal government contends that the regulatory bases for such a California certification are fully preempted by federal law and invalid~~OEMs must also incur significant costs and expend significant resources to engage in the certification process.[4] And because Defendants have repeatedly threatened retroactive enforcement of their currently-preempted regulations, *see, e.g.*, Dkt. 73-33 at 6, OEMs must continue to operate in limbo—choosing between certifying to CARB's preempted standards to avoid significant retroactive penalties, or following only federal standards (the only legally operative emissions standards post-Congressional Resolutions) at the risk of significant retroactive penalties later if CARB succeeds in its attempts to overturn the Congressionally mandated waiver revocations.

~~14.~~15. Prior to filing this lawsuit, Plaintiff OEMs and their trade association sought clarification from CARB regarding OEMs' legal obligations under the Clean Truck Partnership and CARB's underlying emissions standards, noting that the Clean Truck Partnership's requirements were invalid for several reasons, including that they were preempted under the Clean Air Act. ~~To date, CARB has declined to address the concerns raised by regulated parties, despite~~Despite requests by the Plaintiff OEMs and their trade association~~, and~~ to address these concerns raised by regulated parties, CARB has instead ~~issued the May 23, 2025 MAC and Executive Order N-27-25 without any dialogue~~pressed forward with ~~industry~~enforcement of its preempted rules and the Clean Truck Partnership on multiple fronts, as discussed above.

~~15. Furthermore, Plaintiff OEMs have a constitutional right to challenge unlawful standards~~

---

[3] CARB, States That Have Adopted California's Vehicle Regulations, https://perma.cc/PA6F-UCF4.
[4] *See* CARB, On-Road Heavy-Duty and Off-Road Compression Ignition Certification Programs: Certification Steps Overview, https://perma.cc/UUT3-HWG5.

11

1  and petition both the judiciary and the political branches for redress.  But California has attempted to

2  unconstitutionally constrain those rights in its efforts to insulate itself from lawful challenges to its

3  actions.  In that regard, the Clean Truck Partnership prohibits Plaintiff OEMs—as well as other manu-

4  facturer signatories—from challenging CARB's standards or from filing amicus briefs in support of

5  such challenges, and California officials have stated that OEMs that do so will face repercussions.

6  Plaintiff OEMs thus have been irreparably harmed as California officials infringe their constitutional

7  free speech rights.

8       16.    Plaintiff OEMs bring this civil action for declaratory and injunctive relief with the goal

9  of clarifying and establishing the regulatory obligations that they must follow to lawfully offer products

10 for sale in California and the various opt-in states, and to prevent California officials from violating

11 their constitutional rights.  An expeditious decision is~~remains~~ essential for the OEMs.

**JURISDICTION AND VENUE**

13      17.    This is an action for declaratory and injunctive relief brought under the Supremacy

14 Clause of the United States Constitution (including in reliance on this Court's equitable powers under

15 *Ex parte Young*, 209 U.S. 123 (1908)), and under 42 U.S.C. § 1983.  ~~Defendants California Air Re-~~

16 ~~sources Board and~~Defendant Steven S. Cliff, in his official capacity as the Executive Officer of ~~the~~

17 ~~California Air Resources Board (collectively, "CARB"), are~~, is charged with implementing and en-

18 forcing the standards and regulations at issue.  Defendant Gavin Newsom, in his official capacity as

19 the Governor of California, is charged with enforcing state law and has directed CARB to take actions

20 related to enforcement of the state standards and regulations discussed herein.  This Court has jurisdic-

21 tion to grant the relief sought in this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1367, 2201, and 2202.

22      18.    ~~Pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367, this action~~

23 ~~further seeks a declaration that CARB's recent actions to force OEMs into complying with its~~

24 ~~preempted standards and regulations and to restrict the speech of Plaintiff OEMs and other companies~~

25 ~~impacted by its actions violate the California Constitution and constitute underground regulations in~~

26 ~~violation of the California Administrative Procedure Act, Cal. Gov. Code §§ 11340–11361; see Cal.~~

27 ~~Civ. Code § 52.1 ("[a]ny individual whose exercise or enjoyment of rights secured by the Constitution~~

28 ~~or laws of the United States, or of rights secured by the Constitution or laws of [California]" may sue~~

12

1    ~~the persons who violated their rights for declaratory, injunctive, and monetary relief).~~

2    ~~19.~~18.  Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants main-

3    tain an office and conduct their official duties within this judicial district, and/or a substantial part of

4    the events or omissions giving rise to this action occurred within this judicial district.

5                                        **THE PARTIES**

6    ~~20.~~19.  Plaintiff Daimler Truck North America LLC is a limited liability corporation organized

7    under the laws of the State of Delaware with its principal place of business in the State of Oregon.

8    ~~21.~~20.  Plaintiff International Motors, LLC (d/b/a International Motors USA LLC in Illinois

9    and Ohio) is a limited liability corporation organized under the laws of the State of Delaware with its

10   principal place of business in the State of Illinois.

11   ~~22.~~21.  Plaintiff PACCAR Inc. is a corporation organized under the laws of the State of Dela-

12   ware with its principal place of business in the State of Washington.

13   ~~23.~~22.  Plaintiff Volvo Group North America LLC is a limited liability corporation organized

14   under the laws of the State of Delaware with its principal place of business in the State of North Caro-

15   lina.

16   ~~24.~~23.  Each Plaintiff OEM designs, develops, manufactures, and sells heavy-duty trucks.

17   Plaintiff OEMs each offer heavy-duty trucks in California and in all states that have opted into Cali-

18   fornia's rules under 42 U.S.C. § 7507.  These vehicles commonly sell for well over $100,000 when

19   sold at retail in California, and many thousands of Plaintiff OEMs' heavy-duty trucks are sold in Cali-

20   fornia and other opt-in states each year.

21   ~~25.    Under CARB's regulations, all Plaintiff OEMs are subject to CARB's enforcement of~~

22   ~~emissions standards for new motor vehicles and new motor vehicle engines.  In addition, as a regulator,~~

23   ~~CARB asserts that Plaintiff OEMs (and other manufacturer signatories) are also contractually bound~~

24   ~~to comply with the now-preempted state law emissions standards pursuant to the Clean Truck Partner-~~

25   ~~ship.  This use of the Clean Truck Partnership, a regulatory partnership originally designed to harmo-~~

26   ~~nize federal and state law, is an impermissible attempt to enforce preempted standards under the Clean~~

27   ~~Air Act.  As a result of CARB's attempts to enforce these unlawful state standards, Plaintiff OEMs~~

28   ~~currently suffer and will continue to suffer concrete and particularized injuries, which can be redressed~~

                                             13

1    ~~only by this Court's order adjudicating Plaintiff OEMs' obligations under federal and California law.~~

2    ~~Plaintiff OEMs' injuries are fairly traceable to CARB's conduct and would be redressed by a favorable~~

3    ~~decision.~~

4    　　26.　~~Defendant California Air Resources Board~~Steven S. Cliff is the Executive Officer of

5    CARB.  CARB is a branch of the California Environmental Protection Agency, which is an agency of

6    the State of California.  The California Health and Safety Code authorizes CARB to promulgate and

7    enforce regulations to control emissions from new motor vehicles and engines.  ~~CARB is headquartered~~

8    ~~in Sacramento, in the State and Eastern District of California, and held meetings in Sacramento, Cali-~~

9    ~~fornia regarding Advanced Clean Trucks, Omnibus Low NOx, Advanced Clean Cars II, and upon in-~~

10   ~~formation and belief, performed official duties related to other regulatory actions discussed herein in~~

11   ~~Sacramento, California.~~

12   　　27.24.  ~~Defendant Steven Cliff is the Executive Officer of the California Air Resources Board.~~

13   The Executive Officer of CARB is authorized to implement and enforce motor vehicle emission stand-

14   ards in the State of California.  This suit is brought against the Executive Officer in his official capacity~~,~~

15   and therefore reaches the actions of the agency.  References herein to actions taken by "CARB" should

16   be understood to refer to the Executive Officer.  The Executive Officer maintains an office in Sacra-

17   mento, in the State and Eastern District of California, and he performs his official duties in Sacramento,

18   California.

19   　　25.　Under the CARB regulations implemented by the Executive Officer, when CARB has

20   a valid waiver for its emissions standards, all Plaintiff OEMs are subject to CARB's enforcement of

21   emissions standards for new motor vehicles and new motor vehicle engines and required to obtain

22   CARB certification before selling new motor vehicles in California.  In addition, acting through the

23   regulatory powers of the Executive Officer, CARB continues to assert that Plaintiff OEMs are contrac-

24   tually bound to comply with the now-preempted state law emissions standards pursuant to the Clean

25   Truck Partnership.  This use of the Clean Truck Partnership is an impermissible attempt to enforce

26   preempted standards under the Clean Air Act.  As a result of CARB's attempts to enforce these unlaw-

27   ful state standards, Plaintiff OEMs currently suffer and will continue to suffer concrete and particular-

28

14

ized injuries, which can be redressed only by this Court's order adjudicating Plaintiff OEMs' obligations under federal law.  Plaintiff OEMs' injuries are fairly traceable to conduct of the Executive Officer as the head of CARB and would be redressed by a favorable decision.

28.26.  Defendant Gavin Newsom is the Governor of the State of California.  In addition to directingcommanding CARB to enforce the rules at issue here, Governor Newsom has threateneddirected through Executive Order detrimental regulatory treatment and exclusion from government purchase and incentive programs for vehicle and engine manufacturers that do not follow the Clean Truck Partnership or do not certify their products in compliance with preempted CARB standards.  This suit is brought against the Governor in his official capacity.  The Governor maintains an office in Sacramento, in the State and Eastern District of California, and performs his official duties in Sacramento, California.

## FACTUAL AND LEGAL BACKGROUND

### I.  The Clean Air Act and California Regulation of Heavy-Duty Vehicle Emissions

29.27.  Under Section 202(a) of the Clean Air Act, the EPA Administrator "shall by regulation prescribe … standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7521(a)(1).

30.28.  In enacting the Clean Air Act, Congress sought to construct a nationwide regulatory regime focused on limiting emissions of certain pollutants by new motor vehicles.  42 U.S.C. § 7521.  Congress entrusted this endeavor to EPA and expressly preempted State enforcement of emissions standards orand the imposition of State certification requirements.  *See* 42 U.S.C. § 7543(a).  Section 209(a) demonstrates Congress's clear intent to preempt States from adopting or enforcing standards relating to the control of emissions from—or certification requirements for—new motor vehicle engines.  *Id.*

31.29.  Specifically, Section 209(a) expressly and unequivocally states that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."  *Id.*  In addition,

15

Section 209(a) separately prohibits states from requiring "certification, inspection, or any other approval relating to the control of emissions … as a condition precedent" to initial sale or registration of a new vehicle or engine. *Id*.

32.30.   Aware of the unique air pollution concerns California faces faced in the 1960s, however, Congress also included Section 209(b), which allows EPA to grant a waiver of preemption so California can craft its own regulations under EPA's guidance. if certain statutory criteria are met.  42 U.S.C. § 7543(b).  Section 209(b) of the Clean Air Act gives EPA the authority to issue a "waiver" to California to adopt and enforce its own vehicle emissions standards that are "at least as protective of public health and welfare as applicable Federal standards," if certain statutory criteria are met." under certain circumstances, including a showing that California needs those specific standards "to meet compelling and extraordinary conditions" present at the time of the EPA determination.  42 U.S.C. § 7543(b). Section 177 of the Clean Air Act allows other states to adopt California's standards in lieu of the federal standards—in other words, to opt-in to the California program in an identical manner.  42 U.S.C. § 7507.  Absent an EPA-approved waiver, the adoption or enforcement of any state law regulating mobile source emissions is expressly preempted under federal law.  42 U.S.C. § 7543(a).

31.    A preemption waiver granted by EPA under Section 209(b) also allows California to impose a requirement for "certification … or any other approval relating to the control of emissions … as a condition precedent to sale"—a practice otherwise forbidden by the second clause of Section 209(a).  42 U.S.C. § 7543(a).  EPA implemented this statutory prohibition by allowing CARB to mandate conditions precedent where the state has received a preemption waiver for the emission standards applicable to a particular class of vehicles (as opposed to requiring CARB to seek separate preemption waivers for conditions precedent).  Final Agency Action Regarding the Motor Vehicle Provisions of the Clean Air Act, Item 6 (Conditions Precedent to the Sale, Titling, or Registration of New Motor Vehicles in California), 50 Fed. Reg. 35,122, 35,123 (Aug. 29, 1985); *see also* California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption; Notice of Determination, 55 Fed. Reg. 28,825 (July 13, 1990) (explaining that prior EPA preemption waivers for specific "classes of vehicles and engines, based on California's standards and/or accompanying enforcement procedures, removes the prohibitions of section 209(a) regarding … conditions precedent for those classes").

16

33.32.  Under the California Health and Safety Code, these conditions precedent include a requirement that new vehicles and engines receive approval from CARB before they are sold in the state, known as certification.  Cal. Health & Safety Code, §§ 43151 & 43512; *see also* § 1036.801 "Certification," California Exhaust Emission Standards and Test Procedures for 2004 and Subsequent Model Heavy-Duty Diesel Engines and Vehicles (Sept. 9, 2021) ("September 2021 CARB Heavy-Duty Test Procedures") (providing definition of "Certification" for purposes of CARB regulatory program), *incorporated by reference into* Cal. Code Regs. tit. 13, § 1956.8(b).  When successful, certification culminates in an order from CARB approving a particular vehicle or engine for sale in California during that model year.  *See* § 1036.801 "Certificate of Conformity," September 2021 CARB Heavy-Duty Test Procedures (defining the certification document issued by CARB).  Opt-in states may also require that manufacturers receive California certification before offering vehicles or engines in their states. *See, e.g.*, 310 Mass. Code Regs. 7.40 ("No person or other entity, including manufacturers, shall … deliver for sale … a new vehicle  … in or into Massachusetts unless the vehicle has received a California ARB Executive Order for all applicable requirements of Titles 13 and 17 [California Code of Regulations] ….").  Selling vehicles in California without a CARB certification is a serious offense that subjects the seller to substantial civil penalties.  *See* Cal. Health & Safety Code § 43154(a)(1).

34.33.  Despite not having waivers to adopt regulations as required by Section 209(a), relying on *the potential* to obtain preemption waivers from EPA, between 2021 and 2023, CARB adopted a series of standards applicable to the vehicles and engines manufactured by Plaintiff OEMs—including larger trucks, such as tractor-trailers, categorized as "heavy-duty" under the regulations, and more moderately sized, generally commercial vehicles categorized as "medium-duty."  But now, all of CARB's standards applicable to trucks and engines are preempted by federal law, either because the specific regulatory program was explicitly preempted due to Congressional action or because CARB acted without a waiver, and in fact, never received a waiver for the program at all.

35.34.  *First*, as explained further below, the President has signed joint resolutions of Congress that expressly preempted the following standards under the Clean Air Act:

a.    The **Advanced Clean Trucks Regulation** requires manufacturers to sell increasing percentages of zero-emissions vehicles year-over-year, or to buy credits from

17

other entities that exceeded their own percentage obligations.  *See* Cal. Code Regs. tit. 13, §§ 1963.1, 1963.2.  In April 2023, under the Biden Administration, EPA granted a waiver request for the then-current version of CARB's Advanced Clean Trucks, along with three other regulatory programs for which CARB had requested waivers (heavy-duty emission warranty requirements, zero-emission airport shuttles, and certification of zero-emission powertrains).  Notice of Decision, Advanced Clean Trucks Waiver of Preemption, 88 Fed. Reg. 20688, 20689 (Apr. 6, 2023).  As discussed further below, on June 12, 2025, the President signed legislation disapproving and abrogating this waiver for the Advanced Clean Trucks and other standards.  At signing, the President stated that Advanced Clean Trucks and the other standards covered by the invalidated waiver were "fully and expressly preempted by the Clean Air Act and cannot be implemented."  *See* Statement by the President, The White House (June 12, 2025) ("June 12 Statement by the President"), https://perma.cc/Y4JJ-4HLS.[5]

b.    The **Omnibus Low NOx Regulation** requires manufacturers to reduce heavy-duty vehicle emissions of nitrogen-oxide (NOx) and particulate matter.  *See* Cal. Code Regs. tit. 13, § 1956.8.  This regulatory package also included extensive changes to other CARB standards affecting heavy-duty engines and vehicles~~.~~, including some changes to on-board diagnostic standards.[6]  *See* CARB, Final Regulation Order, Title

---

[5] Despite Congress withdrawing the waiver of preemption that authorized Advanced Clean Trucks under the Clean Air Act, CARB recently approved new amendments to those standards changing the availability of credits used for compliance with ~~EV~~zero-emission vehicle mandates.  *See* CARB, CARB approves amendments to clean truck standards to provide flexibility while maintaining emissions benefits (July 24, 2025), https://perma.cc/8D4R-A26K.  As EPA has made clear, CARB cannot adopt or attempt to enforce the amended version of Advanced Clean Trucks until CARB receives a new waiver from EPA under Section 209 of the Clean Air Act.  *See* Sept. 27, 2025 EPA Comment, *supra*.  And because EPA cannot issue a waiver for Advanced Clean Trucks without a subsequent act of Congress, *see* 5 U.S.C. § 801(b)(2), the Advanced Clean Trucks amendments are also fully preempted under Section 209.

