1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MYUNG J. PARK, State Bar No. 210866
    Supervising Deputy Attorney General
3   BENJAMIN P. LEMPERT, State Bar No. 344239
    DAVID M. MEEKER, State Bar No. 273814
4   SARAH M. PFANDER, State Bar No. 347902
    CECILIA D. SEGAL, State Bar No. 310935
5   M. ELAINE MECKENSTOCK, State Bar No. 268861
    Deputy Attorney General
6    1515 Clay Street, 20th Floor
     P.O. Box 70550
7    Oakland, CA  94612-0550
     Telephone:  (510) 879-0299
8    Fax:  (510) 622-2270
     E-mail:  Elaine.Meckenstock@doj.ca.gov
9   *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11             FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13

14   **DAIMLER TRUCK NORTH AMERICA,**              2:25-cv-02255-DC-AC
     **LLC; INTERNATIONAL MOTORS, LLC;**
15   **PACCAR, INC.;** and **VOLVO GROUP**
     **NORTH AMERICA, LLC,**
16
                                   Plaintiffs,      **DEFENDANTS' MEMORANDUM OF**
17                                                  **POINTS AND AUTHORITIES IN**
                                                    **SUPPORT OF THEIR MOTION TO**
18                                                  **DISMISS DAIMLER TRUCK NORTH**
     **THE UNITED STATES OF AMERICA;** and          **AMERICA ET AL.'S FIRST AMENDED**
19   **UNITED STATES ENVIRONMENTAL**                **COMPLAINT (ECF 118)**
     **PROTECTION AGENCY,**
20                                                  Date:        May 1, 2026
                           Plaintiff-Intervenors,   Time:        1:30 PM
21                                                  Courtroom:   10, 13th Floor
                                                    Judge:       Hon. Dena Coggins
22             v.                                   Trial Date:  Not Set
                                                    Action Filed:  August 11, 2025
23

24   **CALIFORNIA AIR RESOURCES BOARD,**
     **STEVEN S. CLIFF,** in his official capacity as
25   the Executive Officer of the California Air
     Resources Board; and **GAVIN NEWSOM,** in
26   his official capacity as the Governor of
     California,
27
                                    Defendants.
28

---

1

**TABLE OF CONTENTS**

2
**Page**

3

4

INTRODUCTION ................................................................................................................ 1

5

BACKGROUND .................................................................................................................. 2

6

I.      California's Long History of Regulating Motor Vehicle Emissions .................................. 2

7

II.     California's Recent Efforts to Reduce New Motor Vehicle Emissions ............................. 3

8       III.    CARB and Several Manufacturers Bargain for and Enter Into The Clean Truck
        Partnership ...................................................................................................................... 4

9

IV.     Congress "Disapproves" of Certain Preemption Waivers, and California Responds ........ 5

10      V.      Plaintiffs Disavow Their CTP Commitments, and CARB Files Suit ............................... 6

VI.     Procedural History .......................................................................................................... 7

11

STANDARD OF REVIEW ................................................................................................. 8

12

ARGUMENT ....................................................................................................................... 8

13      I.      Sovereign Immunity Bars Plaintiffs' Claims against the Governor................................... 8

14      II.     Plaintiffs' Preemption Claim Against the Executive Order (Count II) Should Be
        Dismissed ...................................................................................................................... 11

15              A.      Plaintiffs' Preemption Challenge to the EO Is Unripe......................................... 11

16              B.      Plaintiffs Fail to State a Preemption Claim Against the EO Because It
                Neither Sets Nor Enforces Emission Standards ................................................... 12

17      III.    Plaintiffs' Preemption Claim Against the May MAC (Count II) Is Moot ....................... 14

IV.     Plaintiffs' Preemption Claim Against the CTP (Count III) Should Be Dismissed ........... 15

18              A.      Plaintiffs Fail to Establish Standing to Bring their Preemption Claim
                Against the CTP ................................................................................................. 15

19
                B.      Plaintiffs Fail to State a Preemption Claim Against the CTP ............................... 17

20      V.      Plaintiffs' Preemption Claim Against the Advanced Clean Fleet Regulation's 2036
        Sales Requirement (Count I) Should Be Dismissed ....................................................... 24

21

CONCLUSION .................................................................................................................. 25

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

Page

CASES

Airlines for Am. v. City and Cnty. of San Francisco
    78 F.4th 1146 (9th Cir. 2023) .................................................................... *passim*

Am. Airlines, Inc. v. Wolens
    513 U.S. 219 (1995) ................................................................................. *passim*

Am. Trucking Ass'n, Inc. v. City of Los Angeles
    569 U.S. 641 (2013) ...................................................................................... 19, 21

Arc of Cal. v. Douglas
    757 F.3d 975 (9th Cir. 2014) ............................................................................... 14

Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris
    729 F.3d 937 (9th Cir. 2013) .......................................................................... 9, 10

Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.
    208 F.3d 1 (1st Cir. 2000) ............................................................................. 13, 18

Ass'n of Taxicab Operators USA v. City of Dallas
    720 F.3d 534 (5th Cir. 2013) ............................................................................... 14

B&L Prods., Inc. v. Newsom
    No. 21-cv-01718-AJB-KSC, 2022 WL 3567064 (S.D. Cal. Aug. 18, 2022) ............... 10, 11

Black Diamond Asphalt, Inc. v. Superior Ct.
    109 Cal. App. 4th 166 (2003) .............................................................................. 23

Brach v. Newsom
    38 F.4th 6 (9th Cir. 2022) (en banc) ............................................................... 14, 15

Buscemi v. Bell
    964 F.3d 252 (4th Cir. 2020) ............................................................................... 24

California v. United States
    Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025) ......................................... 5

Cardenas v. Anzai
    311 F.3d 929 (9th Cir. 2002) ............................................................................... 25

Chandler v. State Farm Mut. Auto. Ins. Co.
    598 F.3d 1115 (9th Cir. 2010) ............................................................................... 8

Deitz v. Comcast Corp.
    No. C 06-06352 WHA, 2006 WL 3782902 (N.D. Cal. Dec. 21, 2006) ....................... 16

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*Diamond Alternative Energy, LLC v. EPA*
    606 U.S. 100 (2025) ............................................................................................... 2

*EMA v. South Coast Air Quality Mgmt. Dist.*
    Case No. 02-1354, 2003 WL 23099539 ............................................................... 18

*Engine Mfrs. Ass'n v. EPA*
    88 F.3d 1075 (D.C. Cir. 1996) ............................................................................... 3

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
    541 U.S. 246 (2004) ............................................................................................. 13

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist. (South Coast II)*
    498 F.3d 1031 (9th Cir. 2007) ............................................................................. 14

*Fikre v. FBI*
    904 F.3d 1033 (9th Cir. 2018) ............................................................................. 15

*Griffin & Griffin Expl., LLC v. United States*
    116 Fed. Cl. 163 (2014) ....................................................................................... 23

*Hartmann v. Cal. Dep't of Corr. & Rehab.*
    707 F.3d 1114 (9th Cir. 2013) ............................................................................. 10

*Hughes v. Alexandria Scrap Corp.*
    426 U.S. 794 (1976) ............................................................................................. 14

*In re Gilead Scis. Sec. Litig.*
    536 F.3d. 1049 (9th Cir. 2008) ...................................................................... 8, 9, 16

*Int'l Partners for Ethical Care Inc. v. Ferguson*
    146 F.4th 841 (9th Cir. 2025) .............................................................................. 16

*L.A. Cnty. Bar Ass'n v. Eu*
    979 F.2d 697 (9th Cir. 1992) ............................................................................ 9, 10

*Mesa Golfland, Ltd. v. Ducey*
    No. CV-20-01616-PHX-JJT, 2020 WL 5632141 (D. Ariz. Sept. 21, 2020) ......... 11

*Metro. Taxicab Bd. of Trade v. City of New York*
    633 F. Supp. 2d 83 (S.D.N.Y. 2009) ................................................................... 14

*Mobil Oil Expl. & Producing Se., Inc. v. United States*
    530 U.S. 604 (2000) ................................................................................. 21, 22, 23

1

## TABLE OF AUTHORITIES
### (continued)

2

                                                                              **Page**

3

*Montana v. BNSF Ry. Co.*
4
   623 F.3d 1312 (9th Cir. 2010) ............................................................................... 17

5

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA (MEMA I)*
   627 F.2d 1095 (D.C. Cir. 1979) .............................................................................. 2

6

*Murphy v. Nat'l Collegiate Athletic Ass'n*
7
   584 U.S. 453 (2018) ................................................................................. 17, 19, 25

8

*Murthy v. Missouri*
   603 U.S. 43 (2024) ................................................................................................ 16
9

*Nutt v. United States*
10
   12 Cl. Ct. 345 (1987) ............................................................................................ 23

11

*Ohio v. EPA*
12
   98 F.4th 288 (D.C. Cir.) ........................................................................................ 2

13

*Platinum Sports Ltd. v. Snyder*
   715 F.3d 615 (6th Cir. 2013) ................................................................................ 24
14

*Powell v. SEC*
15
   149 F.4th 1029 (9th Cir. 2025) ............................................................................. 20

16

*Pub. Utils. Comm'n of Cal. v. FERC*
17
   100 F.3d 1451 (9th Cir. 1996) .............................................................................. 15

18

*Reddy v. Foster*
19
   845 F.3d 493 (1st Cir. 2017) ................................................................................ 24

