1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MYUNG J. PARK, State Bar No. 210866
   Supervising Deputy Attorney General
3  BENJAMIN P. LEMPERT, State Bar No. 344239
   DAVID M. MEEKER, State Bar No. 273814
4  SARAH M. PFANDER, State Bar No. 347902
   CECILIA D. SEGAL, State Bar No. 310935
5  M. ELAINE MECKENSTOCK, State Bar No. 268861
   Deputy Attorney General
6    1515 Clay Street, 20th Floor
     P.O. Box 70550
7    Oakland, CA  94612-0550
     Telephone:  (510) 879-0299
8    Fax:  (510) 622-2270
     E-mail:  Elaine.Meckenstock@doj.ca.gov
9  *Attorneys for Defendants*

10           IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12

13

14  **DAIMLER TRUCK NORTH AMERICA,**          2:25-cv-02255-DC-AC
    **LLC; INTERNATIONAL MOTORS, LLC;**
15  **PACCAR, INC.; and VOLVO GROUP**
    **NORTH AMERICA, LLC,**
16                                            **DEFENDANTS' MEMORANDUM OF**
                                 Plaintiffs,  **POINTS AND AUTHORITIES IN**
17                                            **SUPPORT OF THEIR MOTION TO**
                                              **DISMISS THE UNITED STATES' FIRST**
18  **THE UNITED STATES OF AMERICA; and**     **AMENDED COMPLAINT IN**
    **UNITED STATES ENVIRONMENTAL**           **INTERVENTION (ECF 119)**
19  **PROTECTION AGENCY,**
                                              Date:         May 1, 2026
20                      Plaintiff-Intervenors, Time:         1:30 PM
                                              Courtroom:    10, 13th Floor
21                                            Judge:        Hon. Dena Coggins
                                              Trial Date:   Not Set
22                      v.                     Action Filed: August 11, 2025

23

24  **CALIFORNIA AIR RESOURCES BOARD,**
    **STEVEN S. CLIFF,** in his official capacity as
25  the Executive Officer of the California Air
    Resources Board; and **GAVIN NEWSOM,** in
26  his official capacity as the Governor of
    California,
27
                                 Defendants.
28

---

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      California's Long History of Regulating Motor Vehicle Emissions ................................ 2

II.     California's Recent Efforts to Reduce New Motor Vehicle Emissions............................ 3

III.    CARB and Several Manufacturers Bargain for and Enter Into The Clean Truck
        Partnership ....................................................................................................................... 44

IV.     Congress "Disapproves" of Certain Preemption Waivers, and California Responds......... 5

V.      Plaintiffs Disavow Their CTP Commitments, and CARB Files Suit for Breach .............. 7

VI.     Procedural History ......................................................................................................... 8

STANDARD OF REVIEW ................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.      The United States' Preemption Challenge to the CTP Should Be Dismissed for
        Failure to State a Claim.................................................................................................... 9

        A.      Section 209(a) Does Not Preempt Voluntary Agreements ..................................... 9

        B.      The United States Alleges No Facts that Could Support a Conclusion that
                the CTP Was Involuntary and Thus Could Be Preempted.................................... 11

        C.      The United States' Allegations Concerning Irrelevant Factors Cannot Save
                their Claim ............................................................................................................ 14

II.     The United States' Preemption Challenge to the Advanced Clean Fleets
        Regulation Should Be Dismissed for Lack of Jurisdiction ............................................. 17

CONCLUSION..................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

CASES

Airlines for Am. v. City and Cnty. of San Francisco
    78 F.4th 1146 (9th Cir. 2023).................................................................*passim*

Am. Airlines, Inc. v. Wolens
    513 U.S. 219 (1995)........................................................................*passim*

Am. Trucking Ass'n, Inc. v. City of Los Angeles
    569 U.S. 641 (2013).......................................................................11, 12

Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.
    208 F.3d 1 (1st Cir. 2000)...................................................................10

Black Diamond Asphalt, Inc. v. Superior Ct.
    109 Cal. App. 4th 166 (2003)..............................................................15

Buscemi v. Bell
    964 F.3d 252 (4th Cir. 2020)...............................................................17

California v. United States
    Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025).............................6

Chandler v. State Farm Mut. Auto. Ins. Co.
    598 F.3d 1115 (9th Cir. 2010)..............................................................8

Diamond Alternative Energy, LLC v. EPA
    606 U.S. 100 (2025).........................................................................3

Engine Mfrs. Ass'n v. EPA
    88 F.3d 1075 (D.C. Cir. 1996)..............................................................3

Griffin & Griffin Expl., LLC v. United States
    116 Fed. Cl. 163 (2014)....................................................................15

In re Gilead Scis. Sec. Litig.
    536 F.3d. 1049 (9th Cir. 2008)..........................................................9, 12

Mobil Oil Expl. & Producing Se., Inc. v. United States
    530 U.S. 604 (2000)..................................................................14, 15, 16

Motor & Equip. Mfrs. Ass'n, Inc. v. EPA (MEMA I)
    627 F.2d 1095 (D.C. Cir. 1979).............................................................2

Murphy v. Nat'l Collegiate Athletic Ass'n
    584 U.S. 453 (2018)..................................................................1, 9, 18

ii

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3  *Nutt v. United States*
4      12 Cl. Ct. 345 (1987) ........................................................................................ 15

5  *Ohio v. EPA*
        98 F.4th 288 (D.C. Cir.) ................................................................................... 3
6
7  *Platinum Sports Ltd. v. Snyder*
        715 F.3d 615 (6th Cir. 2013) ........................................................................... 17

8  *Powell v. SEC*
        149 F.4th 1029 (9th Cir. 2025) ........................................................................ 12
9

10  *Reddy v. Foster*
        845 F.3d 493 (1st Cir. 2017) ............................................................................ 17

11  *Safe Air for Everyone v. Meyer*
12      373 F.3d 1035 (9th Cir. 2004) ...................................................................... 8, 9

13  *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*
        108 F.4th 1128 (9th Cir. 2024) ........................................................................ 18
14
15  *Stockton v. Brown*
        No. 24-3777, 2025 WL 2656631 (9th Cir. Sept. 17, 2025) ............................. 18

16  *TransUnion LLC v. Ramirez*
17      594 U.S. 413 (2021) ......................................................................................... 17

18  *Warth v. Seldin*
        422 U.S. 490 (1975) .................................................................................. 17, 18
19
20  *Wilson v. Craver*
        994 F.3d 1085 (9th Cir. 2021) ........................................................................... 9

