ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
ROBERT N. STANDER
Deputy Assistant Attorney General
JOHN K. ADAMS
DAVID D. MITCHELL
United States Department of Justice
Environment & Natural Resources Div.
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 353-5905
robert.stander@usdoj.gov
john.adams3@usdoj.gov
david.mitchell@usdoj.gov

ERIC GRANT
United States Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
(916) 554-2700

*Counsel for Intervenors-Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAIMLER TRUCK NORTH AMERICA LLC; INTERNATIONAL MOTORS, LLC; PACCAR INC; and VOLVO GROUP NORTH AMERICA LLC, <br><br> Plaintiffs, <br><br> and <br><br> THE UNITED STATES OF AMERICA; and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Intervenors-Plaintiffs, <br><br> v. <br><br> CALIFORNIA AIR RESOURCES BOARD; STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board; and GAVIN NEWSOM, in his official capacity as the Governor of California, <br><br> Defendants. | 2:25-cv-02255-DC-AC <br><br> **UNITED STATES' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS THE UNITED STATES' FIRST AMENDED COMPLAINT-IN-INTERVENTION (Dkt. No. 119)** <br><br> Date:     May 1, 2026 <br> Time:     1:30 PM <br> Courtroom:  10, 13th Floor <br> Judge:    Hon. Dena Coggins <br> Trial Date:  Not Set <br> Action Filed:  August 11, 2025 |

Opposition to Motion to Dismiss (Dkt. No. 119)
Case No. 2:25-cv-02255-DC-AC

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

   I.  Legal and Factual Background.................................................................................. 2

      A.  The Clean Air Act's Motor Vehicle Emissions Program ................................... 2

      B.  CARB's Recent Truck Emissions Standards and the Electric-Vehicle Mandate .......... 3

      C.  The Clean Truck Partnership ............................................................................ 4

   II. Procedural History ................................................................................................... 4

LEGAL STANDARD....................................................................................................... 5

ARGUMENT .................................................................................................................. 6

   I.  The United States States a Claim that the Clean Truck Partnership is Preempted Under Section 209(a) of the Clean Air Act......................................................................... 6

      A.  The Clean Truck Partnership, Which is Subject to Preemption, is an Unlawful "Attempt to Enforce" Preempted Emission Standards.................................................... 6

      B.  Fabricating a "Voluntary Agreement" Standard Contrary to Binding Precedent, CARB Misapprehends the Legal Rule for Preempted State Contracts........................ 11

   II. The United States Has Standing for Its Claim that CARB Unlawfully Adopted and Is Attempting to Enforce the 2036 Sales Requirement in Clean Fleets................................ 14

      A.  CARB Unlawfully Adopted Clean Fleets Without a Preemption Waiver.................. 15

      B.  The Clean Truck Partnership Is an Unlawful Attempt to Enforce the Electric-Vehicle Mandate in Clean Fleets ................................................................................... 15

      C.  The United States Is Suffering Ongoing Injury ............................................... 16

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

**U.S. Constitution**

U.S. Const. art. VI, § 2 ........................................................................................................... 7

**Cases**

*Airlines for Am. v. City & Cnty. of San Francisco*,

    78 F.4th 1146 (9th Cir. 2023) ................................................................ 10, 12, 13

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,

    569 U.S. 641 (2013) ................................................................ 1, 8, 9, 10, 11, 12, 14

*American Airlines, Inc. v. Wolens*,

    513 U.S. 219 (1995) ................................................................................................ 14

*Ass'n of Int'l Auto. Mfrs., Inc. v. Commissioner, Mass. Dep't of Env't Prot.*,

    208 F.3d 1 (1st Cir. 2000) ...................................................................................... 14

*Buscemi v. Bell*,

    964 F.3d 252 (4th Cir. 2020) .................................................................................. 18

*Cipollone v. Liggett Grp., Inc.*,

    505 U.S. 504 (1992) ................................................................................................ 11

*City of New York v. Chevron Corp.*,

    993 F.3d 81 (2d Cir. 2021) ..................................................................................... 11

*City of Ozark v. Union Pac. R.R. Co.*,

    843 F.3d 1167 (8th Cir. 2016) ................................................................................ 11

*Diamond Alt. Energy, LLC v. EPA*,

    606 U.S. 100 (2025) .................................................................................................. 3

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist*,

    498 F.3d 1031 (9th Cir. 2007) .................................................................................. 9

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,

    541 U.S. 246 (2004) ........................................................................................... 10, 11

*Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*,

    265 F. Supp. 3d 179 (D. Conn. 2017) ................................................................... 17

*Fed. Election Comm'n v. Cruz,*
  596 U.S. 289 (2022) ......................................................................................... 6, 15

*Griffin & Griffin Expl., LLC v. United States,*
  116 Fed. Cl. 163 (2014) ......................................................................................... 12

*Idaho Conservation League v. Bonneville Power Admin.,*
  83 F.4th 1182 (9th Cir. 2023) ................................................................................. 15

*In re Debs,*
  158 U.S. 564 (1895) ................................................................................................ 16

*In re Gilead Scis. Sec. Litig.,*
  536 F.3d 1049 (9th Cir. 2008) ................................................................................. 6

*Int'l Brotherhood of Teamsters v. DOT,*
  861 F.3d 944 (9th Cir. 2017) ................................................................................... 19

*Kurns v. R.R. Friction Prods. Corp.,*
  565 U.S. 625 (2012) ................................................................................................ 11

*La Union del Pueblo Entero v. Abbott,*
  604 F. Supp. 3d 512 (W.D. Tex. 2022) .................................................................... 17

*Law v. Gen. Motors Corp.,*
  114 F.3d 908 (9th Cir. 1997) ................................................................................... 11

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ................................................................................................ 19

*Maya v. Centex Corp.,*
  658 F.3d 1060 (9th Cir. 2011) ................................................................................. 5, 6

*Mobil Oil Expl. & Producing Se., Inc. v. United States,*
  530 U.S. 604 (2000) ................................................................................................ 12

*Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation,*
  17 F.3d 521 (2d. Cir. 1994) ..................................................................................... 3

*Murphy v. NCAA,*
  584 U.S. 453 (2025) ................................................................................................ 18

*Nutt v. United States*,

    12 Cl. Ct. 345 (1987) ......................................................................................................... 12

*Olympic Pipe Line Co. v. City of Seattle*,

    437 F.3d 872 (9th Cir. 2006)............................................................................. 1, 8, 9, 11, 14

*Platinum Sports Ltd. v. Snyder*,

    715 F.3d 615 (6th Cir. 2013)............................................................................................. 18

*Reddy v. Foster*,

    845 F.3d 493 (1st Cir. 2017) ............................................................................................. 18

