# EXHIBIT 10

**Excerpt**

**BEFORE THE**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

In the Matter of California's Request for Waiver )
Pursuant to Clean Air Act Section 209(b) and    )
for Authorization Pursuant to Clean Air Act    )
Section 209(e) for California's "Omnibus"    )
Regulation    )
    )
_____ )

**CLEAN AIR ACT § 209(b) WAIVER AND § 209(e) AUTHORIZATION REQUEST SUPPORT DOCUMENT SUBMITTED BY THE CALIFORNIA AIR RESOURCES BOARD**
**January 31, 2022**

## I. INTRODUCTION AND OVERVIEW

This document supports the request of the California Air Resources Board (CARB or Board) that the Administrator of the United States Environmental Protection Agency (EPA) take waiver action pursuant to Clean Air Act (CAA) section 209(b) with respect to a rulemaking action in which CARB promulgated criteria pollutant exhaust emission standards and other emission-related requirements applicable to new 2024 and subsequent model year (MY) California on-road medium- and heavy-duty engines and vehicles (hereinafter "Omnibus Regulation or Regulation").[1]  Elements of the Omnibus Regulation also establish emission-related requirements applicable to off-road engines. CARB requests that EPA take authorization action pursuant to CAA section 209(e) for those elements.

On-road medium and heavy-duty vehicles that exceed 8,500 pounds (lbs) gross vehicle weight rating (GVWR) are a significant source of oxides of nitrogen (NOx) emissions in California; heavy-duty vehicles emit nearly one third of all statewide emissions of NOx. The Omnibus Regulation establishes exhaust emission standards for NOx that are 90 percent more stringent than the currently applicable California and federal heavy-duty NOx emission standards and significantly strengthens several elements of California's certification and in-use programs to ensure that affected engines and vehicles comply with the more stringent standards throughout their useful lives.

---

[1] The Omnibus regulation is comprised of new title 13, California Code of Regulations (Cal. Code Regs.) sections 2139.5, and 2169.1 through 2169.8; amendments to title 13, Cal. Code Regs., sections 1900, 1956.8, 1961.2, 1965, 1968.2, 1971.1, 1971.5, 2035, 2036, 2111, 2112, 2113, 2114, 2115, 2116, 2117, 2118, 2119, 2121, 2123, 2125, 2126, 2127, 2128, 2129, 2130, 2131, 2133, 2137, 2139, 2140, 2141, 2142, 2143, 2144, 2145, 2146, 2147, 2148, 2149, 2166, 2166.1, 2167, 2168, 2169, 2170, 2423, and 2485; and amendments to title 17 Cal. Code Regs. sections 95662 and 95663.

The Regulation constitutes the single largest NOx control measure in California's current SIP strategy, and will reduce NOx emissions in California by approximately 17.4 tons per day (tpd) statewide by 2031, and by 45.2 tpd statewide, by 2050.  NOx emissions in the South Coast Air Basin and in the San Joaquin Valley Air Basin are projected to decrease by 5.2 and 4.3 tpd, respectively, by 2031.

Section II of this document provides a brief description of the Board's rulemaking action. Section III presents a summary of the elements of the Omnibus Regulation that require waiver and authorization actions.  Section IV identifies the principles applicable to waivers and authorizations, Section V demonstrates that EPA has no basis to deny granting the requested waiver, and Section VI demonstrates that EPA has no basis to deny granting the requested authorizations.  The remainder of Section I discusses waivers that EPA has previously granted for regulations targeting California on-road heavy-duty and medium-duty engine and vehicles.

### A. Preexisting California On-Road Heavy-Duty and Medium-Duty Engine and Vehicle Emission Regulations That Have Been Granted Waivers

#### 1. On-Road Medium- and Heavy-Duty Diesel and Otto-Cycle Engine Emission Standards

California regulations classify motor vehicles as light-duty, medium-duty, or heavy-duty based on their GVWR, a measure of the vehicle's weight plus a defined load weight. The current heavy-duty vehicle classification is further subdivided into three subcategories: light heavy-duty (14,001 to 19,500 lbs GVWR), medium heavy-duty (19,501 to 33,000 lbs GVWR), and heavy heavy-duty (greater than 33,000 lbs GVWR).

