ROB BONTA, State Bar No. 202668
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
DAVID M. MEEKER, State Bar No. 273814
SARAH M. PFANDER, State Bar No. 347902
CECILIA D. SEGAL, State Bar No. 310935
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorney General
 1515 Clay Street, 20th Floor
 P.O. Box 70550
 Oakland, CA  94612-0550
 Telephone:  (510) 879-0299
 Fax:  (510) 622-2270
 E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAImler TRUCK NORTH AMERICA, LLC; INTERNATIONAL MOTORS, LLC; PACCAR, INC.;** and **VOLVO GROUP NORTH AMERICA, LLC,**<br><br>                                    Plaintiffs,<br><br>**THE UNITED STATES OF AMERICA**; and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**<br><br>                        Plaintiff-Intervenors,<br><br>                **v.**<br><br>**CALIFORNIA AIR RESOURCES BOARD, STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board; and **GAVIN NEWSOM**, in his official capacity as the Governor of California,<br><br>                                    Defendants. | 2:25-cv-02255-DC-AC<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT (ECF 144, 145)**<br><br>Date:          August 7, 2026<br>Time:          1:30 p.m.<br>Courtroom:   10, 13th Floor<br>Judge:         The Honorable Dena Coggins<br>Trial Date:    Not Set<br>Action Filed:  August 11, 20225 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 2

I.    California's History of Reducing Vehicular Pollution................................................ 2

    A.    Congress' Preservation of California's State-Level Laboratory............................ 3

    B.    CARB's Most Recent Regulations ...................................................................... 4

        1.    The Advanced Clean Trucks Regulation ................................................... 4

        2.    The Low NOx (or Omnibus) Regulation .................................................... 5

        3.    The Advanced Clean Cars II Regulation ................................................... 5

        4.    The Phase 2 GHG Regulation .................................................................... 5

        5.    The Advanced Clean Fleets Regulation ..................................................... 6

II.    The Clean Truck Partnership ...................................................................................... 6

III.    The Federal Government's Unprecedented Assault on California's Program .................. 7

    A.    The CRA Facilitates Congressional Review of Federal "Rules"............................ 8

    B.    As EPA and Congress Have Long Understood, Section 209(b) Waivers Are "Orders," Not "Rules," and Thus Not Subject to the CRA.................................... 9

    C.    The Executive and Legislative Branches Nonetheless Purported to Invoke the CRA to "Disapprove" Three Section 209(b) Waivers ................................... 11

IV.    California's Response to this Unprecedented Attack................................................... 14

V.    Relevant Procedural History ...................................................................................... 16

STANDARD OF REVIEW ........................................................................................................ 18

ARGUMENT ........................................................................................................................ 18

I.    The ACT, Omnibus, and ACCII Are Not Preempted Because Their Waivers Remain Valid ......................................................................................................... 18

    A.    The Congressional Review Act Does Not Bar Judicial Review of the Resolutions' Validity ....................................................................................... 19

    B.    The Resolutions Are Constitutionally Impermissible Legislative Adjudications ................................................................................................... 21

    C.    The Resolutions Violate the Tenth Amendment and Structural Federalism......... 23

    D.    The Senate Impermissibly Delegated Power to Set Its Internal Rules to the Executive......................................................................................................... 26

II.    In the Alternative, the Recodified (Emergency) Regulations Are Not Preempted Because the Waivers for Them Remain Valid............................................................. 28

III.    The Challenges to the 2036 Sales Requirement and Phase 2 GHG Regulations Should Be Dismissed, But, If They Are Not, Relief Should Be Limited to Preventing Enforcement Absent a Waiver ................................................................... 34

    A.    Plaintiffs Lack Standing to Challenge the 2036 Sales Requirement.................... 34

    B.    The Phase 2 GHG Standards Similarly Present No Case or Controversy ............ 37

i

**TABLE OF CONTENTS**
(continued)

|  |  |  | **Page** |
|---|---|---|---|
| | C. | Any Relief Must Be Limited to Preventing Preempted Enforcement Because, *Inter Alia*, Promulgation of these Regulations Is Not Preempted | 37 |
| IV. | | Plaintiffs' Challenges to the CTP Fail | 40 |
| | A. | OEM Plaintiffs Lack Standing to Challenge the CTP | 40 |
| | B. | The Unites States Also Lacks Standing to Challenge the CTP | 42 |
| | C. | Plaintiffs' Challenges to the CTP Fail on their Merits | 43 |
| | | 1. Section 209 preempts government-imposed standards, not self-imposed commitments | 43 |
| | | 2. The CTP is a voluntary agreement, enforceable as such, and not preempted | 46 |
| | | 3. Plaintiffs' other attempts to bring the CTP within the scope of Section 209(a) fail | 49 |
| V. | | The Challenges to the MACs Fail | 54 |
| | A. | Plaintiffs Lack Standing to Challenge the MACs | 54 |
| | B. | OEM Plaintiffs' Challenge to the May MAC Is Also Moot | 54 |
| | C. | Neither the May Nor August MACs Is a Preempted "Attempt to Enforce" | 55 |
| VI. | | OEM Plaintiffs' Challenge to the EO Fails | 57 |
| VII. | | The Governor Is Immune from OEM Plaintiffs' Suit and Should Be Dismissed | 59 |
| | | CONCLUSION | 60 |

ii

## TABLE OF AUTHORITIES

**Page**

CASES

*Airlines for Am. v. City and Cnty. of San Francisco*
    78 F.4th 1146 (9th Cir. 2023) ....................................................................... 44, 46, 52

*Alcoa, Inc. v. Bonneville Power Admin.*
    698 F.3d 774 (9th Cir. 2012)....................................................................................... 36

*Am. Airlines, Inc. v. Wolens*
    513 U.S. 219 (1995)..................................................................................... 46, 47, 52, 53

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
    569 U.S. 641 (2013).............................................................................................. *passim*

*Am. Trucking Ass'ns v. EPA*
    600 F.3d 624 (D.C. Cir. 2010) ................................................................................... 39

*Arc of Cal. v. Douglas*
    757 F.3d 975 (9th Cir. 2014)....................................................................................... 55

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*
    208 F.3d 1 (1st Cir. 2000)............................................................................................ 44

*B.K.K. Co. v. Schultz*
    7 Cal. App. 3d 786 (1970)........................................................................................... 49

*Baccei v. United States*
    632 F.3d 1140 (9th Cir. 2011)..................................................................................... 40

*Bank Markazi v. Peterson*
    578 U.S. 212 (2016).................................................................................................... 23

*Black Diamond Asphalt, Inc. v. Superior Ct.*
    109 Cal. App. 4th 166 (2003) ..................................................................................... 50

*Boumediene v. Bush*
    553 U.S. 723 (2008).................................................................................................... 23

*Bowsher v. Merck & Co., Inc.*
    460 U.S. 824 (1983)...................................................................................................... 8

*Bowsher v. Synar*
    478 U.S. 714 (1986)..................................................................................................... 21

*Brach v. Newsom*
    38 F.4th 6 (9th Cir. 2022) (en banc)..................................................................... 55, 56

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Buscemi v. Bell*
    964 F.3d 252 (4th Cir. 2020)......................................................................................... 35

*Cal. Dump Truck Owners Ass'n v. Nichols*
    784 F.3d 500 (9th Cir. 2015).......................................................................................... 37

*California ex rel. Lockyer v. Dep't of Agric.*
    575 F.3d 999 (9th Cir. 2009).......................................................................................... 31

*California v. United States*
    Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025)............................................. 15

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)....................................................................................................... 18

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
    563 F. Supp. 2d 1158 (E.D. Cal. 2008).................................................................... 37, 39

*Chadha v. INS*
    634 F.2d 408 (9th Cir. 1980).......................................................................................... 22

*Cipollone v. Liggett Grp., Inc.*
    505 U.S. 504 (1992).................................................................................................. 53, 57

*City of Arlington v. FCC*
    569 U.S. 290 (2013)....................................................................................................... 21

*City of Ozark v. Union Pacific Railroad Company*
    843 F.3d 1167 (8th Cir. 2016)........................................................................................ 45

*Close v. Sotheby's, Inc.*
    909 F.3d 1204 (9th Cir. 2018)........................................................................................ 35

*Ctr. for Biol. Diversity v. Bernhardt (CBD)*
    946 F.3d 553 (9th Cir. 2019)..................................................................................... 19, 23

*Devereaux v. Abbey*
    263 F.3d 1070 (9th Cir. 2001)........................................................................................ 18

*Driftless Area Land Conservancy v. Valcq*
    16 F.4th 508 (7th Cir. 2021) .......................................................................................... 35

*Engine Manufacturers Association v. South Coast Air Quality Management District*
    541 U.S. 246 (2004)................................................................................................ passim

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Engine Mfrs. Ass'n v. EPA*
  88 F.3d 1075 (D.C. Cir. 1996) ................................................................. 4

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
  498 F.3d 1031 (9th Cir. 2007) ........................................................... 52, 58

*Evanston Ins. Co. v. Harrison*
  No. 22-c-01672-WBS-KJN, 2020 WL 6784463 (E.D. Cal. Nov. 18, 2020) ......................... 41

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*
  249 F.3d 1132 (9th Cir. 2001) ............................................................. 18

*FDA v. All. for Hippocratic Med.*
  602 U.S. 367 (2024) .................................................................... 36, 57

*Fikre v. FBI*
  904 F.3d 1033 (9th Cir. 2018) ............................................................. 56

*Fletcher v. Peck*
  10 U.S. 87 (1810) ........................................................................ 21

*Fontana v. Haskin*
  262 F.3d 871 (9th Cir. 2001) ............................................................. 18

*Ford Motor Co. v. EPA*
  606 F.2d 1293 (D.C. Cir. 1979) ........................................................... 39

*Forward, Inc. v. Macomber*
  173 F.4th 1121 (9th Cir. 2026) ......................................................... 59, 60

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
  561 U.S. 477 (2010) ...................................................................... 28

*Garcia v. San Antonio Metro. Transit Auth.*
  469 U.S. 528 (1985) .................................................................... 23, 26

*GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat.*
  *Ass'n*
  671 F.3d 1027 (9th Cir. 2012) ............................................................ 49

*Gestuvo v. INS*
  337 F. Supp. 1093 (C.D. Cal. 1971) ....................................................... 40

*Griffin & Griffin Expl., LCC v. United States*
  116 Fed. Cl. 163 (2014) .................................................................. 50

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Hamilton v. Solano Irr. Dist.*
2013 WL 1499603 (E.D. Cal. Apr. 11, 2013)...........................................................37

*Hughes v. Alexandria Scrap Corp.*
426 U.S. 794 (1976).........................................................................................58

*In re Murray Energy Corp.*
788 F.3d 330 (D.C. Cir. 2015) ...........................................................................37

*In re Office of Att'y Gen. of State of N.Y.*
709 N.Y.S.2d 1 (N.Y. App. Div. 2000) ...............................................................57

*INS v. Chadha*
462 U.S. 919 (1983)...................................................................................22, 28

*Int'l Truck & Engine Corp. v. Lloyd*
2001 U.S. Dist. LEXIS 26127 (E.D. Cal. June 1, 2001)......................................34

*Iten v. Los Angeles*
81 F4th 979 (9th Cir. 2023) ...............................................................................41

*Jackson v. Modly*
949 F.3d 763 (D.C. Cir. 2020) ...........................................................................39

*Kansas Nat. Res. Coal. v. DOI*
971 F.3d 1222 (10th Cir. 2020)...........................................................................19

*L.A. Cnty. Bar Ass'n v. Eu*
979 F.2d 697 (9th Cir. 1992)...............................................................................60

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024).....................................................................................19, 44

*Los Angeles Haven Hospice, Inc. v. Sebelius*
638 F.3d 644 (9th Cir. 2011)...............................................................................58

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992).................................................................................*passim*

*Marbury v. Madison*
5 U.S. 137 (1803)..............................................................................................21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*
456 U.S. 353 (1982)...........................................................................................39

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Mesa Golfland, Ltd. v. Ducey*
No. CV-20-01616-PHX-JJT, 2020 WL 5632141 (D. Ariz. Sept. 21, 2020) ......................... 60

*Metro. Taxicab Bd. of Trade v. City of New York*
633 F. Supp. 2d 83 (S.D.N.Y. 2009) ................................................................. 45, 57

*Mobil Oil Expl. & Producing Se., Inc. v. United States*
530 U.S. 604 (2000) ....................................................................................... 50, 51

*Montana v. BNSF Ry. Co.*
623 F.3d 1312 (9th Cir. 2010) ............................................................................ 42

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992) ....................................................................................... 45, 57

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*
627 F.2d 1095 (D.C. Cir. 1979) ........................................................... 3, 30, 31, 38

*Motor Vehicle Mfrs. Ass'n of U.S. v. N.Y. State Dep't of Env't. Conservation*
17 F.3d 521 (2d Cir. 1994) ................................................................................. 39

*Murphy v. NCAA*
584 U.S. 453 (2018) ..................................................................................... passim

*Murthy v. Missouri*
603 U.S. 43 (2024) ............................................................................................ 40

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*
583 U.S. 109 (2018) .......................................................................................... 19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
567 U.S. 519 (2012) .......................................................................................... 57

*Nat'l Labor Rels. Bd. v. Noel Canning*
573 U.S. 513 (2014) .......................................................................................... 28

*Nat'l TPS Alliance v. Noem*
150 F.4th 1000 (9th Cir. 2025) ........................................................................... 19

*Nebraska v. Cliff*
No. 2:24-cv-01364-TLN-CKD (E.D. Cal) ............................................................ 35

*Nevada v. Watkins*
914 F.2d 1545 (9th Cir. 1990) ............................................................................ 26

**TABLE OF AUTHORITIES**
(continued)

**Page**

*NRG Power Mktg., LLC v. FERC*
862 F.3d 108 (D.C. Cir. 2017) ................................................................. 31

*Nutt v. United States*
12 Cl. Ct. 345 (1987) ............................................................................... 50

*Ohio Telecom Ass'n v. FCC*
150 F.4th 694 (6th Cir. 2025) .................................................................. 20

*Olympic Pipe Line Co. v. City of Seattle*
437 F.3d 872 (9th Cir. 2006) ................................................................... 53

*Our Watch With Tim Thompson v. Bonta*
682 F. Supp. 3d 838 (E.D. Cal. 2023) ................................................. 9, 36

*Pennsylvania v. New Jersey*
426 U.S. 660 (1976) ................................................................................ 41

*Platinum Sports Ltd. v. Snyder*
715 F.3d 615 (6th Cir. 2013) ................................................................... 35

*Plaut v. Spendthrift Farm*
514 U.S. 211 (1995) ................................................................................ 21

*PLIVA, Inc. v. Mensing*
564 U.S. 604 (2011) ................................................................................ 53

*Pub. Citizen v. U.S. DOJ*
491 U.S. 440 (1989) ................................................................................ 28

*Pub. Utilities Comm'n of Cal. v. FERC*
100 F.3d 1451 (9th Cir. 1996) ................................................................. 55

*Robertson v. Seattle Audubon Soc'y*
503 U.S. 429 (1992) ................................................................................ 23

*Sofamor Danek Group, Inc. v. Brown*
124 F.3d 1179 ..................................................................................... 34, 38

*Soremekun v. Thrifty Payless, Inc.*
509 F.3d 978 (9th Cir. 2007) ................................................................... 18

*South Carolina v. Baker*
485 U.S. 505 (1988) ............................................................................ 24, 26

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*
  108 F.4th 1128 (9th Cir. 2024) ................................................................... 35

*Stockton v. Brown*
  152 F.4th 1124 (9th Cir. 2025) ................................................................... 58

*Texas v. United States*
  523 U.S. 296 (1998) .................................................................................... 58

*TransUnion LLC v. Ramirez*
  594 U.S. 413 (2021) .................................................................................... 34

*Tulalip Tribes of Wash. v. Wash.*
  783 F.3d 1151 (9th Cir. 2015) ................................................................... 18

*U. S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*
  498 F.2d 335 (9th Cir. 1974) ..................................................................... 54

*United States v. Abbott*
  85 F.4th 328 (5th Cir. 2023) ...................................................................... 60

*United States v. Arthrex, Inc.*
  594 U.S. 1 (2021) ....................................................................................... 22

*United States v. California*
  No. 2:25-CV-06230-MCS-AGR, 2026 WL 784514 (C.D. Cal. Mar. 18, 2026) ............. 42, 43

*United States v. Graf*
  610 F.3d 1148 (9th Cir. 2010) ................................................................... 38

*Warth v. Seldin*
  422 U.S. 490 (1975) .................................................................................... 43

*Watkins v. U.S. Army*
  875 F.2d 699 (9th Cir. 1989) (en banc) ..................................................... 40

*WildEarth Guardians v. Mont. Snowmobile Ass'n*
  790 F.3d 920 (9th Cir. 2015) ..................................................................... 58

*Wonderful Nurseries LLC v. Agric. Lab. Rels. Bd.*
  789 F. Supp. 3d 855 (E.D. Cal. 2025) ....................................................... 36

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, § 5, cl. 2 ..................................................................... 27

## TABLE OF AUTHORITIES
### (continued)

**Page**

U.S. Const. Article III, § 1 ................................................................................................ 22

**FEDERAL STATUTES**

1 U.S.C.
  § 102 .......................................................................................................................... 19
  § 103 .......................................................................................................................... 19

5 U.S.C.
  § 551(4) .................................................................................................................. 8, 10
  § 551(5) ....................................................................................................................... 10
  § 551(6) ................................................................................................................. 10, 20
  § 551(7) ................................................................................................................. 10, 21
  § 551(8) ........................................................................................................... 10, 12, 20
  § 551(9) ........................................................................................................... 10, 12, 20
  § 553(b) ................................................................................................................. 10, 24
  § 601(2) ......................................................................................................................... 9
  § 801(a)(1)(A) ...................................................................................................... 8, 20, 24
  § 801(a)(1)(D) ............................................................................................................. 20
  § 801(a)(2)(A) ............................................................................................................. 20
  § 801(c)(2) ................................................................................................................... 20
  § 801 et seq. ................................................................................................................. 11
  § 802(a) .............................................................................................................. 8, 20, 23, 24
  § 802(d) ..................................................................................................................... 8, 24
  § 802(d)(1) .................................................................................................................... 8
  § 802(d)(2) .................................................................................................................... 8
  § 804(2) ....................................................................................................................... 20
  § 804(3) .................................................................................................................. *passim*
  § 805 ..................................................................................................................... 8, 19, 20
  § 806(a) ....................................................................................................................... 19
  § 808 ........................................................................................................................... 20

42 U.S.C.
  § 7416 .......................................................................................................................... 45
  § 7521 ............................................................................................................................ 7
  § 7521(a) ...................................................................................................................... 22
  § 7543(a) ................................................................................................................. 45, 56
  § 7543(b) ...................................................................................................................... 32
  § 7543(b)(1) ........................................................................................................... *passim*
  § 7543(e)(2)(A) ............................................................................................................ 39
  § 7602 ..................................................................................................................... 45, 46
  § 7602(k) ...................................................................................................................... 38
  § 7607(b)(1) .............................................................................................................. 33, 37

Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965) ........................................................... 3, 7

x

**TABLE OF AUTHORITIES**
(continued)

Page

Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967).......................................................... 3

139 Stat. 65, 66, 67 (June 12, 2025)............................................................................................... 19

STATE STATUTES

Cal. Gov't Code
  § 8550 et seq. ............................................................................................................................. 58
  § 11346.1(e) ............................................................................................................................... 16
  § 11346.1(h) ............................................................................................................................... 16
  § 11346.4(b) ............................................................................................................................... 39

Cal. Health & Safety Code
  § 43000(a) .................................................................................................................................... 3
  § 43013(a) ......................................................................................................................... 3, 7, 60
  § 43016(a) .................................................................................................................................. 48
  § 43017.......................................................................................................................................... 3
  § 43017........................................................................................................................................ 60
  § 43151(a) ............................................................................................................................. 48, 54
  § 43154(b) .................................................................................................................................. 57

REGULATIONS

40 CFR § 1074.101(a)..................................................................................................................... 40

