# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

DAIMLER TRUCK NORTH AMERICA LLC, INTERNATIONAL MOTORS, LLC, PACCAR INC, and VOLVO GROUP NORTH AMERICA LLC,

      Plaintiffs,

      v.

STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board; and GAVIN NEWSOM, in his official capacity as the Governor of California,

      Defendants.

THE UNITED STATES OF AMERICA, and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

      Plaintiffs-Intervenors,

      v.

CALIFORNIA AIR RESOURCES BOARD; and STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board,

      Defendants.

CASE  NO. 2:25-cv-02255-DC-AC

**DECLARATION OF DANIEL POTTER IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Gibson, Dunn & Crutcher LLP

DECLARATION OF DANIEL POTTER
CASE NO. 2:25-CV-02255-DC-AC

I, Daniel Potter, pursuant to 28 U.S.C. § 1746, state and declare:

1.    I am over eighteen years of age.  If called to testify in this matter, I can and will competently testify to the following facts, of which I have personal knowledge, personal experience, and personal participation in communications with business associates.

2.    I am a resident of Ann Arbor, Michigan.

3.    I have worked at Daimler Truck North America ("DTNA") or an affiliate since 2008.  I am the Director of Compliance and Regulatory Affairs at DTNA, a position I have held since 2026. Prior to this position, I worked for DTNA or its affiliates as a contract engineer on performance and emissions engineering (2008–2011), as a project engineer leading the engine diagnostics team (2011–2016), as a senior engineer leading the fuel systems software team (2016–2019), and as a manager in the Compliance and Regulatory Affairs department (2019–2026).

4.    I attended Lawrence Technological University, from which I received a B.S.E. in mechanical engineering, with a concentration in automotive engineering.

5.    DTNA, through its affiliated companies like Detroit Diesel Corporation, is a leading provider of medium- and heavy-duty engines and vehicles.  In my role as Director of Compliance and Regulatory Affairs, I am responsible for overseeing DTNA's product compliance with federal and state emissions regulations, including the regulations for heavy-duty vehicles and engines of the U.S. Environmental Protection Agency's ("EPA") and the California Air Resources Board ("CARB").  I am personally familiar with DTNA's model-year planning processes, its investments in zero-emission vehicle ("ZEV") technology, and the market and infrastructure conditions that affect DTNA's ability to comply with these emissions regulations.

6.    When California has a valid waiver of preemption for an emissions standard under Section 209(b) of the Clean Air Act, DTNA must obtain a certification from CARB each year for each class of products for initial retail sales.  A CARB certification is valid for one model year, which typically begins on January 1 of the calendar year for which the model year is named (e.g., model year 2026 began on January 1, 2026).  Engines or vehicles covered by that CARB certification can no longer be built after December 31st of the calendar year for which the model year is named (e.g., model year 2025 must be completed by December 31st, 2025, and model year 2026 builds must begin).

DECLARATION OF DANIEL POTTER
CASE NO. 2:25-CV-02255-DC-AC

Gibson, Dunn & Crutcher LLP

7.    In 2020 and 2021, CARB passed several emissions standards that applied to heavy-duty trucks and engines, including the Omnibus Low NOx regulation.  I am not a lawyer, but I understand that at the time these regulations were passed, none had waivers of preemption from EPA.  However, because CARB enforces regulations back to the state law adoption date, as soon as Omnibus Low NOx regulations were applicable under state law, DTNA had to undertake compliance efforts as if Omnibus Low NOx already had a waiver, or else risk being penalized retroactively for noncompliance if and when a waiver was granted.  As a result, DTNA obtained CARB certifications under Omnibus Low NOx in model years 2024 and 2025, even though Omnibus Low NOx did not have a waiver until January 2025 (at which point DTNA had already obtained its model year 2025 certifications).  *See, e.g.*, Ex. 1 (Executive Order A-290-0192-1 for DTNA's Model Year 2024 RDDXH12.8NXC Engine family showing CARB's enforcement of Omnibus standards).

8.    Omnibus Low NOx provided the industry with two years of lead time to comply with its stringent regulations, while the Clean Air Act requires new heavy-duty engine emissions standards to have at least four years of lead time for manufacturers.  Without relief or amendments, these regulations, including the lack of lead time, would have made it impossible for DTNA to sell certain engines in California starting in model year 2024. In addition, our engine suppliers also could not satisfy these more stringent requirements starting in model year 2024, leading to a potential lack of product for certain segments of the truck market, including the medium-duty market.  As mentioned, even though CARB did not have a waiver for Omnibus Low NOx when model year 2024 vehicles were certified and sold, because of CARB's practice of retroactively enforcing its rules for any period where they were operative as a matter of state law after receiving a waiver, DTNA was nevertheless pressured to comply with Omnibus Low NOx's model year 2024 standards.

