# Exhibit 5

# DAIMLER TRUCK
## North America

July 14, 2025

Liane Randolph, Chair
California Air Resources Board
1001 I Street
Sacramento, CA  95814

**Re: Proposed Amendments to the Advanced Clean Trucks (ACT) Regulation and the Zero-Emission Powertrain (ZEP) Certification Test Procedure**

Daimler Truck North America (DTNA) appreciates the opportunity to reply to the proposed amendments as CARB attempts to find a way to resolve substantial product shortages in California.

DTNA is the largest producer of medium- and heavy-duty (M/HD) vehicles in North America. DTNA is developing and selling zero-emission vehicles (ZEVs); we are committed to providing our customers with a diverse lineup of technologies to suit their needs and applications, including zero-emission solutions. We currently offer battery electric school buses, walk-in van chassis (Class 5/6), as well as medium-duty (Class 6/7) and heavy-duty (Class 8) tractors for sale.

DTNA, in partnership with NextEra Energy and BlackRock, has established Greenlane, a joint venture dedicated to developing nationwide commercial public charging and hydrogen refueling infrastructure to support the needs of medium- and heavy-duty vehicles. The first site has been opened in Colton, CA. DTNA offers Detroit eFill, a charging solution designed for efficiency and compatibility and has an expert eConsulting team dedicated to supporting fleets with all aspects of deploying ZEV, including site design and interfacing with utilities.

<u>**M/HD ZEV Challenges**</u>

Despite the substantial effort to sell ZEVs in California, the demand for M/HD ZEVs has not developed sufficiently to match the percentages in the ACT. The single biggest factor inhibiting sales is a complete lack of adequate charging infrastructure to support commercial ZEVs. Construction and permitting delays continue to bog down site development in California, as acknowledged by the extensions granted to fleets in the Advanced Clean Fleets regulation, but not granted to manufacturers in the ACT.

Long lead utility upgrades continue to stall progress and recent utility developments show electric rates and ratepayer sentiment trending in the wrong direction to support fleet electrification. For example, Southern California Edison's General Rate Case (GRC) for Test Year 2025 (with energization in 2030+) should have concluded at the end of 2024. Ratepayer advocates pushed back against the proposed capacity additions, expressing significant concerns about rising electricity costs and the California Public Utilities Commission (CPUC) still has not issued a final decision in that case.

In parallel, Pacific Gas and Electric (PG&E) has filed its GRC, proposing to double subscription charges and overage fees. For example, a fleet depot with a 2MW service today, paying a $3,440 monthly subscription fee, would pay $6,220 under the proposed rates. This fee does not include the actual per kWh energy charge, which is also changing under the proposed rates. PG&E is proposing to increase off-peak and super off-peak rates to $0.203/kWh and $0.181/kWh, respectively. These increased electric

1

# DAIMLER TRUCK
### North America

rates significantly raise the total cost of ownership (TCO) of ZEVs in California and can make them financially infeasible for fleets to adopt. CARB staff should work closely with the state's utilities and CPUC to reevaluate vehicle TCO, the incentives needed to successfully transition fleets without overburdening ratepayers, and ensure that new capacity is being constructed to support the ZEV transition.

Although CARB advertises the health of the M/HD ZEV demand, its analysis is based on flawed premises. In a report on the preparedness of California for the ACT, CARB states that 1 in 6 M/HD vehicles sold today is a Zero Emissions Vehicle[1]. To make this statement, CARB combines Class 2b and 3 vehicles with heavier commercial vehicles.  Class 2b-3 vehicles are fundamentally different than heavier commercial vehicles, including Class 8 trucks and trailers, and are not interchangeable. These smaller vehicles are potentially more likely to achieve CARB's envisioned ZEV sales rates, in part because they can leverage infrastructure for light-duty vehicles. Class 2b-3 vehicles are often not even truly commercial vehicles – they can be pickup trucks, vans, even large SUVs – and are used primarily to transport passengers, making them more similar to the passenger car segment. CARB's own ACT credit summary[2] shows that, of the 18,473 M/HD ZEVs produced and delivered for sale in California, 17,225 of them were Class 2b-3 vehicles from only three manufacturers (Rivian, Ford, and GM). More than 90% of all ZEV deliveries in MY2023 were Class 2b-3 vehicles from these three manufacturers.

