ROB BONTA, State Bar No. 202668
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
DAVID M. MEEKER, State Bar No. 273814
SARAH M. PFANDER, State Bar No. 347902
CECILIA D. SEGAL, State Bar No. 310935
M. ELAINE MECKENSTOCK, State Bar No. 268861
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0299
  Fax:  (510) 622-2270
  E-mail:  Elaine.Meckenstock@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAIMLER TRUCK NORTH AMERICA, LLC; INTERNATIONAL MOTORS, LLC; PACCAR, INC.;** and **VOLVO GROUP NORTH AMERICA, LLC,**<br><br>Plaintiffs,<br><br>**THE UNITED STATES OF AMERICA**; and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**<br><br>Plaintiff-Intervenors,<br><br>v.<br><br>**CALIFORNIA AIR RESOURCES BOARD, STEVEN S. CLIFF**, in his official capacity as the Executive Officer of the California Air Resources Board; and **GAVIN NEWSOM**, in his official capacity as the Governor of California,<br><br>Defendants. | 2:25-cv-02255-DC-AC<br><br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:          The Honorable Dena Coggins<br>Trial Date:     Not Set<br>Action Filed:  August 11, 2025 |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

I.    Neither CARB's Certification Program Nor Its Emission Standards Are Preempted ........ 1

    A.    The Resolutions Are Unconstitutional, and the ACT, Omnibus, and ACCII Regulations Are Not Preempted ................................................................. 2

        1.    The Court has jurisdiction to consider Defendants' arguments ................. 2

        2.    The Resolutions are unconstitutional ........................................................ 6

            a.    The Resolutions are impermissible legislative adjudications ......... 6

            b.    The Resolutions violate the Tenth Amendment and structural federalism ................................................................. 9

            c.    The Senate impermissibly delegated its power under the Rules Clause ................................................................................ 10

    B.    Alternatively, the Recodified Regulations Are Not Preempted ........................... 12

        1.    The waivers authorizing enforcement of the recodified regulations remain operative, particularly if the Resolutions are valid ...................... 12

        2.    OEM Plaintiffs are incorrect that a new waiver is required ...................... 14

        3.    Plaintiffs are incorrect that a waiver is required for CARB to provide transparency about the potential consequences of ongoing litigation ................................................................................................ 17

II.    The Challenges to the 2036 Sales Requirement and Phase 2 GHG Regulations Should Be Dismissed; If They Are Not, Relief Should Be Limited to Preventing Enforcement Absent a Waiver ................................................................................... 18

    A.    The United States Is Not Injured by the 2036 Sales Requirement ....................... 18

    B.    OEM Plaintiffs Are Not Injured by the 2036 Sales Requirement or Phase 2 GHG Regulations ............................................................................................. 20

    C.    Plaintiffs' Challenges to the Promulgation of these Regulations Fail .................. 21

    D.    No Relief Is Available Here Regarding Future Waivers ..................................... 22

III.    The Challenges to the CTP Fail .................................................................................. 22

    A.    No Plaintiff Has Established Standing to Challenge the CTP ............................. 22

    B.    The CTP Preemption Challenges Fail on Their Merits ....................................... 24

        1.    The Clean Air Act's text forecloses these challenges ............................. 24

        2.    Plaintiffs' "proprietary mode" test misconstrues precedent and is inapplicable ........................................................................................ 27

        3.    Plaintiffs cannot save their claims by misconstruing the CTP's terms   30

IV.    The Challenges to the MACs Fail ................................................................................ 32

V.    OEM Plaintiffs' Challenge to the EO Fails ................................................................. 33

VI.    The Governor Is Immune from OEM Plaintiffs' Suit .................................................... 34

CONCLUSION ................................................................................................................. 34

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Airlines for America v. City and County of San Francisco*
  78 F.4th 1146 (9th Cir. 2023) ................................................................................. 28, 29

*Am. Airlines, Inc. v. Wolens*
  513 U.S. 219 (1995) ................................................................................................ *passim*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
  569 U.S. 641 (2013) ............................................................................................ 28, 29, 30

*Ardelyx, Inc. v. Kennedy*
  179 F.4th 947 (D.C. Cir. 2026) .................................................................................... 4

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.* (*AIAM*)
  208 F.3d 1 (1st Cir. 2000) ................................................................................. 24, 27, 30

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*
  733 F.3d 939 (9th Cir. 2013) ...................................................................................... 25

*Badgley v. United States*
  957 F.3d 969 (9th Cir. 2020) ...................................................................................... 16

*Bank Markazi v. Peterson*
  578 U.S. 212 (2016) ...................................................................................................... 8

*Black Diamond Asphalt, Inc. v. Superior Ct.*
  109 Cal. App. 4th 166 (2003) ...................................................................................... 26

*Brach v Newsom*
  38 F.4th 6 (9th Cir. 2022) ............................................................................................ 32

*Cal. Dump Truck Owners Ass'n v. Nichols*
  784 F.3d 500 (9th Cir. 2015) ...................................................................................... 16

*Cal. Expanded Metal Prods. Co. v. Klein*
  426 F.Supp.3d 730 (W.D. Wash. 2019) ................................................................ 20, 23, 33

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
  529 F.Supp. 2d 1151 (E.D. Cal. 2007) .......................................................................... 3

*Center for Biological Diversity v. Bernhardt* (*CBD*)
  946 F.3d 553 (9th Cir. 2019) ...................................................................................... 3, 4

*Close v. Sotheby's, Inc.*
  909 F.3d 1204 (9th Cir. 2018) ................................................................................. 21, 22

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*
  482 F.3d 1157 (9th Cir. 2007)................................................................................5

*Cox v. Gritman Med. Ctr.*
  170 F.4th 724 (9th Cir. 2026) ...............................................................................13

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*
  485 U.S. 568 (1988)................................................................................................8

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
  541 U.S. 246 (2004)........................................................................................17, 24

*FCC v. Consumers' Rsch.*
  606 U.S. 656 (2025)................................................................................................5

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
  561 U.S. 477 (2010)..............................................................................................11

*Freytag v. C.I.R.*
  501 U.S. 868 (1991)................................................................................................6

*Garcia v. San Antonio Metro. Transit Auth.*
  469 U.S. 528 (1985)........................................................................................6, 9, 10

*GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat.*
  *Ass'n*
  671 F.3d 1027 (9th Cir. 2012)...............................................................................31

*Gunter v. Janes*
  9 Cal. 643 (1858) ..................................................................................................24

*Hodges v. Snyder*
  261 U.S. 600 (1923)................................................................................................6

*Horne v. Dep't of Agric.*
  576 U.S. 350 (2015)................................................................................................9

*Immigration & Naturalization Service v. Chadha*
  462 U.S. 919 (1983)................................................................................................7

*In re Border Infrastructure Env't Litig.* (*BIEL*)
  915 F.3d 1213 (9th Cir. 2019)................................................................................5

*KalshiEX LLC v. Johnson*
  No. CV-26-01715-PHX-MTL, 2026 WL 1223373 (D. Ariz. May 5, 2026) ........20

**TABLE OF AUTHORITIES**
(continued)

**Page**

*La Union del Pueblo Entero v. Abbott*
604 F.Supp.3d 512 (W.D. Tex. 2022)...................................................................... 19

*Landor v. La. Dep't of Corr. & Pub. Safety*
146 S. Ct. 1931 (2026) ......................................................................................... 27

*Los Angeles Cnty. Bar Ass'n v. Eu*
979 F.2d 697 (9th Cir. 1992)................................................................................. 34

*McIntosh v. United States*
601 U.S. 330 (2024) ............................................................................................... 4

*Mobil Oil Expl. & Producing Se., Inc. v. United States*
530 U.S. 604 (2000) ............................................................................................. 26

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*)
627 F.2d 1095 (D.C. Cir. 1979) ..................................................................... *passim*

*Mount Graham Coalition v. Thomas*
89 F.3d 554 (9th Cir. 1996)................................................................................ 7, 9

*Mullin v. Doe*
No. 25-1083, 2026 WL 1825840 (June 25, 2026) ............................................. 3, 24

*Murphy v. NCAA*
584 U.S. 453 (2018)................................................................................ 10, 19, 21

*Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*)
583 U.S. 109 (2018).............................................................................................. 4

*Nat'l Pub. Radio, Inc. v. Trump*
827 F.Supp.3d 48 (D.D.C. 2026) ......................................................................... 33

*Nevada v. Skinner*
884 F.2d 445 (9th Cir. 1989)................................................................................. 6

*Nevada v. Watkins*
914 F.2d 1545 (9th Cir. 1990)........................................................................... 6, 10

*NLRB v. Noel Canning*
573 U.S. 513 (2014)......................................................................................... 5, 11

*NRG Power Mktg., LLC v. FERC*
862 F.3d 108 (D.C. Cir. 2017) .............................................................................. 9

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Olympic Pipe Line Co. v. City of Seattle*
437 F.3d 872 (9th Cir. 2006)......................................................................................... 29, 30

*Paramino Lumber Co. v. Marshall*
309 U.S. 370 (1940)............................................................................................................ 7

*Pennsylvania v. Wheeling & Belmont Bridge Co.*
59 U.S. 421 (1855)......................................................................................................... 6, 7

*Perez v. Mortg. Bankers Ass'n*
575 U.S. 92 (2015)............................................................................................................. 8

*Plaut v. Spendthrift Farm, Inc.*
514 U.S. 211 (1995)........................................................................................................... 7

*Ray v. Cnty of Los Angeles*
935 F.3d 703 (9th Cir. 2022)......................................................................................... 17, 21

*Robertson v. Seattle Audubon Soc'y*
503 U.S. 429 (1992)........................................................................................................... 8

*South Carolina v. Baker*
485 U.S. 505 (1988)................................................................................................. 6, 9, 10

*Spokeo, Inc. v. Robins*
578 U.S. 330 (2016)......................................................................................................... 19

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*
108 F.4th 1128 (9th Cir. 2024) ....................................................................................... 18

*TransUnion LLC v. Ramirez*
594 U.S. 413 (2021)......................................................................................... 20, 22, 32

*Trump v. Slaughter*
No. 25-332, 2026 WL 1855612 (June 29, 2026) ................................................................ 6

*United States v. Arizona*
641 F.3d 339 (9th Cir. 2011)........................................................................................... 19

*United States v. California*
824 F.Supp.3d 1079 (C.D. Cal. 2026) ............................................................................. 19

*United States v. Carolene Products Company*
304 U.S. 144 (1938)......................................................................................................... 10

Defendants' Reply in Support of their Cross-Motion for Summary Judgment (2:25-cv-02255-DC-AC)

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. City of Boston*
 No. CV 25-12456-LTS, 2026 WL 1493706 (D. Mass. May 28, 2026) ................................. 19

*United States v. Hawaii*
 No. CV 25-00179 HG-WRP, 2026 WL 1021227 (D. Haw. Apr. 15, 2026) ........................... 19

*United States v. King Cnty., Washington*
 122 F.4th 740 (9th Cir. 2024) ................................................................................................. 33

*United States v. Klein*
 80 U.S. 128 (1871) ...................................................................................................... 6, 7, 34

*United States v. Mattson*
 600 F.2d 1295 (9th Cir. 1979) ................................................................................................ 20

*United States v. Munoz-Flores*
 495 U.S. 385 (1990) ........................................................................................................... 5, 11

*United States v. Sherwood*
 312 U.S. 584 (1941) ................................................................................................................. 6

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*
 529 U.S. 765 (2000) ............................................................................................................... 19

*Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*
 475 U.S. 282 (1986) ............................................................................................................... 33

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, § 5, cl. 2 .................................................................................................... 11