[6] The Heavy-Duty On-Board Diagnostic Regulations apply to the self-diagnostic systems incorporated into the computers of vehicles to monitor vehicle and engine components that can impact emissions performance.  *See* Cal. Code Regs. tit. 13, § 1971.1.  California has not obtained a separate waiver for its standards at section 1971.1 since 2016; that waiver covered only amendments to the rule through 2013.  *See* 81 Fed. Reg. 78,149 (Nov. 7, 2016).  CARB amended the standards in 2016 and 2019 but

13, at 3, Docket No. EPA-HQ-OAR-2022-0332, https://www.regulations.gov/document/EPA-HQ-OAR-2022-0332-0005.[7]  In January 2025, just before the inauguration of the new President, EPA granted a waiver request for CARB's Omnibus Low NOx—covering both the criteria pollutant standards and the other regulatory modifications included in the waiver submission.  Notice of Decision, Omnibus Low NOx Regulation Waiver of Preemption, 90 Fed. Reg. 643 (Jan. 6, 2025).  As discussed further below, on June 12, 2025, the President signed legislation disapproving and abrogating that waiver.  At signing, the President stated that Omnibus Low NOx was "fully and expressly preempted by the Clean Air Act and cannot be implemented."  *See* June 12 Statement by the President.[8]

      c.      The **Advanced Clean Cars II Regulation** primarily applies to light-duty vehicles (*e.g.*, cars and pickup trucks) but includes modifications to several other regulatory programs that apply to heavy-duty vehicles and engines.  For heavy-duty vehicles

---

did not seek a waiver in connection with either amendment.  CARB, On-Board Diagnostic Systems II, https://perma.cc/TV8H-HKLB (documenting adoption of standards on July 25, 2016); CARB, Heavy-Duty On-Board Diagnostic System Requirements 2018, https://perma.cc/P65V-YR8Q (documenting adoption of standards on Oct. 3, 2019).  Amendments to section 1971.1 adopted in the California Code of Regulations as of August 27, 2020 were included in the submission for the Omnibus waiver. *See* CARB, Final Regulation Order, Title 13, at 43, Docket No. EPA-HQ-OAR-2022-0332, https://www.regulations.gov/document/EPA-HQ-OAR-2022-0332-0005.  However, the Omnibus Waiver submission did not address the 2016 or 2019 Heavy-Duty On-Board Diagnostic Regulations, and thus, no waiver was ever obtained for these changes.

[7] Noting that the rulemaking amends the following sections of title 13, California Code of Regulations: 1900,1956.8, 1961.2, 1965, 1968.2, 1971.1, 1971.5, 2035, 2036, 2111, 2112, 2113, 2114, 2115, 2116, 2117, 2118, 2119, 2121, 2123, 2125, 2126, 2127, 2128, 2129, 2130, 2131, 2133, 2137, 2139, 2140, 2141, 2142, 2143, 2144, 2145, 2146, 2147, 2148, 2149, 2423, and 2485; and adopts title 13, California Code of Regulations, sections 2139.5, 2166, 2166.1, 2167, 2168, 2169, 2169.1, 2169.2, 2169.3, 2169.4, 2169.5, 2169.6, 2169.7, 2169.8, and 2170.

[8] Just as CARB has nevertheless pressed forward with amendments to Advanced Clean Trucks despite the Congressional Resolution disapproving its waiver, CARB has likewise sought to amend Omnibus. *See* CARB, Notice of Public Hearing (Sept. 23, 2025), https://perma.cc/2DQ9-NEVX.  As with Advanced Clean Trucks, CARB cannot adopt or enforce any amended version of Omnibus until CARB receives a new waiver from EPA under Section 209 of the Clean Air Act, and due to the Congressional Resolutions, EPA cannot issue a waiver for Omnibus without a subsequent act of Congress, *see* 5 U.S.C. § 801(b)(2).  Thus, any future amendments to Omnibus are fully preempted by Section 209 of the Clean Air Act.

and engines, Advanced Clean Cars II modified standards for evaporative emissions, Cal. Code Regs. tit. 13, § 1976, and refueling emissions, Cal. Code Regs. tit. 13, § 1978. *See* Advanced Clean Cars II, Cal. Off. of Admin. Law Approval ("ACC II OAL Approval"), at 227-30, Docket No. EPA-HQ-OAR-2023-0292, https://www.regulations.gov/document/EPA-HQ-OAR-2023-0292-0016. The on-board diagnostics standards applicable to medium-duty vehicles were also modified in Advanced Clean Cars II. Cal. Code Regs. tit. 13, § 1968.2, ACC II OAL Approval at 284–304. EPA approved the waiver for Advanced Clean Cars II, including the changes affecting heavy-duty vehicles and engines, on January 6, 2025. Notice of Decision, Advanced Clean Cars II Waiver of Preemption, 90 Fed. Reg. 642 (Jan. 6, 2025). As discussed further below, on June 12, 2025, the President signed legislation disapproving and abrogating this waiver. In a statement at signing, the President stated that Advanced Clean Cars II was "fully and expressly preempted by cannot be implemented." *See* June 12 Statement by the President. As a result, the evaporative emissions and refueling emissions standards applicable to heavy-duty vehicles and the medium-duty on-board diagnostics standards, which were included in Advanced Clean Cars II, now lack a preemption waiver for the version of the standards currently enacted in California. These standards are thus preempted and invalid.

36.35. *Second*, California has sought to implement certain standards for which it has never obtained an EPA waiver of federal preemption.

a.    The **Advanced Clean Fleets Regulation** requires, among other things, that manufacturers exclusively sell zero-emission vehicles in California beginning in model year 2036. Cal. Code Regs. tit. 13, § 2016.[9] CARB submitted a waiver request for Advanced Clean Fleets to EPA in July 2024; it then withdrew the request in January 2025. *See* Withdrawal of California's Request for a Waiver (Jan. 13, 2025), Docket No. EPA-HQ-OAR-2023-0589, https://www.regulations.gov/docket/EPA-HQ-OAR-2023-

---

[9] CARB also amended its Advanced Clean Trucks standards to incorporate by reference the 2036 combustion ban. Cal. Code Regs. tit. 13, § 1963.6.

0589.[10]  EPA has not granted a preemption waiver permitting CARB to implement the Advanced Clean Fleets Rule.  As a result, it is preempted by the Clean Air Act.  As part of a settlement with the Nebraska Attorney General, CARB has agreed to repeal the portion of the Advanced Clean Fleets regulation requiring private fleet operators to purchase zero-emissions vehicles.  *See Nebraska v. Cliff*, No. 2:24-cv-01364-TKN-CKD (E.D. Cal. 2024), Dkt. 95.  However, CARB has not repealed the manufacturer-side sales requirement.

b.      The **"Phase 2" Greenhouse Gas Regulations** reduced the greenhouse gas (GHG) emissions standards for heavy-duty vehicles and partially aligned California's GHG standards for 2021 and subsequent model years with the federal Phase 2 Greenhouse Gas standards albeit with some differences.  *See* CARB, Omnibus Regulation Clean Air Act Authorization Request Support Document, 37 (Jan. 31, 2022), https://perma.cc/7GSJ-QTBJ.  CARB previously signaled its intent to submit a waiver request to EPA for its Phase 2 GHG emissions standards, but there is no public record that CARB has submitted such a request.  *See id.* at 37 n.38 ("CARB will submit a separate waiver request for the California Phase 2 GHG Regulation"); EPA, Vehicle Emissions California Waivers and Authorizations, https://~~www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.~~perma.cc/8HZL-GKMV.  Despite the lack of preemption waiver, CARB's Phase 2 Greenhouse Gas emissions standards facially apply to manufacturers beginning in model year 2021.  *See* Cal. Code Regs. tit. 17, § 95663.  In one of CARB's ~~recent~~ di-

---

[10] More recently, CARB stated in federal court that it intends to propose repealing most of Advanced Clean Fleets to settle a pending challenge to those rules, although it has not indicated that it will repeal the model year 2036 100% zero-emission vehicle sale requirement most relevant here.  Stipulation and Request to Hold Case in Abeyance Pending Outcome of Rulemaking, *Cal. Trucking Ass'n v. Cliff*, No. 2:23-cv-02333 (E.D. Cal. Apr. 25, 2025).  A CARB Member explained, "without federal approval, the regulation would have been a legal zombie: dead on its feet, but still scaring the living."  Dean Florez, Why California recently revised its clean air regulations for zero-emission trucks, The Sacramento Bee (May 6, 2025), https://www.sacbee.com/opinion/op-ed/article305738891.html.

rectives to industry, discussed further below, CARB stated that it "will continue to ac-

cept and process certification applications … under the certification requirements" of

the ~~multiple CARB regulations, including the~~ Phase 2 Greenhouse Gas program, among

other CARB regulations.  May 23, 2025 MAC at 3.

      c.     The **Heavy-Duty On-Board Diagnostic Regulations** apply to the self-

diagnostic systems incorporated into the computers of vehicles to monitor vehicle and

engine components that can impact emissions performance.  *See* Cal. Code Regs. tit. 13,

§ 1971.1.  California has not obtained a separate waiver for its standards at section

1971.1 since 2016~~, which~~.  That waiver only covered amendments to the rule through

2013.  *See* 81 Fed. Reg. 78,149 (Nov. 7, 2016).  CARB amended the standards in 2016[11]

and 2019.~~1213~~ but did not seek a waiver in connection with either amendment.  Amend-

ments to section 1971.1 adopted in the California Code of Regulations as of August 27,

2020 were included in the submission for the Omnibus waiver.  *See* CARB, Final Reg-

ulation Order, Title 13, at 43, Docket No. EPA-HQ-OAR-2022-0332, https://www.reg-

ulations.gov/document/EPA-HQ-OAR-2022-0332-0005.  However, the Omnibus

Waiver submission did not address the 2016 or 2019 Heavy-Duty On-Board Diagnostic

Regulations.  Because these ~~later~~ amendments lack waivers, no preemption waiver ex-

ists that covers the heavy-duty on-board diagnostic standards currently adopted under

California law.

## II. Regulatory Uncertainty and the Clean Truck Partnership

    ~~37.~~36.  As California promulgated ~~the aforementioned~~these standards, ~~the~~ heavy-duty truck and

engine manufacturers raised serious concerns about the legality of CARB's actions and the technical

---

[11] CARB, On-Board Diagnostic Systems II, https://perma.cc/TV8H-HKLB (documenting adoption of standards on July 25, 2016).

~~12  CARB, Heavy-Duty On-Board Diagnostic System Requirements 2018, https://perma.cc/P65V-YR8Q (documenting adoption of standards on Oct. 3, 2019).~~

[13] CARB, Heavy-Duty On-Board Diagnostic System Requirements 2018, https://perma.cc/P65V-YR8Q (documenting adoption of standards on Oct. 3, 2019).

22

feasibility of meeting CARB's standards within the limited timeline allotted.  Among others, two objections are particularly salient here.

38.37.  First, Omnibus Low NOx was dramatically different from the federal criteria pollutant emissions standards.  As EPA noted in its rulemaking for criteria pollutant standards, Omnibus Low NOx imposed emissions standards "even more stringent" than the *most* stringent rules considered by EPA.[14]  On behalf of its members, ~~the~~an industry trade association (the Truck and Engine Manufacturers Association (EMA)) ~~expressed concerns~~objected during CARB's rulemaking process that the Omnibus Low NOx emissions standards were unachievable, urging CARB to forego Omnibus Low NOx and instead "work in good faith with all stakeholders to develop a cost-effective *nationwide* [heavy-duty vehicle and engine] low-NOx program to take effect in 2027."  EMA, Comments on CARB's Heavy-Duty Engine and Vehicle Omnibus Regulation and Associated Amendments (Aug. 13, 2020) at 4 (emphasis added).[15]

39.38.  Second, product development in the heavy-duty truck and engine industry requires long lead times—a fact so well-recognized that the Clean Air Act itself specifically requires at least four years of lead time and a three-year regulatory stability period for heavy-duty emissions standards.  42 U.S.C. § 7521(a)(3)(C).  But when CARB promulgated new emissions standards in Omnibus Low NOx, it did not provide the requisite statutory lead time.  Instead, CARB adopted the rules on December 22, 2021, which then became effective in model year 2024—providing only two years of lead time.[16]

40.39.  Consequently, EMA filed suit against CARB asserting that Omnibus Low NOx did not comply with the Clean Air Act's mandated lead time.  Complaint at ¶ 3, *Engine Mfrs. Ass'n v. Cal. Air Resources Bd.*, No. 2:22-cv-03663-JFW-PVC (C.D. Cal. May 27, 2022).  When EPA commenced a

---

[14] *See* Final Rule, Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards, 88 Fed. Reg. 4296, 4301 (Jan. 24, 2023).

[15] Available for download at https://www.arb.ca.gov/lispub/comm/iframe_bccomdisp.php?listname=hdomnibus2020&comment_num=8&virt_num=7.

[16] Cal. Code Regs. tit. 13, § 1956.8(a)(2)(C) (establishing model year 2024-2026 standards); 2021, No. 53-Z, Cal. Regulatory Notice Reg., 1809 (Dec. 31, 2021), https://perma.cc/9JCQ-3NHA (indicating adoption date for revised California Code of Regulations title 13, section 1956.8); CARB, Final Regulation Order, Title 13, at 7-11, Docket No. EPA-HQ-OAR-2022-0332, available for download at https://www.regulations.gov/document/EPA-HQ-OAR-2022-0332-0005.

23

waiver proceeding regarding Omnibus Low NOx and accepted comments on the lead time issue, EMA withdrew its lawsuit.[17]

41.40.  Shortly thereafter, CARB publicly wrote to EMA stating that in recognition of EMA dropping its litigation, CARB sought "discussion" with EMA and was open to "exploring areas of alignment between state and federal combustion rules"—a potential path out of the regulatory quagmire for heavy-duty truck and engine manufacturers.[18]  Nine months later, in July 2023, CARB announced the Clean Truck Partnership, a document styled as an "Agreement" between a regulator—CARB—on one hand, and a regulated industry—heavy-duty truck and engine manufacturers, along with their trade association EMA—on the other.[19]  The Clean Truck Partnership outlined a plan for CARB to undertake several of the regulatory actions sought by industry.  First, CARB stated that it would provide four-year lead-time for future emission standards, as EMA had pursued in its litigation against CARB.  Ex. A (CTP), ¶ 5.  Second, CARB agreed to propose amendments that would harmonize Omnibus Low NOx emissions standards with EPA's federal standards, subject to certain limited exceptions—in effect, agreeing to a more achievable NOx standard that would apply nationwide, as EMA had proposed during the Omnibus Low NOx rulemaking.  Ex. A (CTP), ¶¶ 1(iii), 7.  And, third, CARB agreed to work with industry to try to make the mandates contained in Advanced Clean Trucks more feasible.  Ex. A (CTP), App'x C, ¶ B.  The Clean Truck Partnership was thus intended to help harmonize the State regulatory framework with federal law and facilitate compliance with state and federal heavy-duty vehicle emission standards.

42.41.  Although the document was labeled as an "agreementAgreement," the Clean Truck Partnership imposedis a regulatory framework, and imposes new regulatory requirements on manufacturers.  For this reason, the U.S. Department of Justice has described the "agreement" as an independent "regulatory mechanism by which CARB attempts to enforce" its preempted emissions standards.  Ex.

[17] Press Release, EMA, Truck & Engine Manufacturers Withdraw Lawsuit on Leadtime Requirement for Heavy-Duty Emissions Standards (Aug. 11, 2022), https://perma.cc/LZ3X-RJJZ.

[18] Letter from Steven S. Cliff, Executive Officer, CARB, to Jed R. Mandel, President, EMA (Oct. 14, 2022), https://perma.cc/3RQF-XXV2.

[19] Press Release, CARB and truck and engine manufacturers announce unprecedented partnership to meet clean air goals (July 6, 2023), https://perma.cc/85J7-U75K.