*Safe Air for Everyone v. Meyer*
20
   373 F.3d 1035 (9th Cir. 2004) ................................................................................ 8

21

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*
22
   108 F.4th 1128 (9th Cir. 2024) ............................................................................. 24

23

*Stockton v. Brown*
   No. 24-3777, 2025 WL 2656631 (9th Cir. Sept. 17, 2025) ................................. 25
24

*Texas v. United States*
25
   523 U.S. 296 (1998) ............................................................................................. 11

26

*TransUnion LLC v. Ramirez*
   594 U.S. 413 (2021) ............................................................................................. 24
27

28

iv

1

## TABLE OF AUTHORITIES
### (continued)

2
Page

3
*United States v. Abbott*
4
    85 F.4th 328 (5th Cir. 2023)................................................................. 11

5
*Valenzuela v. Ducey*
    329 F. Supp. 3d 982 (D. Ariz. 2018)................................................... 10
6

7
*Walsh v. Nev. Dep't of Hum. Res.*
    471 F.3d 1033 (9th Cir. 2006)............................................................. 16

8
*Warth v. Seldin*
    422 U.S. 490 (1975)............................................................................ 24
9

10
*WildEarth Guardians v. Mont. Snowmobile Ass'n*
    790 F.3d 920 (9th Cir. 2015).............................................................. 12

11
*Wilson v. Craver*
12
    994 F.3d 1085 (9th Cir. 2021)................................................... 8, 12, 15

13
*Woods v. U.S. Bank N.A.*
    831 F.3d 1159 (9th Cir. 2016).............................................................. 8
14

15
*Ex parte Young. Nat'l Conf. of Pers. Managers, Inc. v. Brown*
    690 F. App'x 461 (9th Cir. 2017) ...................................................... 11

16
*Ex parte Young*
17
    209 U.S. 123 (1908)................................................................ 8, 9, 10, 25

18
**STATUTES**

19
42 U.S.C.
20
    § 7522.................................................................................................. 13
    § 7523.................................................................................................. 13
21
    § 7524.................................................................................................. 13
    § 7525.................................................................................................. 13
22
    § 7543(a).............................................................................................. 12
    § 7543(b).............................................................................................. 12
23
    § 7543(b)(1) .......................................................................................... 2

24
Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965)......................................... 2

25
Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967)...................... 2

26
Cal. Gov't Code
27
    § 8550 et seq. ..................................................................................... 12
    § 11346.1(e)........................................................................................... 6
28
    § 11346.1(h)........................................................................................... 6

v

1

## TABLE OF AUTHORITIES
### (continued)

2

<u>Page</u>

3
Cal. Health & Safety Code
4
 § 39510(b) ................................................................................................ 10
 § 39510(g) ................................................................................................ 10
5
 § 43000(a) .................................................................................................. 2
 § 43013(a) ............................................................................................... 3, 9
6
 § 43017 ...................................................................................................... 3

7

**REGULATIONS**

8
Cal. Code Regs., Title 13
9
 § 1900 ........................................................................................................ 6
 § 1956.8(a)(2) ............................................................................................ 4
10
 § 1963(c) .................................................................................................... 3
 § 1963 *et seq.* .......................................................................................... 3
11
 § 1963.1(b) ................................................................................................ 4
 § 2016 ........................................................................................................ 4

12

13
**FEDERAL REGISTER**

14
59 Fed. Reg. 36,969 (July 20, 1994) ............................................................. 2

15
87 Fed. Reg. 14,332 (Mar. 14, 2022) ............................................................. 3

16
88 Fed. Reg. 20,688 (Apr. 6, 2023) ............................................................... 4

17
90 Fed. Reg. 642 (Jan 6, 2025) .................................................................. 3, 4

18
**OTHER AUTHORITIES**

19
11 Williston on Contracts § 30:19 (4th ed. 2025) .................................... 22, 23

20
21
22
23
24
25
26
27
28

vi

**INTRODUCTION**

In their amended complaint, Plaintiffs—four manufacturers of vehicles or engines—challenge multiple California regulations, an agreement the manufacturers signed with the California Air Resources Board (CARB), a Governor's Executive Order, and two Manufacturer Advisory Correspondences (MACs) issued by CARB. Defendants move to dismiss the Governor, as well as many of Plaintiffs' claims.

Specifically, the Governor has sovereign immunity and should be dismissed from the suit entirely. The Court should likewise dismiss all of Plaintiffs' claims against the Executive Order. It simply directs state agencies to take various steps and consider certain factors when doing so. Plaintiffs cannot state a ripe claim against such an Executive Order. Plaintiffs also cannot state a Clean Air Act preemption claim because the Executive Order does not regulate manufacturers at all, much less impose emission standards on them. Plaintiffs' challenge to the May MAC should also be dismissed, as moot, because that MAC has been expressly superseded by the one issued in August.

Plaintiffs' claims against the Clean Truck Partnership (CTP)—an agreement Plaintiffs voluntarily signed two years ago—fare no better. Plaintiffs' alleged injuries are undercut by their own definitive affirmations that the CTP is *not* affecting their decisions regarding which vehicles to produce or where to sell particular products. Moreover, even if the CTP were impacting such decisions, any injury would be self-inflicted—a result of choices made by sophisticated parties to sign an agreement and commit to its terms. This Court also cannot redress any injury to these Plaintiffs from the enforcement of the CTP through breach-of-contract suit because the Anti-Injunction Act precludes such relief here. Nor can Plaintiffs' state a preemption claim against the CTP. Indeed, they cannot allege the agreement was involuntary or is enforceable through regulatory penalties—the only factors courts have used to conclude that an agreement is effectively a regulation and thus within the scope of preemption.

Finally, Plaintiffs' challenge to the 2036 Sales Requirement of the Advanced Clean Fleets regulation should also be dismissed because Plaintiffs lack standing to seek relief as to that requirement.

1

# BACKGROUND

## I.   CALIFORNIA'S LONG HISTORY OF REGULATING MOTOR VEHICLE EMISSIONS

California has long faced severe air quality challenges and resulting adverse impacts on public health.[1] Because motor vehicles are substantial sources of pollution, Cal. Health & Safety Code § 43000(a), California has been setting emission standards for vehicles since the 1950s. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979).

When Congress began requiring federal vehicle emission standards in 1965, it did not initially preempt the States. Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965). Two years later, manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory programs." *MEMA I*, 627 F.2d at 1109. Congress responded by generally preempting States from setting emission standards for new motor vehicles but required EPA to waive that preemption for California, upon request, absent limited conditions. Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967). In doing so, Congress recognized "the benefits for the Nation to be derived from permitting California to continue its experiments in the field of emissions control … and the benefits for the people of California to be derived from letting that State improve on 'its already excellent program.'" *MEMA I*, 627 F.2d at 1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)).

The waiver provision requires California to determine that its standards "will be, in the aggregate, at least as protective of public health and welfare as" EPA's. 42 U.S.C. § 7543(b)(1). CARB makes that finding and then submits a waiver request to EPA. *E.g.*, 59 Fed. Reg. 36,969, 36,982 (July 20, 1994). Following "notice and opportunity for public hearing," EPA "shall … waive" Clean Air Act preemption for California unless the record evidence supports one of the three limited findings that permit denial. 42 U.S.C. § 7543(b)(1).

Since the enactment of this waiver provision in 1967, California has expanded and strengthened its motor vehicle emissions program to cover additional types of vehicles and to set lower emission levels as new or improved pollution control technologies have emerged. *See*, *e.g.*, *Ohio v. EPA*, 98 F.4th 288, 295-96 (D.C. Cir.), *rev'd and remanded in part by Diamond*

---

[1] *See* Defs.' Req. for Judicial Notice in Supp. Mot. to Dismiss (RJN) Exh. K at 1-2 (CARB's *2022 State Strategy for the State Implementation Plan*); Exh. L at 15-16 (CARB's *Revised Proposed 2016 State Strategy for the State Implementation Plan*).

*Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025). *See* 87 Fed. Reg. 14,332, 14,351 & n.168 (Mar. 14, 2022). CARB—the agency tasked with designing, promulgating, and enforcing the State's motor vehicle pollution control program, *e.g.*, Cal. Health & Safety Code §§ 43013(a), 43017—has requested and EPA has granted more than seventy-five preemption waivers, allowing California to enforce its program through all of these iterative amendments.[2] Thus, for more than half a century, new motor vehicles have been "either 'federal cars' designed to meet the EPA's standards" (and certified by EPA) or 'California cars' designed to meet California's standards" (and certified by CARB). *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996).

## II.  CALIFORNIA'S RECENT EFFORTS TO REDUCE NEW MOTOR VEHICLE EMISSIONS

Although the State has significantly reduced harmful air pollution, including from motor vehicles, more progress is needed. RJN Exh. K at 1; Exh. M at 15, 18. Indeed, several, heavily populated areas in California still experience the worst ozone (or smog) and particulate matter pollution conditions in the country. RJN Exh. N at 1; Exh. O at 1. In one of these areas, the South Coast air basin around Los Angeles, emissions that contribute to smog will need to be reduced *by more than eighty percent* from 2018 levels (already substantially reduced from earlier decades) in order to meet federally mandated ozone standards. RJN Exh. K at 14, 23-24.