21  *Woods v. U.S. Bank N.A.*
22      831 F.3d 1159 (9th Cir. 2016) ........................................................................... 9

23  **STATUTES**

24  42 U.S.C.
        § 7543(a) ........................................................................................................... 1
25      § 7543(b)(1) ...................................................................................................... 2

26  Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965) .................................................. 2

27  Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967) ............................... 2

28

iii

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

Cal. Gov't Code

4

   § 11346.1(e) ................................................................................................ 7

   § 11346.1(h) ............................................................................................... 7

5

Cal. Health & Safety Code

6

   § 43000(a) .................................................................................................. 2

   § 43013(a) .................................................................................................. 3

7

   § 43016(a)(1) ............................................................................................ 12

   § 43017 ...................................................................................................... 3

8

9

**REGULATIONS**

10

Cal. Code Regs., Title 13

   § 1956.8(a)(2) ............................................................................................ 4

11

   § 1963(c) .................................................................................................... 4

   § 1963 *et seq* ............................................................................................ 4

12

   § 1963.1(b) ................................................................................................ 4

   § 2016 ........................................................................................................ 4

13

14

**FEDERAL REGISTER**

15

59 Fed. Reg. 36,969 (July 20, 1994) ...................................................................... 2

16

88 Fed. Reg. 20,688 (Apr. 6, 2023) ........................................................................ 4

17

90 Fed. Reg. 642 (Jan 6, 2025) ............................................................................... 4

18

**OTHER AUTHORITIES**

19

11 Williston on Contracts § 30:19 (4th ed. 2025) ............................................ 14, 15

20

21

22

23

24

25

26

27

28

iv

1

**INTRODUCTION**

2      Plaintiff Intervenors the United States and the U.S. Environmental Protection Agency

3  (collectively the "United States") bring suit against the California Air Resources Board (CARB),

4  and CARB's Executive Officer Steven Cliff. The United States alleges that multiple CARB

5  regulations, a CARB advisory notice, and the Clean Truck Partnership (CTP)—a voluntary

6  agreement between CARB and private parties (including Plaintiffs here)—are all preempted

7  under Section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a).

8      The United States has failed to state a claim against the CTP. Section 209(a) preempts

9  emission standards that have the force of law—regulations imposed unilaterally by the State and

10  backed up by regulatory penalties or other government-only enforcement mechanisms. Section

11  209(a) therefore does not reach voluntary agreements reflecting bargained-for consideration. And

12  the United States cannot allege any facts that could plausibly support the conclusion that the CTP

13  is anything other than a voluntary agreement. The CTP is outside the scope of Section 209(a)

14  preemption, and the United States' challenge to this agreement should be dismissed.

15      This Court should also dismiss the challenge to the 2036 Sales Requirement in CARB's

16  Advanced Clean Fleets regulation because the United States lacks standing for any relief as to

17  that requirement. Indeed, there is *no* possibility that the United States will be injured by a

18  preempted sales requirement because CARB has stipulated in a signed court order in another case

19  that it will not enforce this requirement unless and until Plaintiff-Intervenor EPA waives

20  preemption. And any allegation of cognizable injury from the mere codification of this

21  requirement in the California Code of Regulations is belied by the Constitution. The Framers

22  intentionally withheld from Congress the power to "dictate[]" what laws a State "may or may

23  not" codify. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018). Section 209(a)

24  cannot be read as doing so; and the existence of a codified emission standard therefore does not

25  impinge on any interest of the United States.

26

27

28

1

1

**BACKGROUND**

2

**I.    CALIFORNIA'S LONG HISTORY OF REGULATING MOTOR VEHICLE EMISSIONS**

3       California has long faced severe air quality challenges, including ozone (or smog) pollution,

4    which increases incidences of respiratory ailments; and particulate matter pollution, which can

5    lead to heart attacks and premature deaths.[1] Motor vehicles are substantial sources of this

6    pollution. Cal. Health & Safety Code § 43000(a). Accordingly, California has been setting

7    emission standards for new motor vehicles since the 1950s. *Motor & Equip. Mfrs. Ass'n, Inc. v.*

8    *EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979).

9       When Congress began requiring federal vehicle emission standards in 1965, it did not

10    initially preempt the States. Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965). Two years later,

11    manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory

12    programs." *MEMA I*, 627 F.2d at 1109. Congress responded by generally preempting States from

13    setting emission standards for new motor vehicles but required EPA to waive that preemption for

14    California, upon request, absent limited conditions. Pub. L. No. 90-148, § 208(a), (b), 81 Stat.

15    485, 501 (1967). In doing so, Congress recognized "the benefits for the Nation to be derived from

16    permitting California to continue its experiments in the field of emissions control … and the

17    benefits for the people of California to be derived from letting that State improve on 'its already

18    excellent program.'" *MEMA I*, 627 F.2d at 1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)).

19       The waiver provision requires California to determine that its standards "will be, in the

20    aggregate, at least as protective of public health and welfare as" EPA's. 42 U.S.C. § 7543(b)(1).

21    CARB makes that finding after it promulgates new or amended standards, and CARB then

22    submits its waiver request to EPA. 59 Fed. Reg. 36,969, 36,982 (July 20, 1994). Following

23    "notice and opportunity for public hearing," EPA "shall … waive" Clean Air Act preemption for

24    California unless the record evidence supports one of the three limited findings that permit denial.

25    42 U.S.C. § 7543(b)(1).

26

---

27         [1] *See* Defs.' Req. for Judicial Notice in Supp. Mot. to Dismiss (RJN) Exh. K at 1-2
     (CARB's *2022 State Strategy for the State Implementation Plan*); Exh. L at 15-16 (CARB's
28    *Revised Proposed 2016 State Strategy for the State Implementation Plan*).

1    Since the enactment of this waiver provision in 1967, California has expanded and

2    strengthened its motor vehicle emissions program to cover additional types of vehicles and to set

3    lower emission levels as new or improved pollution control technologies have emerged. *See, e.g.*,

4    *Ohio v. EPA*, 98 F.4th 288, 295-96 (D.C. Cir.), *rev'd and remanded in part by Diamond*

5    *Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025). CARB—the agency tasked with

6    designing, promulgating, and enforcing the State's motor vehicle pollution control program, *e.g.*,

7    Cal. Health & Safety Code §§ 43013(a), 43017—has requested, and EPA has granted, more than

8    seventy-five preemption waivers, allowing California to enforce its program through all of these

9    iterative amendments.[2] Thus, for more than half a century, new motor vehicles have been "either

10    'federal cars' designed to meet the EPA's standards" (and certified by EPA) or 'California cars'

11    designed to meet California's standards" (and certified by CARB). *Engine Mfrs. Ass'n v. EPA*, 88

12    F.3d 1075, 1080 (D.C. Cir. 1996).

13    **II.    CALIFORNIA'S RECENT EFFORTS TO REDUCE NEW MOTOR VEHICLE EMISSIONS**

14    Although the State has made tremendous progress reducing harmful air pollution, including

15    emissions from motor vehicles, more progress is needed. RJN Exh. K at 1; RJN Exh. M at 15, 18.