*Rumsfeld v. Forum for Academic & Inst. Rights*,

    547 U.S. 47 (2006) ............................................................................................................ 19

*Sanitary Dist. of Chi. v. United States*,

    266 U.S. 405 (1925)........................................................................................................... 16

*Schneider v. Cal. Dept. of Corrs.*,

    151 F.3d 1194 (9th Cir. 1998)............................................................................................. 2

*Stauffer v. Brooks Bros., Inc.*,

    619 F.3d 1321 (Fed. Cir. 2010)......................................................................................... 17

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,

    108 F.4th 1128 (9th Cir. 2024) ......................................................................................... 18

*United States v. California*,

    No. 19-cv-2142, 2020 WL 8183945 (E.D. Cal. Feb. 26, 2020)........................................ 17

*United States v. Idaho*,

    623 F. Supp. 3d 1096 (D. Idaho 2022).......................................................................... 16, 17

*United States v. King Cnty.*,

    122 F.4th 740 (9th Cir. 2024) ........................................................................................... 12

*United States v. Texas*,

    566 F. Supp. 3d 605 (W.D. Tex. 2021)........................................................................ 16, 17

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,

    529 U.S. 765 (2000)........................................................................................................... 17

*Wilson v. Craver*,

994 F.3d 1085 (9th Cir. 2021)................................................................................ 6

*Woods v. U.S. Bank N.A.*,

831 F.3d 1159 (9th Cir. 2016)................................................................................ 6

**Statutes**

42 U.S.C. § 7507 ............................................................................................................ 3

42 U.S.C. § 7521(a) .............................................................................................. 16, 18

42 U.S.C. § 7521(a)(1).................................................................................................. 2

42 U.S.C. § 7521(a)(3)(C) .......................................................................................... 10

42 U.S.C. § 7543(a) ........................................................................................... 1, 3, 5, 6

42 U.S.C. § 7543(a)–(b).................................................................................... 15, 16, 18

42 U.S.C. § 7543(b)(1).................................................................................................. 3

49 U.S.C. § 14501(c)(1)................................................................................................ 8

49 U.S.C. § 60104(c) .................................................................................................... 8

Pub. L. No. 89-272, § 101, 79 Stat. 992 (1965)........................................................... 2

Pub. L. No. 95-95, 91 Stat. 685 (1977) ....................................................................... 3

**State Materials**

2021, No. 53-Z, Cal. Regulatory Notice Reg. 1809 (Dec. 31, 2021)......................... 10

Cal. Code Regs. tit. 13, § 1956.8(a)(2)(C) ................................................................. 10

Cal. Code Regs. tit. 13, § 2016(c) .......................................................................... 4, 14

**INTRODUCTION**

Defendants (collectively, "CARB") attempt to circumvent federal preemption with the Clean Truck Partnership ("CTP") and the three preempted emissions standards incorporated therein: the Omnibus Low Nox Rule ("Omnibus"), the Advanced Clean Trucks Rule ("Clean Trucks"), and the Advanced Clean Fleets Rule ("Clean Fleets"). But CARB cannot enforce the CTP or the electric-vehicle mandate in Clean Fleets because section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a), prohibits CARB from either "adopt[ing]" *or* "attempt[ing] to enforce" motor-vehicle emissions standards that, as here, lack a valid preemption waiver from the U.S. Environmental Protection Agency ("EPA").

This Court preliminary enjoined CARB from enforcing the CTP because, at minimum, the electric-vehicle mandate in Clean Fleets lacks a preemption waiver; and yet CARB tried to enforce it through a state court suit. Dkt. No. 94 at 31–32, 34 (filed Oct. 31, 2025); *see also* Dkt. No. 85-1 (state court lawsuit). Overlooking that decision, CARB moves to dismiss in part the United States' First Amended Complaint ("FAC"), Dkt. No. 119, on two narrow grounds. Neither has merit.

First, CARB contends that the Clean Air Act does not preempt the CTP because section 209(a) "does not reach voluntary agreements." Dkt. No. 122-1 at 1 ("MTD"). CARB seeks to obfuscate the law with its fabricated voluntariness standard. It is well-established that a government contract is subject to preemption when the government enters or uses that contract, not as a market participant, but as a regulator. *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013) (distinguishing "between a government's exercise of regulatory authority and its own contract-based participation in a market"); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 881 (9th Cir. 2006) (same). Here, the United States plausibly alleges that CARB entered and uses the CTP in its regulatory capacity because CARB (1) created the CTP to impose public health and safety policies on industry rather than to purchase goods or services, (2) exerts coercive government power unavailable to private parties to ensure compliance, and (3) agreed to use regulatory power (*e.g.*, rulemaking) as its bargained-for consideration, among other reasons. Individually or collectively, these facts subject the CTP to claims of preemption. And the CTP is preempted because CARB uses it to enforce preempted emissions standards. Dkt. No. 94 at 34.

Second, CARB argues that the United States lacks standing to challenge its Clean Fleets regulation, which requires that all heavy-duty trucks in California be fully electric by 2036. CARB claims that "there is *no* possibility that the United States will be injured" because it "has stipulated in a signed court order in another case that it will not enforce this requirement" until it obtains a waiver. MTD at 1. Not true. Notwithstanding that court order, CARB *just* attempted to enforce Clean Fleets by filing a state court lawsuit. *See* Dkt. No. 94 at 31 (concluding that CARB's credibility here "evaporated" when it filed its state court action) (referring to Dkt. No. 85-1). Indeed, CARB tried to serve its state court lawsuit *after* this Court's October 31 order. And CARB refuses to dismiss it. CARB also concedes that it adopted Clean Fleets without a waiver. MTD at 4. The adoption of Clean Fleets without a waiver in violation of section 209(a) independently injures the United States because, among other reasons, CARB tries to usurp federal authority to set nationally uniform emissions standards. Because Clean Fleets is changing parties' behavior now—as CARB intends, as evidenced by its coercive actions and statements—both a declaration that the electric-vehicle mandate is void and a permanent injunction will remedy the injury to the United States.[1]

## BACKGROUND

### I.    Legal and Factual Background

#### A.  The Clean Air Act's Motor Vehicle Emissions Program

In 1965, Congress amended Title II of the Clean Air Act to authorize federal emission standards for motor vehicles. Pub. L. No. 89-272, § 101, 79 Stat. 992 (1965). Section 202(a)(1) governs federal emission standards for air pollutants emitted from new motor vehicles or new motor vehicle engines found to "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). But many states continued developing their own emission programs. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't*

---

[1] CARB's motion ventures well outside the four corners of the United States' FAC, going so far as to introduce factual allegations—which are not subject to judicial notice—about the truck manufacturers' mental state when executing the CTP. *See, e.g.*, MTD at 11–12 (alleging that signatories to the CTP touted the document as a "cooperative effort" or said it was not preempted); *see* Dkt. No. 125 (opposing CARB's request for judicial notice). Setting aside the irrelevance of these assertions, this Court must disregard them as improper. *See Schneider v. Cal. Dept. of Corrs.*, 151 F.3d 1194, 1198 n.1 (9th Cir. 1998) ("[A] court may not look beyond the complaint" when resolving a motion to dismiss).