California first regulated heavy-duty vehicle exhaust emissions in 1969.  EPA first regulated heavy-duty vehicles in 1974. Since 1986, state and federal heavy-duty engine and vehicle emission standards and test procedures have been generally aligned.  EPA has granted waivers for California heavy-duty regulations for preexisting diesel engine standards[2] and Otto-cycle engine standards.[3]  EPA also granted California a number of earlier waivers applicable to heavy-duty diesel engines (HDDEs) and vehicles[4] and to heavy-duty Otto-cycle engines and vehicles.[5]

---

[2] 70 Fed. Reg. 50322 (Aug. 26, 2005).

[3] 75 Fed. Reg. 70238 (Nov. 17, 2010).

[4] 69 Fed. Reg. 59920 (Oct. 6, 2004), 53 Fed. Reg. 7021 (March 4, 1988), 52 Fed. Reg. 20777 (June 3, 1987), 49 Fed. Reg. 39731 (Oct. 10, 1984), 46 Fed. Reg. 36742 (July 15, 1981), 46 Fed. Reg. 26371 (May 12, 1981), 43 Fed. Reg. 36679 (Aug. 18, 1978), 42 Fed. Reg. 31639 (June 22, 1977), and 36 Fed. Reg. 8172 (April 30, 1971).

[5] 69 Fed. Reg. 59920 (Oct. 6, 2004), 53 Fed. Reg. 7022 (March 4, 1988), 53 Fed. Reg. 6197 (March 1, 1988), 49 Fed. Reg. 39731 (Oct. 10, 1984), 46 Fed. Reg. 36742 (July 15, 1981), 46 Fed. Reg. 26371 (May 12, 1981), 43 Fed. Reg. 20549 (May 12, 1978), 42 Fed. Reg. 31637 (June 22, 1977), 42 Fed. Reg.

In 1990, CARB adopted amendments to the exhaust emission standards and associated test procedures for light-duty trucks, medium-duty vehicles and engines, and light heavy-duty vehicles and engines, and additionally adopted amendments that redesignated vehicles rated from 8,501 to 14,000 lbs GVWR, formerly classified as heavy-duty vehicles, as medium-duty vehicles.[6]  EPA granted California waivers for the new definition of medium-duty vehicles and the standards applicable to this class of vehicles.[7]

California's classification of heavy-duty vehicles is similar, but not identical to the federal classification of heavy-duty vehicles (which, as previously stated, includes vehicles that California classifies as medium-duty vehicles), as indicated by Table 1 below.

**Table 1- Federal and California Heavy-Duty Vehicle Weight Classes**

| GVWR (lbs) | 8,501-10,000 | 10,001-14,000 | 14,001-16,000 | 16,001-19,500 | 19,501-26,000 | 26,001-33,000 | 33,001+ |
|---|---|---|---|---|---|---|---|
| Federal | Light heavy-duty | | | | Medium heavy-duty | | Heavy heavy-duty |
| California (1995 and later MY) | Medium-duty | | Light heavy-duty | | Medium heavy-duty | | Heavy heavy-duty |

### 2.  California's On-Board Diagnostic (OBD) II Regulation

CARB initially adopted the OBD II Regulation in 1990 and the OBD II Enforcement Regulation in 2003, and subsequently adopted several amendments to both regulations. EPA granted California a waiver of the OBD II Regulation and the OBD II Enforcement Regulation, both as last amended in 2013, in 2016.[8]

The OBD II Regulation requires motor vehicle manufacturers to incorporate OBD II systems into new passenger cars, light-duty trucks, and medium-duty vehicles and engines.  OBD II systems effectively monitor all emission-related components and systems for proper operation, and for deterioration or malfunctions that cause emissions

---

31639 (June 22, 1977), 36 Fed. Reg. 8172 (April 30, 1971), 34 Fed. Reg. 7348 (May 6, 1969), and 33 Fed. Reg. 10160 (July 16, 1968).

[6] EPA does not have a "medium-duty vehicle" category, but classifies heavy-duty vehicles between 8,501 and 14,000 lbs GVWR as light heavy-duty vehicles.

[7] 59 Fed. Reg. 48625 (Sept. 22, 1994), 63 Fed. Reg. 18403 (April 15, 1998).