Cal. Code Regs., Title 13
  § 1900(b)(6) .................................................................................................................................. 4
  § 1900(b)(13) ................................................................................................................................ 4
  § 1956.8.................................................................................................................................. 16, 29
  § 1956.8(a)(2)(C) .......................................................................................................................... 5
  § 1956.8(a)(2)(D) .......................................................................................................................... 5
  § 1956.8(a)(7)(A) .......................................................................................................................... 6
  § 1960.1(g)(2) ............................................................................................................................... 4
  § 1963(c) .................................................................................................................................... 4, 5
  § 1963.1(b) .................................................................................................................................... 5
  § 1968.2................................................................................................................................... 5, 19
  § 1971.1................................................................................................................................... 5, 19
  § 1976............................................................................................................................................ 5
  § 1978............................................................................................................................................ 5
  § 2013-2015 ................................................................................................................................. 6
  § 2016............................................................................................................................................ 6

FEDERAL REGISTER

33 Fed. Reg. 10,160 (July 16, 1968)............................................................................................... 38

**TABLE OF AUTHORITIES**
(continued)

**Page**

34 Fed. Reg. 7348 (May 6, 1969) ........................................................................... 38

36 Fed. Reg. 8172 (Apr. 30, 1971) ......................................................................... 36

42 Fed. Reg. 31,639 (June 22, 1977) ...................................................................... 30

42 Fed. Reg. 1503 (Jan. 7, 1977) ...................................................................... 30, 32

43 Fed. Reg. 20,549 (May 12, 1978) ...................................................................... 32

50 Fed. Reg. 35,122 (Aug. 29, 1985) ...................................................................... 32

59 Fed. Reg. 36,969 (July 20, 1994) ........................................................ 3, 32, 35, 38

69 Fed. Reg. 59,920 (Oct. 6, 2004) .............................................................. 9, 24, 32

70 Fed. Reg. 50,322 (Aug. 26, 2005) ...................................................................... 29

73 Fed. Reg. 12,156 (Mar. 6, 2008) .......................................................................... 9

75 Fed. Reg. 70,237 (Nov. 17, 2010) ................................................................... 9, 29

78 Fed. Reg. 2112 (Jan. 9, 2013) ........................................................................... 21

79 Fed. Reg. 23,414 (Apr. 28, 2014) ........................................................................ 9

81 Fed. Reg. 52,248 (Aug. 5, 2016) ........................................................................ 23

81 Fed. Reg. 78,143 (Nov. 7, 2016) ........................................................................ 33

81 Fed. Reg. 95,982 (Dec. 29, 2016) .................................................................... 6, 29

82 Fed. Reg. 4867 (Jan. 17, 2017) .......................................................................... 29

84 Fed. Reg. 51,310 (Sept. 27, 2019) .................................................................. 9, 24

87 Fed. Reg. 14,332 (Mar. 14, 2022) ........................................................................ 7

88 Fed. Reg. 20,688 (Apr. 6, 2023) ..................................................................... 7, 11

88 Fed. Reg. 88,908 (Dec. 26, 2023) ...................................................................... 11

89 Fed. Reg. 27,842 (Apr. 18, 2024) ........................................................................ 7

90 Fed. Reg. 642 (Jan 6, 2025) ........................................................................... 7, 9

xii

**TABLE OF AUTHORITIES**
(continued)

Page

**CONGRESSIONAL RECORD**

171 Cong. Rec. S3017 (daily ed. May 21, 2025)....................................................................*passim*

171 Cong. Rec. S3099 (daily ed., May 22, 2025)........................................................... 14, 26, 27

**OTHER AUTHORITIES**

Black's Law Dictionary (4th ed. 1968)....................................................................................... 38

H.R. Rep. No. 104-500 (1996)..................................................................................................... 8

Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1958 (2020) ...................... 13, 25

*PJM Interconnection, LLC*, 161 FERC P 61,252 (2017).................................................. 31

11 Williston on Contracts § 30:19 (4th ed. 2025)............................................................ 50

**INTRODUCTION**

As Congress directed, the United States Environmental Protection Agency (EPA) has waived Clean Air Act preemption more than seventy-five times for iterations of California's program to control new motor vehicle emissions, with each change to the State's regulations and each preemption waiver building on those that came before. Pursuant to those waivers, and its own state-law authority, the California Air Resources Board's (CARB's) regulations have required manufacturers to develop and deploy cleaner technologies to reduce pollution and protect public health for more than sixty years. Plaintiffs—four original equipment manufacturers (OEM Plaintiffs) and Plaintiff-Intervenors the United States and EPA (United States)—say that is all over now. In their view, California has no enforceable program at all because Congress disapproved three preemption waivers authorizing the latest iteration of California's program *and* the previous waivers—which were nowhere mentioned in Congress's resolutions—are defunct and cannot serve as a backstop. Plaintiffs are wrong on both counts.

To mount their coordinated attack on California's program last year, the Executive and Legislative Branches had to make extraordinary, even unprecedented, moves that culminated in congressional resolutions that violate separation of powers and federalism principles. Unconstitutional legislation has no effect, and these Resolutions are no different. The three recent preemption waivers targeted by the Resolutions remain operative as does the latest iteration of California's program. But, even if the Federal Government's assault on that iteration were constitutional and the Resolutions were valid, that could only restore the status quo before those Resolutions—i.e., California's earlier-generation standards, authorized by earlier, untouched waivers. Nothing in the Clean Air Act or sixty years of implementing it suggests otherwise. Thus, CARB is not preempted from requiring manufacturers to certify their vehicles and engines (to at least the earlier standards) before selling them in California—as CARB has done for decades. The only question is whether CARB may do so under the *latest* iteration of its program. And the marked constitutional defects in the Resolutions provide the answer: yes.

Plaintiffs and Defendants do agree about something: that certain regulations—a 2036 sales requirement and CARB's most recent greenhouse gas (GHG) emission standards for heavy-duty

1

vehicles—are unenforceable because EPA has not yet waived preemption. That agreement presents no case or controversy. But should the Court conclude it has jurisdiction, the only remedy would be to enjoin enforcement unless or until EPA does waive preemption.

Plaintiffs next ask this Court to free OEM Plaintiffs from obligations they voluntarily undertook—in an agreement called the Clean Truck Partnership—more than two years before they filed this suit. No Plaintiff has standing to bring this claim. Indeed, none points to a single piece of evidence establishing an injury-in-fact caused by this agreement, much less an injury redressable by this Court. Plaintiffs' claims also fail on their merits. Section 209 of the Clean Air Act preempts state standards unilaterally imposed through lawmaking powers and enforceable through civil or criminal penalties. It does not preempt bargained-for exchanges of consideration enforceable through contract remedies, even when the parties agree to incorporate certain regulations as terms. OEM Plaintiffs offered to sell cleaner vehicles in California, in exchange for valuable consideration from CARB, and CARB accepted the offer. Nothing in the Clean Air Act prevents CARB from obtaining the benefit of this bargain.

Finally, OEM Plaintiffs also challenge two CARB advisory notices (with the United States joining for one) and a Governor's Executive Order. Here, too, no Plaintiff has demonstrated standing or even established *any* effect at all. And here, too, Plaintiffs claims also fail on their merits because these notices and Executive Order do no more than advise stakeholders and direct state agencies, respectively. They do not impose—or even take steps to impose—regulatory requirements or penalties for violating them.

Several of Plaintiffs' claims should be dismissed for lack of jurisdiction. As to the rest, Defendants are entitled to summary judgment.

## BACKGROUND

### I.   CALIFORNIA'S HISTORY OF REDUCING VEHICULAR POLLUTION

California has long faced severe air quality challenges and resulting adverse impacts on public health. Ex. 1 at 1-2; Ex. 2 at 15-16.[1] Because motor vehicles are substantial sources of

---

[1] Unless otherwise indicated, "Ex." refers to exhibits attached to the Declaration of Cecilia D. Segal filed concurrently with this memorandum.

2

pollution, Cal. Health & Safety Code § 43000(a), California has been setting emission standards for vehicles since the 1950s. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 (D.C. Cir. 1979). CARB is the agency tasked with doing so. *E.g.*, Cal. Health & Safety Code §§ 43013(a), 43017.

### A.    Congress' Preservation of California's State-Level Laboratory

When Congress began requiring federal vehicle emission standards in 1965, it did not initially preempt the States. Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965). Two years later, manufacturers "raised the spectre of an anarchic patchwork of federal and state regulatory programs." *MEMA I*, 627 F.2d at 1109. Congress responded by generally preempting States from setting emission standards for new motor vehicles, but it required EPA to waive that preemption for California, upon request, absent limited conditions. Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967). In doing so, Congress recognized the significant benefits for the Nation and for California "from letting that State improve on 'its already excellent program.'" *MEMA I*, 627 F.2d at 1109-10 (quoting S. Rep. No. 90-403, at 33 (1967)).

The waiver provision requires California to determine that its standards "will be, in the aggregate, at least as protective of public health and welfare as" EPA's. 42 U.S.C. § 7543(b)(1). CARB makes that finding and then submits a waiver request to EPA. *E.g.*, 59 Fed. Reg. 36,969, 36,982 (July 20, 1994). EPA then must waive Clean Air Act preemption unless the record evidence supports one of the three limited findings that permit denial. 42 U.S.C. § 7543(b)(1).

California has since expanded and strengthened its motor vehicle emissions program to cover additional types of vehicles and to set lower emission levels as new or improved pollution control technologies have emerged. Declaration of Robin U. Lang (Lang Decl.), ¶¶ 4, 6-10, 13-24. CARB has requested, and EPA has granted, more than seventy-five preemption waivers, allowing California to enforce its program through all of these iterative amendments. Defendants' Statement of Undisputed Facts (SUF) ¶ 3. Thus, for more than half a century, new motor vehicles have been "either 'federal cars' designed to meet the EPA's standards" (and certified by EPA) or 'California cars' designed to meet California's standards" (and certified by CARB). *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996).

3

**B.    CARB's Most Recent Regulations**

Although the State has significantly reduced harmful air pollution, including from motor vehicles, more progress is needed. Ex. 1 at 1; Ex. 5 at 15, 18. Indeed, several heavily populated areas in California still experience the worst ground-level ozone (or smog) and particulate matter pollution conditions in the country. Ex. 6 at 1-6; Ex. 48 at 1. In one of these areas, the South Coast air basin around Los Angeles, emissions that contribute to smog will need to be reduced *by more than eighty percent* from 2018 levels (already substantially reduced from earlier decades) in order to meet federally mandated ozone standards. Ex. 1 at 14, 23-24.

CARB thus continues to iteratively strengthen its motor vehicle emissions program. Lang Decl., ¶¶ 13-24. Relevant here, CARB has amended and expanded its regulations covering new medium- and heavy-duty vehicles sold in the State through a series of rulemakings spanning 2018 to 2023. Those rulemakings built on prior iterations of CARB's regulatory program. Each of the most recent rulemakings is described briefly below, in an order corresponding to the arguments addressing Plaintiffs' challenges.

**1.    The Advanced Clean Trucks Regulation**

The Advanced Clean Trucks (ACT) regulation was designed to capitalize on the success of CARB's long-standing zero-emission-vehicle requirements for light-duty vehicles by similarly requiring gradual increases in the sales of those vehicles in the medium- and heavy-duty sector. Lang Decl., ¶ 24 [2] New sections were added to the California Code of Regulations, defining three broad groups of medium- and heavy-duty vehicles (Class 2b-3, Class 4-8, and Class 7-8 Tractors) based on weight. Cal. Code Regs., tit. 13, § 1963(c). Manufacturers are required to sell increasing percentages of new zero-emission-vehicle in California for each group. *Id.* § 1963.1(b). For example, in model year 2024, California sales were required to be 5%, 9%, and 5% zero-emission for Class 2b-3, Class 4-8, and Class 7-8 Tractors, respectively. *Id.* Those percentages gradually increase through model year 2035. *Id.*

---

[2] A zero-emission vehicle produces zero exhaust emissions of any pollutant—e.g., a battery-electric vehicle. Cal. Code Regs., tit. 13, § 1963(c). Vehicles are classified as light-, medium-, or heavy-duty based primarily on their weight. *Id.* § 1900(b)(6), (b)(13). *See also id.* § 1960.1(g)(2) (1991) (original zero-emission-vehicle requirements).

### 2.   The Low NOx (or Omnibus) Regulation

Complementing the ACT regulation, the Omnibus rulemaking updated CARB's requirements for California sales of new medium- and heavy-duty vehicles *with combustion engines*. Lang Decl., ¶ 14. Most significantly, the Omnibus rulemaking amended a pre-existing regulatory provision containing exhaust emission standards for these vehicles, requiring lower emissions of oxides of nitrogen (NOx), a smog precursor. Cal. Code Regs., tit. 13, § 1956.8(a)(2)(C), (a)(2)(D). The first set of more stringent standards applied beginning in model year 2024, with even more stringent standards applicable to model year 2027 and all subsequent model years. *Id.* The Omnibus rulemaking also amended other pre-existing regulatory provisions, including those governing warranty requirements and on-board diagnostic (OBD) technologies that, among other things, monitor pollution control equipment and alert operators to malfunctions. Lang Decl., ¶ 23; Cal. Code Regs., tit. 13, §§ 1968.2, 1971.1.

### 3.   The Advanced Clean Cars II Regulation

CARB also amended its requirements for new light- and medium-duty vehicles sold in California, as part of its Advanced Clean Cars II (ACCII) rulemaking. Relevant here, CARB amended the exhaust emission standards for NOx, fine particulate matter, and other pollutants, as well as the OBD requirements, standards and test procedures for evaporative emissions, Cal. Code Regs., tit. 13, § 1976, and refueling emissions, Cal. Code Regs., tit. 13, § 1978, for new medium-duty vehicles sold in the State. *See also* Lang Decl. ¶¶ 18-19.

### 4.   The Phase 2 GHG Regulation

CARB also regulates vehicular greenhouse gas (GHG)emissions. It began doing so for medium- and heavy-duty vehicles and engines with the 2014 model year, pursuant to a waiver from EPA. 81 Fed. Reg. 95,982 (Dec. 29, 2016). In 2018, CARB promulgated more stringent ("Phase 2") GHG emission standards for these vehicles and engines, aligning with standards EPA had promulgated. Cal. Code Reg., tit. 13, § 1956.8(a)(7)(A); Lang Decl. ¶¶ 54-55. CARB has not yet requested that EPA waive preemption for these amendments to the State's program and is not presently enforcing them. *Id.* ¶ 55.

5

####     5.    The Advanced Clean Fleets Regulation

CARB promulgated the Advanced Clean Fleets (ACF) rule to further advance the use of zero-emission vehicles in the medium- and heavy-duty sectors. The ACF rule is comprised of four components. Not at issue here, there are three sets of fleet requirements applicable to different categories of fleets. Cal. Code Regs., tit. 13 § 2013-2015. The fourth component is a requirement that all new medium- and heavy-duty vehicles sold in California be zero-emission beginning in 2036 ("2036 Sales Requirement"). *Id.* § 2016. CARB withdrew its waiver request for that (and other) portions of ACF. Lang Decl., ¶ 59. CARB has stipulated—in court orders in other cases—that it will not enforce the 2036 Sales Requirement provision unless and until it has such a waiver. Ex.7 at 3 ¶ 3; Defendants' Req. for Judicial Notice (RJN) ¶ 11; Lang Decl., ¶ 61.

## II.    THE CLEAN TRUCK PARTNERSHIP

In 2023, several manufacturers of medium- or heavy-duty engines and vehicles (including OEM Plaintiffs) and their trade association (the Engine Manufacturers Association or EMA) signed an agreement with CARB: the Clean Truck Partnership (CTP). ECF 144-5 (CTP) at 4-6. All parties to the CTP agreed to take (or not take) certain actions in exchange for promises from other parties. *Id.* at 1-2. The manufacturers wanted certainty that CARB would provide four years of lead time before any future heavy-duty vehicle regulations would take effect. ECF 118 (OEM FAC) at ¶¶ 6, 7. The manufacturers also wanted certainty that CARB would consider certain amendments to the Omnibus and ACT regulations. *Id.* ¶ 7 (describing "regulatory changes sought by industry"). CARB agreed to recommend the requested lead time for future regulations and to consider a set of identified amendments to existing regulations. CTP at 1. In exchange, EMA and the signatory manufacturers promised not to bring legal challenges to specified regulations, and to refrain from supporting challenges brought by others. *Id.* at 2; App. D, ¶ A. The manufacturers also agreed to sell clean vehicles in California consistent with the Omnibus and ACT regulations, and with the 2036 Sales Requirement, regardless of CARB's authority to enforce those regulations. *Id.* at App. D, ¶ B.

After signing the CTP, EMA issued a press release stating that the CTP "demonstrates how EMA and CARB can work together" and highlighting the CTP's bargained-for benefits for

6

EMA's members. Ex. 8 at 1. Several OEM Plaintiffs also directly lauded the agreement, touting the "certainty" it would provide and the "cooperative effort[]" it reflected. *Id.* at 2-3. OEM Plaintiffs have since further confirmed the CTP provided them with bargained-for benefits, indicating each had "signed the CTP with CARB" and agreed to sell vehicles in California consistent with the ACT and Omnibus regulations in exchange for "benefits for its dealers and for customers of its trucks." Ex. 9 at 1-2; *see also* Ex. 10 at 1 (describing what Volvo "gain[ed]" from signing CTP); Ex. 12 at 1 (similar); Ex. 11 at 1 (similar).

### III.    THE FEDERAL GOVERNMENT'S UNPRECEDENTED ASSAULT ON CALIFORNIA'S PROGRAM

Since the 1967 enactment of the waiver provision, the regulation of new motor vehicle emissions has proceeded as Congress intended. EPA and California have iteratively amended their respective programs, generally requiring lower and lower emissions as technologies have advanced and the impacts of vehicular pollution have become clearer. *See* Lang Decl., ¶¶ 4-9, 13-24; 89 Fed. Reg. 27,842, 27,843-27,846 (Apr. 18, 2024) (history of EPA standards). EPA does so through promulgation of federal rules pursuant to the authority in Section 202. 42 U.S.C. § 7521. CARB does so through promulgation of state rules pursuant to its state-law authority, *e.g.*, Cal. Health & Safety Code § 43013(a), and preemption waivers consistently granted by EPA, *see* 87 Fed. Reg. 14,332, 14,337 n.26 (Mar. 14, 2022) ("[I]n the history of EPA waiver decisions, it has only denied a waiver once"); *id.* (describing reversal of that denial).

In keeping with this sixty years of practice, EPA authorized enforcement of the most recent iteration of CARB's regulatory program in a series of three preemption waivers, covering the amendments (described above) made by the ACT, Omnibus, and ACCII rulemakings. *See* 88 Fed. Reg. 20,688 (Apr. 6, 2023) (ACT); 90 Fed. Reg. 644 (Jan. 6, 2025) (Omnibus); 90 Fed. Reg. 642, 642-43 (Jan 6, 2025) (ACCII). Beginning in January 2025, however, the Executive and Legislative Branches mounted an unprecedented attack on this latest iteration of California's program, purporting to invoke the Congressional Review Act (CRA) to disapprove the waivers for those amendments, although both Branches were well aware that the CRA did not apply.

**A.    The CRA Facilitates Congressional Review of Federal "Rules"**

In 1996, Congress enacted the CRA, as part of a broad, bipartisan bill that passed in the Senate with unanimous consent. SUF ¶ 5. The CRA was designed to "provide[] an expedited procedure whereby Congress may review rules to determine whether they should be 'vetoed' prior to taking effect." H.R. Rep. No. 104-500 (1996). To that end, the CRA requires a "Federal agency" that has promulgated a "rule"—as defined, 5 U.S.C. § 804(3)— to submit that rule, along with its "proposed effective date" and other information, to Congress and the Government Accountability Office (GAO) "[b]efore a rule can take effect." *Id.* § 801(a)(1)(A).[3] The CRA borrows (and then further limits) the definition of "rule" from the federal Administrative Procedure Act (APA), *id.* § 804(3), which categorizes federal agency proceedings and actions into rulemaking that produce rules and adjudications that produce orders, *id.* § 551(4)-(9).