9.    Omnibus Low NOx also presented problems for DTNA's future model years. As originally adopted by CARB, the Omnibus Low NOx standards required DTNA's heavy-duty diesel engines sold in California to meet a 20 mg/hp-hr NOx emissions standard starting in model year 2027. At the time the regulations were adopted, DTNA did not have an engine capable of meeting that standard.  *See* Ex. 2 (August 13, 2020 EMA comments to Omnibus regulation) at 43-44, 56-57; Ex. 3 (August 25, 2020 DTNA comments to Omnibus).  This is still true today.  By comparison, the Federal

2

Gibson, Dunn &
Crutcher LLP

NOx emissions standard in model year 2027 is 35 mg/hp-hr. DTNA will have products compliant with this standard in model year 2027.

10.    I have read Defendants' motion for summary judgment in this case, and understand that they argue that DTNA is not injured by many of the regulations and regulatory actions that underlie the lawsuit. This is incorrect. At minimum, DTNA suffers several ongoing injuries, as well as imminent threats of injury, that are caused by the challenged actions:

**Phase 2 GHG Standards:**

11.    CARB began requiring heavy-duty truck and engine manufacturers to certify to this standard starting in model year 2021 through model year 2024. CARB communicated its demand that manufacturers certify to this standard with Manufacturer Advisory Correspondence ("MAC") #2020-02, issued on October 16, 2020. I have personal experience of CARB staff requiring DTNA to seek Phase 2 GHG certification as part of the CARB Executive Order process, including participating in the creation of materials and submitting them to CARB for vehicle certifications starting in 2021 that showed compliance with CARB's Phase 2 GHG standards. I understand that Defendants in this litigation now assert that they will not seek to enforce CARB's Phase 2 GHG Standards until they have received a preemption waiver from the EPA. But CARB's past practices and public statements indicate that, once a waiver is granted, the agency will enforce its emissions standards back to state law adoption date (here, back to model year 2021), and nothing in their filing suggests to me that they do not intend to do so here.

12.    In addition, CARB's testimony in this case is that manufacturers must secure Executive Orders for their trucks. *See, e.g.*, Dkt. 147-3, ¶ 70. An Executive Order is issued by CARB to signify that a particular vehicle or engine family complies with CARB's requirements for sale in California during a given model year. Until model year 2025, Phase 2 GHG standards were the underlying GHG standards for truck Executive Orders. There are no other readily available standards for manufacturers to use in truck Executive Orders because the antecedent regulations (Phase 1 GHG standards at 17 C.C.R. § 95663) are no longer operative and cross reference regulations that no longer exist. DTNA is therefore forced to operate under the assumption that CARB will enforce this certification requirement again in the future. This manifests itself in DTNA being forced to invest significant

3

Gibson, Dunn &
Crutcher LLP

resources in product planning and design that will make compliance with CARB's Phase 2 GHG regulation achievable in the future, even though it is currently a preempted law. These investments are particularly necessary because we must design our vehicles to be compliant with the standards for all model years, on an ongoing basis, because we do not know if CARB will again enforce its Phase 2 GHG regulation, and the model year for which enforcement will begin.

13.    And even though CARB is currently permitting certification through the so-called "Federal Pathway," *see infra* ¶ 19, CARB continues to charge certification fees even for manufacturers that utilize this Federal Pathway. *See* Ex. 4 (June 17, 2026 MAC ECCD-2026-03).

**2036 ICE Ban (Advanced Clean Fleets):**

14.    CARB passed the 2036 ICE Ban as part of its Advanced Clean Fleets regulation in 2023. CARB has not received a preemption waiver for that regulation (including the 2036 ICE Ban). I understand that CARB asserts in this litigation that it will not enforce the ICE Ban until it receives a preemption waiver from the EPA. Even if CARB's assurance of non-enforcement was credited, DTNA is injured by CARB's adoption of the 2036 ICE Ban today. Converting to selling only ZEVs in California (and the states adopting this program outside of California under Section 177 of the Clean Air Act) requires DTNA to significantly restructure its product offerings and production facilities. Accordingly, to even possibly comply with the 2036 ICE Ban as of 2036, DTNA has already invested money and resources in design, production, and infrastructure to comply with this rule, and must continue to do so, given the potential that CARB will later enforce it.