This stands in stark contrast to other vehicles regulated by the ACT rule – like Class 8 Tractors that can have combined weights of 80,000 pounds. CARB's analysis[3] of the success of the ACT in this category relies not on sales, but on incentive program vouchers – which may never end up resulting in an actual vehicle delivery. Effectively, CARB's analysis counts pickup trucks and vans and potential future orders as evidence that the rule is already successful – while heavy-duty data suggests that the rule reduces vehicle availability.

While there might be significant ZEV sales in the Class 2b-3 market, the data does not support CARB's expected demand for ZEVs in the heavier weight classes. This lack of demand can be seen in new-truck registrations in California. According to DTNA's analysis of S&P Global registration data:

- In 2024, ZEVs made up only 4% of California's new Class 4-8 Trucks (compared to the ACT's 9% requirement for this category).
- In the tractor category, ZEVs reached 6% in 2024. However, this doesn't account for the reduction in overall tractor volume. In 2024, total new tractor registrations in California were reduced by 38% compared to prior years. If California had typical Tractor sales volumes (~11,000 tractors per year in 2021-2023), the ZEVs sold in 2024 would have reached only 3.5% (compared to the 5% required by the rule).
- Current-model-year registration data shows a 77% reduction in new tractor registrations compared to 2023 – demonstrating that most of the tractors registered in California in 2024 are older stock – not impacted by the ACT or Omnibus.
- California Class 4-8 Straight Truck new vehicle registrations were not significantly reduced in 2024 compared to prior years. However, registration data shows that this is mostly due to

---

[1] "1 in 6 new trucks, buses, and vans in California are zero-emission," ww2.arb.ca.gov
[2] "Advanced Clean Trucks Credit Summary Through the 2023 Model Year", ww2.arb.ca.gov
[3] "Advanced Clean Trucks Compliance and Incentives Update," ww2.arb.ca.gov

# DAIMLER TRUCK
## North America

registration of older-model-year vehicles in California. New vehicle registration data in California shows a >50% reduction in current-model-year Class 4-8 trucks in 2024 compared to 2023 for Class 4-8 Trucks.

- Overall, California shows a 12% reduction in total new Class 4+ vehicle registrations, and a 66% reduction in current-model-year Class 4+ vehicles in 2024 compared to 2023.
- These trends are not evident in other states.

**Comparison of New Vehicle Registrations in California vs. Rest of U.S.**

| | | Reductions in New Vehicle Registrations - Calendar Year 2024 vs 2023 | |
|---|---|---|---|
| | | California | Rest-of-US |
| All vehicles Class 4-8 | All New Registrations | -12% | -3% |
| | Current-Model-Year Registrations | -66% | -15% |
| Class 7-8 Tractors | All New Registrations | -38% | -16% |
| | Current-Model-Year Registrations | -77% | -18% |
| Class 4-8 Trucks | All New Registrations | 0% | 6% |
| | Current-Model-Year Registrations | -55% | -4% |

Combined, these trends reflect a significant reduction in new vehicle sales in California that cannot be explained by macroeconomic effects and are most likely a result of the combined impact of the ACT rule and the Omnibus Low NOx rule in California. This trend is likely to worsen as the stock of older-model-year trucks and tractors is exhausted, and the required ZEV sales percentage increases. CARB's policies are having the effect of reducing available Class 4+ vehicle volume in California already.

CARB's proposal also fails to recognize the changes to the environment surrounding the sale of commercial ZEVs in the last several years. Federal incentive dollars for the manufacture and purchase of ZEVs have been frozen, and many have been eliminated. Federal support for infrastructure development is likewise paused. California's HVIP program has reduced eligibility, resulting in fewer fleets being able to afford to purchase ZEVs. CARB themselves have voluntarily withdrawn key parts of their Advanced Clean Fleets rule – which CARB had always intended as a critical support designed to complement the ACT rule. The premises that have surrounded the ACT rule have changed significantly, but CARB's proposal makes no changes to the underlying ZEV sales percentage expectations.  The gap between CARB's ZEV aspirations and commercial reality grows more and more stark.

DTNA appreciates the opportunity to provide feedback on the proposed amendments published by CARB and to help California develop solutions to better encourage demand for this new technology.

<u>**DTNA Feedback on the Proposed Advanced Clean Trucks Amendments**</u>

**CARB's proposed modifications are for a regulation that is now preempted under section 209(a) of the Clean Air Act.**

# DAIMLER TRUCK
## North America

On May 22, 2025, the U.S. Congress completed its proceedings under the Congressional Review Act (CRA) to vitiate the federal preemption waiver that EPA previously issued for CARB's ACT regulations. On June 13, 2025, the President signed that Congressional mandate.