**STATUTES**

5 U.S.C.
 § 551(1) ..................................................................................................................................... 3
 § 801(b)(2) ................................................................................................................................ 8
 § 805 .............................................................................................................................. 2, 3, 4, 5

42 U.S.C.
 § 7416 ...................................................................................................................................... 24
 § 7543(a) ...................................................................................................................... 22, 24, 25
 § 7543(b)(1) ...................................................................................................................... passim
 § 7543(b)(1)(A) ......................................................................................................................... 8
 § 7543(b)(1)(C) ................................................................................................................. 15, 22
 § 7602(k) ...................................................................................................... 24, 25, 26, 27
 § 7607(b)(1) .................................................................................................................... 16, 21

**TABLE OF AUTHORITIES**
(continued)

Page

44 U.S.C. § 903 ........................................................................................................ 11

49 U.S.C. § 32902(f) ................................................................................................. 3

**REGULATIONS**

Cal. Code Regs., Title 13, § 1956.8 ........................................................................ 17

**FEDERAL REGISTER**

49 Fed. Reg. 18,887 (May 3, 1984) ................................................................... 15, 16

59 Fed. Reg. 36,969 (July 20, 1994) ...................................................................... 14

74 Fed. Reg. 32,744 (July 8, 2009) ........................................................................ 15

75 Fed. Reg. 70,237 (Nov. 17, 2010) ..................................................................... 21

81 Fed. Reg. 95,982 (Dec. 29, 2016) ..................................................................... 16

87 Fed. Reg. 14,332 (Mar. 14, 2022) ..................................................................... 16

88 Fed. Reg. 20,688 (Apr. 6, 2023) ................................................................... 22, 30

90 Fed. Reg. 36,288 (Aug. 1, 2025) ....................................................................... 18

91 Fed. Reg.7,686 (Feb. 18, 2026) ......................................................................... 18

91 Fed. Reg. 28,463 (May 18, 2026) ...................................................................... 18

91 Fed. Reg. 43,154 (July 14, 2026) ....................................................................... 18

**CONGRESSIONAL RECORD**

171 Cong. Rec. S3047 (daily ed. May 21, 2025) .................................................... 12

171 Cong. Rec. S3140 (daily ed. May 22, 2025) .................................................... 12

**OTHER AUTHORITIES**

11 Williston on Contracts § 30:19 (4th ed. 2025) ................................................... 26

Defendants' Reply in Support of their Cross-Motion for Summary Judgment (2:25-cv-02255-DC-AC)

## INTRODUCTION

OEM Plaintiffs attack a multitude of state actions, seeking to end California's decades-old program for regulating harmful emissions from new vehicles sold in the State. After obtaining many of the benefits of the bargain, OEM Plaintiffs also seek to escape commitments they voluntarily made two years ago to the California Air Resources Board (CARB). The United States joins the fray on some (but not all) of these challenges.

OEM Plaintiffs' radical position that CARB lacks authority to require certification of vehicles before they can be sold in California should be rejected. All parties agree that CARB's certification program is not preempted if there are any enforceable CARB standards. There are. The congressional resolutions that targeted the waivers for the latest iteration of CARB's program are unconstitutional; those waivers remain valid; and that program is enforceable. If, however, the Resolutions are valid, then the previous iteration of CARB's program—with waivers unaffected by the Resolutions—is the operative one. OEM Plaintiffs have no credible argument that *neither* iteration can operate. The United States has notably abandoned that argument.

Plaintiffs' separate challenges to the 2036 Sales Requirement and the Phase 2 GHG standards fail because there is no risk of preempted enforcement and thus no injury from either regulation. The attack on CARB's promulgation of these regulations runs afoul of the statutory text and the Tenth Amendment. Plaintiffs also identify no evidence supporting standing to challenge the Clean Truck Partnership (CTP); and, regardless, voluntary agreements like this fall well outside the preemptive scope of Clean Air Act Section 209(a). Plaintiffs again fail to establish Article III jurisdiction for, and the merits of, any claim that CARB's advisory notices or an Executive Order's (EO) direction to state agencies are somehow attempts to enforce standards against manufacturers. Finally, the Governor is immune from OEM Plaintiffs' suit.

## ARGUMENT

**I.    NEITHER CARB'S CERTIFICATION PROGRAM NOR ITS EMISSION STANDARDS ARE PREEMPTED**

OEM Plaintiffs ask this Court to declare that *all* of CARB's regulations for new heavy-duty vehicles and engines are preempted and that CARB's decades-old program to certify those

Defendants' Reply in Support of their Cross-Motion for Summary Judgment (2:25-cv-02255-DC-AC)

vehicles and engines before they are sold in California must end. *E.g.*, ECF 167 (OEM Opp.) 5:10-12. This sweeping request must be denied. OEM Plaintiffs concede that California's pre-sale certification requirement is authorized so long as any state emission standard is not preempted. *Id.* at 13:25-14:3. As the United States has now effectively conceded, CARB continues to have emission standards that qualify. Certainly, there is a dispute about *which* iteration of CARB's program is enforceable. Defendants have shown that the latest iteration—including the Omnibus regulation—is not preempted because EPA indisputably waived preemption and the congressional resolutions (Resolutions) that purportedly disapproved those waivers are unconstitutional. Alternatively, if the Resolutions are constitutional, that would mean the earlier version of CARB's program (now recodified) remains enforceable, pursuant to previously granted waivers of preemption that the United States now concedes remain valid. Either way, CARB has *an* enforceable program; and its certification requirement is not preempted.

> **A.     The Resolutions Are Unconstitutional, and the ACT, Omnibus, and ACCII Regulations Are Not Preempted**

Plaintiffs contend Section 209(a) preempts the ACT, Omnibus, and ACCII standards because the Resolutions purported to nullify the applicable preemption waivers. But the Resolutions are themselves invalid because they are triply unconstitutional: they violate the separation of powers because they are legislative adjudications, ECF 147-1 (Def. Mem.) 21:5-23:16; they stem from extraordinarily defective political processes, *id.* at 23:17-26:22; and the Senate violated the Rules Clause to pass them, *id.* at 26:23-28:13. Because the nullifying Resolutions are invalid, EPA's waivers remain in effect and inoculate the ACT, Omnibus, and ACCII standards from preemption. Plaintiffs advance overlapping jurisdictional and merits arguments to defend the Resolutions' constitutionality, but each of those arguments fails.

> **1.     The Court has jurisdiction to consider Defendants' arguments**

Defendants showed why the CRA's jurisdiction-stripping provision, 5 U.S.C. § 805, does not apply. Def. Mem. 19:1-21:4. No Plaintiff disputes that this Court has jurisdiction to hear Defendants' argument that the Resolutions are impermissible legislative adjudications. Plaintiffs do assert that Section 805 and the political-question doctrine bar consideration of Defendants'

2

other two constitutional arguments. ECF 165 (US Opp.) 11:12-14:13, 17:1-3; OEM Opp. 5:22-6:8, 6:22-24; *see also id.* at 5:27-28. Plaintiffs are wrong on both counts.

**1.** The Ninth Circuit held in *Center for Biological Diversity v. Bernhardt* (*CBD*) that Section 805 lacks the clear statement necessary to preclude review of constitutional arguments. 946 F.3d 553, 561 (9th Cir. 2019); *see generally Mullin v. Doe*, 609 U.S. ---, 2026 WL 1825840, at *10 (June 25, 2026). Trying to skirt that holding, the United States characterizes Defendants' Rules Clause argument as "premised wholly on a statutory determination" as to whether preemption waivers are rules under the CRA." US Opp. 11:13-14, 11:20. Defendants do indeed argue (correctly) that waivers are not "rules," but their argument under the Rules Clause is not premised on that or on EPA's erroneous, contrary conclusion. Defendants contend that the Senate erred by delegating its power over rules of legislative procedure to the Executive Branch, when it voted to defer reflexively to an issuing agency's mere designation of its actions as rules. Def. Mem. 26:23-28:13. The gravamen of this constitutional argument is not that *EPA* was wrong to designate waivers as rules (although it was), but that *the Senate* was wrong to make EPA's designation dictate the Senate's procedure.

Regardless, Section 805 does not bar a defense premised on the proposition that waivers are not rules. Section 805 applies only to conduct under the CRA; any such conduct is conditioned on the presence of a Section 804 "rule"; and the waivers that EPA granted for ACT, Omnibus, and ACCII are not Section 804 rules. Def. Mem. 19:17-21:2. Conduct as to waivers is not conduct "under the CRA," 5 U.S.C. § 805, and is simply not covered by Section 805. Plaintiffs do not even try to rebut those showings.[1] Their Section 805 argument is left to rest on the "preposterous

---

[1] There is no "incompatib[ility]," OEM Opp. 6:24-28, between Defendants' position that *waivers* are not Section 804 rules and California's position that the *state emission standards* for which a waiver is granted are "motor vehicle standards of the Government" whose "effect … on fuel economy" the National Highway Traffic Safety Administration "shall consider" before issuing average fuel-economy standards under the Energy Policy and Conservation Act (EPCA), 49 U.S.C. § 32902(f). The latter proposition, which establishes that EPCA does not preempt emission standards for which a waiver has issued, rests on a close textual analysis of EPCA—not on the notion that state standards, or EPA's waivers, are federal-agency rules. *See Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F.Supp. 2d 1151, 1172-73 (E.D. Cal. 2007); Ex. F. California has never argued that the State or its agencies are "authorit[ies] of the Government of the United States," 5 U.S.C. § 551(1), that can issue federal rules within the meaning of the APA or CRA. *Contra* OEM Opp. 6:26.

3

position" that this jurisdiction-stripping provision forbids courts from determining whether the provision applies. *Ardelyx, Inc. v. Kennedy*, 179 F.4th 947, 955 (D.C. Cir. 2026) (quotation omitted); *see* US Opp. 12:10-12 ("[Section 805's] purpose … is to prohibit judicial review of th[e] very questions" whether "the CRA has been improperly invoked [or] misinterpreted."). The intersection between the question whether an agency action meets Section 804's definition of "rule" and the question whether Section 805 bars review of conduct respecting that agency action is not "circular[ity]," US Opp. 12:12, but the natural consequence of Congress linking federal jurisdiction to whether conduct occurred "under this chapter," 5 U.S.C. § 805. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.* (*NAM*), 583 U.S. 109, 124-25 & n.8 (2018) (deeming inapplicable a jurisdictional provision limited to agency actions taken "under" listed statutory sections because, despite the issuing agency's designation of one of those listed statutory sections as authorizing its action, that section did not in fact authorize the action).

The Ninth Circuit did not hold, in *CBD*, that courts lack the power to determine, based on their own independent judgment, whether challenged government conduct was "under [the] CRA." US Opp. 12:16-19 (quoting *CBD*, 946 F.3d at 564). The *CBD* plaintiff asserted that a disapproval resolution was unlawful—and could not support the agency's rescission of its rule— because the agency had failed to report that rule to Congress before it took effect. *CBD*, 946 F.3d at 564. The Court proceeded to "consider whether [Section 805] bar[red] judicial review," referencing an earlier Ninth Circuit decision interpreting a different judicial review provision to determine whether it applied. *Id.* at 563 (citing *In re Border Infrastructure Env't Litig.* (*BIEL*), 915 F.3d 1213, 1219-20 (9th Cir. 2019)). The Ninth Circuit easily concluded that the resolution fell within the ambit of Section 805 because Congress had acted "under" the CRA, regardless of the allegedly untimely report. *Id.* at 563. That conclusion is hardly surprising because "under" "is most naturally read to mean… 'pursuant to' or 'by reason of the authority of," *NAM*, 583 U.S. at 124 (cleaned up), and missing a deadline generally does not "deprive a public official of the power to take the action to which the deadline applies," *McIntosh v. United States*, 601 U.S. 330, 339 (2024). In other words, the agency's failure to timely submit its rule to Congress did not take that action—or the ensuing resolution—out from "under" the CRA. While this straightforward

4

proposition required little explication, had the panel intended to depart from the principle that courts interpret "jurisdictional bar … provisions" to determine their "scope," the court certainly would have said so. *See BIEL*, 915 F.3d at 1220. It did not. The Ninth Circuit did not imply, much less hold, that Section 805 bars courts from interpreting Section 805, from deciding whether there is a "rule" at issue to bring agency action "under" the CRA, or from addressing any argument that might touch on the CRA.