24

B (Aug. 7, 2025 DOJ Letter), at 2.  The Clean Truck Partnership dictated that under certain circum-stances where CARB was found to lack authority for Advanced Clean Trucks, Omnibus Low NOx, or the 100 percent zero-emission vehicle sales requirement of Advanced Clean Fleets, (also incorporated by reference into Advanced Clean Trucks), manufacturers would still have to comply with those stand-ards.  Ex. A (CTP), ¶ 2.  Next, the Clean Truck Partnership provided that "California will maintain its certification program," asserting CARB's authority to impose certification requirements on manufac-turers.  Ex. A (CTP), App'x B, at 1.  By creating a regulatory structure that manufacturers had to follow even when CARB had lost federal authority due to "the outcome of any litigation challenging the waiv-ers or authorizations for those regulations or of CARB's overall authority to implement those regula-tions," Ex. A (CTP), ¶ 2, the Clean Truck Partnership ostensibly became a buttress for the new CARB emissions standards and certification obligations applicable to the highly regulated truck industry.  Un-derscoring that the Clean Truck Partnership is fundamentally a regulatory scheme rather than a private agreement, the Clean Truck Partnership does not provide any enforcement mechanism or private right of action among the industry signatories for noncompliance—EMA and manufacturers cannot impose penalties on each other, nor can they deny each other certifications to sell trucks or engines.

43.42.  Furthermore, the Clean Truck Partnership created a new category of regulatory re-strictions: limits Limits on the rights of manufacturers and EMA to speak freely and petition the gov-ernment.  The advocacy-limiting mandates that CARB included in the Clean Truck Partnership prohibit EMA and manufacturers from challenging enumerated CARB standards, including Omnibus Low NOx, Advanced Clean Trucks, and the Advanced Clean Fleets 100 percent zero-emission vehicle sales requirement.  To that end, the Clean Truck Partnership dictates: "[manufacturers] will not (i) challenge CARB's issuance of the regulations set forth in Appendix B[20]; (ii) file a Petition for Review or other-wise challenge any U.S. EPA waiver or authorization granted for such regulations; (iii) file amicus briefs supporting challenges to such waivers or authorizations, or such regulations; or (iv) support stay

---

[20] Omnibus Low NOx, Advanced Clean Trucks, the 100 percent zero-emission sales requirement in Advanced Clean Fleets, the Zero Emission Airport Shuttle regulation, the Zero Emission Powertrain Certification Procedure and its incorporated standards and test procedures, the 2018 Heavy-Duty War-ranty Amendments, and the Standards and Test Procedures for 2004 and Subsequent Model Year Heavy-Duty Diesel Engines and Vehicles (as amended April 18, 2019).

motions or similar motions practice challenging such waiver or authorization decisions, or such regulations." Ex. A (CTP) ¶ 4. As a result, the Clean Truck Partnership purports to insulate the State and its emissions standards from legal challenges.

44.43. The Clean Truck Partnership further limits "advocacy" by EMA and manufactures in any state that is considering adopting CARB's Omnibus Low NOx or Advanced Clean Trucks. Ex. A (CTP) App'x D, ¶ A. In that regard, it explicitly imposes a requirement on EMA and manufacturers to "support or not oppose the adoption of CARB's Omnibus [Low NOx] regulations in any prospective Section 177 states" for model year 2027 and later, and to remain "neutral … in response to any prospective Section 177 States' proposals to consider adopting CARB's [Advanced Clean Trucks] regulations." Ex. A (CTP) App'x D, ¶¶ C, E.

45.44. In sum, through the Clean Truck Partnership, CARB sought to impose imposed industry-wide emissions standards and certification requirements, in a manner that would insulate those standards from litigation challenging CARB's regulatory authority, from any future industry criticism, and from any potential industry-supported judicial review. CARB imposed the Clean Truck Partnership in its capacity as an industry regulator, not in its capacity as a market participant.

46.45. In December 2024, the American Free Enterprise Chamber of Commerce brought federal litigation against CARB and the signatories to the Clean Truck Partnership (including Plaintiff OEMs), seeking a declaratory judgment that the Clean Truck Partnership is preempted and unlawful and an order enjoining the Clean Truck Partnership's enforcement. See This case was transferred to the Eastern District of California and is now pending before this Court as well. *Am. Free Enter. Chamber of Com. v. Engine Mfrs. Ass'n Cliff*, No. 2:25-cv-03255-DC (E.D. Cal.) *originally filed at* No. 3:24 25-cv-50504 (N.D. Ill. Dec. 16, 2024). Responsive pleadings currently are due August 14, 2025.

**III. The Federal Government Enacts Law Preempting CARB's Standards**

47.46. CARB and the federal government have now adopted diametrically opposed positions about what law, regulations, and standards apply to heavy-duty truck manufacturers—including whether the Clean Truck Partnership is a lawful mechanism for CARB to compel compliance with now-preempted California standards.

48.47. As explained above, California's authority to regulate heavy-duty vehicle and engine

26

emissions depended on Clean Air Act preemption waivers granted by EPA. In June 2025, the President signed a Joint Resolution of Congress under the Congressional Review Act that expressly stripped California's preemption waivers for Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II. In response, CARB now points to the Clean Truck Partnership as a source of its ongoing authority to enforce compliance with its standards, while the federal government expressly includes the Clean Truck Partnership within the category of preempted regulatory actions.

49.48.  On February 19, 2025, EPA submitted the waiver decisions for Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II to Congress as rules subject to the Congressional Review Act. *See* 5 U.S.C. §§ 551(4), 804(3). The Congressional Review Act enables Congress to enact joint resolutions invalidating new rules adopted by federal agencies within a review period triggered upon the submission of the rule to Congress. 5 U.S.C. §§ 801–808. In May 2025, both chambers of Congress voted to pass joint resolutions invalidating the Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II waiver decisions. *See* H.R.J. Res. 87, 119th Cong. (2025); H.R.J. Res. 88, 119th Cong. (2025); H.R.J. Res. 89, 119th Cong. (2025). President Trump signed the joint resolutions on June 12, 2025. *See* Statement by the President, The White House (June 12, 2025) ("June 12 Statement by the President"), https://perma.cc/M4Q4-28BM. Once Congress passed and the President signed the measures repealing the recent EPA waivers, CARB lost authority under the Clean Air Act to adopt and enforce its standards. *See Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2131 n.1 (2025) ("Acting under the Congressional Review Act, Congress recently passed and the President signed legislation to block … California regulations.").

50.49.  As a result, the federal government has taken the position that Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II are "fully and expressly preempted by the Clean Air Act and cannot be implemented." June 12 Statement by the President; *see also* 5 U.S.C. § 801(b)(1). The President stated that the resolutions make clear that "California's attempts to impose an electric vehicle mandate, regulate national fuel economy, and regulate greenhouse gas emissions are not eligible for waivers of preemption under section 209 of the Clean Air Act." June 12 Statement by the President. Further, the Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II

waivers cannot be reissued in "substantially the same" form unless authorized later by another legislative action by Congress. *Id.*; 5 U.S.C. § 801(b)(2). Therefore, pursuant to federal law, CARB's Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II are now preempted and void ab initio and have no effect. *See Diamond Alt. Energy*, 145 S. Ct. at 2135 n.3 (explaining that "the result from setting aside EPA's approval of the California regulations" is that "California may not enforce its greenhouse-gas emissions limits and electric-vehicle mandate for new vehicle fleets").

50. ~~Furthermore, on~~On June 12, 2025, on the day the Resolutions were signed by the President, California sued EPA and the President seeking an order "declar[ing] that the [Congressional Review Act] Resolutions have no effect on the status or enforceability of state emissions control programs." Complaint at 4, *California v. EPA*, No. 4:25-cv-04966-HSG (N.D. Cal. June 12, 2025). California alleges, among other things, that Congress's actions were *ultra vires*, violated the Congressional Review Act and the Administrative Procedure Act, and ran afoul of the Constitution's structural guarantees regarding separation of powers and federalism. *Id.* at 27–39. The State has not sought a temporary restraining order or preliminary injunction, and there has been no court order either preliminarily or permanently enjoining the Congressional Resolutions. Nor has the State sought to expedite the litigation in order to bring the dispute to resolution at the earliest possible date and provide certainty to regulated parties. Motion to dismiss briefing is currently ongoing with a hearing on the defendants' motion to dismiss scheduled for February 19, 2026.

51. On August 7, 2025, the U.S. Department of Justice sent a letter to heavy-duty truck and engine manufacturers reiterating the federal government's position that the Congressional Review Act resolutions preempted CARB's standards, and further stating that the Clean Truck Partnership is itself preempted as an attempt to enforce emissions standards that lack a waiver under Section 209(b) of the Clean Air Act. As DOJ writes, "The Clean Truck Partnership … compels manufacturers to comply with CARB's ongoing enforcement of the Omnibus [Low NOx] and [Advanced Clean Trucks] regulations[.]" Ex. B (Aug. 7, 2025 DOJ Letter), at 2. In the letter, DOJ commands Plaintiff OEMs to "immediately cease and desist your compliance with both the Clean Truck Partnership and its preempted state vehicle emission regulations." *Id.*

52.     The federal government views the Clean Truck Partnership as an impermissible regulatory mechanism.  In a statement published by the Federal Trade Commission ("FTC") announcing the closure of an investigation into signatories of the Clean Truck Partnership, including the Plaintiff OEMs, the FTC explained how the Clean Truck Partnership required OEM Plaintiffs "to abide by a series of CARB *regulations*." Dkt. 81-7 (emphasis added).  The FTC expressed concerns about the legality of provisions in the Clean Truck Partnership requiring compliance with the regulations that were invalidated by the Congressional Resolutions.  *Id.*  To address those concerns and close the federal government's investigation, the manufacturers provided letters to the FTC agreeing that the Clean Truck Partnership was rendered unenforceable by the Congressional Resolutions that preempted the underlying CARB regulations.  *See* Dkts. 79-5 (Daimler Truck North America letter), 79-6 (International Motors letter), 79-7 (PACCAR letter), 79-8 (Volvo Group North America letter).

53.     The United States has continually defended its interests against California's disregard for the Congressional Resolutions, including by intervening as plaintiffs in this action, as well as moving to intervene in *American Free Enterprise Chamber of Commerce v. Cliff*.  *See* No. 2:25-cv-03255-DC (E.D. Cal.), Dkt. 121.  The United States has also moved to dismiss cases challenging the EPA waivers granted to CARB *before* the Congressional Resolutions were passed.  *See* Reply Supporting Mot. to Dismiss and Opp'n to Cross-Mot. for Abeyance, *Am. Free Ent. Chamber of Com. v. EPA*, No. 25-89 (9th Cir. Dec. 3, 2025), Dkt Nos. 49 & 50 (Omnibus waiver challenge); Reply Supporting Mot. to Dismiss and Opp'n to Cross-Mot. for Abeyance, *Am. Free Ent. Chamber of Com. v. EPA*, No. 25-106 (9th Cir. Dec. 3, 2025), Dkt Nos. 53 & 54 (Advanced Clean Cars II waiver challenge).

## IV. California Continues to Enforce Preempted Emissions Standards

~~52.~~54.  And yet, while the federal government demands that Plaintiff OEMs do one thing, California directs OEMs to do another.  California ~~has taken the position~~asserts that Congress's waiver-disapproval resolutions were "reckless, politically motivated, and illegal attacks on California,"[21] and has made clear that it will continue to attempt to enforce the requirements included in Advanced Clean

---

[21] *See* Press Release, Governor Gavin Newsom, Assault on California continues:  Governor Newsom sues Trump over illegal attempt to revoke state's clean air policies (June 12, 2025), https://perma.cc/L3Q8-S8QJ/.

Trucks, Omnibus Low NOx, and Advanced Clean Cars II, including the vehicle and engine certification requirements—using, among other mechanisms, the Clean Truck Partnership.  Together, Defendants have sought to constantly shift the regulatory landscape beneath the OEMs, magnifying the uncertainty faced by industry.  This creates a coercive environment that attempts to force regulated parties to comply with CARB's preempted regime.  These multifaceted efforts—including CARB MACs, directives from Governor Newsom, and a state lawsuit—are part of a unified strategy to adopt and enforce preempted standards and certification requirements, in violation of Section 209 of the Clean Air Act.

53.    On June 12, 2025**Clean Truck Partnership.** , California sued EPA and the President seeking an order "declar[ing] that the [Congressional Review Act] Resolutions have no effect on the status or enforceability of state emissions control programs."  Complaint at 4, *California v. EPA*, No. 4:25-cv-04966 HSG (N.D. Cal. June 12, 2025).  California alleges, among other things, that Congress's actions were *ultra vires*, violated the Congressional Review Act and the Administrative Procedures Act, and flouted the Constitution's structural guarantees regarding separation of powers and federalism. *Id.* at 27–39.  The State has not sought a temporary restraining order or preliminary injunction.  The initial case management conference is currently set for September 16, 2025, and as of this filing no further substantive court dates have been set in that case.

54.55.   While its legal dispute is pending, California has stated that it will continue to enforce the preempted emissions standards included in Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II, and require manufacturers to certify regulatory compliance before selling vehicles in California.  To that end, California has repeatedly asserted that it will use the Clean Truck Partnership, which was intended to harmonize compliance with state and federal law, to compel the industry to comply with now-preempted California emissions standards over federal law.

55.    CARB cannot use the Clean Truck Partnership as a backdoor to enforce California's preempted emissions standards.  Even if it could, CARB has not met—and indeed cannot meet—several of its own obligations under the Clean Truck Partnership.  As a result, CARB cannot use the Clean Truck Partnership to force the industry to comply with California's emissions standards.

56.    For one thing, theMost recently, on October 27, 2025, CARB filed a civil action in the Superior Court of Alameda County alleging breach of contract claims against Plaintiffs based on the

30

Clean Truck Partnership ("Alameda County CTP Litigation").  *See* Dkt. 85-1; *California Air Resources Board v. Daimler Truck North America LLC et al.*, No. 25CV151420 (Alameda Sup. Ct. Oct. 27, 2025). In the suit, CARB seeks, among other things, damages and specific performance by means of an injunction compelling Plaintiffs to satisfy alleged commitments included in the Clean Truck Partnership, including compliance with the preempted regulations.  Dkt. 85-1 at 7–8.

57.    On October 31, 2025, this Court preliminarily enjoined Defendants from "implementing, enforcing, attempting to enforce, or threatening to enforce the Clean Truck Partnership." Dkt. 94 at 34.  This injunction includes, but is by no means limited to, "enjoining CARB from enforcing the Clean Truck Partnership by seeking specific performance as a remedy" in the Alameda County CTP Litigation.  Dkt. 94 at 34 n.22.

~~56.~~58.  CARB's obligations in the Clean Truck Partnership are now impossible.  The Clean Truck Partnership requires CARB to substantively amend Advanced Clean Trucks and Omnibus Low NOx, largely for the purpose of harmonization of state and federal emissions standards.  See Ex. A (CTP) App'x A, B.  As explained above, however, the President signed Joint Resolutions of Congress under the Congressional Review Act that expressly revoked California's preemption waivers for Advanced Clean Trucks and Omnibus Low NOx.  Following the signature of ~~these Joint~~the Congressional Resolutions into law, pursuant to the Congressional Review Act, EPA cannot reissue CARB's waivers for those standards without a subsequent act of Congress expressly permitting such action.  5 U.S.C. § 801(b)(2).  As a result, CARB is statutorily foreclosed from meeting its ~~obligation~~obligations under the Clean Truck Partnership to amend Advanced Clean Trucks and Omnibus Low NOx.  If CARB tries to do so, such attempts will be meaningless as California would be preempted from enforcing those rules, amended or otherwise.  In particular, CARB's commitment in the Clean Truck Partnership to align the emissions standards in Omnibus Low NOx with EPA's corresponding emissions standards is now impossible.  CARB has not, and cannot, fulfill this obligation consistent with federal law.

~~57.    For another, when CARB signed the Clean Truck Partnership, it also committed "to work together" with manufacturers "to resolve any issues that may warrant regulatory amendments to either the Omnibus or ACT regulations." Ex. A (CTP) App'x D, ¶ G.  But CARB recently amended Advanced Clean Trucks without engaging with the industry in the manner contemplated by Clean~~

31

1 Truck Partnership or addressing the industry's objections and concerns filed during the comment pro-

2 cess. *See* EMA, Comments on CARB's Proposed Amendments to the Advanced Clean Trucks Regu-

3 lations and the Zero-Emission Powertrain Certification Test Procedure (July 14, 2025).[22] CARB has

4 also refused to work with the manufacturers to resolve issues related to infrastructure and customer

5 demand that undermine the viability of Advanced Clean Trucks. Among other things, CARB has pro-

6 posed to withdraw the sections of Advanced Clean Fleets that would have required trucking fleets to

7 purchase zero-emission trucks. *See supra* note . In other words, CARB has removed the buy-side

8 requirement corresponding to the sales mandates imposed on manufacturers by Advanced Clean

9 Trucks, thereby making manufacturer compliance with Advanced Clean Trucks even more challeng-

10 ing.