To protect public health and to meet those and other standards, CARB continues to iteratively strengthen its motor vehicle emissions program. For example, in 2022, CARB promulgated a set of standards referred to as Advanced Clean Cars II, making longstanding zero-emission-vehicle requirements and standards for several specific pollutants more stringent. *See* 90 Fed. Reg. 642, 642-43 (Jan 6, 2025).[3]

Plaintiffs challenge numerous CARB regulations, ECF 118 (FAC) at ¶¶ 34-35, but only three are relevant to this motion: the Advanced Clean Trucks (ACT), Omnibus, and Advanced Clean Fleets regulations. CARB promulgated the ACT regulation in 2021. *See* Cal. Code Regs.,

---

[2] *See* EPA, *Vehicle Emissions California Waivers and Authorizations*, https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations, last visited March 9, 2026.

[3] A zero-emission vehicle produces zero exhaust emissions of any pollutant—e.g., a battery-electric vehicle. Cal. Code Regs., tit. 13, § 1963(c). Vehicles are classified as medium- or heavy-duty based primarily on their weight. *Id.* § 1900(b)(6), (b)(13). *See also id.* § 1960.1(g)(2) (1991) (original zero-emission-vehicle requirements).

tit. 13, § 1963 *et seq*. Like similar requirements for passenger cars and light trucks, ACT requires increasing sales of zero-emission vehicles—but in the medium- and heavy-duty sector—beginning with model year 2024. Cal. Code Regs., tit. 13, § 1963.1(b). EPA waived preemption for ACT in 2023. 88 Fed. Reg. 20,688 (Apr. 6, 2023).

As part of a different regulation (the Advanced Clean Fleets rule), CARB promulgated a requirement that, beginning with model year 2036, all medium- and heavy-duty vehicles sold in California be zero emission. Cal. Code Regs., tit. 13, § 2016.[4] EPA has not yet waived preemption for this requirement, and CARB has stipulated—in a court order in another case—that it will not enforce this requirement unless and until it has such a waiver. RJN Exh. A.

CARB has also required new vehicles with combustion engines sold in the State to reduce emission levels. Relevant here, CARB tightened its oxides of nitrogen standards for medium- and heavy-duty vehicles and engines in the Omnibus regulation. Cal. Code Regs., tit. 13, § 1956.8(a)(2)(C), (a)(2)(D). EPA once again waived preemption. 90 Fed. Reg. 644 (Jan. 6, 2025).

## III.    CARB AND SEVERAL MANUFACTURERS BARGAIN FOR AND ENTER INTO THE CLEAN TRUCK PARTNERSHIP

In 2023, several manufacturers of medium- or heavy-duty engines and vehicles (including Plaintiffs) and their trade association (the Engine Manufacturers Association or EMA) signed an agreement with CARB: the CTP. CTP at 4-6, ECF 118-1. All parties to the CTP agreed to take (or not take) certain actions in exchange for promises from other parties that reduced or eliminated uncertainty. *Id.* at 1-2. The manufacturers wanted certainty that CARB would provide four years of lead time before any future heavy-duty vehicle regulations would take effect. FAC ¶¶ 6, 7. The manufacturers also wanted certainty that CARB would consider certain amendments to the Omnibus and ACT regulations. *Id.* ¶ 7 (describing "regulatory changes sought by industry"). CARB agreed to recommend the requested lead time for future regulation and to consider a set of identified amendments. CTP at 1. In exchange, EMA and the manufacturers promised not to bring legal challenges to the Omnibus, ACT, or Advanced Clean Fleets

---

[4] The Advanced Clean Fleets regulation contains several other components that are not at issue here.

1  regulations, and to refrain from supporting challenges brought by others. *Id.* at 2; App. D, ¶ A.

2  The manufacturers also agreed to sell clean vehicles in California consistent with the Omnibus

3  and ACT regulations, and with the 2036 Sales Requirement in Advanced Clean Fleets, regardless

4  of CARB's authority to enforce those regulations. *Id.* at App. D, ¶ B.

5          After signing the CTP, EMA issued a press release stating that "[t]his agreement reaffirms

6  EMA's and its members' longstanding commitment to reducing emissions and to a zero-

7  emissions commercial vehicle future." RJN Exh. I at 1. EMA further asserted the CTP

8  "demonstrates how EMA and CARB can work together," highlighting the CTP's bargained-for

9  benefits for EMA's members. *Id.* Several Plaintiffs also directly lauded the agreement, touting the

10  "regulatory certainty" it would provide and the "cooperative effort[]" it reflected. *Id.* at 2, 3.

11
**IV.  CONGRESS "DISAPPROVES" OF CERTAIN PREEMPTION WAIVERS, AND CALIFORNIA
12       RESPONDS**

13          On May 22, 2025, the Senate followed the House and passed Resolutions purporting to

14  disapprove of three preemption waivers EPA had granted to California. H.J. Res. 87 (ACT), H.J.

15  Res. 88 (Advanced Clean Cars II), and H.J. Res. 89 (Omnibus). On June 12, 2025, the President

16  signed the Resolutions. That same day, California and ten other States filed suit in the Northern

17  District of California challenging the Resolutions. *California v. United States*, Case No. 4:25-cv-

18  04966 (N.D. Cal. filed June 12, 2025), ECF 1. That court heard argument on the federal

19  government's motion to dismiss all claims on February 19, 2026. *See id.*, ECF 234.

20          On May 23, 2025, after Congress passed the Resolutions, but before the President signed

21  them, CARB issued the May MAC to provide initial guidance. RJN Exh. P at 1. CARB noted that

22  model year 2026 vehicle and engine certifications were already "well underway" and indicated it

23  would "continue to accept and process certification applications" for that model year in order to,

24  *inter alia*, "provide certainty to affected parties and consumers, provide consistent treatment of

25  regulated entities, [and] maintain stability in the market." *Id.* at 2. CARB indicated that additional

26  information would be forthcoming. *Id.*

27          After the President signed the Resolutions, on June 12, 2025, Governor Newsom issued

28  Executive Order N-27-25 (EO), reaffirming the State's commitment to reducing air pollution.

1   RJN Exh. Q. The EO directs CARB to begin developing new regulations, *id.* at ¶ 2, and to

2   "identify, maintain, and update publicly available lists of" manufacturers and fleets that choose to

3   follow various requirements, *id.* at ¶ 3. The EO further directs CARB and other state agencies to

4   align state vehicle procurement and state-funded incentives with those lists, and directs CARB to

5   "explore opportunities for special considerations and flexibilities for listed manufacturers and

6   fleets" as part of its consideration of future regulations. *Id.*

7          On August 25, 2025, CARB provided the "further clarity" about its certification processes

8   that it had promised, issuing a new, superseding Manufacturers Advisory Correspondence

9   (August MAC). RJN Exh. B at 2. CARB recognized that the intervening enactment of the

10  Resolutions had created "unprecedented uncertainty" in California's vehicle market, prompting

11  more manufacturer questions. *Id.* at 1. Accordingly, CARB clarified the three available pathways

12  to obtain approval from CARB to sell vehicles or engines in the State. *Id.* at 2. The three

13  pathways are: (1) voluntary certification to the latest iteration of CARB regulations—i.e.,

14  Omnibus and ACT for medium- and heavy-duty vehicles; (2) certification to the prior iteration of

15  CARB regulations for which EPA had previously waived preemption; or (3) demonstration of

16  certification to EPA's standards as codified at the time the August MAC issued. *Id.*

17         On September 15, 2025, CARB issued a notice of emergency rulemaking to confirm that

18  the prior iteration of its regulations remain operative, as described in the August MAC, "until a

19  court resolves the uncertainty created by the federal government's actions." RJN Exh. C at 1.

20  That emergency rulemaking was completed. *See* Cal. Code Regs., tit. 13, § 1900. CARB also

21  began a non-emergency rulemaking to promulgate these same regulations, RJN Exh. D, because

22  (under California law) an emergency regulation remains in effect for only 180 days, Cal. Gov't

23  Code § 11346.1(e). That 180-day period will run before CARB can finalize the non-emergency

24  rulemaking, so CARB has moved to extend the emergency regulations for an additional 90 days

25  to allow for that finalization. RJN Exh. J; *see also* Cal. Gov't Code § 11346.1(h).

26  **V.   PLAINTIFFS DISAVOW THEIR CTP COMMITMENTS, AND CARB FILES SUIT**

27         On August 10, 2025, each of the four Plaintiffs here sent nearly identical letters to the

28  Federal Trade Commission (FTC) disavowing the vehicle-sales commitments they had made in

6

1    the CTP. RJN Exhs. E-H. Each letter acknowledged that the manufacturer had "signed the CTP

2    with CARB" and had agreed to sell vehicles in California consistent with the ACT and Omnibus

3    regulations in exchange for "benefits for its dealers and for customers of its trucks." *E.g.*, RJN

4    Exh. E at 1-2. Each manufacturer then disavowed any intention of honoring the commitments

5    CARB had bargained for, stating instead that each company would "independently make

6    decisions about the type and quantity of vehicles it sells without regard" to the CTP. *Id.* at 2-3;

7    *see also* RJN Exh. F at 2; Exh. G at 2-3; Exh. H at 2.

8        After due consideration, CARB filed suit against these manufacturers in Alameda Superior

9    Court on October 27, 2025, alleging breach of contract, rescission of contract, and breach of the

10   implied covenant of good faith and fair dealing. ECF 85-1 at 7-9.