16    Indeed, several, heavily populated areas in California still experience the worst ozone (or smog)

17    and particulate matter pollution conditions in the country. RJN Exh. N at 1; RJN Exh. O at 1. In

18    one of these areas, the South Coast air basin around Los Angeles, emissions that contribute to

19    smog will need to be reduced *by more than eighty percent* from 2018 levels (already substantially

20    reduced from earlier decades) in order to meet federally mandated ozone standards. RJN Exh. K

21    at 14, 23-24.

22    To protect public health and to meet those and other standards, CARB continues to

23    iteratively strengthen its motor vehicle emissions program. For example, in 2022, CARB

24    promulgated a regulation referred to as Advanced Clean Cars II that made several standards

25    applicable to light-duty vehicles (passenger cars and light trucks) more stringent. Specifically,

26    Advanced Clean Cars II made California's zero-emission-vehicle sales requirements (first

27    ───────────────

28    [2] *See* EPA, *Vehicle Emissions California Waivers and Authorizations*,
https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations, last visited March 9, 2026.

3

1    promulgated in 1990) more rigorous and also further limited the amount of smog-forming and

2    particulate matter pollution that vehicles with internal combustion engines may emit. *See* 90 Fed.

3    Reg. 642, 642-43 (Jan 6, 2025).[3]

4         In Count I of its FAC, the United States challenges three CARB regulations: the Advanced

5    Clean Trucks, Omnibus, and Advanced Clean Fleets regulations. ECF 119 (FAC) at ¶¶ 102-08.

6    CARB promulgated the Advanced Clean Trucks (ACT) regulation in 2021. *See* Cal. Code Regs.,

7    tit. 13, § 1963 *et seq*. Like CARB's longstanding zero-emission-vehicle requirements for

8    passenger cars and light trucks, ACT requires increasing sales of zero-emission vehicles—but in

9    the medium- and heavy-duty sector—beginning with model year 2024. Cal. Code Regs., tit. 13,

10   § 1963.1(b). EPA waived preemption for ACT in 2023. 88 Fed. Reg. 20,688 (Apr. 6, 2023).

11        As part of a different regulation (the Advanced Clean Fleets rule) also challenged by the

12   United States in this action, CARB promulgated a requirement that, beginning with model year

13   2036, all medium- and heavy-duty vehicles sold in California be zero emission. Cal. Code Regs.,

14   tit. 13, § 2016.[4] EPA has not yet waived preemption for this requirement, and CARB has

15   stipulated—in a court order in another case—that it will not enforce this requirement unless and

16   until it has such a waiver. RJN Exh. A.

17        At the same time, CARB has required new vehicles with combustion engines sold in the

18   State to reduce emission levels. Relevant here, CARB tightened its oxide of nitrogen (NOx)

19   standards for medium- and heavy-duty vehicles and engines in the Omnibus regulation which the

20   United States also challenges. Cal. Code Regs., tit. 13, §§ 1956.8(a)(2)(C), (a)(2)(D). EPA once

21   again waived preemption. 90 Fed. Reg. 644 (Jan. 6, 2025).

22   **III.    CARB AND SEVERAL MANUFACTURERS BARGAIN FOR AND ENTER INTO THE
23        CLEAN TRUCK PARTNERSHIP**

24        In 2023, several manufacturers of medium- or heavy-duty engines and vehicles (including

25   the private Plaintiffs in this action) and their trade association (the Engine Manufacturers

26       [3] As currently defined, a zero-emission vehicle is one that produces zero exhaust
      emissions of any pollutant—e.g., a battery-electric vehicle. Cal. Code Regs., tit. 13, § 1963(c);
27   *see also id.* § 1960.1(g)(2) (1991) (original zero-emission-vehicle requirements). Vehicles are
      classified as medium- or heavy-duty based primarily on their weight. *Id.* § 1900(b)(6), (b)(13).
          [4] The Advanced Clean Fleets regulation contains several other components that are not at
28   issue here.

4

1    Association or EMA) signed an agreement with CARB: the Clean Truck Partnership (CTP). ECF

2    118-1 (CTP) at 4-6. All parties to this agreement bargained to reduce or resolve uncertainties they

3    faced, agreeing to take (or not take) certain actions in exchange for reduced or eliminated

4    uncertainty. *Id.* at 1-2. The manufacturers wanted certainty that CARB would provide four years

5    of lead time before any future heavy-duty vehicle regulations would take effect. FAC ¶¶ 64-66.

6    The manufacturers also wanted certainty that CARB would consider certain amendments to the

7    Omnibus and ACT regulations. *Id.* ¶ 61 (describing manufacturers' "concerns about … these

8    standards"). During the CTP negotiations, CARB agreed to recommend the requested lead time

9    for future regulation and to consider a set of identified amendments. CTP at 1. In exchange, EMA

10   and the manufacturers promised not to bring legal challenges to the Omnibus, ACT, or Advanced

11   Clean Fleets regulations, and to refrain from supporting challenges brought by others. *Id.* at 2;

12   App. D, ¶ A. The manufacturers also agreed to sell clean vehicles in California consistent with

13   the Omnibus and ACT regulations, and with the 2036 requirement in Advanced Clean Fleets,

14   regardless of CARB's authority to enforce those regulations. *Id.* at App. D, ¶ B.

15        After signing the CTP, EMA issued a press release stating that "[t]his agreement reaffirms

16   EMA's and its members' longstanding commitment to reducing emissions and to a zero-

17   emissions commercial vehicle future." RJN Exh. I at 1. EMA further asserted the CTP

18   "demonstrates how EMA and CARB can work together to achieve shared clean air goals" and

19   highlighted the CTP's benefits for EMA's members, including "lead time and stability" amid

20   "regulatory changes." *Id.* Several manufacturer signatories also lauded the agreement, touting the

21   "regulatory certainty" it would provide and the "cooperative effort[]" it reflected. *Id.* at 2, 3.