Opposition to Motion to Dismiss (Dkt. No. 119)
Case No. 2:25-cv-02255-DC-AC

2

*Conservation*, 17 F.3d 521, 525 (2d. Cir. 1994). Congress responded in 1967 by adding a broad preemption provision that is the "cornerstone" of Title II. *Id.* at 526.

Section 209(a) provides: "No State . . . shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). Next, section 209(b) contains a "unique preemption exception" that applies only to California. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 106 (2025). That provision authorizes EPA to grant a preemption waiver for proposed standards that meet certain criteria and are at least as strict as federal standards, but only if California "need[s] such State standards to meet compelling and extraordinary conditions," and the State standards are consistent with other requirements in section 202(a) of the Clean Air Act. 42 U.S.C. § 7543(b)(1). Unless California obtains a preemption waiver from EPA, it remains unlawful for California to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles." *Id.* § 7543(a).

In 1977, Congress again amended the Act and added section 177. *See* Pub. L. No. 95-95, 91 Stat. 685 (1977). That provision permits certain states to "adopt and enforce" emissions standards for new motor vehicles or new motor vehicle engines that are "identical to the California standards for which a waiver has been granted" under certain conditions. 42 U.S.C. § 7507. Thus, no more than two standards may exist nationwide—the federal standard and the California standard—and states may not "create [any] 'third vehicle.'" *Id.* Unless EPA issues a preemption waiver, the federal standard exclusively applies nationwide.

**B. CARB's Recent Truck Emissions Standards and the Electric-Vehicle Mandate**

In recent years, CARB adopted and attempted to enforce several emissions standards for heavy-duty trucks that became effective in model year 2024: Omnibus, Clean Trucks, and Clean Fleets. *See* FAC ¶¶ 33–55.[2] Omnibus requires truck manufacturers to reduce heavy-duty vehicle nitrogen oxide and particulate emissions. *Id*. ¶¶ 48–54. Clean Trucks imposes yearly increasing quotas for sales of electric trucks in California. *Id.* ¶¶ 33–35. And Clean Fleets requires the purchase

---

[2] *See* Dkt. No. 1 ¶ 4 n.1 for a definition of "heavy-duty truck." The United States also refers to truck manufacturers here as shorthand for Plaintiffs and other similarly situated original equipment manufacturers.

Opposition to Motion to Dismiss (Dkt. No. 119)
Case No. 2:25-cv-02255-DC-AC

3

of electric trucks. *Id.* ¶¶ 40–42. By 2036, Clean Fleets enforces a 100% electric-vehicle requirement for heavy-duty trucks used in California. *See* Cal. Code Regs. Tit. 13, § 2016(c).

CARB adopted Clean Fleets without first obtaining a Clean Air Act preemption waiver. FAC ¶ 43. CARB then sought a preemption waiver from EPA but later withdrew the request after the 2024 presidential election. *Id.* EPA issued preemption waivers for Omnibus and Clean Trucks, *id*. ¶¶ 36, 54, but Congress passed bipartisan statutes, which the President signed into law, disapproving of and voiding those waivers, *id*. ¶¶ 82–84. CARB has no waivers for these regulations.

Clean Fleets was challenged in court. *Id.* ¶ 44. Currently, the California defendants in *Nebraska v. Cliff*, No. 2:24-cv-1364 (E.D. Cal. May 13, 2024), are under a court order not to enforce the electric-vehicle mandate unless and until CARB obtains a Clean Air Act preemption waiver from EPA. *Id.* ¶ 46. But that hasn't stopped CARB from trying to enforce the mandate. CARB has not said that it will repeal the electric-vehicle sale requirement it has adopted into law. *Id.* ¶ 47.

### C. The Clean Truck Partnership

In July 2023, CARB announced the CTP with certain truck manufacturers. *See* FAC ¶ 67; CTP, Dkt. No. 118-1. The CTP requires, among other things, that the truck manufacturers who signed it comply with the Clean Fleets electric-vehicle mandate "as it existed on April 28, 2023" (and other recent emissions regulations), *even if* those regulations are unlawful or California lacks the authority to enforce them. *See* CTP at 2 ¶ 2; *id*, App. B at ii ¶ 2 (requiring compliance with "100 percent [electric-vehicle] sales requirement set forth in Cal. Code Regs title 13, section 2016"); *see also* Dkt. No. 94 at 10–14 (describing CTP); FAC ¶¶ 67, 70, 74–78 (same).

## II.   Procedural History

On August 22, 2025, the United States filed its complaint-in-intervention against CARB, Dkt. No. 56, after the Court granted its motion to intervene, Dkt. No. 54. The complaint asserted two claims: (1) Clean Fleets, Clean Trucks, and Omnibus are preempted; and (2) the CTP is an unlawful attempt to enforce preempted standards. The United States then joined in Plaintiffs' motion for a preliminary injunction, Dkt. No. 57, that sought to prohibit CARB from implementing or enforcing (1) preempted regulations, (2) the CTP, and (3) other official acts, Dkt. No. 23.

On October 31, this Court granted, in part, the motion for a preliminary injunction. *See* Dkt. No. 94. This Court held that the United States is likely to succeed on the merits of its claim that federal law preempts the CTP because CARB is using it to enforce preempted emissions standards. *See id.* at 31–34. The Court reasoned that CARB's credibility about not attempting to enforce preempted emission standards "evaporated" when CARB filed a state court lawsuit seeking to enforce the emissions standards contained in the CTP. *Id*. at 31:24. The Court also held that the United States suffered a "per se irreparable harm." *Id*. at 32:13.

Because CARB has attempted other means to enforce preempted emission standards since the start of this litigation, the United States amended its complaint. On February 10, 2026, the United States filed the FAC asserting four claims: (1) that Clean Trucks, Omnibus, and Clean Fleets are preempted by the Clean Air Act and the U.S. Constitution; (2) that the CTP is an unlawful attempt to enforce the preempted rules in violation of 42 U.S.C. § 7543(a); (3) that CARB's August 2025 Manufacturers Advisory Correspondence—which threatens enforcement of Omnibus in the certification process against heavy-duty truck manufacturers—is an unlawful attempt to enforce Omnibus in violation of 42 U.S.C. § 7543(a); and (4) that CARB's emergency rule adopting emissions standards without an EPA preemption waiver is preempted by the Clean Air Act under 42 U.S.C. § 7543(a) and the Supremacy Clause of the United States Constitution. FAC ¶¶ 97–124.