[8] 81 Fed. Reg. 78143 (Nov. 7, 2016).

to exceed specific thresholds.  The OBD II Regulation also requires OBD II systems to provide specific diagnostic information in a standardized format through a standardized serial data link to ensure that service and repair technicians can properly and promptly repair identified malfunctions.

The OBD II Enforcement Regulation establishes in-use testing procedures and associated remedial measures that are designed to ensure that OBD II systems comply with the requirements of the OBD II Regulation in actual use.  Specifically, the OBD II Enforcement Regulation specifies criteria and protocols for procuring in-use vehicles or engines, for testing the associated OBD II systems, including performance testing emission threshold-related monitors and evaluating in-use monitoring performance ratios, and the procedures for remediating nonconforming OBD II systems.

### 3.  California's Heavy-Duty On Board Diagnostic (HD OBD) System Regulation

CARB initially adopted the HD OBD System Regulation in December 2005, and EPA granted California a waiver for that regulation under CAA section 209(b) in 2008.[9]  The regulation, as initially adopted, required manufacturers to install a fully compliant HD OBD system on all 2013 and later MY diesel and Otto-cycle heavy-duty engines (engines used in vehicles having a GVWR greater than 14,000 lbs).  CARB subsequently updated the HD OBD Regulation and also adopted HD OBD-specific enforcement requirements (the HD OBD Enforcement Regulation) in 2010.  The 2010 HD OBD amendments also aligned the HD OBD requirements with the OBD II requirements for medium-duty vehicles.  EPA issued California a waiver for the 2010 HD OBD amendments in December 2012.[10] In 2013 CARB amended both the HD OBD and the HD OBD Enforcement Regulation. EPA confirmed that certain amendments were within the scope of previously issued waivers, and issued a waiver for the remaining amendments that established new or more stringent requirements.[11]

### 4.  California's Heavy-Duty Diesel In-Use Compliance Regulation

CARB adopted the initial Heavy-Duty Diesel In-Use Compliance Regulation on July 26, 2007.  That regulation established a manufacturer-administered in-use compliance program that was largely identical to a similar in-use program that EPA previously adopted in 2005.  The regulation, as initially adopted, applied to 2007 and subsequent MY engine-dynamometer certified HDDEs installed in motor vehicles with GVWR greater than 8,500 lbs.

---

[9] 73 Fed. Reg. 52042 (Sept. 8, 2008).

[10] 77 Fed. Reg. 73459 (Dec. 10, 2012).

[11] 81 Fed. Reg. 78149 (Nov. 7, 2016).

### a. Accelerated Aftertreatment Aging

The Regulation requires heavy-duty engines to accumulate a minimum percentage of the required aging cycles on an engine dynamometer, but also allows manufacturers to utilize a process that is designed to accelerate the aging of exhaust aftertreatment systems, and correspondingly reduce the duration of the DDP.  CARB staff estimates that 1,000 hours of accelerated aftertreatment aging could represent approximately 435,000 miles of service accumulation (on a chassis dynamometer or approximately 9,800 hours of operation on an engine dynamometer). One possible method for accelerated aftertreatment aging is the Diesel Aftertreatment Accelerated Aging Cycle (DAAAC) which was developed by Southwest Research Institute (SwRI) to model aging of an aftertreatment systems by exposing such systems to thermal and chemical degradation.

### i. Model year applicability

Only heavy heavy-duty and medium heavy-duty diesel engines are eligible to use accelerated aftertreatment aging beginning with the 2024 MY, light-heavy-duty diesel engines are eligible to use accelerated aftertreatment aging beginning with the 2027 MY, and the allowable number of hours such engine categories can utilize accelerated aftertreatment aging increase until the 2031 MY.  The Regulation provides manufacturers options to utilize different amounts of accelerated aftertreatment aging, as well as the option of proposing alternative accelerated aging protocols.

### ii. In-Use Vehicle Emissions Data Reporting

Manufacturers that elect to use accelerated aftertreatment aging must periodically submit data generated from in-use HDDEs to CARB.  Such data includes engine run times, mass emissions of NOx from both the engine and the tailpipe, and the distance traveled.  The data must be collected and stored in the engines' on-board computers, and will help CARB assess how accurately the accelerated aftertreatment aging simulates the real world emission deterioration of in-use engines.  The reporting obligations only apply during the useful life of each engine. Manufacturers that submit in-use emissions reports for more than 50 percent of their California sales volumes of 2024 through 2030 MY engines, for three consecutive MYs, are eligible to use longer periods of accelerated aftertreatment aging for 2024 through 2030 engines. Manufacturers that submit in-use emissions reports for more than 50 percent of their California sales volumes of 2031 and subsequent MY engines, for five consecutive MYs, are eligible to use longer periods of accelerated aftertreatment aging for 2031 and subsequent MY engines.