The federal agency's submission of the rule report triggers a 60 session-day window for Congress to adopt a resolution disapproving of that rule. 5 U.S.C. § 802(a). The text of these resolutions is prescribed in the statute as follows: "That Congress disapproves the rule submitted by the [agency name] relating to [title of rule], and such rule shall have no force or effect." *Id.*; *see e.g.,* H.J. Res. 35 (Mar. 14, 2025). Consideration of CRA resolutions is highly expedited, especially in the Senate. The "filibuster" does not apply, meaning that CRA resolutions require only a simple majority to pass. 5 U.S.C. § 802(d). Motions, amendments, and even debate are all severely limited. *Id.* §§ 802(d)(1), 802(d)(2). The CRA also provides that "no determination, finding, action, or omission under [the CRA] shall be subject to judicial review." *Id.* § 805.

If an agency fails to submit an action, any member of Congress may ask the GAO for a determination as to whether the agency action is a "rule" subject to the CRA. SUF ¶ 7. Congress has treated the GAO's conclusions as dispositive. SUF ¶ 8. Specifically, if the GAO determines an unsubmitted agency action is a "rule," under the CRA's definition, that determination opens the 60 session-day window for resolutions. SUF ¶ 9. On the other hand, if the GAO determines the action is *not* a rule, no resolutions are introduced. SUF ¶ 10.

---

[3] "The GAO is an independent agency within the Legislative Branch that exists in large part to serve the needs of Congress." *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 844 (1983).

**B.**    **As EPA and Congress Have Long Understood, Section 209(b) Waivers Are "Orders," Not "Rules," and Thus Not Subject to the CRA**

From the CRA's enactment in 1996 until last year, EPA consistently maintained that its Section 209(b) waiver decisions are not rules and therefore are not subject to a host of requirements that apply only to rules—including Executive Order 12866, the Regulatory Flexibility Act (5 U.S.C. § 601(2)), and the CRA. *E.g.*, 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule ..., consistent with its previous actions on waiver requests…."); SUF ¶ 12. Unlike rulemakings, EPA's waiver proceedings begin with a request from California, accompanied by the State's determination that its "standards will be, in the aggregate, at least as protective" as EPA's federal standards. 42 U.S.C. § 7543(b)(1). And when EPA finalizes a waiver action, the result is not federal emission standards promulgated in the Code of Federal Regulations, as when EPA conducts a rulemaking to set such standards. *Compare* 90 Fed. Reg. at 644 ("granting California a waiver of preemption") *with* 79 Fed. Reg. 23,414, 23,630-23,886 (Apr. 28, 2014) (finalizing EPA rule and identifying amendments to federal standards in Code of Federal Regulations). Instead, an EPA preemption decision operates similar to a court order in a preemption case, determining whether the state laws at issue are enforceable, and, specifically, here determining whether Section 209(a) preemption applies, 42 U.S.C. § 7543(b)(1) (directing EPA to "waive … application"). It had thus always been EPA's position—through Administrations of both parties—that a Section 209(b) waiver decision "is not a rule." 75 Fed. Reg. 70,237, 70,241 (Nov. 17, 2010); *see also, e.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("The [CRA] … does not apply because this action is not a rule …."); 73 Fed. Reg. 12,156, 12,169 (Mar. 6, 2008) ("As with past waiver decisions, this action is not a rule ….").

The GAO has likewise concluded that Section 209(b) waivers are not rules. When asked by Senator Capito whether a 2022 waiver action was a "rule" subject to the CRA, the GAO concluded that the action "meets the statutory definition of an order," rather than a rule. SUF ¶ 14; Ex. 15 at 5. In so doing, the GAO recognized that the Administrative Procedure Act's definitions (which the CRA incorporates, 5 U.S.C. § 804(3)) categorize agency action as either "rule[s]" produced through "rule making," *id.* § 551(4), (5), or "order[s]" produced through

9

"adjudication," *id.* § 551(6), (7). Ex. 15 at 4. The GAO then observed that the "APA defines an order as 'the whole or a part of a final disposition … in a matter other than rule making but including licensing;'" that a waiver decision is "a 'final disposition'" of a request from a single party (California); and that a waiver "grant[s] California a 'form of permission,'" meaning it is a "license" and thus an "order," not a rule. *Id.* at 4-5 (quoting 5 U.S.C. § 551(6), (8), (9)). Indeed, under the APA, "the grant" of a "statutory exemption," unequivocally constitutes a "license," 5 U.S.C. § 551(8), (9); Section 209(b) directs EPA to exempt California from statutory preemption, 42 U.S.C. § 7543(b)(1); and "licensing" proceedings are categorically "adjudication[s]" that produce an "order[s]," not "rule[s]," 5 U.S.C. § 551(6), (7), (9). Thus, the GAO concluded, the CRA had no application to the 2022 Section 209(b) waiver action. Ex 15 at 7.

Members of both the Senate and the House accepted that conclusion. No one introduced resolutions to disapprove of the 2022 waiver action on which the GAO had opined. SUF ¶ 16. In fact, some members so fully embraced the GAO's conclusion that they introduced ordinary legislation based on it. Senator Mike Lee—and five co-sponsors—introduced a bill to repeal the Clean Air Act's waiver provision, arguing the bill was needed on the ground that Section 209(b) waivers "cannot be reviewed under the Congressional Review Act (CRA)" because they are not "rule[s] as that term is defined in the CRA." SUF ¶¶ 17-19. The author of the companion bill in the House—which had nine co-sponsors—similarly asserted that "none of [California's waivers] are subject to congressional review." SUF ¶¶ 20-22.

Consistent with these understandings (including its own), EPA did not follow rulemaking procedures when considering California's requests for preemption waivers for the ACT, Omnibus, and ACCII amendments. SUF ¶ 23. EPA did not, for example, issue a proposed rule, or even a proposed disposition of California's request, when it solicited public comment. SUF ¶ 24; *cf.* 5 U.S.C. § 553(b). Instead, EPA followed its traditional practice, providing notice to the public that it had received a waiver request from California and an "opportunity for public hearing and comment" on the three, limited findings the waiver provision empowers EPA to make. *E.g.*, 88 Fed. Reg. 88,908, 88,909 (Dec. 26, 2023). Then, when it finalized each of these waiver decisions, EPA reiterated its longstanding position that "the Congressional Review Act, 5 U.S.C. 801 et

10

seq., … does not apply because this action is not a rule for purposes of 5 U.S.C. 804(3)." *E.g.*, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023); SUF ¶ 25. EPA did not submit any of these waivers to Congress before they took effect or when they were published in the Federal Register. SUF ¶¶ 26, 28, 30. Any member of Congress could have asked the GAO to determine whether these unsubmitted actions were rules subject to the CRA, following ordinary congressional procedures, as Senator Capito had in 2022. SUF ¶¶ 7, 14. No member of Congress did so. SUF ¶¶ 27, 29, 31.

### C.    The Executive and Legislative Branches Nonetheless Purported to Invoke the CRA to "Disapprove" Three Section 209(b) Waivers

Instead, after the change in Presidential Administrations in January 2025, the Federal Government charted a new—and unprecedented—course, purporting to invoke the CRA to disapprove the waivers for ACT, Omnibus, and ACCII. On February 14, 2025, President Trump and EPA Administrator Zeldin announced that EPA would transmit these three waivers to Congress, as though they were "rules" subject to the CRA. SUF ¶ 32. In so doing, the President and EPA Administrator appeared to be following a plan first publicized a month earlier as to "how the incoming Trump administration" could purportedly use the CRA to "stop" the State's efforts to reduce vehicular pollution, without following "the administrative process" which could "take years" and without employing "ordinary legislation [which] would have to overcome the 60-vote filibuster in the Senate." SUF ¶¶ 34, 35.

The Administration's announcement provided no explanation for its change in position and no opportunity for public comment or participation. SUF ¶ 33. Indeed, the announcement did not even acknowledge that EPA had always understood waiver decisions to be adjudicatory orders, although it had reiterated that position when it finalized these very waivers. *See* Ex. 19.

EPA then submitted these three waivers to the GAO and Congress on February 19, 2025. SUF ¶ 40. The submissions to Congress provided no explanation for "why the agency was submitting the notices under [the] CRA." Ex. 18 at 2, 6; SUF ¶¶ 40-42. Indeed, the initial submissions described the waiver decisions as "actions" and "Notice[s] of Decisions," rather than rules. Ex. 23 at 1, 3; SUF ¶ 40. EPA later resubmitted, relabeling its actions as "rules." Ex. 24 at

1, 3; SUF ¶ 45. But EPA "still did not address the statements in the notices regarding the inapplicability of the CRA" or otherwise explain its new labels. SUF ¶ 46; *see also* Ex. 24.

Some members of Congress credited "the Trump EPA['s]" submission for "giving Congress the opportunity to reject California's" regulations. SUF ¶¶ 38, 44, 54, 55. As with the Executive's announcement, none of these statements explained why these waivers met the CRA definition of a "rule," when earlier waiver actions did not—except that EPA had now slapped a post-hoc "rule" label on these actions. *See* Ex 25 ("Once they submitted it to us, it's a rule …. [And] we can take it down.") (quoting Senator Capito); *see also* Exs. 22, 25-28.

Meanwhile, three Senators requested that the GAO determine whether these three waivers were rules subject to the CRA. SUF ¶ 43. On March 6, 2025, the GAO issued its opinion, concluding (as before) that Section 209(b) waiver actions are not subject to the CRA. Ex. 18 at 9; SUF ¶ 47. The GAO concluded again that Section 209(b) waiver decisions meet "the APA definition of an order," not of a rule, because they make preemption determinations—i.e., "'final disposition[s]' granting California a 'form of permission' as described in the APA definition" of "order." Ex. 18 at 7 (quoting 5 U.S.C. § 551(6), (8), (9)).

Nonetheless, members of the House introduced the three Resolutions—each targeting one of the three preemption waivers at issue. H.J. Res. 87, 88, 89 (introduced April 2, 2025). SUF ¶ 49. Some Senate leaders suggested they were prepared to do the same. Ex. 26 at 2. No member of the House or Senate identified any errors in the GAO's reasoning or otherwise explained how these waivers fit the CRA's statutory definition of a rule. *E.g., id.* To the extent anyone did offer a basis for purporting to invoke the CRA, the sole basis was EPA's relabeling and submission of the waivers. SUF ¶¶ 44, 54-55, 59. Industry advocates were similarly asserting that "the CRA's text"—including its definition of "rule"—did not "bind" Congress and that Congress had, in fact, "unchallengeable power to invalidate any action that an agency submits for review." SUF ¶ 48.

Several Senators then asked the Senate Parliamentarian—as the "the sole definitive arbiter[] of the CRA parliamentary mechanism" in that chamber, SUF ¶ 51—to address the CRA's applicability. SUF ¶ 50. After hearing arguments on both sides, the Senate Parliamentarian agreed with the GAO that Section 209(b) waivers are not subject to the CRA. SUF ¶ 52; 171 Cong. Rec.

S3017, S3025 (daily ed. May 21, 2025) (Sen. Whitehouse). "[I]n the ordinary course of business, Congress's procedural rules—and the parliamentarians' interpretations of those rules—are as good as binding." Jonathan S. Gould, *Law Within Congress*, 129 Yale L. J. 1946, 1958 (2020); 171 Cong. Rec. S3031 ("The Senate has never overruled the Parliamentarian regarding the CRA ….") (Sen. Durbin). But the Senate was on no ordinary course.

Indeed, Senate leadership was determined to proceed with the Resolutions. SUF ¶ 58. They faced a problem, however. The introduction of the Resolutions would fly in the face of the Senate Parliamentarian's determination that the waivers are not "rules." 171 Cong. Rec. S3025. For the Senate to decide otherwise, it would have to overrule the Parliamentarian. *Id.*; *see* Gould, *Law Within Congress*, 129 Yale L. J. at 1965-66 (describing majority-vote process to overrule "parliamentarian's rulings" and make "new precedent"). But at least some Senate leaders did not want to do *that*. SUF ¶ 61; *see* 171 Cong. Rec. S3047-48 (Sen. Thune); *id.* at S3087-88 (Sen. Capito). So, they needed a way to introduce the Resolutions that did not require a vote on whether any of these waivers actually met the CRA's statutory definition of a rule—i.e., a vote on whether the Parliamentarian was correct. Ex. 26; SUF ¶ 61. The Majority Leader thus decided to tee up a different vote—not on the application of the CRA's statutory definition but on a "point of order" (i.e., a question of Senate procedure) as to "what qualifies for [a] fast-track procedure." *See* 171 Cong. Rec. S3048 (Sen. Thune). A majority then sustained a point of order that:

> joint resolutions that meet all the requirements of section 802 of the [CRA] or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures under the [Act].

*Id.* at S3051; SUF ¶ 63.

On the surface, this point of order appeared to change nothing. Both elements appeared to recite the status quo: (1) that fast-track procedures are used for joint resolutions "that meet all the requirements of section 802 of the [CRA]," 171 Cong. Rec. at S3051; and (2) that those procedures may also be used when the agency action has "been determined to be [a] rule[] subject to the CRA by a legal decision from GAO," *id.* Moreover, that second part would not apply to

13

these Resolutions anyway because GAO had determined these waivers were *not* rules subject to the CRA. SUF ¶ 52.

But the point of order *did* make a change because the Senate then proceeded to introduce and fast-track the three Resolutions "*[p]ursuant to the precedent just established*" in the point of order. 171 Cong. Rec.  S3052 (Sen. Capito as presiding officer) (emphasis added); SUF ¶ 65. In other words, before this point of order, the Senate could not proceed with expedited resolutions of disapproval (without overruling the Senate Parliamentarian), but it could (and did) do so afterwards. The Resolutions' proponents themselves "clarif[ied]" the change effectuated by the first half of the point of order: an Executive Branch denomination as a "rule" in a submission to Congress would now suffice, whether or not the action *was* a rule. 171 Cong. Rec. S3099, S3140 (daily ed., May 22, 2025) (Sen. Lankford). Put another way, the Senate modified its internal procedural rules to substitute the term "Agency-submitted rule," 171 Cong. Rec. S3018 (Sen. Barrasso); *accord id.* at S3088 (Sen. Capito), in place of "rule" as defined (still) in the CRA.

Relying on this new "Agency-submitted" trigger, on May 22, 2025, the Senate passed the Resolutions (which had previously passed the House)—with votes of 51-45 (H.J. Res. 87, ACT), 51-44 (H.J. Res. 88, Advanced Clean Cars II), and 49-46 (H.J. Res. 89, Omnibus). RJN ¶¶ 3-8. Administrator Zeldin hailed the Resolutions as preventing a "single state" from imposing its "radical agenda." SUF ¶ 66. On June 12, 2025, the President signed the Resolutions. SUF ¶ 67. At the signing ceremony, President Trump stated "[I]n a few moments, I'll sign three pieces of legislation that will kill, totally kill [California's regulations], can't do anything about it; they can't take us to court…." SUF ¶ 68.

## IV.    CALIFORNIA'S RESPONSE TO THIS UNPRECEDENTED ATTACK

On May 23, 2025, after Congress passed the Resolutions, but before the President signed them, CARB issued a Manufacturer Advisory Correspondence (MAC) to provide initial guidance. ECF 145-10 (May MAC) at 1. CARB noted that model year 2026 vehicle and engine certifications were already "well underway" and indicated it would "continue to accept and process certification applications" for that model year in order to, *inter alia*, "provide certainty to affected parties and consumers, provide consistent treatment of regulated entities, [and] maintain

14

stability in the market." *Id.* at 2. CARB indicated that additional information would be forthcoming. *Id.*

On June 12, 2025, the same day the President signed the Resolutions, California and ten other States filed suit in the Northern District of California alleging, *inter alia*, that the Resolutions unconstitutionally violated separation of powers and federalism principles. *California v. United States*, Case No. 4:25-cv-04966 (N.D. Cal. filed June 12, 2025), ECF 1.

Governor Newsom also issued Executive Order N-27-25 (EO), reaffirming the State's commitment to reducing air pollution. ECF 145-12 (EO). The EO directs CARB to begin developing new regulations, *id.* at ¶ 2, and to "identify, maintain, and update publicly available lists of" manufacturers and fleets that choose to follow various requirements, *id.* at ¶ 3. The EO further directs CARB and other state agencies to align state vehicle procurement and state-funded incentives with those lists, and directs CARB to "explore opportunities for special considerations and flexibilities for listed manufacturers and fleets" as part of future regulations. *Id.*

On August 25, 2025, CARB provided the "further clarity" about its certification processes that it had promised, issuing a new, superseding Manufacturers Advisory Correspondence. SUF ¶¶ 101-102; ECF 145-11 (August MAC) at 2. CARB recognized that the intervening enactment of the Resolutions had created "unprecedented uncertainty" in California's vehicle market, prompting more manufacturer questions. August MAC at 1. Accordingly, CARB clarified the three available pathways to obtain approval from CARB to sell vehicles or engines in the State. SUF ¶ 103; August MAC at 2. The three pathways are: (1) voluntary certification to the latest iteration of CARB regulations for which EPA waived preemption—i.e., Omnibus, ACCII, and ACT; (2) certification to the prior iteration of CARB regulations for which EPA had previously waived preemption; or (3) demonstration of certification to EPA's standards as codified at the time the August MAC issued. August MAC at 2. On April 30, 2026, CARB reissued the August MAC to clarify that the third pathway remains available, notwithstanding intervening changes to U.S. EPA standards. Ex. 39 at 1.

On September 15, 2025, CARB issued a notice of emergency rulemaking to confirm that the prior iteration of its regulations remain operative, as described in the August MAC, at least

15

"until a court resolves the uncertainty created by the federal government's actions." August MAC at 1; ECF 144-11 (Notice of Emergency Rulemaking). Specifically, the emergency rulemaking recodified the earlier versions of relevant sections of the California Code of Regulations— sections for which EPA had earlier waived preemption in actions never touched by any congressional resolution. SUF ¶¶ 118, 120; Lang Decl., ¶¶ 40, 42-44, 48-51. Each recodified section was assigned a suffix of ".1" to make clear it is the alternative to a section amended by the ACT, Omnibus or ACCII rulemakings. Thus, for example, California Code of Regulations section 1956.8—which has long contained CARB's exhaust emission standards for heavy-duty vehicles and engines—remains codified as amended by the Omnibus rulemaking, and section 1956.8.1 contains the previous iteration of those emission standards for which EPA waived preemption. Lang Decl., ¶¶ 35, 42-44. The recodified sections with the ".1" prefixes constitute one of the pathways for CARB certification described in the August MAC. Lang Decl., ¶¶ 32, 34; August MAC at 2 (pathway (1)).

That emergency rulemaking became effective October 2, 2025. Ex. 41 at 1. CARB also began a non-emergency rulemaking to ensure the recodified provisions remained on a more permanent basis, Ex. 40, because (under California law) an emergency regulation remains in effect for only 180 days, Cal. Gov't Code § 11346.1(e). CARB later extended the emergency regulations for an additional 90 days to allow for the non-emergency rulemaking to be completed. Ex. 41 at 1; *see also* Cal. Gov't Code § 11346.1(h). CARB anticipates completing the non-emergency rulemaking by November 2026. Lang Decl., ¶ 38.

## V.    RELEVANT PROCEDURAL HISTORY

On August 10, 2025, each OEM Plaintiff sent a letter to the Federal Trade Commission (FTC) disavowing the vehicle-sales commitments they had made in the CTP. Exs. 9-12. Each letter acknowledged that the manufacturer had "signed the CTP with CARB" and had agreed to sell vehicles in California consistent with the ACT and Omnibus regulations in exchange for certain benefits. *E.g.*, Ex. 9 at 1-2; SUF ¶¶ 88, 90, 92, 94. Each manufacturer then disavowed any intention of honoring the commitments CARB had bargained for, stating instead that each

16

company would "independently make decisions about the type and quantity of vehicles it sells without regard" to the CTP. *E.g.*, Ex. 9 at 2-3; *see also* Ex. 10 at 2; Ex. 11 at 2-3; Ex. 12 at 2.