**Clean Truck Partnership:**

15.    Even though DTNA makes independent decisions about the quantity and type of vehicles that it sells, and does so without regard to whether those decisions are compliant with any restrictive terms of the Clean Truck Partnership ("CTP"), DTNA suffers ongoing harm from the CTP. On the one hand, DTNA sent the Commitment Letter to the FTC to resolve that federal agency's investigation into the CTP signatories and whether implementation of the CTP following the CRA could result in antitrust violations. In addition, the DOJ issued a cease-and-desist letter to DTNA ordering the company not to comply with CTP or preempted rules. On the other hand, CARB has filed an action against DTNA to enforce the CTP, and therefore DTNA is caught between California and the

4

Federal Government, one of which insists that DTNA comply with the CTP, and the other insists that it cannot.  This regulatory uncertainty forces DTNA to guess at which sovereign it should follow, and to face potential fines, litigation, or other penalties if it guesses wrong.

16.    CARB's attempts to enforce the CTP will also cause DTNA harm.  Because CARB did not fulfill its obligation to align the model year 2027 Omnibus NOx standard with the Federal NOx standard, *infra* ¶ 23, the Omnibus NOx emissions standard for heavy-duty diesel engines in model year 2027 is 20 mg/hp-hr.  If forced to resume compliance with the CTP, DTNA would have to comply with this standard next year, pursuant to CTP Appendix B.  But as mentioned above, *supra* ¶ 9, DTNA does not currently have a product that would meet this threshold, and in my view, it is not technologically possible for DTNA to have such a product in time for model year 2027.  Therefore, it may not be possible for DTNA to continue to sell its heavy-duty trucks in California **at all** under enforcement of the CTP.  Even if compliance were feasible, DTNA would need to spend tens of millions of dollars to bring its vehicles and engines into compliance with the CTP's regulatory standards.

17.    Further, because the CTP mandates that DTNA sell a certain percentage of ZEVs , DTNA would be forced to attempt to sell a specific percentage of ZEVs regardless of customer demand. This could prove impossible, as demand for those trucks is on the decline.  My observation is that a lack of meaningful infrastructure is a significant barrier to our ability to sell ZEVs in higher volumes. According to Polk vehicle registration data, for example, industry-wide Class 8 heavy-heavy-duty truck ZEV adoption was approximately 3.0% in 2023, 2.8% in 2024, and 2.6% in 2025.  This is unsurprising, because there is currently little to no heavy-duty-accessible public charging available in the United States, including in California. The Department of Energy's Alternative Fueling Station Locator indicates that only 17 heavy-duty-accessible public EV stations with DC fast-charging ports exist nationwide, compared to over 120,000 conventional fuel stations.  U.S. Dep't of Energy, Alternative Fuels Data Center: Alternative Fueling Station Locator, https://afdc.energy.gov/stations#/find/nearest (last visited May 28, 2026) (filtered by electric stations in the United States with DC Fast chargers and class 7-8 vehicle accessibility);    NACS,    U.S.    Convenience    Store    Count, https://www.convenience.org/Research/Convenience-Store-Fast-Facts-and-

Stats/FactSheets/IndustryStoreCount (consumer stores that also sell motor fuels). Without public charging infrastructure, fleet owners are effectively required to purchase, install, and operate their own Electric Vehicle Supply Equipment at enormous expense. They must also start and end their journey at the same point (i.e., return to base operations), significantly limiting the utility of the vehicle. That is not of interest to many of our fleet customers, who have a much more user-friendly infrastructure for our other trucks and engines. Further, although DTNA *could* attempt to meet the ZEV sales ratios through the use of credits, DTNA only generates a small number of these credits currently. Purchasing credits from other manufacturers—for example, from the company Rizon (a ZEV-only manufacturer of light- and medium-duty trucks, which certifies its vehicles and therefore earns credits separately from DTNA)—poses many issues for DTNA. These issues include that the purchase of credits would be expensive for DTNA, and that credits may not be available for purchase in sufficient quantity to satisfy ZEV percentage requirements for certain classes of heavy-duty vehicle.

18. For all of these reasons, if forced to comply with the CTP the cost of DTNA's trucks would increase, and therefore complying with the CTP would come at the expense of DTNA's sales and customer goodwill.