By operation of law, ACT regulations are now preempted under section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a). Under the CRA, EPA cannot issue a waiver "that is substantially the same" without express congressional authorization. 5 U.S.C. § 801(b)(2).

As a result, in this rulemaking proceeding, CARB is proposing changes to a rule that lacks a preemption waiver and cannot receive a waiver in the future.  CARB should not adopt amendments to a rule that has no valid legal force.

If CARB proceeds with these amendments, notwithstanding the Clean Air Act's prohibition on any adoption or attempts to enforce without a federal preemption waiver, DTNA provides further comments on these amendments.

**CARB's proposed Credit Pooling mechanism addresses states that are preempted from enforcing the ACT.**

Other states are permitted by federal law to adopt and enforce California mobile source emissions standards that are "identical to the California standards *for which a waiver has been granted* for such model year." 42 U.S.C. § 7507. As discussed above, ACT's waiver has no force or effect as result of congressional action. Therefore, none of the opt-in states have the authority to adopt or enforce the ACT regulation – and any credit pooling mechanism cannot have force or effect in any state. CARB should not amend a rule in a manner that has no legal effect.

**The Clean Truck Partnership**

The recent CRA action terminates and preempts CARB's authority under the CAA to implement the ACT (and the Omnibus Low NOx) regulations. That Congressional action, which did not arise from any litigation or private party challenge to CARB's or EPA's preemption waiver authority,  undermines the viability and effect of the Clean Truck Partnership (CTP).

Regardless, the proposed amendments are inconsistent with Appendix D, paragraph G, of the CTP, which provides that "CARB, EMA and the OEMs mutually agree to work together to resolve any issues that may warrant regulatory amendments to either the Omnibus or ACT regulations." Here, CARB has proposed the amendments without first engaging in any substantive discussions with DTNA or EMA regarding the specifics of the proposed amendments, or whether those proposed amendments are acceptable to EMA and its members.

**CARB's proposed Credit Pooling mechanism is unlikely to increase ICE vehicle availability.**

To the extent that the ACT rule is in effect, if at all, DTNA believes that CARB's proposed constraints related to surplus credits, transfer limitations, and limited credit lifetime ultimately mean that any intended flexibility does not provide any practical relief. DTNA does not expect that OEMs will ultimately have a surplus of credits in any state; therefore, there will be no excess credits to transfer. DTNA does not

4

# DAIMLER TRUCK
## North America

believe that these changes will relieve product availability challenges in California or in any other state adopting and enforcing the ACT rule.

**CARB's restrictions on the "flexibility to make up a deficit" in 1963.3(b) limit manufacturer's ability to carry a deficit for multiple years.**

CARB provides a three-year period to make up a potential deficit. However, CARB places several limits on this flexibility that limit an OEM's practical ability to rely on it as a potential compliance path. Most importantly, CARB limits the net deficit to below 30% of the deficits generated the previous model year.

CARB provides an example of this limit. DTNA has expanded on this example to include accrued deficits in 2026 and 2027 and calculated an "effective ZEV sales %" requirement. The expanded example is included as Appendix A. The table below summarizes the "effective minimum ZEV % sales" for Class 6-7 Trucks to comply with the limits CARB sets in 1963.3(b).

**Extension of CARB example provided in 1963.3(b)**

| Model Year | Year's Deficits[a] | Required ZEV% Sales (Class 6-7 Trucks)[b] | Effective Minimum ZEV% Sales[c] |
|---|---|---|---|
| 2024 | 1000 | 9% | **0%** |
| 2025 | 1500 | 11% | **16%** |
| 2026 | 1700 | 13% | **12%** |
| 2027 | 2600 | 20% | **23%** |

a.) Deficits for 2024 and 2025 are set by CARB's example in 1963.3(b); 2026 and 2027 deficits are calculated to maintain roughly constant sales volume in 2026 and 2027

b.) From 1963.1 - assuming that all vehicles are class 6-7 trucks.

c.) Calculated to maintain complaince with 1963.3(b)

Although CARB agreed to "lengthen the number of years a manufacturer has to make up a deficit from one year to three years," the limitations CARB puts on these carryover deficits set a minimum ZEV sales percentage in the first year after a deficit. DTNA recommends that CARB instead provide three full years for a manufacturer to make up a deficit without interim limits, which would align with other emissions ABT programs.