**2.** On the political-question doctrine, Plaintiffs again mischaracterize Defendants' arguments as "depend[ent] on an allegation that Congress violated or misapplied its own procedural rules for debating legislation." US Opp. 14:9-10; *see also* OEM Opp. 5:22-6:8. Defendants allege a violation not of Congress's own rules, but of the Rules Clause itself—as well as the Tenth Amendment and structural federalism.

The United States maintains "[t]here are no manageable judicial standards because the only relevant constitutional provision is the Rules Clause, which grants Congress exclusive power to determine the Rules of its Proceedings." US Opp. 13:8-10 (cleaned up). On the contrary, it is precisely that grant of exclusive power to make rules of legislative procedure that the Judiciary must enforce if it is to preserve the separation of powers. *Cf. FCC v. Consumers' Rsch.*, 606 U.S. 656, 672-73 (2025) ("distinguish[ing] between the permissible and the impermissible in th[e] sphere" of Article I's legislative powers). Though "the Constitution textually commits the question of legislative procedural rules to Congress," *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007), it commits the question of *the constitutionality of* legislative procedural rules to the Judiciary, *see NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014) ("'[A]ll matters of method are open to the determination of the Senate,' as long as," *inter alia*, "the [procedural] rule does not 'ignore constitutional restraints….'" (quoting *United States v. Ballin*, 144 U.S. 1, 5 (1892)).[2] The political-question doctrine does not preclude courts from policing violations of the Rules Clause or the limits that structural federalism and the Tenth Amendment put on the political process. In fact, the Supreme Court and

---

[2] The presumption of legality of legislative proceedings, OEM Opp. 6:3-8, does not apply where, as here, "a constitutional provision is implicated." *See United States v. Munoz-Flores*, 495 U.S. 385, 391 n.4 (1990).

5

Ninth Circuit have each adjudicated such political-process claims multiple times, concluding each time that the national political process *in that case* did not "operate in a defective manner." *South Carolina v. Baker*, 485 U.S. 505, 513 (1988); *see also Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 556 (1985); *Nevada v. Watkins*, 914 F.2d 1545, 1556-57 (9th Cir. 1990); *Nevada v. Skinner*, 884 F.2d 445, 452 (9th Cir. 1989).

This Court can entertain Defendants' arguments as to why the Resolutions are invalid.

### 2.    The Resolutions are unconstitutional

#### a.    The Resolutions are impermissible legislative adjudications

Defendants have shown that the Constitution outlaws legislation that merely nullifies an adjudicatory order; that waivers are adjudicatory orders; and that the Resolutions merely nullified waivers. Def. Mem. 21:5-23:16. In response, the United States relies on inapposite caselaw and attempts to read new language into the Resolutions. OEM Plaintiffs have no separate response.

The United States argues that legislative nullification of adjudicatory orders is acceptable where "public rights" or executive power is concerned. US Opp. 5:20-6:28. But *United States v. Klein*, 80 U.S. 128 (1871), the seminal case that invalidated a statute for usurping adjudicatory power, undercuts that argument. Congress there erred by overriding adjudication of a public right (to money compensation from the government) performed by the then-Court of Claims—a "non-judicial agenc[y]," *United States v. Sherwood*, 312 U.S. 584, 587 (1941), exercising what was, in all relevant respects, executive power, *see Freytag v. C.I.R.*, 501 U.S. 868, 912 (1991) (Scalia, J., concurring in part and concurring in the judgment); *see also Trump v. Slaughter*, 609 U.S. ---, 2026 WL 1855612, at *18 (June 29, 2026). The United States ignores *Klein* completely, and none of the later Supreme Court decisions on which it relies has overruled *Klein*.

The United States' cases are distinguishable because the statutes upheld as constitutional had prospectively *superseded*—rather than nullified or, as here, "disapproved"—an adjudication by changing the underlying law. In *Hodges v. Snyder*, the Supreme Court upheld a "curative act" that prospectively "legaliz[ed] and validat[ed]" the organization of a school district that a court previously declared unlawful. 261 U.S. 600, 602 (1923). In *Pennsylvania v. Wheeling & Belmont Bridge Co.*, Congress had prospectively "modified" a bridge's status "in the contemplation of

6

law," 59 U.S. 421, 430 (1855), such that the bridge "ceased to be"—not *never was*—the nuisance a court had declared it. *Klein*, 80 U.S. at 146. In *Mount Graham Coalition v. Thomas*, the Ninth Circuit found the statute at issue "reasonably susceptible to [a] prospective interpretation" under which it changed the law without "undoing past [court] judgments" regarding an administrative adjudication. 89 F.3d 554, 557 (9th Cir. 1996).

Lastly, in *Paramino Lumber Co. v. Marshall*, the Supreme Court upheld a statute that told an agency to reopen its adjudication of a worker's compensation claim so that new information could be considered in the adjudication; the statute did not "set aside [the agency's] judgment … or direct the entry of an award." 309 U.S. 370, 378 (1940). Owing to limits imposed by Article III, Congress had more leeway over the agency than over a court in a comparable position. *See id.* at 381 n.25; *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 232-33 (1995). But that does not mean Congress could have taken the further, far more intrusive step of *nullifying* a past agency adjudication, without altering the underlying law under which the adjudication is conducted. That step is tantamount to Congress executing, not making, law.

The United States says the Supreme Court "rejected a similar argument to [Defendants']" in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983). US Opp. 7:1. But the *Chadha* majority did not "reject[]" the claim that a one-House legislative veto breached the separation of powers. US Opp. 7:7. Deeming the veto sufficiently legislative in character as to require bicameralism and presentment, the majority did not reach the separation-of-powers issue. *See* Def. Mem. 22:22-28. The United States does not dispute the important distinctions between the legislative act in *Chadha* and the Resolutions in this case—namely, the distinctions between suspensions of deportation proceedings and preemption waiver grants. *See id.*; *see also Chadha*, 462 U.S. at 957 n.22 (agreeing with Justice White's description of the former); *id.* at 1001 (White, J., dissenting) ("[S]uspension of deportation is equivalent to a proposal for legislation.").

The United States observes that "[b]efore the Resolutions, [California's] regulations were not preempted because it had obtained a waiver, under Section 209(b) of the [Clean Air Act]," whereas "[a]fter the Resolutions, the regulations are preempted as a matter of law, *regardless* of whether California satisfies the criteria under Section 209(b)." US Opp. 10:19-22. But that

7

highlights the difficulty: Congress did not "alter[] the legal standards governing" EPA's adjudications; it just "direct[ed] the result[s]" of three that had already concluded. *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016). Each of the Clean Air Act's (unamended) criteria call for EPA "findings of fact or applications of law … to fact." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992); *e.g.*, 42 U.S.C. § 7543(b)(1)(A) (applying "arbitrary and capricious" review to State's "determination"); *see Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1120 (D.C. Cir. 1979) (describing limited "factual findings" EPA may make).

Defendants explained why the Resolutions are different than the (actual) CRA resolution the Ninth Circuit considered in *CBD*, which disapproved an (actual) agency rule that itself had changed the law. Def. Mem. 23:6-16. The United States responds that "agency rules do not and cannot amend statutes." US Opp. 10:28. Defendants never claimed otherwise, but agency rules can make new law without amending statutes. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the force and effect of law." (cleaned up)).

The United States claims that the Resolutions amended the law by "resolv[ing] the broad policy question of whether there should be nationwide standards for regulating motor vehicle emissions." US Opp. 8:15-16. But the text is the best evidence of statutory meaning, and the text of each Resolution said only that it "disapprove[d]" a particular EPA waiver. H.R.J. Res. 87, 88, 89, 119th Cong. (2025). Congress did not amend the Clean Air Act; it simply nullified three executory acts EPA had taken under that statute. Def. Mem. 22:16-23:3. The United States cites the prospective effect of a CRA resolution on an agency's rulemaking authority, US Opp. 10:22-24, but the Resolutions do not carry that effect because an EPA waiver is not a "rule," 5 U.S.C. § 801(b)(2). Def. Mem. 19:17-21:2. The United States cannot save the Resolutions by interpreting them inconsistently with the CRA's plain definition of "rule." *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (limiting constitutional-avoidance canon to situations where the avoidant construction of the statute is not "plainly contrary to the intent of Congress").

The United States does not dispute that waivers are adjudicatory orders, not rules, in the APA (and CRA) sense. But it argues that waivers are rules in the *constitutional* sense because the party "requesting a waiver is the State of California, not an individual with due process rights." US Opp. 8:3-6. Leaving aside the striking implication that the Constitution affords States less protection than natural persons against arbitrary Federal Government action, *but see infra*, Sec. I.A.2.b, there is no principled reason to distinguish rulemaking from adjudication based on the nature of the individual party whose right (or sovereignty) is at stake. All manner of adjudication can have massive importance for millions of people. *See, e.g.*, *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 110-13 (D.C. Cir. 2017) (discussing agency's adjudication of tariff for power system affecting utilities, generators, and millions of customers). What matters for the constitutional, as well as the statutory, understanding of an adjudication is that it concerns an individual party's rights under existing laws.

The United States claims "there is no relevant difference between saying 'the preemption waivers are disapproved' and 'the regulations are preempted.'" US Opp. 8:23-25. At most, that establishes that there might have been ways for Congress to accomplish its objective without constitutional difficulty. "The Constitution, however, is concerned with means as well as ends. The [Federal] Government has broad powers, but the means it uses to achieve its ends must be consistent with the letter and spirit of the constitution." *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) (cleaned up). The problem here is not that Congress "used the wrong words," but that it "could not constitutionally accomplish the result" of nullifying EPA's adjudications. *Mount Graham Coal.*, 89 F.3d at 557.

### b. The Resolutions violate the Tenth Amendment and structural federalism

Defendants detailed the extraordinary defects in the political process culminating in the enactment of the Resolutions. Def. Mem. 23:17-26:22. Those failings infringe upon the "special and specific position [States occupy] in our constitutional system," *Garcia*, 469 U.S. at 556; they render the resulting legislation "invalid under the Tenth Amendment" and structural federalism, *Baker*, 485 U.S. at 512. Rather than defend the political process used here, the United States tries

9

to undermine Defendants' argument by noting that no State has previously succeeded in bringing such a claim. US Opp. 17:7-22. But when the Federal Government "attempt[s] … to extend its authority in unprecedented ways" against States, that naturally gives rise to new or different federalism claims. *Murphy v. NCAA*, 584 U.S. 453, 471 (2018) (recounting "relatively recent[]" emergence of anti-commandeering principle). Indeed, the potential for the Federal Government to behave in unprecedented ways is precisely why "*Garcia* left open the possibility" of an extraordinary-defects claim. *Baker*, 485 U.S. at 512. Certainly, the Court hoped that "the solicitude" for States built into the national political process would carry the day in most, if not all, circumstances. *Garcia*, 469 U.S. at 557. But the Court also recognized that those protections might fail. *Baker*, 485 U.S. at 512. That two branches of the Federal Government have never previously ganged up on specific States and their chosen laws in this way does not somehow make the Government's actions constitutional.