11   58.   Furthermore, CARB did not abide by its commitment in the Clean Truck Partnership to

12 provide manufacturers with three years to make up a shortfall in the proportion of zero-emission vehi-

13 cles required to be sold pursuant to Advanced Clean Trucks. The Clean Truck Partnership stated that

14 CARB "will propose to modify [Advanced Clean Trucks] to lengthen the number of years a manufac-

15 turer has to make up a deficit from one year to three years." Ex. A (CTP) App'x C, ¶ B. But the

16 standards as adopted did not provide the promised three-year make-up period. Instead, it only allowed

17 manufacturers to carry over 30 percent of the deficit from year-to-year—a material restriction not con-

18 templated by the Clean Truck Partnership. *See* **May 23, 2025 Manufacturers Advisory Correspond-**

19 **ence.**Cal. Code Regs. tit. 13, § 1963.3(b) (providing that "[i]f the net deficit balance is more than 30

20 percent of the deficits generated from the most recent model year, the net deficit must be reduced to

21 below 30 percent by the end of the first and second years of the makeup period.").

22   59.   Because CARB has not met numerous commitments under the Clean Truck Partnership,

23 CARB is foreclosed from using the Clean Truck Partnership to force the industry to comply with

24 CARB's preempted standards.

25   60.   Notwithstanding the foregoing, CARB has stated its intent to enforce its preempted

26
27 [22] Available to download at https://www.arb.ca.gov/lispub/comm/iframe_bccomdisp.php?listname=2
025actpooling&comment_num=523&virt_num=11. *See also* Press Release, CARB approves amend-
ments to clean truck standards to provide flexibility while maintaining emissions benefits (July 24, 20
28 25), https://perma.cc/8D4R-A26K.

1  standards in multiple ways, each of which are independently preempted by the Clean Air Act, which,

2  again, expressly preempts not only the adoption of state emissions standards for which there is no

3  federal waiver, but "attempt[s] to enforce" preempted standards as well.  42 U.S.C. § 7543(a).  Fur-

4  thermore, those attempts to enforce purport to rely on the Clean Truck Partnership – further underscor-

5  ing the status of that document as a regulation in and of itself, which CARB is using, in effect, to

6  circumvent the Clean Air Act and to enforce the preempted state standards.

7      61.59.  **Manufacturers Advisory Correspondence.**  On May 23, 2025, CARB issued a Man-

8  ufacturers Advisory Correspondence ("MAC") document styled as "Regulatory Guidance" in response

9  to the Congressional ~~resolutions~~Resolutions disapproving the prior preemption waivers.  May 23, 2025

10  MAC.  The directive ~~states~~stated that the "Congressional ~~resolutions~~[R]esolutions of disapproval …

11  are the result of illegal actions and are thus invalid," and that the disapproved standards remain "appli-

12  cable to manufacturers."  *Id.* at 1.  The MAC ~~goes~~went on to state that CARB "will continue to accept

13  and process certification applications," justifying this as "necessary" to "facilitate meeting the commit-

14  ments of the Clean Truck Partnership."  *Id.* at 2; *see also id.* at 3 ("CARB will continue to accept and

15  process certification applications for model year 2025 and 2026 model year medium- and heavy-duty

16  vehicles under the certification requirement of the Heavy-Duty Engine and Vehicle Omnibus regula-

17  tion[.]").  California ~~has~~ thus ~~taken~~took the position that compliance with CARB's emissions standards

18  and their related conditions precedent to sale are required by the Clean Truck Partnership, even though

19  the underlying regulations establishing those emissions standards have been preempted.  This further

20  demonstrates that the Clean Truck Partnership itself operates as a regulation, as well as an attempt to

21  enforce CARB's preempted emission standards.

22      62.60.  CARB's directive further ~~requires~~required compliance with the preempted standards to

23  "ensure the requirements of certification are met to enable lawful vehicle sales in California" under the

24  California Health and Safety Code, *id.* at 2, citing statutory provisions that a "person shall not offer for

25  sale … a new motor vehicle … unless the motor vehicle … has been certified" under California law.

26  Cal. Health & Safety Code § 43151.  Notably, violations of this section can incur penalties of up to

27

28

$48,788 "for each such action." Cal. Health & Safety Code § 43154(a)(1).[23]  Thus, CARB has threat-

ened to impose substantial fines against any manufacturer who sells vehicles in California without a

CARB certificate, again notwithstanding the fact that the Clean Air Act expressly prohibits such certi-

fications in the absence of a waiver.  42 U.S.C. § 7543(a); *see also* CARB, CARB approves amend-

ments to clean truck standards to provide flexibility while maintaining emissions benefits (July 24,

2025), https://perma.cc/8D4R-A26K ("The [May 23, 2025 MAC] explained that CARB would con-

tinue accepting and processing certification applications for 2026 models to ensure continuity and en-

able lawful vehicle sales in California.").

61.    There are no procedural limitations preventing CARB from re-issuing a MAC materi-

ally similar to the May 23, 2025 MAC.  Furthermore, although the May 23, 2025 MAC has been su-

perseded, CARB has continually demonstrated that, absent relief from this Court, it will persist in ad-

vancing the policies outlined therein, such as expressing its purported power to retroactively enforce

the preempted emissions standards if OEMs refuse to certify to the preempted standards now through

the Emergency Rulemaking, discussed below.

63.62.  **Executive Order N-27-25.**  On June 12, 2025, Governor Newsom issued Executive

Order N-27-25, which described the waiver-disapproval resolutions as part of "President Trump's war

on California"[24] and directed CARB to implement the Clean Truck Partnership—which incorporates

the emissions standards included in Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean

Cars II—and report "manufacturer progress towards those commitments" to the Governor semi-annu-

ally.  Executive Order N-27-25 stated that manufacturers that continue to certify compliance with Cal-

ifornia's preempted standards will be "prioritize[d] … in government vehicle procurement decisions,"

will receive priority "funding" to "support the purchase of zero-emission vehicles" and directed CARB

---

[23] The statutory penalty is adjusted annually for inflation.  *See* CARB, Memorandum to Enforcement Division Staff, Increase in Maximum Penalties Based on 2024 California Consumer Price Index (Feb. 21, 2025), https://perma.cc/YG4F-9T7Q.

[24] *See* Press Release, Gov. Gavin Newsom, Governor Newsom signs executive order doubling down on state's commitment to clean cars and trucks, kickstarts next phase of leadership (June 12, 2025), https://perma.cc/HHM4-CPXY.

to identify other "opportunities for special considerations and flexibilities for" manufacturers that comply with the preempted standards when crafting future regulations.   Executive Order N-27-25, https://perma.cc/9HZG-EHRV.

64.63.  By contrast, none of those privileges or opportunities will be extended to manufacturers who do not follow the standards "regardless of the status of those regulations under federal law."  Executive Order N-27-25.  Instead, Executive Order N-27-25 suggests that such manufacturers will be put on California's "manufacturer purchasing restriction list," as indeed California has done to disfavored vehicle manufacturers during a prior dispute over whether California's emissions standards were preempted.  *See*, *e.g.*, David Shepardson, *California to Stop Buying GM, Toyota and Fiat Chrysler Vehicles Over Emissions Fight*, Reuters (Nov. 18, 2019), https://www.reuters.com/article/idUSL2N27Y0HU/ (reporting that Governor Newsom "halt[ed] all purchases of new vehicles for state government fleets from" manufacturers that did not agree with CARB's positions in preemption litigation).  The California Executive Order thus purports to adopt and enforce California's separate state emissions regulatory regime in direct conflict with federal law.

64.    **August 25, 2025 Manufacturers Advisory Correspondence.**  On August 25, 2025, two weeks after this action was filed, CARB issued a MAC document styled as "Regulatory Guidance for Engine and Vehicle Certification in California," which purported to supersede the May 23, 2025 MAC.  August 25, 2025 MAC, Dkt. 58-2.  CARB stated that it issued the revised guidance to "address continuing questions raised by vehicle and engine manufacturers about statutory provisions for vehicle and engine certification, and to provide clarity on how CARB will process the applications for certifications that it continues to receive."  *Id.* at 2.  CARB also expressly references this litigation as an impetus for the August 25, 2025 MAC.  *Id.* at 1.  The August 25, 2025 MAC explicitly threatens enforcement for manufacturers that do not embrace CARB's view of its certification and enforcement authority—an impermissible attempt to enforce contrary to Section 209 of the Clean Air Act.  There are no procedural limitations preventing CARB from issuing a new MAC superseding the August 25, 2025 MAC, including re-issuing a MAC materially similar to the May 23, 2025 MAC.

65.    The August 25, 2025 MAC reinforces CARB's position that manufacturers must have

a CARB certificate to lawfully sell vehicles and engines in California, citing statutory provisions making it unlawful to sell without a certificate, *see* August 25, 2025 MAC, at 2, n.5.  It then outlines several purported ways for manufacturers to obtain a CARB certificate for "model year 2025 and subsequent model years."

66.    *Certify to Preempted Standards*.  Vehicle and engine "manufacturers may continue to seek ... CARB certification to the regulations covered by the waivers that were targeted by the congressional resolutions." *Id.* at 2.  Furthermore, manufacturers "who are parties to the Clean Truck Partnership may also continue to seek … CARB certification on the terms provided for in that agreement." *Id.*  In presenting the certification option, CARB states that "[m]anufacturers who seek and obtain certification through either of these pathways will have confidence that they are in compliance with their obligations under CARB's regulations (or under the Clean Truck Partnership, as applicable)." *Id.*  In other words, manufacturers can have certainty as to the legality of their sales in California only if they certify to preempted standards and agree to preempted conditions precedent in circumvention of the Clean Air Act and in defiance of the federal government's Cease & Desist letter.

67.    *"Alternative Pathways."*  CARB stated that it would accept "certification through [] alternative pathways," specifically, that CARB would "certify for model year 2025 and subsequent model years" if the manufacturer submitted either (1) an "approved application for CARB certification to the vehicle and engine emission regulations that immediately preceded those covered by the waivers that were targeted by the congressional resolutions" or (2) a "U.S. EPA certification to its motor vehicle emission standards applicable to the given vehicle in the relevant model year, as those regulations are currently codified." *Id.*

68.    But CARB also stated that "[m]anufacturers choosing these [alternative] pathways should be advised, however, that CARB reserves its right to enforce the regulations covered by the waivers targeted by the congressional resolutions in the event a court of law holds those resolutions invalid, *including with respect to model years that such manufacturers ask CARB to certify under these alternative pathways*." *Id.* at 3 (emphasis added).  In other words, CARB claims that if a court finds the Congressional Resolutions invalid, it has the ability to retroactively enforce its emission standards

for the period when those rules were federally unenforceable, notwithstanding having granted manufacturers a certification pursuant to an alternative pathway authorizing an OEM to sell products in California.  In short, CARB offers Executive Orders allowing OEMs to sell vehicles in California without complying with preempted rules, but at the same time, takes the position that OEMs cannot rely on compliance with the terms of such Executive Orders to avoid later enforcement of the preempted rules.  This threat of retroactivity is a *present* attempt to enforce preempted regulations by pressuring OEMs to comply with the regulations, despite the August 25, 2025 MAC purportedly giving "alternatives" to the preempted rules.

69.    *Preferential Regulatory Treatment.*  Similar to Executive Order N-27-25, the August 25, 2025 MAC also states that "CARB will continue developing programs to reduce vehicle emissions" and "will consider measures, such as eligibility for procurement and other incentives, that account for whether manufacturers have continued to request certification to the regulations covered by the waivers that were targeted by the congressional resolutions."  August 25, 2025 MAC, at 3.  At a public workshop on December 3, 2025, CARB staff stated that CARB is developing criteria for manufacturers to be designated as "Drive Forward Leaders," which will be linked to "incentive funding" and "state procurement."[25]

70.    **September 2025 Emergency Rulemaking.**  On September 15, 2025, CARB initiated emergency rulemaking proceedings under state law to "clarify that protective emission standards for vehicles and engines remain operative" during what CARB characterized as "unprecedented uncertainty" following congressional disapproval of the preemption waivers for ACT, Omnibus, and ACC II.  CARB Emergency Vehicle Emissions Rulemaking Public Notice, Dkt. 73-33 at 6–7.  CARB expressly references this litigation as an impetus for the Emergency Rulemaking.  *Id.* at 2.

71.    The Emergency Rulemaking purports to "amend" and "adopt new sections into" the California Code of Regulations to "confirm that"—until a court resolves the validity of the Congressional Resolutions revoking the waivers—"certain earlier-adopted regulations (displaced by Advanced Clean Cars II and Omnibus) remain operative (as previously adopted)."  *Id.* at 1.  In reality, rather than

---

[25] Recording of Public Workshop on Drive Forward Heavy-Duty Vehicle Standards and Strategies, 17:02-17:17, *available at* https://youtu.be/NiPi8LMHtck?si=fqE_p3V0g1g4c4by&t=1030.

a valid mechanism to restore older rules and, along with them, revitalize associated EPA waivers, the Emergency Rulemaking seeks to establish a new emissions regulation regime that requires new waivers.

72.     The Emergency Rulemaking is a change to the California Code of Regulations that creates new rules and, accordingly, is preempted in the absence of a new waiver for several reasons.  First, the Rulemaking adds dozens of sections to title 13 of the California Code of Regulations—including 2005 criteria-pollutant standards, 2010 NOx requirements, and 2013 on-board diagnostic standards. To the extent these older standards were ever granted waivers, such waivers were granted in different years for discrete rulemakings.  *See id.* at 5 nn.7, 9.  As EPA pointed out in a comment on the Emergency Rulemaking, this new aggregation of standards requires cohesive analysis regarding whether the Rulemaking as a whole meets the waiver criteria in Section 209(b) of the Clean Air Act.  *See* U.S. EPA Comment on CARB's Emergency Rulemaking (Sept. 27, 2025) at 1–2, https://perma.cc/CC38-K3SE. CARB has sought no such determination, and the Emergency Rulemaking thus has no waiver.

73.     Second, in the Emergency Rulemaking, CARB applies this assortment of rules prospectively to model year 2026 and subsequent vehicles—changing which emissions standards *presently* apply.  *See* Dkt. 73-33 at 4.  CARB made this change with no lead time, further distinguishing this purported reenactment from the original enactment, where lead time for implementation of the standards would have been considered at a minimum as part of the EPA waiver process.  By changing the standard applicable to current and future model years—and doing so without lead time—the Emergency Rulemaking constitutes a new emissions standard requiring a new EPA waiver.

74.     Third, the Emergency Rulemaking also adds new language throughout the California Code of Regulations evincing CARB's intent to retroactively enforce its currently preempted rules should it prevail in litigation later.  *See*, *e.g.*, Cal. Code Regs. tit. 13, § 1956.8 (Oct. 2, 2025).

75.     These new rules need a new waiver.  But rather than seek a waiver, CARB simply asserts that these antecedent standards "have extant federal preemption waivers not subject to the recent congressional resolutions."  Dkt. 73-33 at 2–3.  The United States disagrees, explaining in a September 27, 2025 comment on the Emergency Rulemaking that "EPA expects that CARB will submit any presumptively final regulation resulting from this emergency rulemaking to the Agency before adopting or

38

1   attempting to enforce any new or amended standard applicable to new motor vehicles or engines. *Until*

2   *and unless EPA waives preemption for any such new or amended standard under CAA section 209(b),*

3   *no such standard may have legal force or effect*." U.S. EPA Comment on CARB's Emergency Rule-

4   making (Sept. 27, 2025) at 2, https://perma.cc/CC38-K3SE (emphasis added).

5       76.    And, indeed, if CARB were to seek a waiver, the Emergency Rulemaking could not

6   meet the waiver requirements in Section 209 because, among other reasons, the Emergency Rulemak-

7   ing adopts tailpipe emissions standards that are less protective than the corresponding federal standards.

8   *Compare* Cal. Code Regs. tit. 13, § 1956.8.1 *with* 40 C.F.R. § 1036.104.

9       77.    Further, these outdated standards are not technologically feasible for current vehicles.

10  For example, CARB's new regulation excludes several flexibilities added to on-board diagnostic stand-

11  ards in the Omnibus rulemaking package to ensure technical feasibility, including changes to certain

12  test-out criteria and failure adoption thresholds. *See* CARB, Initial Statement of Reasons, Proposed

13  Heavy-Duty Engine and Vehicle Omnibus Regulation and Associated Amendments (June 23, 2020) at

14  III-10. Instead, this rule incorporates on-board diagnostic standards dating back to 2010, which are not

15  consistent with the changes OEMs have made to adapt to federal and state standards since then.

16      78.    All of this makes clear the true purpose of the proposed rule: It is an attempt to enforce

17  CARB's preempted Omnibus emissions standards and an attempt to put into effect new heavy-duty

18  emissions standards to save CARB's certification program from preemption. The public notice an-

19  nouncing the Emergency Rulemaking explains that CARB "continues to accept and process certifica-

20  tion applications for" the preempted standards, Dkt. 73-33 at 6, and repeatedly reserves CARB's right

21  to retroactively "enforce Advanced Clean Cars II and Omnibus" if the Congressional Resolutions are

22  invalidated, *id.* at 1, 3, 10. The notice explicitly warns that manufacturers "assume the risk" of this

23  retroactive enforcement if they "choose to certify only to the antecedent provisions" that the Emergency

24  Rulemaking codifies into California law. *Id.* at 6. The Emergency Rulemaking is preempted both as

25  an attempt to enforce preempted rules and because it lacks a waiver for the novel aggregation of tech-

26  nologically infeasible emissions standards less stringent than federal standards, made newly applicable

27  to current and future model years with no lead time.