11   **VI.    PROCEDURAL HISTORY**

12       Plaintiffs filed this suit on August 11, 2025, ECF 1, and submitted a preliminary injunction

13   motion on all claims the next day, ECF 23. This Court granted the United States' motion to

14   intervene shortly thereafter. ECF 43, 54. The United States filed its Complaint in Intervention on

15   August 22, ECF 56, and, on August 27, joined the private Plaintiffs' preliminary injunction

16   motion in part, ECF 57. Following oral argument, this Court issued an order on October 31, 2025,

17   granting the part of the preliminary injunction motion based on the claim that the CTP is

18   preempted but otherwise denying the motion. ECF 94.

19       On October 10, 2025, Defendants moved to dismiss CARB and the Governor and many of

20   Plaintiffs' claims. ECF 78. Briefing on the motion to dismiss was completed on November 18,

21   2025. ECF 103. Two months later, Plaintiffs moved for leave to amend their complaint, seeking,

22   *inter alia*, to add claims against the August MAC and the September 2025 emergency regulations.

23   ECF 107. Defendants opposed solely as to proposed amendments concerning the lawsuit filed by

24   CARB in state court, on the grounds that relief concerning that suit would be futile due to the

25   Anti-Injunction Act. ECF 113. In reply, Plaintiffs clarified that they "do not seek an injunction to

26   stay" CARB's state-court suit. ECF 115 at 2:24-25. The Court granted Plaintiffs leave on

27   February 9, 2026, and denied Defendants' still-pending motion to dismiss Plaintiffs' original

28   complaint as moot. ECF 117. Plaintiffs filed their amended complaint the next day. ECF 118.

7

1  Defendants now seek to dismiss portions of Plaintiffs' amended complaint. Defendants do

2  not seek to present oral testimony, unless Plaintiffs or the United States offer such testimony, and

3  anticipate that 50 minutes will be required for any hearing on this motion and the motion filed to

4  dismiss parts of the United States' complaint.[5]

5  **STANDARD OF REVIEW**

6  "The party asserting federal subject matter jurisdiction bears the burden of proving its

7  existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). "A

8  Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373

9  F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations

10  contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.*

11  However, if defendants mount a factual attack, the court may review evidence beyond the

12  complaint and "need not presume the truthfulness of the plaintiff's allegations." *Id.*

13  Under Rule 12(b)(6), a complaint fails "to state a claim to relief" when it lacks either "a

14  cognizable legal theory or . . . sufficient facts alleged under a cognizable legal theory." *Woods v.*

15  *U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016) (internal quotation marks omitted). The

16  Court must generally "accept the plaintiffs' allegations as true and construe them in the light most

17  favorable to plaintiffs," but need not "accept as true allegations that contradict matters properly

18  subject to judicial notice" or "that are merely conclusory, unwarranted deductions of fact, or

19  unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)

20  (cleaned up). Courts also "need not accept as true legal conclusions couched as factual

21  allegations." *Wilson v. Craver*, 994 F.3d 1085, 1090 (9th Cir. 2021).

22  **ARGUMENT**

23  **I.    Sovereign Immunity Bars Plaintiffs' Claims against the Governor**

24  The Governor must be dismissed from this lawsuit because sovereign immunity bars

25  Plaintiffs' claims against him, and the limited exception recognized in *Ex parte Young*, 209 U.S.

26

27  [5] Defendants respectfully request that argument time be evenly divided between Plaintiffs

28  and Defendants—e.g., Plaintiffs and Plaintiff-Intervenor collectively receive 25 minutes (to be
divided among them as they deem appropriate) and Defendants receive 25 minutes.

8

1    123, 155-56 (1908), does not apply. That exception is available where the state officer sued has

2    "some connection with the enforcement of the allegedly unconstitutional act." *L.A. Cnty. Bar*

3    *Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (quoting *Ex parte Young*, 209 U.S. at 157)

4    (cleaned up). "This connection must be fairly direct"—more than "a generalized duty to enforce

5    state law or general supervisory power over the persons responsible for enforcing the challenged

6    provision." *Id*. Plaintiffs here have not established the requisite connection as to the Governor;

7    and he should be dismissed with prejudice. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v.*

8    *Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (Governor entitled to immunity where only connection

9    is general duty to enforce California law).

10        Plaintiffs name the Governor as a defendant to all three Counts in the Amended Complaint

11    which challenge (I) "CARB Standards"; (II) "Attempts to Enforce" standards; and (III) the CTP

12    agreement, respectively. FAC at 39, 44, 47. But  Plaintiffs fail to mention the Governor even a

13    single time in the specific allegations related to Counts I and III. *See* FAC ¶¶ 93-105, 114-21. In

14    other words, the Complaint itself indicates those counts have nothing to do with the Governor.

15    Indeed, the only challenged action Plaintiffs allege is remotely connected to the Governor is the

16    EO (included as part of Count II). But, even as to the EO, Plaintiffs cannot invoke the *Ex parte*

17    *Young* exception because the Governor lacks the requisite enforcement connection there as well.

18        There is a good reason the Complaint fails to connect the Governor to the enforcement of

19    CARB's regulations (challenged in Counts I and II): California law provides that CARB, not the

20    Governor, enforces those regulations. Cal. Health & Safety Code § 43013(a) (CARB

21    "implement[s] motor vehicle emission standards."); *id.* § 43017 (CARB "may enjoin any

22    violation . . . of any order, rule, or regulation of the state board."); *id.* § 43154(b) (Attorney

23    General may bring an "action to recover a penalty" on behalf of CARB). Plaintiffs nonetheless

24    allege that the Governor "command[s] CARB to enforce" these standards, FAC ¶ 26, but that is

25    insufficient, *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055. Plaintiffs must identify a source of

26    the Governor's alleged authority to enforce CARB's regulations but fail to do so. *Ass'n des*

27    *Eleveurs*, 729 F.3d at 943-44 (dismissing Governor where statute empowered district attorneys to

28    enforce and no provision gave that authority to Governor). That the Governor appoints certain

9

1    members to CARB's Board, Cal. Health & Safety Code § 39510(b), is irrelevant, and would

2    swallow the exception to the *Ex parte Young* rule. *See Valenzuela v. Ducey*, 329 F. Supp. 3d 982,

3    993 (D. Ariz. 2018). The Board exercises independent judgment in any event. Cal. Health &

4    Safety Code § 39510(g). At most, Plaintiffs' conclusory allegation amounts to a claim that the

5    "only connection to [CARB's regulations] is [the Governor's] general duty to enforce California

6    law"—an insufficient connection to invoke *Ex parte Young*. *Ass'n des Eleveurs*, 729 F.3d at 943.

7         Plaintiffs likewise cannot allege any connection between the Governor and the May and

8    August MACs challenged in Count II. *See* FAC ¶ 26. As Plaintiffs acknowledge, both MACs

9    were issued by CARB. FAC ¶¶ 59-60, 64-65. Neither MAC mentions the Governor nor describes

10   any role for him. RJN Exhs. P & B. Thus, for any injunctive or declaratory relief against the

11   MACs to be effective, it would *have* to be directed at CARB, not the Governor—who has

12   absolutely no duties related to these documents. *See Hartmann v. Cal. Dep't of Corr. & Rehab.*,

13   707 F.3d 1114, 1127 (9th Cir. 2013) (*Ex parte Young* requires plaintiffs to "name the official . . .

14   who can appropriately respond to injunctive relief").[6]

15        The Governor likewise lacks any connection to the enforcement of the CTP (Count III). He

16   is not a party to that agreement, and Plaintiffs do not allege he can enforce it. Indeed, they repeat

17   a claim that the CTP is "an independent regulatory mechanism by which *CARB* attempts to

18   enforce its preempted emissions standards." FAC ¶ 41 (emphasis added) (cleaned up); *see also id.*

19   (referring to "CARB's authority"); *id.* ¶ 44 (alleging actions only by CARB); *id.* ¶ 58 (discussing

20   CARB's obligations under the CTP). It is also CARB, not the Governor, who has brought suit to

21   enforce the CTP through a state-court suit for breach. FAC ¶ 109(f); ECF 85-1 at 5.

22        Finally, Plaintiffs cannot invoke *Ex parte Young* to sue the Governor over the EO. While

23   the Governor may have *issued* the EO, the relevant inquiry turns on whether the Governor

24   *enforces* it—and Plaintiffs cannot show that he does. *See L.A. Cnty. Bar Ass'n*, 979 F.2d at 704;

25   *B&L Prods., Inc. v. Newsom*, No. 21-cv-01718-AJB-KSC, 2022 WL 3567064, at *4 (S.D. Cal.

26

27   _____

     [6] Count II also lists CARB's state-court suit as an improper attempt to enforce preempted
     standards, but Plaintiffs have disavowed any attempt to seek relief as to that suit. ECF 115 at
     2:24-3:3. Nevertheless, any claims against the Governor premised on the state-court suit would

28   have to be dismissed because the Governor is not a party to the lawsuit.