22
IV.  **CONGRESS "DISAPPROVES" OF CERTAIN PREEMPTION WAIVERS, AND CALIFORNIA RESPONDS**
23

24        On May 22, 2025, the Senate followed the House and passed congressional resolutions

25   purporting to disapprove of three Clean Air Act preemption waivers EPA had previously granted

26   to California. H.J. Res. 87 (ACT), H.J. Res. 88 (Advanced Clean Cars II), and H.J. Res. 89

27   (Omnibus). On June 12, 2025, the President signed the resolutions. That same day, California and

28   ten other States filed suit in the Northern District of California challenging those resolutions.

5

Defs.' Mem. in Supp. Mot. to Dismiss United States' First Am. Compl. in Intervention (2:25-cv-02255-DC-AC)

1    *California v. United States*, Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025), ECF 1. That

2    litigation is ongoing; the court heard argument on the federal government's motion to dismiss all

3    claims on February 19, 2026. *See id.*, ECF 234.

4        On May 23, 2025, after Congress passed the Resolutions, but before the President signed

5    them, CARB issued Manufacturers Advisory Correspondence ECCD-2025-03 (May MAC) to

6    provide initial and "necessary guidance" in light of Congress's actions. RJN Exh. P at 1. CARB

7    noted that model year 2026 vehicle and engine certifications were already "well underway" and

8    indicated it would "continue to accept and process certification applications" for that model year

9    in order to, *inter alia*, "provide certainty to affected parties and consumers, provide consistent

10   treatment of regulated entities, [and] maintain stability in the market." *Id.* at 2. This would also

11   allow manufacturers to meet their commitments under the CTP. *Id.* CARB indicated that

12   additional information would be forthcoming. *Id.*

13        After the President signed the Resolutions, on June 12, 2025, Governor Newsom issued

14   Executive Order N-27-25 (EO), reaffirming the State's commitment to reducing air pollution.

15   RJN Exh. Q. The EO directs CARB to begin developing new regulations, *id.* at ¶ 2, and to

16   "identify, maintain, and update publicly available lists of" manufacturers and fleets that choose to

17   follow various requirements, *id.* at 3. The EO further directs CARB and other state agencies to

18   align state vehicle procurement and state-funded incentives with those lists, and directs CARB to

19   "explore opportunities for special considerations and flexibilities for listed manufacturers and

20   fleets" as part of its consideration of future regulations. *Id.* at ¶ 3.

21        On August 25, 2025, CARB provided the "further clarity" about its certification processes

22   that it had promised, issuing a new, superseding Manufacturers Advisory Correspondence

23   (August MAC). RJN Exh. B at 2. CARB recognized that the intervening enactment of the

24   Resolutions had created "unprecedented uncertainty" in California's vehicle market, prompting

25   more manufacturer questions. Accordingly, CARB clarified the three available pathways to

26   obtain approval from CARB to sell vehicles or engines in the State. *Id.* at 1-2. The three pathways

27   are: (1) voluntary certification to the latest iteration of CARB regulations—i.e., Omnibus and

28   ACT for medium- and heavy-duty vehicles; (2) certification to the prior iteration of CARB

6

Defs.' Mem. in Supp. Mot. to Dismiss United States' First Am. Compl. in Intervention (2:25-cv-02255-DC-AC)

1    regulations for which EPA had previously waived preemption; or (3) demonstration of

2    certification to EPA's standards as codified at the time the August MAC issued. *Id.*

3         On September 15, 2025, CARB issued a notice of emergency rulemaking to confirm that

4    the prior iteration of its regulations remain operative, as described in the August MAC, "until a

5    court resolves the uncertainty created by the federal government's actions." RJN Exh. C at 1.

6    That emergency rulemaking was completed and codified in the California Code of Regulations.

7    *See* Cal. Code Regs., tit. 13, § 1900. CARB also began a non-emergency rulemaking to

8    promulgate these same regulations, RJN Exh. D, because (under California law) an emergency

9    regulation remains in effect for only 180 days, Cal. Gov. Code § 11346.1(e). That 180-day period

10   will run before CARB can finalize the non-emergency rulemaking, so CARB has moved to

11   extend the emergency rule for an additional 90 days to allow for that finalization. RJN Exh. J; *see*

12   *also* Cal. Gov. Code § 11346.1(h).

13   **V.    PLAINTIFFS DISAVOW THEIR CTP COMMITMENTS, AND CARB FILES SUIT FOR**
14   **BREACH**

15        On August 10, 2025, each of the four private Plaintiffs here sent nearly identical letters to

16   the Federal Trade Commission (FTC) disavowing the vehicle-sales commitments they had made

17   two years earlier in the CTP. RJN Exhs. E-H. Each letter acknowledged that the manufacturer had

18   "signed the CTP with CARB," agreeing to sell vehicles in California consistent with the ACT and

19   Omnibus regulations in exchange for "benefits for its dealers and for customers of its trucks."

20   *E.g.*, RJN Exh. E at 1-2. Yet, each manufacturer disavowed any intention of honoring the vehicle

21   sales commitments CARB had bargained for, stating instead that the manufacturer would

22   "independently make decisions about the type and quantity of vehicles it sells without regard" to

23   the CTP. *Id.* at 2-3; *see also* RJN Exh. F at 2, Exh. G at 2-3; Exh. H at 2.

24        After due consideration of private Plaintiffs' public disavowals of the commitments they

25   had made in the CTP, CARB filed suit against these manufacturers in Alameda Superior Court on

26   October 27, 2025. ECF 85, 85-1. In that state-court suit, CARB alleges breach of contract,

27   rescission of contract, and breach of the implied covenant of good faith and fair dealing against

28   the manufacturers. ECF 85-1 at 7-9.

7

Defs.' Mem. in Supp. Mot. to Dismiss United States' First Am. Compl. in Intervention (2:25-cv-02255-DC-AC)

**VI. PROCEDURAL HISTORY**

The private Plaintiffs filed this suit on August 11, 2025, ECF 1, and submitted a preliminary injunction motion on all claims the next day, ECF 23. The United States moved to intervene shortly thereafter. ECF 43. This Court granted intervention. ECF 54. The United States filed its Complaint in Intervention on August 22, ECF 56, and, on August 27, joined the private party Plaintiffs' preliminary injunction motion in part, ECF 57. Following oral argument, this Court issued an order on October 31, 2025, granting the part of the preliminary injunction motion based on the claim that the CTP is preempted but otherwise denying the motion. ECF 94.