CARB now moves to dismiss the United States' first claim in part and second claim in full under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* MTD at 1, 8, 19. CARB argues that the United States has failed to state a claim challenging the CTP because, in its view, the CTP is a voluntary agreement. *Id*. at 9–17. CARB also contends that this Court should dismiss the challenge to the 2036 sales requirement in Clean Fleets because, according to CARB, the United States lacks standing due to alleged non-enforcement. CARB declines to address this Court's October 31 order, or otherwise grapple with the effect of its state court action, which it has refused to dismiss despite this Court's order enjoining CARB from enforcing the CTP. *See* Dkt. No. 94 at 33–34.

### LEGAL STANDARD

Motions to dismiss under Rule 12(b)(1) challenge jurisdiction. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). The Court must presume that the allegations in the complaint are

true and construe them in favor of the plaintiff. *Id*. at 1068. General factual allegations are sufficient to survive a standing challenge because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Id*. (cleaned up). This Court must also accept the merits of the plaintiffs' "legal claims" for "standing purposes." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022).

Motions to dismiss under Rule 12(b)(6) challenge whether the complaint fails "to state a claim to relief" because it lacks either "a cognizable legal theory or . . . sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016) (cleaned up). The Court must generally "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (cleaned up). Courts "need not accept as true legal conclusions couched as factual allegations." *Wilson v. Craver*, 994 F.3d 1085, 1090 (9th Cir. 2021).

**ARGUMENT**

**I.    The United States States a Claim that the Clean Truck Partnership is Preempted Under Section 209(a) of the Clean Air Act**

    **A. The Clean Truck Partnership, Which is Subject to Preemption, is an Unlawful "Attempt to Enforce" Preempted Emission Standards**

The United States alleges facts to establish that the CTP is preempted under section 209 of the Clean Air Act, 42 U.S.C. § 7543(a), because CARB has used the CTP in an attempt to enforce emissions standards that have no preemption waiver from EPA. *See* FAC ¶¶ 109–13.

**1.** CARB incorporated elements of the three regulations at issue here into the CTP: (1) Clean Fleets, *see* CTP, App. C–D; FAC ¶ 70; (2) Clean Trucks, *see* CTP, App. C; FAC ¶ 70; and (3) Omnibus, *see* CTP, App. A–B; FAC ¶ 70; *see also* Dkt. No. 94 at 10–13 (recounting emission standards in the CTP). In Appendix D, for example, CARB mandates that the truck manufacturers "sell as many zero-emission trucks as reasonably possible in every state that has or will adopt CARB's [Clean Trucks] regulations . . . , irrespective of the outcome of any litigation . . . challenging the waivers or authorizations for those regulations or CARB's or any state's overall authority

to implement those regulations." CTP App. D ¶ F; *see also id*. ¶ 2 (requiring manufacturers to follow CARB regulations even if they are unlawful).

The purpose of the CTP is to enforce these regulations to reduce vehicular emissions. *See* FAC ¶ 68; *see also* CTP at 1 (executing the CTP to "ensur[e] current and future CARB *regulations* affecting new [heavy-duty trucks] will achieve significant reductions of air pollutants") (emphasis added). CARB believes reducing vehicular emissions through the CTP "protect[s] public health." Dkt. No. 73 at 6. To achieve this regulatory goal, CARB promised "to undertake several . . . regulatory actions" in exchange for the truck manufacturers' commitment to follow the three regulations just described. Dkt. No. 94 at 11. For example, CARB committed to "initiate rulemaking actions and present" specific amendments to Omnibus. CTP, App. A at ii (listing regulatory action such as "allow[ing] engine manufacturers in MY 2024 to certify legacy engines prior to certification of Omnibus-compliant engine families").

In contrast to a commercial contract, the penalties for failing to follow the CTP are regulatory. *See* FAC ¶ 68 (explaining that the CTP lacks "typical contractual provisions"). As an example, the CTP provides that "California will maintain its certification program" so it can issue executive orders to allow truck manufacturers to sell their vehicles in California. CTP, Appx. B ¶ 1; *see also* FAC ¶ 71. As a related example, the CTP describes regulatory "consequence[s]" if the Omnibus rule's "caps are exceeded": the manufacturers' sales "would be considered as non-compliant sales." *Id*. ¶ 72. The CTP also reminds its signatories "that CARB's Executive Officer is authorized to consider specified information in determining whether a recall of a vehicle or engine family is required." *Id.* ¶ 73. Yet one more, CARB has sued manufacturers for specific performance and damages to comply with its regulations. *See* Dkt. No. 85-1 (state court action).

**2.** The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land" and preempts state or local laws in conflict therewith. U.S. Const. art. VI, § 2. Federal law can displace state law through express preemption, such as the express preemption provision in section 209 of the Clean Air Act. To determine whether federal law preempts local standards enforceable through a contract, courts assess whether the government entered or used the contract as a market participant or as a regulator.

Opposition to Motion to Dismiss (Dkt. No. 119)
Case No. 2:25-cv-02255-DC-AC

7

In *American Trucking*, a local government implemented a "Clean Truck Program" that created an "agreement" to govern the relationship between the Port of Los Angeles and trucking companies. *Am. Trucking*, 569 U.S. at 645. "Under that contract, a company may transport cargo at the Port in exchange for complying with various requirements," such as displaying placards and submitting parking plans. *Id*. A trucking association claimed that federal law preempted those contractual requirements. *Id*. at 646 (relying on the preemption clause in 49 U.S.C. § 14501(c)(1)). The city argued against preemption because, in its view, the "contract [containing those requirements] is just like a private agreement" made to advance its "commercial and proprietary interests." *Id*. at 649 (cleaned up). The Court agreed with the premise that the preemption provision in § 14501(c)(1) "draws a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market"—but rejected the city's application of that premise. *Id*. (collecting cases contrasting "regulatory action" with market participation). The Court noted that the contract used "a tool to fulfill [its] goals which only a government can wield: the hammer of the criminal law." *Id*. at 651. The Court also observed that the government had lured companies into the contract in exchange for a promise to "amend[]" an "ordinance," another tool which only government can use. *Id*. Thus, because the government had "act[ed] in a regulatory rather than [a] proprietary mode" in enforcing the placard and parking provisions contained in the contract, the Court held that federal law preempted those provisions. *Id*. at 650.