### D. Amendments to Heavy-Duty On-Board Diagnostic System (HD OBD) and OBD II System Requirements

Both the HD OBD and the OBD II Regulation specify malfunction emission thresholds for emissions critical components and systems that are based on emissions increases relative to the underlying emissions standard.  For example, OBD systems must detect an exhaust gas recirculation (EGR) system malfunction when the EGR flow rate has decreased to the point that NMHC, CO, or NOx emissions are exceeding 2.0 times any of the applicable standards, or PM emissions are exceeding the applicable PM standard by more than 0.02 g/bhp-hr.

As discussed in Sections III.A and B, the Regulation establishes primary and optional NOx emission standards and primary PM exhaust emission standards that are more stringent than the preexisting NOx and PM exhaust emission standards.  Engine manufacturers have requested that CARB grant them interim relief with respect to the HD OBD and OBD II Regulations by allowing them to use malfunction emission thresholds that are based on the preexisting exhaust emission standards, rather than the newly established exhaust emission standards.  To accommodate those concerns, the Regulation allows HD OBD and OBD II systems in medium-duty and heavy-duty engines and vehicles that are certified to either the optional NOx emission standards or the primary NOx and PM emission standards to utilize malfunction emission thresholds that are based on the preexisting exhaust emission standards, rather than the otherwise applicable exhaust emission standards.  The Regulation also incorporates conforming modifications to the HD OBD and OBD II Regulations "test-out" criteria, that allow manufacturers to demonstrate that a specific component has no or minimal impact on emissions, and is therefore exempt from OBD monitoring, and to the HD OBD Enforcement Regulation's nonconformance criteria, to accommodate engines that are certified to an FTP-based NOx emission standard of 0.10 g/bhp-hr or lower.

Based on past experience, CARB staff expects that the majority of OBD monitors are already capable of detecting faults at emission levels lower than the proposed thresholds, with minimal revisions.  For example, many EGR systems can be designed with adaptive controls such that as exhaust gas passages become restricted and reduce the flow, the system automatically adjusts to command more flow until it achieves the desired flow amount.  In such a system, essentially no degradation in emissions occurs until the system is so restricted that the system reaches its maximum control authority and can no longer achieve the desired flow.  Appropriate sizing of the EGR system could then allow an OBD system to detect a fault at this same point of reaching the control limits, whether the engine meets a 0.20 or 0.020 g/bhp-hr standard and result in emission levels that are proportionally similar such as 2.0 times the standard itself.  From the information submitted during OBD certification, staff would be able to verify both the emission level at which faults are actually being detected and the level of degradation of the component being detected.  If manufacturers are able to calibrate the system to delay detection of faults until even more component degradation occurs than is typical of today's OBD systems, it will be a clear indication that the malfunction threshold relief is not needed and will support an immediate further tightening of the threshold.  Accordingly, CARB staff expects to track manufacturers' progress with respect to designing OBD systems capable of detecting lower malfunction emission thresholds and will likely suggest that the Board adopt more stringent malfunction emission thresholds if warranted.

Indeed, the absence of any congressional intent to apply specific, quantitative lead-time requirements to California's adoption of its own standards is evident from Congress's decision to expressly specify those limits for EPA.

As discussed throughout this request, the Administrator cannot find California's requirements are inconsistent with section 202(a), and must accordingly grant California the requested waiver actions.

### vii. Conclusion on Technological Feasibility and Lead Time for 2024 and Subsequent Model Year NOx and PM Emission Standards

As demonstrated by this document and the rulemaking record for the Omnibus Regulation, the Regulation's requirements for the 2024 and subsequent model year primary and optional NOx standards and primary PM emissions standards and associated test procedures for 2024 and subsequent MY medium- and heavy-duty diesel and Otto-cycle engines described in Sections III.A and III.B are technologically feasible, within the lead time provided.  It is also notable that Cummins and PACCAR expressed their intentions to certify engines to the 2024 MY standards during CARB's August 27, 2020 public hearing.