The next day, OEM Plaintiffs filed this suit, ECF 1, and immediately sought a preliminary injunction on all claims, ECF 23. This Court granted the United States' motion to intervene shortly thereafter. ECF 43, 54. The United States then joined the OEM Plaintiffs' preliminary injunction motion in part. ECF 57.

After due consideration, CARB filed suit against these manufacturers in Alameda Superior Court on October 27, 2025, alleging breach of contract, rescission of contract, and breach of the implied covenant of good faith and fair dealing. ECF 85-1 at 7-9.

On October 31, 2025, this Court preliminarily enjoined enforcement of the CTP—including through "seeking specific performance as a remedy" in CARB's state-court lawsuit—but denied all other requests in Plaintiffs' preliminary injunction motion. ECF 94 at 34 & n.22.

Meanwhile, Defendants had moved to dismiss portions of both complaints, ECF 77, 78, with briefing completed on November 18, 2025, ECF 102, 103. Two months later, Plaintiffs moved for leave to amend their complaints, seeking, *inter alia*, to add claims against actions CARB had taken in August and September 2025. ECF 107, 111. The Court granted that leave and denied Defendants' still-pending motions to dismiss as moot. ECF 117. Plaintiffs filed their First Amended Complaints the next day. ECF 118, 119. Defendants moved again to dismiss portions of both complaints, including all claims against the Governor and all challenges to the CTP, the May MAC, and the EO. ECF 120, 122. Those motions remain pending.

In addition, on February 19, 2026, the Northern District of California court heard oral argument in *California* on the Federal Government's motion to dismiss all claims—including the plaintiff States' constitutional challenges to the Resolutions. *See California*, ECF 234. That court took the motion under submission. *See California*, ECF 234.

Plaintiffs here nonetheless chose to move for summary judgment on all of their claims and against all Defendants. ECF 144, 145. Pursuant to the stipulated schedule and page limits approved by the Court, Defendants now submit this single brief in support of their oppositions and cross-motions. *See* ECF 143.

17

## STANDARD OF REVIEW

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact as to the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325). Courts must "view[ ] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). But "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

Where, as here, the "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks omitted). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Id.* at 1134; *Tulalip Tribes of Wash. v. Wash.*, 783 F.3d 1151, 1156 (9th Cir. 2015).

## ARGUMENT

**I.    THE ACT, OMNIBUS, AND ACCII ARE NOT PREEMPTED BECAUSE THEIR WAIVERS REMAIN VALID**

Plaintiffs claim that California's preemption waivers for ACT, Omnibus, and ACCII "have no force or effect" after joint resolutions of disapproval that Congress enacted in 2025. ECF 145-1 (OEM MSJ) 11:3; *see* ECF 144-1 (US MSJ) 16:13-17:1 (ACT and Omnibus only).[4] But it is the Resolutions that have no force or effect, as they are unconstitutional. As a threshold matter, the CRA does not stop this Court from considering the Resolutions' constitutionality. *See* OEM MSJ 11:27-28.

---

[4] These arguments apply to the OBD regulations, Cal. Code Regs., tit. 13, §§ 1968.2, 1971.1, amended through the ACCII and Omnibus rulemakings as EPA waived preemption for those amended provisions. Lang Decl., ¶ 23.

18

### A.    The Congressional Review Act Does Not Bar Judicial Review of the Resolutions' Validity

The CRA is a 1996 statute that fast-tracks congressional review of certain federal agency "rule[s]." 5 U.S.C. § 804(3). Section 805 of the CRA bars judicial review of any "determination, finding, action, or omission under this chapter," *id.* § 805—i.e., "under" the CRA itself. Because the statute lacks "explicit language barring … review of constitutional claims," the Ninth Circuit has held that Section 805 does not bar them. *Ctr. for Biol. Diversity v. Bernhardt (CBD)*, 946 F.3d 553, 561 (9th Cir. 2019). Nor does it bar constitutional *defenses*, like the ones Defendants assert here.

There is an independent reason why Section 805 does not apply: Congress did not enact the Resolutions "under this chapter," i.e., under the CRA. 5 U.S.C. § 805. Courts "apply[] their own legal judgment" to interpret this statutory language, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 n.4 (2024), in order to answer the "first order question" whether Congress meant to strip jurisdiction, *Nat'l TPS Alliance v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025). Neither the Executive Branch's "mere designation" of waivers as rules, nor a Legislative chamber's mere designation of its internal proceedings as conducted under the CRA, "control [the Judiciary's] interpretive inquiry." *Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*), 583 U.S. 109, 125 n.8 (2018).[5]

Section 805's phrase *under this chapter* "is most naturally read to mean … 'pursuant to' or 'by reason of the authority of'" the CRA. *Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*), 583 U.S. 109, 124 (2018). It "refers to duties the CRA imposes on various actors." *Kansas Nat. Res. Coal. v. DOI*, 971 F.3d 1222, 1235 (10th Cir. 2020). For example, the President or issuing agency may "determine[]" that a rule will take effect sooner than usually allowed, 5 U.S.C. §§ 801(c)(2), 808; the White House Office of Management and Budget may "find" that the rule is "major," *id.* § 804(2); or the director of the GAO may "report each major rule" to Congress, *id.* § 801(a)(2)(A). Section 805 bars review of these activities (or failure to perform them) because

---

[5]Although the Resolutions' prefatory clauses purport to be "[p]roviding congressional disapproval under chapter 8 of title 5, [U.S.] Code," 139 Stat. 65, 66, 67 (June 12, 2025), such clauses lack legal effect, *see* 1 U.S.C. §§ 102-103. The CRA's definitions of "rule" and "joint resolution," which *do* have legal effect, are controlling "notwithstanding any other provision of law." 5 U.S.C. § 806(a). And nothing in the Resolutions' enacted text broadens the definitions in the CRA to cover non-rules (i.e., EPA waivers) or joint resolutions that disapprove of non-rules.

Defendants' Memo ISO Their XMSJ and in Opposition to Plaintiffs' MSJs (2:25-cv-02255-DC-AC)

each activity is "taken as part of the … legal obligations and requirements" the CRA imposes regarding rules. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 722 (6th Cir. 2025).

Critically, *every* obligation or activity under the CRA is conditioned on the presence of a "rule," and thus Section 805 is not triggered unless and until a rule issues. Only a rule triggers an agency's duty to send Congress the report with "a copy of the rule," "a concise general statement relating to the rule," and "the proposed effective date of the rule." 5 U.S.C. § 801(a)(1)(A). That submission of a report about a rule then triggers, *inter alia*, the agency's duty to submit a further report "if the rule is made ineffective," *id.* § 801(a)(1)(D), and the window for Congress to pass the type of "joint resolution" to "disapprove[] the rule" that the CRA contemplates, *id.* § 802(a). No action under the CRA concerns anything other than a rule. Thus, a resolution that disapproves something other than a "rule"—as the CRA expressly defines that term, *id.* § 804(3)—cannot be legislation "under" the CRA to which Section 805's jurisdiction-stripping bar could apply.

A waiver granted under Clean Air Act Section 209(b)(1), 42 U.S.C. § 7543(b)(1), is not a "rule" as the CRA defines it, 5 U.S.C. § 804(3). Indeed, EPA held that view, consistently, for decades, SUF ¶ 12, and reiterated it in the waiver decisions later targeted by the Resolutions, SUF ¶ 25. The GAO—whose views of the CRA's applicability Congress normally follows (SUF ¶ 51)—concurred. SUF ¶ 52.

The GAO and (initially) EPA were simply following the statutory language. EPA's waiver grants an individual requesting party (California) a statutory exemption from the "application of" Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(b)(1). Under the Administrative Procedure Act typology that the CRA directly incorporates, *see* 5 U.S.C. § 804(3), "the grant," *id.* § 551(9), of a "statutory exemption or other form of permission" qualifies as a "license," *id.* § 551(8). And "licensing" is "a matter other than rulemaking." *Id.* § 551(6). Licenses like EPA waivers thus are not "rules"; they are "orders" that result from agency "adjudication[s]." *Id.* § 551(7). EPA still has not articulated any argument to the contrary; even in this litigation, the official to whom "[t]he Administrator has delegated the authority to grant California section 209(b) waivers of preemption," 78 Fed. Reg. 2112, 2145 (Jan. 9, 2013), cannot bring himself to declare that waivers are rules. *Cf.* ECF 144-3 (Szabo Decl.) at ¶¶ 6, 11, 17 (differentiating EPA's processes for

20

promulgating its rules from its processes for determining that *California's* rules are entitled to a waiver of preemption).

EPA waivers are not CRA "rules," the Resolutions are not CRA "joint resolutions," and the CRA does not prohibit this Court from setting all the Resolutions aside as unconstitutional.

### B.     The Resolutions Are Constitutionally Impermissible Legislative Adjudications

The constitutional structure forbids legislation that merely nullifies an adjudicatory order. EPA's grant of a waiver to California is an adjudicatory order. And each Resolution did no more than nullify a single waiver grant. The Resolutions therefore breached the separation of powers.

1. The Constitution prohibits Congress from overturning an adjudication concluded by a different Branch. The Vesting Clauses divide powers among the three Branches and "do[] not permit Congress to execute laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). "[S]ince the beginning of the Republic," the Executive Branch has, in appropriate cases, executed laws by determining individual parties' legal rights in adjudications. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). Where Article III permits, the Judiciary—whose province is "to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803)—may review adjudications performed by the Executive and overturn any unlawful ones. But whether in the first instance or on review, *Congress* exceeds its power when it declares the rights of individual parties under its own laws. Congress has authority to *change* the law but cannot adjudicate disputes arising under *existing* law. *See Fletcher v. Peck*, 10 U.S. 87, 136 (1810). *Cf. Plaut v. Spendthrift Farm*, 514 U.S. 211, 225 (1995) ("[R]evers[ing] a determination once made, in a particular case . . . exceeds the powers of Congress." (cleaned up).)

Congress cannot nullify a completed adjudication by the Executive Branch any more than it can nullify a final judgment of the Judiciary. *Cf. United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (observing that federal agencies' adjudicatory duties "partake of a Judiciary quality as well as Executive" (cleaned up)). For agencies and (inferior) courts alike, "Congress may from time to time ordain and establish" bodies in a different Branch, U.S. Const. art. III, § 1, and may assign those bodies a power that Congress itself can never wield: the power to adjudicate rights of

21

individual parties using substantive laws and procedural rules that Congress wrote. Congress may revoke or reshuffle those assignments of adjudicatory power, or it may sway the outcomes of pending and future adjudications by changing the laws that govern the conduct of the parties or the adjudicator. But Congress lacks authority to nullify an adjudication completed by either of the other two Branches. As then-Judge Kennedy wrote in *Chadha v. INS*, "[p]lenary power for making laws does not import authority to revise particular administrative dispositions." 634 F.2d 408, 434 (9th Cir. 1980); *see id.* ("[T]he greater power definitely does not include the lesser.").[6]

2. As shown above, waivers are not rules as the CRA defines them. *See supra*, Sec. I.A. The Clean Air Act directs that EPA "shall" adjudicate the factbound application of an individual party (California) and decide, as a court would, whether the Act does or does not preempt a particular state program. 42 U.S.C. § 7543(b)(1). The direction bears no resemblance to language Congress uses when it empowers the Executive Branch to make rules for vehicle emissions. *See id.* § 7521(a). It is California, not EPA or any other federal agency, that makes the rules in this context. EPA is authorized solely to adjudicate – i.e. to determine whether the revised set of California rules is preempted or not.

3. Each Resolution is an adjudicatory action that did no more than nullify an EPA waiver:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That Congress disapproves the rule submitted by the Environmental Protection Agency relating to [the Federal Register notice of a waiver], and such rule shall have no force or effect.

H.J. Res. 87, 88, 89, 119th Cong. (2025). There is not a plausible construction of this text that could broaden its effects beyond a simple repeal of an EPA preemption waiver. *See Boumediene*

---

[6] On review of this Court's decision in *Chadha*, the Supreme Court affirmed on different grounds. It invalidated a one-House resolution disapproving the Attorney General's suspensions of six deportation proceedings, for failure to comply with the Bicameralism and Presentment Clauses. *INS v. Chadha*, 462 U.S. 919, 957 n.22 (1983). The Court did not answer the question the Ninth Circuit had decided, and that is presented here: whether a bicameral resolution signed by the President violated separation of powers by nullifying a final adjudication of the Executive. Justice Powell, like the Ninth Circuit, found the one-House veto impermissibly exercised judicial power. *Id.* at 964–67 (Powell, J., concurring in the judgment); *Chadha*, 634 F.2d at 429-35. While recognizing the veto's "judicial cast," 462 U.S. at 957 n.22, the majority found Justice Powell's analogy to judicial review "less than perfect" because the Attorney General's decisions were (unlike EPA waivers) unreviewable by courts. *Id.* Also, those decisions were (unlike EPA waivers) discretionary, and contingent on congressional review. *Id.* at 925. The analogy between Congress's passage of disapproval resolutions and judicial review of waivers *is* perfect, and fatal.

*v. Bush*, 553 U.S. 723, 787 (2008) ("We cannot ignore the text and purpose of a statute in order to save it."). The text does not "alter[] the legal standards governing" an agency adjudication; it just "direct[s] the result" of one already-finished adjudication, *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016), in which EPA had made "findings of fact," *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992); *see* 42 U.S.C. § 7543(b)(1)(A)-(C). That is an unconstitutional act.

Contrary to OEM Plaintiffs' suggestion (OEM MSJ 11:2-16), the Ninth Circuit did not hold in *CBD* that every statute with the template language set out in Section 802(a) of the CRA effects "a change to substantive law" that makes the legislation constitutionally permissible, 946 F.3d at 562. There was no dispute in *CBD* that the federal-agency action targeted by a joint resolution of disapproval was a rule subject to the CRA. *Id.* at 558. Because the object of the legislation was a discretionary *rule* by which the agency had changed the law governing the taking of wildlife in certain national wildlife refuges, *id.*; *see* 81 Fed. Reg. 52,248, 52,272 (Aug. 5, 2016), Congress's disapproval of that rule did change the law—namely, the federal rules for wildlife management. *CBD* is silent on whether legislation simply disapproving an agency's adjudicatory order changes the law. That silence is understandable because until the Resolutions at issue here, neither of the political Branches had ever purported to invoke the CRA in relation to an agency's adjudication.

### C.    The Resolutions Violate the Tenth Amendment and Structural Federalism

The Resolutions arose from "failings in the national political process" that infringe on the "special and specific position [that States occupy] in our constitutional system." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554, 556 (1985). Two of the three Branches of the Federal Government joined in an unprecedented effort to invoke an extraordinary congressional procedure that everyone understood to be inapplicable, with the express aims of invalidating the laws of one particular State *and* of depriving that State of any opportunity to defend itself against the attack (including in court). These unprecedented and calculated maneuvers are "extraordinary defects in the national political process," and they make the Resolutions "invalid under the Tenth Amendment" and structural federalism. *South Carolina v. Baker*, 485 U.S. 505, 512 (1988).

1. Appreciating the extraordinary nature of the political process leading to the Resolutions requires an understanding of the "ordinary" CRA process. The statute requires Executive Branch

23

agencies to report their rules to Congress and the GAO. 5 U.S.C. § 801(a)(1)(A). Receipt of such a report opens a short window for a member of Congress to introduce a special "joint resolution" to disapprove the reported agency rule. *Id.* § 802(a). These specialized joint resolutions are easier to enact than most: they bypass the Senate filibuster, get prioritized consideration, no opportunity for amendments, and tight time limits on debate. *Id.* § 802(d). But they apply only to agency rules.

The CRA worked as designed—and as the Senate that passed the statute had unanimously consented to—from 1996 until last year. It was used only to target rules, and only rules issued by federal (as opposed to state) agencies. Before these Resolutions, Congress had never purported to use the CRA's procedures to disapprove of an agency action in the face of a dispute over whether the action qualified as a CRA "rule," unless the GAO had independently found that it was a rule. EPA had consistently maintained that its waivers are orders, not rules. *E.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004) ("[The CRA] does not apply because [the EPA waiver] action is not a rule[.]"). EPA maintained this view even when the first Trump Administration purported to withdraw parts of a waiver issued six years earlier. 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019) ("EPA's action here … is not a rule … , consistent with its previous actions on waiver requests."). When asked to opine on the matter as to a 2022 waiver action, the GAO agreed with EPA that waivers are not rules. SUF ¶¶ 14, 15.

Each of the three EPA waivers later targeted by a Resolution followed this pattern. When considering California's waiver requests, EPA did not follow rulemaking procedures. SUF ¶¶ 23-24; *cf.* 5 U.S.C. § 553(b). And when granting each waiver, EPA reiterated the view that it was not a "rule" subject to the CRA. SUF ¶ 25. EPA did not submit the waivers to Congress, and no legislator even asked GAO to determine whether any of the actions were "rules" subject to the CRA. SUF ¶¶ 26-31.

2. The processes by which the Resolutions were enacted were extraordinary from start to finish. Weeks after President Trump took office in 2025, he and EPA Administrator Lee Zeldin declared, without process or explanation, that these three EPA waivers—which had taken effect months or years earlier—were in fact rules, not orders. SUF ¶¶ 32-33, 36-37. President Trump's

24

allies in Congress decided to play along, introducing joint resolutions of disapproval after EPA reported these three waiver actions to Congress. SUF ¶¶ 38-39, 49.

Asked to opine on the matter, the GAO reaffirmed that EPA waivers are not rules to which the CRA applies. SUF ¶ 47. The same conclusion was reached by the Senate Parliamentarian, SUF ¶ 52, who is ordinarily "the sole definitive arbiter[] of the CRA parliamentary mechanism" for that body, SUF ¶ 51. Indeed, "in the ordinary course of business, … the parliamentarians' interpretations of" legislative procedures "are as good as binding." Gould, *Law Within Congress*, 129 Yale L. J. at 1958.

Waiver opponents in Congress thus found themselves in a bind because they had wanted to override the waivers without abandoning their facial support for the filibuster or their traditional adherence to the Senate Parliamentarian's rulings on procedural issues—including whether the CRA's special procedures governed. *See* 171 Cong. Rec. S3047-48 (Sen. Thune); *id.* at S3087-88 (Sen. Capito). Accordingly, Majority Leader Thune teed up a "vote[] on what qualifies for [a] fast-track procedure," *id.* at S3048, and the Senate sustained a point of order that:

> joint resolutions that meet all the requirements of section 802 of the [CRA] or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures ….

*Id.* at S3051 (Sen. Thune). The Senate then fast-tracked the three Resolutions "[p]ursuant to the precedent just established" in this point of order. *Id.* at S3052 (Sen. Capito as presiding officer).

At first blush, this course of proceedings is puzzling. The first half of the point of order—that fast-track procedures are used for joint resolutions "that meet all the requirements of section 802 of the [CRA]," *id.* at S3051—seemed to just recite the status quo. As did the second half—that fast-track procedures are used for resolutions "disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO," *id.* Moreover, that second half would not apply to these Resolutions because GAO had said already that these waivers were *not* subject to the CRA. SUF ¶ 47.

Waiver opponents later "clarif[ied]" the procedural-rule change they had made, 171 Cong. Rec. S3140 (Sen. Lankford): where the *Executive Branch* determined an action to be a rule subject to the CRA, that view (as embodied in the submission to Congress) would now control,

whether or not the action *was* a rule. The Senate effectively amended its internal process to substitute the term "Agency-submitted rule," 171 Cong. Rec. S3018 (Sen. Barrasso); *accord id.* at S3088 (Sen. Capito), in lieu of "rule" as defined (still) in the CRA.

Relying on this "Agency-submitted" trigger and the Executive Branch's thirteenth-hour reports, the Senate passed each Resolution by a slim majority, and President Trump signed them. When California (and many other States) sued, the Federal Government said they had no remedy.