**May and August MACs:**

19. CARB issued a MAC on May 23, 2025 (the "May MAC") and another MAC on August 25, 2025 ("August MAC"). The August MAC directs DTNA to seek certification for lawful sales in California through one of several "pathways," including certifying to preempted standards (e.g., Omnibus Low NOx and Advanced Clean Trucks, among others), through CARB's more recent "Emergency Rule" (which combines a series of outdated emissions standards from various eras for which CARB used to have waivers), or through the so-called "Federal Pathway," which allows DTNA's vehicles to be certified by CARB if they are certified by EPA. The August MAC explicitly notes that if CARB's preempted rules are ultimately found lawful, CARB may seek retroactive penalties for the sale of vehicles in California that nonetheless had valid certifications under the August MAC at the time they were sold. The August MAC thus harms DTNA in at least two ways. First, it is the document that instructs DTNA that it must continue to seek certifications for its new vehicles and engines sold in California, which even under the so-called Federal Pathway requires DTNA to pay

certification fees of over $1.2 million to CARB, undertake significant administrative expenses including preparing materials for submission to CARB, and subjects DTNA and its vehicles to various audit and testing requirements, all of which come at a meaningful cost, over the longer term.  Second, by expressly threatening retroactive penalties on DTNA, the August MAC puts DTNA in the position of facing the possibility of major future penalties for each vehicle it sells, even though each vehicle it sells is, at the time of sale, fully compliant with California and Federal law.

20.     The May MAC was superseded by the August MAC, but it too exposes DTNA to a risk of harm: Nothing stops CARB from re-issuing the May MAC (or a new, substantially identical future MAC), and thus DTNA remains subject to the real possibility that CARB again demands that DTNA certify its vehicles and engines to preempted state regulations.  Furthermore, both MACs, by insisting on CARB certification at all, deny DTNA its right to sell federally approved vehicles in California.[1]

**Executive Order N-27-25:**

21.     Executive Order N-27-25 ("EO N-27-25") instructs CARB to keep a list of heavy-duty truck manufacturers that certify their vehicles to CARB's preempted regulations.  It then instructs other California agencies to use this list to give preferential treatment to manufacturers that are on it.  These instructions include prioritizing these manufacturers for purchasing decisions, preferencing these manufacturers in state incentive programs, and providing these manufacturers with favorable regulatory treatment (described as "special considerations and flexibilities").  EO N-27-25 therefore harms DTNA because DTNA does not certify to the preempted regulations, and is not able to partake in preferential state incentive programs or to enjoy favorable regulatory treatment by CARB.

22.     CARB undertook certain obligations in CTP.  It has not fulfilled them.  In July 2025, the Board adopted  amendments to the Advanced Clean Trucks regulation.  In Appendix D of the CTP, CARB agreed to "work together [with OEMs such as DTNA] to resolve any issues that may warrant regulatory amendments to either the Omnibus or ACT regulations."  Dkt. 1-2, CTP, App'x D.    But CARB pursued the July 2025 amendments to the Advanced Clean Trucks regulation without first

---

[1] On April 30, 2026, CARB issued a new MAC re-issuing its August MAC, which affirmed that DTNA must seek CARB certification for its vehicles and engines, but may do so under the so-called Federal Pathway.  Even under the Federal Pathway, DTNA must pay to CARB certification fees.  Ex. 4 (June 17, 2026 MAC ECCD-2026-03).

7

Gibson, Dunn & Crutcher LLP

engaging in any substantive discussions with DTNA regarding the specifics of the proposed amendments. In fact, in response to CARB's proposal, DTNA expressly told staff, and commented in response to the rulemaking, that DTNA did not support the proposed modifications to the ACT. Ex. 5 (July 14, 2025 DTNA Comments on ACT Amendment). And indeed, CARB did not even submit this amended regulation to EPA for a preemption waiver. These amendments also ignored CARB's statement in the CTP that it would propose to modify Advanced Clean Trucks to lengthen the number of years a manufacturer has to make up a ZEV credit deficit from one year to three years. *See* Dkt. 1-2, CTP, App'x C. Instead, CARB limited the three-year credit deficit make-up period in significant ways, including by incorporating interim deficit make up limits in ways that significantly altered the "three year[]" deficit-make-up period contemplated in the CTP. *See* Ex. 5 (July 14, 2025 DTNA Comments on ACT Amendment) at 5.[2]

23. The CTP also obligated CARB to propose a rule change to substantially align the Omnibus regulation with the EPA's NOx rules. But CARB failed to fully comply with that commitment. Specifically, as part of the CTP, CARB staff committed to propose amendments to the Omnibus regulation that would generally align the emission standards, test procedures, and accompanying enforcement provisions for 2027 and subsequent model year engines and vehicles with the corresponding provisions in the EPA-NOx rule. As part of that proposal, CARB included a specific list of deviations and exclusions. *See* Dkt. 1-2, CTP, App'x B. Instead, however, in CARB's Emergency Rulemaking, CARB included many additional deviations from EPA's regulation.