Regardless, DTNA believes that an allowance to make up credits will not significantly improve product availability in California. If OEMs are not able to reach the ZEV sales required in a given model year, it is unlikely they will be able to over-comply in following years – especially because ZEV sales requirements increase over time. DTNA believes that manufacturers will not be able to reach the ZEV sales percentages required by the ACT without impacts to product availability – with or without the three-year makeup period. If the ACT rule remains in effect, DTNA recommends that CARB revisit the ZEV sales percentage

**DAIMLER TRUCK**
North America

schedule in 1963.1(b) to reflect the actual state of ZEV demand – especially for Class 4-8 Trucks and Tractors.

**CARB's definition of "Manufacturer" adds uncertainty about which manufacturer is responsible for ACT compliance.**

CARB removes the phrase "of record" from their definition of manufacturer. CARB added the "of record" clarifying text in the modifications to the ACT rule adopted by the Board on November 6, 2024, and now proposes to remove it. The removal of "of record" further complicates and reduces clarity for who is responsible for ACT compliance. This clarity is especially important in the commercial vehicle industry, where multi-stage manufacturing is common, and multiple entities might be considered a manufacturer. DTNA requests that CARB clarify this definition in a matter that makes responsibility clear. In 1963(b), CARB states that the regulation is applicable to "any manufacturer that certifies on-road vehicles" but doesn't state which certification is relevant, and excludes this "manufacturer that certifies" language from the definitions in 1963(c).

**CARB proposes several new unnecessary limitations on credit transfers.**

CARB proposes several new limitations in 1963.2(e) on how credits may be traded between manufacturers, and when they may be traded. These changes limit manufacturer trading activities and are not necessary. Manufacturers are not likely to trade credits in a way that would leave them with an unmet deficit, potentially resulting in penalties. For example, if a manufacturer cannot purchase ZEV credits when the vehicle is produced and delivered for sale, but instead must wait for 180 days after the conclusion of the model year, the manufacturer may not have the certainty they need to offer ICE vehicles they expect to offset with that credit. If CARB moves forward with these amendments, DTNA recommends CARB removes any limits on the timing or quantity of credits that may be traded.

**The proposed flexibility to make up a Class 7-8 Tractor Group net deficit favors smaller manufacturers.**

CARB recognizes the challenges industry faces in selling heavier-weight-class ZEVs, especially in the tractor space. As outlined above, emissions rules in California have led to a 66% reduction in current-model-year registrations of all Class 4+ vehicles last year – and ZEVs made up only 4% of Class 4+ registrations – even with this dramatically reduced ICE volume. This volume of ZEV sales cannot sustain a healthy heavy-duty vehicle market in California in upcoming model years. In 2026, 1 in 10 tractor sales will have to be ZEVs. By 2030, that rises to 1 in 3.

However, rather than adjust the unachievable sales percentage schedule for this group, CARB proposes to increase flexibility to allow some number of these vehicles to be offset by credits generated by ZEVs in the Class 2b-3 and Class 4-8 groups. As discussed above, Class 4-8 ZEV sales in California are also not meeting the minimum requirements in 1963.1(b), so no excess credits can be expected from this group. CARB's proposal, then, amounts to an allowance to use excess credits generated in Class 2b-3 to meet deficits in the Class 7-8 tractor category.

As discussed above, Class 2b-3 vehicles are fundamentally different than heavier commercial vehicles, and potentially more likely to achieve CARB's envisioned ZEV sales rates. Meanwhile, the above evidence

6

# DAIMLER TRUCK
## North America

shows it is not possible for the California market to support the level of ZEVs CARB has required in the Class 4-8 truck and Class 7-8 tractor groups. CARB's proposal would effectively require manufacturers of heavier trucks to purchase credits from manufacturers of smaller vehicles – essentially, a tax on the heavy-duty truck industry to subsidize the electrification of pickup trucks and vans. It also will continue to reduce Class 4-8 product availability in California, and increase the cost of vehicles sold there. DTNA believes this proposed change is an attempt to avoid the reality that California's ZEV demand cannot support the level of CARB's ZEVs requirements.

Additionally, CARB proposes a limit of 1,000 deficits per year to be made up using this approach. This 1,000 deficit number is arbitrary and places more constraints on larger manufacturers than it does on smaller ones. DTNA has calculated below the number of tractors that can be sold using credits from the truck category, which decreases year over year.

| Model Year | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|
| Maximum CA Tractor Sales Available Per OEM Using Credits from Trucks | 3200 | 2133 | 1600 | 1280 | 1066 | 914 | 800 |

Before the impact of the ACT and Omnibus Low NOx rules, registration data shows that DTNA averaged just over 4,000 new tractor registrations in California per year. Therefore, CARB's 1,000 deficits-per-year cap will limit DTNA's ability to use this flexibility as early as next year. Other OEMs which sell significantly fewer tractors in California will not be affected by this limit. International, by comparison, averages less than 600 new tractor registrations per year in California and will not be affected by this limit.