Nor can the United States defeat this claim with a tally of who voted which way or who was able to make a statement on the floor of the House or Senate. US Opp. 17:23-18:1. As in *Garcia* and *Baker*, when Tenth Amendment challenges arise, they regularly attack legislation passed by majorities in Congress and signed by Presidents. That certain States were "outvoted" and bills became laws may not be enough to make out a political-process claim, *Watkins*, 914 F.2d at 1556-57, but being outvoted cannot be a barrier to a federalism claim—else, such claims would fail at the outset. And were there any doubt that this political-process claim is intended to protect States in the minority (who, by definition, will often be outvoted), the Court resolved it, *Baker*, 485 U.S. at 513, by citing to a footnote in *United States v. Carolene Products Company*, 304 U.S. 144, 153 n.4 (1938), that anticipated potential failures in "political processes ordinarily to be relied upon to protect minorities."

### c. The Senate impermissibly delegated its power under the Rules Clause

Defendants explained how, to pass the Resolutions while adhering to the filibuster and not directly overruling the Senate Parliamentarian, the Senate adopted a procedural rule that vests the Executive Branch with sole power to decide whether legislation introduced to disapprove agency

10

action that is not a "rule" under CRA Section 804 nonetheless comes in for extraordinary Senate procedures paralleling those set out in CRA Section 802 of the CRA. Def. Mem. 26:23-28:13. In this way, the Senate transformed an innocuous reporting requirement into a vehicle for agencies to direct legislative process. The Constitution forbids *any* amount of Executive Branch direction in this setting. *See* U.S. Const. art. I, § 5, cl. 2 (Rules Clause). And the flaw in the Senate process was not made harmless by legislation's enactment. *See Munoz-Flores*, 495 U.S. at 397 ("A law passed in violation of the Origination Clause" is "no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than … a law passed in violation of the First Amendment."); *contra* OEM Opp. 6:9-19.

The United States suggests that the only constitutional limitation on legislative process is that it must abide by bicameralism and presentment. US Opp. 16:19-21. But it cites no case for that striking stance, and there is none. The Rules Clause imposes "constitutional restraints" on the rules of legislative procedure, *Noel Canning*, 573 U.S. at 551 (quotation omitted), by keeping them in-Branch. The truism that "Congress made its own decision" to delegate some of its power over internal procedural rules to the Executive Branch, US Opp. 16:18-19, does not render the delegation any less offensive to the separation of powers. After all, if control over the delegation decision were the salient fact, there would be no nondelegation doctrine. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010) ("[T]he separation of powers does not depend on whether the encroached-upon branch approves the encroachment." (cleaned up)).

The United States spends far more time contesting Defendants' characterization of what happened on the Senate floor. Yet there is no better evidence of what happened than the evidence Defendants presented: "[t]he public proceedings of each House of Congress" that are "printed in the Congressional Record." 44 U.S.C. § 903; *see* Def. Mem. 25:9-26:3. That record is not mere "legislative history," US Opp. 15:7-8, because the question is not one of statutory construction, but of how the Senate acted. Under the United States' counter-recitation of the facts, the whole point-of-order maneuver was a bizarre and useless episode because the Senate decided for itself that the three waivers meet CRA Section 804's definition of rule.

It does not matter what individual Senators (or even a majority of Senators) thought about that legal issue. What matters for purposes of the Rules Clause is which procedure they enshrined. Senate Majority Leader Thune, who introduced the points of order, made his view plain: that agency actions "submitted to Congress [as] rules" are "eligible for consideration under the [CRA]," regardless of whether they meet the statutory definition. 171 Cong. Rec. S3047 (daily ed. May 21, 2025); *see also* 171 Cong. Rec. S3140 (daily ed. May 22, 2025) (Sen. Lankford). The Senate enshrined reflexive deference to the Executive on this matter of Senate procedure.

The United States depicts the debate as "not about whether the Senate would defer to the Executive, but about whether it would defer to GAO or instead decide for itself" whether to fast-track resolutions disapproving EPA waivers. US Opp. 15:20-22. In fact, it was about both. The Senate decided for itself to defer to the Executive Branch rather than GAO. And the Senate did not just "*consider*[] EPA's submissions when deciding on procedures for debating legislation," US Opp. 16:12-13 (emphasis added); it *reflexively deferred* to the agency's submissions. Congress is free to agree with the Executive Branch in determining how it should proceed, but the agreement cannot be that the latter decides. That was the unconstitutional agreement in this case.

## B.    Alternatively, the Recodified Regulations Are Not Preempted

If the Resolutions are valid and did disapprove the waivers for the most recent iteration of CARB's program, then the prior iteration remains enforceable (i.e., not preempted) because earlier waivers for those requirements remain operative. Def. Mem. 28:14-31:19. Nothing in Plaintiffs' responses undermines this core proposition. Indeed, the United States has now abandoned its argument that the earlier waivers have somehow become invalid, narrowing its challenge to attack *only* the litigation disclosure promulgated with the recodified regulations. *See* US Opp. 26:17-27:25. Both that narrowed challenge and OEM Plaintiffs' broader one fail.[3]

### 1.    The waivers authorizing enforcement of the recodified regulations remain operative, particularly if the Resolutions are valid

When EPA waived preemption for the pre-Omnibus iteration of CARB's program (now recodified), the emission standards in that program applied to all subsequent model years. Def.

---

[3] Because the permanent recodification rulemaking is underway, Defendants use the term "recodified regulations," not "emergency regulations." *See* Def. Mem. 16:14-20.

12

Mem. 29:1-14. The EPA waivers likewise had no end dates. *Id.* at 29:23-30:14. If the later waivers authorizing the Omnibus iteration are now invalid, the pre-Omnibus iteration remains authorized. *Id.* at 30:15-31:19. This is how iterative regulatory schemes work. *Id.* at 30:16-31:6.

The United States initially argued otherwise: that the recodified regulations required a new waiver. ECF 144-1 (US MSJ) 22:22-24:7. After Defendants demonstrated that the recodified regulations are simply the requirements that existed when EPA previously waived preemption, Def. Mem. 16:2-13, the United States abandoned most of that challenge. It now challenges only the disclosure language codified in CARB's Omnibus-iteration regulations—text explaining that future court orders may render those regulations retroactively enforceable. The United States argues this explanatory disclosure "is a preempted attempt to enforce Omnibus." US Opp. 26:18-19. That argument is wrong, *infra* Sec.I.B.3., but there is no way to understand this argument as a challenge to the pre-Omnibus iteration of CARB's program. Enforcing that iteration (the recodified regulations) cannot be an attempt to enforce the Omnibus iteration. Moreover, the United States nowhere maintains its argument that California needs a new waiver to enforce the recodified pre-Omnibus requirements. *See* US Opp. 26:15-27:25.[4]

The United States is correct to abandon that argument. Indeed, it has argued, in a separate case, that even earlier preemption waivers remain operative. RJN ¶ 4, Ex. C at 19 (arguing waivers granted as far back at 2009 are "legally effective at this time"); *see also* Ex. D (responding).[5] And the United States cannot dispute that the Resolutions—if they are effective— revived the pre-Omnibus iteration of California's program, having argued that consequence flows from disapproval resolutions. ECF 147-54 at 20 ("By disapproving the 2024 Rule, Congress

---

[4] The United States' sole reference to "pre-Omnibus" requirements, US Opp. 27:13-16, is befuddling both because elsewhere the allegedly objectionable "choice" concerns *Omnibus* and because the mixture of state and federal standards described is not a "choice" anyone need make. *See* Suppl. Lang. Decl. ¶ 30. Arguments made in passing (and in garbled form) are not preserved. *See Cox v. Gritman Med. Ctr.*, 170 F.4th 724, 732 n.1 (9th Cir. 2026).

[5] This separate case concerns EPA's June 12, 2026 announcement that it had reclassified four additional preemption waivers (not at issue here)—finalized between 2009 and 2024 as adjudicatory *orders*—into *rules* and submitted the waivers to Congress as such. RJN ¶ 1; Ex. A. California alleges that EPA's actions violate the APA and are ultra vires. RJN ¶ 3. OEM Plaintiffs filed a "Notice of Other Case," acknowledging that California's newly-file case and this one are not "related" under this Court's local rules but suggesting the two cases involve "overlapping subject matter and arguments." ECF 170 at 1:8-10. This case, of course, involves no APA or *ultra vires* claims. *Contra id.* at 2:5-6.

13

restored the 2020 Rule….”). OEM Plaintiffs still contest the latter point, OEM Opp. 10:15-11:14, but do so unavailingly. They do not establish that *judicial* equitable principles apply to *congressional* action, much less establish that the equities favor their preferred outcome. *Id.* at 10:15-28. Indeed, they cite no evidence of the "nonsensical result" or "absurd result" they describe from the recodified regulations. *See id.* at 10:24, 11:1; *see also* Suppl. Lang Decl. ¶¶ 23-32. And the claim that the Resolutions somehow revoked the entire waiver provision are belied by the plain text of the Resolutions. *Supra* 8:15-20; Def. Mem. 22:16-23:16.

The recodified regulations are not preempted.

### 2.    OEM Plaintiffs are incorrect that a new waiver is required

OEM Plaintiffs' additional arguments to the contrary are without merit.

**a.** OEM Plaintiffs' central theory is that the recodified regulations are "new sections" in the California Code of Regulations and therefore need a new waiver. OEM Opp. 7:5-9, 8:1-5. But a new waiver is not required simply because a requirement codified in section 1956.8 when preemption was waived has now been recodified as section 1956.8.1. *See* Def. Mem. 32:10-16. To the contrary, a new waiver is only required when the *standards*—not the section numbers—are "new or different." OEM Opp. 8:1-2 (quoting 43 Fed. Reg. 36,679, 36,680 (Aug. 18, 1978)).

In fact, standards are only "new or different" when they are substantively changed—e.g., become more stringent. Def. Mem. 32:1-20. Thus, when CARB extended an existing standard to additional model years that was not "new or different" and did not require a new waiver. *Id.* at 30:5-8 (citing 42 Fed. Reg. 1503, 1504 (Jan. 7, 1977)). It is not enough, then, if the recodification changed the "emissions standards that applied to model year 2026." OEM Opp. 8:21-22. The extension of an existing standard to an additional model year does the same. The question is whether the scale and direction of the change make the standard "new" or "different." 59 Fed. Reg. 36,969, 36,982 (July 20, 1994) ("if CARB *substantively* amends a rule…" (emphasis added)). And that makes perfect sense: extending (or restoring) pre-existing standards manufacturers have already met (or exceeded) is nothing "new."

OEM Plaintiffs admit, as they must, that the recodification rulemakings have accomplished just such a restoration. ECF 167-10 ¶¶ 119-120. To be clear, OEM Plaintiffs identify *no*

14

requirement that was not simply recodified from an earlier year's code. *See id.*[6] It is also undisputed that EPA waived preemption for these requirements for all subsequent model years. *See* ECF 167-10 ¶ 120; 165-1 ¶ 120; Lang Decl., ¶¶ 42-51. No further waiver is required.

**b.** OEM Plaintiffs then assert that the recodified regulations represent a "combination of separate superseded standards never before assessed by EPA in a single waiver proceeding." OEM Opp. 9:9-10. That does nothing to establish that any standard lacks a waiver and is preempted. Indeed, OEM Plaintiffs appear to misunderstand how waiver proceedings operate.