28      79.    CARB has taken steps to make the Emergency Rulemaking permanent. On September

23, 2025, CARB posted a notice soliciting written comments and setting a public hearing date on a proposal to permanently adopt the Emergency Rulemaking.  CARB, Notice of Public Hearing (dated Sept. 9, 2023, posted Sept. 23, 2025), https://perma.cc/2DQ9-NEVX.  On November 7, 2025, CARB postponed the hearing, but it did not withdraw its proposal or extend the comment period.  CARB, Notice of Postponement (Nov. 7, 2023), https://perma.cc/URC7-DL5Q.  As of the filing of this Amended Complaint, CARB has not announced a rescheduled hearing for this rulemaking.

## V. Plaintiff OEMs are Irreparably Injured as a Result of California's Actions

65.80.  With the federal government and California taking irreconcilable positions on the enforceability of CARB's standards, Plaintiff OEMs face ~~both~~ current and imminent injuries from ~~two sources: California's attempt~~Defendants' violations of the Clean Air Act through adopting, attempting to enforce ~~the~~, and enforcing preempted standards ~~and California's threats to punish Plaintiff OEMs based on their speech~~.

### a.    Injury From California's Enforcement of Preempted Emissions Standards

66.81.  California appears to be intent on acting *ultra vires*.  The federal government has acted to expressly preempt CARB's standards, and California is prohibited by the Clean Air Act from attempting to enforce its heavy-duty emissions standards~~.~~ or certification requirements.  Yet CARB has announced that it will nevertheless enforce the preempted standards and require certification.  For example, in the May 23, 2025 MAC, CARB reiterated that manufacturers will need to obtain a model year 2026 California certification "to enable lawful vehicle sales," May 23, 2025 MAC at 2, implicitly threatening steep penalties for any violations, *see* Cal. Health & Safety Code §§ 43151, 43154(a)(1) (imposing penalties for selling without a CARB certificate).  Similarly, in the August 25, 2025 MAC, CARB reiterated that certification was necessary for lawful sales in California, and stated that if a court were to find the Congressional Resolutions preempting CARB's regulations invalid, that it "reserves its right to enforce the regulations covered by the waivers targeted by the congressional resolutions,

including with respect to model years that such manufacturers ask CARB to certify under the alternative pathways." August 25, 2025 MAC at 3.[26] CARB then went even further by codifying this threat of retroactive enforcement, adding it to the California Code of Regulations in the Emergency Rulemaking. *See, e.g.*, Cal. Code Regs. tit. 13, § 1956.8 (Oct. 2, 2025); Dkt. 73-33 at 1, 3, 6, 10.

67.82. Against this backdrop, Plaintiff OEMs urgently needneeded clarity regarding the law and emission standards that apply to itstheir vehicles and engines for model year 2026. To adequately plan product production and allocation, Plaintiff OEMs must know which vehicles they are authorized to sell, and *where*, well in advance of the start of a model year on January 1. And applying for and receiving CARB certifications takescan take months. As noted previously, CARB's own description of the process lays out a timeline of up to sixty days, at the conclusion of which the manufacturer may receive a certification—or only "substantive feedback … about what further information is needed," heralding an even longer certification process.[27] Thus, working backwards from the January 1, 2026 start of the model year, to allow adequate planning time, Plaintiff OEMs must know within a matter of weeksneeded clarity on whether they must seek a model year 2026 certification from CARB. by October 31. Without regulatory certainty, Plaintiff OEMs are unablewere coerced into obtaining CARB certification for model year 2026 in order to engage in meaningfulmake product planning, reducing their ability to deliveravailable to customers in California without the products they needrisk of imminent enforcement, paying significant and want.unrecoverable certification expenses.

83. Although model year 2026 certification has occurred, CARB's rules (and the attempted enforcement thereof) impact the products available to customers in California throughout the model

---

[26] The August 25, 2025 MAC and Emergency Rulemaking underscores why Plaintiffs are being harmed today. CARB has taken the position that it reserves the right to retroactively enforce the preempted regulations, should a court find that the Congressional Resolutions are invalid. In the meantime, Plaintiffs cannot sell uncertified vehicles in California today without running a severe risk of massive penalties, but following preempted rules (absent a court order directing such compliance) risks noncompliance with federal directives. Uncertainty whether Plaintiffs will be subject to enforcement of an unconstitutional law is itself an injury that is damaging Plaintiffs' ability to serve customers today. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (pre-enforcement suit proper where plaintiff alleges a "credible threat of enforcement").

[27] CARB, On-Road Heavy-Duty and Off-Road Compression Ignition Certification Programs: Certification Steps Overview, https://perma.cc/UUT3-HWG5.

41

1    year and the OEMs' business planning.  To plan their businesses, Plaintiff OEMs need certainty on the
2    applicable regulations and whether they will be subject to retroactive enforcement.

3    84.    For those Plaintiff OEMs who certified to CARB's now-preempted rules, if this Court
4    enjoins CARB's attempts to enforce its preempted rules, such an OEM could shift their strategy to sell
5    *different* vehicles and engines to customers in California.  And even for OEMs that sell the same prod-
6    ucts in California and outside California (*i.e.*, those that certified under a so-called "alternative path-
7    way," *supra* ¶ 67), the enforceability of CARB's rules impact Plaintiff OEMs' costs of compliance
8    associated with the preempted rules.  For example, CARB's regulations include specific requirements
9    for extended warranties, the number of miles during which a truck must meet certain emissions perfor-
10   mance requirements (known as "useful life"), and in-use emissions testing requirements, all of which
11   add significant costs for OEMs.  In addition, CARB emissions credit purchase requirements could
12   require a Plaintiff OEM to restrict sales of certain model year 2026 products in California now if such
13   credits are not available to a Plaintiff OEM.

14   68.85.  Furthermore, CARB's imposition of any requirement for CARB-specific certification
15   when CARB lacks preempted emissions standards on which to base its certification authority harms
16   OEMs.  Applying for a CARB certification entails a substantial investment of time and resources on
17   the part of Plaintiff OEMs.  In addition to the direct cost of paying CARB certification fees, obtaining
18   a certification involves expensive emissions testing to ensure compliance with CARB standards—test-
19   ing which, to generate the requisite emissions testing results, needs to start roughly eight months before
20   the submission of a certification application.  For example, Plaintiff OEMs must "age" engines to sim-
21   ulate real-world wear and tear to ensure that certain regulatory requirements are met—an expensive
22   process that uses emission testing laboratories that could otherwise be used for research and develop-
23   ment.  And once an application is submitted, CARB can take months to provide a certification.  As a
24   result, the certification process can take upwards of a year, and it requires Plaintiff OEMs to invest
25   substantial resources.  Plaintiff OEMs thus need a timely decision about whether CARB's certification
26   requirements —including the "alternative pathways"—are valid for model year 2027.

27   86.    Even OEMs that have sought, or will seek, certification under the August 25, 2025 MAC

and Emergency Rulemaking "alternative pathways" must incur costs to compile and submit applications, and pay fees to CARB. Such OEMs also suffer the ongoing harm of vehicles and engines sold pursuant to the CARB certification being subject to CARB's jurisdiction when CARB's authority to require certification or any other conditions precedent to initial sale is prohibited by the Clean Air Act. Plaintiff OEMs should be free to sell products that comport with federal law anywhere in the United States without any approvals by CARB.

87.    Plaintiff OEMs also need clarity regarding the standards that apply to their vehicles and engines for model year 2027 and subsequent model years, as CARB is attempting to enforce its preempted regulations for subsequent model years through the August 25, 2025 MAC and the Emergency Rulemaking. Without regulatory certainty, Plaintiff OEMs are unable to engage in meaningful product planning, reducing their ability to deliver to customers the products they need and want. Customer purchasing decisions depend on many factors, including product availability and pricing. And the OEMs make product and pricing decisions based on regulatory requirements. These decisions begin well in advance of a model year, and OEMs' long-term planning needs and customer relationships are and will continue to be hindered so long as the regulatory uncertainty persists.

88.    In addition, Plaintiff OEMs are suffering and will suffer harm from CARB's adoption of the 100 percent zero-emissions vehicle sales mandate in Advanced Clean Fleets without a waiver because if this rule is not preempted, Plaintiff OEMs must take steps now to achieve the 100 percent zero-emissions vehicle sales mandate by 2036. Although 2036 may seem distant, nine years is an incredibly short window for achieving the fundamental restructuring of the heavy-duty trucking industry required by a complete ban on internal-combustion engines. And every day that goes by shortens the period in which Plaintiff OEMs can comply. Thus, Plaintiff OEMs must take steps *now* to have any hope of achieving this mandate. Indeed, CARB itself initially proposed that the ban begin in 2040 on the theory that a 2036 ban would prove too ambitious, explaining "sufficient time is needed to build-out maintenance, supply, and infrastructure networks and to make a full transition to [zero-emissions

vehicle]s," and stating that a 2036 deadline "would result in a fast ramp-up of additional [zero-emissions vehicle] demand significantly above the expected supply of [zero-emissions vehicle]s."[28]  Likewise, CARB itself acknowledged that the now-preempted Advanced Clean Trucks standards were needed to gradually ramp up zero-emissions vehicle supply.  *See id.*

89.    But without Advanced Clean Trucks, there is no technical ramp up to the combustion ban, making the 2036 ban even more difficult to achieve.  Furthermore, CARB has abrogated the Advanced Clean Fleets mandate requiring private fleets to purchase zero-emissions vehicles and maintain a specific percentage of zero-emissions vehicles in their fleets, further eroding OEMs' pathway to achieving the 2036 target.  *See Nebraska v. Cliff*, No. 2:24-cv-01364-TKN-CKD (E.D. Cal. 2024), Dkt. 95.

**OEMs must decide now how, and how quickly, to transition fleets to zero-emissions vehicles, including how to invest capital in research and development and new production facilities.  Any disclaimer that CARB will not enforce the combustion ban without a waiver does not mitigate (let alone eliminate) OEM Plaintiffs' current injury.  CARB repealed much of Advanced Clean Fleets (although not the combustion ban at issue in this case) when it withdrew its waiver request because, as a CARB Member explained, "without federal approval, the regulation would have been a legal zombie: dead on its feet, but still scaring the living."  *See supra* note 10b.        Injury From California's Suppressions of Plaintiff OEMs' Free Speech**

69.    California is suppressing Plaintiff OEMs' speech and petitioning rights to insulate State officials from judicial oversight.  To accomplish this, California has threatened Plaintiff OEMs and other heavy-vehicle manufacturers with unfavorable regulatory treatment if they challenge the preempted standards, including that CARB will identify "opportunities for special considerations and flexibilities for" manufacturers when crafting future standards only if those manufacturers continue following the standards that California is prohibited by the Clean Air Act from attempting to enforce. *See* Executive Order N-27-25.  Further, California has stated its intent to prohibit its agencies from purchasing vehicles unless they are from manufacturers that agree with CARB's position—a pledge to punitively restrict the purchase of Plaintiff OEMs' products in its government-owned fleet—and has directed de-prioritizing those manufacturers from government incentive programs. *See supra* ¶¶ .

---

[28] CARB, Public Hearing to Consider the Proposed Advanced Clean Fleets Regulation, Staff Report: Initial Statement of Reasons, (Aug. 30, 2022) at 254, https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/acf22/isor2.pdf.

44

1  ~~Both the May 23, 2025 MAC and Executive Order N-27-25 root the requirement to comply with~~
2  ~~preempted regulations in the Clean Truck Partnership—a document that, as detailed above, includes~~
3  ~~measures to restrict manufacturers' ability to challenge the legality of CARB's standards.~~

4     90.     .  The ban on internal-combustion engines remains a "zombie" that is intended to scare
5  OEMs into taking steps to comply with the preempted ban today, regardless of whether CARB ever
6  seeks or secures a waiver.

7     91.     Furthermore, CARB has stipulated only that it will not enforce the 2036 ban as part of
8  the Advanced Clean Fleets regulation.  Dkt. 78 at 19–20.  But CARB amended its Advanced Clean
9  Trucks standards to include the 2036 combustion ban in that section of its regulations as well, and
10 CARB has not disavowed enforcement of this amendment.  *See* Cal. Code Regs. tit. 13, § 1963.6.
11 Rather, CARB has taken repeated efforts to attempt to enforce Advanced Clean Trucks standards in
12 violation of Section 209 of the Clean Air Act, including codifying a threat to retroactively punish OEMs
13 that do not follow the preempted standards.  *See* Dkt. 73-33 at 1.  And even more directly, CARB has
14 brought a lawsuit against OEM Plaintiffs in state court seeking to enforce the Clean Truck Partner-
15 ship—which incorporates the 2036 combustion ban—via specific performance.  Dkt. 85-1.

16     ~~70.~~92.  As the Ninth Circuit aptly put it, "Courts have adopted various metaphors to encapsulate
17 the dilemma facing a pre-enforcement plaintiff—'the rock … and the hard place,' 'the Scylla … and
18 the Charybdis,' and the choice to comply or 'bet the farm.'"  *Peace Ranch LLC v. Bonta*, 93 F.4th 482,
19 487 (9th Cir. 2024) (citations omitted).  Plaintiff OEMs are in such a dilemma here.  But as the Supreme
20 Court explained, "where threatened action by *government* is concerned," a plaintiff is not required "to
21 expose [itself] to liability before bringing suit to challenge the basis for the threat."  *MedImmune, Inc.*
22 *v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).  Thus, Plaintiff OEMs apply to this Court for declar-
23 atory relief clarifying which laws they must follow when offering new heavy-duty vehicles and engines
24 for sale~~, and prohibiting the Defendants from violating Plaintiff OEMs' constitutional rights~~.

25                                          **COUNT I**

26                        **(Clean Air Act Preemption—CARB Standards)**

27     ~~71.~~93.  Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

28     ~~72.~~94.  The Supremacy Clause of the U.S. Constitution enshrines the "Laws of the United

                                              45

States" as "the supreme Law of the Land."  U.S. Const. Art. VI.  Accordingly, the Supremacy Clause

"provides the constitutional foundation for federal authority to preempt state law."  *Beaver v. Tarsadia*

*Hotels*, 816 F.3d 1170, 1178 (9th Cir. 2016).  Congress expressly preempts state law "when the text of

a federal statute explicitly manifests Congress's intent to displace state law."  *Ass'n des Éleveurs de*

*Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1114 (9th Cir. 2022).  Courts must invalidate

preempted state laws.  *See CSX Transp., Inc., v. Easterwood*, 507 U.S. 658, 663 (1993) ("Where a state

statute conflicts with, or frustrates, federal law, the former must give way.").

95.    The Clean Air Act prohibits states from ~~not only adopting, but from any "attempt to~~ ~~enforce any standard"~~<u>taking three actions</u> relating to new motor vehicle and engine emissions unless a

waiver is granted~~.~~<u>:  States shall not "adopt or attempt to enforce any standard," nor shall they "require</u>

<u>certification, inspection, or any other approval … as condition precedent to [] initial retail sale."</u>  42

U.S.C. § 7543(a).  <u>Here, CARB is violating all three of these prohibitions.</u>

96.    <u>First, CARB contravenes the ban on "adopt[ing]" standards.  The legal definition of</u>

<u>"adopt" includes to "put into effective operation."  Black's Law Dictionary (4th rev. ed. 1968), Adopt.</u>

<u>Under Section 209(a), when a State purports to adopt an emissions standard without a waiver—as</u>

<u>CARB has attempted to do—it is a dead letter under the Supremacy Clause at the moment of adoption</u>

<u>and cannot be put into effective operation.  By expressly preempting the adopting of state standards</u>

<u>without a waiver, Section 209(a) confers on private entities, including plaintiffs, a federal right to sell</u>

<u>trucks subject only to federal constraints.</u>

97.    <u>Here, Plaintiff OEMs have a current federal right to engage in the nationwide sale of</u>

<u>vehicles subject only to federal constraints, which CARB is infringing.  CARB's rules thus impose</u>

<u>immediate injuries when adopted, not just when enforced.  CARB has historically enforced its rules</u>

<u>back to the date that the rules were adopted.  *See, e.g.*, CARB, Advanced Clean Fleets Regulation</u>

<u>Enforcement Notice (Dec. 28, 2023, updated Oct. 25, 2024), at 1 (explaining that CARB will enforce</u>

<u>Advanced Clean Fleets "for any period for which a waiver is granted" including "while the waiver</u>

<u>request is pending").  Indeed, in current federal litigation, CARB has taken the position that EPA waiver</u>

<u>grants "have immediate retrospective … effect: they waive preemption for actions California has al-</u>

<u>ready taken to adopt its standards, *see id.* § 7543(a), (b)(1), as well as for covered standards applicable</u>

46

to vehicles sold before EPA acted, *e.g.*, 90 Fed. Reg. 643, 644 (Jan. 6, 2025) (standards applicable in model years 2024 and later)." Opp. to Mot. to Dismiss, *California v. United States*, No. 4:25-cv-04966-HSG (N.D. Cal. Jan. 9, 2026), Dkt. 194.  Thus, if not restrained by a federal court, CARB will "put [its regulations] into effective operation" as of the state law adoption date, even though the operation of the rules was preempted under Section 209(a) during that time.