                                         10

Aug. 18, 2022). Indeed, the EO is not enforceable against Plaintiffs at all. Plaintiffs' allegations only underscore the point, when they claim the Governor "directed through Executive Order detrimental regulatory treatment and exclusion from government purchase and incentive programs." FAC ¶ 26. As this allegation—and the EO itself—make clear, it is not the Governor who would promulgate the future regulations Plaintiffs fear or who would allegedly exclude Plaintiffs, down the road, from state-funded programs. RJN Exh. Q at ¶ 3. To the contrary, the EO directs *state agencies* to take certain actions. *See* RJN Exh. Q. If those actions occur and are enforceable against Plaintiffs in ways they believe are injurious, they might have a claim (later) against the relevant agency official. They cannot bring a claim against the Governor—now or ever. *See Mesa Golfland, Ltd. v. Ducey*, No. CV-20-01616-PHX-JJT, 2020 WL 5632141, at *4 (D. Ariz. Sept. 21, 2020) (Governor has sovereign immunity where executive order "will be enforced pursuant to the regulatory authority of individual agencies and law enforcement, and not directly by Governor"); *see also United States v. Abbott*, 85 F.4th 328, 334 (5th Cir. 2023). The Governor's issuance of the EO does not change California law and grant him the "direct authority and practical ability to enforce the challenged" regulations. *B&L Prods.*, 2022 WL 3567064, at *4 (quoting *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846-47 (9th Cir. 2002)). The Governor's "general enforcement" authority as head of California's Executive Branch is insufficient to invoke *Ex parte Young*. *Nat'l Conf. of Pers. Managers, Inc. v. Brown*, 690 F. App'x 461, 463 (9th Cir. 2017).

## II. PLAINTIFFS' PREEMPTION CLAIM AGAINST THE EXECUTIVE ORDER (COUNT II) SHOULD BE DISMISSED

As shown in the preceding section, Plaintiffs' preemption claim against the EO must be dismissed as to the Governor on sovereign immunity grounds. And the claim must be dismissed as to *all* Defendants because it is unripe and because Plaintiffs fail to state a claim.

### A. Plaintiffs' Preemption Challenge to the EO Is Unripe

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-581 (1985)).

11

Here, the EO imposes no requirements on Plaintiffs (or on any private party).[7] Rather, as the

Court has observed, "the Executive Order merely provides policy priorities and directives for

state agencies and departments," which "pertain to future actions that might be undertaken." ECF

94 at 30:1-4. Because "those actions have not happened and might not happen," *id.* at 30:4,

Plaintiffs' claim is not ripe.

The Amended Complaint does not contend that the EO prescribes how or when state

agencies will implement its directives. *E.g.*, FAC ¶ 26 (alleging EO "directed" *future* adverse

treatment by state agencies); *id.* ¶ 62 (alleging that, under the EO, CARB will "identify

'opportunities for special considerations and flexibilities for' manufacturers … *when crafting*

*future regulations*" (emphasis added)). Nowhere do Plaintiffs identify any concrete efforts to

implement the EO. *If and when* CARB or another state agency implements the EO's direction,

and if Plaintiffs believe that implementation adversely affects them, only then could they have a

claim—and that claim would lie against the agency for its implementing action, not against the

Governor for the EO. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 933

(9th Cir. 2015).

### B.    Plaintiffs Fail to State a Preemption Claim Against the EO Because It Neither Sets Nor Enforces Emission Standards

Plaintiffs allege that the EO "purports to adopt and enforce" preempted emission standards,

in violation of Section 209(a) of the Clean Air Act and the Supremacy Clause. FAC ¶¶ 62-63,

106-113; 42 U.S.C. § 7543(a), (b) (referencing "adopt[ing] or attempt[ing] to enforce" vehicle

emission standards). Even if it were ripe, this claim fails.

Plaintiffs contend that the EO "direct[s] CARB to penalize" manufacturers who do not

comply with the allegedly preempted standards. FAC ¶ 109(b). That attempt at a legal

characterization of the EO should be disregarded, *Wilson*, 994 F.3d at 1090, but, in any event,

Plaintiffs' bald characterization does nothing to establish how a direction to take future action

constitutes the "adopt[ion]" of standards, FAC ¶ 63. Nor can the EO enforce any actually adopted

---

[7] Executive orders issued in response to a state of emergency proclaimed under California's Emergency Services Act, Cal. Gov't Code § 8550 et seq., are distinct; those do have the force and effect of law and may regulate private conduct. Plaintiffs do not and cannot allege this EO is an *emergency* executive order.

1   standards. As discussed, *supra* 9:19-23, California law does not assign enforcement of CARB's

2   standards to the Governor. An EO cannot change that. And this EO—which "merely provides

3   policy priorities and directives for state agencies and departments," ECF 94 at 30:2-3—certainly

4   does not do so.

5        Plaintiffs' claim hinges on the premise that the EO *indirectly* enforces the allegedly

6   preempted standards by "penaliz[ing]" certain actions. FAC ¶¶ 109-110. But what Plaintiffs label

7   as "penalties" do not enforce—or attempt to enforce—emission standards at all. As the Supreme

8   Court has held, the Clean Air Act's text establishes the "methods" by which vehicle emission

9   standards are enforced. Those methods are (1) prohibitions against "selling any new motor

10  vehicle that" does not meet the standards (as described in Sections 203 and 206, 42 U.S.C. §§

11  7522, 7525) and (2) "fines imposed in civil or administrative enforcement actions" for violating

12  such prohibitions or the standards themselves (as described in Section 204 and 205, 42 U.S.C. §§

13  7523, 7524). *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253-54

14  (2004). Thus, "the term 'attempt to enforce'" in Section 209(a) refers to an attempt to impose

15  "penalties for violation" of standards or the "steps preliminary" to such penalties—i.e., imposition

16  of pre-sale certification or inspection requirements as described in the second sentence of Section

17  209(a). *Id.* at 257; *see also Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*,

18  208 F.3d 1, 7 (1st Cir. 2000) (Section 209(a) preemption is meant "to govern formal

19  regulations"). The EO, however, has nothing do with regulatory penalties. It does not impose

20  them (or attempt to impose them); nor does it impose any pre-sale certification or other

21  requirements as preliminary steps to the imposition of regulatory penalties. Plaintiffs have not

22  alleged otherwise; nor could they do so because the EO directs agencies to reward *voluntary*

23  behavior through incentives. FAC ¶ 109(b); RJN Exh. Q at 3. These are not "commands" of any

24  kind to Plaintiffs, much less ones accompanied by the threat of "fines imposed in civil or

25  administrative enforcement actions." *Engine Mfrs. Ass'n*, 541 U.S. at 254-55.[8]

26

27       [8] For the same reasons, the EO cannot be understood as an attempt to *enforce* the CTP, if
    that is what Plaintiffs intend to allege. *See* FAC ¶¶ 10(b), 62. Moreover, like other agreements,
    the CTP is enforceable by those who signed it (through contract remedies), and the Governor
28  (who is not a party to that agreement) did not, and could not, change that by this EO.

13

1    Plaintiffs' challenge fails for the additional reason that the incentives contemplated by the

2    EO fall within the market participant exception to preemption. *See Engine Mfrs. Ass'n v. S. Coast*

3    *Air Quality Mgmt. Dist. (South Coast II)*, 498 F.3d 1031, 1040-41, 1043 (9th Cir. 2007) (applying

4    exception to Section 209(a)). The EO, for example, directs state agencies to prioritize

5    manufacturers whose practices further California's air pollution reduction goals when those

6    agencies make decisions about the State's own vehicle procurement and certain state-funded

7    programs. EO at 1-3. These are classic market participant behaviors. *South Coast II*, 498 F.3d at

8    1045 (regulatory provisions directing state and local governments to procure vehicles "meeting

9    specified air pollution criteria" constituted "direct state participation in the market"); *Hughes v.*

10   *Alexandria Scrap Corp.*, 426 U.S. 794, 809 (1976) (using state funds to reward private scrap

11   processors for scrapping abandoned automobiles to achieve state's environmental protection

12   goals fell within market participant exception). Plaintiffs cannot state a preemption claim by

13   pointing to California's decisions about its own expenditures.

14   Finally, Plaintiffs may attempt to argue that any future rules-based incentives would affect

15   manufacturers' behavior so significantly that they would eliminate all choice. *Compare Ass'n of*

16   *Taxicab Operators USA v. City of Dallas*, 720 F.3d 534, 542 (5th Cir. 2013) (no preemption

17   found where ordinance's head-of-the-line privilege did not "effectively compel[] a particular

18   course of action"), *with Metro. Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 100

19   (S.D.N.Y. 2009) (preemption found where regulatory rate differential was so large that it

20   foreclosed any real choice and "instead operate[d] as an effective mandate"). That would only

21   underscore Plaintiffs' ripeness problem because the force of any such incentives cannot be

22   alleged, much less determined, now—before such incentives have even been proposed. In any

23   event, *the EO's reference* to incentives that have yet to materialize cannot cross the line.

24   **III.    PLAINTIFFS' PREEMPTION CLAIM AGAINST THE MAY MAC (COUNT II) IS MOOT**

25   All claims against the May MAC are moot because the August MAC expressly supersedes

26   it. RJN, Exh. B at 2; ECF 94 at 29:18-19; FAC ¶ 61 (agreeing August MAC "superseded" May

27   MAC); *see also Arc of Cal. v. Douglas*, 757 F.3d 975, 982 (9th Cir. 2014) (expiration of statute

28   mooted challenges to it); *Brach v. Newsom*, 38 F.4th 6, 11 (9th Cir. 2022) (en banc) (live

14

1  controversy "evaporated" with rescission to executive order). The voluntary cessation exception

2  to mootness is inapplicable. The August MAC refers to this litigation only briefly as background,

3  and Plaintiffs cannot credibly allege that the August MAC was issued "because of" it, *Pub. Utils.*

4  *Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996). Moreover, CARB cannot

5  reasonably be expected to reissue the May MAC. It was an initial advisory, as evinced by the

6  express indication that further information would be forthcoming. RJN Exh. P at 2. And CARB's

7  emergency regulations—and the proposed non-emergency regulations—establish a different

8  course, including certification alternatives not referenced in the May MAC. *See* RJN Exhs. C-D.