On October 10, 2025, Defendants moved to dismiss parts of the United States' complaint-in-intervention. ECF 77. The parties completed briefing on the motion to dismiss on November 18, 2025, ECF 103, and this Court deemed the motion submitted without oral argument, ECF 96. Two months later, both the United States and the private Plaintiffs moved for leave to amend their complaints, seeking, *inter alia*, to add claims against the August MAC and the emergency regulations promulgated in September 2025. ECF 107, 108. Defendants did not oppose the United States's motion. ECF 116. The Court granted the United States leave on February 9, 2026, and denied Defendants' still-pending motion to dismiss the United States' original complaint as moot. ECF 117. The United States filed its FAC the next day. ECF 119.

Defendants now seek to dismiss portions of the United States' amended complaint. Defendants do not seek to present oral testimony, unless the United States or the private Plaintiffs offer such testimony, and anticipate that 50 minutes will be required for any hearing on this motion and the motion filed to dismiss parts of the private Plaintiffs' complaint.[5]

**STANDARD OF REVIEW**

"The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack" under Rule 12(b)(1), "the challenger asserts

---

[5] Defendants respectfully request that argument time be evenly divided between Plaintiffs and Defendants—e.g., Plaintiffs and Plaintiff-Intervenor collectively receive 25 minutes (to be divided among them as they deem appropriate) and Defendants receive 25 minutes.

1    that the allegations contained in a complaint are insufficient on their face to invoke federal

2    jurisdiction." *Id.* However, if a defendant mounts a factual attack on jurisdiction, the district court

3    may review evidence beyond the complaint, and *"*[t]he court need not presume the truthfulness of

4    the plaintiff's allegations." *Id.*

5        Under Rule 12(b)(6), a complaint fails "to state a claim to relief" when it lacks either "a

6    cognizable legal theory or … sufficient facts alleged under a cognizable legal theory." *Woods v.*

7    *U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016) (internal quotation marks omitted). The

8    Court must generally "accept the plaintiffs' allegations as true and construe them in the light most

9    favorable to plaintiffs," but need not "accept as true allegations that contradict matters properly

10   subject to judicial notice" or "that are merely conclusory, unwarranted deductions of fact, or

11   unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d. 1049, 1055 (9th Cir. 2008)

12   (internal quotation marks omitted). Courts also "need not accept as true legal conclusions

13   couched as factual allegations." *Wilson v. Craver*, 994 F.3d 1085, 1090 (9th Cir. 2021).

14                              **ARGUMENT**

15   I.   **THE UNITED STATES' PREEMPTION CHALLENGE TO THE CTP SHOULD BE**
          **DISMISSED FOR FAILURE TO STATE A CLAIM**
16

17        The United States has not stated a preemption claim against the CTP. Section 209(a) of

18   the Clean Air Act—on which the United States exclusively relies—preempts regulatory

19   requirements imposed unilaterally by the State, not commitments made voluntarily as part of

20   bilateral or multilateral bargaining. And the United States alleges no facts that could plausibly

21   establish that the CTP is anything other than a bargained-for agreement and thus outside the scope

22   of preemption.

23        A.   **Section 209(a) Does Not Preempt Voluntary Agreements**

24        "[F]ederal law generally preempts state or local government action that has the force and

25   effect of law"—not voluntary agreements. *Airlines for Am. v. City and Cnty. of San Francisco*, 78

26   F.4th 1146, 1150 (9th Cir. 2023) (cleaned up); *see also Murphy*, 584 U.S. at 479 (preemption

27   "concerns a clash between a constitutional exercise of Congress's legislative power and

28   conflicting *state law*") (emphasis added). Accordingly, when assessing preemption claims, courts

                                            9

1    "contrast 'official, government-imposed policies prescribing binding standards of conduct' with

2    'contractual commitments voluntarily undertaken,'" finding the former preemptable and the latter

3    not. *Airlines for Am.*, 78 F.4th at 1152 (quoting *Am. Trucking Ass'n, Inc. v. City of Los Angeles*,

4    569 U.S. 641, 649 (2013)); *see also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 (1995)

5    (distinguishing, for preemption purposes, "between what the State dictates and what the

6    [regulated party] itself undertakes").

7            Nothing in Section 209(a) indicates that it is an atypical preemption provision that would

8    reach voluntary agreements. In fact, the First Circuit has held that Section 209(a)—like most

9    preemption provisions—was "intended to govern formal regulations adopted by the states, rather

10   than voluntary and cooperative agreements between the states and automakers." *Ass'n of Int'l*

11   *Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 7 (1st Cir. 2000). In reaching

12   that conclusion, the First Circuit relied on the Supreme Court's decision that a preemption

13   provision prohibiting States from "enact[ing] or enforc[ing]" certain requirements on airlines

14   covered "state-imposed regulation" but not "contract terms." *Wolens*, 513 U.S. at 222. As the

15   United States emphasizes, Section 209(a) preempts States from "*attempt[ing] to enforce*" certain

16   vehicular emission control standards. FAC ¶ 3 (quoting 42 U.S.C. § 7543(a)). The First Circuit

17   correctly concluded that this provision draws the same line as in *Wolens*—preempting "state-

18   imposed obligations" but not any "self-imposed undertakings" through agreement. *Wolens*, 513

19   U.S. at 228.

20           It is of no import that the CTP concerns new motor vehicle emissions. The Supreme Court

21   held that state courts could enforce contract terms that—had they been state-imposed laws—

22   would have been preempted because they concerned airlines' "rates, routes, and services."

23   *Wolens*, 513 U.S. at 226. Just as there, Section 209(a) does not "shelter" vehicle manufacturers

24   from their "own, self-imposed undertakings," *id.* at 228—even when those undertakings are

25   within the preempted domain. Put simply, the Supremacy Clause does not prevent a party, like

26   the private Plaintiffs here, from agreeing to do something the State could not require it to do.

27   Indeed, if the Supremacy Clause did forbid such agreements, there would be no need for *Wolens*

28   and its progeny to distinguish between such voluntary commitments and state-imposed

10

Defs.' Mem. in Supp. Mot. to Dismiss United States' First Am. Compl. in Intervention (2:25-cv-02255-DC-AC)

1   requirements in order to resolve preemption claims.