Similarly, the city in *Olympic Pipe Line* had a franchise agreement with a pipeline company that included "safety oversight provisions." 437 F.3d at 874. When the city tried to enforce those contractual provisions, the company sued, contending that federal law preempted them. *Id*. The federal law at issue provides that state and local authorities "may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). Although section 60104(c) expressly preempted the city's attempted safety regulations, the court stated that the city could contractually require the pipeline operator to perform safety tests if, upon entering the contract, the city had "acted as a municipal proprietor rather than as a regulator." 437 F.3d at 881 (collecting cases). That analysis turned on whether the city used the contract "to encourage a general policy [or to] address a specific proprietary problem," and whether "the

challenged action essentially reflects the entity's own interest in its efficient procurement of needed good and services." *Id*. Because the city had "acted pursuant to its general duty to protect the public health and safety—a duty grounded in [its] regulatory, police power," the court held that federal law preempted the contractual provisions. *Id*.

**3.** In this case, it does not matter that CARB stamped the word "Agreement" on the CTP. Because CARB entered and uses the CTP in its regulatory capacity, *see* FAC ¶¶ 68–73, the CTP is subject to preemption under section 209(a) of the Clean Air Act.

**a.** As an initial matter, CARB created the CTP to "encourage a general policy rather than [to] address a specific proprietary problem." *Olympic Pipe Line*, 437 F.3d at 881; *see also Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist*, 498 F.3d 1031, 1041–44 (9th Cir. 2007) (explaining distinction between "propriety" and "regulatory" interests when applying the market participant doctrine under the Clean Air Act). The CTP identifies only public policy goals: (1) "preserving and protecting the environment"; (2) "ensuring current and future CARB regulations . . . will achieve significant reductions of air pollutants"; (3) promoting a zero emissions vehicle mandate; (4) "maintaining a strong and viable industry"; and (5) providing regulatory "certainty and stability." CTP at 1. None of these goals reflects an "interest in [the] efficient procurement of needed good and services." *Olympic Pipe Line*, 437 F.3d at 881. CARB also stated that it uses the CTP to "protect public health." Dkt. No. 73 at 6. CARB "thus acted pursuant to its general duty to protect the public health and safety—a duty grounded in [California's] regulatory, police power—rather than" to address a proprietary problem. *Olympic Pipe Line*, 437 F.3d at 881.

Next, the CTP uses tools "to fulfill [its] goals which only a government can wield: the hammer" of certification and regulatory penalties. *Am. Trucking*, 569 U.S. at 651. Trucking manufacturers need CARB certification to allow them to sell their vehicles in California. FAC ¶ 58. The CTP requires manufacturers "to submit applications for certification . . . to demonstrate compliance with applicable California requirements." CTP, App. B ¶ 1; FAC ¶ 71. The threat of denying certification is meant to ensure compliance. And it's something only the government can accomplish— no private party can use government certification to bar sales of goods in a state. FAC ¶¶ 90–92. The CTP uses another tool unavailable to private parties: threatening to label vehicle sales as "non-

compliant" if the truck manufacturers do not follow the Omnibus regulation. CTP, App. A at i nn.1–2; FAC ¶ 73. "[W]hen the government employs such [] coercive mechanism[s], available to no private party, it acts with the force and effect of law" to bring its contract within the scope of federal preemption. *Am. Trucking*, 569 U.S. at 651–52; *accord Airlines for Am. v. City & Cnty. of San Francisco*, 78 F.4th 1146, 1152 (9th Cir. 2023) (holding government contracts were regulatory actions because they threatened "civil penalties" that were "unavailable to private parties").

The parties' consideration for entering the CTP is also regulatory. CARB agreed not to use government power in conflict with federal law in exchange for the truck manufacturers' agreement to follow regulations. To illustrate, CARB promised to provide four years of lead time for industry to adopt its Omnibus rule, as required by federal law, instead of two years as originally promulgated. *Compare* 42 U.S.C. § 7521(a)(3)(C), *with* Cal. Code Regs. tit. 13, § 1956.8(a)(2)(C); *see also* 2021, No. 53-Z, Cal. Regulatory Notice Reg. 1809 (Dec. 31, 2021). Moreover, and just like the government in *American Trucking*, CARB promised to amend its regulations in exchange for signatures. *See* 569 U.S. at 649. This further illustrates that CARB entered the CTP as a regulator.

**b.** CARB attempts to enforce preempted emissions standards through the CTP in multiple ways. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 257 (2004) (explaining that an "attempt to enforce" under section 209(a) reaches preliminary, coercive, and indirect enforcement actions).

First, the CTP dictates that even when CARB *lacks authority* for Clean Fleets, Clean Trucks, or Omnibus, manufacturers must still comply with them. FAC ¶ 75; CTP at 2 ¶ 2 ("The [manufacturers] commit to meet, in California, the relevant provisions of the CARB regulations . . . irrespective of" their legality). As just described, CARB attempts to enforce these standards with coercive government power via the CTP. *See Airlines for Am.*, 78 F.4th at 1152 (holding that government contracts function as regulatory action when backed by coercive state power).

Second, the CTP provides that "California will maintain its certification program," asserting CARB's authority to impose certification requirements on manufacturers. CTP, App. B ¶ 1; FAC ¶ 71. Conditioning regulatory benefits, certification treatment, or enforcement discretion on compliance with preempted standards is an attempt to enforce those standards, even if no penalties have

yet been imposed. *See, e.g., Engine Mfrs.*, 541 U.S. at 257 (holding that an "attempt to enforce . . . is not limited to the actual imposition of penalties"); *see also Am. Trucking*, 569 U.S. at 649–50 (rejecting use of contractual mechanisms backed by regulatory authority to impose preempted requirements).

Third, CARB has used breach-of-contract claims to indirectly enforce compliance. *See* Dkt. No. 94 at 32, 34 (concluding that CARB's lawsuit is an unlawful attempt to enforce). But CARB cannot use state litigation to enforce preempted standards because federal preemption "does not depend upon the source of a state law claim." *City of Ozark v. Union Pac. R.R. Co.,* 843 F.3d 1167, 1172 (8th Cir. 2016). For example, a request for specific performance to abide by emission standards is "clearly an attempt to enforce" those standards. Dkt. No. 94 at 32. CARB also cannot side-step preemption by recasting its regulatory enforcement through damages. *See* Dkt. 85-1 at 7–8 ¶¶ g–j. Courts recognize that "regulation can be . . . effectively exerted through an award of damages,' and '[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Kurns v. R.R. Friction Prods. Corp.,* 565 U.S. 625, 637 (2012); *accord Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) ("State regulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *City of New York v. Chevron Corp.*, 993 F.3d 81, 92–93 (2d Cir. 2021) (explaining that damages sought in a lawsuit are an effective form of regulation); *see also Law v. Gen. Motors Corp.*, 114 F.3d 908, 910 (9th Cir. 1997) ("The purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state.").