### b. Technical Feasibility of HDDE Durability Program

The elements of the Regulation that establish the more stringent durability demonstration program requirements described in Section III.C are technologically feasible within the lead time provided.  The durability demonstration program does not require manufacturers to utilize newly developed testing equipment, and provides manufacturers several options to utilize accelerated aging demonstrations, and accordingly demonstrate compliance with the program's requirements, especially in the 2024 through 2026 model years.[91]

### c. Technical Feasibility of OBD II and HD OBD Requirements

As described in Section III.D, the Regulation does not establish stricter malfunction emission thresholds for NOx or PM emissions for OBD II or HD OBD systems, but instead allows such systems to utilize malfunction emission thresholds that are based on the preexisting exhaust emission standards rather than the otherwise applicable primary or optional NOx and primary PM exhaust emission standards.  Consequently, no issues of technical infeasibility are presented since manufacturers can utilize their existing OBD II and HD OBD systems.

---

[91] See FSOR, p. 454.  (No accelerated aging options were established for medium-duty and light heavy-duty engines because CARB determined the durability periods for those engine categories could be completed within the time provided without accelerated aging.)

supporting its issuance of prior authorizations for that regulation remain applicable and dispositive.[131]

The costs of compliance associated with the requirements for 2024 and subsequent MY APUs are approximately $2,000, which constitutes approximately 25 percent of the price of a diesel-fueled APU, and CARB determined that these costs are not expected to have a substantive impact on California businesses.[132]

The Amendments do not raise any issue regarding incompatibility between California and federal test procedures, because the Amendments harmonize California's certification test requirements for 2024 and subsequent model diesel-fueled APUs with the corresponding federal certification test requirements.

## X. CONCLUSION

Based on the foregoing, CARB respectfully requests that the Administrator grant California's requests for the waiver and authorization actions as described in this document pursuant to CAA section 209. To assist you in reviewing the requests, CARB is enclosing a CD-ROM that contains the following referenced documents to be included in the record of this waiver proceeding.

Reference Materials from Omnibus Rulemaking

1.    Notice of Public Hearing and Attachments to Notice (Enclosure 1)

2.    Staff Report: Initial Statement of Reasons for Proposed Rulemaking dated June 23, 2020 (Enclosure 2)

3.    Appendices A-I to Staff Report (Enclosure 3)

4.    Errata to Staff Report, dated July 10, 2020 (Enclosure 4)

5.    Resolution 10-23, dated August 27, 2020 and Attachments A and B (Enclosure 5)

6.    Transcript of August 27, 2020 Public Hearing, agenda item number 20-8-2 (Enclosure 6)

7.    30 Day Notice of Availability of Modified Text, and Appendices, posted May 5, 2021 (Enclosure 7)

---

[131] *See Motor and Equipment Mfrs. Ass'n, Inc. v. Environmental Protection Agency*, 627 F.2d 1128, 1132 (D.C. Cir. 1979) (a regulatory compliance option is only a mandate that can result in a denial of a waiver if the regulation does not specify another technically feasible compliance option.)

[132] ISOR, pp. 15-16.

8.      Second Notice of Availability of Modified Text and Appendices, posted June 18, 2021 (Enclosure 8)

9.      Final Statement of Reasons for Rulemaking, Including Summary of Comments and Agency Response (Enclosure 9)

10.     Executive Order R-21-007 dated September 9, 2021 (Enclosure 10)

11.     Updated Informational Digest (Enclosure 11)

12.     Final Regulation Order (Enclosure 12)

13.     Final Test Procedure (Enclosure 13)

14.     Addendum to Final Statement of Reasons (Enclosure 14)

15.     Notice of Decision (Enclosure 15)

16.     Request for Early Effective Date (Enclosure 16)

17.     Fully endorsed STD 400 face sheet as approved by OAL and filed with the Secretary of State DATE (Enclosure 17)

CARB Contacts:

Technical questions or requests for additional technical information on this item should be directed to Kim Heroy-Rogalski, Chief, Mobile Source Regulatory Development Branch, at kim.heroy-rogalski@arb.ca.gov.  Legal questions should be directed to Alex Wang, Senior Attorney, Office of Legal Affairs, at alex.wang@arb.ca.gov.