3. The national political process failed California at every turn. The State was not simply outvoted, or unrepresented on a congressional committee whose members were selected in the ordinary way. *Cf. Nevada v. Watkins*, 914 F.2d 1545, 1556-57 (9th Cir. 1990). Nor was Congress merely "uninformed" or reliant "upon incomplete information." *Baker*, 485 U.S. at 513 (cleaned up). This concerted attack "singl[ing] out" individual disfavored State laws, *id.*, was orchestrated and carried out by both political branches of the Federal Government—who professed to invoke procedures they knew did not apply and to which States had unanimously consented (through their Senators when enacting the CRA) only for *other* kinds of agency actions. The Executive Branch set the wheels in motion with its supposed reclassification of adjudicatory orders into "rules," months (or years) after finalization and while judicial review was pending—providing no process, explanation, or justification for the change, and thereby depriving California "of any right to participate in" that crucial step. *Baker*, 485 U.S. at 513.

The Framers designed the Federal Government to "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia*, 469 U.S. at 551 (quoting The Federalist No. 46, p. 332 (James Madison) (B. Wright ed. 1961)). That design failed, extraordinarily, here. So must the Resolutions.

### D.    The Senate Impermissibly Delegated Power to Set Its Internal Rules to the Executive

The Federal Government's process of birthing the Resolutions violated not only the Tenth Amendment and principles of structural federalism, but also the separation of powers. The Rules Clause of the Constitution grants each House of Congress exclusive and preclusive authority to set its internal rules of procedure. U.S. Const. art. I, § 5, cl. 2. To pass the Resolutions, the Senate

26

adopted a rule of legislative procedure that vests another Branch (the Executive) with power that the Constitution vests exclusively in the Senate itself. The Senate's new rule—adopted to enact these Resolutions without determining itself that waivers are "rules" subject to the CRA—vests the Executive Branch with power to decide which agency actions can be subject to extraordinary Senate procedures paralleling those of the CRA. The Resolutions are unconstitutional because the Senate passed them only by abdicating its exclusive rule-setting power to the Executive Branch.

As detailed above, *see supra* Background III.C, the Senate used extraordinary procedural maneuvers to fast-track joint resolutions of disapproval of non-rules issued by the Executive Branch, merely because the Executive Branch called them rules. The Senate's abdication of its procedural power to the Executive is apparent from the remarks of Senator Capito, who "r[o]se in support of [her] resolution" to disapprove one of EPA's waivers. 171 Cong. Rec. S3086. It was "[f]ortunate[]," she noted, that "President Trump and EPA Administrator Lee Zeldin decided to give the American people a say by submitting the approved California waiver to Congress as a rule." *Id.* at S3087. Absent EPA's after-the-fact (and initially bungled) reclassification in a report to Congress, the Senate would not have considered, much less fast-tracked, her Resolution. The next day, Senator Lankford left no doubt as to what had transpired:

> So we worked to make sure that we were clarifying one simple thing … this one simple question: When an Agency says it is a rule, is it a rule? … The answer is, yes, it is a rule. And then we acted on that.

*Id.* at S3140.

In "acting on that" Executive Branch whim, the Senate acted unconstitutionally. The *when you say so* regime adopted by the Senate invites the Executive to manipulate Senate procedure to serve Executive purposes. The President may, in his sole discretion, direct an agency head to slap a new (and errant) label "rule" on any action by a prior Administration—even one from decades ago—that the President disfavors and report it to Congress, upon which the Senate will duly fast-track a resolution to disapprove it. The Rules Clause rules out this transfer of procedural control.

Since "the Constitution by explicit text commits the power at issue to the exclusive control of" each House of Congress, courts cannot "tolerate any intrusion by" the Executive and must act "to prevent any other Branch from undertaking to alter" that textual commitment. *Pub. Citizen v.*

*U.S. DOJ*, 491 U.S. 440, 485, 487 (1989) (Kennedy, J., concurring in the judgment). It is of no moment that the Branch with the power ceded it willingly, or even that it came up with the idea. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010). Indeed, the Senate's "enthusiasm for" this novel arrangement "sharpen[s] rather than blunt[s]" the need for judicial scrutiny. *Nat'l Labor Rels. Bd. v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment).

Nor does it matter that the Senate stayed *more* in control of its procedures than the Executive, insofar as the Senate could have changed procedures again at any time until it passed the legislation. The Senate had a passenger-side brake, but it still let the President drive. The Constitution demands that the Senate stay in absolute, not relative, control of its procedures. Defining internal rules of procedure "only empowers Congress to bind itself," *Chadha*, 462 U.S. at 955 n.21, but that is precisely why the power must be kept "independent … of the President," *id.* at 955. The procedure by which the Resolutions became law is incurably unconstitutional.

## II.    IN THE ALTERNATIVE, THE RECODIFIED (EMERGENCY) REGULATIONS ARE NOT PREEMPTED BECAUSE THE WAIVERS FOR THEM REMAIN VALID

If the Resolutions are valid and *did* disapprove the three recent waivers expressly named in the Resolutions, CARB can still enforce (and certify to) its earlier standards pursuant to waivers previously granted by EPA and never touched by Congress. Indeed, this is the only way to understand the effect of any disapproval of the most recent waivers, in both legal and practical terms. The prior waivers had no end dates. To the contrary, they authorized CARB to enforce standards that expressly applied to *all subsequent* model years at the time these waivers were granted. And, if (as Plaintiffs appear to suggest) the prior waivers were displaced by the most recent ones—i.e., if the Omnibus waiver displaced the pre-Omnibus waivers, that displacement was undone by the disapproval of the Omnibus waiver, assuming that disapproval has legal effect. Section 209(a) preemption thus remains waived for the prior iteration of CARB's program. And CARB may continue certifying vehicles "without the necessity for a separate waiver determination." US MSJ 17:12-26 (quoting 50 Fed. Reg. 35122, 35123 (Aug. 29, 1985)).

Defendants' Memo ISO Their XMSJ and in Opposition to Plaintiffs' MSJs (2:25-cv-02255-DC-AC)

**1.** The California Code of Regulations now contains an "Alternative" version of each regulatory section purportedly rendered unenforceable by the Resolutions—namely, a prior version for which EPA earlier waived preemption. Take the heavy-duty vehicle and engine emission standards in Section 1956.8, for example. That section was amended by the Omnibus regulation and remains so today. Cal. Code Regs., tit. 13, § 1956.8. But, as EPA itself explained in a January 2017 waiver, EPA had previously waived preemption for CARB's emissions standards for new diesel-fueled heavy-duty engines and vehicles for model years 2007 *and subsequent*, 70 Fed. Reg. 50,322 (Aug. 26, 2005), and for new gasoline-fueled heavy-duty engines for model years 2008 *and subsequent*, 75 Fed. Reg. 70,237 (Nov. 17, 2010). 82 Fed. Reg. 4867, 4868 (Jan. 17, 2017) (describing this history). CARB further amended that section in 2014 with the addition of "Phase 1" GHG standards for new diesel-fueled heavy-duty engines and vehicles for model years 2014 *and subsequent*, and for new gasoline-fueled heavy-duty engines and vehicles for model years 2016 *and subsequent*. Lang Decl., ¶ 42. EPA again waived preemption. 81 Fed. Reg. 95,982, 95,987 (Dec. 29, 2016).

CARB has now recodified the 2014 version of § 1956.8 as § 1956.8.1, with the ".1" suffix and an explicit "Alternative" label demarcating this as the earlier (and now operative again) version of § 1956.8. SUF ¶¶ 119, 121. CARB has similarly recodified earlier versions of other regulatory provisions—all with ".1" suffixes—that were amended by the Advanced Clean Cars II or Omnibus rulemakings, while leaving those amendments in place with the original section number. SUF ¶¶ 119-120; *see also* Lang Decl., ¶ X.[7] Certifying to these recodified requirements is one of the three pathways described in the August MAC. SUF ¶ 118.

**2.** The waivers granted for these recodified emission standards (and other recodified requirements) have not expired. The waiver provision does not provide for end dates. It provides that EPA "shall . . . waive application of [Section 209] to" California, 42 U.S.C. § 7543(b)(1), not "to California *until*" some specified event. The statute likewise does not authorize EPA to impose

---

[7] CARB recently identified five of the many recodified sections in which it erroneously recodified 2015 text instead of the 2012 version for which EPA had waived preemption. Lang Decl., ¶¶ 45-46. CARB will be correcting the error and restoring the 2012 versions of these five sections and anticipates posting a notice to that effect by June 30, 2026. *Id.* at ¶ 47.

an end date. *See id.*; *MEMA I*, 627 F.2d at 1119 (EPA's role "under section 209 is modest in scope"). EPA has long understood this. For example, in 1977, EPA granted a new waiver for prospective, substantive amendments CARB had made in its latest iteration, but EPA also recognized that previous waivers were still "currently in effect." 42 Fed. Reg. 1503, 1504 (Jan. 7, 1977). In fact, EPA concluded that one of those previous waivers covered CARB's newly promulgated extension of a 1977 emission standard to 1978 vehicles (without a change in stringency). *Id.* Thus, previously granted waivers not only remain in effect; they can cover extensions of previously established standards to *new model years*.

In any event, nothing in the waiver decisions relevant here indicates EPA purported to impose an end date, or termination condition, on these waivers.[8] To the contrary, the emission standards themselves were plainly applicable to all model years after the final stringency level was reached, and EPA waived preemption for those standards as promulgated. SUF ¶¶ 115, 117. Those waivers remain operative, as they would have if the Omnibus, ACT, and ACCII amendments had never been promulgated or granted waivers by EPA.

**3.** Even if the previously granted waivers at issue were displaced by the Omnibus, ACT, or ACCII waivers, that displacement was reversed if those waivers were invalidated by the Resolutions. Indeed, this is the ordinary course: when the latest iteration of a regulatory program is rendered unenforceable, the prior iteration is generally revived. And this result is not different when, as here, that requires revival of underlying rules *and* authorizing action that permits enforcement of those rules. For example, the Federal Energy Regulatory Commission (FERC) regulates electricity rates by either accepting or rejecting "tariffs" (including rules by which rates are determined) established by grid operators. *See generally NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 112-13 (D.C. Cir. 2017). If FERC rejects the proposed rules, that turns the clock back, reinstating the "previously approved market design." *See PJM Interconnection, LLC*, 161 FERC P 61,252 at ¶ 41 (2017). A similar result occurs if FERC approves the proposed rules, but a reviewing court determines that approval was in error. *E.g.*, *NRG Power Mktg., LLC*, 862 F.3d at

---

[8] Without conceding that EPA may lawfully impose any conditions on waivers, Defendants note that any purported condition would be express. *E.g.*, 42 Fed. Reg. 31,639, 31,639 (June 22, 1977) ("It is a condition of this waiver that ….").

117 (vacating FERC approval). In either event, there is no question that *a set of rules*, approved by FERC at some point, is operative. Similarly here, the Resolutions may have raised a question as to *which* iteration of CARB's program is enforceable. The Resolutions did not, however, establish that *no* iteration is. Nothing in the text of the Resolutions—which name only the three, targeted waivers—suggests Congress reached even further back to other waivers. To conclude that it did would fly in the face of "[t]he history of congressional consideration of the California waiver provision, from its original enactment up through 1977," which indisputably "indicates that Congress intended the State *to continue* and expand" this regulatory program, not to stop the state program altogether simply because Congress disapproved the most recent in a decades-long series of iterative waivers. *MEMA I*, 627 F.2d at 1110-11 (emphasis added).

Finally, the revival of the prior iteration of CARB's program is all the more irrefutable, if (as Plaintiffs contend) the Omnibus, ACT, and ACCII waivers were rules, such that they could be disapproved through CRA resolutions. Generally, "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force." *California ex rel. Lockyer v. Dep't of Agric.*, 575 F.3d 999, 1020 (9th Cir. 2009) (cleaned up). And EPA itself has taken the position in litigation that congressional disapproval of a rule "restore[s]" the prior version of the rule "to its original form." *See* Ex. 49 at 20. Thus, if these waivers were rules, subject to the CRA and validly disapproved, the preceding waivers were fully restored by the Resolutions and render the recodified iteration of CARB's program (and the State's certification requirements) fully enforceable.

**4.** Plaintiffs' arguments to the contrary fail.

**a.** The United States argues the earlier waivers are no longer "extant," claiming waivers evaporate "if the [relevant California] regulation became ineffective at any time." US MSJ 23:22 (quoting EPA letter). But neither the brief nor the cited EPA letter identifies a single legal authority that supports this proposition, *id.*; ECF 144-13 at 2, and for good reasons. The statute says nothing of the sort. 42 U.S.C. § 7543(b). And EPA's newfound view runs headlong into more than sixty years of consistent and unchallenged agency practice. Waivers have always remained operative for the substantive requirements for which they were granted—even when those requirements are extended to additional years not considered with the original grant. 42

31

Fed. Reg. 1503, 1504 (Jan. 7, 1977); *see also* 59 Fed. Reg. 36,969, 36,982 n.34 (July 20, 1994) (describing longstanding practice of requiring a new waiver only when "CARB *substantively* amends a rule" (emphasis added)). The United States appears to concede the point: only "*new set[s] of emission standards*" would require a new waiver to be enforceable. US MSJ 23:23-24.

The United States then goes on to complain that CARB supposedly "added dozens of new provisions to the California Code of Regulations and amended dozens more," thereby triggering the requirement for a new waiver. US MSJ 22:25-26. But these provisions are not *substantively* new, as the stringency of the standards (and other substantive requirements) are the same as when EPA previously waived preemption for their standards to apply to all "subsequent" model years. SUF ¶¶ 117, 120; *supra* at 16:2-13. These recodified requirements are only "new" in the sense that they now have a different section number—with a ".1" added to the end of the prior number. SUF ¶ 119. A change in section number is irrelevant to the status of a preemption waiver because EPA waives the application of preemption to the State for its "standards" and "accompanying enforcement procedures," not for the numbers it assigns its code provisions. 42 U.S.C. § 7543(b)(1); *see also* 43 Fed. Reg. 20,549 (May 12, 1978) (prior waiver covered division of code section); 50 Fed. Reg. 35,122, 35,123 (Aug. 29, 1985) ("definition of terms" requires no waiver).[9] Plaintiffs identify no standard or accompanying enforcement procedure in the recodified regulations that is substantively changed from the relevant, prior waiver grant. To the contrary, the United States notes that "according to CARB, earlier waivers … cover" these recodified provisions, US MSJ 23:17-18, and declines to dispute the assertion.[10]

---

[9] For the same reasons, OEM Plaintiffs are incorrect to argue that recodification requires a "within the scope" determination from EPA to be enforceable. OEM MSJ 12:5-7. In fact, no such determination is ever required *by the statute*, 42 U.S.C. § 7543(b)(1), and EPA itself has only issued such determinations after a substantive change (e.g., change in stringency), 59 Fed. Reg. 36,969, 36,982 n.34 (July 20, 1994). *See also* 69 Fed. Reg. 59,920, 59,921 (Oct. 6, 2004) (within-the-scope waiver for amendments that changed PM and NOx standards).

[10] The United States does assert that the recodified regulations originate from "disparate rulemakings," US MSJ 23:28, but that does nothing to establish any particular requirement lacks a waiver. In fact, many CARB rulemakings naturally amend pre-existing regulations, so any given regulatory provision can reflect multiple rulemakings. *See* Lang Decl., ¶¶ 23, 42, 44. Also, CARB frequently seeks, and EPA frequently grants, waivers that cover amendments made through multiple rulemakings. *See, e.g.*, 81 Fed. Reg. 78,143 (Nov. 7, 2016) (waiving preemption for 2007, 2010, and 2012 amendments to CARB's on-board diagnostic requirements).

**c.** The United States also argues—in an entirely conclusory fashion—that CARB needed a waiver to complete its recodification rulemaking. US MSJ 23:25, 24:3. That argument fails for a number of reasons, not the least of which is that the Constitution forbids Congress from assuming the role the United States seeks to take on—namely dictating to States which laws they can (and cannot) enact. *Murphy v. NCAA*, 584 U.S. 453, 474–75 (2018); *see also infra* Sec. III.C. Moreover, as explained, EPA has already waived application of Section 209(a) for these substantive requirements. If a waiver is necessary before promulgation (it is not), that waiver has already been granted.

**d.** The United States also resorts to arguing that CARB's contingent reservation of the rights it seeks to vindicate in litigation requires a waiver. US MSJ 22:28-23:1. But the reservation of rights that will materialize or not based on a future court decision—with or without CARB's reservation—is hardly an "attempt to enforce" any emission standard. *Contra id.* 23:6. The public reservation provides transparency to regulated parties and other stakeholders as to the possible results of ongoing litigation. Lang Decl., ¶ 36. That is not a step of any kind toward the "imposition of penalties for violation" of Omnibus or any other emission standard. *EMA*, 541 U.S. at 257.[11] Indeed, if it were, then the filing of the *California* complaint challenging the constitutionality of the Resolutions is an "attempt to enforce," because that litigation (and the defenses asserted here) seek to preserve CARB's rights. Section 209 does not preempt States from filing litigation or mounting defenses to protect their sovereign interests. It therefore cannot preempt a State from reserving the rights it might vindicate through such litigation.

In sum, if this Court concludes that the Resolutions validly disapproved the waivers authorizing enforcement of the Omnibus, ACT, and ACCII amendments to CARB's program (*but see* Sec. I), then the previous iteration of that program—as recodified—remains enforceable

---

[11] The United States' conclusory assertion that CARB failed to give the purportedly required lead time before expressly reserving its rights is nonsensical. *See* US MSJ 23:9-12, 24:4-5. EPA already concluded that CARB provided adequate lead time for the Omnibus regulation on an appropriate administrative record. Ex. 47 at 51-88. The United States provides this Court with no basis to disagree, even if it had jurisdiction to do so. *See* 42 U.S.C. § 7607(b)(1). Moreover, any potential, future enforcement will take place after a court order that allows it. The "lead time" provided will thus be determined *by a court*, not the statute, CARB, or the Executive Branch.

33

pursuant to previously granted waivers. And CARB may lawfully continue to require certification of new motor vehicles and engines sold in the State.

**III.  THE CHALLENGES TO THE 2036 SALES REQUIREMENT AND PHASE 2 GHG REGULATIONS SHOULD BE DISMISSED, BUT, IF THEY ARE NOT, RELIEF SHOULD BE LIMITED TO PREVENTING ENFORCEMENT ABSENT A WAIVER**

Plaintiffs also claim the 2036 Sales Requirement is preempted because preemption was never waived, and the OEM Plaintiffs (but not the United States) mount the same challenge to the Phase 2 GHG Requirements. But it is undisputed that no waiver has been issued for those standards, and so neither regulation can be—or will be—enforced unless EPA waives preemption in the future. These challenges should be dismissed because it is "purely speculative whether [any] Plaintiff will ever face injury from [these] requirements. *Int'l Truck & Engine Corp. v. Lloyd*, 2001 U.S. Dist. LEXIS 26127 (E.D. Cal. June 1, 2001) at *7 (dismissing challenge to CARB regulation because it "had not yet been considered by the EPA").[12] If the Court disagrees, any relief should be limited to preventing preempted enforcement.

**A.  Plaintiffs Lack Standing to Challenge the 2036 Sales Requirement**

Plaintiffs cannot establish standing for any of the shifting "form[s] of relief that they seek" as to the 2036 Sales Requirement. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

**1.** OEM Plaintiffs seek to prevent enforcement of this requirement, OEM MSJ 25:26-27, which is the only relief even arguably be available to them under *Ex parte Young. E.g., Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1183. But there is no threat that a preempted 2036 Sales Requirement will be enforced. CARB has already stipulated—in signed court orders—that it will not enforce this regulatory requirement unless and until it has a preemption waiver from EPA. SUF ¶ 70. Plaintiffs have no standing where, as here, the state agency has "stipulated that it … will not" engage in the challenged conduct (i.e., preempted enforcement). *Buscemi v. Bell*, 964 F.3d 252, 260 (4th Cir. 2020); *see also Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 617 (6th Cir. 2013).[13]

---

[12] A courtesy copy of this order (which is not available on Westlaw) is Ex. 50.