24. The CTP also implicitly required CARB to seek an EPA preemption waiver for the Advanced Clean Fleets regulation. But CARB withdrew its request for an EPA preemption waiver of the Advanced Clean Fleets regulation without consulting DTNA, and I am unaware of any consultation with the other CTP signatories. Advanced Clean Fleets is a necessary corollary to the Advanced Clean Trucks regulation, and without Advanced Clean Fleets DTNA's customers will be unlikely to purchase the ZEV trucks mandated by Advanced Clean Trucks. *Supra* ¶ 17 (documenting low heavy-duty ZEV adoption rates). This problem was identified for CARB on at least May 20, 2025. *See* Dkt. 23-6 (May

---

[2] In May 2026, CARB announced a decision not to proceed with these amendments to the Advanced Clean Trucks regulation.

8

Gibson, Dunn & Crutcher LLP

20, 2025 EMA letter to CARB).

25.    This list of CARB's failures to abide by the commitments it made in the CTP is non-exhaustive.  Others include, for example, the failure to "actively promote further needed infrastructure development."  Dkt. 1-2, CTP, App'x D.

26.    Finally, I understand that CARB contends it can lawfully enforce its Emergency Rulemaking, because EPA's older waivers purportedly still operate on the regulations in the Emergency Rulemaking even after the Congressional Review Act revocation of EPA waivers.  But the regulations in the Emergency Rulemaking are not from a coherent set of prior CARB standards, and indeed in at least some instances they are technologically impossible for DTNA to comply with.  For example, the Emergency Rulemaking's substantive changes to on-board diagnostics (OBD) rules would cause significant problems for DTNA.  OBD systems detect problems with emissions controls when emissions exceed a certain level known as a "malfunction threshold."   In CARB's OBD regulations, many malfunction thresholds are not independently defined, but instead are calculated by multiplying or adding a factor to the applicable tailpipe emissions standard.  Because Omnibus significantly lowered the heavy-duty diesel NOx emissions standards, it also lowered the OBD malfunction thresholds based on those emissions standards.  However, CARB explained during the Omnibus rulemaking that it did not have evidence that OBD systems could "robustly detect failures at the lower emissions levels."  CARB Purpose and Rationale for Proposed Tit. 13 Reg. Order (released June 23, 2020) 36.  In other words, it was unclear if OBD systems would be able to tell a functioning emissions system from a failing one if the malfunction thresholds were derived from the new 50 mg/hp-hr (or lower) NOx standards.  As a result, Omnibus revised the OBD regulations to maintain future malfunction thresholds at "the same absolute emissions levels as engines currently certified" to the 200 mg/hp-hr NOx standard.  *Id.*

27.    However, the Emergency Rulemaking version of the OBD regulation does not have these important changes, and without these changes, it is unlikely that DTNA could design a compliant OBD system.  *Compare* Cal. Code Regs. tit. 13, § 1971.1(g)(5.2) (Omnibus OBD rules providing alternative malfunction thresholds for certain 2024 and subsequent model year engines in subsections 5.2.1.(D)–(E)) *with* Cal. Code Regs. tit. 13, § 1971.1.1(g)(5) (Emergency Rulemaking OBD criteria

9

Gibson, Dunn & Crutcher LLP

containing no such alternative thresholds).  Under the Emergency Rulemaking, DTNA would have to set OBD malfunction thresholds by multiplying or adding to the emissions standard to which the engine is certified.  However, starting in model year 2027, DTNA's heavy-duty diesel engines must comply with the federal NOx standard, which is 35 mg/hp-hr.  But CARB itself said in the Omnibus rulemaking that it lacked evidence that an OBD system could function correctly if malfunction thresholds are based on a reference point below 200 mg/hp-hr.  This means that, if forced to certify under the Emergency Rulemaking, DTNA would have a technologically impossible OBD malfunction threshold based on multiplying or adding a very low NOx standard, rather than the constant OBD malfunction thresholds that CARB adopted in Omnibus.

28.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on June 25, 2026 in Detroit, Michigan.



Daniel Potter

DECLARATION OF DANIEL POTTER
CASE NO. 2:25-CV-02255-DC-AC

Gibson, Dunn &
Crutcher LLP