DTNA believes this proposed flexibility favors manufacturers of smaller vehicles – creating a new demand for their Class 2b-3 ZEV credits – and favors lower-volume manufacturers of larger vehicles—those not limited by the 1,000-deficit cap. The proposed 20% discount for these credits only increases the demand for credits from manufacturers of smaller vehicles – thereby further favoring some OEMs and creating an unlevel playing field.

CARB has failed to provide any rational justification for these unfair flexibilities, which create an uneven playing field and disproportionately impact certain OEMs—violating both the California Administrative Procedure Act and the Equal Protection Clause of the California Constitution.

**Proposed changes to minimum all-electric range (AER) undermine investments in ZEVs.**

CARB proposes to change the minimum all-electric range for vehicles to qualify for ZEV credits from 75 miles to 45 miles starting in 2030. This change undermines manufacturers' investments in the ZEVs and hybrid vehicles which have AERs of 75 miles or more, putting them at a competitive disadvantage to vehicles that meet the lower AER requirement. Additionally, this change runs contrary to the proffered benefit of the ACT on California's emissions inventory, by replacing some vehicles that would have had higher AER, or pure ZEVs, with vehicles that have lower AER, thereby increasing the vehicle miles traveled of the California fleets that are powered by combustion engines.

**CARB's ACT exemption for engines certified to 50 mg or less created an unlevel playing field and violated lead-time requirements of the Clean Air Act.**

# DAIMLER TRUCK
## North America

In the November 2024 amendments to ACT, CARB made amendments affecting vehicles "powered by new 2026 model year California-certified heavy heavy-duty engines that are certified at or below an applicable oxides of nitrogen exhaust emission standard or family emission limit of 0.050 grams per brake horsepower." Singling out engines certified to 50 mg/hp-hr ignores other technologies that have the same benefit to California emissions – namely, engines certified above 50 mg/hp-hr whose excess emissions are offset by the retirement of NOx emissions credits. Engines certified to 50 mg/hp-hr and engines certified to 100 mg/hp-hr with the retirement of credits equivalent to 50mg/hp-hr have identical emissions benefits to California, but only one technology is recognized by the ACT as exempt from generating deficits. CARB's action did not follow the lead-time requirements in the Clean Air Act, nor CARB's commitments to follow those requirements in the Clean Truck Partnership. This action has created a new and unavoidable disbenefit for some OEMs, and a new benefit for others, with no lead time for manufacturers to adequately adjust. DTNA believes that, at minimum, CARB must recognize all engines that have the same emissions benefits to California in the same way.

**The Clean Truck Partnership and the Omnibus Regulation do not allow CARB to certify Option 2 legacy engines in model year 2026.**

As discussed above, the continued effect and viability of CTP has been called into question by congressional action affecting CARB's waivers for ACT and Omnibus.  However, if CARB still considers CTP in effect—and therefore intends to honor its commitments in CTP—CARB cannot certify legacy engines under "Option 2" as described in CTP Appendix A and 13 C.C.R. § 1956.8(a)(2)(C)3.iv.2. in model year 2026 because no Option 2 legacy engines are eligible for sale in California in model year 2026.

The purpose of a CARB Executive Order is to allow a new motor vehicle or engine to be "offer[ed] for sale, introduce[d] into commerce, import[ed], deliver[ed], purchase[d], rent[ed], lease[d], acquire[d], or receive[d] . . . for use, registration, or resale *in this state*."  Cal. Health & Safety Code § 43151(a) (emphasis added).  Option 2 of CTP Appendix A as codified at 13 C.C.R. § 1956.8(a)(2)(C)3.iv.2 allows the sale of certain volumes of legacy engines in model years 2024 and 2025, and then provides: "No legacy engine sales are allowed in 2026 model year."

As documented in the Health and Safety Code, the enabling statute for CARB's certification program under state law, the Legislature has granted CARB the authority to certify vehicles to support the "special interest in assuring that only those new motor vehicles and new motor vehicle engines which meet this state's stringent emission standards and test procedures . . . are *used or registered in this state*."  Cal. Health & Safety Code § 43150 (emphasis added).  If an engine or vehicle is ineligible for sale in California under CARB's own regulations, the enabling statute does not provide CARB with authority to certify that engine or vehicle.  Thus, CARB cannot certify Option 2 engines, which are subject to a total California sales ban in model year 2026 under section 1956.8.