In accord with the statutory text directing first California and then EPA to consider "the State standards … in the aggregate," EPA considers California's *program*, not individual standards, in its waiver proceedings. 42 U.S.C. § 7543(b)(1); *see also*, *e.g.*, 49 Fed. Reg. 18,887, 18,890 (May 3, 1984) (rejecting "the theory that each standard must be analyzed in isolation"). Thus, when EPA waived preemption in 2016 and authorized enforcement of California's GHG standards for heavy-duty vehicles and engines (promulgated in 2014), Lang Decl., ¶ 42, EPA waived preemption for the State's program as amended to include those standards. That amended program (now recodified) is, by definition, a combination of standards for which EPA had previously waived preemption. *See*, *e.g.*, 74 Fed. Reg. 32,744, 32,749 (July 8, 2009) ("[EPA's analysis is] undertaken within the broader context of the previously waived California program."). It includes standards that pre-existed the 2016 waiver (the program for which EPA had previously waived preemption) and the latest amendments (e.g., the 2014 GHG changes). OEM Plaintiffs do not explain how this iterative process results in a combination of standards EPA has never "assessed." OEM Opp. 9:10.

Certainly, having already considered earlier iterations, EPA often focuses on whether the *changes* to "the previously waived California program" should alter its prior conclusions. *See* 74 Fed. Reg. at 32,749. Thus, for example, having determined that a prior iteration of California's program was feasible under 42 U.S.C. § 7543(b)(1)(C), EPA might, on the next request, consider

---

[6] OEM Plaintiffs' conclusory assertion that the *adoption* of the recodified regulations is preempted, OEM Opp. 7:7-9, fails on the plain text and because Congress cannot constitutionally dictate what laws States may or may not enact, Def. Mem. 38:1-39:11. Moreover, EPA waives "application of" all of Section 209(a), 42 U.S.C. § 7543(b)(1), and did so here.

15

only whether amendments to that program would render it infeasible, *e.g.*, 49 Fed. Reg. at 18,894 (considering whether new standard was compatible with pre-existing standard for a different pollutant). But EPA is still considering the changed *program* (i.e., the combination of standards previously considered plus the recent amendments). *See id.*[7]

    **c.** OEM Plaintiffs' final argument is the biggest stretch of all. They ask this Court to declare the recodified regulations preempted because, in their view, the regulations "are incompatible with the waiver provisions." OEM Opp. 9:23. This Court has no jurisdiction to decide that. Congress directed *EPA* to adjudicate *California's requests* for waivers. 42 U.S.C. § 7543(b)(1). OEM Plaintiffs purport to question the protectiveness of California's program, OEM Opp. 10:1-9, 10:23-11:2, but that criterion requires *EPA* to apply "arbitrary and capricious" review to "the determination *of the State*," 42 U.S.C. § 7543(b)(1) (emphasis added).[8] Judicial review of EPA's conclusion can occur only in the appropriate court of appeals. *Id.* § 7607(b)(1). There is no role for this Court. *See Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 510 (9th Cir. 2015).

    Moreover, EPA has asserted that it can reconsider a previously granted waiver "to address … factual circumstances or conditions related to the waiver criteria [that] have changed so significantly that the propriety of the waiver grant is called into doubt." 87 Fed. Reg. 14,332, 14,334 (Mar. 14, 2022). That EPA has not done so here belies OEM Plaintiffs' claim that these previously granted waivers have become "incompatible" with the protectiveness criterion. *See* OEM Opp. 9:23, 10:1-9. Nor could OEM Plaintiffs' assertions about oxides of nitrogen from heavy-duty trucks meet the burden "parties opposing [a] waiver request bear[]," *MEMA I*, 627 F.2d at 1121, because protectiveness is assessed by "*the State*" looking at "the State standards … *in the aggregate*." 42 U.S.C. § 7543(b)(1) (emphasis added). It is not assessed by OEM Plaintiffs

---

[7] This remains true even when EPA's decision does not speak to every previously waived element of California's program. California's requests are "presumed to satisfy the waiver requirements" and "the burden of proving otherwise is on whoever attacks them." *MEMA I*, 627 F.2d at 1121. EPA will thus address concerns about the "combination of … standards" at issue, *see* OEM Opp. 9:9, if waiver opponents present evidence of them. *E.g.*, 81 Fed. Reg. 95,982, 95,985 (Dec. 29, 2016) ("EPA received no comments.").

[8] Plaintiffs also make an entirely conclusory argument about the third criterion, OEM Opp. 9:23-26, which waives the argument, *see Badgley v. United States*, 957 F.3d 969, 978-79 (9th Cir. 2020). Regardless, *all* the criteria are outside this Court's jurisdiction.

16

based on *one standard* for one pollutant for one type of vehicle. *Id.*; *MEMA I*, 627 F.2d at 1110 n.32. Congress afforded district courts no role in that analysis in any event.

### 3. Plaintiffs are incorrect that a waiver is required for CARB to provide transparency about the potential consequences of ongoing litigation

Having abandoned its challenge to the restored standards in the recodified regulations, the United States argues that the prefatory text CARB added to other code provisions constitutes an "attempt to enforce Omnibus" and requires a waiver. US Opp. 26:16-19. OEM Plaintiffs join, though with no substantive argument. OEM Opp. 7:12-14. Plaintiffs are wrong.

The text to which they object states that if a court declares the Resolutions are, regulated manufacturers could become subject to the requirements covered by those waivers "to the extent consistent with the court's final ruling." *E.g.*, Cal. Code Regs., tit. 13, § 1956.8. All this does is inform the public, including regulated parties, of two things: (1) that there is ongoing litigation that will decide which iteration of CARB's vehicle emissions program is enforceable; and (2) that because a favorable court decision for California would "explain[] what the law always was," the Omnibus iteration of CARB's program could be placed in effect retroactively. *See Ray v. Cnty of Los Angeles*, 935 F.3d 703, 714 (9th Cir. 2022).

"[T]elling manufacturers that they may not be able to rely on" compliance with the recodified regulations if the Omnibus regulation is determined to have been enforceable all along is not an attempt to enforce Omnibus. US Opp. 27:3-4. It is a simple statement of how judicial decisions operate. Courts declare "what the law always was," *Ray*, 935 F.3d at 714, and their decisions have retroactive effect, even compelling retroactive compliance during periods when the challenged law had been vacated by a lower court, *id.* at 714-15 (requiring payment of retroactive overtime compensation). Parties to litigation are presumed to be "well aware" of this and thus of the risks of opting for non-compliance during litigation. *Id.* at 715. CARB's decision to ensure regulated parties—and the public—are equally aware of this risk (which exists regardless of CARB's disclosure) is far from a "step[] preliminary to" the imposition of penalties for violating the Omnibus regulation. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.* (*EMA*), 541 U.S. 246, 257 (2004) (interpreting "attempt to enforce"). Indeed, the prefatory text

17

does not even make it more likely that enforcement will occur because, as the text indicates, that will only happen *if a court order allows it*.

## II. THE CHALLENGES TO THE 2036 SALES REQUIREMENT AND PHASE 2 GHG REGULATIONS SHOULD BE DISMISSED; IF THEY ARE NOT, RELIEF SHOULD BE LIMITED TO PREVENTING ENFORCEMENT ABSENT A WAIVER

No Plaintiff has standing to challenge the 2036 Sales Requirement or Phase 2 GHG regulations (which only OEM Plaintiffs challenge). These regulations are not being enforced and will not be enforced while they remain preempted—i.e., unless preemption is waived.[9] And "the mere existence of [a regulation], which may or may not ever be applied to [anyone], is not sufficient to create a case or controversy within the meaning of Article III." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1142 (9th Cir. 2024) (cleaned up).

### A.    The United States Is Not Injured by the 2036 Sales Requirement

The United States has pointed to no evidence of any injury to itself from the 2036 Sales Requirement. Its sole declaration contains general statements about "regulatory certainty" and "the possibility of multiple competing and potentially conflicting standards disrupt[ing] EPA's" rulemakings. US Opp. 3:23, 3:26-28 (quoting Szabo Decl., ¶¶ 13, 17). These general statements do not establish that any disruption has occurred (or will occur), much less connect any disruption to the 2036 Sales Requirement. Moreover, EPA has recently proceeded with numerous rulemakings without a hint of disruption from this (or any other) CARB regulation. Ex. E at 1; 90 Fed. Reg. 36,288 (Aug. 1, 2025); 91 Fed. Reg. 7,686 (Feb. 18, 2026); 91 Fed. Reg. 28,463 (May 18, 2026); 91 Fed. Reg. 43,154 (July 14, 2026). The number and scale of EPA's proposed and finalized changes to its own regulations also bely the claim that "regulatory certainty" is of some paramount importance to the United States. *See* Szabo Decl., ¶¶ 18-19.

In any event, both EPA and the relevant industry have been subject to the "uncertainty" that CARB might promulgate regulations, and then obtain preemption waivers, for more than half a century—pursuant to Congress's design. Def. Mem. 3:5-28, 7:9-24. Staying that course does not

---

[9] Far from "insist[ing] on implementing" this requirement, US Opp. 2:5-6, CARB has proposed regulatory text stating it will not enforce the Phase 2 GHG standards without a waiver, Suppl. Lang Decl., ¶¶ 13-14, while stipulated court orders prevent such enforcement of the 2036 Sales Requirement, Def. Mem. 34:19-22.

18

alter "the regulation of interstate commerce," US Opp. 3:3; *see also id.* at 4:3-4; cannot disrupt an alleged "national uniformity" that never existed, *id.* at 2:23; and has no impact whatsoever on "the United States' ability to enforce federal law," *id.* at 3:6-7. The United States cannot point to a single piece of evidence establishing any of these effects, or  "widespread injuries to the general welfare," *id.* at 4:14-15, or any other "concrete *and* particularized" injury from the 2036 Sales Requirement, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 334 (2016) (cleaned up, emphasis original).

Instead, the United States advances a dramatically expansive view of sovereign injury under which the Federal Government experiences such an injury from every state law it believes is preempted. US Opp. 1:25-2:1, 2:3-3:15. Tellingly, the United States asserts that "no binding authority" *refutes* this theory. *Id.* at 1:25-26. That, of course, does not make this novel theory valid. And multiple courts have rejected it. *United States v. City of Boston*, -- F. Supp. 3d. --, No. CV 25-12456-LTS, 2026 WL 1493706, at *9 (D. Mass. May 28, 2026) (rejecting "essentially limitless view of sovereign injury"); *United States v. California*, 824 F. Supp. 3d 1079, 1083 (C.D. Cal. 2026) (similar); *United States v. Hawaii*, -- F. Supp. 3d --, No. CV 25-00179 HG-WRP, 2026 WL 1021227, at *6 (D. Haw. Apr. 15, 2026) (similar).

Notably, the United States has no binding authority *supporting* its automatic-injury theory. Instead, it strings together no fewer than seven diverse and inapposite cases, US Opp. 2:7-20, to attempt to establish the proposition about which there is supposedly "no question," *id.* at 2:5. But cases in which the United States alleges a defendant violated federal law do not support standing to bring this preemption challenge. *E.g.*, *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000); *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 520 (W.D. Tex. 2022). Preemption provisions do not "operate directly on States." *Murphy*, 584 U.S. at 478. States thus do not *violate* federal law when they enact state laws that the United States believes to be preempted; nor does the United States "enforce federal law" in a preemption case. *Contra* US Opp. 3:6-7; 3:16-18. Equally inapposite are preliminary injunction cases in which, while balancing the equities, courts assert that it is not "*in the public's interest*" for a State to enforce a law that is likely preempted. *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (emphasis original), *aff'd in part, rev'd in part and remanded*, 567 U.S. 387 (2012); *accord*

19

*KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373, at \*8 (D. Ariz. May 5, 2026). None of these cases hold that the United States has standing every time it alleges preemption or that it has standing to challenge a purportedly preempted state regulation that is *not being enforced*. Tellingly, the United States makes no effort to explain how its expansive theory of sovereign injury applies specifically to the 2036 Sales Requirement. The United States must demonstrate standing for each claim and form of relief, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), like other plaintiffs, *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979). It has not done so for this claim.