98.    Because CARB retroactively enforces its rules during these post-adoption, pre-waiver periods, Plaintiff OEMs must take compliance steps beginning when rules are *adopted*, even before EPA has the opportunity to weigh in on whether the rule is permissible under Section 209(b), incurring a myriad of consequences and costs.  Exacerbating the unfairness of this situation, CARB may allow years to pass between adopting rules and obtaining an EPA waiver.  For example, CARB adopted changes to its heavy-duty on-board diagnostics rules in 2016 and 2019 without ever submitting a waiver request, then included 2020 amendments to the rules in a waiver submission to EPA two years later. *See supra* ¶ 35.c; *see also*, *e.g.*, 86 Fed. Reg. 45724, 45725 (Aug. 16, 2021) (CARB rules "became operative under state law" in June 2017 but CARB did not submit waiver request to EPA until over four years later in March 2021).  A ruling by a federal court that CARB's rules are preempted when adopted would prevent Plaintiff OEMs being forced to prematurely comply with preempted rules due to CARB's unfair retroactive interpretation.

~~73.~~99. Second, CARB violates the ban on enforcing or attempting to enforce its preempted standards.  The ordinary meaning of "enforce" is to "compel obedience to."  *See* Enforce, Dictionary.com, https://perma.cc/F4E8-L355 (last visited ~~Aug. 10~~Dec. 22, 2025); *see also* Black's Law Dictionary (4th rev. ed. 1968) (same).  The Supreme Court explained that an "attempt" to enforce an emissions standard includes preliminary acts falling short of enforcement.  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 257 (2004).  As the court observed, the term "attempt to enforce" in Section 209(a) is not limited to the actual imposition of penalties for violations but includes steps preliminary to that action.  *Id.*  CARB is enforcing or attempting to enforce its emissions standards despite all standards being preempted by the Clean Air Act:

~~74.    As relevant here, California is trying to enforce emissions standards and conditions~~

precedent to sale of new heavy-duty vehicles and engines, even though its heavy-duty vehicle emissions standards are all preempted by the Clean Air Act:

a. *First*, all standards contained within the waiver submissions to EPA for Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II are preempted because the Clean Air Act waivers granted based on those submissions were *explicitly* revoked by Congressional ~~resolutions~~Resolutions passed pursuant to the Congressional Review Act. Without any operative waivers, CARB is therefore preempted from "attempt[ing] to enforce" or requiring "certification, inspection, or any other approval relating to" a manufacturer's compliance with Advanced Clean Trucks, Omnibus Low NOx, and Advanced Clean Cars II. 42 U.S.C. § 7543(a). This prohibition also reaches the evaporative emissions and refueling emissions standards applicable to heavy-duty vehicles along with the medium-duty on-board diagnostics standards, which were included in the Advanced Clean Cars II waiver, as well as the heavy-duty warranty, zero-emission airport shuttles, and certification of zero-emission powertrain regulations included in the Advanced Clean Trucks waiver. It also reaches any amendments, reenactments, or other regulatory mechanisms that substantially resemble the rules whose waivers were revoked by statue. Once Congress and the President revoke a preemption waiver by statute, EPA cannot issue a new waiver for the same (or a similar) emissions standards without a subsequent act of Congress. *See* 5 U.S.C. § 801(b)(2). Thus, absent a subsequent act of Congress, California is also preempted from adopting, attempting to enforce, or requiring certification to CARB's amended Advanced Clean Trucks rule, which is substantially similar to the rule whose waiver was revoked by statute. *See* July 24, 2025 CARB Approval, *supra*.

b. *Second*, the Advanced Clean Fleets, Phase 2 Greenhouse Gas, and Heavy-Duty On-Board Diagnostic standards lack waivers under the Clean Air Act and are thus preempted. First, CARB withdrew its waiver request to EPA for Advanced Clean Fleets on January 13, 2025, before EPA could make a waiver decision. By CARB's own account, without a Clean Air Act waiver, Advanced Clean Fleets is "dead

on its feet."[29]  Second, although CARB previously indicated it would submit a waiver request to EPA for its Phase 2 Greenhouse Gas standards, there is no public indication it has submitted such a waiver or that one has been issued.  The Phase 2 Greenhouse Gas standards therefore must likewise be considered a legal nullity.  Finally, as to the Heavy-Duty On-Board Diagnostic standards, CARB has failed to obtain a waiver for the current2016 and 2019 standards, and thusany waiver for subsequent amendments was invalidated when the waiver for Omnibus Low NOx was invalidated by the Congressional Resolutions.  Thus, the Heavy-Duty On-Board Diagnostic standards currently adopted in California hashave no preemption waiver to support itthem.

c.    *Third*, CARB's September 2025 Emergency Rulemaking likewise adopts and attempts to enforce preempted emissions standards and seeks to impose preempted certification requirements.  The rulemaking revises and adds new sections to title 13 of the California Code of Regulations. It readopts several separate superseded standards and applies them prospectively to model year 2026 and subsequent model year vehicles without a valid preemption waiver or the lead time required under the Clean Air Act.  The Emergency Rulemaking further reserves CARB's right to retroactively "enforce Advanced Clean Cars II and Omnibus" and warns manufacturers that they "assume the risk" of this retroactive enforcement if they do not certify to the standards explicitly preempted by Congress.  Dkt. 73-33, at 6.  But California may not "adopt or attempt to enforce" any vehicle emissions standard or certification requirement without a preemption waiver from EPA.  42 U.S.C. § 7543(a).  By changing the standards applicable to current and future model year vehicles with no lead time—even if those standards existed at some point in the past—the Emergency Regulation constitutes an adoption and attempt to enforce a new emissions regulation regime *now*, and requires a new waiver *now*.  But rather than seek a waiver for its new proposed rule, CARB simply

---

[29] Dean Florez, Why California recently revised its clean air regulations for zero-emission trucks, The Sacramento Bee (May 6, 2025), https://www.sacbee.com/opinion/op-ed/article305738891.html.

asserts that these antecedent standards "have extant federal preemption waivers not subject to the recent congressional resolutions." Dkt. 73-33 at 2–3. This legally unsound premise ignores that the Clean Air Act contemplates that EPA will make the waiver determination based on a given set of regulations at a specific moment in time. *See, e.g.*, 42 U.S.C. § 7543(b)(1)(C). Any change in the currently effective standard thus requires a new waiver determination, as EPA has explained: A prior waiver is invalid "if a regulation becomes ineffective at any time, whether through the passage of time, repeal, or by any other means." *See* EPA Comment on CARB's Emergency Amendment and Adoption of Vehicle Emissions Regulation, September 27, 2025, available at https://shorturl.at/wLmJV. Furthermore, as a novel patchwork of antiquated standards, California also must obtain a *new* waiver because this is an emissions standard that "differ[s] in any way from provisions already subject to an extant preemption waiver." *Id.*

100.    Third, California is trying to enforce conditions precedent to the sale of new heavy-duty vehicles and engines, including certification requirements. But because all of California's heavy-duty vehicle emissions standards are preempted by the Clean Air Act, CARB has no basis for its certification authority. As CARB succinctly summarized Plaintiff OEMs' position: "CARB has *no* operative emissions standards to which it can certify new motor vehicles to be sold in the State." CARB Emergency Vehicle Emissions Rulemaking Public Notice, Dkt. 73-33, at 3.

~~75.~~101.    Because none of the aforementioned CARB standards have lawful and operative Clean Air Act waivers, ~~they are~~ CARB's adoption of the standards, attempts to enforce the standards, and imposition of certification requirements are all expressly preempted by federal law.

~~76.~~102.    Absent declaratory and injunctive relief, ~~in a matter of weeks~~ Plaintiff OEMs will need to begin investing or will be forced to continue to invest substantial resources to certify to and comply with California's model year ~~2026~~2027 emissions standards.

103.    Plaintiff OEMs may also suffer detrimental impacts to their ability to make products available to customers in California throughout the current model year and inability to undertake business planning.

~~77.~~104.    Such ~~investments~~outcomes would irreparably harm Plaintiff OEMs. *See, e.g.*,

50

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."). Because sovereign immunity bars money damages against a state, *California Pharm. Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009), *vacated on other grounds*, 565 U.S. 606 (2012), Plaintiff OEMs would thus not be able to recover any costs resulting from complying with regulations later found to be invalid, a harm that is by definition unrecoverable and irreparable, *see Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016).

78.105.    Plaintiff OEMs are therefore entitled to (1) a declaration that CARB's adoption of emissions standards applicable to new heavy-duty vehicles and engines areis preempted by the Clean Air Act, and (2) an injunction barring Defendants from taking any steps to enforce those standards against Plaintiff OEMs, including the imposition of conditions precedent to sale such as certification requirements.

## COUNT II

### (Clean Air Act Preemption—May 23, 2025 MAC & EO N-27-25Attempts to Enforce Preempted Standards)

79.106.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

80.107.    The Clean Air Act provides that absent a preemption waiver, "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or … engines," including by requiring "certification, inspection, or any other approval relating to the control of emissions" as a condition of sale. 42 U.S.C. § 7543(a).

81.108.    Because none of CARB's emissions standards applicable to new heavy-duty vehicles and engines have lawful and operative waivers, they are preempted by the Clean Air Act.

82.109.    Nevertheless, Defendants are "attempt[ing] to enforce" their preempted emissions standards in the following twoa variety of ways. For example:

    a.    *First*, CARB issued a MAC in which it announced that it "will continue to accept and process" certification applications from manufacturers demonstrating compliance with the standards set forth in Advanced Clean Trucks and Omnibus Low

NOx, and that such certification is required to "enable lawful vehicle sales in California." May 23, 2025 MAC at 2–3 (citing statutes that make it illegal to sell uncertified vehicles). Although the May 23, 2025 MAC has been superseded, CARB has continually demonstrated that, absent relief from this Court, it will continue to advance the policies outlined therein. For example, in the Emergency Rulemaking, CARB evinced its intent and purported power to retroactively enforce the preempted emissions standards if OEMs refuse to certify to the preempted standards now, one of the policy goals of the May 23, 2025 MAC. *See* Dkt. 79-3 at 3. *See Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (noting that government "bear[s] the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again").

b.    *Second*, in Executive Order N-27-25, Governor Newsom directed CARB to penalize any heavy-duty vehicle manufacturers that fail to certify compliance with CARB's preempted standards. Those penalties include deprioritizing the non-certifying "manufacturers in government vehicle procurement decisions," cutting their access to "funding" relating to "the purchase of zero-emission vehicles," and leveraging any other "special considerations and flexibilities" in crafting future rules to disadvantage non-certifying manufacturers. Executive Order N-27-25 at 3.

c.    ~~The May 23, 2025 MAC and Executive Order N-27-25 are therefore unlawful "attempt[s] to enforce" preempted emissions standards, and they~~*Third*, in the August 25, 2025 MAC, CARB reiterated that a certification is necessary to lawfully sell vehicles in California. It further stated that, instead of certifying to preempted rules, manufacturers could alternatively seek a CARB certification by providing either (1) an "approved application for CARB certification to the vehicle and engine emission regulations that immediately preceded those covered by the waivers that were targeted by the congressional resolutions" or (2) a "U.S. EPA certification to its motor vehicle emission standards applicable to the given vehicle in the relevant model year, as those regulations are currently codified." August 25, 2025 MAC at 2. But these alterative pathways are illusory. Under *any* pathway besides full Omnibus certification, an OEM is

subject to retroactive enforcement of Omnibus if a court were to hold that the Congressional Resolutions were invalid:  CARB purports to "reserve[] its right to enforce" the preempted regulations, including "with respect to model years that such manufacturers ask CARB to certify under these alternative pathways."  August 25, 2025 MAC at 3. This threat of retroactive enforcement attempts to compel compliance with the preempted standards now.  In addition, CARB stated that it would penalize manufacturers that did not continue to certify to the preempted standards, including by denying those manufacturers "eligibility for procurement and other incentives." *Id*.

d.    *Fourth,* CARB's September 2025 Emergency Rulemaking asserts continuing certification authority, stating that CARB will not only certify to the novel patchwork of superseded standards, but that CARB "continues to accept and process certification applications" for the Advanced Clean Cars II and Omnibus standards.  Dkt. 73-33 at 6.  CARB further warns manufacturers that they "assume the risk" of the threatened retroactive enforcement of the preempted standards if the Congressional Resolutions are invalidated. *Id.*

e.    *Fifth*, both the August 25, 2025 MAC and the Emergency Rulemaking include explicit threats of significant penalties through retroactive enforcement of the preempted standards if later found lawful.  *See* August 25, 2025 MAC, at 3; Dkt. 73-33 at 1, 3, 10.  These threats effectively "attempt to enforce" the preempted standards.

f.    *Sixth*, CARB filed the October 27, 2025 lawsuit against the OEM Plaintiffs seeking damages and specific performance of any obligations under the Clean Truck Partnership.  *See California Air Resources Board v. Daimler Truck North America LLC et al.*, No. 25CV151420 (Alameda Sup. Ct. Oct. 27, 2025).

~~83.~~110.    Each of the foregoing is an unlawful "attempt to enforce" preempted emissions standards and impose unlawful "certification" requirements "relating to the control of emissions" as a condition of sale in California.  42 U.S.C. § 7543(a); *see* California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption; Notice of Determination, 55 Fed. Reg. 28,825 (July 13, 1990) (explaining that prior EPA preemption waivers for specific "classes of vehicles and engines,

53

based on California's standards and/or accompanying enforcement procedures, removes the prohibitions of section 209(a) regarding … conditions precedent for those classes").).").

84.111.    Such actions, and any similar attempts to enforce the preempted emissions standards, are expressly preempted by the Clean Air Act.

85.112.    Absent declaratory and injunctive relief, Plaintiff OEMs will be irreparably harmed as they are now forced to choose between investing substantial resources to comply with ultimately preempted standards on the one hand, and risking significant liability (and a loss of customer goodwill) from regulatory noncompliance on the other hand. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009).

86.113.    Plaintiff OEMs are thus entitled to (1) a declaratory judgment that any and all attempts to enforce the preempted standards, including the May 23, 2025 MAC and, Executive Order N-27-25, the August 25, 2025 MAC, the September 2025 Emergency Rulemaking, and any and all similar actions by Defendants violate the Clean Air Act and Supremacy Clause of the U.S. Constitution; and (2) an injunction barring Defendants from carrying out the enforcement, compliance, and punishment directives described in the May 23, 2025 MAC and, Executive Order N-27-25, the August 25, 2025 MAC, the September 2025 Emergency Rulemaking, and any and all similar actions.

## COUNT III

### (Clean Air Act Preemption—Clean Truck Partnership)

87.114.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

88.115.    Section 209(a) of the Clean Air Act broadly preempts actions by any "State or any political subdivision thereof" that "*adopt* or *attempt* to enforce … any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines" subject to federal regulation. 42 U.S.C. § 7543(a) (emphasis added). By dictating that manufacturers must "meet, in California, the requirements of the relevant regulations … regardless of the outcome of any litigation challenging the waivers/authorizations for those regulations, or CARB's overall authority to implement those regulations," Ex. A (CTP) App'x B, the Clean Truck Partnership violates both strictures of Section 209(a)'s comprehensive and express preemption of state action.

54

89.116.      First, the Clean Truck Partnership operates as an *adoption* of a standard.  Specifically, it purports to readopt and implement the CARB standards at issue in the event of litigation outcomes adverse to CARB.  Functionally, the Clean Truck Partnership thus becomes the backstop regulatory mechanism for CARB to implement the specific emissions standards—the listed regulations—applicable to heavy-duty vehicles and engines.  The Clean Truck Partnership applies to all manufacturer signatories, which represent all manufacturers of heavy-duty on-highway internal-combustion vehicles and engines.  Ex. A (CTP) ¶ 2, App'x B,  at 1.

90.117.      Second, by purporting to require compliance by the manufacturers, in the absence of lawful authority, the Clean Truck Partnership represents an *attempt to enforce* the cited standards.  *See* Executive Order N-27-25 at 2 (describing requirements of the Clean Truck Partnership as requiring manufacturers "to meet California's heavy-duty vehicle emission standards that will require the sale and adoption of zero-emissions technology in California, regardless of the outcome of any change in law concerning California's authority to implement its more stringent emissions standards under the federal Clean Air Act").  Defendants seek to enforce the Clean Truck Partnership as an industry-wide mandate to follow regulations abrogated by federal legislation and prohibited by federal law.  As one example, CARB attempted to enforce the Clean Truck Partnership by filing a civil action in the Superior Court of Alameda County seeking, among other things, to compel Plaintiffs to satisfy the commitments included in the Clean Truck Partnership, including compliance with the preempted regulations.  *See* Dkt. 85-1 (notice to this Court of lawsuit filed by CARB to enforce Clean Truck Partnership).