9  CARB's choices, and particularly its regulatory modifications, cannot be "easily abandoned,"

10  *Brach*, 38 F.4th at 13 (quoting *Fikre v. FBI*, 904 F.3d 1033, 1037-38 (9th Cir. 2018)).

11      The Court should disregard Plaintiffs' unfounded legal conclusion that "[t]here are no

12  procedural limitations" preventing reissuance of the May MAC, FAC ¶ 61, because it ignores

13  both CARB's consistent commitment to a different approach and the procedural limitations

14  inherent in reverting the California Code of Regulations. *Wilson*, 994 F.3d at 1090. Nor does

15  CARB's disinclination to waive any enforcement rights it may have, if and when it obtains a

16  favorable judicial decision that the allegedly preempting congressional Resolutions are invalid,

17  make it at all likely that CARB will reissue the May MAC. FAC ¶¶ 61, 109(a). To the contrary,

18  CARB expressly acknowledged that such enforcement would turn on a future judicial decision—

19  *not* reissuance of the May MAC or other unilateral action by the agency. In short, the "procedural

20  safeguards" against reissuance of the May MAC, *Fikre*, 904 F.3d at 1039, and CARB's clear and

21  repeated actions to chart a different course, confirm the voluntary cessation exception does not

22  apply. For the same reasons, the May MAC is not capable of repetition yet evading review.

23  *Brach*, 38 F.4th at 15.

24  **IV.   PLAINTIFFS' PREEMPTION CLAIM AGAINST THE CTP (COUNT III) SHOULD BE DISMISSED**

25  
26      **A.   Plaintiffs Fail to Establish Standing to Bring their Preemption Claim Against the CTP**

27      Plaintiffs lack standing to challenge the CTP because they have not alleged a cognizable

28  injury-in-fact that is traceable to the CTP (rather than their own agreement to its terms) and that is

15

1  redressable by this Court. Plaintiffs claim they are injured by being unable "[t]o adequately plan

2  product production and allocation"—a harm they allege results from a purported lack of certainty

3  about "which vehicles they are authorized to sell, and *where*." FAC ¶ 14. But, whatever its force

4  as to the rest of Plaintiffs' claims, this alleged injury cannot meet Plaintiffs' standing burden as to

5  the CTP. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

6      First, each of the four Plaintiffs has expressly disavowed that the CTP is affecting their

7  production and allocation plans in any way. Each affirmed to the FTC that it "will independently

8  make decisions about the type and quantity of vehicles it sells *without regard to whether those*

9  *decisions are compliant with any restrictive terms of the CTP*." RJN Exh. E at 1-2 (emphasis

10  added); Exh. F at 2; Exh. G at 2-3; Exh. H at 2. These definitive statements that Plaintiffs are

11  producing and allocating vehicles without regard to the CTP cannot be reconciled with allegations

12  that the CTP is hampering such planning. *In re Gilead*, 536 F.3d. at 1055; *see also Walsh v. Nev.*

13  *Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (plaintiff lacked standing absent

14  allegation she "has any interest in returning" to work—i.e., pursuing the employment contract

15  that caused the alleged injury); *Deitz v. Comcast Corp.*, No. C 06-06352 WHA, 2006 WL

16  3782902, at *3 (N.D. Cal. Dec. 21, 2006) (plaintiff lacked standing where "the alleged wrong is

17  over" and he had no intent to reup the contract that allegedly caused the injury).

18      Second, Plaintiffs agreed to the CTP's terms two years ago. They signed an agreement

19  that opens by stating "the undersigned heavy-duty on-highway (HDOH) manufacturer[s] … do

20  hereby agree as follows," where what follows is a commitment to sell cleaner vehicles in

21  California—consistent with "the CARB regulations set forth in Appendices A and B"—

22  "irrespective of … CARB's overall authority to implement those regulations." CTP at 1-2; *see*

23  *also id.* at 4-6 (signature pages). To the extent that commitment is causing the alleged inability to

24  plan for production and allocation (despite Plaintiffs' disavowal of any such impacts), that injury

25  would be self-inflicted and could not support standing. *E.g.*, *Int'l Partners for Ethical Care Inc. v.*

26  *Ferguson*, 146 F.4th 841, 848-49 (9th Cir. 2025) (quotation mark omitted).

27      Third, these Plaintiffs identify no redress available from this Court that would ameliorate

28  any planning and allocation uncertainty allegedly caused by the CTP. Plaintiffs identify the state-

16

1   court breach suit filed by CARB in Alameda Superior Court as the sole attempt to enforce the

2   CTP. FAC ¶¶ 10(e), 56, 109(f), 117. Yet, as Plaintiffs recognize, they cannot obtain relief as to

3   that suit (or any similar state-court suit) here, due to the Anti-Injunction Act. ECF 115 at 2:24-25

4   ("OEM Plaintiffs do not seek an injunction to stay the proceedings in Alameda County Superior

5   Court or a declaratory judgment that would have the same effect."); *see also*, *e.g.*, *Montana v.*

6   *BNSF Ry. Co.*, 623 F.3d 1312, 1315 (9th Cir. 2010) ("Any doubts as to the propriety of a federal

7   injunction against state court proceedings should be resolved in favor of permitting the state

8   courts to proceed....") (cleaned up). Indeed, Plaintiffs assert they seek relief only as to CARB

9   regulations, CARB MACs, and Executive Orders issued by the Governor. *Id.* at 3:12-13. Having

10  failed to identify any relief this Court could provide to these Plaintiffs as to the CTP, Plaintiffs

11  further fail to establish standing for their CTP challenge.

12          **B.    Plaintiffs Fail to State a Preemption Claim Against the CTP**

13          Even if they could establish standing to challenge the CTP, Plaintiffs still have not stated a

14  preemption claim against this voluntary agreement. Section 209(a) of the Clean Air Act—on

15  which Plaintiffs exclusively rely—preempts regulatory requirements imposed unilaterally by the

16  State, not commitments made voluntarily as part of bilateral or multilateral bargaining. And

17  Plaintiffs allege no facts that could plausibly establish that the CTP is anything other than a

18  bargained-for agreement and thus outside the scope of preemption.[9]

19          **1.    Section 209(a) Does Not Preempt Voluntary Agreements**

20          "[F]ederal law generally preempts state or local government action that has the force and

21  effect of law"—not voluntary agreements. *Airlines for Am. v. City and Cnty. of San Francisco*, 78

22  F.4th 1146, 1150 (9th Cir. 2023) (cleaned up); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*,

23  584 U.S. 453, 479 (2018) (preemption "concerns a clash between a constitutional exercise of

24  Congress's legislative power and conflicting *state law*") (emphasis added). Accordingly, when

25  assessing preemption claims, courts "contrast 'official, government-imposed policies prescribing

26

27          [9] This Court's preliminary conclusion "that there are serious questions going to the merits of [this] claim," ECF 94 at 32:6-7, is no barrier to dismissal, *see City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (recognizing district courts' "inherent procedural power to reconsider, *rescind,* or modify an interlocutory order").

28

17

1    binding standards of conduct' with 'contractual commitments voluntarily undertaken," finding the

2    former preemptable and the latter not. *Airlines for Am.*, 78 F.4th at 1152 (quoting *Am. Trucking*

3    *Ass'n, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013)); *see also Am. Airlines, Inc. v.*

4    *Wolens*, 513 U.S. 219, 223 (1995) (distinguishing, for preemption purposes, "between what the

5    State dictates and what the [regulated party] itself undertakes").

6            Nothing in Section 209(a) indicates that it is an atypical preemption provision that reaches

7    voluntary agreements. In fact, the First Circuit concluded the opposite, holding that Section

8    209(a) was "intended to govern formal regulations adopted by the states, rather than voluntary

9    and cooperative agreements between the states and automakers." *Ass'n of Int'l Auto. Mfrs., Inc. v.*

10   *Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 7 (1st Cir. 2000). That conclusion relied on the

11   Supreme Court's decision that a preemption provision prohibiting States from "enact[ing] or

12   enforc[ing]" certain requirements on airlines covered "state-imposed regulation" but not "contract

13   terms." *Wolens*, 513 U.S. at 222. Plaintiffs allege that Section 209(a) preempts States from

14   "adopt[ing] or attempt[ing] to enforce" certain vehicular emission control standards, FAC ¶¶ 115-

15   117 (quoting 42 U.S.C. § 7543(a)), and the First Circuit correctly concluded that this provision

16   draws the same line as in *Wolens*—preempting "state-imposed obligations" but not any "self-

17   imposed undertakings," *Wolens*, 513 U.S. at 228. [10]

18           Hoping for a different conclusion here, Plaintiffs posit that private parties cannot "contract

19   around the Supremacy Clause." FAC ¶ 119. But that misses the point of the line drawn repeatedly

20   by the Supreme Court (and followed by the First and Ninth Circuits): there is no Supremacy

21   Clause issue to "contract around" because preemption provisions do not generally reach

22   "contractual commitments voluntarily undertaken." *Airlines for Am.*, 78 F.4th at 1152 (quoting

23   *Am. Trucking Ass'n*, 569 U.S. at 649). Put another way, because "federal preemption is generally

24   confined to formal state laws and regulations," "contracts and other voluntary agreements" are

25   outside the scope of the Supremacy Clause, rather than attempts to get around it. *Ass'n of Int'l*

---

26   [10] Notably, three years after that First Circuit decision, Plaintiffs' trade association, EMA,
took this very position, arguing to the Supreme Court that the distinction recognized in *Wolens*
27   "between voluntary and enforceable standards ... is rooted in Section 209(a) itself." Pet. Reply Br.
7, *EMA v. South Coast Air Quality Mgmt. Dist.*, Case No. 02-1354, 2003 WL 23099539.
28   Plaintiffs have not explained their newfound divergence with EMA's position.