2       **B.    The United States Alleges No Facts that Could Support a Conclusion that**
         **the CTP Was Involuntary and Thus Could Be Preempted**

3           The United States has not alleged any facts to plausibly support an inference that the CTP

4   is anything other than a voluntary agreement and thus outside the scope of Section 209(a)

5   preemption. Precedent identifies two, and only two, factors relevant to this analysis: (1) whether

6   the allegedly preempted obligations were voluntarily undertaken (rather than unilaterally imposed

7   by a regulator) and (2) whether those obligations are enforceable through contract remedies or

8   means available only to governments—such as civil or criminal penalties. For example, in

9   *American Trucking Association*, 569 U.S. at 650, the challenged contract term was preempted 1)

10  because it was imposed not through "the parties' voluntary commitments" but unilaterally

11  through "a form of municipal ordinance," and 2) because violations were "punishable by a fine or

12  a prison sentence." *See also id.* at 651 ("commitments result[ed] not from ordinary bargaining…,

13  but instead from the threat of criminal sanctions"); *Wolens*, 513 U.S. at 233 (distinguishing "what

14  the State dictates" from "what the [party] itself undertakes"); *Airlines for Am.*, 78 F.4th at 1152

15  (contrasting "government-imposed policies … with contractual commitments voluntarily

16  undertaken") (cleaned up); *id.* ("when the government employs a coercive mechanism, available

17  to no private party, it acts with the force and effect of the law") (cleaned up); *id.* ("civil penalty

18  provisions alone may amount to the force and effect of law rendering a government entity a

19  regulator rather than a market participant").

20          The United States cannot allege the facts necessary to establish the first factor. The private

21  Plaintiffs signatories have themselves repeatedly indicated that they entered into the CTP

22  voluntarily. At signing, their trade association (EMA) touted the CTP as "demonstrat[ing] how

23  EMA and CARB can work together," and several Plaintiffs lauded the "cooperative effort[]" that

24  produced the CTP. RJN Exh. I at 1, 2, 3. EMA later explained that, in the CTP, "EMA (and its

25  OEM members)" reached a "*consensual* path forward." ECF No. 23-12, at 2 (emphasis added).

26  And private Plaintiffs' recent letters to the FTC confirm that they actively bargained for the CTP.

27  Two Plaintiffs stated that "through the CTP, [the OEM] was able to obtain benefits for its dealers

28

1    and for customers of its trucks." RJN Exh. E at 2; Exh. F at 2. The other two Plaintiffs affirmed

2    that they signed the CTP to "gain" promises from CARB "in exchange for" promises they

3    offered. RJN Exh. H at 1; *see also* Exh. G at 1.[6]

4         Even setting aside these plain affirmations of voluntariness, the manufacturers who signed

5    the CTP are "sophisticated players who are represented by counsel"—precisely the type of parties

6    that courts assume sign agreements voluntarily, with an understanding of the terms. *See Powell v.*

7    *SEC*, 149 F.4th 1029, 1042 (9th Cir. 2025). Finally, and perhaps fundamentally, the terms of the

8    agreement make plain there was an exchange of consideration. CTP at 1-3 (setting forth

9    commitments by all signatories). Nothing about this bargained-for exchange remotely resembles

10   the unilateral imposition of obligations in *American Trucking Association*, where a State forced

11   private parties into an agreement not with "ordinary bargaining (as in *Wolens*), but instead [by]

12   the threat of criminal sanctions." 569 U.S. at 651.

13        The United States likewise cannot allege facts to support the second factor—that the CTP

14   is enforceable through regulatory penalties or other "mechanism[] available to no private party."

15   *Airlines for Am.*, 78 F.4th at 1150. CARB has brought a breach-of-contract action, seeking

16   contract remedies, and has not sought to impose civil penalties. ECF 85-1 at 5-9 (state-court

17   complaint). The conclusory allegation that the Clean Truck Partnership "threaten[s] *regulatory*

18   consequences" should not be credited, *In re Gilead Scis.*, 536 F.3d. at 1055, particularly in the

19   absence of any supporting facts. Moreover, any such allegation runs headlong into the fact that

20   California law provides regulatory penalties for violations of statutes or "any order, rule, or

21   regulation adopted pursuant to" statutes, *e.g.*, Cal. Health & Safety Code § 43016(a)(1)—not for

22   breach of contracts or other agreements.

23        Significantly, private Plaintiff signatories to the CTP appear to believe they can enforce

24   the CTP against CARB, which is only possible if the CTP can be enforced through means (like

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26        [6] Private Plaintiffs also informed the FTC that the CTP was not preempted at the time they
     signed it but only became so after the enactment of Resolutions purporting to disapprove certain
     preemption waivers. *E.g.*, RJN Exh. E at 2 (asserting "the CTP was rendered unenforceable by a

27   Congressional joint resolution of disapproval signed by the President on June 12, 2025"). The
     signatories understanding that the CTP was *not preempted* when signed only underscores that it is

28   a negotiated agreement, not a regulation with the force and effect of law.

                                                  12

1  breach-of-contract action) available to private parties. ECF 118 ¶ 41 (disavowing ability to

2  enforce CTP against other manufacturers but not CARB); *see also e.g.*, RJN Exh. E at 1 & n.3

3  (similarly asserting "DTNA has never had any right to enforce" the CTP against "the other

4  original equipment manufacturer signatories").

5        The United States nonsensically alleges that CARB continuing its certification program is

6  among the "penalties" manufacturers would face "for failing to follow the [CTP]." FAC ¶ 71. An

7  agency continuing to operate a program as it has done for decades is hardly akin to the fines that

8  courts have treated as penalties when assessing preemption. *E.g.*, *Airlines for Am.*, 78 F.4th at

9  1153 (terms allowing for imposition of civil fines rendered "agreement" preemptable as carrying

10  the force and effect of law). Moreover, the statement in the CTP that "California will maintain its

11  certification program" is simply a description of how CARB implements its regulatory program.