### B. Fabricating a "Voluntary Agreement" Standard Contrary to Binding Precedent, CARB Misapprehends the Legal Rule for Preempted State Contracts

CARB selectively strings together stray sentences from a handful of cases and contends that, because the CTP is a "voluntary agreement," section 209(a) does not preempt it. MTD at 9–11. That is incorrect. Binding authority holds that contracts executed by states are subject to federal preemption when states enter or use those contracts in their regulatory capacities. *See, e.g., Am. Trucking*, 569 U.S. at 655; *Olympic Pipe Line*, 437 F.3d at 880–81. CARB's cases prove that preemption here turns on whether CARB executed the CTP as a regulator or as a market participant.

*See Airlines for Am.*, 78 F.4th at 1152 ("In this case, the question posed . . . is whether the City . . . acts as a regulator or *a market participant*.") (emphasis added); *see also Am. Trucking*, 569 U.S. at 649 ("draw[ing] a rough line between a government's exercise of regulatory authority and its own contract-based participation *in a market*") (emphasis added).

CARB does not argue (because it cannot) that it executed the CTP to obtain goods and services or to protect a proprietary interest. *See* FAC ¶ 79 (alleging that CARB entered and uses the CTP "in its capacity as an industry regulator—not in its capacity as a market participant"); *see also United States v. King Cnty.*, 122 F.4th 740, 759 (9th Cir. 2024) (explaining that market participant means (1) pursuing procurement of "needed goods and services" or (2) resolving "a specific proprietary problem"). Rather, CARB entered the CTP to "preserv[e] and protect[] the environment," "ensur[e] current and future CARB regulations affecting new [heavy-duty] vehicles and engines will achieve significant reductions of air pollutants," and other regulatory goals. CTP at 1.

CARB thinks that "bargain[ing] with other parties" transforms the CTP from a regulatory mechanism into an ordinary contract beyond the scope of federal preemption. MTD at 16–17. But merely bargaining with other parties is not the standard. Because CARB does not state the relevant legal distinction—between *regulator* and *market participant*—it fails to appreciate that its incorporation of (now preempted) regulatory standards into the CTP is fatal to its defense.

On this point, CARB asserts that the CTP references these regulatory standards as a convenient shorthand for the parties' contractual obligations. MTD at 14–16. In support, CARB cites cases in which the United States incorporated statutes and regulations as enforceable terms in contracts to (a) lease resource exploration rights in exchange for over $100 million, *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 609 (2000), (b) lease national forest land to drill for oil and gas, *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 167 (2014), and (c) provide financing to farmers otherwise unable to obtain a loan, *Nutt v. United States*, 12 Cl. Ct. 345, 347 (1987). None of these cases addresses preemption or the relevant legal test here. They are about core market activity that CARB does not contend it engaged in when forming the CTP.

CARB relies exclusively on cases that consider whether certain governmental actions have the "force and effect of law" because the state "employs 'a coercive mechanism, available to no

Opposition to Motion to Dismiss (Dkt. No. 119)
Case No. 2:25-cv-02255-DC-AC

12

private party.'" MTD at 9–11, 16–17 (citing *Airlines for Am.*, 78 F.4th at 1152). But this analysis is nothing more than another way to draw the same distinction between a governmental entity acting "as a regulator or a market participant" when it enters a contract. *Airlines for Am.*, 78 F.4th at 1152. And CARB uses the "force and effect of" California law to compel compliance with the CTP. *See supra* § I.A.3.a. (explaining, for example, CARB's threat to decline certification so it can ensure regulatory compliance); *see also Airlines for Am.*, 78 F.4th at 1154–55 (declining to reach market-participant test because government contract had the force and effect of law). Because CARB employs coercive mechanisms throughout the CTP, the United States has sufficiently alleged that the CTP is subject to preemption.

CARB effectively concedes this point. The certification process, CARB boasts, is "how [it] implements its regulatory program." MTD at 13. Exactly right. CARB "implements" the CTP through its "regulatory program," with the full range of regulatory consequences for noncompliance—none of which a private party could employ. And CARB does not disclaim the power to deny certification to the CTP signatories for failure to comply with the CTP. Regarding CARB's threats to label vehicle sales non-compliant or issue a recall, CARB retreats to its contention that these are voluntary terms, without asserting—because it cannot—that a private party could employ these coercive mechanisms in a normal, arm's-length agreement. *See* MTD at 13–14. Contrary to CARB's contention that the FAC makes only "conclusory allegation[s]" regarding the regulatory consequences for breach, *id.* at 12, the United States explains that the CTP contains multiple governmental remedies that only CARB may employ in its regulatory capacity, *see, e.g.*, *supra* § I.A.3.a; *accord* FAC ¶¶ 71–73.

CARB cannot avoid the United States' preemption claim by springing a breach-of-contact action against the truck manufacturers on the eve of a preliminary injunction hearing. *See* MTD at 12; Dkt. No. 85-1 (state court action). As explained, a lawsuit seeking specific performance or damages is yet another regulatory tool CARB wields here, *see* § I.A.3.b, and "CARB's filing of that lawsuit is clearly an attempt to enforce preempted standards." Dkt. No. 94 at 32.[3]

---

[3] Notably, the state lawsuit belies CARB's contention that the appendices to CTP merely describe

The other cases CARB relies upon are distinguishable. In *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), the Supreme Court considered, among other things, whether the Airline Deregulation Act preempted breach-of-contract claims filed by consumers participating in American Airlines' frequent flyer program. *Wolens*, 513 U.S. at 224–25, 228–29. The Court stated that the statute's preemption provision did not reach contracts between *private* parties. *Id.* at 229. Because no government was a party to the contract in *Wolens*, there was no occasion to consider whether a state was acting as a regulator or a market participant. The Supreme Court has also cited *Wolens* when it reaffirmed that state contracts are subject to preemption when the government enters or uses them in its regulatory capacity. *See, e.g.*, *Am. Trucking*, 569 U.S. at 649–50.

Nor can CARB evade federal preemption by relying on *Association of International Auto. Manufacturers, Inc. v. Commissioner, Massachusetts Department of Environmental Protection* 208 F.3d 1 (1st Cir. 2000). First, unlike here, the court did not consider whether the agreement was an "attempt to enforce" a preempted regulation. Second, the emissions requirements were provided solely in the agreement "rather than legislation or formal administrative regulations." *Id.* at 7. Finally, to the extent that decision could be read to wholesale exempt any agreement from section 209(a)'s preemptive reach, that case is inconsistent with precedent. *See Am. Trucking*, 569 U.S. 641; *Olympic Pipe Line*, 437 F.3d 872.