[13] The claim that CARB violated one of these court orders by seeking to enforce the CTP, OEM MSJ 3 n.2, is meritless, as Defendant Cliff appropriately explained to the court that issued the order, *Nebraska v. Cliff*, No. 2:24-cv-01364-TLN-CKD (E.D. Cal), ECF 109 at 8:15-11:10. In (continued…)

34

**2.** Implicitly acknowledging there is no risk of preempted enforcement, the United States asserts it was (and is) injured simply by CARB's codification of this requirement in the California Code of Regulations. *See* US MSJ 14:1, 14:15-17.[14] But "the mere existence of [a regulation], which may or may not ever be applied to [anyone], is not sufficient to create a case or controversy within the meaning of Article III." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1142 (9th Cir. 2024) (cleaned up). Moreover, a State's codification of a law cannot injure the United States because the Constitution forbids the Federal Government from "dictat[ing]" the laws States may (or may not) *enact*. *See Murphy*, 584 U.S. at 474. And even if that were not the case, no injury befalls the United States where (1) CARB followed EPA's express direction to promulgate its regulations *before* seeking a waiver, 59 Fed. Reg. 36,969, 36,982 (July 20, 1994); and (2) the codified law will only ever be enforced if *the United States itself* waives preemption. SUF ¶¶ 75, 69. Finally, no redress is available for any alleged injury from CARB's codification because this Court cannot order repeal. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("[T]he federal judiciary … has no power to vacate the actions of state agencies."); *Close v. Sotheby's, Inc.*, 909 F.3d 1204, 1209 (9th Cir. 2018) (similar).

**3.** Still seeking a viable standing theory, the United States now asks for declaratory relief to constrain the temporal scope of a hypothetical waiver that might be granted in 2038 or later. US MSJ 14:6-9, 16:6. This theory likewise fails.

**a.** The possibility that EPA might grant a waiver in 2038 or later cannot establish an "actual or imminent" injury that has "already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Indeed, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012) (cleaned up). Any

---

any event, CARB's suit for breach-of-contract does not establish any risk of enforcement of the *regulatory provisions* OEM Plaintiffs challenge in Count I. OEM FAC ¶ 99(a). *That* enforcement occurs through other means, *see* Ex. 45, none of which have been initiated for the 2036 Sales Requirement, Lang Decl. ¶ 58.

[14] The United States purports to incorporate arguments from its opposition to the motion to dismiss. US Mot. 14 n.2. The plaintiff's standing burden differs at the summary judgment stage, *Lujan*, 504 U.S. at 561, so the significance of this incorporation is unclear. But, to the extent the Court allows this incorporation, Defendants likewise incorporate their arguments, ECF 122-1 at 17:8-18:25; ECF 141 at 8:13-13:2.

35

potential future "dispute" over the hypothetical scope of a yet-to-be-issued EPA waiver is too "speculative to present a justiciable controversy." *Wonderful Nurseries LLC v. Agric. Lab. Rels. Bd.*, 789 F. Supp. 3d 855, 869 (E.D. Cal. 2025) (cleaned up).

**b.** This newly asserted injury and request for redress rest on untenable speculation that the United States *will injure itself* by granting California a waiver with the feared temporal scope. In the words of the United States' own EPA declarant, Section 209(b) creates "a workable system whereby EPA reviews" waiver requests under congressionally established criteria. Szabo Decl. ¶ 16; *see also id.* ¶ 17. Where appropriate under those criteria, EPA has occasionally imposed temporal conditions on waiver grants. *E.g.*, 36 Fed. Reg. 8172 (Apr. 30, 1971) (effectively delaying implementation of California regulation). The United States does not explain why or how any future waiver grant made pursuant to this "workable system," Szabo Decl. ¶ 16, would "undermine[] EPA's ability to administer" that very system and thereby injure the United States, *contra* US MSJ 16:11.[15] Moreover, the hypothetically injurious waiver grant would be an action *by EPA. See Our Watch With Tim Thompson v. Bonta*, 682 F. Supp. 3d 838, 852 (E.D. Cal. 2023) ("self-inflicted" injuries not "fairly traceable to the defendant" are "insufficient to confer standing" (cleaned up)). Effectively, the United States seeks to prevent EPA from maintaining its longstanding interpretation of the waiver provision's lead-time requirements. *See* US MSJ 14 n.3. But the United States fails to explain why it needs protection from its own possible future interpretations, much less why this Court could or should provide that protection now, when a hypothetical future waiver action is subject to judicial review only when it is final and, even then, only in the appropriate court of appeals. 42 U.S.C. § 7607(b)(1); *In re Murray Energy Corp.*, 788 F.3d 330, 336 (D.C. Cir. 2015) (rejecting request for relief before EPA took final action); *Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 507 (9th Cir. 2015) (affirming dismissal of

---

[15] Pointing to a declaration concerning a different regulation with compliance dates beginning much earlier cannot establish injury from the 2036 Sales Requirement. *See* US MSJ 15:8-9, 15:23-25 (relying on declaration concerning ACT). The United States' statements about how manufacturers generally respond to unspecified regulations, *id.* 15:11-13, 15:25-26, also provide no "specific facts," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up), about *this* regulation.

36

complaint purporting to challenge to state regulation because "as a practical matter," it sought only to constrain a future "EPA final action").[16]

Because Plaintiffs cannot identify any redressable injury caused by the 2036 Sales Requirement, their challenges to it should be dismissed.

### B.   The Phase 2 GHG Standards Similarly Present No Case or Controversy

OEM Plaintiffs (but not the United States) also challenge the Phase 2 GHG standards. OEM MSJ 11:19. The parties agree that EPA has not yet granted the necessary preemption waiver. OEM FAC ¶ 99(b); SUF ¶ 71. There is thus no case or controversy for this Court to decide. Moreover, as this Court has already observed, "CARB is not enforcing [these standards and] will not do so unless it obtains a preemption waiver." PI Order 8:19-9:2; SUF ¶¶ 72, 73. Pointing to no evidence at all, OEM Plaintiffs fail to carry their burden to "set forth by affidavit or other evidence specific facts" that support each of the three elements of standing—injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).[17]

### C.   Any Relief Must Be Limited to Preventing Preempted Enforcement Because, *Inter Alia*, Promulgation of these Regulations Is Not Preempted

Should the Court conclude it has jurisdiction over any regulation that lacks a waiver, relief should be limited to preventing enforcement of a preempted regulation. Another court in this district has already so held, declining to expand the scope of relief beyond enjoining "enforcement … until such time as EPA may grant a waiver of federal preemption." *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 563 F. Supp. 2d 1158, 1165 (E.D. Cal. 2008). Plaintiffs here are not entitled to more.[18]

---

[16] The conclusory assertion, in a footnote, that a new interpretation is "best" also provides the Court with no basis on which to agree. US MSJ 14 n.3. It likewise provides Defendants with nothing to which to respond, thereby forfeiting this argument. *E.g.*, *Hamilton v. Solano Irr. Dist.*, 2013 WL 1499603, at *2 (E.D. Cal. Apr. 11, 2013). Should this Court nonetheless wish to take up the interpretation of the waiver provision and how it might apply to a future waiver, Defendants respectfully request the opportunity to provide additional briefing.

[17] Even if "there is *ordinarily* little question" that a plaintiff has standing when it is "an object of the action … at issue," *Lujan*, 504 U.S. at 562 (emphasis added), OEM Plaintiffs did not argue, much less establish, that the same presumption applies when the action at issue is not being enforced and will not be enforced unless and until the alleged preemption is waived.

[18] OEM Plaintiffs cannot obtain any other relief because *Ex parte Young* allows federal courts only "to enjoin official actions that violate federal law . . . ." *Sofamor*, 124 F.3d at 1183.

The United States nonetheless seeks greater relief as to the 2036 Sales Requirement on the theory that Section 209(a) precludes California from even promulgating regulations in the first place before EPA waives preemption. US MSJ 14:15-16.[19] This argument runs afoul of the Act's plain text and the way EPA has *always* interpreted and applied that text. The word "adopt" means "[t]o accept, consent to, *and put into effective operation*." Black's Law Dictionary (4th ed. 1968) (emphasis added). Accordingly, for nearly 60 years, EPA has understood the waiver provision to prevent California from putting its new motor vehicle emission regulations into effective operation absent a waiver, not from promulgating regulations or codifying them into the California Code of Regulations (so that they would be ready to take effect upon waiver of preemption). *E.g.*, 33 Fed. Reg. 10,160 (July 16, 1968) (granting waiver for already promulgated and codified regulations); 34 Fed. Reg. 7348 (May 6, 1969) (same).

This understanding also comports with the definition of "emission standard" as "a requirement *established* by the State" (past tense). 42 U.S.C. § 7602(k) (emphasis added). California cannot make the requisite determination that its "State standards will be, in the aggregate, at least as protective" as EPA's, 42 U.S.C. § 7543(b)(1), before standards exist—i.e., before the State has "established" its requirements. EPA has thus properly and "consistently interpreted sections 209(a) and (b) to provide that the waiver process commences after state regulatory adoption." 59 Fed. Reg. 36,969, 36,981 (July 20, 1994). And, far from disturbing EPA's interpretation, Congress "expressed general approval of [EPA's] subsection (b) decisions," *Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1114 (D.C. Cir. 1979) (cleaned up), ratifying it by amending *other* text of Section 209, *Jackson v. Modly*, 949 F.3d 763, 773 (D.C. Cir. 2020); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran* (*Curran*), 456 U.S. 353, 382 n.66 (1982).

Courts have also shared EPA's (and California's) longtime understanding, characterizing a waiver as allowing California to "place standards into effect," not as a requirement for

[19] OEM Plaintiffs appeared to state a similar claim. OEM FAC ¶¶ 97-99, 101, 105. In their brief, however, they raise the issue only once, in conclusory fashion, as to the Emergency Rulemaking, OEM MSJ 12:2-3. Elsewhere, however, OEM Plaintiffs recognize that post-promulgation waivers are, in fact, valid. *E.g.*, *id.* 4:7-8 (recognizing valid 2016 waiver for amendments promulgated in 2013). OEM Plaintiffs have thus forfeited any claim that pre-waiver adoption is unlawful. *See United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing . . . are generally deemed waived.").

38

promulgating them in the first place. *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1298 (D.C. Cir. 1979); *see Motor Vehicle Mfrs. Ass'n of U.S. v. N.Y. State Dep't of Env't. Conservation*, 17 F.3d 521, 534 (2d Cir. 1994) (rejecting contrary argument); *Cent. Valley Chrysler*, 563 F. Supp. 2d at 1164 (Section 209(b) "allows California to *adopt* automobile emissions regulations and submit same to EPA for their consideration.").

Moreover, even if the Act's text and the unbroken history of its application did not wholly undermine the United States' position here, the Constitution forecloses it. Congress cannot constitutionally "prohibit[] a State from enacting new laws," any more than it can "compel a State to enact legislation." *Murphy*, 584 U.S. at 474. It would thus be a "mistake" to read Section 209(a) as preventing States from promulgating regulations—even if the statutory "language might appear to" do so. *Id.* at 478.[20]

Finally, even if the use of the word "adopt" could (and did) preclude California's promulgation of regulations, EPA long ago waived application of that part of Section 209(a). Section 209(b)(1) requires EPA to "waive application of" Section 209(a) "to [the] State." 42 U.S.C. § 7543(b)(1). In other words, after an EPA waiver, some or all of Section 209(a) does not apply *to California*. If "adopt" in that section means "promulgate" or "codify," EPA long ago waived application of that part of Section 209(a). Indeed, EPA maintains to this day a codified regulation establishing that the process by which EPA "authorize[s] California *to adopt and enforce* standards" for non-road vehicles and engines under Section 209(e)(2)(A), 42 U.S.C. § 7543(e)(2)(A) (emphasis added), involves a request from California "to enforce its *adopted* standards," 40 CFR § 1074.101(a). If nothing else, the United States should be equitably estopped from claiming CARB acted unlawfully by promulgating regulations prior to EPA waiving preemption, when CARB did so pursuant to EPA's repeated explicit direction, SUF ¶¶ 74-75, 78—i.e., a "pattern of false promises" that EPA would (only) consider post-promulgation

---

[20] In fact, the United States' new reading of Section 209 would make it challenging, if not impossible, for CARB to finalize *any* emission standard because CARB must do so within one year of proposing a standard. Cal. Gov't Code § 11346.4(b). If EPA delayed in granting a waiver, CARB would be forced to start its rulemaking over (perhaps multiple times). *See id.* Congress did not intend to impose such burdens, *Am. Trucking Ass'ns v. EPA*, 600 F.3d 624, 629 (D.C. Cir. 2010), even if it could constitutionally have done so (which it could not).

39

waivers. *See Baccei v. United States*, 632 F.3d 1140, 1147 (9th Cir. 2011); *see also Watkins v. U.S. Army*, 875 F.2d 699, 701 (9th Cir. 1989) (en banc). CARB's reliance on EPA's consistent interpretation "prevented [it] from meeting the requirements" the United States now says apply, *Gestuvo v. INS*, 337 F. Supp. 1093, 1102 (C.D. Cal. 1971), and imposition of those new requirements would render CARB's expenditure of rulemaking resources wasted.

## IV. PLAINTIFFS' CHALLENGES TO THE CTP FAIL

### A. OEM Plaintiffs Lack Standing to Challenge the CTP

As demonstrated in Defendants' motion to dismiss, OEM Plaintiffs failed to allege a cognizable injury-in-fact that is traceable to the CTP (rather than their own agreement to its terms) and that is redressable by this Court. ECF 120-1 at 15:27-17:11. But even if OEM Plaintiffs had alleged facts sufficient to establish standing at the pleading stage, they "can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts" at this summary judgment stage. *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). Yet, OEM Plaintiffs identify no evidence at all that they are cognizably injured by the CTP in a way redressable by this Court. Their CTP claim should be dismissed for lack of jurisdiction.

In their Complaint, OEM Plaintiffs allege they are injured by being unable "[t]o adequately plan product production and allocation"—a harm they claim results from a purported lack of certainty about "which vehicles they are authorized to sell, and *where*." OEM FAC ¶ 14. But, whatever its force as to the rest of Plaintiffs' claims, this alleged injury cannot meet Plaintiffs' standing burden as to the CTP. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

First, each of the four OEM Plaintiffs has expressly disavowed that the CTP is affecting their production and allocation plans in any way. Each affirmed to the FTC that it "will independently make decisions about the type and quantity of vehicles it sells *without regard to whether those decisions are compliant with any restrictive terms of the CTP*." SUF ¶¶ 89, 91, 93, 95. Plaintiffs point to no contrary evidence—e.g., no declarations or other evidence indicating that the CTP is, in fact, hampering their product planning and distribution decisions.

Second, OEM Plaintiffs agreed to the CTP's terms two years ago. They signed an agreement that opens by stating "the undersigned heavy-duty on-highway (HDOH)

40

manufacturer[s] … do hereby agree as follows," where what follows is a commitment to sell cleaner vehicles in California—consistent with "the CARB regulations set forth in Appendices A and B"—"irrespective of … CARB's overall authority to implement those regulations." CTP at 1-2; *see also id.* at 4-6 (signature pages). "Nothing required" any of these large companies (with access to counsel) to make that commitment; and they should not now "be heard to complain" about having to honor it. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *see also Iten v. Los Angeles*, 81 F4th 979, 990 n.1 (9th Cir. 2023). Moreover, any assertion that the CTP is causing uncertainty is belied by OEM Plaintiffs' own characterizations of the CTP at the time they signed it. Having then lauded the "certainty" the CTP provided, Ex. 8, they cannot now establish standing by alleging—without evidence—that the agreement is having the opposite effect.  OEM Plaintiffs have conceded they "signed the CTP with CARB" and agreed to sell vehicles in California consistent with the ACT and Omnibus regulations in exchange for "benefits." SUF ¶ 88; *see also* SUF ¶¶ 90, 92, 94. OEM Plaintiffs are not injured by Defendants simply because they no longer like the bargain they struck; nor should any equitable redress be available to them from this Court on that basis—after OEM Plaintiffs sat on this preemption claim while CARB performed most of its CTP obligations. *E.g.*, *Evanston Ins. Co. v. Harrison*, No. 22-c-01672-WBS-KJN, 2020 WL 6784463, at *7 (E.D. Cal. Nov. 18, 2020) ("district court must balance concerns of judicial administration, comity, and fairness to the litigants" (cleaned up)).

Third, these Plaintiffs identify no redress available from this Court that would ameliorate any uncertainty allegedly caused by the CTP. OEM Plaintiffs identify the state-court breach suit filed by CARB in Alameda Superior Court as the sole attempt to enforce the CTP. OEM FAC ¶¶ 10(e), 56, 109(f), 117; OEM MSJ 15:20. Yet, as OEM Plaintiffs recognize, they cannot obtain relief as to that suit (or any similar state-court suit) here, due to the Anti-Injunction Act. ECF 115 at 2:24-25 ("OEM Plaintiffs do not seek an injunction to stay the proceedings in Alameda County Superior Court or a declaratory judgment that would have the same effect."); *see also*, *e.g.*, *Montana v. BNSF Ry. Co.*, 623 F.3d 1312, 1315 (9th Cir. 2010) ("Any doubts as to the propriety

41

of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed...." (cleaned up)).

OEM Plaintiffs lack standing, and their challenge to the CTP should be dismissed.

### B.    The Unites States Also Lacks Standing to Challenge the CTP

The United States must also establish that it has standing to challenge the CTP. *United States v. California*, No. 2:25-CV-06230-MCS-AGR, 2026 WL 784514, at \*2 (C.D. Cal. Mar. 18, 2026) ("[United States] similarly must establish its standing to bring a civil suit in federal court."). Yet, like the OEM Plaintiffs, the United States fails to point to any evidence of injury-in-fact caused by the CTP and thus similarly fails to meet its standing burden for summary judgment. *Lujan*, 504 U.S. at 561.

Certainly, the United States did submit a declaration with its motion, unlike the OEM Plaintiffs. ECF 144-3 (Szabo Decl.). But that declaration never mentions the CTP, much less establishes any injury the agreement is causing the United States that could be redressed by this Court. *See Lujan*, 504 U.S. at 561 (requiring "specific facts" (cleaned up)). In generalized terms, the declaration asserts that "manufacturers … require regulatory certainty" and implies that the absence of such certainty can interfere with "EPA's ability" to understand "manufacturers' ability to comply" with standards EPA might impose. Szabo Decl., ¶¶ 14, 15. But the manufacturers who signed the CTP can be presumed to have understood their own needs for "research and development, testing, and production planning," *id.* ¶ 10, before they promised to deliver vehicles with particular characteristics in California. The declaration certainly does not establish otherwise. Nor does the declaration establish that commitments made in publicly disclosed agreement create uncertainty of any kind, especially when the signatories to the agreement asserted it had precisely the opposite effect. Ex. 8 at 2-3.

With its failure to identify any evidence supporting its standing, the United States appears to be relying on an implied "sovereign injury theory." *See United States v. California*, No. 2:25-CV-06230-MCS-AGR, 2026 WL 784514, at \*3. But it cites no authority for the proposition that the "mere *existence*" of an allegedly preempted agreement causes sovereign harm to the Federal Government. *See id.*; *see also id.* at 4 ("[T]he Supremacy Clause does not itself conjure a

42

substantive right that Congress or the United States may vindicate through suit."). And, while it is theoretically possible that the enforcement of such an agreement might "give rise to an injury in fact by impeding the operations or functions of the federal government," the United States offers no evidence that enforcement of *this* agreement would do so. *See id.* at *3. Indeed, as noted, the United States' sole declarant espouses concerns about manufacturers' ability to respond to "more stringent" or "different" requirements that are sprung on manufacturers with insufficient warning, Szabo Decl., ¶ 13—concerns that are simply not implicated by some, but not all, manufacturers agreeing that they can and will produce cleaner vehicles on a gradual timeline and for a single State's market. *See* SUF ¶¶ 81, 82 (not all medium- and heavy-duty vehicle manufacturers signed the CTP).