Furthermore, CTP itself indicates this is the correct interpretation of the Option 2 cap.  CTP provides in Appendix A that "CARB commits that it will initiate rulemaking . . . [t]o extend the legacy engine provisions flexibility *through 2026 MY (under option 1 only)* to allow manufactures to *certify* engines to the exhaust emission standards for NOx and PM" in 13 C.C.R. § 1956.8(a)(2)(C)3, provided that manufacturers offset NOx or PM deficits.  In this language, CARB made clear that the ability to *certify* engines in model year 2026 is a prerogative only of manufacturers who have elected Option 1, and that

8

# DAIMLER TRUCK
## North America

the "0 percent legacy cap in 2026" (CTP Appendix A) which bars the sale of Option 2 engines also prevents such engines from receiving CARB certification.

**Conclusion**

As discussed above, the recent Congressional Review Act action preempts CARB's authority to implement the ACT, and any subsequent amendments cannot receive a waiver from the EPA. The Clean Truck Partnership, to the extent it has any remaining effect, requires CARB to engage with OEMs on future amendments to the ACT rule, including those to address product availability and credits. CARB proposed these amendments without consulting DTNA or EMA regarding the changes. DTNA does not believe CARB's current proposed amendments were drafted in this spirit.

CARB's proposed amendments to the ACT lack adequate lead time and are not likely to significantly increase product availability in California. CARB's proposals create additional burden for OEMs, place unnecessary limits on how credits may be transferred and used, and create an unlevel playing field – providing advantages to OEMs that sell fewer vehicles in California, and effectively forcing manufacturers of large commercial vehicles to subsidize manufacturers of electric pickup trucks and package delivery vans through the purchase of credits. CARB's proposals do not provide adequate lead time or stability for manufacturers to plan their product portfolios, and introduce new incentives and disincentives that create new winners and losers. CARB's proposals also ignore the issue of federal preemption.

Simply put, CARB's proposed amendments try to address product shortages by further leveraging credits generated by electric pickup trucks and vans, rather than addressing the fundamental issue with the ACT – unrealistic ZEV penetration rates for heavier categories of vehicles. This amounts to an expectation for manufacturers of heavy-duty commercial vehicles to subsidize manufacturers of small ZEVs. DTNA believes that, to address product shortages in California, CARB should not proceed with these proposed amendments and instead reconsider the continuing viability of the ACT as a whole, including its expected ZEV penetration rates.

# DAIMLER TRUCK
### North America

**Appendix A**

**Extension of CARB example provided in 1963.3(b)**

| Model Year | Year's Deficits[a] | Required ZEV% Sales (Class 6-7 Trucks)[b] | Total Vehicle Sales (ZEV and ICE) to reach deficit number[c] | Maximum Net Deficits (30% of prior year deficits) | Net Deficits (current year plus prior year carryover) | Deficits that **Must** be Resolved per 1963.3(b)[d] | Deficits that **ARE** resolved | Deficits Carried Over to Next Year | Number of ZEV sales needed to offset the deficits that are resolved[e] | Effective Minimum ZEV% Sales[f] |
|---|---|---|---|---|---|---|---|---|---|---|
| 2024 | 1000 | 9% | 7,407 | n/a | 1,000 | - | - | 1,000 | - | **0%** |
| 2025 | 1500 | 11% | 9,091 | 300 | 2,500 | 2,200 | 2,200 | 300 | 1,467 | **16%** |
| 2026 | 1700 | 13% | 8,718 | 450 | 2,000 | 1,550 | 1,550 | 450 | 1,033 | **12%** |
| 2027 | 2600 | 20% | 8,667 | 0 | 3,050 | 3,050 | 3,050 | - | 2,033 | **23%** |

a.) Deficits for 2024 and 2025 are set by CARB's example in 1963.3(b); 2026 and 2027 deficits are calculated to maintain roughly constant sales volume in 2026 and 2027

b.) From 1963.1 - assuming that all vehicles are class 6-7 trucks.

c.) Calculated from the example Year's Deficits and the Required ZEV% Sales in 1963.1.

d.) Per 1963.3*b) provision that states "the net deficit must be reduced to below 30 percent of the deficits generated in the previous model year"

e.) Calculated number of Class 6-7 truck ZEVs that must be sold in MY to meet the maximum number of carryover deficits

f.) Calculated to maintain complaince with 1963.3(b)