### B.    OEM Plaintiffs Are Not Injured by the 2036 Sales Requirement or Phase 2 GHG Regulations

OEM Plaintiffs also failed to establish injury from standards that will not be enforced unless they are not preempted. Def. Mem. 34:15-25, 37:6-13. This failure cannot be cured on reply. *Cal. Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d 730, 743 (W.D. Wash. 2019) (striking new evidence that "should have presented in [the] opening brief"). Regardless, none of OEM Plaintiffs' new declarations establishes an injury caused by preempted enforcement of either the 2036 Sales Requirement or the Phase 2 GHG regulations. Only two declarants even mention either of these regulations, and they claim to be injured by the possibility that CARB will receive a waiver for these requirements in the future. *E.g.*, ECF 167-1 ¶ 11 (claiming injury from conduct that would occur "once a waiver is granted"). To obtain relief on their preemption claims, however, OEM Plaintiffs must establish injury from *preempted conduct*. The possibility that CARB might enforce these requirements *when it is not preempted from doing so* does not count.[10]

OEM Plaintiffs' complaints about being "in the untenable position of making a prediction on the regulatory framework" do not cure this fatal defect. ECF 167-9 ¶ 7; *see also* ECF 167-1 ¶ 14; OEM Opp. 23:12-14; 23:15-21. Far from being untenable, this "position" is a long-standing feature of the statutory regime Congress designed, whereby California establishes standards; California determines that its standards are "at least as protective" as EPA's; California requests a

---

[10] For this reason, pre-enforcement cases—where plaintiffs seek to prevent unlawful conduct from occurring—are inapposite. *See* OEM Opp. 21:4-28. OEM Plaintiffs seek to prevent CARB from engaging in lawful conduct (enforcement covered by a future waiver of preemption).

waiver; EPA considers and ultimately acts on California's request, taking lead time into account; and EPA's action is subject to judicial review in the appropriate court of appeals. 42 U.S.C. §§ 7543(b)(1), 7607(b)(1). Certainly, this process can sometimes take years, during which there may be uncertainty about whether California's standards will remain preempted and for what period of time. But that has been true for decades, and OEM Plaintiffs do not explain why they are suddenly injured by it now. *E.g.*, 75 Fed. Reg. 70,237, 70,238 (Nov. 17, 2010). Regardless, this is the design Congress chose in 1967 and has left in place ever since (including through other amendments to Section 209). *See MEMA I*, 627 F.2d at 1110, 1114. This is not a cognizable injury, much less one caused by these regulations. Indeed, parties challenging laws routinely face this kind of uncertainty, because a challenged law may retroactively apply depending on the final judgment. *E.g.*, *Ray*, 935 F.3d at 715.

### C.   Plaintiffs' Challenges to the Promulgation of these Regulations Fail

Because no relief is necessary to prevent preempted enforcement of either the 2036 Sales Requirement or the Phase 2 GHG regulations, Plaintiffs resort to claiming CARB's *promulgation* of these regulations is unlawful and injurious. *E.g.*, ECF 167-1 ¶ 14; OEM Opp. 14:24:28, 22:20; US Opp. 2:12-13, 18:16 (seeking to "void" California law), 19:7-10. These arguments fail. Def. Mem. 35:1-8, 38:3-39:11. Section 209 cannot "operate directly on the States" and thus cannot prohibit promulgation of regulations, even if the language Congress chose may "obscure[]" that point. *Murphy*, 584 U.S. at 474-75, 478. Promulgation is not preempted.[11]

There is also no relief available from the mere existence of state regulatory code provisions. Def. Mem. 35:1-15. Federal courts do not order repeal of state laws or render them "null and void." *Close v. Sotheby's, Inc.*, 909 F.3d 1204, 1210 (9th Cir. 2018). Rather, courts prevent enforcement of preempted state law until federal law changes and no longer preempts. *Id.* That relief—the only relief available here—would change nothing because no enforcement will occur unless the Clean Air Act no longer preempts (as a result of an EPA waiver).

---

[11] The United States' attempts to avoid equitable estoppel on this point make no sense. It concedes EPA has always interpreted Section 209 as requiring California to promulgate regulations before seeking a waiver but then insists this uninterrupted practice cannot have "actively misled" CARB into following EPA's instructions. US Opp. 20:10-16.

21

### D.    No Relief Is Available Here Regarding Future Waivers

In a last-ditch effort to establish standing to challenge the 2036 Sales Requirement, the United States claims this court *can* provide redress by constraining the timeframe during which CARB could enforce this requirement, if EPA waives preemption in the future. US Opp. 18:15-19. The United States attempts to frame this as relief against CARB, *id.*, but, for such relief to have any effect, it would need to operate *against EPA*. If, in the future, EPA waives "application of" Section 209(a), 42 U.S.C. § 7543(a), that action will render the 2036 Sales Requirement enforceable for any period covered by that waiver. That will remain true even if this Court concludes that this requirement is currently preempted because the entire function of a Section 209(b) waiver is to render a preempted regulation not preempted. *Id.* at § 7543(b)(1); *see Close*, 909 F.3d at 1209 (preempted state law "unenforceable … until" federal law changes).

Thus, the only way to prevent the 2036 Sales Requirement from becoming enforceable for certain periods is to *prevent EPA* from waiving preemption for those periods. Setting aside the oddity of a plaintiff-intervenor seeking relief *against itself*, this court has no jurisdiction to decide this future, hypothetical controversy; to predetermine the outcome of a future EPA proceeding; or to preemptively nullify an EPA waiver. Def. Mem. 35:19-37:2.[12] The United States' requested relief is not available, and its request cannot establish redressability.

### III.    THE CHALLENGES TO THE CTP FAIL

### A.    No Plaintiff Has Established Standing to Challenge the CTP

**1.** In its opening brief, the United States failed to identify any evidence of concrete harm *from the CTP*. Def. Mem. 42:4-43:18. It now advances only generalized standing theories that supposedly support all of its claims. US Opp. 1:21-5:7. Those theories fail. *Supra* Sec. II.A. They are also not facts and, in any event, identify no harm *from the CTP*. *TransUnion*, 594 U.S. at 431 (requiring "standing for each claim").

---

[12] The United States admits that EPA, not courts, apply the waiver criteria "in the first instance." US Opp 19:1-6 (quoting *Central Valley Chrysler-Jeep*, 563 F. Supp. 2d at 1167). It nonetheless asks this Court to adopt the United States' new interpretation of a cross-reference in the third waiver criterion (42 U.S.C. § 7543(b)(1)(C). The United States offers no basis, or authority, to distinguish the third criterion from the others; nor does it attempt to support its new interpretation of that text. US Opp. 19:1-6; *see* 88 Fed. Reg. 20,688 20,704-723 (Apr. 6, 2023). (EPA applying opposite interpretation of the same text).

**2.** OEM Plaintiffs' efforts to establish standing are equally unavailing. They continue to point to no evidence that the CTP is "hampering their product planning and distribution decisions," as they alleged in the Complaint. *See* Def. Mem. 40:25-26. Instead, OEM Plaintiffs argue that they will be harmed if they are held to the promises they made in the agreement. OEM Opp. 24:6-19. OEM Plaintiffs may now regret the bargain they struck more than two years ago, but the possibility that these large companies with sophisticated counsel may be held to promises they made (and on which another party relied) does not establish cognizable injury-in-fact *to OEM Plaintiffs*, much less that CARB is the cause of any such injury.

There is no dispute that these manufacturers voluntarily agreed to sell vehicles in California consistent with certain regulations, even if CARB lacked authority to enforce those regulations— e.g., if that enforcement were preempted. CTP at 2, ¶ 2; *see also*, *e.g.*, ECF 167-10 ¶¶ 79, 80; ECF 167-8 ¶ 7. Either OEM Plaintiffs believed those terms were preempted at the time they agreed to them, but then waited two years (for CARB to perform) before advancing that theory in this suit; or OEM Plaintiffs understood, in 2023, that the Clean Air Act was no preemptive barrier to their sale commitments but then concocted this unavailing preemption theory two years later when they decided to walk away from those commitments. *See*, *e.g.*, ECF 167-8 ¶¶ 13-14 (indicating markets have differed from PACCAR's "forecast" when it signed the CTP).[13] Either way, *CARB's conduct* is not causing injury-in-fact *to OEM Plaintiffs*. Def. Mem. 40:27-41:19. And, far from "impossible," OEM Opp. 24:3, the choices OEM Plaintiffs face are the same ones a contracting party always faces when it regrets the bargain it struck: (1) perform, (2) attempt to renegotiate terms, or (3) breach and accept the consequences.

Nor have OEM Plaintiffs identified any relief available that would redress their alleged injuries. They baldly assert that the declaratory relief they seek is not barred by the Anti-Injunction Act but fail to explain how that relief would provide redress to them if it did not effectively enjoin CARB's state-court suit for breach. OEM Opp. 27:21-28:1; *see also* Def. Mem.

---

[13] OEM Plaintiffs' reply evidence should be disregarded. *Klein*, 426 F. Supp. 3d at 743. Regardless, the suggestion that the Resolutions called the CTP's validity into question is absurd. *E.g.*, ECF 167-8 ¶ 8. The CTP term at issue is agnostic as to *why* CARB lacks enforcement authority. CTP at 2 ¶ 2. Similarly absurd is the claim that the "[t]he CTP … *implicitly* required" a waiver for the Advanced Clean Fleets regulation. ECF 167-1 ¶ 24 (emphasis added).

23

41:20-42:2. The presence of the United States does not solve this problem, *contra* OEM Opp. 28:1-3, because it also lacks standing to challenge the CTP, *supra* 22:20-24; and even if the United States has standing to seek injunctive relief, that would not establish that OEM Plaintiffs have standing to seek declaratory relief, much less to do so via a separate complaint.

**B.     The CTP Preemption Challenges Fail on Their Merits**

Even if one or more Plaintiffs had established standing, their challenges to the CTP fail on the merits because voluntary agreements—and attempts to enforce them—are outside the scope of Section 209(a). Congress made this clear in the plain text of the Clean Air Act, and that resolves the matter. If further confirmation were required, precedent—including the only case to answer this specific question—provides it.[14]

**1.     The Clean Air Act's text forecloses these challenges**

The scope of Section 209(a) is limited to "standard[s] relating to the control of emissions from new motor vehicles or new motor vehicles engines." 42 U.S.C. § 7543(a). The term "emission standard" is defined in the Clean Air Act as a "requirement *established by the State* or [EPA]." *Id.* at § 7602(k) (emphasis added); Def. Mem. 45:8-11. Congress further underscored that Section 209(a) speaks only to requirements unilaterally imposed by the State, describing the provision as "preempting certain State *regulation* of moving sources." 42 U.S.C. § 7416 (emphasis added); Def. Mem. 45:12-14. Thus, on its face, Section 209(a) does not encompass contracts, the terms of which are a "joint creation of … the parties," not requirements established by the State. *Gunter v. Janes*, 9 Cal. 643, 659 (1858). Accordingly, the First Circuit—the only court to have addressed this specific question—held that Section 209 was "intended to govern formal regulations adopted by the states, rather than voluntary and cooperative agreements between the states and automakers." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.* (*AIAM*), 208 F.3d 1, 7 (1st Cir. 2000); *cf. EMA*, 541 U.S. 246 (determining that rules *established by government* were "standards" under Section 209(a)). In other words, "the source of

---

[14] Plaintiffs seek to rely heavily on this Court's preliminary injunction order. OEM Opp. 2:6-8, 3:16-17, 15:28-16:1, 22:5-6, 24:20-21, 27:5-7. But "[w]hen interim relief is sought, … a court does not make a final decision on any matter necessary to the ultimate judgment." *Mullin*, 2026 WL 1825840, at *11.