91.118.      Any adoption of a standard or attempt to enforce a standard relating to the control of emissions must have a waiver from EPA, or it is expressly preempted.  *See* 42 U.S.C. §§ 7543(a), (b).  The Clean Truck Partnership lacks a waiver and is thus preempted by Section 209(a).

92.119.      CARB cannot attempt to enforce through a misapplied Clean Truck Partnership what federal law prohibits it from doing as a regulator, nor can it contract around the Supremacy Clause.  Even if the Clean Truck Partnership were understood as an agreement rather than the adoption and enforcement of a backstop regulation, it still cannot be a backdoor for CARB to enforce preempted emissions standards.  Under well-established law, "a government official cannot do indirectly what she

55

is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Because Defendants cannot directly enforce ~~their~~CARB's preempted standards—which would violate the Supremacy Clause and frustrate Congress's decision to ensure that the nation is governed by a single national emissions policy—they cannot use the Clean Truck Partnership to indirectly accomplish the same end. After all, "[i]t would be a palpable incongruity to strike down" an act that directly compels compliance with a preempted law, while "uphold[ing] an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege." *Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 593 (1926).

~~93.~~120.        Therefore, the Clean Truck Partnership is preempted for the same reasons as the May 23, 2025 MAC ~~and~~, Executive Order N-27-25, and August 25, 2025 MAC are preempted. Absent declaratory and injunctive relief, Plaintiff OEMs will be irreparably harmed as they are forced to choose between ~~investing substantial resources to comply~~numerous harms flowing from complying with ultimately preempted standards on the one hand, and risking significant liability (and a loss of customer goodwill) from regulatory noncompliance on the other hand. *Morales*, 504 U.S. at 381; *Am. Trucking Ass'ns*, 559 F.3d at 1057–58.

~~94.~~121.        Plaintiff OEMs are therefore entitled to (1) a declaratory judgment that the Clean Truck Partnership violates the Clean Air Act and Supremacy Clause of the U.S. Constitution, and (2) an injunction barring Defendants from taking any steps to enforce the Clean Truck Partnership.

~~**COUNT IV**~~

~~**(First Amendment—EO N-27-25, May 23, 2025 MAC, Clean Truck Partnership)**~~

~~95.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.~~

~~96.    The First Amendment prohibits governments from "abridging the freedom of speech" or the right "to petition the Government for a redress of grievances." U.S. Const. amend. I; *see also Gitlow v. New York*, 268 U.S. 652 (1925) (incorporating the First Amendment against the States).~~

~~97.    At the heart of the First Amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Standing shoulder to shoulder with the citizenry's interest in uninhibited,~~

56

1    robust debate on public issues is its equally profound "mistrust of governmental power." *Citizens*

2    *United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

3        98.    To protect these freedoms, the First Amendment generally prohibits government offi-

4    cials from "impos[ing] rules and conditions which in effect insulate [their] own laws from legitimate

5    judicial challenge." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548–49 (2001).

6        99.    A condition that restricts a citizen's right to bring lawful challenges against the govern-

7    ment will be void and unenforceable if the government's asserted interests in enforcing that condition

8    are outweighed by strong policy interests that are rooted in the First Amendment. *Davies v. Grossmont*

9    *Union High Sch. Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991).  By contrast, a condition that requires a

10   private party to forfeit their First Amendment rights is valid and enforceable if the government has a

11   compelling interest in the restriction and there is a sufficiently "close nexus—a tight fit—between the

12   specific interest the government seeks to advance … and the specific right waived." *Id.*

13       100.   The government's interest in conditioning favorable treatment on the waiver of a con-

14   stitutional right "may wane as time passes," however. *Powell v. SEC*, --- F.4th ----, No. 24-1899, 2025

15   WL 2233792, at *11 (9th Cir. Aug. 6, 2025).

16       101.   Here, whatever compelling interest Defendants might have had prior to June 2025 in

17   enforcing the Clean Truck Partnership and its conditions limiting Plaintiffs' rights to challenge those

18   conditions, such interests no longer exist today.

19       102.   Indeed, when the parties entered into the Clean Truck Partnership in 2023, the federal

20   government had not yet enacted laws that specifically preempted California from enforcing its emis-

21   sions standards.  On the contrary, at that time, California could still apply for Clean Air Act waivers

22   from EPA that would allow California to adopt and enforce its own emissions standards.  But in June

23   2025, the federal government statutorily vitiated those federal waivers, thereby prohibiting California

24   from enforcing the emissions standards contained in the Clean Truck Partnership, a contingency not

25   covered by the document.  *See* Ex. A (CTP) ¶ 2 (providing that Plaintiffs' commitments are triggered

26   by successful "*litigation* challenging the waivers or authorizations for those regulations or of CARB's

27   overall authority to implement those regulations" (emphasis added)).

28       103.   Just as importantly, EPA cannot grant California the waivers it needs to adopt or attempt

1  to enforce the now-preempted emission standards contained in the Clean Truck Partnership—or any

2  other versions "in substantially the same form"—without a subsequent act of Congress specifically

3  authorizing such action. *See* 5 U.S.C. § 801(b)(2). Because Defendants have no interest, let alone a

4  compelling one, in enforcing preempted standards, there can no longer be a "close nexus … between

5  the specific interest the government seeks to advance" by restricting Plaintiffs' speech "and the specific

6  right waived." *Davies*, 930 F.2d at 1399.

7        104.    On the other side of the ledger, "[c]riticism of government is at the very center of the

8  constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966).

9        105.    This means that the public interest against enforcing the Clean Truck Partnership's

10  speech restrictions is "of the highest order," whereas Defendants have no interest at all in suppressing

11  legitimate challenges against unlawful standards. *Davies*, 930 F.2d at 1397; *see also Velazquez*, 531

12  U.S. at 548–49.

13        106.    That imbalance in interests suggests a First Amendment violation in and of itself. But

14  even setting that aside, the Clean Truck Partnership's speech restrictions are simply too sweeping to

15  satisfy any "nexus" requirement. *See Powell*, --- F.4th ----, 2025 WL 2233792, at *11.

16        107.    Indeed, the Clean Truck Partnership not only prevents Plaintiffs from challenging

17  CARB's standards, but it also requires them to support or remain neutral towards "any prospective

18  Section 177 states' proposals" to implement CARB's preempted standards. Ex. A (CTP) ¶ 2, App'x D.

19        108.    It is well established that government officials cannot, without violating the First

20  Amendment, require their citizens to follow unlawful standards or force them to "adopt—as their

21  own—the Government's view on an issue of public concern" as a condition of receiving favorable

22  regulatory treatment. *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 218

23  (2013).

24        109.    That Defendants have unconstitutionally restricted Plaintiffs' speech rights is even more

25  apparent given that Defendants have promised to not only put Plaintiffs "back in the position they were

26  in before" they signed the Clean Truck Partnership if Plaintiffs challenge CARB's standards and

27  agenda, but have also threatened to make them even worse off if Plaintiffs exercise their speech rights.

28  *Powell*, --- F.4th ----, 2025 WL 2233792, at *11. Indeed, Defendants have threatened to engage in

58

1    "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse gov-

2    ernment action" in retaliation for speaking against or challenging the government. *See Nat'l Rifle Ass'n*

3    *of Am. v. Vullo*, 602 U.S. 175, 191 (2024).

4          110.    For years, California previously has attempted to insulate itself and its emissions regu-

5    lations from legitimate challenge by penalizing any manufacturers who disagree with CARB. *See, e.g.,*

6    David Shepardson, *California to Stop Buying GM, Toyota and Fiat Chrysler Vehicles Over Emissions*

7    *Fight*, Reuters (Nov. 18, 2019), https://www.reuters.com/article/idUSL2N27Y0HU/ (Governor New-

8    som "halt[ed] all purchases of new vehicles for state government fleets from" manufacturers that did

9    not agree with CARB's positions in preemption litigation).

10         111.    More recently, Governor Newsom issued Executive Order N-27-25, which directs

11   CARB to penalize any heavy-duty truck manufacturers that fail to certify compliance with CARB's

12   now-preempted standards or comply with the Clean Truck Partnership's speech restrictions.  Those

13   penalties include deprioritizing the non-certifying "manufacturers in government vehicle procurement

14   decisions," cutting their access to "funding" relating to "the purchase of zero-emission vehicles," and

15   most significantly—leveraging "special considerations and flexibilities" in forthcoming regulatory pro-

16   grams to disadvantage manufacturers who refuse to certify compliance with CARB's preempted stand-

17   ards or otherwise challenge CARB's emissions agenda.  Executive Order N-27-25 at 3.

18         112.    CARB's May 23, 2025 MAC similarly compels manufacturers—by implicit threat of

19   substantial fines—to comply with CARB's preempted standards and certification requirements, com-

20   pliance that CARB also characterized as "necessary" to "facilitate meeting the commitments of the

21   Clean Truck Partnership" and "enable lawful vehicle sales."  May 23, 2025 MAC at 2–3 (citing Cal.

22   Health & Safety Code §§ 43100, 43151-43153).

23         113.    For all these reasons, Defendants are violating Plaintiffs' First Amendment rights.

24   There is no "close nexus … between the specific interest the government seeks to advance" by enforc-

25   ing the Clean Truck Partnership "and the specific right waived" therein.  *Davies*, 930 F.2d at 1399.

26   And "[t]here is no room under our Constitution" for Defendants to use threats of fines and unfavorable

27   treatment to retaliate against critical speech, *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949),

28   "insulate [their] own laws from legitimate judicial challenge," *Velazquez*, 531 U.S. at 548, or enforce

1    unconstitutional and preempted regulations, *Baird*, 81 F.4th at 1042.

2        114.    Absent declaratory and injunctive relief, Plaintiff OEMs will be irreparably harmed.

3    *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) ("A party seeking

4    preliminary injunctive relief in a First Amendment context can establish irreparable injury ... by demon-

5    strating the existence of a colorable First Amendment claim.").  Plaintiff OEMs are therefore entitled

6    to (1) a declaration that Executive Order N-27-25 and the May 23, 2025 MAC violate the First Amend-

7    ment's guarantee of the right to participate in uninhibited debate of issues of public importance; (2) a

8    declaration that the Clean Truck Partnership is unenforceable because it violates the public policy in

9    the First Amendment; and (3) an injunction barring Defendants from using Executive Order N-27-25,

10   the May 23, 2025 MAC, or the Clean Truck Partnership to insulate themselves from legitimate legal

11   challenges or to punish entities that raise such challenges.

12

13                                **COUNT V**

14   **(Art. I, § 3 Cal. Constitution – EO N-27-25, May 23, 2025 MAC, Clean Truck Partnership)**

15       115.   Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

16       116.   Article I, Section 3 of the California Constitution provides that "[t]he people have the

17   right to instruct their representatives, petition government for redress of grievances, and assemble

18   freely to consult for the common good."  This provision of the California Constitution is "[a] protective

19   provision more definitive and inclusive" than its federal counterpart in the First Amendment.  *Robins*

20   *v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 908, 910 (1979).

21       117.   "The right to petition for redress of grievances is the right to complain about and com-

22   plain to the government."  *Wolfgram v. Wells Fargo Bank*, 53 Cal. App. 4th 43, 51 (1997).  "The right

23   includes the right to petition the executive or legislative branches directly" and also encompasses "the

24   right to petition the judicial branch for resolution of legal disputes."  *Vargas v. City of Salinas*, 200 Cal.

25   App. 4th 1331, 1342 (2011).

26       118.   Under California Civil Code section 52.1(c), "Any individual whose exercise or enjoy-

27   ment of rights secured by the Constitution or laws of the United States, or of rights secured by the

28   Constitution or laws of [California]" may sue the persons who violated their rights for declaratory,

60

injunctive, and monetary relief. California state courts have held that "reasonable, narrowly drawn restrictions designed to prevent abuse of the right can be valid under the state Constitution." *Chorn v. Workers' Comp. Appeals Bd.*, 245 Cal. App. 4th 1370, 1385 (2016) (cleaned up).

119. A government condition that restricts the ability of a party to "file or participate in litigation or support legislation to challenge or modify" the terms of that contract will violate Article I, Section 3 unless the government shows that: (1) the condition requiring the party to surrender their petitioning rights is "reasonably related" to a compelling government interest; (2) "the public value of imposing the condition manifestly outweighs its burden on constitutional rights"; and (3) "there are no less restrictive means" to achieve the government interest. *San Diego Cnty. Water Auth. v. Metro. Water Dist. of S. California*, 12 Cal. App. 5th 1124, 1157, 1160 (2017). If the government fails to meet its burden, the California Constitution will be violated "however well-informed and voluntary th[e] waiver" of the party's petitioning rights. *Id.* (citation omitted).

120. Here, Defendants—via Executive Order N-27-25, the May 23, 2025 MAC, and the Clean Truck Partnership—have attempted to deny Plaintiff OEMs and other manufacturers their petitioning rights guaranteed under the California Constitution. As alleged, Defendants have no cognizable interest in insulating themselves from legitimate legal challenges to state actions. "Where the right to petition is at issue, therefore, the government interest must be unrelated to the suppression of constitutionally protected petitioning activity." *Mejia v. City of Los Angeles*, 156 Cal. App. 4th 151, 163 (2007); *cf.* Cal. Civ. Code § 1668 ("All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.") The right to petition the government "is essential to the functioning of a democracy," and the interest in protecting that right far outweighs any conceivable interest the government might have in insulating CARB from legitimate challenge, especially with respect to federally preempted regulations. *City of San Jose v. Superior Ct.*, 2 Cal. 5th 608, 615 (2017).

121. Absent declaratory and injunctive relief, Plaintiff OEMs will continue to be irreparably harmed and subjected to violations of its petitioning rights under State law. Plaintiff OEMs are there-

1  fore entitled to (1) a declaration that Executive Order N-27-25, the May 23, 2025 MAC, and Defend-

2  ants' interpretation of the Clean Truck Partnership violate Article I, Section 3 of the California Consti-

3  tution; and (2) an injunction barring Defendants from enforcing Executive Order N-27-25, the May 23,

4  2025 MAC, or the Clean Truck Partnership to restrict Plaintiff OEMs' petitioning rights under Article

5  I, Section 3 of the California Constitution.

6

7  **COUNT VI**

8  **(California APA—May 23, 2025 MAC)**

9      122.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

10     123.    Pursuant to 28 U.S.C. § 1367(a), subject to certain exceptions, "in any civil action of

11  which the district courts have original jurisdiction, the district courts shall have supplemental jurisdic-

12  tion over all other claims that are so related to claims in the action within such original jurisdiction that

13  they form part of the same case or controversy."

14     124.    Here, it is appropriate for this Court to hear a related state law claim that arises out of

15  the same case and controversy: specifically, that the May 23, 2025 MAC is an underground regulation

16  promulgated in violation of the California Administrative Procedure Act ("California APA").

17     125.    This claim does not raise novel or complex issues of State law, nor does it substantially

18  predominate over the claims over which this Court has original jurisdiction.    *See* 28 U.S.C.

19  §§ 1367(c)(1)–(2).

20     126.    Under the California APA, any "person may obtain a judicial declaration as to the va-

21  lidity of any regulation or order of repeal by bringing an action for declaratory relief." Cal. Gov't Code

22  § 11350.

23     127.    The California APA places procedural requirements on state agencies, including CARB,

24  before the agencies can issue regulations to "ensure that those persons or entities whom a regulation

25  will affect have a voice in its creation." *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal. 4th 557,

26  568 (1996); *see also* Cal. Gov't Code §§ 11346.2, 11346.8. Accordingly, California Government Code

27  section 11340.5(a) states that a state agency shall not "issue, utilize, enforce, or attempt to enforce any

28  guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule,

62

1  which is a regulation as defined in [Government Code] Section 11342.600, unless the guideline, crite-

2  rion, bulletin, manual, instruction, order, standard of general application, or other rule has been adopted

3  as a regulation" and the procedures of the APA have been satisfied.  Regulations promulgated in vio-

4  lation of this provision are unlawful "underground regulations."  *See* Cal. Code Regs. tit. 1, § 250.

5  128.  Section 11342.600 of the California Government Code "defines 'regulation' very

6  broadly to include 'every rule, regulation, order, or standard of general application or the amendment,

7  supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to im-

8  plement, interpret, or make specific the law enforced or administered by it, or to govern its procedure.'"