1    *Auto. Mfrs., Inc.*, 208 F.3d at 7. Plaintiffs' contention also runs headlong into *Wolens*, where the

2    Supreme Court held that state courts could enforce contract terms that—had they been state-

3    imposed laws—would have been preempted because they affected airline "rates, routes, and

4    services." 513 U.S. at 226. The Court's conclusion that the preemption provision did not "shelter

5    airlines from suits … seeking recovery solely for the airline's alleged breach of its own, self-

6    imposed undertakings," *id.* at 228—despite the implications of those undertakings for the

7    preempted domain—is a clear indication that regulated parties may, in fact, agree to forego a right

8    afforded them by a preemption provision, *Murphy*, 584 U.S. at 477. Put simply, the Supremacy

9    Clause does not prevent a party—like Plaintiffs here—from agreeing to do something the State

10   could not require it to do. Indeed, if the Supremacy Clause did forbid such agreements, there

11   would be no need for *Wolens* and its progeny to distinguish between such voluntary commitments

12   and state-imposed requirements in order to resolve preemption claims.[11]

### 2. Plaintiffs Allege No Facts that Could Support a Conclusion that the CTP Was Involuntary and Thus Could Be Preempted

15   Plaintiffs have not alleged any facts to plausibly support an inference that the CTP is

16   anything other than a voluntary agreement and thus outside the scope of Section 209(a)

17   preemption. Precedent identifies two, and only two, factors relevant to this analysis: (1) whether

18   the allegedly preempted obligations were voluntarily undertaken (rather than unilaterally imposed

19   by a regulator) and (2) whether those obligations are enforceable through contract remedies or

20   means available only to governments—e.g., civil or criminal penalties. For example, in *American

21   Trucking Association*, 569 U.S. at 650, the challenged contract term was preempted 1) because it

22   was imposed not through "the parties' voluntary commitments" but unilaterally through "a form

23   of municipal ordinance," and 2) because violations were "punishable by a fine or a prison

24   sentence." *See also id.* at 651 ("commitments result[ed] not from ordinary bargaining…, but

25   instead from the threat of criminal sanctions"); *Wolens*, 513 U.S. at 233 (distinguishing "what the

26   State dictates" from "what the [party] itself undertakes"); *Airlines for Am.*, 78 F.4th at 1152

27   ———————————
     [11] For the same reasons, Plaintiffs' assertion that the CTP is an attempt to "do indirectly
28   what [CARB] is barred from doing directly" also fails. FAC ¶ 119. Section 209(a) covers
     regulatory requirements, and a voluntary agreement is not an indirect way of imposing those.

19

1   (contrasting "government-imposed policies … with contractual commitments voluntarily

2   undertaken") (cleaned up); *id.* ("when the government employs a coercive mechanism, available

3   to no private party, it acts with the force and effect of the law") (cleaned up); *id.* ("civil penalty

4   provisions alone may amount to the force and effect of law rendering a government entity a

5   regulator rather than a market participant").

6         Plaintiffs cannot allege the facts necessary to establish the first factor. Plaintiffs

7   themselves have repeatedly indicated that they entered into the CTP voluntarily. At signing, their

8   trade association (EMA) touted the CTP as "demonstrat[ing] how EMA and CARB can work

9   together," and several Plaintiffs lauded the "cooperative effort[]" that produced the CTP. RJN

10   Exh. I at 1, 2, 3. EMA later explained that, in the CTP, "EMA (and its OEM members)" reached a

11   "*consensual* path forward." ECF No. 23-12, at 2 (emphasis added). Even setting aside these plain

12   affirmations of voluntariness, Plaintiffs are "sophisticated players who are represented by

13   counsel"—precisely the type of parties that courts assume sign agreements voluntarily, with an

14   understanding of terms. *See Powell v. SEC*, 149 F.4th 1029, 1042 (9th Cir. 2025). Finally, and

15   perhaps fundamentally, the terms of the agreement make plain there was an exchange of

16   consideration. CTP at 1-3 (setting forth commitments by all signatories). Indeed, in their

17   complaint, Plaintiffs concede they bargained for commitments from CARB and that they got

18   much of what they sought from the CTP negotiations. *E.g.*, FAC ¶ 7 (alleging CARB agreed, in

19   the CTP, "to undertake regulatory changes sought by industry"); *id.* ¶ 40 (same). Their letters to

20   the FTC confirm as much. Two Plaintiffs stated that "through the CTP, [the OEM] was able to

21   obtain benefits for its dealers and for customers of its trucks." RJN Exh. E at 2; Exh. F at 2. The

22   other two Plaintiffs affirmed that they signed the CTP to "gain" promises from CARB "in

23   exchange for" promises they offered. RJN Exh. H at 1; *see also* Exh. G at 1.[12] Nothing about this

24   bargained-for exchange remotely resembles the unilateral imposition of obligations in *American*

---

25       [12] Plaintiffs also informed the FTC that the CTP was not preempted at the time they
26   signed it but only became so after the enactment of Resolutions purporting to disapprove certain
  preemption waivers. *E.g.*, RJN Exh. E at 2 (asserting "the CTP was rendered unenforceable by a
27   Congressional joint resolution of disapproval signed by the President on June 12, 2025"). But an
  agreement that was voluntary when signed does not become involuntary later due to
  congressional action, any more than Plaintiffs' apparent dissatisfaction with the CTP's terms all
28   these years later could retroactively make the agreement involuntary when signed.

1    *Trucking Association*, where a state forced private parties into an agreement not with "ordinary

2    bargaining (as in *Wolens*), but instead [by] the threat of criminal sanctions." 569 U.S. at 651.

3         Plaintiffs likewise cannot allege facts to support the second factor—that the CTP is

4    enforceable through regulatory penalties or other "mechanism[] available to no private party."

5    *Airlines for Am.*, 78 F.4th at 1150. As Plaintiffs acknowledge, CARB has brought a breach-of-

6    contract action, seeking contract remedies, and has not sought to impose civil penalties. FAC ¶

7    56; *see also* ECF 85-1 at 5-9 (state-court complaint). Plaintiffs themselves refer to this suit as an

8    "attempt to enforce the Clean Truck Partnership," FAC ¶ 10(e), and allege "CARB continues to

9    assert that Plaintiff OEMs are *contractually bound* to comply" with the CTP's terms, *id.* ¶ 25

10   (emphasis added). There are, notably, no factual allegations to support the conclusion that the

11   CTP could also be enforced via regulatory penalties. And though Plaintiffs allege they are unable

12   to enforce the CTP *against each other*, they tellingly do not assert the same inability to enforce

13   *against CARB*. FAC ¶ 41; *see also e.g.*, RJN Exh. E at 1 & n.3 (asserting "DTNA has never had

14   any right to enforce" the CTP against "the other original equipment manufacturer signatories").

15   If, as they appear to believe, these Plaintiffs can enforce the CTP against CARB, CTP

16   enforcement must be through means (like breach-of-contract action) available to private parties,

17   rather than through regulatory penalties or other means available only to government actors.

18   ### 3.   Plaintiffs' Allegations Concerning Irrelevant Factors Cannot Save their Claim

19

20        Plaintiffs' Complaint includes several red herrings—allegations on subjects no court has

21   treated as relevant to assessing whether agreements are preempted. None of these allegations can

22   save Plaintiffs from their failure to state a claim.

23        **a.** Plaintiffs first attempt to focus this Court on the nature of the consideration CARB

24   offered—namely, CARB's agreement to consider certain regulatory amendments. FAC ¶¶ 40, 44.

25   Plaintiffs identify no authority for the proposition that the type of consideration offered can

26   transform a voluntary contract into a regulation that could be preempted—and for good reason.