12  CTP, App'x B at ¶ 1. It is not a threat for failing to honor the CTP's terms. This is clear from the

13  immediately preceding heading, which identifies the relevant statement as a characterization of

14  how "CARB Carries Out Its Authority." *Id.* CARB's statutory and regulatory authority is

15  "independent[]" of the CTP, *id.*, and the statement at issue simply confirms that the CTP *did not*

16  *change* the applicable regulatory or statutory requirements—including the statutory requirement

17  that manufacturers certify vehicles and engines with CARB before selling in California. Far from

18  transforming the CTP into a regulation, this statement clarifies the opposite: that, by agreeing to

19  go beyond regulatory requirements (under certain circumstances), manufacturers were not

20  somehow freed from *also* following applicable California law.[7]

21        The United States additionally mischaracterizes commitments the manufacturers

22  bargained for as regulatory penalties. FAC ¶¶ 72, 73. Specifically, the United States points to

23  Appendices A and C to the CTP, alleging they establish "penalties for failing to follow" the CTP.

24  *Id.* ¶¶ 71-73. Notably, the private Plaintiff signatories to the CTP make no such allegations about

25  these Appendices. For good reason: by the plain terms of the CTP, "Appendices A, B, and C"

26        [7] While they could have agreed to a different way to measure compliance (i.e., third-party
verification), the parties to the CTP were all quite familiar with CARB's decades-old certification
27  program, so the decision to incorporate that well-understood mechanism into the agreement—
rather than establish a duplicative and less familiar one—is hardly surprising. Agreed upon terms
28  of voluntary agreements are not preempted *laws*. *Supra* Sec. I.A.

describe "the actions" CARB "commit[ed] to initiate" as part of the exchange of consideration. CTP at 1 ¶ 1. Appendix A "set[s] forth," *id.*, the regulatory amendments to the Omnibus regulation that CARB agreed to consider, *id.*, App'x A. And the relevant part of Appendix C indicates that CARB agreed that its Executive Officer "will objectively evaluate" specified information "in assessing whether a recall is required" (rather than imposing automatic recall triggers). *Id.*, App'x C, § A. Far from establishing regulatory penalties for manufacturers, these Appendices describe actions the manufacturers *bargained for CARB to take*.

### C.    The United States' Allegations Concerning Irrelevant Factors Cannot Save their Claim

The United States' Complaint includes several red herrings—allegations on subjects no court has treated as relevant to assessing whether agreements are preempted. None of these allegations can save the United States from its failure to state a claim.

**a.** The United States leans heavily into the fact that the CTP incorporates certain CARB regulations by reference, alleging such incorporation means the CTP is not, in fact, an agreement. FAC ¶¶ 67, 69, 78, 79, 111. As a threshold point, the United States identifies no precedent that make such incorporation by reference relevant to the preemption analysis. And again there is a good reason for this failure: the fact that the agreement's terms reference regulatory provisions (as a convenience) does not convert the CTP into a regulation, any more than the incorporation of "statutes and regulations" transforms the Federal Government's contracts into laws. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 609 (2000). Rather, as *Mobil Oil*'s enforcement of such terms as *contractual promises* indicates, "[w]hen a contract expressly incorporates a statutory enactment by reference, that enactment *becomes part of the contract* for the indicated purposes just as though the words of that enactment were set out in full in the contract." 11 Williston on Contracts § 30:19 (4th ed. 2025) (emphasis added). Notably, in *Mobil Oil*, the United States *agreed* that the incorporation of statutes and regulations into a contract made them terms of that contract. *See Mobil Oil*, 530 U.S. at 615. The dispute there was only over *which* provisions had, in fact, been incorporated. *Id.* ("The Government's 'no breach' arguments depend upon [incorporation of] not only the OCSLA provisions…, but also certain other statutory

14

1   provisions and regulations….").

2         Nothing in the United States' complaint provides a basis to depart from its position in

3   *Mobil Oil* or the black-letter law that parties to a contract may agree to use existing legal

4   requirements to define a term of the contract, thereby providing a shorthand and readily

5   understood description of what one or more parties committed to do. Those terms then "emanate

6   from contract" and are "separate animals" from "obligations created by statute [or regulation]."

7   *Black Diamond Asphalt, Inc. v. Superior Ct.*, 109 Cal. App. 4th 166, 171 (2003). And this

8   principle applies with equal force when the federal or state government is a party to the

9   agreement. Specifically, when the government "exact[s] promises from a party with whom it

10  contracts that he will comply with [certain] regulations," those promises are independent of the

11  referenced regulation and are enforceable through a "breach of contract" suit. *Nutt v. United*

12  *States*, 12 Cl. Ct. 345, 351 (1987), *aff'd sub nom. Smithson v. United States*, 847 F.2d 791 (Fed.

13  Cir. 1988). And, thus, when the Federal Government failed to abide by statutory provisions

14  "incorporated" into contracts, *Mobil Oil*, 530 U.S. at 609, the Supreme Court held that the

15  Government broke *its promise* in the contracts—not that it violated the incorporated statute, *id.* at

16  624. Likewise, when one of the "regulations incorporated into the terms of" federal lease

17  agreements provided that "[l]eases shall be subject to cancellation if improperly issued," the

18  Court of Federal Claims enforced the cancellation of the leases, not under the incorporated

19  regulations, but as consistent with *the lease terms. Griffin & Griffin Expl., LLC v. United States*,

20  116 Fed. Cl. 163, 176-77 (2014).

21        The CTP is no different. In exchange for promises from CARB, certain manufacturers

22  (including private Plaintiffs here) promised to sell cleaner vehicles in California, with the terms

23  (i.e., the agreed-upon vehicles) defined in a way all the parties could easily understand—by

24  reference to particular CARB regulations. These same requirements could have been restated in

25  full in the agreement and would have had the same meaning; that the parties chose the simpler

26  shorthand of cross-referencing regulatory provisions does not change the nature of the

27  commitment. 11 Williston on Contracts § 30:19 (4th ed. 2025). The manufacturers' promises are

28  thus terms of the contract; and any action to enforce them is just that—an effort to enforce the

15

Defs.' Mem. in Supp. Mot. to Dismiss United States' First Am. Compl. in Intervention (2:25-cv-02255-DC-AC)

1    terms of a contract, not an "attempt to enforce" the incorporated regulations.

2         **b.** The United States also alleges that the CTP is not an actual agreement because it

3    purportedly lacks "typical contract provisions." FAC ¶ 68. Again, the United States identifies no

4    precedent holding that the absence of any particular contract term is relevant to preemption

5    analysis. *See id.* To the contrary, it is the *presence* of certain terms—such as terms that impose

6    regulatory penalties for non-compliance—that can lead to a conclusion that an agreement has the

7    force of law and can be preempted. *E.g.*, *Airlines for Am.*, 78 F.4th at 1153 ("[W]e find that two

8    penalty provisions of the [contracts] … are unique governmental functions that carry the 'force

9    and effect of law'"). Contracting parties' choices to omit certain terms that the United States (a

10   non-party) believes would otherwise be "typical" is simply irrelevant to this preemption claim.