## II.    The United States Has Standing for Its Claim that CARB Unlawfully Adopted and Is Attempting to Enforce the 2036 Sales Requirement in Clean Fleets

Clean Fleets requires truck manufacturers to produce and deliver for sale in California only electric heavy-duty trucks starting in model year 2036. FAC ¶¶ 40–47; *see also* Dkt. No. 94 at 7–8 (discussing Cal. Code Regs. Tit. 13, § 2016(c)). This electric vehicle mandate, adopted in 2023 and implemented since without a waiver, is codified in California's regulations and applicable to all covered manufacturers. FAC ¶¶ 40–47. CARB does not refute that it unlawfully adopted Clean

---

commitments to the manufacturers. *See* MTD at 13–14 (stating that "by the plain terms of the CTP, [the appendices] describe 'the actions' CARB 'committed to initiate' as part of the exchange of consideration" (quoting CTP at 1 ¶ 1)). In its state court complaint, CARB described Appendices A and B as "set[ting] forth" "requirements" that the truck manufacturers must meet. Dkt. No. 85-1 at 7.

Fleets. The only disputed question, then, is whether the United States has standing. It does.

Clean Fleets is currently interfering with interstate and foreign commerce by forcing manufacturers to take compliance measures now. And CARB has already attempted to enforce Clean Fleets in its state court suit. The United States has standing to redress these injuries to interstate commerce and to its exclusive sovereign authority to regulate vehicle emissions absent a waiver.

### A. CARB Unlawfully Adopted Clean Fleets Without a Preemption Waiver

Because CARB does not contest the merits of the United States' argument that it unlawfully adopted Clean Fleet without a preemption waiver, *see* MTD at 17–18, this Court must "accept as valid the merits" of the United States' "legal claims" for "standing purposes." *Cruz*, 596 U.S. at 298; *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1189 (9th Cir. 2023) ("For standing purposes, we accept as valid the merits of [petitioners'] legal claims.").

In short, section 209 prohibits "adopt[ing]" a regulation without a waiver. 42 U.S.C. § 7543(a)–(b). Here, CARB "adopted the proposed Clean Fleets" regulation in 2023.[4] And it "ordered that" the Clean Fleets' code sections be "adopted" into the California code of regulations.[5] Yet CARB had not obtained a preemption waiver from EPA, and it still has not obtained a waiver. Adopting an emissions standard without a waiver violates the plain text of section 209(a).

### B. The Clean Truck Partnership Is an Unlawful Attempt to Enforce the Electric-Vehicle Mandate in Clean Fleets

Separately, CARB is unlawfully attempting to enforce the electric-vehicle mandate in Clean Fleets now through the CTP. CARB requires the truck manufacturers who signed the CTP to comply with the electric-vehicle mandate regardless of whether Clean Fleets is lawful. FAC ¶¶ 78, 88–89, 111. CARB has attempted to enforce Clean Fleets. *See* Dkt. No. 94 at 32 ("CARB's filing of that lawsuit is clearly an attempt to enforce preempted standards as least in part, because the model year 2036 zero-emissions requirement is included in the [CTP] yet CARB never obtained a preemption waiver for that requirement."); *accord* Dkt. No. 85-1 (state court action).

---

[4] CARB, Final Statement of Reasons for Rulemaking, Advanced Clean Fleets https://perma.cc/9CJQ-4DXG, (referring to "adopted Regulations" and "adopting" Clean Fleets).

[5] CARB, Executive Order R-23-003, https://perma.cc/VJN3-HKW8.

### C. The United States Is Suffering Ongoing Injury

**1.** The United States has "standing in court" to sue for "injury to the general welfare," *In re Debs*, 158 U.S. 564, 584 (1895), and one such injury is interference with "interstate and foreign commerce," *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 426 (1925); *see also, e.g., United States v. Texas*, 566 F. Supp. 3d 605, 640 (W.D. Tex. 2021) (standing based on injury to "the general welfare" or the "public at large"); *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022) (United States "may sue to redress widespread injuries to the general welfare.").

In this case, the zero-emissions mandate in Clean Fleets is causing ongoing interference with "interstate and foreign commerce." *Sanitary Dist.*, 266 U.S. at 426. As the truck manufacturers explain, the Clean Fleets mandate requires a massive transformation of the production of heavy-duty trucks. In fact, CARB initially proposed that the mandate take effect in 2040 considering the challenges in building out the necessary infrastructure to support Clean Fleets. *See* Mfrs.' Opp. at 13–17, Dkt. 123. CARB additionally recognized that Clean Trucks would be necessary to effect a full transition to electric vehicles. *See id.* at 14. But Congress has disapproved the waiver for Clean Trucks and that rule is preempted, making it even more difficult for truck manufacturers to comply with the electric vehicle mandate by 2036. *See id.* As a result, the manufacturers must make critical decisions regarding investment and development now and cannot wait to see if CARB will obtain a waiver to enforce the mandate in the future. *See id.* at 13–17; Mfrs.' Am. Comp. ¶ 88, Dkt. No. 118 (explaining that the truck manufacturers "must take steps *now* to have any hope" of complying with the electric-vehicle mandate).

This not only provides the truck manufacturers with standing, but it also provides the United States with standing to prevent unlawful interference with "interstate and foreign commerce." *Sanitary Dist.*, 266 U.S. at 426; FAC ¶ 47 (explaining the "market uncertainty" due to Clean Fleets). Sections 202 and 209 of the Clean Air Act provide that EPA alone will establish national emissions standards. 42 U.S.C. §§ 7521(a), 7543(a)–(b). States cannot set their own except with one limited exception that does not apply to the electric-vehicle mandate. *Id.* The continued threat of the electric-vehicle mandate upsets this federal-state balance and burdens interstate commerce by functionally subjecting truck manufacturers to two sets of operative rules and imposing immediate costs on

them. CARB's adoption of Clean Fleets, therefore, necessarily implicates and interferes with interstate commerce. *See* Mfrs.' Am. Compl., Dkt. No. 118 ¶¶ 19–22 (identifying domiciles of parties); *Texas*, 566 F. Supp. 3d at 641–42 (finding standing for United States where challenged legislation "implicate[d] commerce across state lines").

The electric-vehicle mandate further burdens interstate commerce by restricting the truck manufacturers' choices regarding investment and development decisions. A ruling from this Court holding that Clean Fleets is preempted under section 209(b) will remedy those injuries and the disruption to interstate and foreign commerce, because the truck manufacturers will no longer be compelled to undertake steps to prepare for compliance by 2036.