At bottom, the United States appears to pursue this claim in order to seek a remedy that the OEM Plaintiffs cannot: an injunction preventing CARB from requiring the manufacturers to fulfill their promises. ECF 91 at 3:16-17. But the fact that "the United States is not subject to the Anti-Injunction Act", *id.* at 4:1-5, does not establish standing to bring a claim or to seek this relief. Nor does a theory that the manufacturers inappropriately waived a right "confer[red]" *on them* by Section 209(a), *Murphy*, 584 U.S. at 478, help the United States because "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

### C.    Plaintiffs' Challenges to the CTP Fail on their Merits

#### 1.    Section 209 preempts government-imposed standards, not self-imposed commitments

Regardless, Plaintiffs could not succeed on their preemption claim against the CTP, a voluntary agreement. The parties here appear to agree that Section 209(a) preemption is limited to "government-imposed policies," OEM MSJ 23:17 (cleaned up)—i.e., "state law dut[ies]," *id.* 24:25—enforceable by use of "tools … only a government can wield"—e.g., regulatory penalties, US MSJ 20:1-2 (cleaned up); US MSJ 20:7-13 (focusing on whether enforcement mechanism is "unavailable to private parties"); OEM MSJ 23:12-14 (arguing this is "dispositive factor"). In other words, only when the State "acts with the force and effect of law" does a purported contract

fall "within the scope of federal preemption" under Section 209(a). US MSJ 20:10-11 (cleaned up). And "contractual commitments voluntarily undertaken" are outside that scope. OEM MSJ 23:18 (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013)).

As Plaintiffs' briefs indicate, this dividing line for the application of preemption—between requirements imposed unilaterally by governments and commitments offered as consideration—is consistent with binding precedent concerning other preemption provisions. *Am. Trucking*, 569 U.S. at 649 (preemption does not reach "contractual commitment[s] voluntarily undertaken") (quoting *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 (1995)); *Airlines for Am. v. City and Cnty. of San Francisco*, 78 F.4th 1146, 1150 (9th Cir. 2023) (preemption "generally [applies to] state or local government action that has the force and effect of law"—not to voluntary agreements). And the only appellate court to have addressed this question under the Clean Air Act agreed that preemption under Section 209(a) tracks this same dividing line. *E.g.*, *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot. (AIAM)*, 208 F.3d 1 (1st Cir. 2000). As the First Circuit has explained, Section 209(a) is meant to govern "formal regulations adopted by the states, rather than voluntary and cooperative agreements between the states and automakers." *Id.* at 7. It thus does not preempt bargained-for exchanges like one in which "manufacturers agreed to … develop [zero-emission vehicle] technology" and to sell specified "number[s] of [such vehicles]" in California during particular years, and in which CARB "agreed to provide infrastructural support" for zero-emission vehicle implementation. *Id.* at 3.[21]

The Supreme Court did not hold otherwise in *Engine Manufacturers Association v. South Coast Air Quality Management District (EMA)*, 541 U.S. 246 (2004). Indeed, the Court had no occasion to speak to whether self-imposed, bargained-for commitments are "standards" subject to preemption because "all the Fleet Rules" before it were "mandates," *id.* at 255, not voluntarily assumed obligations. Certainly, the Court held that Section 209(a) applies to "standards" imposed indirectly on manufacturers through mandates on their customers. *Id.* ("A command,

---

[21] At the time of the *AIAM* decision, EPA agreed that "voluntary agreements generally are not standards subject to" preemption under Section 209. *AIAM*, 208 F.3d at 4. To the extent the United States takes a different view now for litigation purposes, that new position should be given no deference at all. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024).

accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles."). But that does not remotely extend the scope of Section 209(a) to actions that are not standards at all. To the contrary, the Court focused on the mandatory nature of the rules at issue—describing them as "coerc[ing] manufacturers" and "compel[ling] production," *id.* at 256—which only highlights that *voluntarily* assumed obligations fall outside Section 209(a)'s ambit. [22]

Were there any remaining doubt, the text of the Clean Air Act resolves it. Section 209(a) preempts "standard[s] relating to the control of emissions," 42 U.S.C. § 7543(a), and the Act defines "emission standard" as a "requirement[s] *established by the State*," *id.* § 7602 (emphasis added). In other words, a standard is unilaterally imposed by the State, not undertaken through the offer and acceptance of bargaining. Confirming the point, the Act elsewhere describes the scope of Section 209 as "preempting certain State *regulation* of moving sources." *Id.* § 7416 (emphasis added). Of course, Section 209(a) preempts "*attempt[s]* to enforce … standard[s]," not just completed enforcement. 42 U.S.C. § 7543(a) (emphasis added). But that does not change the meaning of "standard," such that an "attempt to enforce" a voluntary agreement becomes an "attempt to enforce" a government-imposed regulation. Thus, although this Court previously concluded—at the preliminary injunction stage—that CARB's state-court suit for breach-of-contract was "an attempt to enforce [at least some] preempted standards," PI Order 32:3-4, Defendants respectfully request the court reconsider. The CTP signatories bargained for the promises in that agreement, SUF ¶¶ 79-80, 88—including the promises defined by incorporating certain regulations as terms of the agreement, *see infra* Sec. IV.C.3 (demonstrating that such incorporation produces contractual terms, not regulatory obligations). CARB's suit seeks to enforce *the bargain*, not any "standard" established solely by the State. 42 U.S.C. § 7602.

_____

[22] Plaintiffs' other cases are likewise inapposite, as they, too, involve mandates (de jure or de facto) and thus cannot establish that Section 209(a) extends to voluntary agreements. *See Metro. Taxicab Bd. of Trade v. City of New York*, 633 F. Supp. 2d 83, 99 (S.D.N.Y. 2009), *aff'd*, 615 F.3d 152 (2d Cir. 2010) ("choice" to forgo 76% of profits was effective "mandate"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 379 (1992) (addressing attempt to enforce "state laws"); *City of Ozark v. Union Pacific Railroad Company* 843 F.3d 1167, 1169 (8th Cir. 2016) (addressing request for an "order requiring" railroad to restore public grade crossing).

## 2. The CTP is a voluntary agreement, enforceable as such, and not preempted

Because Section 209(a) covers government-imposed standards (and attempts to enforce them) but not voluntarily assumed obligations (or attempts to enforce them), Plaintiffs must establish that the CTP is effectively a regulation—i.e., has the force and effect of law. They cannot do so. As touched on above, precedent identifies two, and only two, factors relevant to this analysis: (1) whether the obligations were voluntarily undertaken, rather than unilaterally imposed by the State; and (2) whether the obligations are enforceable through means available to private parties, rather than means available only to governments, such as civil or criminal penalties. To illustrate, in *Am. Trucking*, 569 U.S. at 650, the challenged contract term was preempted (1) because it was imposed not through "the parties' voluntary commitments" but unilaterally through "a form of municipal ordinance," and (2) because violations were "punishable by a fine or a prison sentence." *See also id.* at 651 ("commitments result[ed] not from ordinary bargaining…, but instead from the threat of criminal sanctions"); *Wolens*, 513 U.S. at 233 (distinguishing "what the State dictates" from "what the [party] itself undertakes"); *Airlines for Am.*, 78 F.4th at 1152 (contrasting "government-imposed policies … with contractual commitments voluntarily undertaken") (cleaned up); *id.* ("When the government employs a coercive mechanism, available to no private party, it acts with the force and effect of the law") (cleaned up); *id.* ("civil penalty provisions alone may amount to the force and effect of law"). Plaintiffs cannot establish either factor—involuntariness or regulatory enforcement; and their preemption claims fail.

**1.** On the first factor, the United States concedes the point, recognizing that the CTP was an "exchange" of commitments as consideration, US MSJ 18:18—i.e., a voluntary agreement, not a government-imposed standard. OEM Plaintiffs attempt to imply the opposite with coded language. *E.g.*, OEM MSJ 5:12 (stating "CARB signed the CTP" while omitting fact that OEM Plaintiffs did too); 5:8 (claiming CTP "imposes regulatory requirements" and "dictates"); 16:5 (claiming CTP "attempts to compel"). Coded language is not evidence and cannot alter the facts:

46

that the CTP's terms are bargained-for promises and that the agreement is enforceable by means available to all the signatories.

The OEM Plaintiffs themselves repeatedly touted the CTP's consensual nature and the benefits they secured for themselves. At signing, the manufacturers' trade association (EMA) said the CTP "demonstrate[d] how EMA and CARB can work together to achieve shared clean air goals." SUF ¶ 83. One of the OEM Plaintiffs praised the "cooperative effort[]" that produced the CTP. SUF ¶ 84. EMA later described the CTP as a "*consensual* path forward." ECF No. 23-12, at 2 (emphasis added). And more than two years after signing the agreement, one OEM Plaintiff stated that "through the CTP, [the OEM] was able to obtain benefits for its dealers and for customers of its trucks." SUF ¶ 88. The others likewise affirmed signing the CTP to extract valuable promises from CARB. SUF ¶¶ 90, 92, 94.

Significantly, the very terms of the agreement confirm that the CTP was no one-sided deal. Indeed, Plaintiffs cannot explain why a "regulatory requirement" CARB allegedly "dictate[d]" to manufacturers, OEM MSJ 5:8, *binds CARB* to perform any obligations at all, *e.g.*, CTP at 1, ¶ 1; *id.* at 1, ¶ 5; *id.* at App. A. This is no regulation in disguise. Rather, it is exactly what it looks like—a bargained-for exchange resulting from months of negotiation during which all parties were free to—and did—propose their preferred terms and reject terms proposed by others. SUF ¶¶ 79, 80. In short, the CTP reflects "[c]ontractual commitments resulting . . . from ordinary bargaining (as in *Wolens*)" and is not preempted. *See Am. Trucking*, 569 U.S. at 651.

**2.** Plaintiffs also cannot establish the second factor—that signatory manufacturers face regulatory penalties for non-compliance with the CTP—which OEM Plaintiffs argue is "dispositive … in determining whether preemption applies." OEM MSJ 23:14. As Plaintiffs acknowledge, CARB sought breach-of-contract remedies against the manufacturer signatories in state court. US MSJ 21:10-12; OEM MSJ 3 n.2, SUF ¶ 96. That type of suit is, of course, available to private parties, just as to government entities, and bears no resemblance to the government-only means CARB employs when it enforces regulations. *See* Ex. 45 (CARB Enforcement Policy). CARB has taken no action to seek civil penalties—or to begin any other form of *regulatory* enforcement—for a breach of the CTP. *See* SUF ¶ 86. Nor do Plaintiffs point

47

to any source of authority that would allow CARB to take such action, and for good reasons. The most relevant provision of California law authorizes CARB to seek civil penalties only for violations of "any provision of [Health & Safety Code Division 26, Part 5], or any *order, rule, or regulation* of the state board." Cal. Health & Safety Code § 43016(a) (emphasis added). Moreover, it strains credulity that parties with sophisticated counsel, such as OEM Plaintiffs, would agree to a bargained-for-exchange in which the enforcement mechanism was available only to CARB (and not to them).[23] *See* SUF ¶ 87.

Plaintiffs resort to arguing that the CTP requires signatory manufacturers to "submit applications for certification." OEM MSJ 21:15-17 (citing CTP, App. B); US MSJ 18:23-27; 20:6-9. But that requirement flows from California law, not the CTP. *E.g.*, Cal. Health & Safety Code § 43151(a). The CTP's restatement of that requirement simply manifests the parties' understanding that California law would continue to operate, independent of (and in addition to) the CTP's contractual commitments. Specifically, the manufacturers agreed that they would "still be required … to demonstrate compliance with" California law—i.e., would still be required to certify vehicles and engines in accord with the Health and Safety Code. CTP, App. B; Declaration of Kim Heroy-Rogalski (Heroy-Rogalski Decl.) at ¶ 24. Regardless, even if the signatory manufacturers did agree to submit certification applications to demonstrate that they were honoring their commitments under the CTP, that would be nothing more than a promise to perform a contractual obligation subject to a mutually acceptable, well-understood, and convenient means of verification. That does nothing to establish a regulatory penalty would apply to non-performance.

Plaintiffs also seize on the presence of the phrase "non-compliant," OEM MSJ 22:4-5; *see also* US MSJ 20:7–9, but fail to acknowledge that the CTP uses that language only in reference to what would constitute non-compliance with the *regulatory amendments* that CARB agreed to

---

[23] OEM Plaintiffs' artful characterization of certain obligations based on incorporated regulations as "*penalty-carrying* provisions," OEM MSJ 22:3 (emphasis added), concedes the crucial point: that the CTP has no *penalty-imposing* provisions in it at all. This characterization also seems to presume that the CTP implicitly incorporated every possibly related regulatory and statutory provision of California law—a remarkable presumption for which they provide no factual, textual, or legal support.

48

consider in exchange for the signatories' commitments. CTP App. A at i nn.1, 2. In other words, the quoted text describes what CARB's regulations would require—of all manufacturers—if CARB finalized the amendments the signatory manufacturers requested. Heroy-Rogalski Decl., ¶ 23. That proposed CARB regulations would define regulatory non-compliance is hardly surprising; and that aspect of *CARB's promise* does not mean that the *OEMs' promises to CARB* were anything but contractual commitments, subject to breach actions.[24]

Finally, the fact that the parties to the CTP forewent bespoke contract remedies—such as a liquidated damages provision found in a different agreement, *see* OEM MSJ 23:20–24:4 (citing CTP, § V.3.B)—does not mean that the CTP lacks the remedies available by default in every contract, much less that the private-party signatories implicitly agreed to be subject to regulatory penalties they could never impose on CARB. *Contra* OEM MSJ 22:4-5. To the contrary, "where the contract is silent as to remedies," "conventional contract remedies typically apply. *E.g., B.K.K. Co. v. Schultz*, 7 Cal. App. 3d 786, 794 (1970) (employing "conventional contract" remedies "where the contract is silent as to remedies"). Plaintiffs identify no reason the CTP should be understood differently.

### 3.   Plaintiffs' other attempts to bring the CTP within the scope of Section 209(a) fail

Unable to establish either involuntariness or regulatory enforcement, Plaintiffs resort to other arguments in an effort to bring the CTP within Section 209(a)'s reach. Plaintiffs identify no precedent relying on such points in determining whether an agreement is preempted, and these arguments fail on that basis—and for other reasons, too.

**1.** Plaintiffs take issue with the fact that the CTP cross-references the California Code of Regulations. OEM MSJ 21:6-9; 23:11-12; 24:12-13; US MSJ 18:8-10. As a threshold point, Plaintiffs identify no precedent that makes incorporation by reference relevant to the preemption analysis. Regardless, "[w]hen a contract expressly incorporates a statutory enactment by

---

[24] The United States' arguments about contract meaning must be disregarded for the additional reason that a third party does not have standing to "enforce or interpret the terms of" an agreement to which it is not a party, unless "it has enforceable third-party rights" under the agreement. *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1029, 1033 (9th Cir. 2012) (granting motion to dismiss for lack of standing). The United States has no such rights under the CTP; nor has it argued that it does.

49

reference, that enactment *becomes part of the contract* for the indicated purposes just as though the words of that enactment were set out in full in the contract." 11 Williston on Contracts § 30:19 (4th ed. 2025) (emphasis added). The ensuing obligations then "emanate from contract" and are "separate animals" from "obligations created by statute [or regulation]." *Black Diamond Asphalt, Inc. v. Superior Ct.*, 109 Cal. App. 4th 166, 171 (2003).

Plaintiffs' principal strategy is to deny that this distinction exists. They assert that voluntary agreements are "practical[ly]," "indirect[ly]," or "effective[ly]" state regulations with the force and effect of law. OEM MSJ 14:16; 14:15-16; 25:2-10; *see also id*. 24:6-7 (equating a voluntary agreement with "putting into effective operation" a regulation); US MSJ 19:4-5 (baldly asserting that Section 209(a) "preempts local standards" that "the government enforces . . . through a contract."). And they assert that enforcing a contract is equivalent to "attempt[ing] to enforce" state regulation. OEM MSJ 14:11-16; US MSJ 20:21-24. But the distinction between agreements (whatever their terms) and laws is real and recognized, and these "separate animals" do not become the same animal simply from Plaintiffs' say-so. *See Black Diamond Asphalt*, 109 Cal. App. 4th at 171. Rather, as precedent makes clear, when the government "exact[s] promises from a party with whom it contracts that he will comply with [certain] regulations," those promises are independent of the referenced regulation and are enforceable through a "breach of contract" suit. *Nutt v. United States*, 12 Cl. Ct. 345, 351 (1987), *aff'd sub nom. Smithson v. United States*, 847 F.2d 791 (Fed. Cir. 1988); *see also Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607, 609, 624 (2000) (holding Federal Government "broke *its promise*," not that it violated the statute, by failing to abide by incorporated statutory provisions) (emphasis added)); *Griffin & Griffin Expl., LCC v. United States*, 116 Fed. Cl. 163, 176-77 (2014).

**2.** The nature of the consideration CARB offered also does not transform the OEM's voluntarily assumed obligations into "standards" enforceable through regulatory penalties. *See* OEM MSJ 21:24-27; US MSJ 20:14-20. Plaintiffs cite no authority establishing that the nature of the consideration is relevant here. Perhaps this is because the Supreme Court has readily found that "the law applicable to contracts between private individuals" governs agreements in which the government's consideration includes a promise to take regulatory action according to

50

statutory timelines. *Mobil Oil*, 530 U.S. at 607. In other words, a promise to exercise regulatory power does not turn a bargained-for exchange of promises into a unilaterally imposed regulation that has the force of law.

*American Trucking* does not indicate otherwise. *Contra* OEM MSJ 22:17-22. There, the Port of Los Angeles had "exercised classic regulatory authority" because the purported "contract" was not a result "of the parties' voluntary commitments." 569 U.S. at 650.[25] Rather, the challenged terms were set unilaterally by ordinance; agreement was coerced through the threat of exclusion from the Port; and violations were "punishable by a fine or a prison sentence of up to six months." *Id*. That decision confirms that, as shown above, a purported agreement can "function[] as part and parcel of a governmental program" when the government "wield[s] coercive power over private parties, backed by the threat of criminal punishment." *Id.* That does nothing to establish that the nature of the consideration exchanged is relevant to preemption, much less that the CTP was coerced or could be enforced with criminal (or even civil) penalties. And notwithstanding the United States' repeated claim, US MSJ 20:19-20; ECF 126, Opp. Mot. Dismiss. at 10:12–14, no offer to amend any ordinance was made in *American Trucking*. Rather, the Board unilaterally amended its tariff (or ordinance) before any agreements were signed—in a way that *required* those signatures. 569 U.S. at 645, 650. In other words, there does not appear to have been *any* consideration in that case. And that's the point: the "agreement" there was not a freely bargained-for exchange but a unilaterally imposed regulation in the guise of an agreement.

**3.** Plaintiffs' focus on the CTP's "goals" also fails to shore up their claims. OEM MSJ 5:2-4; 21:27-22:1; US MSJ 19:17-26. An exchange of promises, like the CTP, does not necessarily have "goals," except perhaps that the parties all honor their commitments. Here, what Plaintiffs refer to as the agreement's "goals" are actually statements by the parties simply "recognizing the importance" of specified broad principles, including environmental protection and market stability. CTP at 1. Regardless, the Supreme Court has expressly held that "intentions are not

[25] The United States is simply incorrect when it asserts "the government in *American Trucking* … promised to amend its regulations in exchange for signatures." US MSJ 20:19-20. Certainly, the Port amended its "tariff—a form of municipal ordinance," but it did not promise to do so in exchange for promises from the trucking companies. 569 U.S. at 650. Rather, the Port amended the tariff to unilaterally impose obligations on those trucking companies. *Id.*

what matters" when determining whether a purported agreement is actually a regulatory act that could be subject to preemption. *Am. Trucking*, 569 U.S. at 651. Rather, what matters is whether the "tool" employed is one "only a government can wield"—e.g., "the hammer of the criminal law." *Id.* Those holdings follow from the Court's earlier decision in *Wolens*, where the Court concluded that enforcement of an agreement was *not* preempted, 513 U.S. at 232-33, even though the parties had clearly intended the terms to affect airline rates and services (i.e., the preempted domain), *id.* at 226-27. Plaintiffs cannot evade these controlling precedents any more than they can establish that the CTP employs government-only tools.