[the] obligations"—whether it is regulation or bargained-for contract—matters. *Contra* US Opp. 24:9. Indeed, it is dispositive.

The plain text of the Clean Air Act is thus fatal to Plaintiffs' challenges. Plaintiffs have conceded that the terms of the CTP were negotiated over a period of months, during which the manufacturers rejected some of the terms CARB proposed. ECF 167-10 ¶¶ 79, 80; 167-10 ¶¶ 79, 80; *see also* Def. Mem. 46:21-47:19.[15] In other words, the sales commitments that ultimately ended up in the agreement were—like the other CTP terms—voluntarily assumed. Plaintiffs muster no interpretation of "standards" that could conceivably encompass this bargained-for exchange. *See* OEM Opp. 1:12-5:8 (advancing no interpretation of statutory text). In fact, the United States concedes that the CTP is not "in and of itself a standard." US Opp. 21:4-5. That disposes of Plaintiffs' claims because Section 209(a) concerns only "standards."

Plaintiffs cannot avoid this result by pointing out that Section 209(a) reaches "attempt[s] to enforce." 42 U.S.C. § 7543(a); *see* US Opp. 20:28-21:5, 22:25; OEM Opp. 17:20-23. The sole object of "attempt to enforce" is "any *standard*." 42 U.S.C. § 7543(a) (emphasis added). Section 209(a) thus does not extend beyond attempts to enforce "requirements established by the State." *Id.* § 7602(k) (defining "emission standard"). It has no bearing on attempts to enforce anything else, including contractual obligations established by mutual agreement of the parties. *See also Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 (1995) ("A remedy confined to a contract's terms simply holds parties to their agreements.").[16]

This result is not altered simply because the obligations in a voluntary agreement are defined by reference to regulations. Def. Mem. 49:24-50:5. Manufacturers can agree that 30% of the Class 2b-3 vehicles they sell in California in 2030 will be zero-emission by reference to that

---

[15] Plaintiffs' feeble effort to refute voluntariness is a single conclusory sentence that cites to paragraphs in a declaration that fail to mention the CTP at all. OEM Opp. 28:12-15.

[16] OEM Plaintiffs appear to now argue that Section 209 prevents them from voluntarily agreeing to sell vehicles that are cleaner than applicable law requires. OEM Opp. 4:20-5:5. But the fact that EPA can waive the application of Section 209(a) to California, 42 U.S.C. § 7543(b)(1), has no bearing on whether a manufacturer can choose to exceed federal or state emission standards in exchange for valuable consideration. It certainly does not overcome the presumption "that statutory provisions are subject to waiver by voluntary agreement of the parties." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 957 (9th Cir. 2013) (quoting *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995)). OEM Plaintiffs cite no authority even suggesting otherwise.

requirement in the Advanced Clean Trucks regulation *or* by spelling out that percentage requirement in the text of the contract. Either way, the commitment is the same; and the contract term is a "separate animal[]" from the regulatory requirement. *Black Diamond Asphalt, Inc. v. Superior Ct.*, 109 Cal. App. 4th 166, 171 (2003). The United States concedes the point, recognizing that "incorporated statutes and regulations" become "enforceable terms [of] contracts." US Opp. 21:13-14. And this black-letter rule of contract law, 11 Williston on Contracts § 30:19 (4th ed. 2025), is not limited to contracts involving "core market activity," *contra* US Opp. at 21:18-19—an undefined term for which the government provides no authority. To the contrary, the Supreme Court held the federal government to its "*promise* to follow [statutory] provisions" in approving an "Exploration Plan" on a specified timeline. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 613 (2000) (emphasis added). That is plainly a promise to carry out regulatory responsibilities, not "core market activity," *see* US Opp. 21:13-15, and the nature of that promise did not stop the incorporated statutory provisions from becoming terms of the contract.

Nor can Plaintiffs prevail on the (obliquely made) argument that the specter of preemption alters the rules of contract interpretation such that regulations incorporated by reference as contract terms nonetheless remain regulations. *See* OEM Opp. 4:2-7; US Opp. 21:21-22. Plaintiffs identify no precedent supporting their "preemption-is-different" approach to contract interpretation. And far from helping Plaintiffs' cause, the fact that no court has seen the need to reiterate a black-letter rule governing the interpretation of contract terms in a preemption case only underscores that how the terms are drafted is irrelevant. Indeed, in the handful of cases where plaintiffs have brought preemption challenges to agreements (or regulations in the guise of agreements), the courts have consistently looked to *other factors*—namely, whether the obligations were imposed or would be enforced through means available only to the government. Def. Mem. 46:5-21. Ultimately, what matters here is whether the CTP obligations are standards— i.e., were "established by the State," 42 U.S.C. § 7602(k)—and they are not because they were arrived at through negotiations and agreed to by all signatories. How they are drafted does not change that.

26

Plaintiffs cannot establish—and no longer even argue—that the CTP or its terms are "standards." Like the similar agreement in *AIAM*, the CTP is outside the scope of Section 209(a).

### 2. Plaintiffs' "proprietary mode" test misconstrues precedent and is inapplicable

Unable to support their claims with the statute's text, Plaintiffs turn to misconstruing the case law in which courts have assessed purported agreements to determine whether they are, in fact, voluntary agreements or, rather, regulations in disguise.[17] With the exception of *AIAM*, these cases concern different preemption provisions in different statutes and therefore cannot change whether Section 209(a)'s text reaches bargained-for promises (it does not, *supra* Sec. III.B.1). Regardless, the decisions in these cases provide no support for Plaintiffs' claims. Def. Mem. 44:4-11, 46:2-49:15, 51:4-19, 51:25-52:8, 52:24.

Plaintiffs' primary contention is that CARB was not engaged in a "proprietary mode" or acting as a "market participant" when it negotiated the CTP. *E.g.*, OEM Opp. 1:14; US Opp. 20:23. Plaintiffs purport to answer the wrong question. As a threshold point, Plaintiffs fail to ground their "proprietary mode" test in the text of the preemption provision under which they bring their claims. As shown above, Section 209(a) covers "standards," 42 U.S.C. § 7543(b)(1)— i.e., requirements imposed by the State, *id.* § 7602(k)—and no other state action, regardless of whether the State is buying or selling in a market. Thus, the only question before this Court is whether the CTP or its terms are "standards" such that attempts to enforce them would be within the scope of Section 209(a). They are not. *Supra* Sec. III.B.1. That ends the matter.

The Supreme Court's decisions underscore the point. When presented with a preemption challenge to a purported agreement, the Court has not looked to whether the State was buying or selling anything. Rather, the Court has interpreted the preemption provision to determine its scope and then determined whether the challenged state conduct is within that scope. For example, in *Wolens*, the preemption provision referred to a "law, rule, regulation, standard, or other provision

---

[17] This case law readily establishes that voluntariness is relevant, if not dispositive. *E.g.*, *Wolens*, 513 U.S. at 228-29. Albeit in a different context, the Supreme Court also recently confirmed the line between exercises of "regulatory authority" and obligations established through "voluntary and knowing consent." *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941-42 (2026).

having the force of law." 513 U.S. at 222-23 (quoting 49 U.S.C. § 14501(c)(1)). The Court interpreted that text (including the word "standard") as limited to "official, government-imposed policies." *Id.* at 229 n.5. State enforcement of the contract term was thus not preempted because it would not impose a government policy but, rather, "simply hold[] parties to their agreements." *Id.* at 229. In other words, the Court first determined that the preemption provision reached only "state-imposed obligations," and then concluded the challenged state conduct would produce no such obligation. *Id.* at 228. The fact that the state was not acting in a proprietary capacity (adjudicating breach-of-contract claims) was so irrelevant that it went unmentioned.[18]

*American Trucking* followed suit. It involved the same preemption provision as *Wolens*, so the only question was whether the requirements in a concession agreement "ha[d] the force and effect of law"—i.e., were government-imposed obligations even though styled as an agreement. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013). The Court concluded the requirements were imposed by the government (and thus preempted). It did so because the Port "exercised classic regulatory authority" by amending an ordinance to force trucking companies to sign the concession agreements, "backed by the threat of criminal punishment." *Id.* at 650; *contra* OEM Opp. 2:26-3:2 (claiming the Port bargained with consideration). The Court made clear that it was the Port's choice of "a tool … which only a government can wield: the hammer of the criminal law" that mattered because "when the government employs such a coercive mechanism, available to no private party, it acts with the force and effect of law, *whether or not it does so to turn a profit*." *Am. Trucking*, 569 U.S. at 651-52 (emphasis added). Thus, as in *Wolens*, the only question was whether the Port was acting as a regulator. *See also Airlines for Am.*, 78 F.4th at 1152 ("civil penalty provisions alone may amount to the force and effect of law rendering a government entity a regulator…."); Def. Mem. 46:2-21.[19]

---

[18] Plaintiffs attempt to distinguish *Wolens* on the ground that the agreement there was between a "private airline and its frequent flyers." OEM Opp. 3:12-13; *see also* US Opp. 22:13-15. But when the "government enters a contract," the "same reasoning holds" and voluntary agreements, bargained for with consideration, are not preempted. *Am. Trucking*, 569 U.S. at 649-50. Indeed, if the presence of a government party automatically established that an agreement is involuntary, the *American Trucking* decision need not have been longer than a paragraph.

[19] By contrast, Plaintiffs offer no examples of courts treating the nature of consideration as relevant. OEM Opp. 4:12-19; *see* Def. Mem. 50:23-51:3. Thus, Plaintiffs' continued arguments

(continued…)

28

It is true, as Plaintiffs repeatedly point out, that courts have sometimes labeled the non-regulatory state actions (that are not preempted) using market-based terms. *E.g.*, US Opp. 22:3-4; OEM Opp. 1:13-22. For example, the Supreme Court described one preemption provision as "draw[ing] a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market." *Am. Trucking*, 569 U.S. at 649. But those short-hand descriptions do not change the question the courts have asked and answered: whether the State acting in a regulatory capacity, as evinced by the utilization of a coercive tool unavailable to private parties either to impose the obligations or to enforce them. *Id.* at 651; *Airlines for Am.*, 78 F.4th at 1150; *see* ECF 145-1 (OEM MSJ) 23:14 (arguing the enforcement mechanism is dispositive). Indeed, if Plaintiffs were correct that proprietary activity is necessary to avoid preemption, state courts could never enforce contract terms that touch on preempted domains because judicial adjudication is not a proprietary activity. That proposition is simply wrong, as *Wolens* illustrates. The dividing line is between regulatory activity (which is preempted) and everything else, regardless of how everything else is labeled.

*Olympic Pipe Line* does not alter the analysis or render Plaintiffs' "proprietary mode" test applicable here. There, the City of Seattle attempted to force a pipeline operator to agree to city oversight by threatening the operator with criminal sanctions if it continued operating without signing an "agreement" revised to allow for that oversight. *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 875-76, 879 n.20 (9th Cir. 2006). The Court concluded the City's action was preempted—i.e., the City was attempting to *regulate* the pipeline in the guise of negotiating an agreement. *Id.* at 880. That holding effectively anticipated *American Trucking*, where the Supreme Court held that the Port also acted in a regulatory (and thus preempted) capacity when it forced companies to sign concession "agreements" under "the threat of criminal punishment." 569 U.S. at 650. CARB, however, did not threaten to criminally punish the CTP signatories if they continued to operate in California or otherwise coerce manufacturers into signing. Def.

on this score fail. *E.g.*, OEM Opp. 2:16-18. As do Plaintiffs' repeated invocations of the CTP's supposed "purpose." US Opp. 21:9; OEM Opp. 4:12-19. It is not "intentions" that matter. *Am. Trucking*, 569 U.S. at 651; Def. Mem. 51:25-52:8.