9  *Tidewater Marine Western*, 14 Cal. 4th at 571 (quoting Cal. Gov't Code § 11342(g)).  A "regulation"

10  under the California APA "has two principal identifying characteristics." *Tidewater Marine Western*,

11  14 Cal. 4th at 571.  "First, the agency must intend its rule to apply generally, rather than in a specific

12  case," and second, the regulation must "implement, interpret, or make specific the law enforced or

13  administered by [the agency], or govern … [the agency's] procedure." *Id.*

14  129.  The May 23, 2025 MAC is an underground regulation promulgated in violation of the

15  California APA.

16      a.      *First*, the MAC is a rule of general application.  The MAC is a "blanket

17      interpretation[s]" that CARB "intend[s] to apply in … all cases of a particular class or

18      kind," indicating that it too embodies "polic[ies] of general application and thus … reg-

19      ulation[s]." *Tidewater Marine Western*, 14 Cal. 4th at 573; *see also Vasquez v. Dep't

20      of Pesticide Regul.*, 68 Cal. App. 5th 672, 689 (2021).  The MAC is not an individual

21      adjudication.  It does not involve a case-specific exercise of CARB's discretion and is

22      not designed to apply a "rule to a specific set of existing facts." *Strumsky v. San Diego*

23      *Cnty. Emps. Ret. Ass'n*, 11 Cal. 3d 28, 35 n.2 (1974).  Rather, it sets forth which stand-

24      ards are in effect in California for the 2026 model year, impacting an entire industry,

25      and therefore has a prospective legislative purpose.  For example, in the MAC, CARB

26      takes the position that it will certify vehicles for model year 2026 pursuant the Advanced

27      Clean Trucks and Omnibus Low NOx.  The MAC is thus a new regulatory program that

28      requires manufacturers of internal-combustion powered on-road heavy-duty trucks and

63

1    engines to comply with CARB's now-preempted standards.

2         b.    *Second*, the MAC implements CARB's legal authority.  It creates new

3    obligations for an entire industry, requiring all manufacturers of heavy-duty trucks and

4    engines to comply with preempted standards.  Although the underlying regulations went

5    through the California APA process, the requirement that manufacturers certify vehicles

6    and engines for model year 2026 pursuant to those regulations even in the absence of

7    federal authorization under the Clean Air Act is a novel interpretation and implementa-

8    tion of CARB's legal authority, yet this requirement did not go through the California

9    APA process.  The MAC also provides CARB with new authorities not contained in

10   other laws or regulations.  For example, the MAC similarly purports that CARB can

11   certify vehicles and engines for the 2026 model year pursuant to the requirements of

12   preempted standards.  As such, it "implements and makes specific the law the [agency]

13   administers," thereby establishing the second requirement for an underground rulemak-

14   ing.  *Vasquez*, 68 Cal. App. 5th at 673; *see also Tidewater Marine Western*, 14 Cal. 4th

15   at 571.  CARB did not follow the California APA procedures to promulgate the MAC.

16   CARB did not file a copy of the regulatory correspondence with the Secretary of State

17   of California, as required by section 11343 of the California Government Code, nor did

18   CARB follow the requirements to provide notice and an opportunity for public comment

19   as required by Office of Administrative Law regulations.  Cal. Code Regs. tit. 1, §§ 5

20   (Submission of Notices for Publication), 44 (Public Availability of Changes to Regula-

21   tions).

22        130.   Nor does the MAC satisfy the exemptions in section 11340.9 of the California Govern-

23   ment Code, so CARB's actions are not excused from the California APA requirements.

24        131.   The California APA's notice and comment requirements serve to further the APA's

25   goals of "bureaucratic responsiveness and public engagement in agency rulemaking." *Morning Star*

26   *Co. v. State Bd. of Equalization*, 38 Cal. 4th 324, 333 (2006).  In promulgating the MAC as an under-

27   ground regulation in violation of the California APA, CARB deprived stakeholders of this transparency

28   and engagement that is designed to promote reasoned and informed policymaking.

1    132.   Absent declaratory and injunctive relief, Plaintiff OEMs will continue to be irreparably

2    harmed and subjected to unlawful regulations.  Plaintiff OEMs are therefore entitled to (1) a declaration

3    that the May 23, 2025 MAC constitutes an underground regulation that violates the California APA;

4    and (2) an injunction barring Defendants from enforcing the May 23, 2025 MAC.

5

6                                    **COUNT VII**

7                        **(California APA—Clean Truck Partnership)**

8    133.   Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

9    134.   For many of the same reasons, the Clean Truck Partnership is also an underground reg-

10   ulation promulgated in violation of the California APA.[30]

11                 a.   *First*, the Clean Truck Partnership includes rules of general application.

12            The Clean Truck Partnership is a "blanket interpretation" that CARB "intend[s] to apply

13            in … all cases of a particular class or kind," indicating that it embodies "polic[ies] of

14            general application and thus [] regulation[s]."  *Tidewater Marine Western*, 14 Cal. 4th

15            at 573; *see also Vasquez*, 68 Cal. App. 5th at 689.  Here, the Clean Truck Partnership

16            applies to all manufacturers of internal-combustion powered on-road heavy-duty trucks

17            and engines, and it sets forth which regulations are in effect in California across this

18            entire industry.  Further, it purports to provide CARB with the authority to maintain its

19            certification program regardless of whether CARB has any underlying authorization for

20

21

---

22   [30] The Western States Trucking Association filed a petition with the California Office of Administra-
     tive Law ("OAL") alleging that the Clean Truck Partnership is an underground regulation promulgation
23   in violation of the California APA on June 18, 2-25.  Western States Trucking Association, WSTA
     Petition to OAL Regarding CTP (June 18, 2025), https://perma.cc/D9M2-7JT4.  As of the date of this
24   Complaint, the OAL's deadline to determine whether to take up the petition is August 18, 2025.  OAL,
     Underground Regulation Petitions Under Review, https://perma.cc/ST7F-R7JY.  The California APA
25   provides that administrative exhaustion is not required to seek a judicial determination regarding
     whether an agency has promulgated an underground regulation.  Cal. Gov't Code, § 11350(a) ("The
26   right to judicial determination shall not be affected by the failure either to petition or to seek reconsid-
     eration of a petition filed pursuant to Section 11340.7 before the agency promulgating the regulation
27   or order of repeal"); Cal. Gov't Code. § 11340.7 (providing the right to petition state agencies for the
     repeal of a regulation).

28

---

1  its regulations.  In doing so, the Clean Truck Partnership creates a new regulatory pro-

2  gram where all manufacturers in an industry must comply with preempted standards, all

3  as upheld through the enforcement mechanism of CARB's requirement for certification.

4    b.  Framing the Clean Truck Partnership as an agreement does not exempt

5  that action from being a rule of general applicability subject to the California APA.

6  State law and principles of administrative law dictate that CARB was not permitted to

7  use an agreement with regulated parties to avoid California APA procedural require-

8  ments.  *Vasquez*, 68 Cal. App. 5th at 687; *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d

9  1037, 1053–54 (D.C. Cir. 1987).

10    c. *Second*, the Clean Truck Partnership implements CARB's legal author-

11  ity. The Clean Truck Partnership purports to create new obligations for an entire indus-

12  try, requiring all manufacturers of internal-combustion powered on-road heavy-duty

13  trucks and engines to comply with preempted standards.  Although the underlying reg-

14  ulations went through the California APA process, the requirement that manufacturers

15  comply with those regulations even in the absence of federal authorization is a novel

16  interpretation and implementation of CARB's legal authority, yet this requirement did

17  not go through the California APA process.  The Clean Truck Partnership also provides

18  CARB with new authorities not contained in other laws or regulations.  For example,

19  the Clean Truck Partnership provides that CARB can maintain its certification program

20  regardless of the authorization for the regulations underlying the certification program.

21  As such, the Clean Truck Partnership "implements and makes specific the law the

22  [agency] administers," thereby establishing the second requirement for an underground

23  rulemaking.  *Vasquez*, 68 Cal. App. 5th at 673; *see also Tidewater Marine Western*, 14

24  Cal. 4th at 571.

25  135.  Nor does the Clean Truck Partnership satisfy the exemptions in section 11340.9 of the

26  California Government Code, so CARB's actions are not excused from the California APA require-

27  ments.

28  136.  In promulgating the Clean Truck Partnership as an underground regulation in violation

66

of the California APA, CARB deprived stakeholders of the transparency and engagement that is required by law to promote reasoned and informed policymaking. *Morning Star*, 38 Cal. 4th at 333.

137. Absent declaratory and injunctive relief, Plaintiff OEMs will continue to be irreparably harmed and subjected to unlawful regulations. Plaintiff OEMs are therefore entitled to (1) a declaration that the Clean Truck Partnership constitutes an underground regulation that violates the California APA; and (2) an injunction barring Defendants from enforcing the Clean Truck Partnership.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff OEMs respectfully request that this Court enter the following relief:

I. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that all emissions standards included in the waiver submissions for Advanced Clean Trucks, Advanced Clean Cars II, and Omnibus Low NOx are preempted by the Clean Air Act;

II. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that the 2016 and 2019 Heavy-Duty On-Board Diagnostics, and rules, the Phase 2 Greenhouse Gas, and regulation, the 100 percent zero-emission vehicle sales requirement in Advanced Clean Fleets and as incorporated into Advanced Clean Trucks, and the September 2025 Emergency Rulemaking are preempted by the Clean Air Act;

III. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that CARBDefendant Cliff cannot require any conditions precedent to initial retail sale, including requirements under California Health and Safety Code §§ 43151 and 43512 for CARB certification prior to initial retail sale, when CARB lacks valid preemption waivers for its emissions standards;

IV. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, that the May 23, 2025 MAC, Executive Order N-27-25, and the August 25, 2025 MAC, the September 2025 Emergency Rulemaking, the Clean Truck Partnership, and any and all other attempts to enforce emissions standards without an EPA waiver violate the Clean Air Act and the Supremacy Clause of the U.S. Constitution;

V. A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules

of Civil Procedure, that Executive Order N-27-25, the May 23, 2025 MAC, and the Clean Truck Part-nership violate the First Amendment to the U.S. Constitution, public policy, and Article I, Section 3 of the California Constitution, and are therefore void;

VI.    A declaratory judgment, pursuant to 28 U.S.C. §§ 1367 and 2201, and Rule 57 of the Federal Rules of Civil Procedure, that the May 23, 2025 MAC, and Clean Truck Partnership are un-derground regulations in violation of California Government Code § 11340.5(a) and thus invalid;

VIIV.  Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure:

    a.    Enjoining Defendants from enforcing or attempting to enforce the Advanced Clean Trucks, Advanced Clean Fleets, Advanced Clean Cars II, 2016 and 2019 Heavy-Duty On-Board Diagnostic, and Omnibus Low NOx, and Phase 2 Greenhouse Gas, or the September 2025 Emergency Rulemaking standards, or the 100 percent zero-emission vehicle sales require-ment in Advanced Clean Fleets and incorporated into Advanced Clean Trucks without a waiver of preemption from EPA;

    b.    Enjoining Defendants from requiring any conditions precedent to initial retail sale, including requirements under California Health and Safety Code §§ 43151 and 43512 for CARB certification prior to initial retail sale, without a waiver of preemption from EPA;

    c.    Enjoining Defendants from putting into effective operation (*i.e.*, adopting) any standard relating to the control of emissions for new heavy-duty motor vehicles or engines for which a waiver is necessary under 42 U.S.C. § 7543 and has not been obtained;

    d.    Enjoining Defendants from enforcing or attempting to enforce any standard or approval relating to the control of emissions for new heavy-duty motor vehicles or engines for which a waiver is necessary under 42 U.S.C. § 7543 and has not been obtained;

    de.    Enjoining Defendants from enforcing or attempting to enforce Executive Order N-27-25, the May 23, 2025 MAC, andthe August 25, 2025 MAC, the September 2025 Emer-gency Rulemaking, the Clean Truck Partnership;

    e.    Requiring Defendants, and all similar past and future attempts to redress the un-lawful promulgationenforce emissions standards or to require a CARB certification prior to

1  initial retail sale without a current waiver of ~~the underground regulations included in the May~~

2  ~~23, 2025 MAC, and Clean Truck Partnership by reissuing these regulations in accordance with~~

3  ~~the California APA, or, in the alternative, withdrawing such regulations~~preemption from EPA;

4  and

5  ~~VII~~VI. Such other relief available under federal or state law that may be considered appropriate

6  under the circumstances, including fees and costs of this action to the extent allowed by federal or state

7  law.

8

9  Dated: ~~August 11, 2025~~January 16, 2026                    Respectfully submitted,

10

11  _____
   BENJAMIN WAGNER, State Bar No. 163581

12  **GIBSON, DUNN & CRUTCHER LLP**

13  BENJAMIN WAGNER, State Bar No. 163581

14  310 University Avenue
Palo Alto, CA  94301-1744
Telephone:   650.849.5395

15  Facsimile:   640.849.5095
BWagner@gibsondunn.com

16  RACHEL S. BRASS, State Bar No. 219301

17  One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715

18  Telephone:   415.393.8293
Facsimile:   415.393.8306

19  RBrass@gibsondunn.com

20  STACIE B. FLETCHER (*pro hac vice* ~~forth-coming~~)

21  MIGUEL A. ESTRADA (*pro hac vice* ~~forth-coming~~)

22  JACOB T. SPENCER (*pro hac vice*)
VERONICA J.T. GOODSON, State Bar No. 314367

23

24  1700 M Street N.W.
Washington, D.C. 20036-4504

25  Telephone:   202.955.8500
Facsimile:   202.467.0539

26  SFletcher@gibsondunn.com
MEstrada@gibsondunn.com

27  JSPencer@gibsondunn.com
VGoodson@gibsondunn.com

28

*Attorneys for Plaintiff Daimler Truck North America LLC*

1

2

3

/s/ Robin M. Hulshizer
(as authorized on ~~Aug. 11, 2025~~Jan. 16, 2026)

ROBIN M. HULSHIZER, State Bar No. 158486

**LATHAM & WATKINS LLP**

ROBIN M. HULSHIZER, State Bar No. 158486

ARTHUR FOERSTER (*pro hac vice* ~~forthcoming~~)

KEVIN M. JAKOPCHEK (*pro hac vice* ~~forthcoming~~)

330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Robin.hulshizer@lw.com
Arthur.foerster@lw.com
Kevin.jakopchek@lw.com

BELINDA S. LEE, State Bar No. 199635

505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415.391.0600
Facsimile: 415.395.8095
Belinda.lee@lw.com

*Attorneys for Plaintiff International Motors, LLC*

/s/ ~~Eugene Illovsky~~Joseph A. Ostoyich
(as authorized on ~~Aug. 11, 2025~~Jan. 16, 2026)

~~EUGENE ILLOVSKY, State Bar No. 117892~~

~~**ILLOVSKY GATES & CALIA LLP**~~

~~EUGENE ILLOVSKY, State Bar No. 117892~~
~~KEVIN CALIA, State Bar No. 227406~~

~~1611 Telegraph Avenue, Suite 806~~
~~Oakland, CA 94612~~
~~Eugene@illovskygates.com~~
~~Kevin@illovskygates.com~~

JOSEPH A. OSTOYICH (*pro hac vice*)

**CLIFFORD CHANCE LLP**

JOSEPH A. OSTOYICH (*pro hac vice* ~~forthcoming~~)

WILLIAM LAVERY (*pro hac vice* ~~forthcoming~~)

STEVE NICKELSBURG (*pro hac vice* ~~forthcoming~~)

DANIELLE MORELLO (*pro hac vice* ~~forthcoming~~)

DOROTHEA R. ALLOCCA (*pro hac vice* ~~forthcoming~~)

2001 K Street NW
Washington, DC 20006-1001
Telephone: 202.253.9077
joseph.ostoyich@cliffordchance.com
william.lavery@cliffordchance.com
steve.nickelsburg@cliffordchance.com
danielle.morello@cliffordchance.com
dodi.allocca@cliffordchance.com

**ILLOVSKY GATES & CALIA LLP**

EUGENE ILLOVSKY, State Bar No. 117892
KEVIN CALIA, State Bar No. 227406

1611 Telegraph Avenue, Suite 806
Oakland, CA 94612
Eugene@illovskygates.com
Kevin@illovskygates.com

*Attorneys for Plaintiff PACCAR Inc*

/s/ Jeffrey M. Goldman
(as authorized on ~~Aug. 11, 2025~~Jan. 16,

70

2026)
JEFFREY M. GOLDMAN, State Bar No. 233840

**TROUTMAN PEPPER LOCKE LLP**

JEFFREY M. GOLDMAN, State Bar No. 233840

350 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone:    213.928.9800
Facsimile:    213.928.9850
jeffrey.goldman@troutman.com

T. SCOTT MILLS, State Bar No. 313554

600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308-2305
Telephone:    404.885.3000
Facsimile:    404.885.3900
scott.mills@troutman.com

JEREMY HEEP *(pro hac vice forthcoming)*
DANIEL J. BOLAND *(pro hac vice forthcoming)*

3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103
Telephone:    215.981.4000
Facsimile:    215.981.4750
jeremy.heep@troutman.com
daniel.boland@troutman.com

*Attorneys for Plaintiff Volvo Group North America LLC*