27   The Supreme Court has enforced, *as a contract,* an agreement in which the Federal Government's

28   sole consideration was its commitment to take certain steps in its regulatory capacity. *Mobil Oil*

21

1 | *Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 609-611 (2000) (describing
2 | government's promises to process permit requests in specified ways); *id.* at 618 (concluding "that
3 | the Government violated the contracts"). Indeed, the Supreme Court explicitly applied "the law
4 | applicable to contracts between private individuals" to this agreement, despite the fact that the
5 | Government's consideration was to carry out its regulatory responsibilities in a particular way. *Id.*
6 | at 607. As that case confirms, the nature of the consideration offered bears on whether the parties
7 | may reach an agreement (i.e., whether the offeree wants what the offeror can and will provide)—
8 | not on whether an alleged agreement is effectively a regulation.[13]

9 | **b.** Plaintiffs further allege that the incorporation of certain regulations in the CTP
10 | constitutes an effort to adopt those regulations, implying that any effort to enforce the agreement
11 | would be an attempt to enforce those regulations. FAC ¶ 56. But the CTP adopts only its own
12 | *contract terms* and its enforcement likewise concerns only those terms. That the CTP's terms
13 | reference regulatory provisions (as a convenience) does not convert the agreement into a
14 | regulation, any more than the "statutes and regulations, the terms of which in effect were
15 | incorporated into the contracts" in *Mobil Oil* transformed those contracts into statutes or
16 | regulations. *Mobil Oil*, 530 U.S. at 609. Rather, as in *Mobil Oil*, "[w]hen a contract expressly
17 | incorporates a statutory enactment by reference, that enactment *becomes part of the contract* for
18 | the indicated purposes just as though the words of that enactment were set out in full in the
19 | contract." 11 Williston on Contracts § 30:19 (4th ed. 2025) (emphasis added). Parties to a
20 | contract may incorporate legal requirements to define a term of the contract, providing a
21 | shorthand and readily understood description of what one or more parties agreed to do. But those

22 | [13] Plaintiffs also allege "CARB imposed the Clean Truck Partnership in its capacity as an
23 | industry regulator, not in its capacity as a market participant." FAC ¶ 44. But when a government
bargains with other parties, it is engaging in contracting activities—like private parties do—not
24 | engaging in regulation. *See Mobil Oil*, 530 U.S. at 607 (applying "the law applicable to contracts
between private individuals" although United States was a party and agreed to carry out its
25 | regulatory responsibilities in a particular way). It is only when the government acts with "the
force and effect of law" that it acts as "a regulator rather than a market participant." *Airlines for*
26 | *Am.*, 78 F.4th at 1152 (cleaned up). Certainly, when the government exercises its purchasing
power, the determination that a government is not acting as a regulator may be an easy one. *Id.*
27 | But that does not mean that *only* exercises of purchasing power are on the voluntary-contractual-
commitments side of this line. Indeed, the Supreme Court held that state-court "enforcement of
28 | contract terms" was *not preempted*, although such enforcement is far from typical market
participation. *Wolens*, 513 U.S. at 222.

1    terms then "emanate from contract" and are "separate animals" from "obligations created by

2    statute [or regulation]." *Black Diamond Asphalt, Inc. v. Superior Ct.*, 109 Cal. App. 4th 166, 171

3    (2003).

4         Thus, when the government "exact[s] promises from a party with whom it contracts that

5    he will comply with [certain] regulations," those promises are independent of the referenced

6    regulation and are enforceable through a "breach of contract" suit. *Nutt v. United States*, 12 Cl.

7    Ct. 345, 351 (1987), *aff'd sub nom. Smithson v. United States*, 847 F.2d 791 (Fed. Cir. 1988).

8    And when the Federal Government failed to abide by statutory provisions "incorporated" into

9    contracts, *Mobil Oil*, 530 U.S. at 609, the Supreme Court held that the Government broke *its*

10   *promise* in the contracts—not that it violated the incorporated statute, *id.* at 624. Likewise, when

11   one of the "regulations incorporated into the terms of" federal lease agreements provided that

12   "[l]eases shall be subject to cancellation if improperly issued," the Court of Federal Claims

13   enforced the cancellation of the leases as consistent with *their terms*. *Griffin & Griffin Expl., LLC*

14   *v. United States*, 116 Fed. Cl. 163, 176-77 (2014).

15        The CTP is no different. In exchange for promises from CARB, Plaintiffs promised to sell

16   cleaner vehicles in California, with the terms (i.e., the agreed-upon vehicles) defined in a way all

17   the parties could easily understand—by reference to particular CARB regulations. These same

18   requirements could have been restated in full in the agreement and would have had the same

19   meaning; that the parties chose the simpler shorthand of cross-referencing regulatory provisions

20   does not transform contractual commitments into regulations. 11 Williston on Contracts § 30:19

21   (4th ed. 2025). The manufacturers' promises are the terms of the contract; and any action to

22   enforce them is just that—an effort to enforce the terms of a contract, not an "attempt to enforce"

23   the incorporated regulations. [14]

24

25        [14] Plaintiffs' position that the CTP became preempted and unenforceable only due to
     enactment of the allegedly preempting Resolutions, *supra* at n.12, only underscores the point. If
26   Plaintiffs were correct that the incorporation of a preempted regulation renders an agreement
     preempted, then the CTP was preempted at the time of signature—not years later—because EPA
27   had not waived preemption for two of the incorporated regulations (Omnibus and Advanced
     Clean Fleets) at the time the CTP was signed. FAC ¶ 7 (alleging CTP signed in July 2023); *id.* ¶
28   34(b) (alleging Omnibus waiver granted January 2025); *id.* ¶ 35(a).

23

1  | **V.    PLAINTIFFS' PREEMPTION CLAIM AGAINST THE ADVANCED CLEAN FLEET**
2  | **REGULATION'S 2036 SALES REQUIREMENT (COUNT I) SHOULD BE DISMISSED**

3       Finally, Plaintiffs' claim against the 2036 Sales Requirement in the Advanced Clean Fleets

4  regulation should be dismissed because Plaintiffs lack standing "for each form of relief that they

5  seek" as to that regulation. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

6  Specifically, there is no threat that a preempted requirement will be enforced against Plaintiffs (or

7  anyone) because CARB has already stipulated—in a signed court order in another case—that it

8  will not enforce this regulatory requirement unless and until it has a preemption waiver from

9  EPA. RJN Exh. A at 3; *see Buscemi v. Bell*, 964 F.3d 252, 260 (4th Cir. 2020) (no standing where

10 state agency "has stipulated that it … will not" engage in challenged conduct); *Reddy v. Foster*,

11 845 F.3d 493, 501-02 (1st Cir. 2017) ("plaintiffs lack standing, at this time" where "the

12 government has affirmatively disavowed prosecution" unless or until specified conditions occur).

13 Plaintiffs must allege facts sufficient to establish that they "would benefit in a tangible way from

14 the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508 (1975). They cannot do so because

15 CARB is already subject to a court order barring enforcement absent a preemption waiver.

16 *Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 616-17 (6th Cir. 2013) ("stipulated final judgment"

17 entered in earlier case and enjoining enforcement of challenged laws made clear "the federal

18 courts have no authority to resolve this 'dispute'"). Plaintiffs thus face no realistic possibility of

19 the injury they claim to fear—namely, enforcement of a preempted regulation. Indeed, if the 2036

20 Sales Requirement is enforced in the future, the regulation will *not be preempted* because EPA

21 will have waived preemption.

22      To the extent Plaintiffs claim they are entitled to a declaratory judgment that the

23 codification of the 2036 Sales Requirement into the California Code of Regulations was

24 preempted absent a waiver (FAC at 49 ¶ II), they lack standing for relief as to that, as well. For

25 one thing, any such declaration would provide no tangible benefit to Plaintiffs, *Warth*, 422 U.S. at

26 508, given the stipulated order precluding enforcement without a waiver—i.e., precluding the

27 alleged injury of enforcement of a preempted regulation. Moreover, Plaintiffs cannot identify a

28 cognizable injury-in-fact from California's codification of a particular law. *Stavrianoudakis v.*

1  *U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1142 (9th Cir. 2024) (cleaned up) ("the mere

2  existence of [the regulation], which may or may not ever be applied to [anyone], is not sufficient

3  to create a case or controversy within the meaning of Article III") (quoting *Cal. Tow Truck Ass'n*

4  *v. City & Cnty. of San Francisco*, 693 F.3d 847, 866 (9th Cir. 2012)).

5        To credit such an injury, this Court would have to conclude that Section 209(a) establishes

6  a legally protected interest in preventing State legislatures and agencies from codifying emission

7  control standards for new motor vehicles. *Stockton v. Brown*, No. 24-3777, 2025 WL 2656631, at

8  *10 (9th Cir. Sept. 17, 2025) ("Whether framed as an issue of standing or ripeness, an injury must

9  involve an invasion of a legally protected interest….") (cleaned up). But that would interpret

10  Section 209(a) as a direct order to States as to what laws they may or may not codify, in violation

11  of the anti-commandeering doctrine. *Murphy*, 584 U.S. at 470 ("The anticommandeering doctrine

12  … is simply the expression of a fundamental structural decision incorporated into the

13  Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the

14  States."). Congress cannot "dictate[] what a state legislature may and may not do," *id.* at 474, so

15  Section 209(a) cannot be understood as establishing a legally cognizable interest in the

16  codification of any particular state law.

17        Finally, any relief directed at CARB's *past* regulatory actions—including its past

18  promulgation of this requirement—would be impermissibly retroactive in nature in violation of

19  *Ex parte Young*. *E.g.*, *Cardenas v. Anzai*, 311 F.3d 929, 935 (9th Cir. 2002) ("Whether the *Ex*

20  *parte Young* doctrine applies in this case turns primarily upon one question: Is the relief the

21  plaintiffs seek prospective, aimed at remedying an ongoing violation of federal law, or is it

22  retrospective, aimed at remedying a past violation of the law?"). The *Ex parte Young* exception to

23  sovereign immunity is simply not available to remedy an alleged past wrong. *Id.*

24        Plaintiffs cannot establish standing for any relief concerning the 2036 Sales Requirement,

25  and their challenge to it should be dismissed.

26                              **CONCLUSION**

27  The Court should grant Defendants' motion to dismiss.

28

1    Dated:  March 10, 2026                              Respectfully submitted,

2                                                        ROB BONTA
                                                         Attorney General of California
3                                                        MYUNG J. PARK
                                                         Supervising Deputy Attorney General
4

5

6                                                        /s/ M. Elaine Meckenstock
                                                         M. ELAINE MECKENSTOCK
7                                                        Deputy Attorney General
                                                         Attorneys for Defendants
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Mem. in Supp. Mot. to Dismiss Pls.' First Am. Compl. (2:25-cv-02255-DC-AC)