11        **c.** The allegation that "a key goal" of the CTP is to "ensur[e] current and future *CARB*

12   *regulations*" reduce air pollution likewise cannot save this preemption claim. FAC ¶ 68 (emphasis

13   original). For one thing, the relevant text of the CTP establishes only that the parties to the

14   agreement all "recogniz[ed] the importance" of several desired outcomes, including reducing

15   vehicular air pollution (by way of regulation and technological progress). CTP at 1. The CTP

16   does not indicate that any of these developments was a "key goal" of the CTP. *Id.* The goals of

17   the parties are, of course, better understood from the text that follows—namely, the terms that

18   indicate the consideration the parties bargained for. In any event, yet again the United States

19   provides no basis for concluding that the goal of an agreement is relevant to this preemption

20   claim. Statements of shared concerns do not give an agreement the force of law. And, indeed, it is

21   unclear how a regulator and regulated entities voluntarily sharing a goal to reduce air pollution

22   could lead to preemption under the Clean Air Act.

23        **d.** Finally, the United States resorts to a conclusory allegation that CARB signed the CTP

24   "in its capacity as an industry regulatory—not in its capacity as a market participant." FAC ¶ 79.

25   But when a government bargains with other parties, it is engaging in contracting activities—like

26   private parties do—not engaging in regulation. *See Mobil Oil*, 530 U.S. at 607 (applying "the law

27   applicable to contracts between private individuals" although United States was a party and

28   agreed to carry out its regulatory responsibilities in a particular way). It is only when the

                                          16

1  government acts with "the force and effect of law" that it acts as "a regulator rather than a market

2  participant." *Airlines for Am.*, 78 F.4th at 1152 (cleaned up). Certainly, when the government

3  exercises its purchasing power, the determination that a government is not acting as a regulator

4  may be an easy one. *Id.* But that does not suggest that *only* exercises of purchasing power land on

5  the voluntary-contractual-commitments side. Indeed, the Supreme Court held that state-court

6  "enforcement of contract terms" was *not preempted*, although such enforcement is far from

7  typical market participation. *Wolens*, 513 U.S. at 222.

8  **II.    THE UNITED STATES' PREEMPTION CHALLENGE TO THE ADVANCED CLEAN
   FLEETS REGULATION SHOULD BE DISMISSED FOR LACK OF JURISDICTION**

9

10  The United States' claim against the 2036 Sales Requirement in the Advanced Clean Fleets

11  regulation (FAC ¶¶ 105-106) should also be dismissed because the United States lacks standing

12  "for each form of relief that [it] seek[s]" as to that regulation. *See TransUnion LLC v. Ramirez*,

13  594 U.S. 413, 431 (2021). Specifically, there is no threat that a preempted requirement will be

14  enforced because CARB has already stipulated—in a signed court order in another case—that it

15  will not enforce this regulatory requirement unless and until it has a preemption waiver from

16  EPA. RJN Exh. A at 3; *see Buscemi v. Bell*, 964 F.3d 252, 260 (4th Cir. 2020) (no standing where

17  state agency "has stipulated that it … will not" engage in challenged conduct); *Reddy v. Foster*,

18  845 F.3d 493, 501-02 (1st Cir. 2017) ("plaintiffs lack standing, at this time" where "the

19  government has affirmatively disavowed prosecution" unless or until specified conditions occur).

20  In other words, CARB will only enforce this challenged regulation *if Plaintiff-Intervenor EPA*

21  takes action allowing CARB to do so. The United States cannot allege facts to establish that it

22  "would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490,

23  508 (1975). *See also Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 616-17 (6th Cir. 2013)

24  ("stipulated final judgment" entered in earlier case and enjoining enforcement of challenged laws

25  made clear "the federal courts have no authority to resolve this 'dispute'").

26  To the extent the United States claims it is entitled to a declaratory judgment that the

27  codification of the 2036 Sales Requirement into the California Code of Regulations was

28  preempted absent a waiver (FAC at ¶ 106; *id.* at 49 ¶ A), it lacks standing for relief as to that, as

17

1   well. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1142 (9th Cir. 2024)

2   (cleaned up) ("the mere existence of [the regulation], which may or may not ever be applied to

3   [anyone], is not sufficient to create a case or controversy within the meaning of Article III")

4   (quoting *Cal. Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 866 (9th Cir.

5   2012)). A declaration that this regulatory provision is "unenforceable," FAC at 49 ¶ A, would

6   provide no tangible benefit to the United States, *Warth*, 422 U.S. at 508, given the stipulated

7   order precluding enforcement without a waiver—i.e., precluding the alleged injury of

8   enforcement of a preempted regulation.

9          Moreover, to credit an injury for the mere existence of this provision in the California Code

10  of Regulations (FAC ¶ 106), this Court would have to conclude that Section 209(a) establishes a

11  legally protected interest in preventing State legislatures and agencies from codifying emission

12  control standards for new motor vehicles. *Stockton v. Brown*, No. 24-3777, 2025 WL 2656631, at

13  *10 (9th Cir. Sept. 17, 2025) ("Whether framed as an issue of standing or ripeness, an injury must

14  involve an invasion of a legally protected interest….") (cleaned up). But that would interpret

15  Section 209(a) as a direct order to States as to what laws they may or may not codify, in violation

16  of the anti-commandeering doctrine. *Murphy*, 584 U.S. at 470 ("The anticommandeering doctrine

17  … is simply the expression of a fundamental structural decision incorporated into the

18  Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the

19  States."). Congress cannot "dictate[] what a state legislature may and may not do," *id.* at 474, so

20  Section 209(a) cannot be understood as establishing that the United States (or anyone) has a

21  legally cognizable interest in the mere codification of any particular state law. *See* FAC ¶ 7

22  (alleging injury based on "supremacy of federal authority that Congress enacted in the Clean Air

23  Act[]").

24         The United States cannot establish standing for any relief concerning the 2036 Sales

25  Requirement, and its challenge to the requirement should be dismissed.

26

27

28

1

**CONCLUSION**

2    For the foregoing reasons, Defendants respectfully request that the Court dismiss the United

3  States' claim against the CTP for failure to state a claim and the claim against the Advanced

4  Clean Fleets regulation for lack of Article III jurisdiction.

5

6  Dated:  March 10, 2026                    Respectfully submitted,

7                                            ROB BONTA
                                             Attorney General of California
8                                            MYUNG J. PARK
                                             Supervising Deputy Attorney General
9

10

11                                           */s/ M. Elaine Meckenstock*
                                             M. ELAINE MECKENSTOCK
12                                           Deputy Attorney General
                                             *Attorneys for Defendants*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28