**2.** Separately, the United States is suffering an injury to its sovereignty because, by "adopting" emissions standards before obtaining a waiver, CARB usurped exclusive "federal authority to set national uniform emissions standards for mobile sources." FAC ¶¶ 7, 10.

As the Supreme Court recognized, "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [the United States'] sovereignty arising from violation of its laws." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). "When state governments enact laws that impugn the United States' sovereignty, a personal injury to the United States arises." *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 527 (W.D. Tex. 2022). Courts have repeatedly applied this principle to hold that "the United States' sovereign interests are harmed when its laws are violated." *Idaho*, 623 F. Supp. 3d at 1107; *accord Stauffer v. Brooks Bros., Inc.*, 619 F.3d 1321, 1326 (Fed. Cir. 2010) ("From the government's perspective, a harm arises from an 'injury to its sovereignty arising from violation of its laws.'"); *United States v. California*, No. 19-cv-2142, 2020 WL 8183945, at *3 (E.D. Cal. Feb. 26, 2020) ("The United States has plausibly alleged its claimed injury—the usurpation of federal authority to conduct foreign affairs."); *Equal Emp. Opportunity Comm'n v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 192 (D. Conn. 2017) (The United States suffers an "injury to its sovereignty . . . from violation of its laws."). Indeed, as the enforcer of all federal laws—civil and criminal—the United States has sovereign-interest standing to enforce any violation of federal law.

CARB adopted Clean Fleets because, as it is fully aware, its mere adoption of the electric-

vehicle mandate in that regulation requires truck manufacturers to comply today to meet the electric-vehicle mandate by 2036, irrespective of federal law. The adoption without a waiver thus defies Congress's choice for uniform federal emissions standards and injures the United States' sovereign interests. 42 U.S.C. §§ 7521(a), 7543(a)–(b).

**3.** CARB argues that the claim is not ripe because it is not currently enforcing the electric-vehicle mandate in Clean Fleets. MTD at 17–18. But the truck manufacturers' ongoing compliance refutes this argument. *See* Mfrs.' Am. Compl., Dkt. No. 118 ¶ 88; Mfrs.' Opp., Dkt. 123 at 13–17. So does CARB's decision to file a state court enforcement action. As this Court explained, that decision "evaporate[s]" CARB's no-enforcement argument. Dkt. No. 94 at 31. At any rate, that CARB says it will not enforce the electric-vehicle mandate without a waiver (despite its actions to the contrary) does not matter, as the United States cannot remedy the ongoing injury to interstate commerce absent a declaration that Clean Fleets is preempted, void, and unenforceable.

CARB's cited cases have no bearing here.  This is not a case where (a) the defendant has agreed not to apply the challenged statute to preclude the plaintiff's intended activity, *Buscemi v. Bell*, 964 F.3d 252, 260 (4th Cir. 2020); (b) the challenged statute has not caused plaintiffs to alter their present behavior, *see Reddy v. Foster*, 845 F.3d 493, 502 (1st Cir. 2017), or (c) a court has entered final judgment declaring the statutes at issue unconstitutional and enjoining enforcement of the law, *see Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 617 (6th Cir. 2013). CARB retains the power to attempt to enforce Clean Fleets, compelling truck manufacturers to alter their behavior and incur costs to comply *now*.

CARB leans on *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128 (9th Cir. 2024), for the proposition that the mere existence of a regulation is insufficient to establish standing. *See* MTD at 18. But United States does not rely on the "mere existence" of the regulation. Rather, the United States relies on the current interference with interstate and foreign commerce, which injures the general welfare, along with the usurpation of federal authority to adopt vehicle emissions regulations. The United States independently relies on CARB's attempt to enforce Clean Fleets through the CTP. *See* Dkt. No. 94 at 31–32, 34. Those injuries are ongoing.

Lastly, CARB contends that the United States suffers no "injury for the mere existence of

Opposition to Motion to Dismiss (Dkt. No. 119)
Case No. 2:25-cv-02255-DC-AC

18

[the electric-vehicle mandate] in the California Code of Regulations," and that interpreting section 209(a) "as a direct order to States as to what laws they may or may not codify" would violate "the anti-commandeering doctrine." MTD at 18 (citing *Murphy v. NCAA*, 584 U.S. 453 (2025)). This contention lacks merit. The United States does not seek to "dictate what [the California] legislature may and may not do," *id.* (quoting *Murphy*, 584 U.S. at 474), nor does the United States care one way or the other about the "codification of any particular state law," *id.* Rather, the United States simply seeks a declaration from *this Court* that what CARB has already done is preempted by section 209, among other forms of relief. The injury to the United States is also tethered to the ongoing concrete injury the truck manufacturers are suffering because they are compelled to change their manufacturing decisions *now* in order to fully comply in the future. This injury is fully re-dressable by a declaration and injunctive relief.

**4.** Regardless, even if the Court concludes otherwise—and it should not—the United States' first claim for relief as to Clean Fleets still should not be dismissed. "An intervenor of right must independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction." *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). Here, both the manufacturers and the United States seek the same relief: a declaration that Clean Fleets is preempted and an injunction prohib-iting its enforcement. *Compare* Dkt. No. 118 at Prayer for Relief II, V, *with* FAC at Prayer for Relief A–B. Therefore, inquiring into the [United States'] independent Article III standing" would be "error." *Little Sisters*, 591 U.S. at 674–75 n.6.

Moreover, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2. (2006). Therefore, if one party has standing, the court "need not evaluate whether the [other plaintiffs] have standing." *Int'l Brotherhood of Teamsters v. DOT*, 861 F.3d 944, 951 (9th Cir. 2017). Here, the truck manufactures have standing to challenge Clean Fleets because they must alter their behavior today to determine "how, and how quickly, to transition fleets to zero-emissions vehicles, including how to invest capital in research and development and new production facili-ties." Mfrs.' Am. Compl. ¶ 90; *see also* Mfrs.' Opp., Dkt. 123 at 13–17 (same). The Court does not

even need to consider whether the United States has standing to pursue this part of its first claim.

## CONCLUSION

For these reasons, CARB's motion to dismiss the United States' FAC should be denied.

Respectfully submitted,
ADAM R.F. GUSTAFSON
*Principal Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

Dated: March 24, 2026　　　　　　　　/s/ John K. Adams
　　　　　　　　　　　　　　　　　_____

ERIC GRANT　　　　　　　　　JOHN K. ADAMS
*United States Attorney*　　　　DAVID D. MITCHELL
　　　　　　　　　　　　　　United States Department of Justice
　　　　　　　　　　　　　　Environment & Natural Resources Div.

*Counsel for Intervenors-Plaintiffs*