**4.** Plaintiffs also claim, in passing, that the exception to preemption for market participants does not apply to the CTP. OEM MSJ 22:9-22; US MSJ 19:19-20. But Defendants do not need to invoke an "exception" to preemption, *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*("*EMA II*"), 498 F.3d 1031, 1040 (9th Cir. 2007), because Section 209(a) preemption simply does not apply to voluntary agreements, *supra* Sec. IV.C.1. The dispositive question is thus whether the CTP "carr[ies] the force of law." *Airlines for Am.*, 78 F.4th at 1148. It is that force that "render[s] the [government] a regulator" and subjects a purported agreement to preemption. *Id.* at 1150. That courts sometimes use "market participant" as a shorthand to refer to government actions taken as a *non-regulator* does not change the test that defines that dividing line—namely, whether the obligations were unilaterally imposed by the State and whether those obligations are enforceable through government-only means. *See also supra* Sec. IV.C.2. Plaintiffs' contrary suggestion—that only actions taken exclusively in proprietary role are outside the scope of preemption—cannot be reconciled with *Wolens*, which held the State could enforce an agreement that touched on the preempted domain, *because the agreement was voluntary*, even though state-court enforcement is far from market participation. *Wolens*, 513 U.S. at 222. Like that agreement, the CTP is not preempted; and no exception to preemption is required for Defendants to prevail.

*Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006) does not indicate otherwise. *See* US MSJ 19:7-28; OEM MSJ 24:15-17. In that case, the city had attempted to enforce the "agreement" through "its police and regulatory powers," 437 F.3d at 882—a means not available to private parties—thereby indicating the agreement carried the force and effect of

law. 437 F.3d at 882. Contrary to Plaintiffs' contentions, that outcome *confirms* the test established in every other case. *Supra* Sec. IV.C.2. And *Olympic Pipe Line* cannot be stretched to do more, particularly as it was based on an erroneous premise: that "[p]reemption is a power of the federal government, not an individual right of a third party that the party can waive." 437 F.3d at 883 (cleaned up). The Supreme Court effectively held the opposite in *Wolens* when it concluded that the airline's agreement to a term affecting its rates and services could be enforced—i.e., the airline had waived its right to avoid such enforcement. *See* 513 U.S. at 228. And if any doubt remained, the Supreme Court removed it, after *Olympic Pipe Line* was decided, instructing that preemption provisions "confer[] on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478-79.

**5.** Finally, citing to tort liability cases, OEM Plaintiffs argue that damages awards function as regulation and thus the prospect of damages for breach of the CTP makes that agreement a regulation. OEM MSJ 24:19-25 (citing *San Diego Bldg. Trades Council Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 239 (1959) ("tort based on an unfair labor practice"); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 508 (1992) (failure to warn). OEM Plaintiffs' argument is contradicted by one of these very cases which indicates that "a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a requirement imposed under state law." *Cipollone*, 505 U.S. at 526.[26] Moreover, even if tort damages or other common-law remedies might sometimes function as regulation, that cannot transform voluntarily assumed contractual obligations into regulations simply because damages might be available for breach. If it did, then nearly every contract ever written is a regulation. *See U. S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 338 (9th Cir. 1974) ( "normal remedy for breach of contract" is "damages").

[26] OEM Plaintiffs' citation to *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 608 (2011) is even more puzzling, OEM MSJ 24:25-25:1, as that case involved a duty imposed by state tort law (not an obligation voluntarily assumed by agreement). Moreover, the duty could not be satisfied without "the Federal Government's special permission," *PLIVA, Inc.*, 564 U.S. at 623, whereas manufacturers do not need EPA's permission to sell vehicles that emit *less* pollution than federal standards allow. Plaintiffs unsupported assertions to the contrary, OEM MSJ 25:11-12, do not change the law.

53

**V.    THE CHALLENGES TO THE MACs FAIL**

**A.    Plaintiffs Lack Standing to Challenge the MACs**

At this summary judgment stage, Plaintiffs must establish standing with "specific facts" supported by "affidavit or other evidence." *Lujan*, 504 U.S. at 561 (cleaned up). Yet, they cite no evidence of any injury from either the May or August MACs. *See* OEM MSJ 5:26-6:4 (citing only the MACs themselves); US MSJ 7:11-8:1 (same).[27] Plaintiffs cannot rely on a claim that they are the "object of the action," *Lujan*, 504 U.S. at 561, because they identify no action in the MACs of which *anyone* is the object. They assert that the MACs "mandate[d]" certification before sale in California. OEM MSJ 6:1-2, 17:7-8; *see* US MSJ 7:12-17. But that requirement was established by the Legislature in statute, *e.g.*, Cal. Health & Safety Code § 43151(a), not by CARB in a MAC. For the August MAC, Plaintiffs also point to CARB's reservation of rights it seeks to vindicate through litigation. OEM MSJ 6:3-4; US MSJ 7:17-21. However, Plaintiffs fail to explain, much less substantiate, how a reservation of rights that might be afforded by a future court order causes anyone injury. That reservation does not change the potential outcomes of litigation (or their likelihood). And, far from "threaten[ing]" anything, OEM MSJ 6:3; US MSJ 7:17, the August MAC indicates that CARB will decide whether or how it would exercise such rights "if and when that question becomes ripe," August MAC at 3. Finally, the United States points to CARB's statement that it will "consider" taking certain future actions, US MSJ 7:26, but that does not establish an action to which anyone is subject to, much less injured by, now.[28]

**B.    OEM Plaintiffs' Challenge to the May MAC Is Also Moot**

The May MAC expressly provided guidance as to model year 2026 only, and, as OEM Plaintiffs admit, has been superseded in any event. SUF ¶¶ 99, 101. OEM Plaintiffs point to no evidence establishing that the May MAC is having any effect. *See* OEM MSJ 5:27–6:4 (citing only the MAC itself). That moots their claim, as "there is nothing left to enjoin" or to declare invalid. *See Arc of Cal. v. Douglas*, 757 F.3d 975, 982 (9th Cir. 2014); PI Order at 29:18-19.

---

[27] Only OEM Plaintiffs challenge the May MAC.

[28] With an artful use of ellipsis, the United States mischaracterizes CARB's statement as concerning future "regulatory treatment," US MSJ 7:23-27, where the omitted text actually refers to "eligibility for procurement and other incentives," August MAC at 3.

OEM Plaintiffs have previously asserted the "voluntary cessation" exception to mootness applies. ECF 123 at 17:18:3. But where plaintiffs cannot show that the voluntary cessation arose "*because of* the litigation," this exception is unlikely to apply. *Pub. Utilities Comm'n of Cal. v. FERC*, 100 F.3d 1451, 1460 (9th Cir. 1996) (concluding petitioner's "arguments fail"); *Brach v. Newsom*, 38 F.4th 6, 12 (9th Cir. 2022) (en banc) ("State did not rescind its school closure orders in response to the litigation."). Here, the superseding MAC was issued "to address continuing questions" from regulated parties, SUF ¶ 102, not "to sidestep the litigation," *Brach*, 38 F.4th at 13. A passing reference to this litigation as one of several recent events does not establish otherwise. *See* August MAC at 1. Moreover, the undisputed facts demonstrate that "the challenged behavior cannot reasonably be expected to recur." *See Brach*, 38 F.4th at 12. In fact, OEM Plaintiffs identify no particular behavior begun or effectuated by the May MAC because, contrary to their claim, the May MAC did not establish California's pre-sale certification requirement. *Supra* at 54:9-12. Additionally, as OEM Plaintiffs concede, the August MAC "outlined several … 'pathways'" for certification that were not available under the May MAC. OEM MSJ 18:10-13; *see also* SUF ¶¶ 103, 104. CARB "has consistently" maintained those pathways since, and not through "mere statement of aspiration," *see Brach*, 38 F.4th at 13: it has pursued clarifying rulemakings and reissuance of the August MAC, thereby creating "procedural safeguards" against reversing course, *Fikre v. FBI*, 904 F.3d 1033, 1038-40 (9th Cir. 2018). There is simply no "evidence indicating that [the May MAC] likely will be reenacted." *See Brach*, 38 F.4th at 14. OEM Plaintiffs' claims against it are moot.

### C.    Neither the May Nor August MACs Is a Preempted "Attempt to Enforce"

Even assuming they had standing, OEM Plaintiffs' challenge to the May MAC and Plaintiffs' challenges to the August MAC fail on their merits. *See* OEM FAC ¶¶ 107-113; US FAC ¶¶ 115-118. Plaintiffs claim the MACs are preempted by the "attempt to enforce" language in Section 209. OEM FAC ¶ 109; US FAC ¶ 117. No form of this claim holds water.

An "attempt to enforce" a new motor vehicle emission standard, 42 U.S.C. § 7543(a), is a "command" concerning the emissions characteristics of certain vehicles that is "accompanied by sanctions" for failure to comply. *EMA*, 541 U.S. at 255. An attempt to impose "penalties for

55

violation" of emission standards qualifies, as can "steps preliminary to that action." *Id*. at 257. Neither MAC contains a "command" as to vehicle emissions characteristics, much less seeks to impose—or take steps toward imposing—penalties or other sanctions.

Plaintiffs assert that the MACs "announced," OEM MSJ 18:7-8, or "proclaimed," US MSJ 7:12-14, California's certification requirement. *See also* US MSJ 22:16-19. But, as OEM Plaintiffs admit, that requirement predates both MACs and was established by the Legislature, not by CARB. OEM MSJ 13:4-5; *see also supra* at 54:9-12. Thus, even if statutory provisions that prohibit "selling any new motor vehicle that is not covered by a" CARB certificate are a command, *EMA*, 541 U.S. at 253, neither MAC imposed it, SUF ¶ 105.

Similarly, as Plaintiffs elsewhere acknowledge, the penalties for violating this certification requirement are set by statute, not the MACs. OEM FAC ¶ 32 (citing Cal. Health & Safety Code § 43154(a)(1)). Neither MAC is a step toward imposing those sanctions; indeed, neither even mentions penalties. SUF ¶¶ 106, 107. Moreover, the process is fact- and manufacturer-specific and bears no resemblance to either MAC. As CARB explains, it first gathers information about a potential violation, might "issue a citation, notice of violation, or equivalent document" to a manufacturer, would discuss the matter with that manufacturer, and, as warranted and appropriate, initiate an administrative, civil, or criminal proceeding. Ex. 45 at 5-6; *see also e.g.*, Cal. Health & Safety Code § 43154(b) (authorizing civil suit). By contrast, a Manufacturers *Advisory Correspondence* is just that—a communication to *all* manufacturers. An advisory to "address continuing questions" from all manufacturers is simply not the initiation of a penalty proceeding. August MAC at 2.[29]

Finally, the assertion that the August MAC is an attempt to "retroactive[ly]" enforce standards falls flat. *See* OEM MSJ 16:27-17:4, 18:18-21; US MSJ 7:17-22. The August MAC plainly states that CARB will consider such issues "if and when that question becomes ripe." SUF

[29] This also distinguishes OEM Plaintiffs' cases, OEM MSJ 14:17-15:8, which each involve litigation, filed or imminent, to obtain damages or other remedies using state common law, tort law, and consumer protection law, respectively. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 509 (1992) (private complaint filed); *In re Office of Att'y Gen. of State of N.Y.*, 709 N.Y.S.2d 1, 4-5 (N.Y. App. Div. 2000) (investigation initiated by state and subpoenas issued); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 379-80 (1992) (notice of intent to bring state enforcement suit). Neither MAC initiates litigation or seeks any remedy.

56

¶¶ 108, 109. Far from a "step[] preliminary" to the imposition of penalties, the August MAC confirms CARB has not yet even decided to take such steps. *EMA*, 541 U.S. at 257. Remarkably, the United States contends that CARB's decision to be transparent about having deferred these decisions somehow "bullies manufacturers" into complying with CARB's Omnibus standards. US MSJ 22:11. But the United States fails to explain how a reservation of rights that would only materialize *if secured by court order* bullies anyone into anything. And, notably, no Plaintiff has submitted any evidence establishing this alleged bullying effect.

Nor do any of the United States' cases stand for the proposition that a reservation to exercise rights that might be secured through litigation is enough to "bully" anyone into a particular action. Instead, they involve challenges to regulatory or legislative actions *already taken* that directly threatened States with the loss of 100% of their Medicare funding, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012), or threatened taxicab drivers with the loss of 76% of their profits, *Metro. Taxicab Bd.*, 633 F. Supp. 2d at 99. If a reservation of rights creates an effective "mandate" like the ones in those cases, *id.* at 87, then every lawsuit filed is such a mandate, because the point of litigation is to preserve (and ultimately determine) legal rights.[30]

## VI.    OEM PLAINTIFFS' CHALLENGE TO THE EO FAILS

OEM Plaintiffs' challenge to the EO also fails on both jurisdictional grounds and its merits.

**1.** The EO presents no live case or controversy because it imposes no requirements on OEM Plaintiffs (or on any private party).[31] It "merely provides policy priorities and directives for state agencies and departments" to take "future actions." PI Order at 30:1-4; *see also* EO. OEM Plaintiffs are thus not "the direct object of" the EO and cannot rely on any presumption of injury. *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011). Yet, they point to no evidence establishing any injury from the EO, *see* OEM MSJ 19:7-20:20, and lack standing for this challenge, *Lujan*, 504 U.S. at 561. To the extent OEM Plaintiffs seek to

---

[30] OEM Plaintiffs' remaining authorities—cited generally, rather than in connection to any specific argument about the MACs (OEM MSJ 14:1-15:8)—likewise do not establish that a reservation of rights is an attempt to enforce anything.

[31] Executive orders issued in response to a state of emergency proclaimed under California's Emergency Services Act, Cal. Gov't Code § 8550 et seq., are distinct; those do have the force and effect of law and may regulate private conduct. Plaintiffs do not and cannot contend this EO is an *emergency* executive order.

challenge *future* agency actions that might (or might not) be taken in response to the EO, PI Order at 30:4, such claims are not ripe, *Texas v. United States*, 523 U.S. 296, 300 (1998). Any alleged injury from such future actions "is speculative and may never occur." *Stockton v. Brown*, 152 F.4th 1124, 1142 (9th Cir. 2025). Moreover, any such challenge would lie against the relevant agency for its implementing action, not against the Governor for the EO. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 933 (9th Cir. 2015).

**2.** The EO is also not an attempt to enforce preempted emission standards. *Contra* OEM MSJ 19:8-11. For one thing, the incentives contemplated by the EO fall within the market participant exception to preemption. *See EMA II*, 498 F.3d at 1040-41, 1043 (applying exception to Section 209(a)). The EO, for example, directs state agencies to prioritize manufacturers whose practices further California's air pollution reduction goals when those agencies make decisions about the State's own vehicle procurement and certain state-funded programs. EO at 1-3. That is classic market participant behavior. *EMA II*, 498 F.3d at 1045 (directions to state and local governments to procure vehicles "meeting specified air pollution criteria" constituted "direct state participation in the market"); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 809 (1976) (using state funds to incentivize private scrap processors fell within market participant exception). Plaintiffs cannot succeed on a preemption claim by pointing to directions intended to guide California's decisions about its own expenditures.

Plaintiffs' claim fails for the additional reason that the EO issues no "command" to manufacturers at all. *EMA*, 541 U.S. at 255. OEM Plaintiffs assert the EO "preserves" California's certification requirement, OEM MSJ 19:19, but that is just another way of admitting that "command," if it is one, pre-exists the EO, *supra* at 54:9-12. Plaintiffs then try to locate the necessary command in the EO's direction to state agencies to take certain future actions, OEM MSJ 19:22-20:20, but the commands preempted by Section 209(a) are those issued *to manufacturers* (whether directly or indirectly via commands to consumers), *EMA*, 541 U.S. at 255. Directions to state agencies to consider particular factors when designing future programs is no such command. It is likewise not a step toward the "imposition of penalties for violation" of emission standards. *Id.* at 257. Indeed, the EO makes no reference to regulatory penalties, *see* EO,

much less resembles the actual enforcement of those standards, *see* Ex. 45. Finally, the contention that future incentives might be "substantial" enough to create a "Hobson's choice" or "mandate" only highlights that this claim is not ripe, OEM MSJ 19:24-27, 20:14, because the scale and effect of any incentives cannot possibly be known at this time. OEM Plaintiffs concede as much by declining to produce a single manufacturer declaration describing the nature and power of these incentives that are purportedly irrefusable enough to require Omnibus compliance. *Id.* at 20:16.

## VII. THE GOVERNOR IS IMMUNE FROM OEM PLAINTIFFS' SUIT AND SHOULD BE DISMISSED

OEM Plaintiffs' claims against the Governor fail as a matter of law for the separate reason that all such claims here are barred by sovereign immunity. OEM Plaintiffs may sue the Governor in his official capacity for prospective relief *only if* he has a "connection with the enforcement of the [challenged] act" and that connection is "fairly direct." *Forward, Inc. v. Macomber*, 173 F.4th 1121, 1124 (9th Cir. 2026) (cleaned up). OEM Plaintiffs have failed to make this demonstration.

The vast majority of the conduct OEM Plaintiffs challenge has absolutely nothing to do with the Governor. Indeed, they mention the Governor only when discussing the issuance of the EO, an action they challenge in one of the discrete claims lumped into Count II as an "attempt to enforce" preempted standards. OEM MSJ 19:8-20:20. Plaintiffs have not, therefore, come close to establishing the requisite connection to the Governor for any claim other than the one against the EO.[32] And, as to the EO, Defendants have repeatedly shown the EO is not enforceable against OEM Plaintiffs at all. ECF 120-1 at 10:22-11:19; ECF 140 at 1:22-2:11. The EO contains a series of directives to *CARB*, as OEM Plaintiffs concede. *See* OEM MSJ 19:16-18 (the EO "directs CARB"). The execution of those directives *may* establish enforcement roles for other agencies down the road, but the Governor's issuance of the EO alone does not create a sufficiently direct connection between him and any enforcement to overcome sovereign immunity. *See Mesa Golfland, Ltd. v. Ducey*, No. CV-20-01616-PHX-JJT, 2020 WL 5632141, at *4 (D. Ariz. Sept.

---

[32] Moreover, Count I challenges several of CARB's regulations, and California law clearly provides that CARB, not the Governor, enforces those regulations. Cal. Health & Safety Code § 43013(a) (CARB "implement[s] motor vehicle emission standards."); *id.* § 43017 (CARB "may enjoin any violation . . . of any order, rule, or regulation of the state board."). Count III challenges the CTP and the Governor is not a party to that agreement, nor do Plaintiffs proffer any evidence that he can enforce it.

21, 2020) (Governor immune where executive order "will be enforced pursuant to the regulatory authority of" others); *United States v. Abbott*, 85 F.4th 328, 334-35 (5th Cir. 2023) (same).

Plaintiffs cannot cure this defect with references to the Governor "wield[ing] the State's procurement apparatus," *see* OEM MSJ 19:22-23, because any such control is insufficient as a "general supervisory power over the persons responsible for" that procurement. *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). OEM Plaintiffs notably "fail[] to identify any direct actions" that the Governor will take. *Forward, Inc*, 173 F.4th at 1125. Because OEM Plaintiffs cannot meet their burden of establishing *Ex parte Young*'s requirement as to the Governor, his sovereign immunity entitles him to dismissal of all claims.

## CONCLUSION

Defendants respectfully ask the Court to dismiss the Governor from this suit, to dismiss all claims against the 2036 Sales Requirements, the Phase 2 GHG regulations, the CTP, the MACs, and the EO for lack of subject matter jurisdiction, and to grant the remaining Defendants summary judgment on all remaining claims—unless the Court finds it has jurisdiction over OEM Plaintiffs' challenge to the Phase 2 GHG regulations, in which case those plaintiffs are entitled only to a prospective declaration that enforcement of those regulations is preempted by the Clean Air Act unless and until EPA waives preemption for those requirements.[33]

Dated:  June 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Defendants*

---

[33] Should the Court rule for Plaintiffs on the merits of an any of their disparate claims, Defendants respectfully request supplemental briefing as to remedy.

60