29

Mem. 46:21-47:19.[20] Indeed, Plaintiffs have admitted that bargaining over terms went on for months, and that the manufacturers rejected some of CARB's proposed terms—evincing bargaining power that belies coercion. ECF 165-1 ¶¶ 79, 80; ECF 167-10 ¶¶ 79, 80. In other words, CARB did *not* "exercise[] classic regulatory authority" in negotiating the CTP. *Am. Trucking*, 569 U.S. at 650; *Olympic Pipe Line*, 437 F.3d at 875.

Plaintiffs ignore this part of *Olympic Pipe Line*, relying on its second holding in which the Court rejected the City's invocation of the "market participant" *exception* to preemption. 437 F.3d at 881-82; *see*, *e.g.*, OEM Opp. 2:4-6, 3:8-10, 4:27-28; US Opp. 23:14-19 (arguing market participation exception cases apply); 24:11-25:1 (same). That part of the decision is not relevant here because no *exception* to preemption is needed. Illustrating the point, the *Olympic Pipe Line* panel only reached the "market participant" exception question *after* it concluded the City was acting in a regulatory capacity—by utilizing a government-only tool (criminal sanctions) in its "negotiations." Here, however, the parties to the CTP negotiated that agreement in the ordinary course—with all parties proposing terms and accepting or rejecting the proposals of others. ECF 147-4 (Heroy-Rogalski Decl.) ¶¶ 16-32, 35; ECF 167-10 ¶¶ 79-80; ECF 165-1 ¶¶ 79-80. Because that activity falls well outside Section 209(a)'s preemptive scope, market-participation *exception* decisions, like the second part of *Olympic Pipe Line*, have no bearing on this case. As in *Wolens* and *AIAM*, this agreement is not preempted in the first place.[21]

The only relevant question here is whether CARB acted "**as a regulator**," OEM Opp. 1:23 (emphasis original). It did not, as Plaintiffs' strenuous efforts to change the question underscore.

### 3.    Plaintiffs cannot save their claims by misconstruing the CTP's terms

As a last resort, Plaintiffs reassert erroneous interpretations of CTP provisions that, they claim, show CARB is utilizing tools unavailable to private parties. US Opp. 23:23-26, 24:7-9; OEM Opp. 2:9-15. Defendants have already demonstrated that Plaintiffs' interpretations are

---

[20] Conclusory assertions from a non-signatory are not *evidence* of why the manufacturers came "to the table." US Opp. 24:6, particularly when the manufacturers make no similar assertions. Moreover, the cited evidence suggests it was EPA's waiver proceeding that may have encouraged manufacturers to opt for negotiations rather than litigation, Heroy-Rogalski Decl. ¶ 12; *see also* 88 Fed. Reg. 20,688 (Apr. 6, 2023) (waiver granted before CTP negotiations).

[21] As Defendants demonstrated, at least one premise of the *Olympic Pipe Line* decision was called into question by a subsequent Supreme Court decision. Def. Mem. 53:2-10.

belied by the plain language of the CTP. Def. Mem. 47:20-49:6. Plaintiffs' reassertion of identical arguments is no response.

Plaintiffs cannot establish that the CTP is enforceable through regulatory means—e.g., civil penalties—unavailable to private parties. Perhaps most telling on this point is that the OEM Plaintiffs have declined to assert that *they* cannot enforce the CTP *against CARB*. *See* Def. Mem. 48:5-7. If the OEM Plaintiffs can enforce the CTP against CARB (which they appear to believe they can), then the agreement is enforceable through a means (e.g., suit for breach) available to private and public parties alike. Plaintiffs' recycled assertions that the CTP is enforced through certification and would result in regulatory penalties for "non-compliance" are simply wrong. Def. Mem. 48:8-49:6.

The requirement to obtain CARB certification before selling vehicles in the State was imposed by the Legislature, not the CTP. Def. Mem. 48:10-11. OEM Plaintiffs (obliquely) concede the point by now asserting that the CTP merely "advance[s]" CARB's certification authority, OEM Opp. 1:27, whatever that means. While the United States continues to claim that the States's certification requirements arise from the CTP, the interpretations of a non-signatory are immaterial. *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1029, 1033 (9th Cir. 2012). Regardless, the CTP itself indicates that CARB's continued implementation of the Legislature's certification requirement is "independent[]" of the agreement. CTP, App. B at i, ¶ 1. And no Plaintiff identifies a term of the CTP that permits CARB to deny certification for a vehicle that complies with applicable California emission standards on the grounds that it contravenes commitments in the CTP. True, the manufacturer would breach the CTP if it sold such a vehicle in California, but the enforcement mechanism for that is breach-of-contract suit, not denial of certification or regulatory penalties. Nothing in the CTP indicates otherwise.[22]

---

[22] Repeated quotation of the word "non-compliant" from an appendix defining one of CARB's promises does not transform that promise or the proposed regulatory amendments into an enforcement mechanism for this agreement. Def. Mem. 48:22-49:6; *contra* US Opp. 23:24-26, 24:8-10; OEM Opp. 3:23-25.

This agreement is enforceable in precisely the same way as the agreement in *Wolens*—through breach-of-contract suit. As there, this remedy is "confined to a contract's terms" and thus "simply holds parties to their agreements—in this instance, to business judgments [certain manufacturers] made public about" their California vehicle sales. *Wolens*, 513 U.S. at 229.

### IV.   THE CHALLENGES TO THE MACs FAIL

OEM Plaintiffs fail to meaningfully respond to Defendants' demonstration that the challenge to the May MAC is moot. Def. Mem. 54:21-55:20. OEM Plaintiffs simply pretend Defendants made no such showing. *Compare* OEM Opp. 25:10 ("Defendants have identified no procedural safeguards against reissuance."), *with* Def. Mem. 55:13-20 (identifying safeguards). All of CARB's actions since superseding the May MAC establish it "cannot reasonably be expected to recur." *See Brach v Newsom*, 38 F.4th 6, 12 (9th Cir. 2022).

Further, no Plaintiff has established standing to challenge *either* MAC. The United States (which only challenges the August MAC) does not even try. *See* US Opp. 1:22-5:7 (no mention of MAC); *TransUnion*, 594 U.S. at 431 ("standing is not dispensed in gross"); *supra* Sec. II.A.

OEM Plaintiffs' standing theories fail for the same reasons that all challenges to the MACs fail on their merits. The recycled claims that the MACs impose a pre-sale certification requirement still fail because that requirement pre-existed the MACs and would still exist if this Court declared the MACs preempted. Def. Mem. 56:4-12; *contra* OEM Opp. 18:4-5. Alleged injuries from certification are thus not caused by the MACs or redressable by relief targeting them. And, on the merits, even if imposing a certification requirement may be an "attempt to enforce" standards, the Health and Safety Code (not the MACs) would be that "attempt."

CARB's transparent disclosure that it will consider whether or not to enforce the Omnibus regulations for any past period permitted by a possible future court order similarly does not injure anyone or attempt to enforce anything. *Contra* OEM Opp. 18:5-6; US Opp. 25:9-26:14. A statement that an agency will consider its options *if a court validates its rights* does nothing other than provide information. Def. Mem. 56:22-57:15. It does not change the law or even the likelihood of a court order favorable to CARB. Moreover, the trigger for any attempt to enforce

would be a court order declaring that enforcement *not preempted. Id.* at 57:5-7. There is simply no threat to enforce preempted regulations in this disclosure, and no injury either.

## V.  OEM PLAINTIFFS' CHALLENGE TO THE EO FAILS

OEM Plaintiffs' challenge to the EO is equally unavailing. They cannot meet *their* burden to establish the factual predicates for jurisdiction by accusing Defendants of "fail[ing] to engage with … factual reality." OEM Opp. 26:1-3. Nor can they cure their opening-brief failure, Def. Mem. 57:18-58:6, on reply, *Klein*, 426 F. Supp. 3d at 743. Regardless, there is no injury-in-fact (and no ripe controversy) simply because California might, in the future, stand up a state program. *See* ECF 167-9 at ¶ 6 (speculating about future "rulemaking proceedings"). OEM Plaintiffs cannot make this as-of-yet-undeveloped program "concrete" simply by using that word. OEM Opp. 26:9. A very different Executive Order may well have injured other plaintiffs by precluding them "from even participating in the competition for federal grants," *Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 77 (D.D.C. 2026), but *this* EO is not precluding anyone from doing anything. ECF 167-1 at ¶ 21 ("DTNA does not certify to the preempted regulations.").[23]

On the merits, OEM Plaintiffs concede that "attempt[s] to enforce" are "steps preliminary to" the "imposition of penalties" for violating standards. OEM Opp. 19:7-9. Yet they fail to explain how the EO's directions to state agencies concerning future incentive programs (which involve neither violations nor penalties) and future rules (which cannot be violated until they are promulgated) could be such a step. Indeed, with no "command to manufacturers," *id.* at 19:6, there is therefore nothing for them to violate and no threat of any penalties for doing so.

Moreover, as OEM Plaintiffs admit, a government's choice "to procure [cleaner] vehicles" qualifies for the market participant exception to preemption, OEM Opp. 18:24, because it "addresses a specific proprietary problem," *see United States v. King Cnty., Washington*, 122 F.4th 740, 759 (9th Cir. 2024).[24] OEM Plaintiffs nonetheless argue that California's (as-of-yet hypothetical) procurement choices would not qualify because the clean-vehicle qualifications

---

[23] The other declaration paragraphs to which OEM Plaintiffs cite contain no mention of the Executive Order or any injuries allegedly caused by it. *See* OEM Opp. 26:13-14.

[24] That a *different* statute might foreclose this exemption is irrelevant to these Clean Air Act challenges. *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 290 (1986).

would (in OEM Plaintiffs' view) be "preempted." OEM Opp. 18:28. This claim that the *exception* to preemption is unavailable in the only circumstance in which it would ever be needed (if preemption applied) is nonsensical. And unsupported and conclusory arguments—advanced for the first time in reply—cannot transform reports from state agencies to the Governor into regulation of manufacturers. OEM Opp. 19:1-4, 19:14-16; *see also Klein*, 426 F. Supp. 3d at 742–43 (new arguments on reply are waived). The challenge to the EO fails.

## VI.    THE GOVERNOR IS IMMUNE FROM OEM PLAINTIFFS' SUIT

Finally, the Governor should be dismissed from OEM Plaintiffs' suit because he lacks the requisite "connection with *enforcement*" of any challenged act. *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (cleaned up, emphasis added). OEM Plaintiffs resort to claiming the Governor has "expressly direct[ed] CARB to *uphold* the preempted emissions standards." OEM Opp. 19:19-20 (emphasis added). Whatever is meant by directing CARB to "uphold" standards, it is clearly not *enforcement* of those standards. And CARB's pre-existing enforcement authority comes from statute, not this EO. Def. Mem. 59:7-60:9. Reports from a state agency to a Governor are likewise not enforcement—of anything. *Contra* OEM Opp. 19:19-21; *see also supra* 34:5-6 (new arguments on reply are waived). Cases involving statutes that do not "give[] rise to enforcement proceedings," *Eu*, 979 F.2d at 704, are inapposite because OEM Plaintiffs claim the EO is an attempt to enforce emission standards, OEM Opp. 19:18-19—requirements that do give rise to *CARB* enforcement proceedings, Def. Mem. 56:13-18. OEM Plaintiffs simply cannot identify any enforcement connection to the Governor. *Id.* at 59:18-19.

## CONCLUSION

Defendants respectfully request the Court deny Plaintiffs' motions for summary judgment, dismiss the claims for which Plaintiffs have failed to establish standing or ripeness, and grant Defendants summary judgment on the remaining claims.

Dated: July 24, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Defendants*

35